UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM T. OBEID, directly and derivatively on behalf of GEMINI REAL ESTATE ADVISORS LLC, et al.,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER LA MACK and DANTE MASSARO,<br><br>Defendants,<br><br>and<br><br>GEMINI REAL ESTATE ADVISORS LLC, et al.,<br><br>Nominal Defendants. | No. 14-cv-06498-LTS<br><br>**AMENDED VERIFIED COMPLAINT** |

Plaintiff, William T. Obeid ("Obeid"), by his attorneys, for his Complaint against defendants, Christopher F. La Mack ("La Mack") and Dante A. Massaro ("Massaro," and, together, "Defendants"), alleges directly and derivatively on behalf of Gemini Real Estate Advisors, LLC ("GREA"); Gemini Fund 5, LLC; 36 West 38th Street Holding, LLC; 33 Peck Slip Holding, LLC; Gemini Centerville Galleria, LLC; Gemini College Plaza H, LLC; Gemini Dubois Mall, LLC; Gemini Indian Creek, LLC; Gemini Opportunity Fund I, LLC; Gemini Opportunity Fund IV, LLC; Gemini Parkway Plaza, LLC; Gemini Real Estate Partners, LP; Gemini Real Estate Indian Creek Member, LLC; Gemini Rio Norte H, LP; Gemini River Ridge, LLC; Gemini Tamiami, LLC; Gemini Youngsville Crossing M, LLC; Gemini 300 West 22nd Street, LLC (the "Subsidiaries"); Gemini Rowlett Partners, LLC; Gemini Rowlett Crossing, LP; Gemini 449 West 36th Street MT, LLC; Gemini 442 West 36th Street MT, LLC; Gemini 305 West 39th Street MT, LLC; Gemini 135 East Houston MT, LLC; and Gemini Equity Partners,

LLC (the "Affiliates" and, with GREA and the Subsidiaries, "Gemini"), as follows:

**SUMMARY OF ACTION**

1.      This action arises out of Defendants' breaches of their fiduciary duties, their breaches of GREA's Operating Agreement, and their misappropriation of Gemini intellectual property, all while acting in their self-interest and to the detriment of Gemini, its investors, and Obeid.  Defendants have engaged in their misconduct in a misguided effort to seize control of Gemini, grind its productivity to a halt, and to try to exercise leverage over Obeid in buyout discussions, without regard to their strategy's detrimental effect on Gemini and its investors.

2.      Gemini is an owner, operator and developer of commercial real estate, with over $1 billion of real estate assets under management.  Obeid, Massaro, and La Mack are the members of GREA, and each holds a one-third interest.  Generally, each of Gemini's Subsidiaries and Affiliates relate to specific Gemini real estate projects, and those entities sell membership interests to third-party investors, who then obtain an expected return based on the projects' performance.

3.      Obeid historically has originated and led the execution of the vast majority of Gemini's projects.  Obeid also has led all debt and equity capital-raising for Gemini projects.  In consideration of that role, in early 2014, Obeid requested that the parties agree to restructure Gemini to reflect their respective contributions.  Defendants shook hands with Obeid on such an arrangement at first, but soon thereafter – after conferring with counsel – they reneged.

4.      In particular, seeking to further their own interests, Defendants proposed a "business divorce" and immediately embarked on a freeze-out process designed to strengthen their negotiation position in discussions concerning a potential buyout of Obeid.  Defendants executed this strategy despite knowing that it would paralyze Gemini's operations, cause existing

2

development projects to become distressed assets, and risk Gemini's default on over $97 million in loans and $15 million of investors' equity for its development projects alone.

5.      It is no surprise that such conduct already has significantly damaged Gemini's and Obeid's reputations and risks destroying Gemini's business and good name, along with its investors' hopes of receiving any return on their investments.

6.      In addition, Defendants all the while misappropriated Gemini's intellectual property in connection with non-Gemini projects, pursued projects with Gemini resources from which they intend to exclude Obeid, and devoted their time and attention to developing a meritless complaint against Obeid.

7.      As a result of Defendants' abandonment of their obligations to Gemini in favor of their personal interests, Gemini's business is failing, its reputation is deteriorating, and its investors are suffering.

## THE PARTIES

8.      Plaintiff, William T. Obeid, is an individual residing at 159½ E 94th Street, New York, New York 10003.

9.      Nominal Defendant GREA is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 200 Park Avenue South, Suite 1305, New York, New York 10003.

10.     Nominal Defendant Gemini Fund 5, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 200 Park Avenue South, Suite 1305, New York, New York 10003.

11.     Nominal Defendant 36 West 38th Street Holding, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 200 Park Avenue South, Suite 1305, New York, New York 10003.

12.     Nominal Defendant 33 Peck Slip Holding, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 200 Park Avenue South, Suite 1305, New York, New York 10003.

13.     Nominal Defendant Gemini College Plaza H, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

14.     Nominal Defendant Gemini Indian Creek, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

15.     Nominal Defendant Gemini Parkway Plaza, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

16.     Nominal Defendant Gemini River Ridge, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

17.     Nominal Defendant Gemini Youngsville Crossing M, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

18.     Nominal Defendant Gemini Tamiami, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

19.     Nominal Defendant Gemini 300 West 22nd Street, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 200 Park Avenue South, Suite 1305, New York, New York 10003.

