UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM T. OBEID, directly and derivatively on behalf of GEMINI REAL ESTATE ADVISORS LLC, et al., | Civ. Action No. 14-cv-06498-LTS |
| **Plaintiff,** | **DECLARATION OF** <br> **WILLIAM T. OBEID** |
| v. | |
| CHRISTOPHER LA MACK and DANTE MASSARO, | |
| **Defendants,** | |
| and | |
| GEMINI REAL ESTATE ADVISORS LLC, et al., | |
| **Nominal Defendants.** | |

**DECLARATION OF WILLIAM OBEID IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

WILLIAM OBEID, being at least eighteen years of age and duly sworn, deposes and says:

1.      I am the Co-Founder and former Operating Manager of Gemini Real Estate Advisors, LLC ("GREA" and with its Affiliates and Subsidiaries, "Gemini").[1] Gemini is an owner, operator, manager and developer of commercial real estate, with over $1 billion of real

---

[1]      GREA's subsidiaries include: (1) Gemini Fund 5, LLC; (2) 36 West 38th Street Holding, LLC; (3) 33 Peck Slip Holding, LLC; (4) Gemini Centerville Galleria, LLC; (5) Gemini College Plaza H, LLC; (6) Gemini Dubois Mall, LLC; (7) Gemini Indian Creek, LLC; (8) Gemini Opportunity Fund I, LLC; (9) Gemini Opportunity Fund IV, LLC; (10) Gemini Parkway Plaza, LLC; (11) Gemini Real Estate Partners, LP; (12) Gemini Real Estate Indian Creek Member, LLC; (13) Gemini Rio Norte H, LP; (14) Gemini River Ridge, LLC; (15) Gemini Tamiami, LLC; (16) Gemini Youngsville Crossing M, LLC; (17) Gemini 300 West 22nd Street, LLC; (18) Gemini Property Management LLC (the "Subsidiaries").  GREA's affiliates include:  (1) Gemini Rowlett Partners, LLC; (2) Gemini Rowlett Crossing, LP; (3) Gemini 449 West 36th Street MT, LLC; (4) Gemini 442 West 36th Street MT, LLC; (5) Gemini 305 West 39th Street MT, LLC; (6) Gemini 135 East Houston MT, LLC; and (7) Gemini Equity Partners, LLC (the "Affiliates" and, with GREA and the Subsidiaries, "Gemini").  A Gemini Organizational Chart is attached herein as **Exhibit 1.**

1

estate assets under management.  The Individual Defendants Christopher La Mack and Dante Massaro ("Individual Defendants") and I each hold a one-third interest in GREA.

2.      Generally, each of Gemini's Subsidiaries and Affiliates relate to Gemini management entities, specific real estate projects or real estate related pooled funds (which invest in multiple real estate projects).  Those project specific and pooled fund related entities sell membership interests to third-party investors, who then obtain an expected return on the projects' and funds' performance.

3.      On July 1, 2014, Individual Defendants replaced me as the Operating Manager of GREA in a surprise coup d'etat of control over Gemini in retaliation for my proposal to restructure Gemini in a manner that more accurately reflected our respective contributions to Gemini.  Once they control, Individual Defendants undertook destructive actions designed to enrich themselves at Gemini's and my expense by among other things (i) usurping Gemini corporate opportunities in favor of new entities formed by Individual Defendants, (ii) engaging in pervasive corporate looting and waste of Gemini's assets and (iii) engaging in pervasive self-dealing whereby Individual Defendants elevated their own interests to the detriment of Gemini, its investors and my own financial position within Gemini.

4.      Individual Defendants initially attempted to usurp Gemini's corporate opportunities by misappropriating Gemini's (non-hospitality) development deals for themselves, which (among other reasons) was the basis for filing my Complaint on August 22, 2014.  However, within the last month – I have discovered that Individual Defendants have transferred all of Gemini's valuable hotel management contracts to a third-party competitor (Bridgeton Holdings, LLC) and also raided Gemini's New York hospitality and corporate employees as well as its hospitality infrastructure platform including but not limited to its information technology,

2

accounting and revenue management systems, which they subsequently transferred to Bridgeton

Holdings, LLC.  I have also recently discovered that Individual Defendants are actively trying to

sell Gemini's hotel development projects at heavily discounted prices to a third-party developer

(The Congress Group) with whom, upon information and belief, Individual Defendants have

struck a side-deal with to enrich themselves from these transactions at my expense.  The breadth

of Individual Defendants' clandestine and continuing bad-faith conduct is so egregious and

dangerous on an ongoing basis that it risks causing irreparable harm to Gemini and me without

this Court's immediate intervention and issuance of a *status quo* TRO.

> 5.     I therefore submit this Declaration in support of Plaintiffs' Motion for a

Temporary Restraining Order ("TRO") and for a Preliminary Injunction enjoining the Individual

Individual Defendants from: (a) transferring, selling or disposing of Gemini's assets pending

further order of the Court; (b) concealing material information concerning Gemini's operations,

Gemini's existing investments, Gemini's targeted investments, Gemini's financial condition and

Gemini's investor relations; and (c) usurping Gemini business opportunities.

> 6.     As explained below, even though I am a one-third owner of GREA and a one-

third owner of Gemini Equity Partners, LLC ("GEP"),[2] I have been frozen out of all aspects of

Gemini operations and management by Individual Defendants since they took control of Gemini,

including but not limited to being circumvented out of material decisions concerning: (a) the

acquisition, sale or disposition of Gemini projects, (b) the leveraging of Gemini projects for

unspecified purposes, (c) the "renegotiation" or outright breach of existing Gemini loans and

other debt obligations that have plunged certain Gemini projects into default or halted their

---

[2]     Gemini Equity Partners, LLC ("GEP") is an Affiliate of GREA that is the entity with ultimate authority over managing three unfinished Gemini hotel development projects: (a) the Jade Bryant Park Hotel; (b) the Jade Seaport Hotel; and (c) the Jade Miami Beach  Hotel.  I have a one-third membership interest in GEP and the Defendants own the remaining two-thirds membership interests.  A true and correct copy of the GEP Operating Agreement is attached herein as **Exhibit 2.**

development to a standstill, (d) the transfer of Gemini's profitable hotel management contracts to a previously undisclosed third-party competitor (Bridgeton Holdings, LLC), including the raiding and wholesale transfer of Gemini's hospitality employees to Bridgeton Holdings, LLC, and (e) the abrupt transfer of Gemini's hospitality infrastructure platform, including but not limited to its information technology, accounting and revenue management systems to Bridgeton Holdings, LLC such that I have extremely limited access to Gemini's books and records.

7.     In short, since Individual Defendants took control of GREA and GEP, they have breached their fiduciary duties owed to me, GREA, GEP and the Gemini investors.  They have been able to do so by keeping me in the dark regarding material developments concerning Gemini's existing properties and Gemini's development projects.

8.     Individual Defendants' secretive and unlawful violations of their contractual obligations and fiduciary duties owed to me as a minority member under the GREA and GEP Operating Agreements threaten to cause me irreparable harm because their acts of self-dealing have caused some of Gemini's projects to go into default under the terms of their loan agreements raising the possibility that Gemini may lose those investments altogether.  Other projects have been needlessly delayed causing these properties to become increasingly distressed.

9.     Leaving aside the heavy investment losses in specific and unique Gemini ventures and the overall diminution of the value of my one-third membership interest in GREA and GEP, I am also personally exposed on a number of personal loan guarantees tied to the specific Gemini projects that the Individual Defendants have deliberately mismanaged in an effort to later scoop the projects for themselves at rock bottom bargains.[3]  For example, Individual Defendants'

---

[3]     I was the Operating Manager of GREA until July 1, 2014 and the President of GEP until November 1, 2014. During that time period, I procured the overwhelming number of Gemini's projects.  I also took an added risk

4

sabotage of Gemini's hotel development projects has put Gemini at immediate risk of defaulting on over $97 million in loans and jeopardized $15 million of investors' equity on these development projects alone.

