# EXHIBIT

# 7

## RESERVATION AGREEMENT

This Reservation Agreement (this "**Agreement**") is entered into as of this ___ day of _____, 2015 (the "**Effective Date**") by and between **Ryland Properties, LLC**, a South Carolina limited liability company ("**Ryland**") and **Gemini Real Estate Advisors, LLC**, a Delaware limited liability company (the "**Developer**").

## RECITALS

A.  Ryland owns certain real property located at the southeast quadrant of Hammett Bridge Road and East Suber Road in Greenville County, South Carolina, which is the location of the proposed Riverside Crossing Shopping Center, which real property is more particularly described on **Exhibit "A"** hereto (the "**Project**")

B.  Developer, prior to Ryland's purchase of the Project, incurred development costs associated with performing certain items of due diligence and obtaining certain permits related to the development of the Project (the "**Due Diligence Costs**") for the benefit of Ryland and the Project.  The Due Diligence Costs are set forth on **Exhibit "F"** hereto.

C.  Ryland, or an affiliate of Ryland, currently desires to open a Lowe's Food grocery store ("**Lowe's**") in the Project, in the area outlined in red on the site plan (the "**Site Plan**") attached hereto as **Exhibit "B"** (the "**Demised Premises**"), and in connection therewith currently intends to sell the Project and lease back the Demised Premises, subject to terms and conditions acceptable to Ryland and Developer, including the terms and conditions set forth in this Agreement.

D.  Ryland and Developer are entering into this Agreement to set forth their mutual understandings and agreements with respect to the foregoing.

NOW, THEREFORE, in consideration of these premises, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1.  **Option to Purchase.**  If, during the period commencing on the Effective Date and expiring on the date that is three (3) years from the Effective Date (the "**Option Term**"), Ryland elects to develop the Project, then subject to the terms of this Agreement, Developer shall have an exclusive option during the Option Term to purchase the Project at a purchase price of Three Million One Hundred Twenty Thousand and 00/100 Dollars ($3,120,000.00) (the "**Option**").  If Ryland elects to develop the Project during the Option Term, Ryland shall give Developer written notice of the same, and Developer may thereafter exercise the Option by written notice to Ryland within fifteen (15) days after Developer receives such written notice from Ryland.  If Developer timely exercises the Option, the parties shall enter into a contract for purchase and sale for the Project in the form attached hereto as **Exhibit "C"** (the "**Contract**").  If the Contract is entered into within one (1) year of the Effective Date, Developer shall have a one hundred twenty (120) day due diligence period to secure financing.  If the Contract is entered into after one (1) year from the Effective Date, Developer shall have one hundred twenty (120) days as an initial due diligence period to secure financing, with the option of two (2) additional due diligence extension periods of thirty (30) days each to secure financing.  The Contract shall obligate Developer to use

1

commercially reasonable efforts to secure such financing on terms reasonably acceptable to Developer and to obtain any permits or approvals required for the development of the Project. Developer shall have the right to terminate the Contract at any time prior to the expiration of the applicable due diligence period in the event that Developer is unable to obtain financing on terms reasonably acceptable to Developer and/or in the event that any permits or approvals required for the development of the Project have lapsed or expired and have not been restored or reissued during such due diligence period (although Developer shall not be able to terminate the Contract for any other reason). In the event Developer purchases the Project, Ryland and Developer shall execute a lease on the closing date, as briefly described in Section 2 below and in the form attached hereto as **Exhibit "D"** (the "**Lease**"), and this Agreement shall terminate and become null and void. The Option, and Developer's rights under this Section 1 shall automatically terminate and become null and void in the event that (i) Ryland does not elect to develop the Project during the Option Term, (ii) Developer fails to timely exercise the Option by written notice to Ryland within the fifteen (15) day period described above, (iii) Ryland and Developer execute a Contract or (iv) Developer purchases the Project.

If Ryland does not, within six (6) months from the Effective Date, deliver written notice to Developer advising Developer that Ryland elects to develop the Project, Ryland shall reimburse Developer for the Due Diligence Costs.

2. **Lease.** The parties agree that if Developer purchases the Project pursuant to Section 1 above within six (6) months from the Effective Date, the annual rent under the Lease for the entire term thereof shall equal $14.80 per square foot of building improvements within the Demised Premises. If Developer does not purchase the Project within six (6) months from the Effective Date, Developer shall have the right to rebid the site and building costs along with any other variable costs and/or fees related to the development of the Project, excluding the cost of the real property (collectively, "**Development Costs**") and update the Budget (as defined below) accordingly. If it is determined that Development Costs have then increased by no more than five percent (5%) over Development Costs as of the Effective Date as reflected in the Budget, the annual rent under the Lease shall remain $14.80 per square foot of building improvements within the Demised Premises. If it is determined (and Ryland agrees with such determination) that Development Costs have then increased by more than five percent (5%) over Development Costs as of the Effective Date as reflected in the Budget, the annual rent under the Lease shall be increased by a sum equal to nine percent (9%) of such Development Costs increase.

3. **Development of Project.**

    (a)    If Developer does not acquire title to the Project as set forth in Section 1 above, and Ryland subsequently decides to develop the Project during the Option Term, Ryland shall grant Developer the right of first offer during the Option Term to develop the Project on behalf of Ryland by delivering to Developer an executed Development Agreement in the form attached hereto as **Exhibit "G"** (the "**Development Agreement**"). If Ryland delivers an executed Development Agreement to Developer, Developer may thereafter accept such offer by, within fifteen (15) business days after Developer receives such executed Development Agreement from Ryland, execute and deliver the Development Agreement to Ryland. The Development Agreement shall require that Developer shall construct the Project as shown on the Site Plan, which shall include (i) a 49,195 (+/-) square foot Lowe's, (ii) those parcels designated as "Outparcels" on the Site Plan (the "**Outparcels**"), (iii) all off-site public roadways, streets, turning, approach, and deceleration lanes, traffic signals, directional markings, medians and curb cuts as shown

2

on or contemplated in the Site Plan and (iv) all lighting shown on or contemplated in the Site Plan, including without limitation foot candles of illumination as shown on the Site Plan (the Project, the Demised Premises, the Outparcels and all such improvements are collectively referred to herein as the "**Improvements**"). Any and all changes to the Site Plan and/or to the scope of the Improvements shall be approved by Ryland in writing. The Improvements shall be built by Developer in accordance with the Site Plan and the Development Agreement. The initial agreed-upon Development Costs for the Project are as set forth on **Exhibit "E"** attached hereto (the "**Budget**"). It is agreed that the Budget reflects all Development Costs as of the Effective Date, and that the Budget shall be fixed for the first six (6) months following the Effective Date. If Ryland delivers an executed Development Agreement to Developer pursuant to this Section 3(a) after the first six (6) months following the Effective Date, Developer shall have the right to rebid Development Costs and adjust the Budget, and if Ryland agrees with such adjustments, an updated Budget shall be attached to the Development Agreement. If Developer develops the Project pursuant to this Section 3(a), Developer shall be paid a developer fee of four percent (4%) of Development Costs as shown in the approved Budget for its services, in addition to reimbursement of Development Costs as shown in the approved Budget, and the same shall be set forth in the Development Agreement. Developer's rights under this Section 3(a) shall automatically terminate and become null and void in the event that (i) Ryland does not proceed to develop the Project during the Option Term, (ii) Developer fails to provide Ryland with an executed Development Agreement within the fifteen (15) business day period described above in this Section 3(a) or (iii) Ryland and Developer execute a Development Agreement. In the event that Developer's rights under this Section 3(a) are terminated, Ryland may contact with another developer for the construction of the Project on terms and conditions acceptable to Ryland.

(b)     During the Option Term, Developer shall have the right of first offer to purchase the Outparcels. Ryland shall notify Developer in writing of its intention to sell any Outparcel. Developer shall have fifteen (15) business days after receipt of such notice to respond with an offer (an "**Offer**"), which shall include the terms and conditions for the purchase of such Outparcel, and if Developer fails to timely respond with an offer, Developer shall be deemed to have waived its right of first offer with respect to such Outparcel(s). Ryland shall have fifteen (15) business days to accept the Offer and/or negotiate terms acceptable to Ryland and Developer, and if the Offer (or any other agreement between the parties) is accepted, the parties shall enter into a contract for such Outparcel(s) subject to terms and conditions similar to those set forth in the Contract. If Ryland does not accept any such Offer, Ryland shall not be allowed to sell the Outparcel(s) that was subject to such Offer for one (1) year to any third party offering to purchase such Outparcel(s) for less consideration. Notwithstanding the above, Developer's refusal to purchase one Outparcel shall in no way waive its right to purchase the other Outparcels.

(c)     Exclusive Brokerage of Outparcels. If Ryland maintains ownership of the Project, Ryland shall grant Sprucewood Realty, LLC the exclusive right to market and lease the Outparcels for so long as Sprucewood Realty, LLC performs its obligations to the reasonable satisfaction of Ryland. The parties shall enter into a brokerage agreement setting forth the terms and conditions of such right.

4. **Notices.** All notices, requests or demands herein provided to be given or made, or which may be given or made by either party to the other, shall be given or made only in writing and shall be

3

deemed to have been duly given: (i) when delivered personally at the address set forth below; or (ii) on the date delivered when sent via Overnight Mail, property addressed and postage prepaid. The proper address to which notices, requests, or demands may be given or made by either party shall be the address set forth at the end of this Section. Such address may be changed by written notice given to the other party in accordance with this Section.

**If to Ryland:**

Ryland Properties, LLC
1381 Old Mill Circle, Suite 200
Winston-Salem, NC 27103-1400
Re: LFS Store No._____
Attn: Roger Henderson

**If to Developer:**

Gemini Real Estate Advisors, LLC
16740 Birkdale Commons Parkway
Suite 306
Huntersville, NC 28078
Attn: Christopher LaMack

5. **General Provisions.**

    5.1    Gender; Number

        The use of (i) the neuter gender includes the masculine and feminine and (ii) the singular number includes the plural whenever the context requires.

    5.2    Captions

        Captions in this Agreement are inserted for the convenience of reference only and do not define, describe, or limit the scope or intent of this Agreement or any of its terms.

    5.3    Exhibits

        All attached exhibits are a part of this Agreement and are incorporated in full by this reference.

    5.4    Entire Agreement

        This contains the entire agreement of Ryland and Developer and supersede any prior written or oral agreements between them concerning the subject matter contained herein.

    5.5    Modification

        No modification, waiver, amendment, discharge, or change of this Agreement shall be valid unless it is in writing and signed by the party against which enforcement of the modification, waiver, amendment, discharge, or change is or may be sought.

4

5.6     Intentionally Deleted.

5.7     Governing Law

This Agreement shall be construed and enforced in accordance with the laws of the State of South Carolina.

5.8     Time of Essence

Time is of the essence as to this Agreement.

5.9     Severability

In the event any term, covenant, condition, or provision of this Agreement is held to be invalid, void, or otherwise unenforceable by any court of competent jurisdiction, the fact that such term, covenant, condition, or provision is invalid, void, or otherwise unenforceable shall in no way affect the validity or enforceability of any other term, covenant, condition, or provision of this Agreement.

5.10    Successors and Assigns

Except as otherwise provided herein, all terms of this Agreement shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective legal representatives, successors, and assigns.  Developer may not assign any of its rights, or delegate any of its obligations, under this Agreement without the prior written consent of Ryland.

5.11    Attorneys' Fees

If any action at law or in equity shall be brought on account of any breach of, or to enforce or interpret any of the covenants, terms, conditions, or agreements of this Agreement, the prevailing party shall be entitled to recover from the other party, as a part of the prevailing party's cost, reasonable attorneys' fees, the amount of which shall be fixed by the court and shall be made a part of any judgment rendered.

5.12    Relationship of Parties

Developer and Ryland shall not be construed as joint venturers or partners, and neither shall have the power to bind or obligate the other party.

5.13    Default; Remedies

If either party fails to comply with any provision of this Agreement or perform any obligation under this Agreement after receipt of written notice from the other party and a reasonable opportunity to cure (not to exceed thirty (30) days), then the party shall have the right to terminate this Agreement and/or the right to seek any and all other rights and remedies available at law or in equity.  The election by a party of one or more of the remedies set forth in this Agreement shall not limit its ability to pursue other available legal or equitable remedies.

5.14    Counterparts

US2008 6221230 5

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original. The counterparts shall together constitute but one agreement.

5.15    Confidentiality

The parties agree that the terms, conditions and negotiations of this Agreement and all verbal or written information associated herewith shall remain confidential and shall not be disclosed, directly or indirectly, to any individual or entity without the express written consent of the other party hereto, with the exception of (i) affiliates, consultants, employees, agents, lawyers, accountants, lenders and other professionals employed or otherwise retained by Ryland or Developer with respect to this Agreement who have a legitimate business need to know about such Agreement and who have agreed to maintain the confidentiality hereof, and (ii) such disclosures as may be required to comply with applicable legal requirements or as otherwise required by a court of law.

(Remainder of Page Intentionally Left Blank)

6

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

**RYLAND**:

**RYLAND PROPERTIES, LLC,**
a South Carolina limited liability company

By: _____

Name: _____

Title: _____


**DEVELOPER**:

**GEMINI REAL ESTATE ADVISORS, LLC,**
a Delaware limited liability company


By: _____

Name: _____

Title: _____

7

## EXHIBIT "A"

## LEGAL DESCRIPTION OF PROJECT

## PARCEL ONE

ALL THAT CERTAIN piece, parcel or tract of land, situate, lying and being in the State of South Carolina, County of Greenville, containing a total of 15.187 acres, more or less, (inclusive of portion of road right-of-way and Duke Power Company right-of-way), identified as Tract A on a plat of survey entitled "Survey for Greene Family Properties", prepared by C. O. Riddle, dated July 19, 1996 and recorded in the Office of the Register of Deeds for Greenville County in Plat Book 34N at Page 74A &B. Reference is hereby made to said plat for a metes and bounds description thereof.

**LESS AND EXCEPT:** ALL THAT CERTAIN piece, parcel or tract of land, situate, lying and being in the State of South Carolina, County of Greenville, lying along the easterly right-of-way of Suber Road, containing 0.93 acres, (40,548 square feet), according to a plat of survey entitled "Survey for Enigma Corporation", dated May 8, 2002, and recorded in the Office of the Register of Deeds for Greenville County in Plat Book 45-X at Pages 7A&B; and having, according to said plat, the following metes and bounds, to-wit:

BEGINNING at an iron pin on the easterly right-of-way of Suber Road, at the joint front corner of property now or formerly of Riverside  Townes II, LLC, and the within described tract; thence running along the easterly right-of-way of Suber Road, N. 11-18-40 W. 50.14 feet to a point; thence running N. 12-31-59 W. 6.54 feet to a point; thence turning and leaving the easterly right-of-way of Suber Road and running along the joint line of a 4.79 Acre Future Development tract and the within tract, the following three (3) courses and distances, N. 50-27-15 E. 194.84 feet to a 5/8" rebar iron pin; thence N. 54-31-14 E. 57.30 feet to a 5/8" rebar iron pin; thence running N. 57-11-02 E. 556.70 feet to a 5/8" rebar iron pin; thence turning and running S. 14-36-44 E. 52.63 feet to a ¾" open top iron pin at the joint line of property now or formerly of Riverside Townes II, LLC and the within described tract; thence turning and running along the joint line of property now or formerly of Riverside Townes II, LLC, the following three (3) courses and distances: S. 57-11-02 W. 539.09 feet to a ½" rebar iron pin; thence running S. 54-31-14 W. 54.37 feet to a ½" bent rebar iron pin; thence running S. 50-27-15 W. 219.76 feet to a point, being the point of beginning.

**LESS AND EXCEPT:**  ALL THAT CERTAIN piece, parcel or tract of land, situate, lying and being in the State of South Carolina, County of Greenville, containing 0.168 acres more or less, as described in the Deed from Enigma Corporation, a South Carolina corporation, to South Carolina Department of Transportation, dated August 30, 2007, and recorded in the Office of the Register of Deeds for Greenville County in Deed Book 2291 at Page 1597.

Derivation:  This being a portion of the property conveyed to the Grantor herein by deed of MO Properties, LLC, a South Carolina limited liability company, and JOG Properties, LLC, a South Carolina limited liability company recorded on May 31, 2002 in the Office of the Register of Deeds for Greenville County, South Carolina in Deed Book 1996 at Page 1519.

## PARCEL TWO

 ALL THAT CERTAIN piece, parcel of lot of land, situate, lying and being in the State of South Carolina, County of Greenville, lying along the southerly right-of-way of Hammett Bridge Road, being a portion of the Greenville County Tax Maps as Sheet 535.3, Block 1, Lot 11, as shown on plat of survey entitled "Survey for Enigma Corporation", dated May 8, 2002, and recorded on July 19, 2002, in the

Office of Register of Deeds for Greenville County in Plat Book 45X at Pages 7A & B; and having, according to said plat, the following metes and bounds, to-wit:

BEGINNING at a MAG nail found in Hammett Bridge Road running thence with the road N. 46-53-27 E. 56.89 feet to a point common corner of property herein conveyed and other property of Grantor; thence turning and running along common line S. 14-36-44 E. 833.12 feet to IPS 5/8" RB; thence turning and running along the common line of property herein described and property shown as transmission power line S. 80-26-46 W. 50.20 feet to IPS 5/8" RB common corner of property herein described and other property of Grantee; thence turning and running with the common line N. 14-36-44 W. 801.55 feet MAG nail found, being the Point of Beginning.

**LESS AND EXCEPT:**   ALL THAT CERTAIN piece, parcel or tract of land, situate, lying and being in the State of South Carolina, County of Greenville, containing 0.168 acres more or less, as described in the Deed from Enigma Corporation, a South Carolina corporation, to South Carolina Department of Transportation, dated August 30, 2007, and recorded in the Office of the Register of Deeds for Greenville County in Deed Book 2291 at Page 1597.

Derivation: This being a portion of the property conveyed by deed of Greer Commission of Public Works, recorded on August 21, 2002 in the Office of the Register of Deeds for Greenville County, South Carolina in Deed Book 2006 at Page 1189.