20.     Nominal Defendant Gemini Rio Norte H, LP is a limited partnership organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

21.     Nominal Defendant Gemini Real Estate Indian Creek Member, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

22.     Nominal Defendant Gemini Real Estate Partners, LP is a limited partnership organized under the laws of the State of Delaware, with its principal place of business at 200 Park Avenue South, Suite 1305, New York, New York 10003.

23.     Nominal Defendant Gemini Opportunity Fund IV, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 200 Park Avenue South, Suite 1305, New York, New York 10003.

24.     Nominal Defendant Gemini Opportunity Fund I, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 200 Park Avenue South, Suite 1305, New York, New York 10003.

25.     Nominal Defendant Gemini Dubois Mall, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

26.     Nominal Defendant Gemini Centerville Galleria, LLC is a limited liability corporation organized under the laws of the State of Delaware, with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

27.     Nominal Defendant Gemini Rowlett Partners LLC is a limited liability corporation organized under the laws of the State of North Carolina with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

28.     Nominal Defendant Gemini Rowlett Crossing LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

29.     Nominal Defendant Gemini 449 West 36th Street MT, LLC is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

30.     Nominal Defendant Gemini 442 West 36th Street MT, LLC is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

31.     Nominal Defendant Gemini 305 West 39th Street MT, LLC is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

32.     Nominal Defendant Gemini 135 East Houston MT, LLC is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

33.     Nominal Defendant Gemini Equity Partners, LLC is a limited liability corporation organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, North Carolina 28078.

34.     Defendant Christopher F. La Mack is an individual with a residence at 369 Montibello Drive, Mooresville, North Carolina 28117.

35.     Defendant Dante A. Massaro is an individual with a residence at 12829 Shamley Court, Huntersville, North Carolina 28078.

## JURISDICTION AND VENUE

36.     This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367 because this action arises out of violations of the federal laws.

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

38.     This Court also has jurisdiction over Defendants because, as more fully described herein, Plaintiff's claims arise in whole or in part out of Defendants' contacts with and conducting of business in the State of New York, whereby Defendants purposefully availed themselves of the benefits of New York law.  Defendants also committed torts, in whole or in part, in the State of New York, which torts were directed toward Gemini whose principal place of business is New York and Mr. Obeid who is a New York resident.

39.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

**BACKGROUND**

I.   **Gemini's Structure**

40.   The parties formed GREA in 2003.  It is a member-managed LLC controlled by an LLC agreement that the parties originally agreed upon in 2004 and that they most recently amended in 2009, through the Amended and Restated Limited Liability Company Agreement of Gemini Real Estate Advisors LLC (the "Operating Agreement," attached as Exhibit 1).

41.   Exhibit A to the Operating Agreement provides that La Mack, Massaro and Obeid are one-third members, with each possessing a 33.333% membership interest.  They are GREA's only members.  In addition, La Mack, Massaro and Obeid are GREA's only Managers.  La Mack and Massaro together thus form a control group.

42.   GREA is the ultimate parent company of all of the Subsidiaries.  Through their controlling interest in GREA, La Mack and Massaro control each of the Subsidiaries.  GREA also is a direct or indirect member or shareholder of each of the Subsidiaries.

43.   Gemini Rowlett Partners LLC ("Gemini Rowlett") is owned by Massaro, La Mack, and Obeid, with each holding 33.33% shares.  La Mack and Massaro thus form a control group for Gemini Rowlett.  Gemini Rowlett, in turn, wholly owns Gemini 449 West 36th Street MT LLC, Gemini 442 West 36th Street MT LLC, Gemini 305 West 39th Street MT LLC, Gemini 305 West 39th Street MT, LLC, and Gemini 135 East Houston MT LLC.  It also has a partnership interest in Gemini Rowlett Crossing LP.

44.   Gemini Equity Partners LLC ("Gemini Equity") also is owned by Massaro, La Mack, and Obeid, with each holding 33.33% shares.  Massaro and La Mack thus form a control group for Gemini Equity.

45.   In addition, Obeid personally is a member of 300 West 22nd Street, LLC.

46.     Sections 4.2 and 4.2.2 of the Operating Agreement require "the approval of all Members" for the members, on behalf of GREA, to "[a]lter[] the rights of Voting Members to vote on matters affecting [GREA] as set forth herein."  The term "Voting Members," as defined in the Operating Agreement, includes Massaro, La Mack, and Obeid.

47.     Section 5.16 of the Operating Agreement contemplates that a member-designated Operating Manager (also defined as the company's "President") primarily would operate GREA. The same section provides that Obeid would be GREA's Operating Manager and President, with La Mack and Massaro both taking the title of Assistant Operating Manager.

48.     Gemini's commercial real estate activity is broad.  It simultaneously acquires, develops, finances, manages, and operates investments in various real estate projects across multiple states.  On the acquisition side, Gemini sources potential investments, performs due diligence, obtains financing, and executes investments.  On the development side, Gemini coordinates the projects' financial, zoning, and design elements and also oversees construction. On the financing side, Gemini identifies potential investors, generates investor presentations, including compiling both creative and financial projections, and secures financing from equity investors and lenders for its projects.  On the operations side, Gemini operates and manages a wide variety of retail, hospitality and fixed-income investments.

49.     As a result of the scope of the business, the Operating Agreement required the Operating Manager to engage in a range of activities.  Indeed, any meaningful operation of the business required the Operating Manager to be heavily involved in all aspects of acquisitions, development, operations and financing.