10.      Unlike the Individual Defendants, I also invested my (and my family's) own money into the Gemini projects and personally procured the necessary outside equity and debt financing.  The outside investors who committed to Gemini's projects did so based on the strength of my relationship with them, my track record and my reputation.     Individual Defendants' sabotage of the Gemini hotel projects and their corporate waste threatens the ongoing viability of many of these projects, which if they collapse will cause irreparable damage to Gemini's brand and my reputation in the real estate industry in an amount that is not quantifiable.

**Gemini's Structure And Historical Operations**

11.      I co-founded GREA in 2003 along with Individual Defendants La Mack and Massaro.  GREA has always been a member-managed LLC controlled by an LLC agreement that we originally agreed upon in 2004 and that was most recently amended in 2009, through the Amended and Restated Limited Liability Company Agreement of Gemini Real Estate Advisors LLC (the "Operating Agreement," attached herein as **Exhibit 3**).

12.      GREA is the ultimate parent company of all of the Subsidiaries. As explained below, beginning on July 1, 2014, Individual Defendants gained a controlling interest in GREA and replaced me as the Operating Manager.  As a result of their controlling interest in GREA, Individual Defendants also now control each of the Subsidiaries.

---

of guaranteeing some of the Gemini projects (a risk that La Mack and Massaro did not assume on certain projects). Accordingly, I am uniquely vulnerable to La Mack's and Massaro's self-dealing and intentional mismanagement of the Gemini projects.

13.     Separate and apart from Individual Defendants' control of GREA's Subsidiaries, they also now control all of the Affiliates (including GEP), which are also limited liability companies operating in the real estate industry and that I formed with Individual Defendants (with each of us owning directly or indirectly one-third of each Affiliate).

14.     Gemini's commercial real estate activity is broad. It simultaneously acquires, develops, finances, manages, and operates investments in various real estate projects across multiple states. On the acquisition side, Gemini sources potential investments, performs due diligence, obtains financing, and executes investments. On the development side, Gemini coordinates the projects' financial, entitlements, and design elements and also oversees construction.  On the financing side, Gemini identifies potential investors, generates investor presentations, including compiling financial projections, and secures financing from equity investors and lenders for its projects. On the operations side, Gemini operates and manages a wide variety of retail, hospitality and fixed-income investments for its projects as well as projects owned by third-parties.

15.     In total, Gemini owns and operates eleven hotels and twenty-two retail and commercial properties throughout the United States.  Gemini has two principal places of business. The New York office has always served as Gemini's corporate headquarters, where Gemini's accounting, tax, audit, investor relations, fixed income, and asset management functions were under my day-to-day supervision.  Gemini's hospitality division for which I was responsible for its day-to-day operations was until this month based out of Gemini's corporate headquarters in New York City.[4]   Gemini's retail property division, of which Individual

---

[4]     As explained below, Defendants upon taking control of Gemini – abruptly moved all of the hospitality employees to a third-party competitor's office (Bridgeton Holdings, LLC) and transferred nearly all of the other Gemini corporate employees to Bridgeton Holdings, LLC's office.

Defendants were primarily responsible for, operates out of its Huntersville, North Carolina office.

16.     As a result of Gemini's scope of business, the GREA Operating Agreement required the Operating Manager to engage in a range of activities including involvement in acquisitions, development, operations and financing.[5]

17.     Although Section 5.1 of the Operating Agreement provides the Operating Manager with authority to run GREA on a day-to-day basis – the Operating Manager's authority is not unfettered but rather is subject to the restrictions contained in the Operating Agreement requiring that the remaining Managers be informed of the Operating Manager's actions that materially affect GREA. The Operating Agreement further requires certain material decisions to be approved by a formal vote by the Managers.  For example, §§ 4.1 & 4.2 require that the Operating Manager solicit and obtain Manager approval for certain actions including but not limited to "the sale or other disposition of a Project" or "the borrowing of funds, including a refinance of existing indebtedness, or the pledging of any assets of the Company, in excess of $250,000." *See* Operating Agreement §§ 4.2.1.9 & 4.2.1.10.  Moreover, § 5.16 of the Operating Agreement authorizes the Operating Manager "to act on behalf of the Company [GREA] and to execute any and all documents, instruments and agreements," but only if "the execution of such documents has been approved by the Managers."

18.     When I served as GREA's Operating Manager, I kept Individual Defendants informed of all material developments concerning Gemini.  However, as discussed below, Massaro (who is now the Operating Manager of GREA and President of GEP) along with La Mack have concealed material Gemini developments from me and have conspired to keep me in

---

[5]     The GREA Operating Agreement's use of the term "Operating Manager" is synonymous with "Managing Member" and the term "Manager" refers to GREA's remaining LLC Members.

the dark with respect to their decisions to dispose, sell and refinance certain Gemini properties as well as their side-deals with various third-parties (such as Bridgeton Holdings) to manage existing Gemini assets even though said assets were effectively managed by Gemini's own employees. Individual Defendants have also concealed their tortious actions in usurping Gemini corporate opportunities in favor of new entities they formed for their own exclusive benefit.

19.    Prior to my replacement as Operating Manager of GREA, the three Members focused on the portions of Gemini's business that best suited their particular skills. Individual Defendants focused on Gemini's retail projects, including commercial spaces for such uses as grocery stores, fitness centers and department stores. I focused on hospitality projects, with a primary focus on independent and boutique hotels. However, as GREA's Operating Manager and GEP's President – I also oversaw all of Gemini's projects and capital raising activities, ensuring their efficient operation and productivity.

20.    Since its inception in 2003 until the time that I was removed as the Operating Manager of GREA, Gemini grew dramatically despite the significant market turmoil in 2008 and 2009. In only eleven years, Gemini has grown from $0 to over $1 billion in real estate assets under management.

21.    Gemini's success was primarily attributable to my own success in the real estate industry and my successful efforts at procuring lenders, equity investors and originating projects for all of Gemini's business segments (i.e. hospitality, retail and fixed income). By comparison, Individual Defendants' achievements were modest. Neither has originated any new projects that has brought Gemini income in over five years. Instead, Individual Defendants had simply maintained an existing retail portfolio with a lackluster leasing effort. This disparate performance among us set the table for the existing dispute.

8

**Individual Defendants Initially Agree to My Proposal to Restructure Gemini,
But Then Renege and Pull Off a Surprise _Coup_**

22.     In or around mid-2013, as Gemini's business grew and its business lines became more distinct, I concluded that a restructuring would benefit Gemini, by mitigating risk as between its retail and hospitality practices, as well as by modifying the members' interest percentages to better reflect our respective contributions.

23.     I raised this proposal with Individual Defendants and, recognizing the benefits of such a proposal, they both agreed to discuss it at a meeting on March 28, 2014, at the offices of Bryan Cave LLP, one of Gemini's corporate counsel at the time.

24.     I came away from the meeting with the view, and believed that Individual Defendants took the view, that a restructuring must be done thoughtfully because Gemini's existing projects required stability in order to ensure that its investors' interests would be served. I took the view, and believed that the Individual Defendants took the view, that if the restructuring was not done thoughtfully, Gemini risked severely damaging its investors' and its own interests. This not only included Gemini's financial interests, but also its credit and reputation in the market.

25.     After some discussion at the March 28, 2014 meeting, Individual Defendants and I came to an agreement in principle on the basic terms of a restructuring. We discussed that GREA would form two new LLC's. First, it would create an LLC dedicated to Gemini's retail business (the "Retail LLC"). The Retail LLC would focus on the sort of retail projects that Individual Defendants primarily had experience with. Second, it would create an LLC dedicated to Gemini's hospitality business (the "Hospitality LLC"). The Hospitality LLC would focus on the hotel projects that I primarily had experience and success with.