Greenville County Tax Map No. 0535.03-01-027.07

**EXHIBIT "B"**

**SITE PLAN**

**EXHIBIT "C"**

**FORM OF CONTRACT**

**EXHIBIT "D"**

**LEASE**

**EXHIBIT "E"**

**BUDGET**

**EXHIBIT "F"**

**DUE DILIGENCE COSTS**

## EXHIBIT "G"

## DEVELOPMENT AGREEMENT

US2008 6221230 5

**LEASE AGREEMENT**

**between**

**RIVERSIDE CROSSING, LLC,**

**LANDLORD**

**and**

**LOWES FOODS, LLC,**

**TENANT**

**LEASE AGREEMENT
BETWEEN RIVERSIDE CROSSING, LLC, LANDLORD,
AND
LOWES FOODS, LLC, TENANT**

**TABLE OF CONTENTS**

**[TO BE FINALIZED AFTER LEASE IS FINALIZED]**

PARAGRAPH                                                                                    PAGE

1.   DEMISED PREMISES ........................................................................................ 1
2.   TERM ................................................................................................................... 1
     2.1    Commencement Date .................................................................................. 1
            2.1.1   Commencement Date Acknowledgment ...................................... 1
            2.1.2   Cost Estimates Acknowledgment ................................................ 2
     2.2    Opening for Business Prior to Payment of Annual Rent .......................... 2
     2.3    Option to Renew ........................................................................................ 2
3.   CONSTRUCTION OF DEMISED PREMISES .................................................. 3
     3.1    Construction ............................................................................................... 3
     3.2    Completion Dates ....................................................................................... 3
            3.2.1   Certain Dates ............................................................................... 3
            3.2.2   Construction Delays ..................................................................... 3
            3.2.3   Commencement of Construction; Substantial Completion .......... 4
            3.2.4   Termination .................................................................................. 4
            3.2.5   Liquidated Damages .................................................................... 5
            3.2.6   Right of First Refusal .................................................................. 5
     3.3    Store Fixturing Date ................................................................................... 5
     3.4    Other Store Fixturing Date Deadlines ....................................................... 6
            3.4.1   Landlord Notification ................................................................... 6
            3.4.2   Revised Store Fixturing Deadline Date ....................................... 6
            3.4.3   Conflicting Obligations ............................................................... 7

i

|  | 3.4.4 | Fixtures | 7 |
|  | 3.4.5 | Equipment Storage | 7 |
|  | 3.4.6 | Adjustment of Opening Date | 7 |
|  | 3.4.7 | Force Majeure | 7 |
| 3.5 | Plans | | 8 |
|  | 3.5.1 | Completion of Plans | 8 |
|  | 3.5.2 | General Contractors | 8 |
|  | 3.5.3 | Changes to Construction | 8 |
| 3.6 | Code Requirements | | 9 |
| 3.7 | Remedies | | 9 |
| 3.8 | Outparcels | | 10 |
| 3.9 | Audit | | 10 |
| 4. | RENT | | 10 |
| 4.1 | Annual Rental | | 10 |
| 4.2 | Renewal Rental | | 10 |
| 5. | COMMON AREA | | 12 |
| 5.1 | Definition | | 12 |
| 5.2 | Landlord's Common Area Obligations | | 12 |
| 5.3 | Common Area Maintenance Charges | | 12 |
| 5.4 | CAM Estimate | | 13 |
| 5.5 | CAM Charges | | 13 |
| 5.6 | Reimbursement of Actual CAM Charges | | 13 |
| 5.7 | Comparison of CAM Charges | | 14 |
| 5.8 | Tenant's Self-Help | | 14 |
| 5.9 | Sidewalk Merchandise | | 14 |
| 6. | USE OF DEMISED PREMISES BY TENANT | | 15 |
| 7. | LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS | | 15 |
| 7.1 | Zoning | | 15 |
| 7.2 | Flooding | | 15 |
| 7.3 | Title Matters | | 15 |
| 7.4 | Use Restrictions on the Center | | 16 |
|  | 7.4.1 | Use Prohibition | 16 |

|        | 7.4.2 | Tenant Exclusive | 16 |
|        | 7.4.3 | Landlord's Other Property | 17 |
|        | 7.4.4 | Landlord's Default | 17 |
| 7.5    | | Site Plan | 17 |
| 7.6    | | Utilities | 18 |
| 7.7    | | Survey | 18 |
|        | 7.7.1 | As-Built Survey | 18 |
| 7.8    | | Hazardous Substances, Disposal and Storage of Hazardous Waste | 18 |
|        | 7.8.1 | Underground Storage Tanks | 19 |
|        | 7.8.2 | Survival; Indemnification | 19 |
|        | 7.8.3 | Landlord's Environmental Covenant | 19 |
|        | 7.8.4 | Knowledge | 20 |
| 7.9    | | Landlord's Tax Identification Number | 20 |
| 7.10   | | Conflict | 20 |
| 7.11   | | Nuisance | 20 |
| 8.     | | TENANT'S REPRESENTATIONS AND WARRANTIES | 21 |
| 8.1    | | Authority | 21 |
| 8.2    | | Tax Identification Number | 21 |
| 8.3    | | Tenant's Environmental Covenant | 21 |
| 9.     | | MAINTENANCE AND REPAIRS | 21 |
| 9.1    | | Landlord's Repairs | 21 |
| 9.2    | | Tenant's Repairs | 21 |
| 9.3    | | Landlord's Right To Inspect | 22 |
| 9.4    | | Tenant's Right to Cure | 22 |
| 10.    | | ADVERTISING SIGNS | 22 |
| 10.1   | | Temporary Sign | 22 |
| 10.2   | | Permanent Signs | 22 |
| 10.3   | | Shopping Center Sign | 23 |
| 11.    | | REMODELING THE DEMISED PREMISES | 23 |
| 12.    | | ACCESS TO CENTER | 23 |
| 13.    | | INSURANCE | 23 |
| 13.1   | | Landlord's Special Form Insurance | 23 |

|       | 13.2 | Common Area Liability Insurance | 23 |
|       | 13.3 | Tenant's Casualty Insurance | 24 |
|       | 13.4 | Tenant's Liability Insurance | 24 |
|       | 13.5 | Tenant Reimbursement of Landlord's Cost for Insurance | 24 |
|       | 13.6 | Insurance Company | 25 |
|       | 13.7 | Release and Waiver of Subrogation | 25 |
| 14.   |      | REAL ESTATE TAXES | 25 |
| 15.   |      | INDEMNITY | 26 |
|       | 15.1 | Tenant's Indemnity | 26 |
|       | 15.2 | Landlord's Indemnity | 26 |
| 16.   |      | CASUALTY LOSS | 26 |
|       | 16.1 | Minor Damage | 26 |
|       | 16.2 | Major Damage | 27 |
| 17.   |      | CONDEMNATION | 27 |
|       | 17.1 | Entire Taking | 27 |
|       | 17.2 | Partial Taking | 27 |
| 18.   |      | TENANT'S FIXTURES AND EQUIPMENT | 28 |
| 19.   |      | QUIET ENJOYMENT | 28 |
| 20.   |      | SUBORDINATION | 28 |
|       | 20.1 | Tenant's Subordination | 28 |
|       | 20.2 | Existing Mortgage | 29 |
| 21.   |      | ASSIGNMENT AND SUBLETTING | 29 |
| 22.   |      | OPTION AND RIGHT OF FIRST NEGOTIATION | 29 |
| 23.   |      | DEFAULT | 29 |
|       | 23.1 | Tenant's Default | 29 |
|       | 23.2 | Credit Against Judgment | 30 |
|       | 23.3 | Intentionally Deleted | 30 |
|       | 23.4 | Landlord's Default | 30 |
|       |      | 23.4.1 Monetary | 30 |
|       |      | 23.4.2 Non-Monetary | 30 |
|       | 23.5 | Default Rate | 31 |
| 24.   |      | REDELIVERY OF DEMISED PREMISES | 31 |

| | | |
|---|---|---|
| 25. | HOLDING OVER | 31 |
| 26. | REMOVALS BY TENANT | 31 |
| 27. | NOTICES | 32 |
| | 27.1 Addresses | 32 |
| | 27.2 Lender Notification | 33 |
| | 27.3 Rental Payment Address | 33 |
| 28. | TRANSFER OR SALE OF LANDLORD'S INTEREST | 33 |
| 29. | LANDLORD'S LIABILITY AND SELF-HELP | 33 |
| 30. | AUTHORITY | 34 |
| 31. | MEMORANDUM OF LEASE | 34 |
| 32. | ROOF RIGHTS | 34 |
| 33. | DISPUTE RESOLUTION | 34 |
| 34. | MISCELLANEOUS | 35 |
| | 34.1 Modifications to Lease | 35 |
| | 34.2 Partial Invalidity | 35 |
| | 34.3 Descriptive - Headings | 35 |
| | 34.4 Binding Effect | 35 |
| | 34.5 Non-Waiver | 35 |
| | 34.6 Estoppel | 35 |
| | 34.7 Choice of Law | 35 |
| | 34.8 Remedies Cumulative | 35 |
| | 34.9 No Construction Against the Preparer of this Lease | 35 |
| | 34.10 Entire Agreement | 36 |
| | 34.11 Termination | 36 |

Exhibit A – Site Plan
Exhibit B – Legal Description
Exhibit C – Commencement Date Acknowledgment
Exhibit D – Tenant's Plans
Exhibit E – Subordination, Attornment, and Non-Disturbance Agreement
Exhibit F – Tenant Estoppel Certificate
Exhibit G – Memorandum of Lease
Exhibit H – Tenant's Signage
Exhibit I – Guaranty of Lease

US2008 6154729 5
US2008 6154729 6

Exhibit J – Declaration of Covenants, Conditions, Restrictions and Easements

**STATE OF SOUTH CAROLINA**

**COUNTY OF GREENVILLE**

**LEASE AGREEMENT**

       **THIS LEASE AGREEMENT** is made and entered into as of
_____, ~~2014,~~2015, between **RIVERSIDE CROSSING, LLC,** a
Delaware limited liability company ("Landlord"), and **LOWES FOODS, LLC,** a North Carolina
limited liability company ("Tenant"). This Lease Agreement is made for the purpose of
supplementing and completing that certain Memorandum of Lease (as set forth on Exhibit "G"
attached hereto) between Landlord and Tenant of even date herewith and constitutes a material
part thereof for all purposes and to the same extent as if actually set forth therein. Any reference
to the word "Lease" shall include the provisions of the Memorandum of Lease and this Lease
Agreement as though fully contained herein. Landlord and Tenant agree as follows:

1.     **DEMISED PREMISES.** Landlord hereby leases to Tenant and Tenant hereby leases
from Landlord, upon the following terms and conditions, to have and to hold those certain
premises being 49,195 (+/-) square feet and outlined in red on Exhibit "A" ("Site Plan") attached
hereto and made a part hereof ("Demised Premises"), being located in a part of Riverside
Crossing Shopping Center described in the legal description set forth on Exhibit "B" ("Center",
which excludes the Outparcels (as hereinafter defined)), as outlined in orange on Exhibit "A" in
the City of Greer, County of Greenville, State of South Carolina (collectively, the "Real
Property"), for a term of twenty (20) years, unless sooner terminated, as provided herein.

2.     **TERM.** The initial term of this Lease shall run and extend for twenty (20) years from
and after the Commencement Date as set forth below, unless sooner terminated as herein
provided (the "Initial Term"). Tenant shall have the option to renew this Lease in accordance
with Paragraph 2.3 herein. In the event this Lease is canceled or terminated, the expiration date
of this Lease shall be that date on which the Lease is canceled or terminated.

     2.1    Commencement Date. The Initial Term of this Lease shall commence on the
earlier to occur of: (a) the expiration of seventy-five (75) days after the Store Fixturing
Date as defined in Paragraph 3, or (b) the date Tenant opens for business in the Demised
Premises (the earlier of the two such dates being the "Commencement Date"); provided,
however, that notwithstanding any other term or condition hereof to the contrary, Tenant
shall not be obligated to commence its transaction of business in the Demised Premises or
commence the Initial Term of this Lease (a) until (i) Tenant shall have been provided
with a certificate of occupancy (or local equivalent) for the Demised Premises and (ii) at
least nineteen (19) days have elapsed since the Center is deemed completed as provided
in Paragraph 3.2.3, or (b) during the period of November 15 through and including
January 15.

2.1.1   Commencement Date Acknowledgment.  When the Commencement Date of the Initial Term has been ascertained, it shall be set forth in a Commencement Date Acknowledgment in the form of Exhibit "C" attached hereto which shall be executed in the same manner as this Lease and shall be attached to this Lease as a part hereof.  If necessary, the Memorandum of Lease will be amended and recorded in the county where the Center is located to reflect the Initial Term of the Lease and the Commencement Date.  If there have been any revisions to the Site Plan after the date hereof, the final, revised Site Plan shall be attached to the Commencement Date Acknowledgement and attached to this Lease.

2.1.2   Cost Estimates Acknowledgment.  Prior to the execution of the Lease, Landlord will provide Tenant with its current good faith estimates of the costs of developing and constructing the Center and the Demised Premises for Tenant's confidential use in connection with Tenant's lease accounting procedures with respect to capitalization of leases.

2.2      Opening for Business Prior to Payment of Annual Rent.  Tenant shall have the right, but not the obligation, following at least fifteen (15) days written notice to Landlord, to open for business prior to Landlord's fulfillment of its covenants but shall not be responsible for the payment of Annual Rent, nor shall Annual Rent accrue, until the following items are provided to Tenant by Landlord:

(a)      ALTA leasehold owner's title insurance policy, as required in Paragraph 7.3, in an amount equal to the first year's Annual Rent, at Landlord's cost, insuring title to the Demised Premises with no exceptions that would adversely affect the intended use of the Demised Premises as a supermarket;

(b)      Certificate of coverage of Landlord's Special Form Insurance coverage naming Tenant as an additional insured and containing a waiver of subrogation clause, as required in Paragraph 13.1;

(c)      Certificate of coverage evidencing common area liability insurance policy naming Tenant as additional insured and containing a waiver of subrogation clause, as required in Paragraph 13.2;

(d)      A Commencement Date Acknowledgement executed and acknowledged by Landlord; and

(e)      The Shopping Center Sign, as described in Paragraph 10.3 hereof, is complete.

2.3      Option to Renew.  Landlord hereby grants to Tenant, provided Tenant is not then in default beyond any applicable notice and cure periods, the option to extend the term of this Lease for six (6) additional periods of five (5) years each (each period referred to individually as an "Option Period" and collectively as the "Option Periods"), upon the

2

same terms and conditions as apply to the Initial Term of the Lease, upon the condition that Tenant notifies Landlord in writing of its intention to extend at least one hundred eighty (180) days prior to the date of commencement of such Option Period and thereupon, this Lease shall be so extended without the execution of any further document. Wherever the word "Term" appears in this Lease, it shall be deemed to include both the Initial Term of this Lease and any Option Period which Tenant may exercise pursuant to this Paragraph 2.3.

3.    **CONSTRUCTION OF DEMISED PREMISES.**

3.1    Construction. Landlord agrees to construct the Center as shown on Exhibit "A", including the Demised Premises.   Landlord shall also construct, or cause to be constructed, all off-site public roadways, streets, turning, approach, and deceleration lanes as well as traffic signals, directional markings, medians and curb cuts ("Off-Site Improvements") as shown on the Site Plan.  Exhibit "A" shall also indicate the lighting plan for the Center, including without limitation foot candles of illumination.  Any and all changes to the Site Plan shall be approved by Tenant. Such approved, revised Site Plan shall be attached to this Lease as Exhibit "A" and the Center shall, at all times, be built in accordance with Exhibit "A" hereto.   The Demised Premises shall be constructed according to working drawings and specifications to be prepared by Landlord's architect (the "Plans"), said Plans being prepared in accordance with those Requirement Plans and Specifications furnished to Landlord by Tenant ("Tenant's Plans"), described in Exhibit "D" and made a part hereof, and in compliance with a budget prepared by Landlord and approved by Tenant in writing.   Landlord's completion of the Demised Premises in accordance with said Plans shall make the Demised Premises "Ready for Fixturing." Landlord covenants to have the Demised Premises Ready for Fixturing on the "Store Fixturing Deadline Date."

3.2    Completion Dates.

3.2.1    Certain Dates. As referred to in this Lease, the following defined terms shall mean the actual dates indicated next to each such term:

(a)    "Center Construction Start Date" – [TBD_____];

(b)    "Store Fixturing Deadline Date" – [TBD_____];

(c)    "Center Completion Date" – [_____] [To be no later than fifty-six (56) days after the Store Fixturing Deadline Date];

(d).    "Outside Completion Date" - [_____];

3.2.2    Construction Delays. Landlord covenants and agrees that the Construction of the Center (as such term is defined in Paragraph 3.2.3) shall begin no later than the Center Construction Start Date and if the same shall not be begun by the Center Construction_ Start Date, Tenant, at its option, may: (i) cancel and

3

terminate this Lease; or (ii) extend Landlord additional time for the beginning of construction; provided, however, that if Landlord's failure to commence construction within the stipulated time shall be due to Force Majeure (as defined in Paragraph 3.4.7), then in such event the Center Construction Start Date shall be extended by the length of the delays caused by any such events. Landlord covenants and agrees that the ~~construction~~Construction of the Center shall be completed, as defined in Paragraph ~~3.2.3.~~3.2.3 no later than the Center Completion Date and that the Store Fixturing Date (as such term is defined in Paragraph 3.3) shall not be later than the Store Fixturing Deadline Date. ~~If construction is; and~~ if the same shall not ~~be~~ completed ~~as provided above~~by the respective dates, Tenant shall be entitled to Liquidated Damages (as such term is defined in Paragraph 3.2.5), provided, however, if Landlord's failure to complete the improvements within the stipulated time shall be due to Force Majeure, then in such event, the Center Completion Date, and the Store Fixturing Deadline Date shall be extended by the length of delays caused by such event. Furthermore, if the Construction of the Center is not completed by the Outside Completion Date, or the Store Fixturing Date has not occurred by the Outside Completion Date, Tenant, at its option, may, in either of such events cancel and terminate this Lease by written notice to Landlord. Notwithstanding anything herein to the contrary, the Center Completion Date and the Store Fixturing Deadline Date shall not be extended by more than sixty (60) days for events of Force Majeure, without the consent of Tenant. If Force Majeure or casualty result in damage to or destruction of more than fifty percent (50%) of the Center or the Demised Premises, then the Center Completion Date and the Store Fixturing Deadline Date shall each be extended to the earlier to occur of: (i) the date which is one hundred fifty (150) days from the date of the said event of damage or destruction; or (ii) the date of completion of construction following the damage or destruction.

3.2.3   Commencement of Construction; Substantial Completion. "Construction of the Center" shall be deemed to have begun when the first concrete footings have been poured. The Center shall be deemed completed upon the existence or completion of the Off-Site Improvements as shown in Exhibit "A", installation of all landscaping, the substantial completion of all paved common areas, including paving and striping of the parking areas serving the Demised Premises, the provision to Tenant of a certificate of occupancy (or local equivalent) for the Demised Premises, and the substantial completion of the exterior portions of the buildings shown in Exhibit "A" as the "Initial Buildings to be Constructed in Addition to the Demised Premises". It shall not be necessary for Landlord to complete the inside of such buildings as it is understood that such work will be done by tenants for such buildings, or to their specifications by others, which such work may occur after the Center has been deemed completed as provided in this Paragraph 3.2.3.

3.2.4   Termination. Tenant shall have a right to terminate this Lease due to the failure of Landlord to meet the Center Construction Start Date, such termination

4

to be made by written notice to Landlord within thirty (30) days after such missed date and shall become effective forty-five (45) days following the giving of such notice, unless Landlord has commenced construction of the Center by such effective date and is diligently pursuing completion of the construction of the Center.   Except as provided for in Paragraph 3.2.5, in the event Tenant does not elect to terminate within the applicable period, the termination right set forth in this Paragraph 3.2.4 shall be deemed waived, and the Lease shall remain in full force and effect.  In the event Tenant terminates this Lease, upon the effective date of termination, this Lease shall become null and void and Tenant and Landlord shall have no further obligation or liability to each other.

3.2.5   Liquidated Damages.  If Landlord fails to meet the Store Fixturing Deadline Date or Center Completion Date.Tenant elects not to terminate this Lease pursuant to Sections 3.2.2 and 3.2.4, Landlord shall forthwith continue to construct the Demised Premises, but shall be subject to liquidated damages in the amount of one day's Annual Rent for every day that the Store Fixturing Deadline Date or Center Completion Date (as the same may be extended under Paragraph 3.2.2) is not met ("Liquidated Damages") unless such failure is due to delays caused by Tenant.  Landlord and Tenant agree that actual damages to Tenant in the event of construction delays would be difficult, if not impossible, to ascertain.  Liquidated Damages shall be in addition to any other rights that Tenant may have under this Lease and shall include all days after the failure to meet the Store Fixturing Deadline Date or Center Completion Date; provided, however, that in the event more than one deadline date is not met, the Liquidated Damages shall not be cumulative for each missed deadline.  In the event that the criteria for Center Completion have not been met as set forth in this Paragraph 3, Tenant may nonetheless determine (in its sole discretion) to commence its business in the Demised Premises, provided however that (i) such determination shall not be deemed a waiver of any of such criteria or the other requirements of this Paragraph 3, and (ii) notwithstanding such commencement of business by Tenant, Liquidated Damages shall be due and payable by Landlord as and to the extent required hereunder.  Notwithstanding Paragraph 3.2.4 to the contrary, at every thirty (30) day anniversary of Landlord's failure to meet the Center Construction Start Date, Tenant's right to terminate the Lease shall revive, and Tenant shall have five (5) days in which to exercise such termination.

3.2.6   Right of First Refusal.  Notwithstanding anything in this Lease to the contrary, if pursuant to this Paragraph 3.2, Tenant shall terminate this Lease, Landlord agrees for a period of two (2) years after the Lease is terminated that Tenant shall have the following right of first refusal to become a tenant at the Center.  If Landlord proposes completion of the Center and the leasing of space therein to a supermarket within two (2) years of the date on which the Lease was terminated, Landlord shall give notice of such fact to Tenant ("Proposal Notice").  Tenant shall then have the one-time right, exercisable by written notice within sixty (60) days after receipt of the Proposal Notice, to elect whether to enter into a

5

new lease, within thirty (30) days, for the Demised Premises under the same terms and conditions of this Lease. If Tenant elects not to exercise its right to enter into a new lease, its right of first refusal shall lapse and expire, and Landlord shall have no further obligation to Tenant with respect to the Center and the leasing of space therein to a supermarket.

3.2.7 ~~Intentionally Deleted~~

3.3     Store Fixturing Date. The "Store Fixturing Date" shall be defined as the time when:

(a)     All of the work to be performed herein by Landlord in the sales area is complete, subject to minor punch list items, including the following: (1) ceiling grids to be installed; (2) flooring to be installed; (3) fire sprinklers to be installed and operational; (4) lighting system to be installed and operational; (5) Tenant supplied decor to be installed; (6) building plumbing, restrooms, and drainage to be complete and operational; (7) doors, including hardware, to be installed; (8) the Demised Premises glassfront to be installed; and (9) all Demised Premises offices to be complete, including installations of the vinyl wall covering;

(b)     All of the work to be performed herein by Landlord in the backroom and prep areas is complete, subject to minor punch list items, including the following: (1) wall coverings to be installed; (2) flooring materials to be installed; (3) exposed concrete to be sealed; (4) lighting to be operational; (5) electrical system to be operational; (6) plumbing system to be operational; (7) ceilings to be installed; and (8) only minor punch list items remaining to be completed or corrected;

(c)     Dock well and approach to dock have been paved and cleared to allow Tenant free access for equipment deliveries. The first one hundred fifty (150) feet directly in front of the Demised Premises have been paved with at least the base coat of pavement; and

(d)     The Demised Premises has connected permanent power, the Demised Premises' HVAC is operational, and the Demised Premises' plumbing system (both water and waste systems) is operational.