50.     In addition, acknowledging the need for GREA's managers to actively support its operations, Section 5.14 of the Operating Agreement requires that "[d]uring the existence of the

Company, a Manager shall devote such time to the business of the Company as may reasonably be required to conduct its business in an efficient and profitable manner."

51.     Gemini has extensive common-law rights in the name "Gemini" and any similar derivation.  In all relevant markets, GREA and each of the Subsidiaries and Affiliates are commonly known by, recognized as, and associated with the trade name "Gemini."  (Exhibits 6, 7, and 8.)  The "Gemini" name is a strong, inherently distinctive name that has become inextricably linked in the market's perception to Gemini and its real estate projects.  Since its founding, Gemini has regularly used its marks in connection with services and business operations that ensure that market participants have come to recognize and associate the marks with Gemini and its business operations.  Through Gemini's notable growth and active market participation, its marks have become widely-known within its markets and, accordingly, are strong marks entitled to a wide scope of protection.

## II.   Gemini's Historical Operations

52.     Over time, Gemini's corporate and management structures have served it well. Since its 2003 inception, Gemini grew dramatically despite the significant market turmoil that followed in 2008 and 2009.  In only eleven years, the company has grown from $0 to over $1 billion in real estate assets under management.

53.     Each of the managers gravitated to the portions of Gemini's business that best suited his skills.  La Mack and Massaro gravitated towards Gemini's retail projects, including commercial spaces such as grocery, fitness, and department stores.  Obeid focused on hospitality projects, with a primary focus on independent and boutique hotels.  Despite their distinct focuses, Obeid (as Operating Manager) oversaw all of Gemini's projects and capital raising activities, ensuring their efficient operation and productivity.

54.     Gemini creates funds and wholly owned entities to facilitate its projects including certain of the Subsidiaries and Affiliates.  Gemini's equity investors in each project are members of or partners in those projects' related entities, including Obeid himself.

55.     Over the years, Obeid has performed considerably better than La Mack and Massaro, owing to Obeid's unique efforts in developing and delivering on opportunities for Gemini.  Obeid has generated the vast majority of Gemini's lenders, equity investors, and project originations.  Most recently, Gemini's (and Obeid's) Jade Hotel in New York City was featured in Hospitality Design and Life & Style Magazine, and was listed in Travel + Leisure's "World's Greatest Hotels 2014 Edition."  Obeid has been widely quoted in trade journals and periodicals and is a sought after speaker for real estate and hotel investment conferences.  (See e.g., Exhibit 5.)

56.     By comparison, La Mack and Massaro's achievements have been modest. Neither has originated any new projects in over five years.  Their most meaningful contributions have been to maintain Gemini's retail portfolio and oversee a lackluster leasing effort.

57.     Notwithstanding the disparity in member productivity, Gemini historically has served its members, investors, and lenders relatively well.

III.    **La Mack and Massaro Reverse Course on a Restructuring in Favor of a Self-Interest Driven Strategy**

58.     In or around mid-2013, as Gemini's business grew and its business lines became more distinct, Obeid concluded that a restructuring would benefit Gemini, by mitigating risk as between its retail and hospitality practices, as well as by allowing the members' interest percentages to better reflect their respective contributions.

59.     Obeid raised this proposal with La Mack and Massaro and, recognizing the benefits of such a proposal, they both agreed to discuss it at a meeting on March 28, 2014, at the

offices of Bryan Cave LLP, Gemini's corporate counsel at the time.  Dan Cullen, an attorney at Bryan Cave, attended the meeting and gave advice to the members.

60.     Obeid came away from the meeting with the view, and believed that the Defendants took the view, that a restructuring must be done thoughtfully because Gemini's existing projects required stability in order to ensure that its investors' interests would be served. Obeid took the view, and believed that the Defendants took the view, that if the restructuring was not done thoughtfully, Gemini risked severely damaging its investors' and its own interests.  This not only included Gemini's financial interests, but also its credit and reputation in the market.

61.     After some discussion, the members came to an agreement in principle on the basic terms of a restructuring.  The members discussed that GREA would form two new LLC's. First, it would create an LLC dedicated to Gemini's retail business (the "Retail LLC").  The Retail LLC would focus on the sort of retail projects that Massaro and La Mack primarily had developed.  Second, it would create an LLC dedicated to Gemini's hospitality business (the "Hospitality LLC").  The Hospitality LLC would focus on the hotel projects that Obeid primarily had developed, including the Jade Hotel.

62.     In addition, GREA would wholly own the Retail LLC, with Massaro and La Mack retaining their combined 66.666% interest in the Retail LLC through their membership interest in Gemini, while Obeid would retain his 33.333% interest.  By contrast, GREA would hold a 30% interest in the Hospitality LLC, with Obeid holding the remaining 70% interest.

63.     The plan was sensible, as reflected by the members' agreement in principle.  It allowed Gemini's structure to equitably reflect the ways in which the members had grown apart professionally while maintaining Gemini's stability and productivity for the benefit of its members, lenders, and investors.

64.     After the meeting, Cullen distributed to the members a draft restructuring agreement capturing their agreement at the March 28 meeting.  Defendants remained silent and did not object to the draft.  Business at Gemini continued as usual while Gemini's Chief Accounting Officer worked with Bryan Cave to separate and restructure GREA's numerous subsidiaries and affiliates.