26.     In addition, GREA would wholly own the Retail LLC, with Individual Defendants retaining their combined 66.666% interest in the Retail LLC through their membership interest in Gemini, while I would retain my 33.333% interest. By contrast, GREA would hold a 30% interest in the Hospitality LLC and I would hold the remaining 70% interest.

27.     This plan was sensible, as reflected by Individual Defendants' agreement in principle. It allowed Gemini's structure to equitably reflect the ways in which the three of us had grown apart professionally while maintaining Gemini's stability and productivity for the benefit of its members, lenders, employees and investors.

28.     After the meeting, Gemini's corporate counsel Bryan Cave's Dan Cullen distributed to Individual Defendants and me a draft restructuring agreement capturing our agreement at the March 28 meeting. Individual Defendants remained silent and did not object to the draft.

29.     Over the course of the next two months business at Gemini continued as usual while Gemini's Chief Accounting Officer worked with Bryan Cave to separate and restructure GREA's numerous subsidiaries and affiliates.

30.     I have since discovered, however, that between March 28 and June 9 2014, Individual Defendants were in regular communications with their counsel at McGuire Woods and also with Gemini's corporate counsel at Bryan Cave (without my knowledge) about Gemini's future and a strategy to further their personal long-term interests (to my and the Gemini investors' detriment).

31.     On June 9, 2014, Individual Defendants revealed their true intentions to me when I received an email from Peter Matejcak (also of Bryan Cave) which, to my surprise,

10

communicated Individual Defendants' decision not to proceed with the restructuring that all three of us had previously agreed upon in principle.

32.     Instead of proceeding with the restructuring plan, Individual Defendants informed me (through Matejcak) that they wanted a "business divorce" – a risky and destabilizing process. Matejcak communicated to me that Individual Defendants wished to negotiate my separation from Gemini by buying me out, which they hoped would only last "months." In other words, notwithstanding the fact that I had built and led Gemini, Individual Defendants wished to retain the Gemini name and infrastructure.

33.     A few days later, Individual Defendants informed me that they would present me with a plan to effectuate their proposed "business divorce."

34.     I asked Individual Defendants to provide me with their proposed "business divorce" as soon as possible and reiterated the importance of handling the "business divorce" in an intelligent, smooth and expeditious manner so as not to alarm Gemini's investors, especially in light of the fact that Gemini was in the midst of several unfinished hospitality development projects.

35.     Individual Defendants ignored my request and failed to provide me with their "business plan." Individual Defendants' delay in providing me with their ambiguous "business divorce" plan paralyzed Gemini's operations. I could not meaningfully raise much-needed capital from new (or existing) investors for Gemini projects without knowing what Gemini's future would be, leaving lucrative but capital-starved projects withering on the vine.

36.     Specifically, I could not honestly represent to investors whether (i) Gemini would continue to exist; (ii) it would continue to develop hospitality projects; (iii) I would continue to be involved in projects; or (iv) Gemini's future form would have similar borrowing capacity as

11

its current form – a significant feature of a business such as Gemini that heavily relies on third-party capital (debt and equity). Each of these long-term assurances is critical to my (and Gemini's) capital-raising efforts where, as is the case, I would be asking investors to place their money with Gemini's projects for seven years, on average. In short, my and Gemini's ongoing projects were forced to a standstill when these development projects needed to be moving forward.

37.     Realizing the situation's urgency and gravity, I repeatedly emailed Individual Defendants on June 11, 13, 15, 16, 17, 18, and 23, requesting that they provide clarity as to the "divorce" they desired. Individual Defendants failed to provide any meaningful response.

38.     On June 25, 2014, after waiting weeks for Individual Defendants to put forward any type of plan – even an informal one – and watching Gemini suffer from this standstill, I had seen enough. I wrote to Individual Defendants, calling for a special meeting of the Managers on July 1, 2014 "to discuss the terms of [the proposed] divorce" at the New York offices of Bryan Cave (the "Special Meeting").

39.     I subsequently discovered that during this time when Individual Defendants were delaying providing me with their plan for a "business divorce" – they were surreptitiously scheming to remove me as the Operating Manager of GREA so they could take control of Gemini for their own personal gain and buy me out "on the cheap."

40.     On July 1, 2014, I held the Special Meeting at the offices of Bryan Cave's New York office. Bryan Cave's Dan Cullen was present and I attended the Special Meeting along with my counsel.   Only minutes before the meeting began – we learned that Individual Defendants declined to attend the meeting in-person but chose to participate via teleconference along with their counsel (McGuire Woods LLP).

12

41.     At the meeting's outset, I reminded Individual Defendants that their longstanding delay in providing a business divorce plan was significantly damaging Gemini and its investors' interests. Individual Defendants nevertheless offered no plan – not even an informal or broad structure – despite it having been nearly a month since they had announced their desire for a divorce and that such plan was the Special Meeting's purpose.

42.     Instead of offering any type of "business divorce plan," Individual Defendants informed me that they had devoted their time, effort and attention to a corporate resolution to replace me as Operating Manager of GREA (the "Corporate Resolution"), which their counsel presented at the Special Meeting. The Corporate Resolution replaced me as Operating Manager with Massaro.

43.     When repeatedly pressed at the Special Meeting to provide a timeline for when a proposed business divorce plan could be expected, Individual Defendants' counsel repeatedly refused to provide even a rough estimate, but only would commit to providing one as soon as practicable.

44.     Only hours after the meeting and on the same day, Individual Defendants filed a baseless suit against me in North Carolina, alleging disagreements with my management style. It thus turns out that Individual Defendants had not only been focused on usurping Gemini's business opportunities, misappropriating Gemini intellectual property for their personal projects and preparing the Corporate Resolution, but they had also been hatching a plan to exert litigation leverage over me in buyout discussions by drafting and filing a complaint.

45.     Individual Defendants' lawsuit was not only baseless but also ill-conceived since it catapulted our disagreement into a public forum, which I knew would jeopardize Gemini's standing with its investors, lenders and employees. Concerned that lenders and investors would

13

not do business with an organization whose partners could not professionally and privately work out their differences, I requested that Individual Defendants withdraw their lawsuit and send me their proposed "business divorce."    Individual Defendants refused to withdraw their North Carolina Complaint.

46.    After waiting over one month to receive Individual Defendants' "business divorce plan," which they have failed to produce even to this date, I decided to commence this action on August 14, 2014 because I began discovering that Individual Defendants were breaching their fiduciary duties by usurping Gemini corporate opportunities and sabotaging Gemini's existing projects in a calculated effort to buy me out of Gemini "on the cheap."

47.    That is, Individual Defendants are sabotaging many of Gemini's projects in an attempt to temporarily depress the value of Gemini's holdings and development projects so I will sell my membership interests to them at below fair market value.   As explained below, Individual Defendants' self-dealing has already plunged Gemini into default on a number of its existing projects (and threatens to do so on several more), which is having a profound negative effect on the Gemini brand and my personal reputation. Nearly all of the equity invested in Gemini's development projects has been through my family, friends, business associates, and my capital raising efforts. In addition, Individual Defendants' reckless conduct threatens to leave me personally exposed on several loan guarantees because their conduct violates several loan and investor covenants for Gemini's projects thereby threatening to bring Gemini into default on its loans.   In other words, I bear the risk from the fallout of Individual Defendants' wrongful conduct but have no knowledge (other than the limited information I discovered on my own) concerning their actions, let alone, any input into the management of Gemini's investments.