In the event that the criteria for the Store Fixturing Date have not been met as set forth in this Paragraph 3.3, Tenant may nonetheless determine (in its sole discretion) to accept the Demised Premises to receive and begin installation of its equipment and fixtures upon the revised and final Store Fixturing Deadline Date, provided however that (i) such determination shall not be deemed a waiver of any of such criteria or the other requirements of this Paragraph 3.3, and (ii) notwithstanding such acceptance of the Demised Premises by Tenant, Liquidated Damages shall be due and payable by Landlord for each day of delay beyond the

6

final and revised Store Fixturing Deadline Date until the completion of all of Landlord's work required to be completed under this Paragraph 3.3.

3.4     Other Store Fixturing Date Deadlines.

3.4.1    Landlord Notification.  Within one (1) week after the completion of the foundations of the Demised Premises, Landlord shall notify Tenant of the estimated Store Fixturing Date.  Based upon this date, Tenant will order the store equipment.

3.4.2    Revised Store Fixturing Deadline Date.  Within one (1) week after start of the roof membrane installation, Landlord will provide certified written notification of the final Store Fixturing Date to Tenant.  Once this notification is received, the final Store Fixturing Date shall also become the revised Store Fixturing Deadline Date and equipment orders will be released for delivery.  The revised Store Fixturing Deadline Date will be subject to the Liquidated Damages under Paragraph 3.2.5 but not subject to the termination right under Paragraph 3.2.4.  If notification of the revised Store Fixturing Date is not received by Tenant within one (1) week after the start of the roof membrane installation, the estimated Store Fixturing Date under Paragraph 3.4.1 above shall become the final Store Fixturing Date and the revised Store Fixturing Deadline Date.

3.4.3    Conflicting Obligations.  IT IS UNDERSTOOD AND AGREED, HOWEVER, THAT IF THE REVISED STORE FIXTURING DEADLINE DATE CONFLICTS WITH TENANT'S OBLIGATIONS TO OPEN OTHER STORES, TENANT SHALL SO NOTIFY LANDLORD AND ANOTHER STORE FIXTURING DATE AND A REVISED STORE FIXTURING DEADLINE DATE SHALL BE AGREED UPON IN WRITING, SUCH DATE NOT TO EXCEED SIXTY (60) DAYS AFTER THE ORIGINAL STORE FIXTURING DEADLINE DATE.

3.4.4    Fixtures.  On the Store Fixturing Date, Tenant shall have the right to receive, store, and install its fixtures and equipment in the Demised Premises; provided, however, that Tenant shall not interfere with Landlord's work.  It is expressly agreed that such action by Tenant shall not constitute acceptance of the Demised Premises as being completed as required herein.

3.4.5    Equipment Storage.  Should the Store Fixturing Deadline Date, as may be revised pursuant to the terms hereof, not be met, it will be the responsibility of Landlord, in addition to other obligations contained herein, to receive, store, protect, and redeliver, at Landlord's expense, the store equipment that arrives after such specified date until such Store Fixturing Date is reached.  Equipment shall be stored in a bonded warehouse, and certification shall be furnished to Tenant.

3.4.6    Adjustment of Opening Date.  If the Center has not been deemed completed as provided in Paragraph 3.2.3 by the Center Completion Date, Tenant

7

reserves the right to adjust its store opening date to be up to thirty (30) days after the Center is deemed completed as provided in Paragraph 3.2.3. Any such extension shall be at no expense to Tenant, and the Commencement Date shall be adjusted accordingly.

3.4.7  Force Majeure. Except as otherwise expressly set forth herein, neither Landlord nor Tenant shall be responsible for delays caused by acts of God, fire, earthquake, hurricane or tornado (or comparable adverse weather conditions of unusual severity, such as, by way of example, severe flooding), war, material shortages, strikes, embargoes, acts of the public enemy, riot, insurrection or civil disorder, or other reasons of a like nature which are beyond the reasonable control of the Landlord or Tenant (collectively referred to herein as "Force Majeure"). Notwithstanding the foregoing provisions, the financial inability of the Landlord or the Tenant to perform their respective obligations under this Lease shall not constitute an event of Force Majeure. Further, with respect to "adverse weather conditions," Landlord acknowledges that it has taken into account normal weather conditions. Normal weather does not mean statistically average weather, but rather means a range of weather patterns which might be reasonably anticipated based on weather data for the past ten (10) years using available public historic records. The request for additional time shall be further substantiated by weather data collected during the period of delay at the Center worksite. Said data must indicate that an actual departure from normal weather occurred at the Center worksite during the dates in question.

Landlord and Tenant shall notify each other, in writing, of any of these delays within five (5) days after the occurrence of any event giving rise to such delays and advise of the new Store Fixturing Date or Center Completion Date. Failure to so notify will result in a forfeiture of the Force Majeure defense contained herein.

3.5  Plans.

3.5.1  Completion of Plans. Prior to starting construction of the Demised Premises, Landlord shall submit for review to Tenant two (2) sets of Plans covering all trades and incorporating the basic requirements of this Lease and Tenant's Plans. The Plans are to be produced by an architect. Notwithstanding Landlord's right to select an architect for the Center, Tenant reserves the right to select the architect to prepare plans for the Demised Premises. Tenant will, within ten (10) business days after receipt of said Plans, provide Landlord with its comments and corrections, if any, to said Plans. Landlord shall then incorporate any and all corrections into the Plans and provide Tenant with a corrected and revised set of complete and detailed Plans. Once the Plans are completed in accordance with the basic requirements of this Lease and Tenant's Plans, Tenant shall sign and date those Plans indicating Tenant's approval of same. Notwithstanding Tenant's formal general approval of the Plans, if there is a variation between the Plans and Tenant's Plans that has not been specifically approved by Tenant, then in such event the Demised Premises shall be constructed

8

in accordance with Tenant's Plans unless Tenant's Plans conflict with any applicable law, code, regulation or ordinance.

3.5.2   General Contractors. Landlord shall invite no fewer than three (3) general contractors, all of which shall be selected from a Tenant provided general contractor list which shall include no fewer than six (6) general contractors, to submit competitive bids to build the Demised Premises. Notwithstanding the above, Landlord shall have the right to include general contractor(s) on Tenant's general contractor list provided such general contractor(s) have pre-qualified with Tenant and are to Tenant's satisfaction.

3.5.3   Changes to Construction. Any and all changes to the construction of the Demised Premises desired by Tenant subsequent to the date Tenant signed the Plans shall be made only by written change orders signed by Landlord, its contractor, and Tenant ("Change Orders"). Any Change Orders which decrease the construction cost of the Demised Premises shall offset, to the extent of the amount of such Change Orders, any Change Orders which increase the construction cost of the Demised Premises. If any Change Orders increase the construction cost of the Demised Premises, then Tenant shall pay the amount of any such increased costs to Landlord at the time payment for such work is due. Landlord shall not make any changes to the Plans without Tenant's prior written consent. Landlord and Tenant acknowledge that any material change order requested by Tenant after the Construction Start Date could result in a Tenant-caused delay to the Store Fixturing Deadline Date and Center Completion Deadline Date, and in such event, upon request by Landlord, the parties agree to amend this Lease to new dates mutually acceptable to Landlord and Tenant.

3.6   Code Requirements. On the Store Fixturing Date, all equipment, material, and workmanship, which is the responsibility of Landlord, shall comply with requirements of applicable laws, codes, regulations, ordinances, and O.S.H.A. and have the approval of inspection authorities having jurisdiction. If any of the plans or specifications conflict with the code requirements or governing authorities having jurisdiction, Landlord shall inform Tenant of corrective procedures prior to performing the work. If any work furnished and/or installed by or on Landlord's behalf does not conform to said laws, codes, regulations, and ordinances, Landlord shall bear all costs incurred in connection with bringing such work into conformance. After the Store Fixturing Date, Tenant shall be responsible for compliance with all applicable laws pertaining to the Demised Premises, including without limitation, the Americans with Disabilities Act of 1990, as amended (or such other similar regulations or law enforceable by other federal, state, and local governments pertaining thereto).

3.7   Remedies. If at any time Landlord materially fails to perform any obligation under this Paragraph 3 (including failure by Landlord or its general contractor to complete any item of construction in accordance with the Plans, and provided Landlord is not diligently pursuing correction of such failure) within five (5) business days after written notice from Tenant, Tenant may, at its option, do any one or more of the following:

9

(a)    Deduct from Annual Rent due after the Commencement Date a credit equal to all Tenant's actual, verifiable damages incurred in connection with any failure by Landlord to materially comply with this Paragraph 3 or the Plans, in accordance with Paragraph 23.4;

(b)    Extend the time for completion of any construction by notice to Landlord;

(c)    Perform any construction obligations of Landlord and/or its general contractor, in which event Landlord shall pay to Tenant all actual, verifiable costs incurred by Tenant in connection with such performance. Failure to pay such costs within thirty (30) days of demand shall entitle Tenant to the remedies set forth in Paragraph 23.4; and/or

(d)    Pursue any other right or remedy available at law or equity or under this Lease.

3.8    Outparcels. For the purposes of this Lease, an "Outparcel" shall mean the cross-hatched area, as depicted on the Site Plan. Tenant shall have the right to approve, such approval not to be unreasonably withheld, conditioned or delayed, building placement and height of any improvements built on any Outparcel. Any Outparcel improvements must meet the following criteria:  height of any structure, including any screening, parapet, mechanical equipment or similar appurtenance erected on any Outparcel shall be no more than twenty percent (20%) of the building linear frontage and may extend up to a maximum of twenty-four (24) feet, measured perpendicular to the finished floor elevation of Tenant's Demised Premises, in order to accommodate the Outparcel tenant's particular design requirements.  Additionally, (i) the Outparcel under construction shall be screened from the remainder of the Center with a fence at least six (6) feet in height, (ii) any equipment or construction materials used in connection with construction on any Outparcel shall be placed only upon such Outparcel under construction, and not on any other portion of the Center and (iii) no owner or occupant of any Outparcel (including any customer or invitee of such owner or occupant) shall be entitled to park on any part of the Center other than within its own Outparcel.  Further no construction work on any Outparcel shall take place during the period of November 15 through and including January 15 of any given year during the Term unless (a) all equipment and construction materials used in the construction of the Outparcel are kept inside of the screened fencing at all times and (b) those areas specified as the critical access drives on Exhibit "A" are not used at any point during or in connection with such construction.

3.9    Audit. Within fifteen (15) days following the Center Completion Date, Landlord shall submit to Tenant an itemized statement of the actual cost per square foot to construct the Demised Premises in accordance with the provisions of this Paragraph 3 (the "Construction Costs"), together with copies of paid invoices.  Tenant shall have the

10

right to audit, at its own expense, any such costs and expenses within six (6) months following submission of such statements.

3.10   Payment of Excess Construction Costs.  If the actual Construction Costs (as reflected in the itemized statement described in Paragraph 3.9 of this Lease) that has been approved by Tenant) exceed Eighty-Five and 00/100 DOLLARS ($85.00) per square foot of the Demised Premises, then Tenant shall be responsible for paying such excess to Landlord, which sum shall be payable by Tenant to Landlord within ~~thirty~~sixty (~~30~~60) days ~~from when the excess cost is incurred, but in no event, no~~after the later ~~than thirty~~of (~~30~~i) ~~days from the date such expense accrued~~the Commencement Date, (ii) the date that Tenant shall have been provided with a certificate of occupancy for the Demised Premises or (iii) the date that the Center has been completed as provided in Paragraph 3.2.3 of this Lease.

4.   **RENT.**

4.1   Annual Rental.  Beginning on the Commencement Date of the Initial Term, Tenant shall pay to Landlord rental for the Demised Premises equal to Fourteen and 80/100 DOLLARS ($14.80) per square foot per annum (the "Annual Rent") based upon the actual square footage of the Demised Premises (which square footage shall be determined conclusively on or before the Commencement Date and shall mean the square footage of the building on the Demised Premises measured from the middle of common walls and the exterior of outside walls, and excluding any mezzanine areas) payable monthly in advance in equal installments of one-twelfth (1/12) of the yearly rental on or before the first day of each calendar month without demand or set-off, except as expressly provided in this Lease.  If at any time Annual Rent should become due for a part of a month, such Annual Rent shall be prorated and paid on that date.  It is anticipated that the monthly rental shall be [____ Dollars ($____)] based on 49,195 square feet.  Notwithstanding the foregoing, if the actual Construction Costs are less than Eighty-Five and 00/100 DOLLARS ($85.00) per square foot, then the Annual Rent throughout the Term shall be decreased by nine percent (9%) of the difference between (i) $85.00 per square foot and (ii) the actual Construction Costs per square foot.

4.2   Renewal Rental.  During each duly exercised Option Period, the Annual Rent shall be according to the following schedule:

| Option Periods | Amount Per Square Foot | Annual Rent |
| --- | --- | --- |
| First | (~~$17.00~~)16.28 | ~~$836,315.00~~ 800,894.60 |
| Second | (~~$18.70~~)17.03 | $~~919,946.50~~837,7 90.85 |
| Third | (~~$20.57~~)17.78 | $~~1,011,941.15~~874, 687.10 |

11

| | | |
|---|---|---|
| Fourth | (~~$22.63~~)18.53 | ~~$1,113,282.85~~ 911,583.35 |
| Fifth | (~~$24.89~~)19.28 | ~~$1,224,463.55~~948,479.60 |
| Sixth | (~~$27.38~~)20.03 | ~~$1,346,959.10~~985,375.85 |

5.    **COMMON AREA**.

5.1    Definition. The entire tract of land on which Landlord will construct the Center and the Demised Premises is shown on Exhibit "A" attached hereto.  Such Exhibit "A" designates the location and size of all buildings that will be constructed, now or later, store sizes, parking area, which shall be sufficient for not less than four and one half (4.5) cars for every 1,000 square feet of leased premises, customer parcel pickup facilities, and Tenant's delivery and service areas.  All that portion of the Center not covered by buildings or future buildings is hereinafter referred to as "Common Area" including, but not limited to, all parking areas, sidewalks, exterior stairways and ramps, entrances, exits, landscaped areas, exterior lighting facilities, drainage facilities and signs, and shall be for the joint use of all tenants, customers, invitees, and employees.  No part of the Common Area may be improved with additional buildings, kiosks, tents, or expansion of present buildings, nor may the parking lot layout, including parking spaces, aisles, driveways, and walkways, be altered or removed without the prior written consent of Tenant which shall not be unreasonably withheld.  Tenant shall have uninterrupted access to its loading area and enclosed docks at all times.

5.2    Landlord's Common Area Obligations.  Landlord agrees to operate and maintain in good condition and repair, including replacement, if necessary, all of the Common Area, as defined in Paragraph 5.1 hereof, and provide therefor all such services as are reasonably required including, but not limited to, cleaning and sweeping, lighting (including without limitation repair and replacement required to maintain the levels of foot-candles shown on Exhibit "A"), snow and ice removal if necessary, general repair and maintenance of all paved surfaces, repainting, striping, resurfacing, and resealing of the parking area, planting, seeding, watering, and maintenance of landscaped areas, sign maintenance and lighting and providing security.  Landlord shall, as needed, use its best reasonable efforts to prevent loitering in the Common Area, to prevent commuter parking in the Common Area, to prevent the use of the Common Area by through traffic to and from adjoining streets and as a "turnaround area", and to provide security service if necessary.  In addition, at no cost to Tenant (i.e., not to be considered a common area maintenance expense reimbursable by Tenant), Landlord shall prevent the parking of tractor trailers owned or operated by others on the Center and the Outparcels, other than those directly servicing Tenant or any other tenant of the Center or the Outparcels.  In order to protect Tenant's investment in the Demised Premises, Tenant shall have the self-help rights described in Paragraph 5.8 with respect to all Common Areas.

12

5.3     Common Area Maintenance Charges.  For such services described in Paragraph 5.2, subject to Paragraph 7.7.1 hereof and the caps set forth below, which caps shall exclude insurance premiums which are reimbursed as set forth in Paragraph 13 and real estate taxes which are reimbursed as set forth in Paragraph 14, Tenant shall pay to Landlord in advance, during the Term as additional rental hereunder and as reimbursement for the annual cost of operating the Common Area (the "CAM Charges") (CAM Charges and Annual Rent shall collectively be referred to herein as "Rent"), the amount of Tenant's pro rata share of such charges, computed in the proportion which the square footage of Tenant's Demised Premises (excluding mezzanine areas) bears to the total gross leasable square footage of all buildings (but excluding the mezzanine areas in Tenant's Demised Premises) existing in the Center from time to time, but excluding any Outparcels ("Tenant's Pro Rata Share").  Tenant shall pay CAM Charges along with each installment of monthly rental in equal monthly installments of one-twelfth (1/12) of the yearly amount as provided and/or estimated in Paragraph 5.4 below.

5.4     CAM Estimate.  ~~Notwithstanding anything contained herein to the contrary, for~~For the first ~~"two (2) Lease Year" (as defined below)~~Years of the Initial Term, and subject to the terms of this Section 5.4, Tenant's annual contribution for CAM Charges shall be ~~fixed at~~ a sum equal to the ~~rate~~product of $1.50~~-~~ multiplied by the square footage of the Demised Premises, ~~which shall be paid monthly commencing on the Commencement Date. Beginning in the second~~payable in equal monthly installments with the payment of Annual Rent hereunder.  Notwithstanding anything in this Lease to the contrary, in the event that Tenant's Pro Rata Share of CAM Charges for either of the first two (2) Lease Years is more than $1.50 per square foot of the Demised Premises, Tenant shall reimburse Landlord for such increased share of expenses within thirty (30) days after Tenant's receipt of written notification of the increase from Landlord (which notice shall include supporting documentation therefor).  If Tenant's Pro Rata Share of CAM Charges for either of the first two (2) Lease Years is less than $1.50 per square foot of the Demised Premises, Landlord shall credit the amount over paid to Rent thereafter coming due hereunder.  Beginning in the third (3rd) Lease Year ~~of the Initial Term~~, and continuing through the remainder of the Term (including during any Option Periods, as applicable), Tenant's Pro Rata Share CAM Charges shall be based on ~~Tenant's Pro Rata Share~~Landlord's actual expenses for the preceding Lease Year divided by twelve (12), such payments to be made on a monthly basis in the same fashion as described above.  Notwithstanding anything in this Lease to the contrary, in no event shall the actual or estimated Tenant's Pro Rata Share of CAM Charges for the third (3rd) Lease Year ~~of the Initial Term and every~~or any Lease Year thereafter (including during Option Periods, as applicable) ~~shall be subject to a~~exceed the amount that is three percent (3%) ~~cumulative cap based on~~greater than the actual amount of Tenant's Pro Rata Share of the CAM Charges due and payable by Tenant in the immediately preceding ~~year~~Lease Year hereunder~~, specifically excluding,~~.  Specifically excluded from this cap are all costs related to snow and ice removal ~~from the cap~~and major repairs to and re-sealing and re-striping of the parking lot.  For purposes of this Lease, "Lease Year" means a period of twelve (12) consecutive calendar months commencing on the ~~first day of January.~~ Commencement Date. Any portion of the ~~term~~Term which is less than a full Lease Year

13

shall be deemed a "Partial Lease Year" and computations requiring proration shall be made on a per diem basis using a 365-day year. References to a Lease Year shall be deemed to include a Partial Lease Year where necessary to apply the terms of this Lease to a portion of the term which is less than a Lease Year.

5.5     CAM Charges.  CAM Charges must be reasonably connected with the necessary maintenance and repairs of the Common Area.  The following items will be excluded from CAM Charges: large areas of structural sub-base replacement and replacement of the parking lot, sidewalks and curb and gutter; cave-in repairs; shopping center management fees; and administrative cost.  Equipment, repairs or replacements of a capital nature (whether or not capitalized) shall not be included in the CAM Charges.

5.6     Reimbursement of Actual CAM Charges.  Promptly at the end of each calendar year, and in no event more than ninety (90) days after the end of such year, Landlord shall submit to Tenant an itemized statement of all such CAM Charges, together with copies of paid invoices.  In the event Landlord fails to submit such itemized statement of CAM Charges Tenant may withhold subsequent payments of future CAM Charges until it receives the aforementioned statement.  Subject to Paragraph 7.7.1 hereof, Tenant shall reimburse Landlord, within thirty (30) days, for any underpayment made in the preceding year as revealed by the statement of actual expenses; conversely, Landlord shall promptly reimburse Tenant for any overage paid by Tenant and, failing such reimbursement by Landlord within thirty (30) days, Tenant may deduct such amount from Annual Rent then due or thereafter to become due and other payments required of Tenant under this Lease. Tenant shall not reimburse Landlord for any expense unless such expense is reasonably connected with the necessary maintenance or repair (excluding large areas of structural sub-base replacement and replacement of the parking lot, sidewalks, or curb and gutter) of the Center's Common Areas.  Tenant shall have the right to audit, at its own expense, any such cost and expenses for a period of up to two (2) calendar years following submission of such statements.

5.7     Comparison of CAM Charges.  Tenant shall have the right to compare Landlord's CAM Charges with CAM Charges at similar shopping centers of like size, tenant mix, construction, landscaping, amenities and age within a reasonable geographic distance from the Center that are maintained in first class condition ("Comparable Projects"). Upon such comparison, if Tenant determines that overall CAM Charges for the Center are materially higher than comparable expenses for the Comparable Projects, Tenant shall deliver notice to Landlord of the compared CAM Charges and the excess amount Tenant believes it paid Landlord for such service (although nothing in this Paragraph 5.7 shall require Landlord to reimburse Tenant for any such excess amount).  Landlord agrees to work in good faith with Tenant (i) to determine potential cost savings in CAM Charges and (ii) to explore changing vendors or contracts based on the results of the review of comparable centers in an attempt to reduce CAM Charges.