65.     Between March 28 and June 9, however, Defendants communicated with their personal counsel at McGuire Woods and also with Gemini's corporate counsel at Bryan Cave (without Obeid's knowledge) about Gemini's future and a strategy to further their personal long-term interests.  These discussions culminated on June 9, when La Mack and Massaro revealed their strategy.  That day, Obeid received an email from Peter Matejcak (also of Bryan Cave) which, to Obeid's surprise, communicated Defendants' decision to not proceed with the restructuring that the members had agreed upon in principle.

66.     Indeed, rather than proceed with that restructuring, Defendants sought a "business divorce" – a risky and destabilizing process.  They communicated, through Matejcak, their desire to "negotiate [Obeid's] separation from Gemini, buying [him] out" and then "separating the business . . . with La Mack and Massaro retaining the Gemini name, infrastructure, etc. and continuing the existing operating agreement."  They further expressed their desire to have this process last "months" and referred to the prospect of "dissolution or other member dissociation options."  Defendants also sought to "unwind [Gemini's] deals."  Days later, Defendants committed to proposing a plan to Obeid to effectuate a "business divorce."

67.     Massaro and La Mack's decision was and continues to be driven by self-interest. In particular, La Mack recently has demanded increased member distributions, citing personal

needs that, in part, constitute divorce expenses.[1]  Obeid refused La Mack's request, noting that

Gemini's cash reserves were limited due to it being fully invested in ongoing projects and

covering necessary overhead in its New York and North Carolina offices.  By obtaining a

business divorce, Defendants would be free to manipulate Gemini's economics to their self-

interest, including adjusting membership distributions at will.[2]

68.     In addition, La Mack and Massaro finally (for the first time in over five years)

have identified potential opportunities to develop in the retail grocery space, including with

Lowes Foods and to be financed by Asheville Savings Bank.  Gemini originally sourced this

opportunity but, seeing an opportunity to trade on Gemini's name for their own benefit,

Defendants have elected to divert the opportunity to their personal entity while using the Gemini

name purposefully to create confusion.

69.     Specifically, Defendants misappropriated Gemini intellectual property to

surreptitiously form an entity that includes only them –Gemini Commercial Realty LLC.  This is

a previously non-existent entity that (i) has no legal tie to Gemini; (ii) does not include Obeid,

and (iii) nevertheless uses Gemini intellectual property in its name.  (Exhibit 2.)  Defendants

intend, in bad faith, to trade on Gemini's name and without Gemini's authorization or providing

any consideration for doing so by using an entity name that not only uses the "Gemini" name but

also is structured similarly to Gemini's Subsidiaries.  In addition, Defendants' entity is using

Gemini intellectual property in the same geographic and commercial real estate markets as

---

[1]     This was not the first time that La Mack demanded membership distribution increases.
When he had done so previously, Obeid and Massaro agreed to provide him greater distributions
than themselves (despite his relatively low contribution to the business) so that he could address
his personal obligations.

[2]     On information and belief, Peter J. Kalmus, a broker-dealer registered representative
(with DFPG Investments, Inc.), who for various reasons is motivated to have a relationship with
and an interest in Gemini, has actively encouraged and supported Defendants' actions.

Gemini.  Aware of their actions' impropriety, Defendants' concealed their formation and use of the Gemini Commercial Realty from Obeid.

70.     Defendants are misappropriating Gemini's intellectual property with full knowledge of Gemini's exclusive right to use it.  Upon information and belief, the net effect of Defendants' misappropriation of Gemini's intellectual property will be to confuse consumers into believing that Defendants' projects are backed by the goodwill, reputation, and credentials – all associated with the Gemini name – of GREA, the Subsidiaries, the Affiliates, and Obeid. Indeed, by using Gemini's name, Defendants are seeking to provide their personal entity immediate legitimacy in its markets.  They are pursuing this personal goal regardless of the consequences for Gemini, its investors, and Obeid.

71.     In the meantime, Massaro's and La Mack's ambiguous request on March 28 for a "business divorce" had paralyzed Gemini's operations.  Indeed, Obeid could not meaningfully raise much-needed capital from investors for Gemini projects without knowing what Gemini's future would be, leaving lucrative but capital-starved projects withering on the vine.

72.     Specifically, Obeid could not honestly represent to investors whether (i) Gemini would continue to exist; (ii) it would continue to develop hospitality projects; (iii) he would continue to be involved in projects; or (iv) its future form would have similar borrowing capacity as its current form – a significant feature of a business such as Gemini that heavily relies on third-party capital (debt and equity).  Each of these long-term assurances is critical to Obeid's (and Gemini's) capital-raising efforts where, as is the case, he would be asking investors to place their money with Gemini's projects for seven years, on average.  In short, Obeid – and, with him, Gemini's ongoing projects – were forced to a standstill when they needed to be moving forward.

73.     Obeid immediately recognized the situation's urgency and gravity.  He repeatedly requested, in emails on June 11, 13, 15, 16, 17, 18, and 23, that Defendants provide clarity as to the divorce they desired.  Defendants failed to provide any meaningful response.

74.     On June 25, after waiting weeks for Defendants to put forward any type of plan – even an informal one – and watching Gemini suffer from this standstill, Obeid had seen enough. He wrote Massaro and La Mack, calling for a special meeting of the Managers on July 1 "to discuss the terms of [the proposed] divorce" at the New York offices of Bryan Cave (the "Special Meeting").