14

**Individual Defendants Have Abused Their Positions Of Control**
**Over Gemini And Have Breached Their Fiduciary Duties**

48.     Since Individual Defendants took control over GREA and Gemini, I have been frozen out of every decision concerning Gemini's operations even though Individual Defendants have an obligation under the GREA Operating Agreement to keep me informed of material developments regarding Gemini and in some instances to set their actions down for a vote.

**A. Individual Defendants Usurp Gemini's Corporate Opportunities**

49.     Individual Defendants have frozen me out while they have usurped Gemini's corporate opportunities for their personal gain.  For example, in August 2014, I discovered that a retail development project in Greenville, South Carolina ("Greenville Project") originally sourced and promoted by GREA's retail development team had been co-opted by Individual Defendants for their own personal gain.

50.     The Greenville Project originally involved GREA (through one of its Gemini subsidiaries) purchasing 15 acres of land to construct a 60,000 square foot retail center anchored by Lowes Food (a national grocer).  The Greenville Project was originally conceptualized and promoted in the first quarter of 2014 by GREA's retail real estate teams.

51.     Although I was not personally involved in this deal, Gemini's employees were actively involved in promoting this development project and I was aware that Gemini resources were being committed to bring the Greenville Project into the Gemini "deal pipeline."

52.     Once I was replaced as GREA's Operating Manager, Individual Defendants deliberately kept me in the dark on all projects including the Greenville Project. As of the date of my removal (i.e. July 1, 2014), I was under the impression that Gemini was seeking lenders to finance the Greenville Project and that Gemini was pushing ahead with the project.

53.     In August 2014, however, I discovered from a third-party source that Individual

Defendants had co-opted the Greenville Project for their personal profit at Gemini's expense.

Specifically, Individual Defendants had approached Ashville Savings Bank in June 2014 for a

construction loan in the amount of up to $9.5 million to construct the Greenville Project's retail

center. In their dealings with Ashville Savings Bank, Individual Defendants kept the appearance

that they were acting in their capacities as Managers of GREA and that this development project

was yet another Gemini venture. Individual Defendants used Gemini's extensive track record

and financials as the credible window dressing necessary to land a construction loan. In reality,

however, Individual Defendants had formed another limited liability entity (Riverside Crossing,

LLC), a single purpose entity functioning as the borrower of the construction loan and the owner

of the 15 acre property subject to development into the Greenville Project.

54.     That is, Individual Defendants used Gemini's staff, resources and its brand name

to induce Ashville Savings Bank into a commitment to finance the Greenville Project through a

$9.5 million construction loan. Individual Defendants succeeded in doing so by misrepresenting

to the bank that this project was a Gemini project when, in reality, the borrower and developer

Riverside Crossing, LLC was an entity owned only by Individual Defendants (and had no legal

affiliation with Gemini or me).[6]

55.     I discovered Individual Defendants' malfeasance concerning the Greenville

Project on or about August 7, 2014. At this time, I became concerned that Individual Defendants

were also steering other Gemini projects to newly formed entities that they owned. Accordingly,

---

[6]      A copy of the Term Sheet from Ashville Savings Bank containing its terms and conditions for the
Greenville Project's construction loan is attached herein as **Exhibit 4**. The Term Sheet, dated June 13, 2014 is
addressed to La Mack and Massaro of GREA. Attached herein as **Exhibit 5** are email communications between
Ashville Savings Bank and Garrett Giusti (one of La Mack's and Massaro's associates at GREA), dated August 7,
2014 concerning the fact the La Mack's and Massaro's new entity Riverside Crossing, LLC would be the borrower
of the construction loan and owner of the Greenville Project.

my counsel in this action took action and questioned Individual Defendants' counsel concerning the particulars of the Greenville Project, including the fact that I was in possession of documentary evidence clearly indicating that Riverside Crossing, LLC (and not Gemini) would be the owner of the Greenville Project.

56.     After being caught red-handed trying to usurp this corporate opportunity from Gemini, Individual Defendants back-pedaled and informed me that the draft loan documents between Ashville Savings Banks and Riverside Crossing, LLC (which omitted me as a member) were "mistakes." On August 7, 2014 Individual Defendants (through one of their Gemini retail analysts Garrett Giusti) informed Mary Ann Lawrence of Ashville Savings Bank that the borrower on the construction loan would be Riverside Crossing, LLC but that the entity would not be owned by La Mack and Massaro but would be a wholly-owned subsidiary of GREA. The bank acknowledged Individual Defendants' abrupt change in course and even referenced their departure from the prior deal structure in which Individual Defendants had intended to circumvent me out of the deal. A true and correct copy of the August 7, 2014 communications between Ashville Saving Bank and Garrett Giusti is attached herein as **Exhibit 6.**

57.     Although Individual Defendants have assured me that they will close this deal as a Gemini project with GREA as the parent entity to Riverside Crossing, LLC thereby including me in the transaction, I have yet to receive any further updates on where this project stands. Despite Individual Defendants' personal assurances on or about August 26, 2014 that the omission of GREA and Gemini from the proposed construction loan Term Sheet was a "mistake" and that the project would be developed as a Gemini project – Individual Defendants subsequently told me in late September 2014 that the "deal was dead" without any further specifics or information. When I questioned Individual Defendants about the ongoing expenses

17

being incurred by GREA for the Greenville Project – Individual Defendants told me that those expenses were "dead deal costs" and would not provide any further explanation.

58.     I do not know whether the Greenville Project closed (either as a Gemini project or as a La Mack/Massaro project) or whether Individual Defendants are delaying the closing of this construction loan until such time as when they believe they can force me out of Gemini by buying my membership interests in GREA and GEP "on the cheap." In fact, in the course of my recent investigation in trying to piece together what Individual Defendants have been doing over the past several months – I uncovered a draft "Reservation Agreement" between Individual Defendants ostensibly on behalf of GREA and Roger Henderson of Lowes Foods in which the parties agreed to go forward with the planned shopping center but to temporarily hold the retail development in abeyance until after the litigation between us is resolved. A copy of the Reservation Agreement between Individual Defendants and Lowes is attached as **Exhibit 7.**

59.     The Greenville Project is simply representative of Individual Defendants' self-dealing in usurping Gemini business opportunities that were in the Gemini deal pipeline and for which Gemini resources were expended in identifying and procuring the target projects. In total, I am aware of thirteen other retail development deals in various stages of financing or development that are Gemini deals but for which I have no information whatsoever (despite my repeated requests for information) and which I believe have been steered to other newly formed entities (owned exclusively by La Mack and Massaro). A true and correct copy of the aforementioned retail development opportunities in the Gemini pipeline are attached herein as **Exhibit 8.**

60.     Shortly after I caught Individual Defendants attempting to divert the Greenville Project from Gemini to their own newly formed entity, I met with them again in New York City

18

on August 15, 2014 to discuss Gemini's future and a sensible separation.  At the meeting, Individual Defendants admitted that they wanted to reap the benefits of the Gemini projects without any further participation by me in Gemini.  However, they also conceded that they did not have a "business divorce" plan to propose despite the fact that it had been over two months since Individual Defendants had communicated their desire for a separation.   Incredibly, Individual Defendants even claimed that their actions did not cause any negative impact on Gemini despite its development projects grinding to a halt, its lenders threatening default on approximately $100 million in loans, and its fundraising sources having seized up due to the uncertainty over Gemini's future, which Individual Defendants only exacerbated through their ill-conceived North Carolina lawsuit.

61.    The New York City meeting ended without any resolution other than Individual Defendants' promise to produce a "business divorce plan" soon.  Going forward, Individual Defendants continued to ignore my requests for information and updates regarding Gemini business and a resolution to our partnership dispute.  The distress on the hotel development projects in New York City and Miami was particularly concerning for me since I procured the overwhelming number of equity investors in the Gemini hotel projects and had my own money (as well as my family members' capital) tied up in these projects for which I no longer had control.  In addition, I became increasingly worried that Individual Defendants were damaging Gemini's brand (and my reputation) through their self-dealing and mismanagement and that this would cause lenders and outside investors to pull their financing from Gemini's projects.