5.8     Tenant's Self-Help.  Tenant shall have the following rights with respect to the Common Area:

14

(i)     If Landlord, after thirty (30) days of receipt of written notice to do so (unless in Tenant's sole judgment failure of Landlord to perform immediately would materially, adversely affect Tenant's business, in which case no written notice to Landlord shall be required), shall fail to make or commence to make and diligently pursue the repairs or perform the services to the Common Area as required herein of Landlord, Tenant shall have the right to make such repairs or cause such services to be performed on Landlord's behalf; and if Landlord does not reimburse Tenant for the actual, verifiable cost of such repairs within thirty (30) days after presentation of an invoice to Landlord, Tenant shall deduct from Annual Rent due or thereafter to become due such reasonable sums as may be necessary to reimburse Tenant for the actual, verifiable costs expended or incurred, including interest at the Default Rate (as defined herein), by Tenant in curing such Landlord default.

(ii)    Notwithstanding the foregoing, Tenant is not entitled to self-help if Landlord has commenced such repair and is diligently pursuing the same. Furthermore, Landlord and Tenant hereby agree that Tenant may, in the event of a snow or ice storm creating an emergency situation that Landlord has not responded to, contract for snow and ice removal in the Common Area for the emergency on behalf of Landlord without prior notice (but Landlord shall be given notice as soon as reasonably possible thereafter), and Tenant shall have the same right to deduct from Annual Rent due or thereafter to become due such reasonable sums as may be necessary to reimburse Tenant for the actual, verifiable costs expended or expense incurred, including interest at the Default Rate, by Tenant in doing so. If Tenant contracts for snow and ice removal, Tenant shall be responsible and liable for any property damage caused by Tenant's snow and ice removal contractor.

5.9     Sidewalk Merchandise. Tenant shall have the following rights with respect to that portion of the Common Area that is immediately adjacent to Tenant's main entrance:

(a)     Tenant shall have the right to install, or have a vendor install drink dispensing machines on the sidewalk in front of the Demised Premises. Said drink machines shall be located near the front door in a place so as not to disrupt the normal flow of pedestrian traffic. Tenant shall be responsible for the maintenance and security of the drink machines. Tenant shall ensure that said drink machines are in good working order and are timely serviced and maintained by Tenant or Tenant's agent;

(b)     It is further understood that Tenant shall have the right to display and sell merchandise on the sidewalk in front of the Demised Premises. Tenant shall also be permitted to erect such display racks as to adequately display such merchandise. Said displays shall be located in such a place so as not to disrupt the normal flow of pedestrian traffic along and across the sidewalk immediately in front of the Demised Premises and any other storerooms within the Center.

15

Tenant agrees to keep the said sidewalk clean and neat and to maintain the displays in a neat, orderly manner so long as it uses the sidewalk for the above mentioned purposes. Tenant shall promptly remove any trash or debris associated with Tenant's displays; and

(c)     Notwithstanding anything herein to the contrary, Tenant shall not be responsible for maintenance of any portion of the Center other than the Demised Premises, provided, however, Tenant shall be responsible for promptly retrieving any Tenant shopping carts and grocery bags which are found in the Common Areas. Tenant shall store Tenant's shopping carts in the area identified on Exhibit "A".

6.     **USE OF DEMISED PREMISES BY TENANT**.  Tenant may use the Demised Premises in any lawful manner; provided, however, the Demised Premises may not be used for any of the uses prohibited under Paragraph 7.4.1 of this Lease. Landlord and Tenant agree that nothing herein shall be construed to mean or imply that Tenant is required to conduct its business in any particular manner, or for any specified number of hours per day or week, or to limit the number of hours per day or week that Tenant may operate in the Demised Premises, or to require Tenant to operate any business of any kind in the Demised Premises. Notwithstanding the foregoing, Tenant will initially open as a supermarket and operate as same for one (1) day. It is understood and agreed that Tenant shall have the right to provide ATM and other banking services within the Demised Premises. Tenant's rights to provide an ATM and other banking services shall be non-exclusive, and Landlord shall have the right to rent space in the Center to other tenants providing such ATM and banking or other financial services.

7.     **LANDLORD'S REPRESENTATIONS, WARRANTIES AND COVENANTS.**  As to all other covenants and agreements by Landlord found in this Lease, Landlord hereby specifically covenants and represents as follows:

7.1     Zoning.  The Demised Premises is zoned for the type of supermarket business operation contemplated by Tenant and such zoning is appropriate for the Center.

7.2     Flooding.  The Real Property is not susceptible to flooding and does not lie within a flood plain.

7.3     Title Matters.  Prior to the Commencement Date of this Lease, Landlord, at its expense, shall deliver to Tenant an ALTA commitment for Leasehold Title Insurance ("Commitment"), in a form and amount acceptable to Tenant covering the Real Property, which binds the title insurance company to issue on or before the Commencement Date a (non-ground lease) leasehold title insurance policy to Tenant based on such Commitment showing that Landlord has good and marketable indefeasible fee simple title to the Demised Premises, free and clear of any and all encumbrances, liens, or exceptions, except mortgages, that would materially affect the ability of Tenant to use the Demised Premises for the purposes allowed under this Lease. The amount of the policy will be equal to the first year's Annual Rent under the Lease. The final policy shall be delivered to Tenant on or before the Commencement Date.

16

7.4   Use Restrictions on the Center.  The Real Property shall be used for the sole purpose of promoting and operating a shopping center, and there shall be no buildings erected on the Real Property except those shown on Exhibit "A" attached hereto.

7.4.1   Use Prohibition.  Landlord, as to the Center and the Outparcels, and Tenant, as to the Demised Premises, shall not lease or use space in the Center or the Demised Premises, as the case may be, for the following uses, without ~~Tenant's~~sthe prior written consent~~, which consent shall not be unreasonably withheld, conditioned or delayed~~ of the other party: (a) professional offices comprising more than ten percent (10%) of the Center, (b) a movie theater, (c) a cocktail lounge, tavern or bar; provided, however, a bar in conjunction with a restaurant is allowed, (d) a health club or spa with leased space of more than five thousand (5,000) square feet (except with Tenant's prior written consent, which may be withheld in Tenant's sole discretion), (e) a night club or discotheque, (f) any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction), (g) any dumping, disposing, incineration, or reduction of garbage (exclusive of dumpsters located in the rear or side designated locations of any building), (h) an auction house operation or flea market, (i) any automobile, truck, trailer, or R.V. sales, leasing, display, or repair; provided, however, an auto parts sales location is allowed, (j) any skating rink, bowling alley, bingo parlor, or other place whose primary business is recreation or amusement, (k) any living quarters, sleeping apartments, hotels, motels or lodging rooms, (l) any animal raising facilities or pet shop (except that this prohibition shall not prohibit pet shops which are not adjacent to the Demised Premises), (m) a mortuary or funeral parlor, (n) any establishment renting, selling, or exhibiting pornographic materials, (o) school or training facilities; provided, however, children's play centers and day care centers and tutoring and learning centers such as Kumon, Sylvan Learning Center, Mathnasium and similar concepts are allowed, (p) a manufacturing or warehouse facility, (q) a convenience store, (r) a nursing home, (s) any sit-down restaurant within  seventy-five (75) feet of the exterior of any outside wall of the Demised Premises and containing 1,500 square feet or more or (t) any church.

7.4.2   Tenant Exclusive.  Landlord covenants and agrees not to lease, rent, occupy, or suffer or permit to be occupied, any part of the Center or the Outparcels (other than the Demised Premises) for the purpose of conducting therein or for use as a food store or a food department, or for the sale for off-premises consumption of groceries, dairy products, wine or bakery products, or any of the foregoing ("Grocery Items"); provided, however, that nothing contained herein shall prevent any tenant in the Center or occupant of the Outparcels from selling Grocery Items as an incidental part of its principal business so long as (a) the total number of square feet devoted by such tenant to the display for sale of Grocery Items does not exceed five percent (5%) of the total number of square feet of building area leased by such tenant in the Center or

17

occupant of the Outparcels, or 500 square feet (including, in either such case, one-half (1/2) of the aisle space adjacent to any display area), whichever is smaller; or (b) the tenant is primarily a restaurant selling freshly prepared food for contemporaneous consumption on or off the tenant's premises, including, but not limited to, such stores as a pizza store, ice cream store, "Subway" type sandwich store, and a "Dunkin Donuts" type donut store. Notwithstanding the foregoing, fresh meat and produce shall not be considered Grocery Items and their sale by any tenant in the Center or occupant of any Outparcel (other than Tenant or any subtenant or assignee of Tenant) shall be strictly prohibited. This covenant shall cease to be in force and effect if (i) Tenant is in default beyond any applicable notice and cure period, (ii) Tenant, or a subtenant or assignee of Tenant, fails to conduct a business in the Demised Premises for the sale of groceries, produce, dairy products, meats, bakery products, or any of them, for off-premises consumption for a period of one hundred eighty (180) days or longer, except when such failure is caused by renovations, strikes, labor disputes, casualty, or conditions beyond the control of Tenant or its subtenant or assignee. Landlord agrees not to engage in destructive competition.

7.4.3    Landlord's Other Property.  If property contiguous to the Center or within one (1) mile from the Demised Premises is developed by Landlord, directly or indirectly, for commercial purposes, the provisions of Paragraphs 7.4.1 and 7.4.2 shall apply to said contiguous property or controlled area property.  In addition, Landlord, any entity which controls, is controlled by or under common control with Landlord, any entity which acquires all or substantially all of Landlord's assets, or Landlord's affiliates, successors or assigns, shall not (directly or indirectly) develop a supermarket on any property within a radius of three (3) miles from any portion of the Demised Premises.

7.4.4    Landlord's Default.  The covenants set forth in this Paragraph 7.4 shall run with the land for the duration of the Term including any extension or renewal thereof.  Landlord acknowledges that, in the event of any breach hereof that would constitute a default under this Lease, Tenant's remedies at law would be inadequate and therefore, in such event, Tenant shall be entitled, with the notice described below, to terminate this Lease, relief by injunction, abatement of monthly Rent by fifty percent (50%) until such default hereunder is cured, or any other remedies available to Tenant at law or in equity, which remedies shall be cumulative rather than exclusive.  Tenant shall notify Landlord in writing of any violation pursuant to this Paragraph, and shall allow thirty (30) days after the date of such notice for rectification of such violation prior to exercising its remedies provided in this Paragraph.

7.5    Site Plan.  The Site Plan attached hereto as Exhibit "A" is an accurate representation of the Center, the Demised Premises and the Off-Site Improvements and no material changes shall be made to such Site Plan without the prior written consent of Tenant.   Landlord will use all best efforts to prevent any change to the Off-Site Improvements as shown on Exhibit "A" which in any way adversely affects any ingress

18

or egress to the Center; provided, however that Landlord shall not be in default of this Lease in the event that changes are made to the Off-Site Improvements after the Commencement Date which are beyond the control of Landlord, except as specified in Paragraphs 12 and 17 of this Lease.

7.6     Utilities. Landlord, at its own cost, shall furnish, install and maintain (to the extent such maintenance is not the responsibility of the utility or governmental entity providing the utility service) the following utility service connections to the Demised Premises in accordance with the Plans, each of which is to be separately metered unless otherwise indicated: water, sanitary sewer (may not be subject to separate metering), telephone, and electricity.  Without limiting Landlord's obligations under the foregoing sentence, if at any time Tenant shall be unable to conduct its business upon the Demised Premises because the Demised Premises shall, without fault on the part of Tenant, be without electricity, water or sewer service or any necessary public utility, or because the Center or the Demised Premises shall be without an adequate stormwater drainage system, and if such conditions shall continue for ten (10) consecutive days or more, all rent and other charges to be paid by Tenant under this Lease shall abate until water service, sewer service or the necessary public utility or stormwater drainage, as the case may be, is restored to the Demised Premises and the Center.  In addition to the foregoing, if at any time Tenant shall be unable to conduct its business upon the Demised Premises because the Demised Premises or the Center shall, without fault on the part of Tenant, be without water or sewer service or any necessary public utility or stormwater drainage service, Tenant shall have the right to avail itself of the remedies set forth in Paragraphs 9.4 and 23.4.  Tenant, at its sole cost, shall be responsible for providing, in accordance with the Plans, all other utility services needed including without limitation, cable TV or other telecommunications services.  Landlord shall allow Tenant to access such utility services (that Tenant is responsible for providing) through the Center at locations to be reasonably determined by Landlord.  Tenant may maintain microwave towers, provided such towers are allowable under applicable governmental laws and are screened and located in a manner to be reasonably approved by Landlord.  Tenant shall be responsible for paying the cost of all utility services used by Tenant at the Demised Premises commencing on the Store Fixturing Date.  In addition, Tenant shall be responsible for arranging for and paying the costs of its own trash and waste removal (including with respect to meeting any recycling requirements).

7.7     Survey. Landlord agrees, at its expense, prior to the execution of this Lease, to furnish Tenant a survey satisfactory to Tenant, showing a metes and bounds legal description of the Real Property, and the location of any rights of way, easements, encroachments, or flood plains, if any.

    7.7.1   As-Built Drawings. Within ninety (90) days after the date of completion of the improvements of the Center or when furnished to Landlord's lender, whichever is earlier, Landlord shall furnish Tenant an as-built drawings showing the exact location of all buildings, including the actual square footage of each building, malls, if any, driveways, easements, strip parking, rights-of-way, underground utility lines, and storm water drainage systems or flood plains, if any.

19

If the as-built drawings shows the Center contains more or less square footage and the CAM Charges were miscalculated as a result thereof, Tenant Pro Rata Share calculation shall be adjusted and Tenant shall reimburse Landlord for any underpayment of CAM Charges or Landlord shall reimburse Tenant for any such overpayment, as the case may be, within thirty (30) of Tenant's receipt of such as-built drawings.

7.8   Hazardous Substances, Disposal and Storage of Hazardous Waste.   Landlord represents and warrants that to the best of its knowledge no hazardous, toxic or dangerous waste substance including, but not limited to, petroleum derivative substances or material defined as such in (or for purposes of) any state, federal, or local environmental laws, regulations, decrees, or ordinances in the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, or in any so called state or local "Super Fund," "Super Lien," or "Cleanup Lien" law or any other federal or state regulation, order, or decree relating to or imposing liability or standards of conduct concerning any such substances or material or any amendments or successor statutes thereto, has been discharged, disbursed, released, stored, treated, generated, disposed of, or allowed to escape on, under, or from the Center or the Demised Premises.   Landlord further represents and warrants that to the best of its knowledge no asbestos, asbestos containing materials, or any polychlorinated biphenyls have been installed, used, incorporated into, or disposed of on or under the Center or the Demised Premises.   Moreover, Landlord agrees that no such asbestos, asbestos containing materials, or polychlorinated biphenyls will be installed in the Demised Premises.

7.8.1   Underground Storage Tanks.   If the Center contains any underground storage tanks that do not meet applicable governmental requirements, Landlord agrees that it shall bring any such tanks into compliance with such requirements or remove all underground storage tanks prior to the Store Fixturing Date and such removal shall be in accordance with all applicable laws and regulations.   Tenant shall be provided with copies of such documentation, if any, indicating the removal of any such tanks in compliance with the applicable laws and regulations as may be available.

7.8.2   Survival; Indemnification.   Landlord agrees that the representations and warranties in this Paragraph 7.8 shall survive any termination of this Lease to the extent that Tenant has, following the termination of this Lease, some liability to others due to Landlord's breach of such representations and warranties during the term of this Lease.   Landlord agrees to indemnify and hold harmless Tenant from any and all costs, expenses, claims, and damages arising out of a breach of the foregoing representations and warranties, except to the extent that such breach was due to the actions of Tenant or its agents and invitees.   Landlord's indemnity obligations under this Paragraph 7.8.2 shall survive termination and/or expiration of this Lease.   In the event of a breach of the representations and warranties of Landlord contained in this Paragraph 7.8 and such breach has created a condition constituting a constructive ejectment of Tenant, then Tenant shall have the right to terminate this Lease upon thirty (30) days' prior written notice to Landlord.   Any

20

dispute regarding whether a condition is a constructive ejectment will be determined by arbitration pursuant to the rules of the American Arbitration Association with the venue to be in Charlotte, North Carolina. Landlord will be responsible to Tenant for any prepaid Rent for the period between the date of the notice of constructive ejectment and the decision of the arbitrator, which decision will be binding and non-appealable.

7.8.3   Landlord's Environmental Covenant.  Landlord will not, and will not allow any other tenant in the Center to, unlawfully generate, store, handle, or otherwise deal with any hazardous or toxic waste or material, radioactive material, or other contaminants, the removal of which is required or the maintenance of which is prohibited, regulated, or penalized by any federal, state, or local agency, authority, or governmental unit.  Landlord will indemnify, defend, and hold Tenant harmless from any loss arising from Landlord's, or any other tenant in the Center's use, storage, generation, or handling of same.  In the event any environmental contamination is discovered on the Real Property, Landlord shall promptly notify Tenant of the same along with any potential remediation efforts necessary.  In the event such contamination or remediation materially adversely affects Tenant's business, in Tenant's reasonable judgment, Tenant shall have the ability to terminate this Lease, effective thirty (30) days after written notice to Landlord of such termination.

7.8.4   Knowledge.  With respect to both Landlord and Tenant, whenever any representation or warranty of an individual is expressly qualified by reference to knowledge, the "knowledge" so referred to shall be deemed to be such individual's actual knowledge after reasonable inquiry under the circumstances. Whenever any representation and warranty of a corporation, partnership or limited liability company is expressly qualified by reference to knowledge, the "knowledge" so referred to shall be deemed to be the actual knowledge, after reasonable inquiry under the circumstances, of its officers, directors, and employees, in the case of a corporation, its partners in the case of a partnership and its managers and employees in the case of a limited liability company, including those officers, directors, and employees having authority over or responsibility for the subject matter of such representation or warranty, at the time such representation or warranty is made.

7.9   Landlord's Tax Identification Number.  Landlord's federal tax identification number is: [_____].

7.10   Conflict.  Landlord represents and warrants that the execution of this Lease, compliance with the terms hereof, and occupation of the Demised Premises by Tenant will not conflict with, constitute, or cause a breach or default under the terms of any agreement or instrument to which Landlord is a party, including a lease for space in the Center or instrument affecting the Center.  The signatories to this Lease are authorized to sign this Lease on behalf of Landlord.  A breach of this Paragraph by Landlord shall entitle Tenant to all available equitable relief as well as any and all remedies at law, and

21

Landlord shall indemnify Tenant from and against all damages, expenses, and costs arising out of or resulting from a breach of this Paragraph. Landlord's indemnity obligations under this Paragraph 7.10 shall survive termination of this Lease.

7.11    Nuisance. Landlord warrants and represents that the Demised Premises, the Outparcels, and the Center are and will be, by the Store Fixturing Date and throughout the Term of the Lease, free from obnoxious fumes, odors, and unsanitary conditions (other than as may be incidental to the completion of construction of the Center in accordance with commercially reasonable standards for same). Landlord shall not permit the emanation of any undue noise, obnoxious fumes, odors, or any other nuisance from any property owned by Landlord contiguous to the Center which exceeds the levels normally found at shopping centers such as the Center, applying commercially reasonable standards.

8.    **TENANT'S REPRESENTATIONS AND WARRANTIES.** Tenant hereby represents and warrants to Landlord that all of the following are true, correct, and complete as of the date hereof and shall be true, correct, and complete on the Commencement Date and throughout the Term:

8.1    Authority. Tenant has full right, power, and authority to enter into this Lease and to perform the obligations of Tenant hereunder. This Lease and the performance of Tenant's obligations hereunder do not contravene any contract, agreement, law, covenant, judgment, order, or decree of any court or arbiter binding upon Tenant. The signatories to this Lease are authorized to sign this Lease on behalf of Tenant.

8.2    Tax Identification Number. Tenant's federal tax identification number is: 56-0862207.

8.3    Tenant's Environmental Covenant. Tenant will not unlawfully generate, store, handle or otherwise deal with any hazardous or toxic waste or material, radioactive material, or other contaminants, the removal of which is required or the maintenance of which is prohibited, regulated, or penalized by any federal, state, or local agency, authority, or governmental unit, and Tenant will indemnify, defend, and hold Landlord and Landlord's lenders harmless from any loss arising from Tenant's use, storage, generation, or handling of same. Tenant's indemnity obligations under this Paragraph 8.3 shall survive termination and/or expiration of this Lease.

9.    **MAINTENANCE AND REPAIRS.**

9.1    Landlord's Repairs. Landlord shall, at its cost and expense, maintain and repair the exterior portions and structural elements of the Demised Premises including, without limitation, the roof (including any interior damage resulting from leaks), roof structures, and supports; foundation and structural supports; walls and floors; gutters, downspouts, and canopy; and utility lines servicing the Demised Premises, unless caused by Tenant's willful acts or gross negligence. Landlord shall make any repair or replacement to the Demised Premises and its appurtenances resulting from defective materials and/or

22

workmanship. Landlord agrees to repair any portion of the interior of the Demised Premises damaged as a result of its refusal or neglect to maintain and/or repair the exterior and structural elements of the Demised Premises after Tenant's written notice to Landlord regarding its need to do so.