75.     On July 1, Obeid, his counsel, and Gemini's counsel met at Bryan Cave's New York offices, while Massaro and La Mack, declining to attend in person, participated in the Special Meeting via teleconference.

76.     At the meeting's outset, Obeid reminded Defendants that their longstanding delay in providing a divorce plan significantly was damaging Gemini and its investors' interests. Defendants nevertheless offered no plan – not even an informal or broad structure – despite it having been nearly a month since they had announced their desire for a divorce and that such plan was the Special Meeting's purpose.

77.     Instead, Defendants had been devoting their time, effort and attention to a corporate resolution they effectuated at the Special Meeting (the "Corporate Resolution," attached as Exhibit 3).  The Corporate Resolution achieved two of Defendants' goals.  First, it replaced Obeid as Operating Manager with Massaro.  Second, it altered the members' voting rights by providing them more voting rights than they ever had possessed.  In addition, like Defendants' request for a business divorce, the Corporate Resolution restricted and prevented Gemini's efficient operation.

78.     When repeatedly pressed at the Special Meeting to provide a timeline for when a proposed divorce could be expected, Defendants' counsel repeatedly refused to provide even a rough estimate, but only would commit to providing one as soon as practicable.

79.     Only hours after the meeting and on the same day, Defendants filed suit against Obeid in North Carolina, alleging disagreements with his management style.  It thus turns out that Defendants had not only been focused on misappropriating Gemini intellectual property for their personal projects and preparing the Corporate Resolution, but they had also been hatching a plan to exert litigation leverage over Obeid in buyout discussions by drafting and filing a complaint.  Defendants likewise have been focused on discussions with third-party financiers (without Obeid's involvement) ostensibly to fund a buyout of Obeid's interest in GREA.

80.     On July 16, after another week had passed without Defendants providing any proposed divorce structure (and now five weeks after they had announced their desire for one), Obeid sent another letter to Defendants.  (Exhibit 4.)  He noted Defendants' North Carolina complaint, and as "another gesture of good faith" he asked them "to withdraw [their] complaint by [the following Monday, July 21] and put forth [their] long-awaited proposal of a business divorce" so that Gemini's managers could "focus on furthering the interests of Gemini and its investors while [they] privately address ongoing disagreements."

81.     In the same letter, Obeid further reminded Defendants that their "strategy will compound the harm that [their] recent conduct already has caused:  Gemini's ability to acquire, develop, operate, and finance new and existing projects to our investors' benefit will continue to be paralyzed.  Simply put, lenders and investors will not do business with a partnership that does not professionally and privately work out its differences. . . .  As a Gemini member who cares

deeply about it and its investors' well-being . . . I suggest you work with me to further their interests rather than litigating."

82.     July 21 came and passed.  Defendants did not withdraw their complaint, but instead continued their familiar refrain – that they would be setting forth a plan "shortly" but with no particular timeframe.  Defendants still have yet to provide a plan (even an informal one) – now, over two months after having announced their desire for a divorce – or give any indication that they will cease acting in their self-interest by inexplicably delaying this process with full knowledge that it is damaging Gemini, its members and its investors' interests.

## IV.   Defendants' Misconduct Harms and Poses Irreparable Harm to Gemini, Its Investors and Obeid

83.     Since Defendants have initiated their strategy, Gemini's reputation, credit and stability all have been meaningfully harmed, and the Corporate Resolution along with Defendants' continued inaction threaten further irreparable harm.

84.     Defendants' misappropriation of Gemini's name threatens to irreparably damage its hard-earned reputation and goodwill.  Gemini's business relies on the goodwill of investors and lenders who are overwhelmingly sensitive to reputation and brand identity.  Defendants' unlawful use of Gemini's intellectual property irreparably alters the market's perception of Gemini, including because market participants will be confused as to whether:  (i) Gemini has a stable management structure; (ii) Obeid will be involved in Gemini projects' management; and (iii) projects seeming to be connected with Gemini will, in fact, be backed by Gemini's full expertise and resources.  Introducing this uncertainty into a reputation-sensitive market will reduce Gemini's standing in the marketplace.  In effect, Gemini deals, overnight, will be perceived as risky propositions much like its projects, overnight, became distressed assets due to Defendants' destabilizing strategy.

85.     Similarly, if Defendants are permitted to continue to use Gemini intellectual property, Gemini will have no ability to control its reputation.  Indeed, Gemini will not be able to ensure that Defendants will maintain the level of professionalism and relative success that Gemini has enjoyed with Obeid's leadership.  Based on past history, Defendants' entity, using the Gemini name, will not be able to live up to Gemini's reputation either in light of the Defendants' poor historical performance in the market.  As noted, Defendants have not generated meaningful opportunities in years and, in fact, put Defendants and Obeid at great personal risk when one of the only projects they generated cratered, leaving Defendants and Obeid vulnerable on personal guarantees.  As Defendants would later concede, Defendants' mistakes on this past project required Obeid to step-in to negotiate their release under the personal guarantees.  Defendants are thus, based on past performance, ill-equipped to live up to the Gemini name's reputation and standards.  Accordingly, allowing Defendants to independently trade on the Gemini name, without Gemini's involvement (including Obeid), would leave Gemini without control over its own reputation and at great risk of having that reputation damaged by Defendants.  No remedy at law can recompense Gemini for such reputational harm which is neither calculable nor precisely compensable.