62.    Individual Defendants' self-dealing continued unabated.  In September 2014, Individual Defendants (without informing me) instructed GREA's New York office employees to cease communications with me and withhold information concerning Gemini activities.

19

Individual Defendants also unilaterally terminated employees with whom I had longstanding relationships and hired their own loyalists to GREA's New York corporate office and the Huntersville (North Carolina) office. For example, Individual Defendants terminated my Executive Assistant of the last seven years, Jenna Parker, who also managed the New York office. By terminating Ms. Parker, Individual Defendants undoubtedly intended to further cripple my participation and effectiveness within Gemini. As a result, the New York office quickly fell into a state of chaos, with employees lacking knowledge over who was in charge of what at the company. A few of Gemini's best employees decided to quit as a result.

**B.    Individual Defendants Secretly Torpedo Gemini's Unfinished Hotel Projects To Further Their Own Side Deals With Third-Parties**

63.    In October 2014, Individual Defendants secretly began exploring selling Gemini's assets or restructuring them on terms that were exceedingly unfavorable to Gemini and its existing investors but that personally benefitted the Individual Defendants. In doing so, the Individual Defendants concealed their actions from me.

64.    On November 1, 2014, Individual Defendants also removed me as President of GEP, an Affiliate of GREA that had ultimate authority for managing three of Gemini's hotel projects, which were not yet complete.

65.    Once I was removed as GEP's President in favor of Massaro, Individual Defendants deliberately sabotaged two of the three lucrative Gemini hotel development projects previously managed by me through GEP.

66.    The first hotel development project sabotaged by Individual Defendants is the planned Jade Bryant Park Hotel located at 36 West 38th Street in Manhattan.[7] The principal common equity investors in the Jade Bryant Park Hotel project are myself, my family and close

---

[7]    The Jade brand is Gemini's luxury hotel brand that I have worked tirelessly to promote and expand. The Jade Bryant Park Hotel was intended to be a luxury boutique hotel in the desirable Bryant Park area of Manhattan.

outside investors some of whom I have dealt with for over a decade. The preferred equity investors placed their investment into the project through Gemini Fund 5 LLC (a structure I created for capital raising efforts) and are high net worth individuals. In total, these equity investors have invested $5.65 million in the Jade Bryant Park Hotel project. I also procured a participating loan from UBS Realty Advisors LLC ("UBS Realty") in the amount of up to $50.5 million and I have worked from the beginning up to the time of my removal as President of GEP with the general contractor, architects, lawyers and lender to make this project a world-class boutique hotel within the upscale Jade brand of hotels.

67.     The second hotel development project sabotaged by Individual Defendants is the planned Jade Seaport Hotel located at 33 Peck Slip in Manhattan. Like the Jade Bryant Park Hotel project, this hotel development project seeks to construct another boutique hotel under the Jade luxury brand.[8] Moreover, like the Jade Bryant Park Hotel – the equity investors comprise of high net worth individuals (some of these investors and their advisors I have known for more than a decade) who invested in this project based on my involvement and leadership in this project. In total these equity investors have invested $4.5 million in the Jade Seaport Hotel project. UBS Realty is also the lender on this project as well and issued a construction loan in the amount of $36.5 million. Like the Jade Bryant Park Hotel project, I selected and have worked with the Jade Seaport's general contractor, architects, lawyers and lender to bring this project to fruition (until my removal as President of GEP).

68.     Individual Defendants contributed nothing to either the Jade Bryant Park Hotel project or the Jade Seaport Hotel project. They did not invest their own money, did not procure

---

[8]     Currently, the property is being operated as a Best Western Hotel until such time as demolition and construction gets underway for the planned luxury hotel development – something that Defendants have wrongfully halted as explained below.

21

investors or lenders and had no involvement with the design, approvals or construction of the two projects.

69.     Notwithstanding the fact that these two hotel development projects are projected to be a highly profitable for Gemini, Individual Defendants immediately began to secretly explore selling the Jade Bryant Park and Jade Seaport projects to third-parties.  Like all other Gemini matters, I was completely in the dark concerning Individual Defendants' actions until recently when I discovered that they convinced UBS Realty to stop funding both projects so that they could sell them at fire sale bargain prices to a third-party developer (Boston-based Congress Group) with whom, upon information and belief, they entered into a side-deal (the details of which have been concealed from me).

70.     Unbeknownst to me at the time, Individual Defendants contacted John Connelly, Jr., Executive Director of Acquisitions for UBS Realty on or about the first week in October 2014 and requested an in-person meeting in Hartford, Connecticut (without me present) to discuss UBS Realty's significant investment in the Jade Bryant Park and Jade Seaport projects.

71.     At the meeting, La Mack and Massaro requested that UBS Realty agree to renegotiate the terms of its two participating loans on the Jade Bryant Park and Jade Seaport projects as well as provide UBS Realty's consent to the properties' sale to the Congress Group to whom according to Massaro – he and La Mack had been "discussing the projects for some time."

72.     In an attempt to convince the skeptical UBS Realty team[9] (consisting of John Connelly and Brent Hall) to renegotiate the loans and consent to the sale of the projects, Individual Defendants portrayed Gemini as having a chaotic and uncertain future (including by

---

[9]     UBS Realty was bullish on the profitability of the two hotel development projects.  UBS Realty participating loans had no pre-payment provisions during the lockout period of approximately four years to ensure that UBS Realty maximized its return on these two hotel projects.  True and correct copies of the UBS Realty Master Loan Agreements for Jade Bryant Park Hotel and Jade Seaport Hotel projects are attached herein as **Exhibits 10 & 11.**

highlighting the pending lawsuits in North Carolina and New York) and that renegotiating the loans and assenting to the properties' sale to the Congress Group would be the only way for UBS Realty to recoup its investments.

73.     Massaro pressed John Connelly, Jr. of UBS Realty on this issue by letter, dated October 14, 2014.  In his letter, Massaro summarized the substance of Individual Defendants' meeting with UBS Realty and further outlined his and La Mack's proposal for renegotiating the UBS Realty loans and obtaining its consent to the sale of the two projects to the Congress Group. A true and correct copy of Massaro's October 14, 2014 letter to UBS Realty is attached herein as **Exhibit 9.**

74.     Massaro's letter to UBS Realty opened and closed with a request that UBS Realty keep his secret solicitation confidential from me – a wholly unprofessional and alarming behavior from the President of a borrower entity vis-à-vis its lender on two major loans.

75.     Next, Massaro shockingly lobbied UBS Realty to stop funding his own company's two leading hotel projects by ceasing all future loan disbursements.  Instead, Massaro requested that UBS Realty provide its consent for Massaro's and La Mack's sale of the two projects to the Congress Group or another third-party through a commercial property listing with a broker they recommended at RobertDouglas (Doug Hercher). In exchange, Massaro promised that UBS Realty's two loans would be repaid with interest accruing through the date of closing plus a profit sharing of any remaining proceeds after the Gemini equity investors recovered their investment and a return.  Massaro's proposal offered a significantly worse financial return for UBS Realty (as well as for the equity investors) than the existing Gemini investment projections from the two hotel development projects.

76.     In order to convince UBS Realty to consider walking away from its attractive long-term investment, Massaro proceeded to falsely portray a doomsday scenario for UBS Realty in which it would lose its investment if it continued funding the projects as it was obligated to do under its existing loan agreements with Gemini. Massaro misrepresented to UBS Realty that its loans were in danger of a future default given the unmanageable and dire situation at Gemini arising from the pending lawsuits between the parties over control of Gemini and that both projects suffered from significant cost overruns.