9.2     Tenant's Repairs. Except for Landlord's obligations set forth in Paragraph 9.1 above, Tenant shall maintain and repair the interior of the Demised Premises including, without limitation, the ceiling, walls, floor covering, plate glass, windows, doors, interior plumbing lines and plumbing fixtures, light fixtures, interior wiring including electrical distribution system, and water heaters; excluding repairs and/or replacement which may be required as a result of damage by Landlord. Tenant shall also maintain and repair the automatic door operators and the heating, air-conditioning, and ventilating system, up to and including replacement. Landlord agrees to assign or cause its contractors to assign to Tenant all contractors' or subcontractors' guarantees or warranties which relate to any construction work Tenant shall have the obligations to maintain or repair.

9.3     Landlord's Right To Inspect. Landlord has both the right and responsibility to enter the Demised Premises periodically at any reasonable time to inspect the condition of said Demised Premises and to make repairs. It is Landlord's responsibility to inspect the roof of the Demised Premises and Landlord shall be responsible at all times for all defects and damage to such roof. All construction, repairs, restorations, alterations, additions, maintenance, cleaning, or payments which are obligations of Landlord shall be completed or made within a reasonable time.

9.4     Tenant's Right to Cure. Should Landlord neglect or refuse to perform or commence to perform and diligently pursue any such construction, repairs, restorations, alterations, additions, maintenance, cleaning, or payments required by this Paragraph 9, within thirty (30) days after written notice to Landlord (provided, however, only telephone notice is required in emergency situations when property loss or injury to persons is threatened) (unless in Tenant's sole judgment failure to perform immediately would materially, adversely affect Tenant's business, in which case no prior notice shall be required), Tenant, without liability or forfeiture of its term or terms herein, may make or perform such construction, repairs, restorations, alterations, additions, maintenance, cleaning, or payments therefor, and, if Landlord does not reimburse Tenant for the actual, verifiable cost of such items within thirty (30) days after presentation of an invoice, Tenant may deduct the cost thereof from the Rent or other monies due hereunder thereafter payable. Notwithstanding the foregoing, Tenant is not entitled to self-help if Landlord is diligently attempting to repair or restore such damaged condition. Any repairs or other work done by Landlord shall be performed so as to cause the least possible interference with Tenant's operation. Tenant's self-help rights under this Paragraph 9.4 are not exclusive, and Tenant may pursue any and all other legal remedies against Landlord for defaults under this or any other Paragraph of the Lease.

10.     **ADVERTISING SIGNS.**

23

10.1    Temporary Sign. Immediately after execution of this Lease, Landlord shall erect, at its sole cost and expense, a sign on the Real Property announcing the future opening of Tenant's store. Such sign shall be placed in a conspicuous place on the Real Property acceptable to Tenant and Landlord and shall be designed and constructed pursuant to Landlord's and Tenant's mutual specifications and satisfaction.

10.2    Permanent Signs. Subject to applicable laws, codes and ordinances Tenant may erect its standard signs, as shown on Exhibit "H" attached hereto and incorporated herein by this reference, on the exterior of its Demised Premises in a manner and at a location satisfactory to Tenant. In the event Tenant's standard sign does not meet applicable local sign ordinances, Landlord shall use reasonable efforts to obtain a variance from local officials for Tenant's standard sign, and Tenant shall reimburse Landlord for the actual, reasonable and verifiable third-party costs incurred by Landlord in doing so. Should Landlord allow any other tenants in the Center to erect signs in the parking area or other Common Areas, it shall also allow Tenant the same privilege. Tenant shall install its signs at its own expense and may remove them at the termination of this Lease. Any damage to the building as a result of the removal of Tenant's signs shall be repaired at the expense of Tenant. Landlord shall not erect, nor permit to be erected, any signs on the Demised Premises other than those of Tenant.

10.3    Shopping Center Sign. Subject to applicable laws, codes and ordinances, Landlord agrees to furnish at its sole cost and expense within the Center one or more signs advertising the entire Center, and said signs shall be kept in good order and repair and lighted during the evening hours of Tenant's operation, which cost will be included in the CAM Charge during the Initial Term and any renewal term of the Lease. Landlord may not place or permit to be placed on any such sign the names of other tenants in the Center unless Tenant's name is placed at the top of such sign and with lettering materially greater in size to that of any other tenant.

11.    **REMODELING THE DEMISED PREMISES.** Any interior non-structural remodeling or alterations to the Demised Premises which Tenant may deem necessary during the term hereof or of any renewals hereof shall be made at Tenant's expense, and Landlord hereby consents thereto. Major structural or exterior changes to the Demised Premises shall be made only with Landlord's written consent, which consent shall not be unreasonably withheld. Tenant shall be under no obligation to restore or remove any such change at the expiration of this Lease. Tenant agrees not to permit any liens to stand against the Demised Premises for work or materials furnished to it by its contractors or subcontractors. Tenant agrees to reimburse Landlord for all increases in real estate taxes and insurance premiums caused by such remodel, addition, or renovation.

12.    **ACCESS TO CENTER.** If any adjoining street, adjoining right of way or all or any part of the Common Area is materially obstructed or blocked for repairs, reconstruction, or otherwise by Landlord, subject to Force Majeure, for a period of fifteen (15) consecutive days or more, to the extent the operation of Tenant's business is materially adversely affected, a proportionate reduction of Rent shall be made. If customer access to the Demised Premises is totally blocked by Landlord, except during periods of Landlord repairs, for more than ten (10) business days

24

after written notice to Landlord, ~~other than by Force Majeure,~~ Rent shall totally abate beginning on the date of such blockage. Rent shall immediately resume following removal of such obstruction or blockage. If customer access to the Demised Premises is totally blocked (i) by Landlord's acts or omissions for more than ~~thirty~~ten (30_10_) days~~, except during periods of Landlord repairs~~; or (ii) by any other reason~~, other than by Force Majeure,~~ for more than one hundred twenty (120) days, Tenant shall have the option to cancel the Lease upon written notice to Landlord.

13.  **INSURANCE**.

13.1   Landlord's Special Form Insurance.  Landlord shall carry Special Form insurance with a financially responsible insurer authorized to do business in the State of South Carolina with a BEST'S rating of at least "A" on the Demised Premises, including any additions, alterations, and improvements made thereto by Landlord or Tenant, and all other buildings within the Center in the amount of one hundred percent (100%) of the full replacement value thereof, above foundation walls.  Landlord shall name Tenant as an additional insured, and, upon receipt of written notice from Tenant, Landlord shall provide Tenant with a certificate of such coverage from the insurer which shall require thirty (30) days' written notice to Tenant prior to change in or cancellation or termination of such coverage.  Said insurance shall include a clause waiving rights of subrogation against Tenant.

13.2   Common Area Liability Insurance.  In addition to its indemnification obligations under Paragraph 15, Landlord agrees to carry insurance insuring Landlord and Tenant against claims arising from the use by Landlord, Tenant and third parties of the Common Area.  The insurance required hereunder shall be in the form of a commercial general liability policy with limits of not less than Three Million Dollars ($3,000,000), combined single limit for bodily injury and property damage.  In addition, the insurance policy shall name Tenant as an additional insured and shall be issued by financially-responsible insurer authorized to do business in the State of South Carolina and holding a BEST's rating of at least "A".  The insurance policy shall include a clause waiving rights of subrogation against Tenant and requiring insurer to give Tenant thirty (30) days' prior written notice of the insurance being canceled, altered, or expiring.  Prior to Tenant's opening the Demised Premises for business, Landlord shall provide Tenant with a certificate of insurance evidencing the coverage and including the clauses provided herein.

13.3   Tenant's Casualty Insurance.  Tenant, at its own cost and expense, may carry on its fixtures, equipment, and merchandise in the Demised Premises fire insurance with additional coverage commonly known as Supplemental Contract or Extended Coverage, together with coverage for vandalism and malicious mischief, written by a financially responsible insurer authorized to do business in the State of South Carolina with a BEST's rating of at least "A".  Tenant shall provide Landlord with satisfactory evidence that its insurance policy contains an adequate waiver of subrogation clause in favor of Landlord.

25

13.4    Tenant's Liability Insurance. In addition to its indemnification obligations under Paragraph 15, Tenant agrees to carry insurance insuring Landlord and Tenant against claims arising from the use and occupancy of the Demised Premises. The insurance required hereunder shall be in the form of a commercial general liability policy with limits of not less than Three Million Dollars ($3,000,000), combined single limit for bodily injury and property damage. The insurance policy shall name Landlord and Landlord's lender as an additional insured and shall be issued by financially-responsible insurer authorized to do business in the State of South Carolina and holding a BEST's rating of at least "A". In addition, the insurance policy shall require insurer to give Landlord thirty (30) days' prior written notice of the insurance being canceled, altered, or expiring. A certificate reflecting the insurance coverage described herein and designating Landlord and its mortgagee as an additional insured and insured mortgagee thereunder shall be delivered to Landlord upon request. Any insurance required of Tenant under this Lease may be furnished by Tenant under a blanket policy carried by Tenant, so long as the blanket policy satisfies the requirements of this Paragraph 13.4.

13.5    Tenant Reimbursement of Landlord's Cost for Insurance. Beginning on the Commencement Date of the Initial Term, and during the ~~term of this Lease~~Term for each ~~full calendar year,~~ Lease Year (and proportionately for any ~~part of a calendar year~~Partial Lease Year), Tenant agrees to pay (a) Tenant's Pro Rata Share of Landlord's cost for Special Form insurance, as required herein for Landlord to purchase, and (b) Tenant's Pro Rata Share of Landlord's cost of the Common Area liability insurance. Such payment shall be paid by Tenant to Landlord within thirty (30) days after Landlord furnishes Tenant with a paid copy of the insurance premiums and the calculations therefor. Notwithstanding anything herein to the contrary, (i) Tenant shall not be liable for the cost of any vacancy loss insurance and (ii) Tenant's Pro Rata Share of Landlord's cost for Special Form insurance, plus Tenant's Pro Rata Share of Landlord's cost of the Common Area liability insurance shall not in any event in any given year exceed the product of $0.50 multiplied by the square footage of the Demised Premises.

13.6    Insurance Company. Landlord agrees that in the event Special Form insurance premiums under Paragraph 13.1 and/or public liability insurance premiums under Paragraph 13.2 are secured by Tenant from another insurance carrier with a BEST rating of at least "A" and reasonably acceptable to Landlord and its mortgagee, Tenant shall have the right to obtain bids from said carriers. In the event any one bid for comparable insurance is less than the bid for the insurance secured by Landlord, then Landlord shall be obligated to either (a) secure a comparable policy with the company having the lowest bid for the same amount of coverage, or (b) keep the insurance with the same carrier and refund to Tenant its Pro Rata Share of the difference between the premium charged by the insurance company having the lowest bid and the premium charged by Landlord's existing carrier for the same amount of coverage.

13.7    Release and Waiver of Subrogation. Notwithstanding anything to the contrary contained in this Lease, neither Landlord nor Tenant shall be liable to the other party or to any insurance company (by way of subrogation or otherwise) and both Landlord and Tenant hereby waive and release each other of and from any and all rights of recovery,

26

claim, action, or cause of action against each other, their agents, officers, directors, partners, and employees, for any loss or damage that may occur to the Demised Premises, Common Areas, improvements to the building and/or Center of which the Demised Premises is a part, or personal property including building contents within such building and/or Center by reason of fire or the elements of nature, regardless of cause or origin including negligence of Landlord or Tenant and their agents, officers, directors, partners, employees, and attorneys.  Because this Paragraph 13.7 will preclude the assignment of any claim mentioned in it by way of subrogation or otherwise to any insurance company or any other person, each party to this Lease, at its own expense,  agrees immediately to give to each insurance company which has issued to it policies of insurance covering all risk of direct physical loss written notice of the terms of mutual waivers contained in this Paragraph 13.7, and to have the insurance policies properly endorsed to prevent the invalidation of such insurance coverage by reason of these waivers.  Each party shall provide the other annually with evidence that its policies have been so endorsed.  The foregoing shall not, however, release the parties from their respective obligations as set forth in Paragraph 13.

14.    **REAL ESTATE TAXES.**  Landlord ~~shall take all necessary steps to establish the Demised Premises as a separate tax parcel for real estate taxes~~will pay in the first instance all general real estate taxes and assessments for betterments or improvements which may be levied or assessed by any lawful authority against the Center where the Demised Premises are situated.  Beginning on the Commencement Date of the Initial Term and during the term of this Lease for each full calendar year, and proportionately for any part of a calendar year, Tenant agrees to pay to Landlord Tenant's Pro Rata Share of any such real estate taxes and assessments levied or assessed against the Center.  The term "real estate taxes" shall mean all taxes on the Real Property or improvements within the Center for which failure to pay may result in a lien placed against the Real Property and fees paid to tax contest firms that Landlord may have employed on Tenant's behalf (provided such fees are based on a percentage of the tax savings achieved by such firm and not a fixed fee).  ~~Landlord shall request that all real estate tax bills, notices, statements and/or invoices be mailed directly to Tenant with a copy to Landlord.  If the same cannot be mailed directly to Tenant, Landlord shall forward all real estate tax bills, notices, statements and/or invoices to Tenant within fifteen (15) days of receipt.  Tenant shall timely pay all real estate taxes directly to the taxing authority and Tenant shall be responsible for any late fees, fines, assessments and/or penalties.  Tenant shall provide Landlord with evidence of payment of real estate taxes.  Tenant's failure to timely pay real estate taxes shall be a default under this Lease.  Tenant shall provide Landlord with written notice of Tenant's intent to pursue a tax protest and Landlord shall be permitted, at Landlord's election, to participate in such tax protests.  Notwithstanding the above, if Landlord's lender requires an escrow of real estate taxes, Tenant shall prepay an estimated Tenant's Pro Rata Share of real estate taxes, as calculated pursuant to Paragraph 5.3 above.  If Landlord is unable to establish the Demised Premises as a separate tax parcel for real estate tax purposes, then, beginning on the Commencement Date of the Initial Term and during the term of this Lease for each full calendar year, and proportionately for any part of a calendar year, Tenant agrees to pay to Landlord Tenant's Pro Rata Share of any such real estate taxes and assessments levied or assessed against the Center.  The estimated amount of Tenant's Pro Rata Share of real estate taxes for the first year of the Initial Term is~~

27

$~~~~~~~~~Notwithstanding anything herein to the contrary, Tenant's Pro Rata Share shall not include taxes on Outparcel areas or future undeveloped areas of the Center. Landlord will furnish Tenant with a statement for its Pro Rata Share of real estate taxes including photostatic copies of any tax bill paid by it and records reasonably necessary to calculate the obligation of Tenant. Tenant shall pay its Pro Rata Share of real estate taxes within thirty (30) days of its receipt of the required statement. Landlord shall notify Tenant in writing within thirty (30) days of receipt of any notice that real estate taxes are to be increased, and, in the event Tenant so elects, Landlord shall join with Tenant in proceedings to protest such increase. If Tenant requests Landlord to join in the proceedings, Tenant shall pay and be responsible for Landlord's reasonable expenses including attorneys' fees. In the event Landlord does not notify Tenant within thirty (30) days of its receipt of any tax increase notification, Tenant shall not be required to pay the tax increase for that year unless Landlord can provide evidence to Tenant's satisfaction that Landlord protested such increase in a timely fashion. For purposes of establishing Landlord's receipt of a tax increase notification, receipt shall be deemed to have been received ten (10) business days after such notice is~properly mailed by the tax authority. Landlord agrees to pay all taxes before delinquency and shall further obtain all savings, if any, offered for early payment. Tenant shall not be obligated to pay any portion of any penalty for delinquent payment, unless Tenant causes the delinquency. Any payment due hereunder shall be prorated as of the date Tenant opens the Demised Premises for business and/or the termination or expiration date of this Lease.

15. **INDEMNITY.** Subject to the waiver of subrogation provisions of Paragraphs 13.1 and 13.3, Landlord and Tenant shall provide the following indemnification:

15.1 <u>Tenant's Indemnity</u>. Tenant will indemnify Landlord, its officers, directors, members, shareholders, partners, lenders, agents, and employees against, and hold them harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments, and expenses (including without limitation reasonable attorneys' fees and court costs) arising in the Demised Premises, except for any claim which arises as a result of Landlord's gross negligence or willful misconduct, or that of its agents, contractors and/or assigns. If any action or proceeding is brought against Landlord, its officers, directors, members, shareholders, partners, lenders, employees, or agents, by reason of any such claim, Tenant, upon notice from Landlord, will defend the claim at Tenant's expense with counsel reasonably satisfactory to Landlord. This indemnification shall survive the expiration and/or termination of this Lease.

15.2 <u>Landlord's Indemnity</u>. Landlord will indemnify Tenant, its officers, directors, members, shareholders, partners, lenders, agents, and employees against, and hold them harmless from, any and all demands, claims, causes of action, fines, penalties, damages (including without limitation consequential damages), losses, liabilities, judgments, and expenses (including without limitation reasonable attorneys' fees and court costs) arising in the Center, except for any claim which arises as a result of Tenant's gross negligence or willful misconduct, or that of its agents, contractors and/or assigns. If any action or proceeding is brought against Tenant, its shareholders, partners, lenders, employees, or agents, by reason of any such claim, Landlord, upon notice from Tenant, will defend the

28

claim at Landlord's expense with counsel reasonably satisfactory to Tenant. This indemnification shall survive the expiration and/or termination of this Lease.

16.  **CASUALTY LOSS.**

16.1  <u>Minor Damage</u>. If the Demised Premises shall be damaged by any cause and Tenant shall be deprived of the occupancy or use of any portion of the Demised Premises due to such damage but can nevertheless continue to engage in its regular business, a proportionate reduction in Annual Rent shall be made to Tenant from the Annual Rent corresponding to the time during which and to the portion of the Demised Premises of which Tenant shall be deprived. In such event, Landlord shall proceed promptly at no expense to Tenant to repair the damage and restore the Demised Premises. In the event Landlord shall fail to ~~sustainably~~ complete such repairs or restorations within two hundred ten (210) days after the date of the occurrence of casualty, Tenant ~~shall have a one-time right~~may elect to terminate ~~this~~the Lease~~,~~ (provided ~~that~~ Tenant delivers <u>such</u> notice of ~~Tenant's election to terminate this Lease to Landlord within thirty (30) days following the expiration of the two hundred ten (210) day period above~~termination prior to Landlord's completion of all such repairs and restorations) and thereupon both parties shall stand released of and from all further liability under this Lease, except as expressly provided otherwise in this Lease. In the event Tenant does not terminate the Lease, ~~Tenant waives the right to terminate and~~ the Annual Rent shall continue at the reduced amount until such repairs or restorations are completed. ~~Notwithstanding the above, Landlord shall have the right to terminate this Lease upon thirty (30) days written notice to Tenant during the last year of the Term or if Landlord does not receive sufficient insurance proceeds to rebuild the Demised Premises.~~

16.2  <u>Major Damage</u>. If the Demised Premises shall be damaged by any cause to the extent that in Tenant's reasonable judgment the Demised Premises is rendered untenantable and it cannot engage in its regular business and does not do so, Annual Rent shall totally abate and Landlord shall pay to Tenant any prepaid Annual Rent corresponding to the time during which Tenant is deprived of engaging in its business. If Landlord has not commenced construction to restore the Demised Premises within one hundred ~~eighty~~fifty (~~180~~150) days after the date of the occurrence of the casualty, Tenant shall have the right to terminate this Lease; provided, however, if Landlord commences restoration of the Demised Premises within two (2) years of the date on which the Demised Premises was rendered untenantable, Landlord shall give notice of such fact to Tenant, and Tenant shall have the one-time right, exercisable within sixty (60) days after receipt of such notice, to elect whether or not to take a new lease on the Demised Premises under the same terms and conditions of this Lease, except:

(i)  If the casualty occurred during the last five (5) years of the Initial Term, the lease term for the new lease shall be ten (10) years and Annual Rent for the first five (5) years shall be at the same rate as Annual Rent ~~at the time the Major Damage occurred.~~immediately prior to the termination of this Lease as set forth above in this Section 16.2. Annual Rent for the remaining five (5) years <u>of the initial term</u> shall be the Annual Rent for the ~~First~~first Option Period, as provided

29

in Paragraph 4.2 above. Thereafter, Tenant shall be entitled to four (4) successive renewals thereof, each for a term of five (5) years. Annual Rent for the first of the four (4) successive renewals shall be the Annual Rent for the ~~Second Option Period, increasing with each successive renewal~~second Option Period payable hereunder, Annual Rent for the second renewal shall be the Annual Rent for the third Option Period payable hereunder, Annual Rent for the third renewal shall be the Annual Rent for the fourth Option Period payable hereunder, and Annual Rent for the fourth renewal shall be the Annual Rent for the fifth Option Period payable hereunder; or

(ii)    If the casualty occurred during the first or second exercised Option ~~Period~~Periods, the lease term for the new lease shall be ten (10) years and Annual Rent for the first five (5) years shall be the Annual Rent payable for the ~~First~~first Option Period hereunder. Annual Rent for the remaining five (5) years shall be the Annual Rent for the ~~Second~~second Option Period payable hereunder. Tenant shall be entitled to three (3) renewals thereof, each renewal being for a term of five (5) years. Annual Rent for the first of the remaining three (3) renewals shall be at the Annual Rent for the ~~Third Option Period, increasing with each successive renewal~~third Option Period payable hereunder, Annual Rent for the second renewal shall be at the Annual Rent for the fourth Option Period payable hereunder and Annual Rent for the third renewals shall be at the Annual Rent for the fifth Option Period payable hereunder.