86.     In addition, upon learning of Defendants' removal of Obeid as Operating Manager and their desire for a corporate divorce, lenders began asserting that they may place Gemini in default of its obligations under loans with a combined $150 million value.  Moreover, these loans are necessary to complete value-add projects that are still in various stages of development.  If the lenders' capital does not come through, Gemini's investors will not receive any meaningful return and, indeed, may experience losses which dramatically would injure

Gemini's goodwill, reputation and credit.[3]  Nor is Gemini or Obeid positioned to seek financing

elsewhere – as noted, Obeid cannot honestly tell investors what they are investing in so long as

Defendants continue to conceal whatever divorce plan they have in mind (if any).

87.     More specifically, many of Gemini's investors are "Fund 5 Investors" – preferred

bridge equity investors expecting a 9% net return on a near-term horizon.  That return will not be

achievable so long as these projects lack the permanent equity to achieve completion.  Likewise,

if the development never occurs, Gemini's longer-term investors will never enjoy these

developments' added-value upside (their primary motivation in the investment).  Such a result

would destroy Gemini's reputation in relevant markets.  Indeed, almost all of Gemini's financing

is achieved through personal relationships – either directly with lenders and investors or through

advisors who place their investors with Gemini-sponsored projects.  If the projects fall through,

Gemini will not meaningfully be able to raise funds in the future.

88.     Gemini already is now in default under certain of its lenders' liquidity provisions

because of Defendants' conduct, rendering it vulnerable to massive liabilities.  If not for

Defendants' misconduct, this would not have occurred, because Obeid has many permanent

investors seeking to put capital into Gemini projects.  Defendants have exacerbated this problem

by misinforming the broker-dealer channel that Obeid was leaving Gemini for purportedly

inappropriate conduct.  Even setting aside Defendants' statement's falsity, their publicly making

that false assertion has caused capital providers to seize up.  Indeed, while describing how

serious Gemini's current instability is (owing to Defendants' actions), one private-equity firm

---

[3]     Certain of these loans also include completion guarantees.  The practical result is that,
even if those projects are completed at some point, any delays in their completion will
significantly harm Gemini financially.

has characterized Gemini's ongoing projects as "instantly distressed assets" that no rational investor would be well-advised to pursue.

89.     In addition, Obeid's name inextricably is tied to these projects – he alone generated the financing for them and Gemini's investors view its hospitality projects as Obeid projects.  Indeed, in most cases, lenders, investors and their advisors have invested in Gemini projects based on their relationship with Obeid.  As a result, Defendants' conduct already has and threatens to pose additional irreparable harm to Obeid's personal reputation.

90.     Defendants' unnecessary and unlawful increase of the members' voting rights has frustrated Obeid's right to participate in Gemini's management, including by ensuring that its ongoing projects proceed smoothly for both Gemini's and its investors' benefit.

91.     The Defendants' foregoing acts of misconduct have occurred in, or in a manner affecting, interstate commerce.

**V.    Demand Is Futile**

92.     Obeid brings the derivative causes of action in this Complaint for the benefit of Gemini and its investors to redress the injuries suffered, and to be suffered, by Gemini as a result of Defendants' wrongdoing.

93.     Obeid was a member of GREA, Gemini Rowlett, and Gemini Equity during Defendants' wrongful course of conduct and continues to be a member as of the date of this Complaint.  He adequately and fairly represents Gemini's and its investors' interests in enforcing and prosecuting their rights.

94.     Despite Obeid's insistence that Defendants perform their duties lawfully, Defendants have failed to rectify the wrongs described in this Complaint, because Defendants, who through their membership interests and manager positions control GREA, Gemini Rowlett,

Case 1:14-cv-06498-LTS   Document 8   Filed 08/25/14   Page 22 of 30

Gemini Equity, the Subsidiaries, and the Affiliates, suffer from conflicts of interest and divided loyalties that preclude them from exercising their independent business judgment on this matter.

95.     Indeed, Defendants are the sole beneficiaries of their challenged conduct. Defendants solely benefit from (i) their demand for a corporate divorce; (ii) wrongfully delaying any presentation or even description of a divorce plan; (iii) their misappropriation of Gemini's intellectual property and resources; and (iv) their knowingly allowing Gemini's reputation, credibility and credit to be tarnished.  In addition, they solely benefit from their devotion to furthering their personal interests, including forming entities apart from Gemini, using Gemini resources for projects from which they intend to exclude Obeid, drafting and filing meritless complaints against Obeid, and drafting and implementing the Corporate Resolution all while Gemini's projects and investors suffer.  In addition, through their improper use of their combined control power, Defendants have sought to entrench their control over Gemini to the detriment of Gemini, Obeid, and Gemini's investors.  In sum, Defendants are unable to consider a demand independently and impartially.  Moreover, due to such conduct, there is a substantial likelihood that they will personally be liable for their wrongdoing.

96.     Demand also is futile because Defendants' wrongful conduct as described herein is not the product of valid business judgment but is instead driven solely by their self-interest.