77.     Massaro's letter succeeded in sufficiently alarming UBS Realty. As a result, UBS Realty ceased disbursing any additional funds in early November 2014 for either project (other than to complete demolition at the Bryant Park Hotel project site) until it further investigated the claims asserted by Massaro. I was not aware of Massaro's and La Mack's sabotage of the Jade Bryant Park and Jade Seaport projects until late November 2014 when UBS Realty informed me of its secret communications with Massaro and La Mack.[10]

78.     I was shocked to discover that the Individual Defendants would sabotage their own company's projects to further their side deal with the Congress Group. Individual Defendants, however, were unable to hoodwink UBS Realty into consenting to the sale of the two projects. UBS Realty's Brent Hall informed me that it did not consent to the sale of the two projects but that it had serious concerns over the perceived dysfunctionality at Gemini (based on Massaro's communications) and as a result would not continue funding the two projects until such time as the Individual Defendants and I reached an agreement for moving forward with the two projects.

---

[10]     UBS Realty's John Connolly told me that UBS Realty had not disclosed its communications with Massaro and La Mack to me earlier because Massaro had represented to UBS Realty that he would keep me informed of their discussions.

79.     UBS Realty's reaction was precisely the type of lender and investor fallout that I had sought to avoid from the outset when I repeatedly pressed Individual Defendants for their proposed "business divorce" so that our separation could be effectuated privately and expeditiously without any harm inflicted on Gemini, its Managers or investors.

80.     Fearful over the prospect of having two of Gemini's primary development projects languishing as a result of an abrupt cut-off in lender financing caused exclusively by Massaro's sabotage, I immediately demanded answers from the Individual Defendants.

81.     On December 1, 2014 Massaro responded to my inquiries and informed me that he and La Mack entered into an exclusive listing agreement on November 13, 2014 with the commercial brokerage firm RobertDouglas for the sale of the two projects.  A copy of the RobertDouglas exclusive listing agreement for the Jade Bryant Park Hotel project and the Jade Seaport Hotel project is attached herein as **Exhibit 12.**

82.     I was speechless at Massaro's response not only because he once again took unilateral and unauthorized actions without keeping me informed, but also because Individual Defendants and I had commenced discussions in the beginning of November 2014 concerning a separation along the contours I had originally proposed (i.e. I keep the hotel investments and Individual Defendants retain the retail and commercial property investments).   Individual Defendants' unilateral and secretive decision to sell the Jade Bryant Park Hotel and Jade Seaport Hotel projects removed two of Gemini's most valuable development projects from a potential future separation agreement between the Individual Defendants and me.

83.     Even worse, however, was the prospect that the equity investors I procured into these two Gemini projects pursuant to an understanding that they were investing in a long-term and lucrative development project were now at risk of losing their investment since both projects

grounded to a halt as a result of the cutoff in funding and the recoupment of their principal investment now hinged on the successful sale of these two stalled projects.[11]

84.     Complicating matters even more was the fact that the Individual Defendants listed the two projects for sale without obtaining UBS Realty's consent as required under the loan agreements in place with Gemini for both projects, which was particularly egregious given that Massaro had solicited but had not obtained UBS Realty's consent as early as October 14, 2014.

85.     Gemini's planned sale of either project violates the transfer restrictions contained in the loan agreements for the two properties, which would immediately constitute a default permitting UBS Realty to seek full recourse against GREA as the guarantor of the full amount of the loans.[12]

86.     I requested that Individual Defendants withdraw the listing for both projects so as to not further damage the relationship with UBS Realty and to reach an agreement on Gemini's sale of the two projects to me as part of a negotiated separation agreement.   Individual Defendants refused to withdraw the listing.   Instead, Massaro told me that the RobertDouglas brokers were actively marketing both projects and that the brokers represented the best chance to procure the highest offers for the properties.

---

[11]     Defendants' actions also subjected Gemini to potential lawsuits from contractors and other professionals hired to construct the two hotels.

[12]     The UBS Realty Loan for the Jade Seaport Hotel project was issued by 33 Peck Slip Hotel Capital LLC (a UBS Realty special purpose entity) ("Seaport Loan") and the borrower was 33 Peck Slip Acquisition LLC (one of the GEP subsidiaries).   Seaport Loan §§ 9.8 (a) & (b) and 6.4.1 provide that the borrower cannot "sell, convey, transfer dispose of or otherwise alienate" the property without the lender's prior consent.   If the borrower does so, such action is deemed a breach of the transfer restrictions set forth in § 9.8 and thereby under Seaport Loan § 11.4.2(a) giving lender full recourse rights against the guarantor, which is GREA.   True and correct copies of the Seaport Loan Agreement and corresponding Guaranty are attached herein as **Exhibits 13 & 14**.   The UBS Loan for the Jade Bryant Park Hotel project is similar.   The loan was issued by 36 West 38th Street Hotel Capital LLC (a UBS Realty special purpose entity) ("Bryant Park Loan") and the borrower was 36 West 38th Street LLC (one of the GEP subsidiaries).   Bryant Park Loan §§ 9.8 (a) & (b) and 6.4.1 provide that the borrower cannot "sell, convey, transfer dispose of or otherwise alienate" the property without the lender's prior consent.   If the borrower does so, such action is deemed a default under Bryant Park Loan § 11.4.2(a) giving lender full recourse rights against the guarantor, which is GREA.   True and correct copies of the Bryant Park Loan Agreement and the corresponding Guaranty are attached herein as **Exhibits 15 and 16.**

87.     In reality, however, Individual Defendants were doing everything in their power to discourage bona-fide offers to buy the two projects so that they could sell the Jade Bryant Park Hotel and Jade Seaport Hotel projects to the Congress Group (and to prevent me from purchasing the two projects).  For example, between late January and early February 2015, I contacted several third-party real estate fund managers to solicit their participation in a buy-out offer of the two projects (subject to UBS Realty's approval).  The responses I received from these third-parties were unanimous in that they could not support my offer for the two properties because they had also met with the RobertDouglas brokers and were surprised by the brokers' low opening bid offers (made at Individual Defendants' direction) for the two properties, which raised red-flags for these third-party investors who declined to take any further action.

88.     The proof that Individual Defendants were not serious about obtaining genuine fair-market offers for the two properties was manifest when Massaro abruptly and inexplicably intervened on January 26, 2015 to demand that the RobertDouglas brokers recall their blast emails marketing the two properties.

89.     Individual Defendants' conduct vis-à-vis the two hotel projects was orchestrated to provide the appearance of Gemini's effort to sell them but Individual Defendants intentionally refused to provide any meaningful follow-up or strategy to close out a deal to either me or a third-party because Individual Defendants had already decided to sell the two properties to the Congress Group whom they first identified to UBS Realty in October 2014.

90.     Indeed, on January 30, 2015, La Mack forwarded an email to me attaching Individual Defendants' new proposal to UBS Realty for the disposition of the two projects – both involved the participation of the Congress Group.  Per UBS Realty's earlier admonishment that it would not consider any proposals if they were not reached in agreement by all three Members –

La Mack sought my assent to Individual Defendants' proposal, which could only be charitably characterized as a giveaway to the Congress Group to the detriment of our existing investors.