17.    **CONDEMNATION**.

17.1    Entire Taking. In the event the entire Demised Premises is taken in condemnation proceedings, this Lease shall terminate, and neither party shall have any right in any compensation or damages payable to the other in connection with such condemnation.

17.2    Partial Taking. In the event any part of the Demised Premises is taken, Tenant may cancel this Lease. Tenant may also cancel this Lease if:

(a)    Twenty percent (20%) or more of the rentable space in the Center (excluding the Demised Premises) shall be taken; or

(b)    Ten percent (10%) or more of the Common Area parking shall be taken; or

(c)    Any of the Common Area adjoining the Demised Premises, or rights-of-way adjoining the Demised Premises, or points of ingress or egress in the Center shall be taken.

In the event Tenant elects to not cancel this Lease, Landlord shall restore the remainder of the Center forthwith. Until Tenant resumes operating its business in the Demised Premises, Rent shall totally abate. Thereafter, Rent shall be reduced in the same proportion that the loss of such area(s) of adversely affect Tenant's business at the Demised Premises ~~that are actually taken~~. For the purpose of this Paragraph 17 "condemnation proceedings" shall include conveyances and

30

~~US2008 6154729.5~~
US2008 6154729.6

grants made in anticipation or in lieu of condemnation proceedings. Nothing herein shall constitute a waiver of Tenant's right to contest for compensation for damages, and Tenant shall be entitled to compensation for its leasehold interest in the Demised Premises.

18.    **TENANT'S FIXTURES AND EQUIPMENT.** All fixtures and equipment, of whatsoever nature, placed or installed in or upon the Demised Premises by Tenant shall remain its property, and Tenant shall have the right to remove the same at any time. All of Tenant's trade fixtures, equipment, inventory, and other property owned by Tenant and located in the Center (collectively, "Tenant's Property") shall remain the property of Tenant (or Tenant's lessor or installment seller of such Tenant's Property, as the case may be) exempt from the claims of Landlord or any mortgagee or other lienholder of Landlord or any ground lessor without regard to the means by which or the persons by whom such Tenant's Property is installed or attached. Tenant or any other owner of Tenant's Property shall have the right at any time or from time to time to remove any of Tenant's Property provided that any damage to the Demised Premises caused thereby is repaired at Tenant's sole cost. Landlord agrees from time to time upon request of Tenant to execute a waiver in form specified by the owner of or lender upon any of Tenant's Property, which relinquishes any rights Landlord may now or hereafter have in Tenant's Property. Landlord further agrees to expressly exclude Tenant's Property from any lien on or lease of the Demised Premises or the Center and, if required by Tenant, use reasonable efforts to obtain from any lienholder or ground lessor an acknowledgment that such lien or ground lease does not cover Tenant's Property. ~~Tenant shall pay Landlord's reasonable attorney's fees associated with the review of such request, which fee shall not exceed One Thousand Five Hundred Dollars and no/100 ($1,500.00).~~ Tenant shall have forty-five (45) days from the date of the termination of the Lease to remove its merchandise, fixtures, equipment, and property as long as Tenant pays all Rent for said forty-five (45) days in advance. If any of Tenant's Property remains in the Demised Premises following said forty-five (45) day period, the same shall be deemed abandoned by Tenant and Landlord may dispose of Tenant's Property as Landlord sees fit.

19.    **QUIET ENJOYMENT.** Landlord hereby warrants that it has or will have prior to the Commencement Date good and marketable title in fee simple to the Demised Premises and Center and full right, power and authority to lease same in accordance with the terms hereof and to perform the obligations of Landlord hereunder. Landlord covenants and agrees that, provided Tenant performs all covenants and agreements herein stipulated to be performed on Tenant's part, subject to any applicable notice and cure periods, Tenant shall at all times have the peaceable and quiet enjoyment and possession of the Demised Premises and easement rights herein granted with respect to the Common Area without any manner of let or hindrance from Landlord or any other person or persons.

20.    **SUBORDINATION.**

20.1    Tenant's Subordination. Upon the request of Landlord in writing, Tenant agrees to subordinate this Lease to the lien of any present or future first mortgage upon the Demised Premises or any property of which the Demised Premises forms a part, provided that the holder of any such mortgage ("Mortgagee") shall execute, deliver and cause to be

31

recorded a written agreement with Tenant substantially in the form attached hereto as Exhibit "E", to the effect that, in the event of foreclosure or other action taken under the mortgage by Mortgagee, this Lease and the rights of Tenant hereunder shall not be disturbed so long as Tenant shall not be in default hereunder beyond any time permitted to cure, but shall continue in full force and effect. It is expressly agreed that Landlord shall pay Tenant's reasonable attorneys' fees in connection with any requests to execute subordination agreements and tenant estoppel agreements other than in the form of Exhibit "E" and Exhibit "F" attached hereto as well as any other document required by Landlord's lender.

20.2    Existing Mortgage. The Demised Premises is not subject to any mortgage encumbering Landlord's interest, or other encumbrance in the nature of a mortgage, other than a mortgage made to [_____] (the "Existing Mortgage"). Furthermore, it is a condition to Tenant's obligation to pay rent or other amounts due hereunder that Landlord shall obtain a subordination, non-disturbance and attornment agreement, substantially in the form attached as Exhibit "E", from the holder of any mortgage having priority over this Lease, including, the Existing Mortgage, which agreement Landlord shall cause to be executed by all necessary parties, recorded and delivered to Tenant.

21.    **ASSIGNMENT AND SUBLETTING**. ~~After receiving~~Tenant may, with Landlord's ~~approval, which shall~~consent, not ~~to~~ be unreasonably withheld, ~~Tenant may sublet the Demised Premises or assign this Lease.~~ conditioned, or delayed, assign this Lease, or sublease the Demised Premises in whole or in part, provided Tenant herein shall continue to remain liable and responsible for the payment of Annual Rent and due performance of all other terms, covenants, and conditions of this Lease. Tenant shall notify Landlord of its intent to sublet or assign. ~~It is expressly agreed that Tenant shall pay Landlord's reasonable attorneys' fees in connection with any requests to assign or sublet this Lease.~~ If such notice is given and Landlord does not object within thirty (30) days, it shall be conclusively presumed that Landlord has approved the subletting or assignment. ~~After such subletting or assignment the word Tenant as~~In the event that Landlord does not grant its consent to any proposed or requested assignment or sublease by Tenant for the operation of a use that is permitted pursuant to Section 6 of this Lease, Tenant shall be permitted to terminate this Lease, whereupon neither party shall have any further liability or obligation hereunder (except to the extent expressly provided herein), and whereupon Landlord shall pay to Tenant the Unamortized Costs (as hereinafter defined) within thirty (30) days after any such termination. As used herein, "Unamortized Costs" shall ~~also mean such subtenant or assigned. Tenant herein shall continue to remain liable and responsible for the payment of Annual Rent and due performance of all other terms, covenants, and conditions of this Lease~~ mean all costs and expenses incurred by Tenant with respect to building improvements and fixture and/or equipment installation costs as of the effective date of such termination, amortized on a straight-line basis over the lesser of the useful life of the same as reported by Tenant in accordance with generally accepted accounting principles for federal income tax purposes or the remaining term of this Lease (excluding any unexercised renewals or extensions). Notwithstanding anything to the contrary, at any time and from time to time, Tenant shall have the right to ~~effect a Transfer~~assign this Lease, or to sublet all or any portion of the Demised

32

Premises, to a Permitted Transferee (as hereinafter defined) without the prior consent of Landlord. A "Permitted Transferee" is (1) an entity controlling Tenant, controlled by Tenant, or under common control with those controlling Tenant (a "Tenant Affiliate"), (2) an entity ~~in~~into which the Tenant is merged or consolidated, (3) an entity which acquires a majority of Tenant's assets or ownership interests, (4) an entity which acquires at least twenty-five (25) stores operated by Tenant or Tenant Affiliates, or (5) any authorized franchisee of Tenant or a Tenant Affiliate, provided that such Permitted Transferee's use shall not violate any use ~~restriction as provided in Paragraph 7.4 above, or violate any~~ restrictions ~~as~~ set forth ~~on Exhibit "J".~~herein.

22.     **INTENTIONALLY DELETED.**

23.     **DEFAULT.**

23.1    Tenant's Default. Landlord shall give Tenant written notice of any default by Tenant under this Lease (but not more than three (3) written notices shall be required in any given twelve (12) month period for Tenant's failure to pay Annual Rent when required). If Landlord notifies Tenant of a monetary default, Tenant shall have ~~five~~ten (~~5~~10) days after Tenant's receipt of Landlord's default notice to cure such default; provided, however, that if the default relates to Landlord's dispute of Tenant's right to deduct an amount pursuant to Paragraph 23.4 of this Lease, Tenant shall not be in default under this Lease unless Landlord receives a final judgment in its favor regarding the disputed amount and Tenant does not pay such judgment within five (5) days after Tenant's receipt of written notice from Landlord of such judgment. If Landlord notifies Tenant of a non-monetary default, Tenant shall have thirty (30) days after Tenant's receipt of Landlord's default notice to cure such default (unless such default cannot reasonably be cured within thirty (30) days, in which case Tenant shall have as much time to cure such default as is necessary provided Tenant promptly commences and diligently pursues such cure). If Tenant fails to cure any default within the applicable cure period, then Landlord shall be entitled to all remedies available at law or in equity, including, but not limited to the following:

(a)     Landlord shall have the right to continue this Lease in full force and effect, and the Lease shall continue in effect as long as ~~landlord~~Landlord does not terminate this Lease ~~and until such time Landlord shall have the right to collect rent when due~~. During any period Lessee shall be in default_ beyond all applicable notice and cure periods_, Landlord shall have the right to enter the _Demised_ Premises without notice to vacate (any right to which is hereby waived by Tenant) and relet them, without prior notice or demand, ~~using such reasonable force as may be necessary,~~ changing any or all locks on the _Demised_ Premises all without being liable for forcible entry, trespass, or other tort. Tenant shall be liable immediately to Landlord for all _actual and_ reasonable costs Landlord shall incur in reletting the _Demised_ Premises including, without limitation, broker's commissions, _and_ expenses for ~~remodeling required by the reletting, and like costs~~performing Tenant's maintenance and repair obligations hereunder (but excluding any costs incurred to improve or remodel the Demised Premises). Reletting can be for a period shorter or longer than the remaining term of the Lease. Tenant shall pay to Landlord the rent due under this Lease on the date that the rent is due, less the rent Landlord

33

receives from any reletting. No act by Landlord allowed by this section shall terminate this Lease unless Landlord notifies Tenant that Landlord elects to terminate this Lease.

(b) Landlord shall have the right to terminate this Lease without notice to vacate (any right to which is hereby waived by Tenant) and Tenant's rights to possession of the Demised Premises at any time, and re-enter the Demised Premises as described in Subsection (a) hereinabove. No act by Landlord other than giving notice of termination to Tenant shall terminate this Lease. Acts of maintenance, efforts to relet the Demised Premises, or the appointment of a receiver of Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's right to possession. Upon termination, Landlord shall have the right to pursue its remedies at law or in equity to recover of Tenant all amounts of rent then due or thereafter accruing and such other damages as are caused by Tenant's default. ~~Landlord shall have the right to accelerate rent due under the Lease, provided that any judgment therefor shall be limited to the fair market value of the future rents due, and Tenant shall be entitled to a credit for any rents received from any re-leasing of the Demised Premises.~~

(c) Notwithstanding Subsection (b), in the event Landlord recovers a final judgment for damages during the term of the Lease, it is understood and agreed that any sums received by Landlord upon reletting the Demised Premises during the lease term, after actual and reasonable expenses of reletting, shall operate as a credit against the judgment and Landlord shall so notify Tenant of all sums received during the lease term.

(d) If any default relates to Landlord's dispute of Tenant's right to deduct an amount pursuant to Section 22.3 of this Lease or any other section of this Lease, Tenant shall not be in default under this Lease unless Landlord receives a final judgment in its favor regarding the disputed amount and Tenant does not pay such judgment within ~~five~~fifteen (~~5~~15) days after Tenant's receipt of written notice from Landlord of such judgment.

(e) ~~Any amount payable by Tenant to Landlord pursuant to the terms of this Lease which is not paid by the applicable due date shall bear interest from such due date at the Penalty Interest Rate hereinafter defined.~~Notwithstanding anything herein to the contrary, (i) Landlord waives its right to dispossess Tenant from the Demised Premises without first availing itself of the judicial process, (ii) Landlord shall in no event have any right to accelerate the Annual Rent or any other charges payable by Tenant hereunder and (iii) Landlord shall use commercially reasonable efforts to mitigate its damages in the event of Tenant's default hereunder.

23.2 Credit Against Judgment. Notwithstanding Paragraph 23.1, in the event Landlord recovers a final judgment for damages during the term of this Lease, it is understood and agreed that any sums received by Landlord upon reletting the Demised Premises during the time period of the Initial Term or any Option Period in effect, after reasonable expenses of filing of judgment and reletting, shall operate as a credit against the judgment, and Landlord shall take steps to so credit the judgment.

23.3 Intentionally Deleted.

34

23.4    Landlord's Default.

       23.4.1  Monetary.  If Landlord fails to pay any amount owed by Landlord pursuant to the terms of this Lease to anyone other than Tenant and such amount becomes a lien against the Center including the Demised Premises and should Landlord fail to discharge (or bond off) such lien within sixty (60) days, then, and in such event, Tenant may, at its option, pay such amount to such person upon notice to Landlord.  Landlord shall reimburse Tenant for all amounts so paid by Tenant or Tenant shall deduct such amounts so paid from Rent due.  If Landlord fails to pay to Tenant any amount when due, Tenant may, at its option (a) deduct the amount owed by Landlord, including interest, from Rent and other charges due by Tenant to Landlord pursuant to the terms of this Lease; and/or (b) pursue any other remedy to which Tenant is entitled at law or in equity; and/or (c) terminate this Lease.

       23.4.2  Non-Monetary.  In addition to Tenant's self-help rights in Paragraphs 3.7, 5.8 and 9.4 Tenant shall have the right to give Landlord written notice of any non-monetary default by Landlord under this Lease.  Landlord shall have thirty (30) days after Landlord's receipt of Tenant's default notice to cure such default unless in Tenant's sole judgment failure to perform immediately would materially adversely affect Tenant's business; provided, however, that if such default cannot reasonably be cured within thirty (30) days, Landlord shall have as much time to cure such default as is necessary provided Landlord promptly commences and diligently pursues such cure; and, provided further, that if the default relates to a matter which, in Tenant's reasonable judgment, is of an emergency nature, Landlord shall have only forty-eight (48) hours (or such lesser period as is reasonable under the circumstances) to cure, or commence to cure, such default. If Landlord fails to cure, or commence to cure, any such default within such cure period, then Tenant may, at its option (a) terminate this Lease with thirty (30) days' written notice to Landlord, unless such default has been cured by such date (or if not curable within thirty (30) days, the cure has been commenced within such thirty (30)-day period and is being diligently pursued); (b) cure the default, in which event Landlord shall reimburse Tenant for all amounts spent on such cure; and/or (c) pursue any other remedy to which Tenant is entitled at law or in equity, including enjoining any violation or threatened violation by Landlord of any provision of this Lease.   If Landlord fails to reimburse Tenant under this Paragraph 23.4.2, such failure will constitute a monetary default under Paragraph 23.4.1 entitling Tenant to deduct such charges from Rent and other charges due by Tenant to Landlord under this Lease.

23.5    Default Rate.  Any amount payable by either party to the other pursuant to the terms of this Lease shall bear interest at a rate which shall be the greater of eight percent (8%) per annum or Wells Fargo's prime rate plus two percent (2%) at the time of default (the "Default Rate") and shall be paid by such party, together with such interest, within the time period specified in this Lease for such payment (or, if no such time period is specified, within thirty (30) days).

35

24.     **REDELIVERY OF DEMISED PREMISES.**  Tenant shall, at the termination of this Lease or any extension thereof, peacefully quit, surrender, and deliver up to Landlord, its successors or assigns, the Demised Premises in good condition, with the exception of usual wear and tear, condemnation, fire, the elements, civil riot, war or other unavoidable casualty, loss or damage, regardless of the cause.  Landlord acknowledges that usual wear and tear includes the condition of the Demised Premises normally found when Tenant's Property, with its various former connections and attachments, is removed, and therefore is not to be considered damage to the Demised Premises.

25.     **HOLDING OVER.**  In the event Tenant should remain in possession of the Demised Premises after expiration of this Lease or other written agreement, without the execution of a new lease, Tenant shall be deemed to be occupying the Demised Premises as a tenant from month-to-month, subject to all the conditions, provisions, and obligations of this Lease, including the payment of Rent, insofar as the same are applicable to a month-to-month tenancy.  The month-to-month tenancy may be terminated by either party as of the last day of any calendar month by written notice delivered to the other party on or before the fifteenth (15th) day of the month.

26.     **REMOVALS BY TENANT.**  Tenant shall have the right at any time prior to or upon termination or expiration of this Lease to remove any and all of its merchandise, machinery, equipment, counters, shelving, light fixtures, signs, and other fixtures (regardless of the manner in which any of said items have been attached or fastened to the Demised Premises) which it owns and has placed in, upon, and about the Center, as well as any and all personal property located in said Demised Premises and owned by Tenant at such time.  In removing such personal property, Tenant shall not materially injure or damage the Demised Premises, and any such material damage resulting shall be repaired at the expense of Tenant.  It is understood that a bona fide dispute between Landlord and Tenant as to Rent claimed to be due shall not operate to prevent removal of property by Tenant pursuant to this Paragraph 26, but in such event Tenant shall have the right to remove the same as if no Rent were then due.  Landlord hereby waives all claims and rights, including without limitation security interests or any "landlord's liens", whether by statute or common law, in Tenant's Property.

27.     **NOTICES.**  All notices required or options granted under this Lease shall be given or exercised in writing, and shall be deemed to be properly served if (a) sent by certified mail with return receipt requested, or (b) personally delivered, or (c) sent by nationally recognized overnight courier service which provides proof of delivery (the "Courier") to the address hereinafter identified.  Except as herein otherwise specifically provided to the contrary, the effective date of such notice or exercise of any option shall be two (2) business days after the date which is stamped by the United States Post Office Department on the envelope enclosing same, one (1) business day following deposit with the Courier or the date on which personal delivery is made.  The parties hereto shall not refuse to accept delivery of said notices.  Further, the parties agree that any official act performed with regularity by a government authority shall, for purposes of notice, be deemed to have been performed in accordance with historical data of such performance.  Either party may, from time to time, by ten (10) days' prior written notice given as provided above, designate a different address to which notices to it shall be sent.

36

27.1    Addresses.  Until changed by written notice from the appropriate party to the other, the addresses of the parties are and shall be:

LANDLORD:        Riverside Crossing, LLC
                 16740 Birkdale Commons Parkway, Suite 306,
                 Huntersville, North Carolina, 28078
                 Attn: Dante Massaro

TENANT:          Lowes Foods, LLC
                 Re: LFS Store No._____
                 Attn: Roger Henderson
                 1381 Old Mill Circle, Suite 200
                 Winston-Salem, NC  27103-1400

WITH A COPY TO:  ~~McGuireWoods LLP~~Kilpatrick Townsend & Stockton
                 Attn: ~~Jane Whitt Sellers~~C. Todd Burbank, Esq.
                 ~~201~~214 North Tryon Street, Suite ~~3000~~2400
                 Charlotte, NC  28202

27.2    Lender Notification.  If Tenant shall have received written notice of an assignment of this Lease by Landlord to a lender, Tenant shall, upon written request by Landlord, notify such lender in writing of any Landlord default hereof which has given rise to Tenant's ability to terminate this Lease pursuant to the terms hereof.

27.3    Rental Payment Address.  Until appropriately changed by thirty (30) days written notice to Tenant, rental payments hereunder shall be made to Landlord either by mail or otherwise as follows:

LANDLORD:        Riverside Crossing, LLC
                 16740 Birkdale Commons Parkway, Suite 306,
                 Huntersville, North Carolina, 28078
                 Attn: Paul Harnett

In the event the rental payment address is changed in connection with the transfer of a beneficial interest in the Center, Tenant shall not be required to comply with such notice unless the same is accompanied by evidence satisfactory to Tenant of such change of ownership, and any payments made by Tenant prior to receiving such satisfactory evidence shall be deemed properly paid.