**VI.     Defendants Admit the Self-Serving Nature of Their Misconduct**

97.     On August 15, 2014, the Obeid met with Defendants in New York, New York to discuss Gemini's future.  There, Defendants remarkably conceded that their strategy was driven by their desire to reap the benefits of projects on their own and without Obeid or Gemini benefitting.

98.     More specifically, Defendants arrived to the meeting and admitted that they still had no proposal for a business divorce despite it being months since they had announced their desire for one.  Incredibly, Defendants claimed that their actions have not caused any negative impact on Gemini despite its development projects being in free fall, its lenders threatening default on over $150 million in loans, and its fundraising sources having seized up due to the uncertainty that Defendants have introduced and done nothing to resolve.

99.     Defendants' explanation for their conduct was remarkable.  It had no relation to Gemini's interests or its investors' interests.  Rather, it solely related to Defendants' personal interests.  In particular, Defendants explained that they are "sick of [Obeid] being in charge" that they "want a turn at leading the company" and that they want to develop projects on their own, outside of Gemini, and apparently through their personal Gemini Commercial Realty entity. Despite the parties discussing the matter for over an hour, Defendants did not provide any justification for their conduct that considered Gemini's, its investors', or Obeid's well-being and, in fact, failed to acknowledge or accept that Gemini and its investors would not be served well by marginalizing Obeid's role, who generated and developed the vast majority of Gemini's projects.

100.     When Obeid pressed Defendants to explain how they do not have a plan after months had passed, Defendants' only explanation is that they inexplicably have been waiting on directives from Bryan Cave.  Defendants also admitted that they had not even been in touch with Bryan Cave and had only been waiting for Bryan Cave to call them.  By all indications, since announcing their desire for a corporate divorce, Defendants had done nothing to resolve the situation other than wait for Gemini's corporate counsel to tell them what to do.  As has become

their practice, when Obeid asked Defendants to articulate a plan at the meeting, Defendants

refused.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duties – Derivative)

101.    Plaintiff re-alleges each allegation contained herein.

102.    As members and managers of GREA, Gemini Rowlett and Gemini Equity, with

control power over Gemini, Defendants owe to GREA, Gemini Rowlett, Gemini Equity, Obeid,

the Subsidiaries, the Affiliates, and their investors the fiduciary duties of due care, loyalty and

good faith.

103.    Defendants breached their fiduciary duties through their conduct described herein,

including destabilizing and paralyzing Gemini's operations, misappropriating Gemini's

intellectual property, and failing to exercise any diligence in resolving Gemini's instability.

104.    Defendants' bad faith and ulterior motives drove their misconduct and

wrongdoing.  In addition, their wrongdoing was the product of their willful or, at the very least,

grossly negligent misconduct.

105.    Defendants' conduct was an unreasonable exercise of their fiduciary duties and

breached those duties.  Such breach has caused damage to GREA, its members, the Subsidiaries,

the Affiliates, and Gemini's investors, and threatens to cause irreparable harm to the same.

## SECOND CAUSE OF ACTION
**(Breach of Fiduciary Duties – Direct)**

106.    Plaintiff re-alleges each allegation contained herein.

107.    As members and managers of GREA, Gemini Rowlett, Gemini Equity with control power over Gemini, Defendants owe to Obeid, a minority GREA, Gemini Rowlett, Gemini Equity and 300 West 22nd Street, LLC member, the fiduciary duties of due care, loyalty and good faith.

108.    Defendants failed to act in regard to Obeid, in good faith and with the degree of responsibility required from fiduciaries.

109.    Defendants' bad faith and ulterior motives drove their wrongdoing which was the product of their willful or, at the very least, grossly negligent misconduct.

110.    Defendants' conduct in this regard was an unreasonable exercise of their fiduciary duties and a breach of those duties.  Such breach has caused damage to and threatens irreparable harm to Obeid.

## THIRD CAUSE OF ACTION
**(Infringement Under the Lanham Act, 15 U.S.C.A. § 1125 – Derivative)**

111.    Plaintiff re-alleges each allegation contained herein.

112.    Defendants' use of the name "Gemini" constitutes an infringement of Gemini's trademark under the Lanham Act.

113.    Defendants' aforementioned acts constitute unfair competition in violation of the Lanham Act, Section 43(a), 15 U.S.C. § 1125.  Defendants' unauthorized use of the "Gemini" name is likely to cause confusion, or to cause mistake, or to deceive as to sponsorship, affiliation, connection, or association of Defendants or Defendants' commercial activities with Gemini or Gemini's commercial activities.

114.     Upon information and belief, by such wrongful acts, Defendants have caused, and unless restrained by the Court will continue to cause, serious irreparable injury and damage to Gemini and to the goodwill associated with the "Gemini" name.  Gemini is without an adequate remedy at law.

## FOURTH CAUSE OF ACTION
### (Infringement Under N.Y. Gen. Bus. Law § 360-k – Derivative)

115.     Plaintiff re-alleges each allegation contained herein.

116.     Defendants' aforementioned acts constitute an infringement of Plaintiff's trademark under the N.Y. Gen. Bus. Law § 360-k.

117.     Upon information and belief, by such wrongful acts, Defendants have caused, and unless restrained by the Court will continue to cause, serious irreparable injury and damage to Gemini and to the goodwill associated with the "Gemini" name.  Gemini is without an adequate remedy at law.