91.     First, Individual Defendants' proposal concerning the Jade Bryant Park Hotel project simply proposed a "recapitalization" of the UBS Realty loan on this project from a participating loan to a construction loan and a transfer of the development rights from Gemini to the Congress Group (in which Gemini would lose its development fees). In addition, Individual Defendants proposed that the Congress Group infuse an additional $5 million in equity into the project – a clear attempt to dilute and subordinate the existing Gemini equity investors' position in the project. In essence, Individual Defendants failed to procure a "sale" for the Jade Bryant Park Hotel project but simply proposed an inferior "recapitalization" plan that would adversely affect Gemini's existing investors in the project.     A true and correct copy of Individual Defendants' recapitalization proposal for the Jade Bryant Park Hotel project is attached herein as **Exhibit 17.**

92.     Second, Individual Defendants proposed selling the Jade Seaport Hotel project to the Congress Group for conversion into a "high-end luxury condominium" development. This proposal was even more ambiguous than the Jade Bryant Park Hotel project and omitted such basic terms like the purchase price. In fact, the miniscule deposit offered by the Congress Group ($1,250,000) and the absence of a concrete purchase price underscored Individual Defendants' bad-faith and self-dealing in promoting the Congress Group's substandard offer, which did nothing to protect the Gemini investors' rights. A true and correct copy of Individual Defendants' offer to sell the Jade Seaport Hotel project to the Congress Group is attached herein as **Exhibit 18.**

93.     Alarmed at having been kept in the dark by Individual Defendants before they made these weak proposals to UBS Realty and confident that I could (on my own) procure a vastly superior offer to purchase the two projects (and protect the Gemini investors' rights) – I submitted two concrete offers to purchase both projects on February 4, 2015. True and correct copies of my Letters of Intent to purchase the Jade Bryant Park Hotel and Jade Seaport Hotel projects are attached herein as **Exhibits 19 & 20** respectively.

94.     Unlike Individual Defendants' proposal for the Jade Bryant Park Hotel, I actually submitted an offer to buy the project for $24.9 million (the only offer that I am aware of in the five month period in which Individual Defendants have purportedly attempted to sell this property). Moreover, my offer was a firm one with a hefty 10% deposit (i.e. $2.49 million), no due diligence period (which was a component of the Congress Group's offer thereby making the already weak offer a conditional one) and a closing date no later than 45 days after signing of the Purchase and Sale Agreement.

95.     Even though Individual Defendants do not have a genuine alternative offer, let alone a superior one to the one I tendered – they refused to accept my offer by the February 11, 2015 deadline. Instead, La Mack informed Gemini's investors in the project that Individual Defendants will purportedly "continue to market the property" (even though they had been doing so since at least November 13, 2014 without success) and expect additional purchase offers for the property to be received by February 25, 2015. In the meantime, the Jade Bryant Park Hotel project continues to languish along with the capital poured into it by the Gemini equity investors.

96.     Similarly, I also made an offer to purchase the Jade Seaport Hotel project for $36 million (unlike the Congress Group who failed to actually provide a purchase price in its offer). Like the Jade Bryant Park Hotel project, my offer was a firm one with a 10% deposit (i.e. $3.6

million), no due diligence period (which was also a component of the Congress Group's offer for this project) and a closing date no later than 45 days after signing of the Purchase and Sale Agreement. Individual Defendants did not respond to me or return the signed Letter of Intent for the purchase and sale of the Jade Seaport Hotel project.

97.    Instead, the largest investor in the Jade Seaport Hotel project (Sumeer Kakar) has informed me that he has urged Individual Defendants to accept my offer but that Individual Defendants had indicated to him that although they were "likely" to accept my offer - they wished to "exhaust their options" some more.  On February 12, 2015, I received an email attaching a draft purchase and sale agreement for the Jade Seaport Hotel project from another law firm claiming to represent Individual Defendants on this transaction.   However, there has been no follow-up or activity since I received the "draft purchase and sale agreement" from Individual Defendants' transactional counsel and I still do not have the executed Letter of Intent, which leads me to believe that Individual Defendants are simply stalling for more time while the Jade Seaport Hotel project continues to languish along with the capital poured into it by the Gemini equity investors.[13]

## C. Individual Defendants Loot Gemini's Assets By Unlawfully Transferring Gemini's Existing Hotel Management Contracts To Bridgeton Holdings, LLC

98.    Individual Defendants' egregious conduct continued beyond usurping Gemini's corporate opportunities for their own newly formed entities and engaging in insider transactions for the fire sale of Gemini's assets to third-parties like the Congress Group.

---

[13]    Defendants have a history of reneging on prior agreements.  Throughout December 2014 and January 2015 – I had been negotiating the terms of a Separation Agreement with the Defendants through our respective counsel. On repeated occasions, Defendants represented that we had an agreement on the terms of the separation and the division of assets only to later renege on said agreements.

99.    In late January 2015, I discovered that Individual Defendants were secretly transferring Gemini's hotel management contracts to a competitor Bridgeton Holdings, LLC ("Bridgeton"). Bridgeton is a real estate investment firm controlled by a former Gemini employee named Atit Jariwala.

100.    Aside from developing and owning its own hotels, Gemini's hospitality group also operates hotels for third-parties. Gemini's hotel management contracts are the most profitable source of revenue for Gemini's hospitality business line. I was therefore stunned to discover that Individual Defendants were secretly transferring all of Gemini's valuable hotel management contracts to Bridgeton.

101.    I was kept entirely in the dark about Individual Defendants' indiscriminate transfer of Gemini's assets to a competitor like Bridgeton. The first time I learned of the scale of Individual Defendants' actions (i.e. their wholesale transfer of all twelve (12) Gemini hotel management contracts to Bridgeton) was when I received the January 26, 2015 Gemini Press Release announcing that Gemini "has retained New York-based Bridgeton Hotel Management (Bridgeton) to manage its hotel properties, effective immediately." A true and correct copy of the January 26th 2015 Gemini Press Release is attached herein as **Exhibit 21.**

102.    Individual Defendants' actions constituted a clear breach of their fiduciary duties and a blatant breach of the GREA Operating Agreement, which required Individual Defendants to keep me informed of material decisions affecting GREA and to set forth certain decisions such as the "sale or disposition of GREA Projects" for a vote among the Managers. *See* GREA Operating Agreement §§ 4.2.1.9 & 5.16.

103.    Individual Defendants' secrecy surrounding the transfer of Gemini's hotel management contracts to Bridgeton has prevented me from discovering the circumstances behind

31

this material transfer of Gemini assets to a competitor. Individual Defendants have failed to provide me with any information concerning the compensation (if any) Bridgeton paid to acquire these hotel management contracts, which were previously handled without issue by Gemini's in-house hospitality employees.

104. Separate and apart from the sheer revenue losses Gemini will sustain from Individual Defendants' handover of the hotel management contracts to Bridgeton, Individual Defendants' tortious actions have also exposed GREA and me personally to liability under Gemini's loans for its hotel properties because Individual Defendants unilaterally transferred the hotel management contracts without obtaining the lenders' prior approval to such a change.

105. Under every loan agreement in place for Gemini's hotel properties, the lenders prohibit Gemini from unilaterally transferring its hotel management contracts or entering into new hotel management contracts without first obtaining the lenders' prior approval.

106. For example, the loan agreement between the lender and Gemini for the Jade Miami Beach Hotel redevelopment project in Miami, Florida contains a provision restricting Gemini's transfer of a hotel management agreement for this hotel property without first obtaining lender's prior written approval. Individual Defendants' breach of the loan agreement risks placing Gemini in default of the loan, which puts me at personal risk because I have personally guaranteed the loan in an amount up to $10 million.[14]

---

[14] The loan for the Jade Miami Beach Hotel was issued by Edgewood MAC V LLC (a special purpose entity of Edgewood Capital Advisors, LLC) ("Jade Miami Loan") and the borrower was 1775 James Avenue LLC (one of GEP's subsidiaries and a Gemini entity). Jade Miami Loan Agreement § 7(b)(1) prohibited the borrower from transferring the management contract with Gemini Property Management, LLC (another Gemini entity) without first obtaining Edgewood MAC V LLC's prior written consent. Defendants' breach of the Jade Miami Loan Agreement is troubling since Defendants risk placing the borrower (1775 James Avenue LLC) into default as a result of their actions and I am a guarantor for the Jade Miami Loan for an amount of up to $10 million (Massaro and La Mack are not guarantors under this loan). True and correct copies of the Jade Miami Loan Agreement and corresponding Guaranty are attached herein as **Exhibits 22 & 23**.