28.    **TRANSFER OR SALE OF LANDLORD'S INTEREST.**  No transfer or sale of Landlord's interest hereunder shall be binding upon Tenant until Tenant has received a photocopy of the original instrument assigning or transferring Landlord's interest in this Lease. Such instrument shall evidence the fact that such assignee or transferee has assumed all of Landlord's obligations hereunder, recognized Tenant's rights under this Lease and acquired sufficient title to the Demised Premises and Center to enable it to perform such obligations; provided, however, this provision shall not be applicable to any such transfer as security for any loans made to Landlord.  In the event of the sale, assignment, or transfer by Landlord of its

37

interest in the Center or in this Lease (other than a collateral assignment to secure a debt of Landlord) and an assumption of all of Landlord's obligations hereunder by a subsequent assignee or purchaser, Landlord shall thereupon be released or discharged from all of its covenants, except those under Paragraph 7.4.3 hereof, and obligations hereunder, except such obligations as shall have accrued by default or otherwise prior to any such sale, assignment, or transfer. Landlord's assignment of the Lease or all of its rights herein shall in no manner affect Tenant's obligations or rights hereunder.  Tenant shall thereafter attorn and look to such assignee, as Landlord, provided Tenant has first received written notice of such assignment of Landlord's interest, as provided above.  It is further agreed that this Paragraph 28 shall have no effect on any of Tenant's self-help rights that may have accrued prior to the sale, assignment, or transfer.

29.    **LANDLORD'S LIABILITY AND SELF-HELP.**  Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed that there shall be absolutely no personal liability on the part of Landlord's officers, directors, members, managers, partners, and/or shareholders with respect to any of the terms, covenants, and conditions of this Lease, and that Tenant shall look solely to the assets of Landlord (including but not limited to Landlord's equity in the Center and any rent, insurance proceeds, condemnation proceeds and sales proceeds thereof) or such successor-in-interest to Landlord in the Center and its self-help rights under the Lease for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants, and conditions of this Lease to be performed by Landlord.

30.    **AUTHORITY.**  Each party hereto affirms and states that it has full right and authority to enter into and perform this Lease.

31.    **MEMORANDUM OF LEASE AND DECLARATION.**  Landlord agrees that it will not record this Lease, but contemporaneously herewith, will execute a Memorandum of Lease in the form of <u>Exhibit "G"</u> attached hereto, which will set forth a legal description of the Demised Premises or the Center, the term of the Lease, and any other provisions hereof as Tenant may request, and Landlord will record such Memorandum of Lease in the real property records of the county in which the Center is located prior to the recording of any permanent financing on the Center.  The provisions of this Lease shall control with regard to any omissions from, or provisions hereof which may be in conflict with, the Memorandum of Lease.  Additionally, contemporaneously herewith, Landlord will execute and record a Declaration of Covenants, Conditions, Restrictions and Easements for the Center and the Outparcels in the form attached hereto as of <u>Exhibit "J"</u>.

32.    **ROOF RIGHTS.**  Tenant shall have the sole and exclusive right to access and use the roof over the Demised Premises to install, maintain, repair and replace equipment on the roof, including without limitation satellite dishes, aerial telecommunications equipment and/or solar panels (the "Rooftop Equipment"), and to make connections therefrom to and from the Demised Premises.  Tenant shall obtain, at its expense, any and all necessary governmental permits, licenses, variances and approvals that are necessary to install and maintain such Rooftop Equipment.  Tenant shall, at Tenant's cost and expense, remove the Rooftop Equipment upon the expiration or earlier termination of the Term and shall repair any damage caused by such removal.  Tenant shall reimburse Landlord for the actual, reasonable and verifiable third-party

38

costs incurred by Landlord to repair any damage caused to the roof by Tenant's exercise of its
rights pursuant to this Paragraph 32.

33.    **DISPUTE RESOLUTION**.  Any controversy or claim arising out of or relating to this
Lease, or the breach thereof, shall be settled in the following progressive manner: (a) through
good faith negotiation; (b) through non-binding mediation; and (c) through binding arbitration.
In the event a dispute cannot be resolved using methods (a) or (b) listed above and arbitration is
required, such arbitration shall be held in Mecklenburg County, North Carolina, in accordance
with the Commercial Arbitration Rules of the American Arbitration Association, and judgment
upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.
The arbitration shall be conducted before and by a single arbitrator selected by the parties, which
arbitrator shall have at least fifteen (15) years' experience in commercial real estate leasing
activities.  If the parties have not selected an arbitrator within ten (10) days of written demand for
arbitration, the arbitrator shall be selected by the American Arbitration Association pursuant to
the then current rules of that Association or its successor.  Consistent with the expedited nature
of arbitration, each party will, upon the written request of the other party, promptly provide the
other with copies of documents on which the producing party may rely in support of or in
opposition to any claim or defense.  Any dispute regarding discovery, or the relevance or scope
thereof, shall be determined by the arbitrator, which determination shall be conclusive.  All
discovery shall be completed within sixty (60) days following the appointment of the arbitrator.
The arbitrator shall instruct the non-prevailing party to pay all costs of the proceedings, including
the administrative fees of the AAA, the fees and expenses of the arbitrator and the reasonable
attorneys' fees and the expenses of the prevailing party.  If the arbitrator determines that there is
not a prevailing party, each party shall be instructed to bear its own costs and to pay one-half of
the fees and expenses of the arbitration, including, without limitation, the fees and expenses of
the arbitrator.  The arbitrator(s) shall not have the authority to assess punitive or other damages
not measured by the prevailing party's actual damages.  The decision of the arbitrator shall be
non-appealable and binding upon all parties.

34.    **MISCELLANEOUS**.

   34.1    Modifications to Lease.  Landlord and Tenant agree that no alterations, changes,
   or modifications of this Lease shall be effective unless made in writing and executed in
   the same manner as is this present instrument and specifically agree that no verbal or oral
   changes are effective.

   34.2    Partial Invalidity.  Should any clause or provision of this Lease be invalid or void
   for any reason, such invalid or void clause shall not affect the whole of this instrument,
   but the balance of the provisions hereof shall remain in full force and effect.

   34.3    Descriptive - Headings.  The descriptive headings of the paragraphs of this Lease
   are for convenience only and shall not be used in the construction of the contents hereof.

   34.4    Binding Effect.  It is covenanted between the parties hereto that all covenants and
   undertakings contained in this Lease shall extend to and be binding upon the respective
   successors and assigns of the parties hereto.  The covenants and agreements contained

39

herein shall run with the land and continue for the term of this Lease and any extension thereof.

34.5    Non-Waiver. Any assents, expressed or implied, by Landlord or Tenant to any breach of any specific covenant or condition herein contained shall not be construed as an assent or waiver of any such covenant or condition generally, or of any subsequent breach thereof.

34.6    Estoppel. Upon written request of either party, the other party agrees within thirty (30) days after receipt of the request, to deliver written notice to the requesting party and/or to its designee of the status of this Lease, in the form attached hereto as Exhibit "F". All such statements regarding the above shall be on the party's best knowledge of such facts that are true and ascertainable and shall not in any event modify or change the provisions of the Lease. If the requesting party and/or its designee do not receive the reply of the party to whom such request is made within thirty (30) days after receipt of written request therefore, it will be conclusively presumed that the Lease is in good standing, is in full force and effect, has not been amended except as contained in said notice of the requesting party, and is not in default.

34.7    Choice of Law. This Lease shall be governed by and construed in accordance with the laws of the State of South Carolina.

34.8    Remedies Cumulative. Unless expressly provided otherwise in this Lease, no remedy conferred under this Lease shall be exclusive of any other remedy, and each remedy shall be cumulative and in addition to every other remedy provided or now or hereafter existing at law, in equity, herein, or otherwise. The election of any one or more remedies by a party hereto shall not be deemed, and shall not constitute, a waiver of that party's right to pursue any other available remedy or remedies.

34.9    No Construction Against the Preparer of this Lease. This Lease has been reviewed by Landlord and its professional advisors. Landlord and Tenant believe this Lease is the product of all of their efforts, that it expresses their agreement, and that it should not be interpreted in favor of either Landlord or Tenant or against either Landlord or Tenant merely because of their effort in preparing it.

34.10   Entire Agreement. This Lease contains and embraces the entire agreement between the parties hereto with respect to the matters contained herein. Landlord and Tenant acknowledge and agree that neither party, nor any of that party's representative nor any broker, has made any representation to or agreement with the other party relating to the Demised Premises, this Lease or the Center which is not contained in express terms of this Lease. Both parties acknowledge and agree that its execution and delivery of this Lease is based upon its independent investigation and analysis of the business potential and expenses represented by this Lease, and each hereby expressly waives any and all claims or defenses it may have against the enforcement of this Lease which are based upon allegations of representations, projections, estimates, understandings or agreements

40

by the other party or that party's representative that are not contained in the express terms of this Lease.

34.11   Termination.  In the event of the termination of this Lease pursuant to the terms hereof, both Landlord and Tenant shall be released from any further liability or obligation under this Lease, except that no such release shall apply to any rights or obligations under this Lease which by their terms survive or come into effect after the date of termination of the Lease.

34.12   Confidentiality.  Landlord and Tenant agree that the terms, conditions and negotiations of this Lease and all verbal or written information provided by Landlord and Tenant with respect hereto shall remain confidential and shall not be disclosed, directly or indirectly, to any individual or entity without the express written consent of the other party hereto, with the exception of (i) affiliates, consultants, employees, agents, lawyers, accountants, lenders and other professionals employed or otherwise retained by Landlord or Tenant with respect to this Lease who have a legitimate business need to know about such Lease and who have agreed to maintain the confidentiality hereof, and (ii) such disclosures as may be required to comply with applicable legal requirements or as otherwise required by a court of law.  Prior to the Store Fixturing Date, Landlord or Tenant shall not, without the express written consent of the other party hereto, issue, circulate or otherwise release to any third party any press releases or other public announcements, any marketing or promotional materials or any other public disclosure regarding this Lease.

34.13   USA Patriot Act.

34.13.1            Certification.  Pursuant to Executive Order *13224*, signed by President George W. Bush on September 24, 2001, each of Tenant and Landlord hereby certifies that:

(1) It is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and

(2) It is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity, or nation.

34.13.2            Indemnification.  Each party hereto hereby agrees to defend, indemnify and hold harmless the other from and against any and all claims, damages, losses, risks, liabilities and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing certification.

41

34.14  Guaranty.  As an inducement for Landlord to enter into this Lease, it is expressly understood that Tenant's obligations under this Lease will be guaranteed and endorsed by Alex Lee, Inc. and such Guaranty shall follow the form on Exhibit "I", attached hereto and made a part hereof.


[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]


42

IN WITNESS WHEREOF, Landlord and Tenant have executed and delivered this Lease on the date first above written.

LANDLORD:

**RIVERSIDE CROSSING, LLC**,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

STATE OF _____

CITY/COUNTY OF _____

I, _____, a Notary Public of the aforesaid _____ and State, do hereby certify that _____, personally came before me this day and acknowledged that s/he is _____ of **RIVERSIDE CROSSING, LLC**, a Delaware limited liability company, and that by his/her authority duly given and as the act of the company, the foregoing instrument was signed in its name.

Witness my hand and official stamp or seal this _____ day of _____, 2014.2015.

_____
Notary Public

My Commission Expires: _____ _____

(Stamp/Seal)

43

TENANT:

**LOWES FOODS, LLC**,
a North Carolina limited liability company

By: _____

Timothy D. Lowe, President

STATE OF NORTH CAROLINA

COUNTY OF _____

I, _____, a Notary Public of the aforesaid _____ and State, do hereby certify that Timothy D. Lowe personally came before me this day and acknowledged that he is President of **LOWES FOODS, LLC**, a North Carolina limited liability company, and that by his authority duly given and as the act of the company, the foregoing instrument was signed in its name.

Witness my hand and official stamp or seal this _____ day of _____, ~~2014.~~2015.

_____

Notary Public

My Commission Expires: _____ __

(Stamp/Seal)

44

EXHIBIT A

(attached to and made a part of that certain
Shopping Center Lease, dated _____, ~~2014~~2015
between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

(Site Plan)

A- 1

## EXHIBIT B

(attached to and made a part of that certain
Shopping Center Lease, dated _____, ~~2014~~2015
between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

Riverside Crossing Shopping Center

(Legal Description)

B- 1

EXHIBIT C

(attached to and made a part of that certain
Shopping Center Lease, dated _____, ~~2014~~2015
Between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

**COMMENCEMENT DATE ACKNOWLEDGMENT**

    **THIS COMMENCEMENT DATE, ACKNOWLEDGEMENT**, entered into this _____ day of _____, ~~2014,~~2015, by and between **RIVERSIDE CROSSING, LLC**, a Delaware limited liability company, hereinafter referred to as "Landlord" and **LOWES FOODS, LLC**, a North Carolina limited liability company, hereinafter referred to as "Tenant";

**WITNESSETH**:

    **WHEREAS**, Landlord and Tenant have previously entered into a certain Shopping Center Lease dated as of _____, ~~2014~~2015 (the "Lease"), covering Demised Premises in the improvements located on the Real Property more particularly described on Exhibit "A" attached hereto; and

    **WHEREAS**, by this instrument and pursuant to the terms of Paragraph 2.1.1 of the Lease, Landlord and Tenant desire to set forth in a written document the Commencement Date of the term of the Lease.

    **NOW, THEREFORE**, for valuable consideration and in consideration of the terms and covenants herein contained, Landlord and Tenant agree as follows:

    1.    Commencement Date.  The Commencement Date of the primary term of the Lease shall be at 12:01 o'clock A.M. on the _____ day of _____.

    2.    Termination.  The Termination Date of the primary term of the Lease shall be at 12:00 o'clock Midnight on the _____ day of _____; provided, however, Tenant has the option to extend the term of the Lease for six (6) additional terms of five (5) years each.

    3.    Confirmation of Square Footage.  The verified square footage of the Demised Premises is _____. All square footage references in the Lease and the Memorandum of Lease are hereby amended to read "_____" and all calculations based on the square footage are hereby amended to be calculated based on a square footage of _____.

    4.    Effect.  This Commencement Date Acknowledgment is executed pursuant to the terms of Paragraph 2.1.1 of the Lease and in no way alters, modifies, or amends the Lease, and the Lease continues uninterrupted, unabated and in full force and effect.

C- 1

**IN WITNESS WHEREOF**, Landlord and Tenant have executed and delivered this Commencement Date Acknowledgment on the day, month, and year first above written.

LANDLORD:

**RIVERSIDE CROSSING, LLC**,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

STATE OF _____

CITY/COUNTY OF _____ _____

I, _____, a Notary Public of the aforesaid _____ and State, do hereby certify that _____, personally came before me this day and acknowledged that s/he is _____ of **RIVERSIDE CROSSING, LLC**, a Delaware limited liability company, and that by his/her authority duly given and as the act of the company, the foregoing instrument was signed in its name.

Witness my hand and official stamp or seal this \_\_\_\_\_ day of _____, 201\_.

_____
Notary Public

My Commission Expires: _____

(Stamp/Seal)

C-2

TENANT:

**LOWES FOODS, LLC,**
a North Carolina limited liability company

By:   _____

Timothy D. Lowe, President


STATE OF NORTH CAROLINA

COUNTY OF _____

I, _____, a Notary Public of the aforesaid _____ and State, do hereby certify that Timothy D. Lowe personally came before me this day and acknowledged that he is President of **LOWES FOODS, LLC**, a North Carolina limited liability company, and that by his authority duly given and as the act of the company, the foregoing instrument was signed in its name.

Witness my hand and official stamp or seal this _____ day of _____, 201_.


_____
Notary Public

My Commission Expires: _____

(Stamp/Seal)

C- 3

US2008 6154729 5
US2008 6154729 6

EXHIBIT D

(attached to and made a part of that certain
Shopping Center Lease, dated _____, ~~2014~~2015
between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

Tenant's Plans

Plans for: [SHOPPING CENTER NAME]
Drawn by:
Date:
For: Lowes Foods, LLC (owned guide plans)


TABLE OF CONTENTS

Architectural
A-0 Cover Sheet
F-1 Fixture Plan
F-2 Enlarged Fixture Plan
F-3 Enlarged Alternate Meat Prep Department
A-1 Floorplan and Mezzanine
A-1a Reflected Ceiling Plan and Mezzanine
A-1b Roof Plan
A-2 Concrete Placement Plan and Mezzanine
A-3 Door and Room Finish Schedule
A-4 Standard Details
A-5 Interior Elevations
A-6 Floor Covering Plan and Mezzanine
A-7 Exterior Elevations
A-8 Wall Sections @ Front Canopy
A-8a Wall Sections @ Front Canopy
A-8b Wall Sections @ Front and Sidewalls
A-8c Wall Sections @ Rear
A-9 Miscellaneous Details

HVAC
M-1 HVAC Plan
M-2 HVAC Details

Plumbing
P-1 Refrigeration Mechanical Plan
P-2 Plumbing Plan

D-1

Electrical
E-1 Power Plan
E-2 Lighting Plan
E-3 Electrical Dimensions
E-4 Electrical Circuit Schedule
E-5 Electrical Details
E-6 Electrical Details

D- 2

EXHIBIT E

(attached to and made a part of that certain
Shopping Center Lease, dated _____, ~~2014~~2015
between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

**SUBORDINATION, ATTORNMENT, AND NON-DISTURBANCE AGREEMENT**

**THIS AGREEMENT**, made as of the _____ day of _____, _____, by and between _____, a _____ (hereinafter referred to as the "Mortgagee"), and **LOWES FOODS, LLC**, a North Carolina limited liability company (hereinafter referred to as the "Tenant");

**WITNESSETH**:

**WHEREAS**, the Tenant has entered into a certain Shopping Center Lease, dated _____, ~~2014,~~2015, (hereinafter referred to as the "Lease") with **RIVERSIDE CROSSING, LLC**, a Delaware limited liability company (hereinafter referred to as the "Landlord"), which Lease covers retail store space (hereinafter referred to as the "Demised Premises") in the shopping center known as Riverside Crossing Shopping Center, Greenville County, South Carolina, which is located on the Real Property more particularly described on Exhibit "A" attached hereto and incorporated herein (hereinafter referred to as the "Property"); and

**WHEREAS**, the Lease is evidenced of record by a Memorandum of Lease recorded in Book _____ at Page _____ of the records of Greenville County, South Carolina; and

**WHEREAS**, the Mortgagee is the holder of a certain Deed of Trust dated _____, _____, executed by Landlord, covering the Property, and recorded in Book _____ at Page _____ of the records of Greenville County, South Carolina (hereinafter referred to as the "Mortgage"); and

**WHEREAS**, the Mortgagee has agreed to the extension of credit secured by the Mortgage provided that the Lease is subordinated to the lien of the Mortgage; and

**WHEREAS**, the Tenant desires to be assured of continued occupancy of the Demised Premises under the terms of said Lease and subject to the terms of the Mortgage; and

**NOW, THEREFORE**, in consideration of the premises and other valuable consideration, the receipt of which is hereby acknowledged, it is agreed as follows:

1.    Subordination. Said Lease is and shall be subject and subordinate to the Mortgage and the lien thereof as it affects the Property of which the Demised Premises forms a part, and to all renewals, modifications, consolidations, replacements, and extensions of such

E-1

Mortgage of which Tenant has knowledge and which do not adversely affect or impair Tenant's Lease or its possessory interest in the Demised Premises, as fully and as if the Mortgage and all of its renewals, modifications, consolidations, replacements, and extensions had been executed, delivered, and recorded prior to execution of the Lease.

2.    Foreclosure.   In the event of foreclosure of the Mortgage, the Mortgagee thereunder will not join the Tenant under said Lease in foreclosure proceedings so long as: (a) the Tenant is not in default under any of the terms, covenants, or conditions of said Lease, or (b) if default shall exist, so long as Tenant's time to cure such default has not expired.

3.    Nondisturbance.   It is the express intent of the parties hereto that a foreclosure of the Mortgage or the exercise of any other remedies provided therein, or provided in any other instrument securing the indebtedness secured by the Mortgage, or the delivery of a deed to the Property in lieu of foreclosure shall not, of itself, result in the termination of the Lease, but any purchaser or other grantee upon foreclosure of the Mortgage or conveyance in lieu of foreclosure (the "Foreclosure Owner") shall thereby automatically succeed to the position of the Landlord under the Lease and Tenant's rights in and to any common areas and Tenant's other rights arising out of or under the Lease will be fully recognized and protected by Mortgagee, or its successors or assigns, as applicable, and shall not be disturbed, cancelled, terminated, or otherwise affected by reason of the Mortgage or of any action or proceeding instituted by Mortgagee or its successors or assigns to foreclose the Mortgage, or by any modification, extension, renewal, consolidation, or replacement of same, irrespective of whether Tenant shall have been joined in any action or proceeding.

4.    Attornment.   If, by disposition, foreclosure, or otherwise, the Mortgagee, its successors, or assigns, or the Foreclosure Owner shall come into possession or become the owner of the Property, such person shall succeed to the interest of the Landlord under said Lease, and the Lease shall take effect as a lease of the Demised Premises, together with all the rights and privileges therein contained, between such person and the Tenant for the balance of the term of the Lease, together with all extensions and renewals thereof as the same may ~~by~~be exercised by Tenant thereunder, between the Landlord and the Tenant; the Tenant agrees to attorn to and accept such person as Landlord under said Lease, and to be bound by and to perform all the obligations imposed by said Lease upon the Tenant therein; and the Mortgagee, its successors or assigns, or the Foreclosure Owner will not disturb the possession of the Tenant, and will be bound by all the obligations imposed by said Lease upon the Landlord therein as if such party were originally named therein as Landlord.