## FIFTH CAUSE OF ACTION
### (Dilution and Injury to Business Reputation Under N.Y. Gen. Bus. Law § 360-l – Derivative)

118.     Plaintiff re-alleges each allegation contained herein.

119.     Defendants' aforementioned acts constitute trademark dilution and injury to business reputation in violation of N.Y. Gen. Bus. Law § 360-l.

120.     Upon information and belief, by such wrongful acts, Defendants have caused, and unless restrained by the Court will continue to cause, serious irreparable injury and damage to Gemini and to the goodwill associated with the "Gemini" name.  Gemini is without an adequate remedy at law.

## SIXTH CAUSE OF ACTION
### (Unfair Competition Under New York Common Law – Derivative)

121.     Plaintiff re-alleges each allegation contained herein.

122.     Defendants' aforementioned acts constitute unfair competition under the common law.

123.     Upon information and belief, by such wrongful acts, Defendants have caused, and unless restrained by the Court will continue to cause, serious irreparable injury and damage to Gemini and to the goodwill associated with the "Gemini" name.  Gemini is without an adequate remedy at law.

## SEVENTH CAUSE OF ACTION
### (Breach of Sections 4.2 and 4.2.2 of the Operating Agreement – Direct)

124.     Plaintiff re-alleges each allegation contained herein.

125.     Sections 4.2 and 4.2.2 of the Operating Agreement require the members' unanimous approval to "[a]lter[] the rights of Voting Members to vote on matters affecting the Company as set forth herein."

126.     Defendants breached these sections of the Operating Agreement by approving and implementing the Corporate Resolution, which altered the Voting Members' voting rights.

127.     Defendants' breach of Sections 4.2 and 4.2.2 of the Operating Agreement has caused and continues to cause damages to Obeid.

## EIGHTH CAUSE OF ACTION
### (Breach of Sections 4.2 and 4.2.2 of the Operating Agreement – Derivative)

128.     Plaintiff re-alleges each allegation contained herein.

129.     Sections 4.2 and 4.2.2 of the Operating Agreement require the members' unanimous approval to "[a]lter[] the rights of Voting Members to vote on matters affecting the Company as set forth herein."

130.    Defendants breached these sections of the Operating Agreement by approving and implementing the Corporate Resolution, which altered the Voting Members' voting rights.

131.    Defendants' breach of Sections 4.2 and 4.2.2 of the Operating Agreement has caused and continues to cause damages to Gemini and its investors.

<u>**NINTH CAUSE OF ACTION**</u>
**(Breach of Section 5.13 of the Operating Agreement – Derivative)**

132.    Plaintiff re-alleges each allegation contained herein.

133.    Section 5.13 of the Operating Agreement requires each Manager to "devote such time to the business of the Company as may reasonably be required to conduct its business in an efficient and profitable manner."

134.    Defendants breached this section of the Operating Agreement by failing to reasonably devote sufficient time to Gemini in favor of focusing on their strategy to seize Gemini to further their own interests.  While Gemini projects have deteriorated, its reputation has been damaged, and its investors' and lenders' interests increasingly have been put at risk, Defendants idly have stood by, while focusing only on their personal interests.

135.    Defendants' breach of this section of the Operating Agreement has caused damages to Gemini, its investors, and its members and poses irreparable harm to the same.

WHEREFORE, Plaintiff, individually and derivatively, demands the entry of a judgment:

1.    Preliminarily enjoining Defendants' implementation of the Corporate Resolution;

2.    Awarding to Nominal Defendants and Plaintiff Obeid damages, in an amount to be determined at trial on Counts I through IX;

3.    Granting preliminary and permanent injunctive relief under 15 U.S.C. § 1116 restraining and permanently enjoining Defendants and all of their agents,

representatives, employees, attorneys, assigns and successors in interest, and all other persons acting in concert with them, from using any names, words, designations, or symbols which are confusingly similar to, or which colorably imitate, any Gemini marks, or which are likely to cause confusion or mistake in the mind of the public or to deceive the public into the belief that Defendants' commercial operations are in any way associated with or related to Gemini;

4.   Directing that Defendants be ordered to pay Plaintiff's reasonable attorneys' fees, costs and disbursements incurred herein in view of Defendants' intentional and willful infringement, pursuant to 15 U.S.C. § 1117 and New York General Business Law § 360-l;

5.   Awarding Plaintiff pre-judgment and post-judgment interest to the maximum extent provided by law;

6.   Awarding to Nominal Defendants and Plaintiff Obeid all costs and fees incurred in connection with this action including reasonable attorneys' fees; and

7.   Awarding all such other and further relief as the Court deems appropriate.

Dated: Armonk, New York
       August 22, 2014

BOIES, SCHILLER & FLEXNER LLP

By:   /s/ Edward Normand

Edward Normand
Marc Ayala
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

*Attorneys for Plaintiff*

## **VERIFICATION**

I, William T. Obeid, declare as follows:

1.     I am over the age of eighteen years and make this statement under oath.

2.     I have personal knowledge of the facts stated in this Verified Amended Complaint dated August 22, 2014.

3.     I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Amended Complaint are true and correct.  28 U.S.C. § 1746.

Executed on this 22nd day of August, 2014.

_____
                          William T. Obeid

Sworn to before me on:
August 22, 2014



_____
Notary Public

BARBARA REYES
Notary Public - State of Florida
My Comm. Expires Oct 20, 2016
Commission # EE 840375
Bonded Through National Notary Assn.