107.   This is not a trivial or academic point.  The lender Edgewood MAC V LLC has already defaulted 1775 James Avenue LLC (the Gemini borrower entity) as a result of Individual Defendants' actions jeopardizing $4.6 million of equity in the project.  Default interest is being charged by the lender thereby putting the property into distress. Individual Defendants' transfer of the hotel management contract to Bridgeton has had an adverse cascading effect with the equity investors on the Jade Miami Hotel project as well.

108.   For example, on February 5, 2015, Gemini received a letter from a law firm (Winget Spadafora & Schwartzberg LLP) representing many of the Gemini Fund 5 investors (Madison Avenue Securities ["MAS"]) in the Jade Miami Hotel project.  MAS expressed its "surprise" and "unease" at receiving the January 26, 2015 Gemini Press Release announcing the transfer of all Gemini hotel management contracts to Bridgeton.  MAS noted its discomfort at Bridgeton's ability to manage the hotel properties especially in light of Gemini's and my historical familiarity with the properties.  MAS further highlighted its "concern" over Gemini's "troubling" default under the Jade Miami Hotel loan caused by Individual Defendants' transfer of the hotel management contract to Bridgeton.   A true and correct copy of the MAS letter, dated February 5, 2015 is attached herein as **Exhibit 24.**

109.   By way of another example, the loan agreement between the lender and Gemini for the Boston Holiday Inn Express hotel contains a provision prohibiting the borrower Gemini entity from transferring the Gemini hotel management contract to a third-party without the lender's prior written consent.  Individual Defendants' breach of the Boston Holiday Inn loan agreement provides the lender with full recourse rights against the seven guarantors.[15]  I am one

---

[15]      The loan for the Boston Holiday Inn was issued by Camden National Bank ("Holiday Inn Loan") and the borrower was Gemini 280 Friend Street, LLC (one of GREA's subsidiaries and a Gemini entity).  The Boston Holiday Inn Loan Agreement § 6.6(d) prohibited the borrower from transferring the management contract with Gemini Property Management, LLC (another Gemini entity) without first obtaining Camden National Bank's prior

of the seven guarantors of the loan, which I personally guaranteed in an amount of up to $14.8 million.

110.    Notwithstanding the damage Individual Defendants' and Bridgeton are inflicting on Gemini, myself and the Gemini investors, Individual Defendants and Bridgeton are continuing to communicate with the franchisors (e.g. IHG, Wyndham and Choice hotels) to effectuate the transfer of those hotel management contracts that Individual Defendants announced in their Press Release on January 26, 2015.

**D.  Individual Defendants Continue To Loot Gemini's Assets With Their Recent Raid On Gemini's New York City Office And Their Unlawful Transfer Of Gemini's Data Infrastructure And Employees To Bridgeton Holdings, LLC**

111.    While I was attending a hotel conference in California, Individual Defendants continued to dismantle Gemini's hospitality business through its wholesale transfer of assets, infrastructure and staff.  On January 26, 2015, a private security firm (acting on Individual Defendants' instructions) arrived at GREA's New York City corporate headquarters located at 200 Park Avenue South, Suite 1305 and informed all of the Gemini employees that their offices had been moved to another location.  The private security firm gave the employees the choice of either packing their belongings in a box in thirty (30) minutes to move to a new undisclosed midtown office or be fired.

112.    Leaving aside the sheer unprofessional and absurd manner in which this "office move" was orchestrated by Individual Defendants, it was done without my knowledge. Moreover, I was not informed by Individual Defendants (or anyone else) where the "new office" would be located and why such a move was necessary.  In total, twenty-one (21) out of twenty-

---

written consent.  Defendants' breach of the Boston Holiday Inn Loan Agreement provides Camden National Bank with full recourse rights against me personally as one of the seven guarantors of this loan for an amount up to $14.8 million.  True and correct copies of the Boston Holiday Inn Loan Agreement and the corresponding Guaranties are attached herein as **Exhibits 25 & 26.**

four (24) Gemini employees moved to the "new office," including all fifteen (15) of the Gemini Hospitality Operations employees and six (6) Gemini Corporate Operations employees. The one employee who questioned the "move" and asked for time to consider it was fired by the Individual Defendants on the spot.

113.    I was subsequently informed by some of the transferred employees (but not by the Individual Defendants) that the Gemini employees were moved to Bridgeton's office located at One Rockefeller Plaza, 33rd Floor. I was informed that the transferred Gemini employees were instructed by Individual Defendants that they were now Bridgeton employees.

114.    Approximately two weeks later on February 9, 2015 – Individual Defendants issued another Gemini Press Release announcing that "Gemini is pleased to provide its new address for the Gemini New York City office: Gemini Real Estate Advisors, LLC, 1 Rockefeller Plaza, 33rd Floor New York, New York 10020" and that "effective immediately, all Capital Markets, Investor Relations and Marketing related deliverables should be directed to the above mailing instructions." The address listed in the Press Release is Bridgeton's principal office location. A true and correct copy of Gemini's February 9, 2015 Press Release is attached herein as **Exhibit 27.**

115.    Beginning five days earlier on February 4, 2015, Gemini's outside data management and information security contractor contacted the Individual Defendants and me to report suspicious activity in the form of heavy data downloads off of the Gemini network. True and correct copies of the communications from Gemini's IT contractor to Individual Defendants and me concerning the unauthorized removal of information from Gemini's network are attached herein as **Exhibits 28.**  As it turns out, Individual Defendants surreptitiously downloaded all of Gemini's electronically stored information and established a parallel information technology

35

platform (presumably at Bridgeton) where they now have access to all of Gemini's proprietary files and information.   Once again, Individual Defendants have deliberately concealed their actions from me and other than the reports provided by Gemini's outside data management and information security contractor to me – I have no information concerning their actions.

116.   In essence, Individual Defendants have circumvented me out of my own company.   Gemini's hospitality business, which formerly was its leading business segment no longer exists as a result of Individual Defendants' wholesale transfer of assets, infrastructure, hotel management contracts and employees to Bridgeton.   Aside from the hospitality team, I no longer have direct access to Gemini's corporate employees that were raided and brought to the Bridgeton office.

**Gemini and I Will Suffer Irreparable Harm If The**
**Court Does Not Grant A TRO And Preliminary Injunction**

117.   As detailed above, Individual Defendants' conduct threatens to destroy Gemini's hotel development projects and cause significant losses to Gemini's investors and lenders.   Aside from the significant financial losses on these development projects, however, Individual Defendants' outrageous and unlawful conduct threaten to irreparably damage Gemini's and my personal reputation in the real estate industry, which is neither calculable nor precisely compensable.

118.   Moreover, Individual Defendants' wrongful actions have placed Gemini and me in jeopardy of incurring massive potential liability to both the lenders and investors as a result of Individual Defendants breaches of the loan agreements in place concerning the hotel properties. In short, I am experiencing a Kafkaesque nightmare in which I could lose my personal assets and reputation for actions over which I neither control nor have knowledge as a direct result of Individual Defendants' tortious and disgraceful conduct.

36

119.    For these reasons, I respectfully request that the Court grant my application for a TRO and Preliminary Injunction to enjoin the Individual Defendants from taking any further tortious actions that will cause additional harm to Gemini, its investors and myself.

I declare under the penalty of perjury under the laws of the United States of America and the State of New York that the foregoing is true and correct.   Executed on this 27th. day of February, at New York, New York.

_____
William Obeid