5.    Lease Agreement.   Upon the written request of either Tenant or Mortgagee to the other given after a foreclosure of the Mortgage or conveyance in lieu of foreclosure, which covers the Demised Premises, the said parties agree to execute a Lease of the Demised Premises upon the same terms and conditions as said Lease between the

E- 2

Landlord and the Tenant, which Lease shall cover any unexpired term of said Lease existing prior to such foreclosure or conveyance in lieu of foreclosure.

6.      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.      Effectiveness.  This Agreement shall become effective upon its execution and delivery by each party hereto and recordation of same in the county where the Center is located.  The failure of Mortgagee to execute this Agreement or to cause the recordation of same in the county where the Center is located shall relieve the other signatories of their obligations hereunder.

**IN WITNESS WHEREOF**, the parties have caused this instrument to be executed as of the date first above written.

MORTGAGEE:

By:      _____
Name: _____
Title:   _____

STATE OF NORTH CAROLINA

COUNTY OF _____

I, _____, a Notary Public of the aforesaid County and State, do hereby certify that _____, personally came before me this day and acknowledged that s/he is _____ of ___, a ___ ___, and that by his/her authority duly given and as the act of the company, the foregoing instrument was signed in its name.

WITNESS    my hand and official stamp or seal, this _____ day of _____, 2014.2015.

_____
Notary Public

My Commission Expires: _____

(Stamp/Seal)

E- 3

TENANT:

**LOWES FOODS, LLC,**
a North Carolina limited liability company


By: _____

Timothy D. Lowe, President

STATE OF NORTH CAROLINA

COUNTY OF _____

     I, _____, a Notary Public of the aforesaid County and State, do hereby certify that Timothy D. Lowe, personally came before me this day and acknowledged that he is President of **LOWES FOODS, LLC,** a North Carolina limited liability company, and that by his authority duly given and as the act of the company, the foregoing instrument was signed in its name

     Witness my hand and official stamp or seal this _____ day of _____, 201_.


_____

Notary Public


My Commission Expires: _____


(Stamp/Seal)


E- 4

EXHIBIT F

(attached to and made a part of that certain
Shopping Center Lease, dated _____, ~~2014,~~2015, between Tenant and
between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

**TENANT ESTOPPEL CERTIFICATE**


The undersigned, **LOWES FOODS, LLC** ("Tenant"), the tenant named in that certain
Lease Agreement (the "Lease") dated as of _____, ~~2014,~~2015, between Tenant and
**RIVERSIDE CROSSING, LLC**, as Landlord for those certain premises located in the
Riverside Crossing Shopping Center (the "Premises"), certifies to _____
_____ ("Lender") and its successors and assigns as follows, all of which is true and
correct as of the date set forth below:

Based upon knowledge and belief only, upon reasonable investigation as to the terms of
the Lease and without prejudice to, or without waiver of, any rights or remedies relating to any
claims about which the undersigned has no actual knowledge at the time of the execution hereof,
the undersigned certifies that:

1.    Tenant is the holder of the lessee's interest under the Lease and is in sole
possession of the Premises.  Tenant has not subleased all or any part of the Premises or
assigned the Lease or otherwise transferred its interest in the Lease except: _____
_____.

2.    The Lease is in full force and effect, constitutes the entire agreement between
Landlord and Tenant, and has not been modified, changed, altered, amended or
supplemented in any respect, except:
_____.

3.    Tenant has accepted and now occupies the Premises and the conduct of Tenant's
business on the Premises falls within the uses stipulated in the Lease.  The Lease term
commenced on _____ and is currently scheduled to expire on _____
_____.

4.    Tenant has made no agreements with Landlord or its agents or employees
concerning, and has no right to, free rent, partial rent, rebate of rental payments or any
other type of rental concession, except: _____
_____.

5.    Tenant is current in payment of all fixed rent and other charges due to be paid
under the Lease, with minimum rent paid in full for the period ending _____
_____.  The monthly minimum rent is $_____.  No rent or other sum payable under

F- 1

the Lease is being paid in arrears. No rent or other sum payable under the Lease has been paid more than one (1) month in advance of the due date thereof, and Tenant hereby agrees with Lender that it shall not pay any minimum rent or any other sum due or to be paid under the Lease more than thirty (30) days in advance of the due date thereof.

6.      All of the obligations of the part of Landlord under the Lease to construct and deliver the Premises and any common areas including parking have been satisfactorily performed by Landlord and all obligations for the performance of any construction, work or installation of any equipment, have been carried out. Tenant has no claim or knowledge of any claim against the holder of Landlord's interest on account of any default or failure of performance under the Lease. As of the date hereof, Tenant is entitled to no offset or deduction in rent and has no claim or defense to the payment for any obligation under the Lease.

7.      Any and all payments, credits, allowances or abatements for tenant improvement work due Tenant under the Lease have been paid by Landlord or received by Tenant, except:

_____.

8.      No notice of default under the Lease has been given by Tenant to Landlord; no notice of default has been received by Tenant from Landlord; and, to the best of Tenant's knowledge, information and belief: (i) no condition exists which might give rise to a default under the Lease; and (ii) no claim of any nature exists by Tenant under the Lease against Landlord or the Premises.

9.      Neither Tenant nor, to the best knowledge of Tenant, Landlord is in violation of any exclusive use, radius or non-competition clause in the Lease or in any Lease of any space in the Property.

10.     The Lease does not contain and Tenant has no outstanding rights of first refusal to purchase the Premises demised by the Lease or any part thereof or the real property of which such Premises are a part.

11.     This certification is made knowing that Lender shall rely upon the truth of this certificate in making a loan disbursing funds to Landlord.

12.     Pursuant to the Lease, Tenant has paid to Landlord no security deposit.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

F- 2

IN WITNESS WHEREOF, this Certificate is executed under seal dated this _____ day of
_____, 2014.2015.

TENANT:

**LOWES FOODS, LLC**,
a North Carolina limited liability company

By:     _____
        Timothy D. Lowe, President

F- 3

EXHIBIT G

(attached to and made a part of that certain
Shopping Center Lease, dated _____, ~~2014~~2015
between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

**MEMORANDUM OF LEASE**

**THIS MEMORANDUM OF LEASE** is made and entered into as of
_____, ~~2014,~~2015, by and between **RIVERSIDE CROSSING, LLC**, a
Delaware limited liability company ("Landlord"), and **LOWES FOODS, LLC**, a North Carolina
limited liability company ("Tenant").

For and in consideration of Ten Dollars ($10.00) and other good and valuable
consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord does
hereby lease and demise unto Tenant, upon and subject to each of the covenants and undertakings
hereinafter set forth as well as each and every covenant, agreement, and undertaking set forth in a
certain Lease Agreement between Landlord and Tenant of even date herewith (hereinafter called
the "Lease Agreement" and which is hereby incorporated herein for all purposes), a storeroom,
which is or shall be 49,195 square feet (hereinafter called the "Demised Premises"), being
located in a part of Riverside Crossing Shopping Center ("Center"), which entire Center is shown
on Exhibit "A" attached to the Lease Agreement, and which is more particularly described on
Exhibit A attached to this Memorandum and made a part hereof, together with all other
improvements constructed or to be constructed thereon, and all other rights of way, tenements,
hereditaments, riparian rights and appurtenances belonging or pertaining thereto, including all
necessary easements for drainage, sewer and utility service to the Demised Premises, for
underground encroachment of footings and foundations and for above- ground encroachment of
building signs, pediments, canopies, vestibules and other architectural features, which Center is
located at the southeast corner of Hammett Bridge Road and Suber Road, in the City of Greer,
County of Greenville, and State of South Carolina.

This Memorandum of Lease has been prepared to provide notice that the Demised
Premises are subject to the terms and conditions of the Lease Agreement, which terms are hereby
incorporated by reference into this Memorandum of Lease. In no event shall the terms of this
Memorandum of Lease be deemed to modify, amend, limit or otherwise affect the terms and
conditions of the Lease Agreement. In the event this Memorandum of Lease conflicts with any
of the terms or conditions in the Lease Agreement, the terms and conditions of the Lease
Agreement shall control.

Tenant shall have the right, privilege and easement to use, in common with other tenants,
all of the Center not occupied by buildings, or shown on Exhibit "A" attached to the Lease
Agreement. Such parts of the Center as are not covered by buildings according to Exhibit "A"
attached to the Lease Agreement shall be called the "Common Area" including, but not limited
to, all parking areas, sidewalks, exterior stairways and ramps, entrances, exits, landscaped areas,

G- 1

exterior lighting facilities and drainage facilities and signs. The Common Area shall be maintained for unobstructed pedestrian traffic and for the parking of automobiles and other passenger vehicles of Tenant and all persons trading with or doing business with Tenant and other occupants of premises located in the Center. Tenant shall have uninterrupted access to its loading area and enclosed docks at all times.

TO HAVE AND TO HOLD the Demised Premises for a term of twenty (20) years from the Commencement Date, unless sooner terminated as provided for or permitted in the Lease Agreement.

Tenant shall be entitled to four (4) successive renewals, each for a term of five (5) years, upon the terms and conditions as set forth in the Lease Agreement, except as to term and number of renewals.

Should Tenant remain in possession of the Demised Premises after termination of this Lease or of any renewal term of which Tenant shall have availed itself or after any earlier termination provided or permitted herein or by the Lease Agreement, it shall be a Tenant from month to month at the same rental and on the same conditions, except as to term, as herein provided.

Landlord as to the Center and the Outparcels, and Tenant as to the Demised Premises shall not lease or use space in the Center or the Demised Premises, as the case may be, for the following uses: (a) professional offices comprising more than ten percent (10%) of the Center, (b) movie theater, (c) cocktail lounge, tavern or bar; provided, however, a bar in conjunction with a restaurant is allowed, (d) health club or spa with leased space of more than five thousand (5,000) square feet (except with Tenant's prior written consent, which may be withheld in Tenant's sole discretion), (e) night club or discotheque, (f) any mobile home park, trailer court, labor camp, junkyard, or stockyard (except that this provision shall not prohibit the temporary use of construction trailers during periods of construction), (g) any dumping, disposing, incineration, or reduction of garbage (exclusive of dumpsters located in the rear or side designated locations of any building), (h) an auction house operation or flea market, (i) any automobile, truck, trailer or R.V. sales, leasing, display or repair; provided, however, an auto parts sales location is allowed, (j) any skating rink, bowling alley, bingo parlor or other place whose primary business is recreation or amusement, (k) any living quarters, sleeping apartments, hotel, motel or lodging rooms, (l) any animal raising facilities or pet shop (except that this prohibition shall not prohibit pet shops which are not adjacent to the Demised Premises), (m) any mortuary or funeral parlor, (n) any establishment renting, selling or exhibiting pornographic materials, (o) school or training facilities; provided, however, children's play centers and day care centers are allowed, (p) manufacturing or warehouse facility, (q) a convenience store, (r) nursing home, (s) any sit-down restaurant within one hundred (100) feet of the exterior of any outside wall of the Demised Premises or (t) any church.

Landlord covenants and agrees not to lease, rent, occupy, or suffer or permit to be occupied, any part of the Center or the Outparcels (other than the Demised Premises) for the purpose of conducting therein or for use as, a food store or a food department, or for the sale for

G-2

off-premises consumption of groceries, produce, dairy products, meats, wine or bakery products, or any of the foregoing ("Grocery Items"); provided, however, that nothing contained herein shall prevent any tenant in the Center or occupant of the Outparcels from selling Grocery Items as an incidental part of its principal business so long as (i) the total number of square feet devoted by such tenant to the display for sale of Grocery Items does not exceed 5% of the total number of square feet of building area leased by such tenant in the Center or occupant of the Outparcels, or 500 square feet (including, in either such case, 1/2 of the aisle space adjacent to any display area), whichever is smaller; or (ii) the tenant is primarily a restaurant selling freshly prepared food for contemporaneous consumption on or off the tenant's premises, including, but not limited to, such stores as a pizza store, ice cream store, "Subway" type sandwich store and a "Dunkin Donuts" type donut store. Notwithstanding the foregoing, fresh meat and produce shall not be considered Grocery Items and their sale by any tenant in the Center or occupant of any Outparcel (other than Tenant or any subtenant or assignee of Tenant) shall be strictly prohibited. This covenant shall cease to be in force and effect if Tenant, or a subtenant or assignee of Tenant, fails to conduct a business in the Demised Premises for the sale of groceries, produce, dairy products, meats, bakery products, or any of them, for off premises consumption for a period of one hundred eighty (180) days or longer, except when such failure is caused by renovations, strikes, labor disputes, casualty or conditions beyond the control of Tenant or its subtenant or assignee.

Tenant shall have the right to approve, such approval not to be unreasonably withheld, building placement and height of any improvements built on any Outparcel. Any Outparcel improvements must meet the following criteria: height of any structure, including any screening, parapet, mechanical equipment or similar appurtenance erected on any Outparcel may not exceed twenty (20) feet measured perpendicular to the finished floor elevation of the Demised Premises. Additionally, (i) Landlord shall not engage in any construction work on any Outparcel during the period of November 15 through and including January 15 of any given year, (ii) the Outparcel under construction shall be screened from the remainder of the Center with a fence at least six (6) feet in height, (iii) any equipment or construction materials used in connection with construction on any Outparcel shall be placed only upon such Outparcel under construction, and not on any other portion of the Center and (iv) no owner or occupant of any Outparcel (including any customer or invitee of such owner or occupant) shall be entitled to park on any part of the Center other than within its own Outparcel.

If property contiguous to the Center or within a radius of one (1) mile from any portion of the Demised Premises is developed by Landlord, directly or indirectly, for commercial purposes, the provisions of the immediately foregoing two (2) paragraphs shall apply to said contiguous property or controlled area property. In addition, Landlord, any entity which controls, is controlled by or under common control with Landlord, any entity which acquires all or substantially all of Landlord's assets, or Landlord's affiliates, successors, or assigns shall not (directly or indirectly) develop a supermarket on any property within a three (3) mile radius from any portion of the Demised Premises.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

G- 3

**IN WITNESS WHEREOF**, this Memorandum of Lease has been duly executed as of the day and year first above written.

LANDLORD:

**RIVERSIDE CROSSING, LLC**,
a Delaware limited liability company

By: _____

Name: _____

Title: _____

STATE OF _____

CITY/COUNTY OF _____

I, _____, a Notary Public of the aforesaid _____ and State, do hereby certify that _____, personally came before me this day and acknowledged that s/he is _____ of **RIVERSIDE CROSSING, LLC**, a Delaware limited liability company, and that by his/her authority duly given and as the act of the company, the foregoing instrument was signed in its name.

Witness my hand and official stamp or seal this _____ day of _____, 2014.2015.

_____
Notary Public

My Commission Expires: _____

(Stamp/Seal)

G- 4

TENANT:

**LOWES FOODS, LLC,**
a North Carolina limited liability company

By: _____

Timothy D. Lowe, President

STATE OF NORTH CAROLINA

COUNTY OF _____

    I, _____, a Notary Public of the aforesaid _____ and State, do hereby certify that Timothy D. Lowe personally came before me this day and acknowledged that he is President of **LOWES FOODS, LLC**, a North Carolina limited liability company, and that by his authority duly given and as the act of the company, the foregoing instrument was signed in its name.

    Witness my hand and official stamp or seal this _____ day of _____, 201_.


_____

Notary Public

My Commission Expires: _____

(Stamp/Seal)

G- 5

EXHIBIT A

Legal Description of Center

G- 6

## EXHIBIT H

(attached to and made a part of that certain
Shopping Center Lease, dated _____, ~~2014~~2015
between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

**TENANT'S SIGNAGE**

*To be attached.*

I- 1

EXHIBIT I

(attached to and made a part of that certain
Shopping Center Lease, dated _____, ~~2014;~~2015,
between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

**GUARANTY OF LEASE**

THIS GUARANTY made as of _____, ~~2014;~~2015, by **ALEX LEE, INC.**, a North Carolina corporation, herein referred to as "Guarantor," to **RIVERSIDE CROSSING, LLC,** a Delaware limited liability company, herein referred to as "Landlord."

In consideration of Landlord executing and entering into a Lease or other obligation with Lowes Foods, LLC, herein called Tenant, for premises in _____ Shopping Center, City of Greer, Greenville County, South Carolina, the undersigned Guarantor irrevocably and unconditionally guarantees payment when due, whether by acceleration or otherwise, of the rent and other amounts due under the Lease, and in all schedules or leases now or hereafter entered into with Tenant and all the obligations and liabilities due and to become due to Landlord from Tenant under the Lease or any note or other obligation of Tenant to Landlord, together with all interest thereon and all attorneys' fees, costs and expenses of collection incurred by Landlord in enforcing any such obligations and liabilities under this Guaranty.

The undersigned Guarantor specifically agrees that this Guaranty is and shall be an open and continuing guaranty and all obligations and liabilities to which it applies or may apply shall be conclusively presumed to have been created in reliance hereon and shall continue in full force and effect, notwithstanding any: (a) change in rentals or other obligations under the Lease; (b) renewals, modifications, additions or extensions thereto; or (c) extensions of time to perform any of the obligations thereunder.

No invalidity, irregularity or unenforceability of all or any part of the obligations and liabilities hereby guaranteed or of any security therefore shall affect, impair or be a defense to this Guaranty. This Guaranty is a primary obligation of the Guarantor. Nothing herein shall be construed to obligate Guarantor if the Lease is terminated according to its terms.

This instrument shall be deemed to have been made in the County of Catawba, State of North Carolina and shall be interpreted in accordance with the laws of the State of North Carolina.

As part of the consideration for Landlord's execution of the Lease, the undersigned Guarantor agrees that any and all actions or proceedings arising directly or indirectly from this Guaranty shall be litigated in courts having a situs within the State of North Carolina.

This Guaranty shall bind the respective heirs, executors, administrators, successors, and assigns of the Guarantor.

I- 2

Any act of Landlord, or the successors, assigns or agent of Landlord, consisting of a waiver of any of the terms or conditions of the Lease, or the giving of any consent to any manner or thing relating to the Lease, or the granting of any indulgences or extensions of time to Tenant, may be done without notice to Guarantor and without releasing the obligations of Guarantor hereunder.

The obligations of Guarantor hereunder shall not be released by Landlord's receipt, application or release of security given for the performance and observance of covenants and conditions in the Lease contained on Tenant's part to be performed or observed; nor by any modification of the Lease, but in case of any such modification the liability of Guarantor, shall be deemed modified in accordance with the terms of any such modification of the Lease.

The liability of Guarantor hereunder shall in no way be affected by: (a) the release or discharge of Tenant in any creditors' receivership, bankruptcy or other proceedings; (b) the impairment, limitation, modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's said liability under the Lease, resulting from the operation of any present or future provision of the Federal Bankruptcy Act or other similar insolvency statutes; (c) the rejection or disaffirmance of the Lease in any such proceedings; and (d) the assignment or transfer of the Lease by Tenant.

Until all the covenants and conditions in the Lease on Tenant's part to be performed and observed are fully performed and observed, Guarantor: (a) shall have no right of subrogation against Tenant by reason of any payments or acts of performance by the Guarantor, in compliance with the obligations of the Guarantor hereunder; (b) waives any right to enforce any remedy which Guarantor now or hereafter shall have against Tenant by reason of any one or more payments or acts of performance in compliance with the obligations of Guarantor hereunder; and (c) waives any rights Guarantor may otherwise have under the provisions of North Carolina General Statutes, Section 26-7, et. seq.

This instrument may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and Landlord.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

J-3

In witness whereof, Guarantor has executed this Guaranty at Hickory, North Carolina the day and year first above written.

GUARANTOR:

**ALEX LEE, INC.**

By: _____  _____
            Boyd L. George, Chairman

FOR IDENTIFICATION:

TENANT:     Lowes Foods, LLC          LANDLORD: Riverside Crossing, LLC

Address:     P.O. Box 24908          Address:     16740 Birkdale Commons Parkway
                                                                Suite 306
                  Winston-Salem, NC                      Huntersville, North Carolina, 28078
                  27114-4908                                  Attn: Dante Massaro

Shopping Center: _____

I-4

EXHIBIT J

(attached to and made a part of that certain
Shopping Center Lease, dated _____, 2014<u>2015</u>
between RIVERSIDE CROSSING, LLC and
LOWES FOODS, LLC)

**DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND
EASEMENTS**

J- 5

Document comparison by Workshare Compare on Friday, January 16, 2015
4:41:41 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMSCLT1/US2008/6154729/5 |
| Description | #6154729v5<US2008> - Lease - Lowes Foods - Greer SC |
| Document 2 ID | interwovenSite://DMSCLT1/US2008/6154729/6 |
| Description | #6154729v6<US2008> - Lease - Lowes Foods - Greer SC |
| Rendering set | Firm |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 163 |
| Deletions | 155 |
| Moved from | 5 |
| Moved to | 5 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 328 |