# EXHIBIT

# 9



Gemini Real Estate Advisors, LLC

**Dante Massaro – President**

16740 Birkdale Commons Parkway
Suite 306
Huntersville, NC 28078
T (704) 895-7845 ext. 101
F (704) 895-7846
dmassaro@gemini-re.com
www.gemini-re.com

FOR SETTLEMENT PURPOSES

October 14, 2014

**Via E-Mail and FedEx**

Mr. John R. Connelly, Jr.
Executive Director, Acquisitions
UBS Realty Advisors LLC
10 State House Square, 15th Floor
Hartford, Connecticut 06103-3604

Re:    Gemini – Jade Bryant Park and Jade Seaport (the "Projects")

Dear Jack:

Chris La Mack and I enjoyed our recent visit to Hartford. As a follow up to our discussions there, I am writing to make a proposal regarding the UBS loans on the Projects. Given the sensitive nature of the topics addressed in this letter, we ask that you please keep it confidential.

The Proposal: We propose that the Jade Bryant Park and the Jade Seaport be placed on the market and sold as development sites. We propose listing the Projects with RobertDouglas in New York (Doug Hercher), with the net proceeds going 1) to repay UBS, with interest accrued through the date of the closing, then 2) to the Gemini investors at par, except that Gemini Fund 5 would receive a 9% return, and then, 3) any additional proceeds to go 75% to UBS and 25% to the Gemini investors. Gemini would waive any additional development fees.

Please consider the following when evaluating our proposal:

1. The situation between the principals of Gemini is uncertain. As you know, the three equal principals of Gemini Real Estate Advisors, LLC ("Gemini") are Chris La Mack ("La Mack"), Dante Massaro ("Massaro") and Will Obeid ("Obeid"). In July of this year, La Mack and I removed Obeid as President because it was in the best interests of Gemini. La Mack and I also filed a suit against Obeid, in North Carolina, on behalf of ourselves and the Company. That complaint has since been amended and is attached for your convenience as Exhibit A. Obeid responded by filing a lawsuit against us in federal court in New York asking, among other things, that a judge make Obeid the President again.

While litigation is pending between partners, it is much more difficult for a company to obtain new financing and raise equity for existing projects. Unfortunately, we do not know how long this litigation will continue.

2. The UBS loan for the Projects will most likely have to be modified if the loan is not repaid now. For the reasons set out in our lawsuit against Obeid, it is unlikely that La Mack and I will be partners with Obeid on new deals. In time, Gemini could become an inactive entity that it is not doing any new business, while its principals pursue new projects with different companies. Ultimately, any settlement or resolution of the issues between the Gemini principals will most likely require making a request to change or modify the UBS loans for the Projects, especially if new equity is required.

3. The Projects are subject to being controlled by La Mack and Massaro. As we discussed in our recent meeting in Hartford, La Mack and I have been allowing Obeid to continue to manage the Projects, and have not interfered with his management. Obeid is still President of the Manager entities for the Projects. However, Obeid can be removed at any time as both President and as an officer.

    You should be aware that La Mack and I have concerns about both Projects that may lead us to eventually conclude that we need to take over the management of the Projects. Jade Bryant Park is likely over budget and will require more equity unless some design modifications are made to offset the escalating construction costs. The Seaport hotel, which is still a Best Western, is stable under Gemini management. Our concern with the Seaport hotel is that under the current development plan, we may be spending more money than justified for the market.

4. A sale would return all of UBS's investment in the Projects. RobertDouglas has already evaluated and underwritten the Projects. RobertDouglas estimated the value for Bryant Park to be $19.5M and the value for Seaport to be $34.25M. These values do not assume any construction costs or FF&E expenses which may also be recouped at sale. Their BOV analysis is attached for your convenience as Exhibit B.

5. There is already preliminary interest to purchase the Projects. We have been discussing the Projects with the Congress Group (www.congressgroup.com). The President of Congress, Dean Stratouly, has already toured both of the Projects with me. Congress is running numbers, and we hope to have offers soon.

    The offer for Jade Bryant Park is subject to some cost cutting in the design. Congress shares the concern that La Mack and I have about the cost of the design. Besides a purchase offer, Congress is also considering coming in with additional equity, taking over the development, and leaving the UBS loan in place through 2016. Under this option, Congress would want UBS to allow a sale of the Jade Bryant Park at TCO in 4Q 2016.

    For Seaport, the offer will probably be based on a conversion of the project into a residential development – which Congress believes is a better use there than a Jade hotel. Congress is also looking at the hotel option, especially given the mounting FF&E

expenditures and the looming closing of the hotel. In either case, Congress will propose a take out of the existing UBS loan.

The preliminary numbers we have been discussing would be considerably higher than the projected balances of the UBS loans at the end of the year, which are approximately $17.4M for Bryant Park and $29.9M for Seaport.

The Projects are marketable and there is an opportunity for UBS to recoup its investment. While we understand your commitment to these deals and your desire to achieve the initially projected long term returns, we believe the uncertainty of Gemini's situation, the likelihood of cost overruns, and the risk that the Projects don't meet their return projections, are all reasons to accept our proposal. While you are considering our proposal, we recommend that we do not spend additional money at the Seaport hotel, and do not close the hotel yet. We would like UBS to make a decision regarding this proposal as soon as practicable. Again, we ask that you maintain this in confidence.

We believe this proposal is in the best interests of all concerned – UBS, Gemini and our investors. We look forward to hearing from you regarding our proposal.

Sincerely,

Dante A Massaro

Dante A. Massaro
Gemini Real Estate Advisors, LLC

cc: Mr. Brent N. Hall
    Mr. Christopher La Mack

<u>EXHIBIT A</u>

NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14-CVS-12010

CHRISTOPHER LA MACK, )
DANTE A. MASSARO, and )
GEMINI REAL ESTATE )
ADVISORS, LLC, )
 )
     Plaintiffs, )
 )
     vs. )
 )
WILLIAM T. OBEID, )
 )
     Defendant, )

**FIRST AMENDED
COMPLAINT**

Plaintiffs Christopher La Mack, Dante A. Massaro (the "Individual Plaintiffs") and Gemini Real Estate Advisors, LLC ("Gemini" or the "Company") (collectively "Plaintiffs"), state as follows for their First Amended Complaint against William T. Obeid ("Defendant" or "Obeid"), individually and as a Manager of Gemini:

## SUMMARY AND NATURE OF ACTION

1.    Plaintiffs bring this lawsuit against Defendant Obeid as a manager of Gemini. Through this action, Plaintiffs seek to recover damages from, and seek injunctive relief against, Defendant Obeid on several causes of action, including breach of Gemini's amended operating agreement, breach of fiduciary duty, conversion, negligent misrepresentation, and tortious interference with business relationships.

2.    Defendant Obeid abused his position as Operating Manager and Manager of Gemini for personal gain at the expense of the Individual Plaintiffs and the Company, concealed unauthorized transfers of Company funds, hired family members and personal friends at

artificially inflated salaries, interfered with Gemini's lending and business transactions, and otherwise acted outside the scope of his authority under Gemini's amended operating agreement.

## PARTIES

3. At all times hereinafter mentioned, Gemini was and is a closely held Delaware limited liability company, duly licensed to conduct business in North Carolina and actually doing business in Mecklenburg County, North Carolina, with a principal place of business at 200 Park Avenue South, Suite 1305, New York, NY 10003 and an office in Mecklenburg County, North Carolina.

4. At all times hereinafter mentioned, Christopher La Mack was and is a resident of Iredell County, North Carolina.

5. At all times hereinafter mentioned, Dante A. Massaro was and is a resident of Mecklenburg County, North Carolina.

6. At all times hereinafter mentioned, William T. Obeid was and is a resident of New York, New York.

7. At all times hereinafter mentioned, William T. Obeid was and is a member and manager of Gemini.

8. At all times hereinafter mentioned, Plaintiffs were and are members and managers of Gemini.

9. As set forth more fully in paragraphs Defendant Obeid regularly conducted business in North Carolina on behalf of Gemini.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to N.C. GEN. STAT. §§ 7A-240 and 7A-243.

2

11.     This Court has personal jurisdiction over the Defendant in this action pursuant to N.C. GEN. STAT. § 1-75.4.

12.     Gemini, in which Obeid has and does participate as an LLC member, is licensed to do business in North Carolina, owns numerous properties in North Carolina, and maintains an office in Mecklenburg County, North Carolina.

13.     Many of the transactions arising out of and giving rise to the claims set forth in this First Amended Complaint took place in the State of North Carolina, including meetings at which Defendant Obeid was present. Additionally, Obeid directly and through his New York counsel has intentionally interfered with Gemini's prospective business relationships in North Carolina.

14.     At all relevant times, Defendant Obeid maintained substantial, continuous and systematic contacts with the State of North Carolina that subject him to jurisdiction here. Defendant Obeid traveled to North Carolina on numerous occasions to meet with Plaintiffs and others at both Gemini's offices and various other locations in Mecklenburg County, and to conduct business, enter into agreements, and negotiate agreements with Plaintiffs. Defendant Obeid has further contacted Gemini's lenders and other business partners in North Carolina for the purpose of interfering with Gemini's business transactions.

15.     Defendant Obeid communicated instructions to several others to take the improper actions set forth in this First Amended Complaint all of whom were within the state of North Carolina by means of written, electronic and telephonic communications and correspondence.

16.     Defendant Obeid has waived any objection to this Court's jurisdiction over his person pursuant to N.C. GEN. STAT. § 1A-1, Rule 12(h).

3

17.     Gemini is a closely held limited liability company in which the only members are Plaintiffs and Defendant Obeid.

18.     Defendant Obeid and the Individual Plaintiffs are the only managers of Gemini.

19.     Venue is proper in this Court pursuant to N.C. GEN. STAT. §§ 1-80 and 1-82.

## FACTS

### Formation of Gemini

20.     On or about April 15, 2003, Individual Plaintiffs and Defendant Obeid formed Gemini in order to "acquire, own, operate, improve, manage and dispose of commercial real estate." **Exhibit A (Amended Operating Agreement), Ex. D.**

21.     Defendant Obeid and the Individual Plaintiffs entered into an initial Operating Agreement for the governance of Gemini.

22.     On or about February 19, 2009, Defendant Obeid and the Individual Plaintiffs entered into an Amended and Restated Limited Liability Company Agreement of Gemini Real Estate Advisors, LLC (the "Amended Operating Agreement").

23.     Defendant Obeid was named as the initial Operating Manager of Gemini in the Amended Operating Agreement.

24.     Under Section 5.16 of the Amended Operating Agreement, Defendant Obeid, as Operating Manager, had the power to: "act on behalf of the Company and to execute any and all documents, instruments and agreements," but only if "*the execution of such documents has been approved by the Managers*." **Amended Operating Agreement § 5.16 (emphasis added).**

25.     The Amended Operating Agreement further provides that "[n]either any Member nor a successor, representative or assign of such Member, shall have any right, title or interest in or to any Company property," *id.* **§ 2.7**, and that "Company funds shall not be commingled with funds from other sources and shall be used solely for the business of the Company," *id.* **§ 5.1.2.**

4

Rather, Gemini's managers are to use Company assets only "for the Company's purposes." *Id.* §
5.1.4.

## Defendant Obeid's Abuse of his Position as Operating Manager of Gemini

26.     Defendant Obeid unilaterally caused Gemini to enter into business deals without
seeking or obtaining Plaintiffs' input or approval in direct violation of, among other things,
Section 5.16 of the Operating Agreement.   One such deal was the acquisition of a hotel in
Miami, Florida (the "Miami Hotel Deal").    Without seeking or obtaining the Individual
Plaintiffs' opinion or approval, or even informing the Individual Plaintiffs of the existence of the
Miami Hotel Deal, Defendant Obeid intentionally and purposely caused Gemini to pay a
nonrefundable deposit of $250,000.00 toward the purchase of the Hotel and despite knowing that
the Miami Hotel Deal constituted a highly risky investment for Gemini.

27.     Defendant Obeid wilfully and purposely kept the Individual Plaintiffs completely
unaware of the Miami Hotel Deal until approximately two weeks before the Miami Hotel Deal
was scheduled to close, at which time, Defendant Obeid had already caused Gemini to pay the
nonrefundable deposit.

28.     When Defendant Obeid eventually approached the Individual Plaintiffs regarding
the Miami Hotel Deal, he did so only because the sellers were insisting on an additional
payment, and he could not obtain the necessary funds without the Individual Plaintiffs'
signatures.

29.     As a result, the Individual Plaintiffs' only choice was to execute the loan
documents and allow the Miami Hotel Deal to close or refuse to sign, in which case, Gemini
would lose its deposit.

30.     When questioned as to why he did not inform the Individual Plaintiffs in advance

5

of entering into the Miami Hotel Deal, Defendant Obeid told them that he "forgot" about it.

31.    Defendant Obeid wilfully and purposely misrepresented to the Individual Plaintiffs the amount of the investment in the Miami Hotel Deal. Defendant Obeid represented to the Individual Plaintiffs that they would need to invest an additional $500,000 to preserve the previously undisclosed $250,000 deposit.

32.    In fact, Defendant Obeid invested an additional $1,078,000 of Gemini's funds, through Gemini or through entities wholly owned by Gemini, without the authorization or consent of the Individual Plaintiffs.

33.    Defendant Obeid has wilfully and purposely used Gemini business projects as a means of taking money out of Gemini to an unknown account or location and, upon information and belief, has intermingled such funds with his personal accounts.

34.    On July 9, 2014, Mr. Obeid requested a "true up" of the Gemini partners' capital accounts in order to withdraw $100,281.93. Upon information and belief, his purpose in seeking to withdraw these funds was to further consolidate power in himself and deplete Gemini's capital reserves despite substantial upcoming capital requirements. Many of the projects requiring outlays of capital from Gemini—such as the Miami Hotel Deal—were initiated by Mr. Obeid without consultation with the other member-managers of Gemini. Despite a majority of the Gemini managers opposing Mr. Obeid's proposed withdrawal from the capital account, Mr. Obeid unilaterally withdrew the funds.

35.    On numerous occasions Defendant Obeid has hired and fired employees of Gemini, including senior managers, without informing, consulting, or obtaining the approval of Plaintiffs.

36.    For example, without consulting with the Individual Plaintiffs, Defendant Obeid

6

has hired persons to work for Gemini, which include personal contacts of Defendant Obeid, many of whom were not qualified for the jobs for which they were hired.

37. Upon information and belief, persons hired by Defendant Obeid were often paid inflated salaries in excess of those set by Company policy and those paid to other Gemini employees performing similar jobs.

38. Defendant Obeid has also unilaterally caused the termination of the employment of Gemini employees despite agreement among the Individual Plaintiffs and Defendant Obeid that these employees should remain employed by Gemini.

39. Defendant Obeid has systematically sought to consolidate control of Gemini in himself despite owning only one third of the Company. He has abused his position as Operating Manager.

## The July 1, 2014 Meeting

40. On July 1, 2014, Defendant Obeid held a member/manager meeting solely for the purpose of demanding that the Individual Plaintiffs provide him with a restructuring proposal to increase his ownership in the Company. At this meeting, Defendant Obeid did not attempt to discuss any of the Company's business and expressed no interest in moving the Company forward. He was focused solely on his self-interested demand of receiving more ownership interest in the Company.

41. At the July 1 meeting the Individual Plaintiffs voted to remove Defendant Obeid as the Operating Manager pursuant to the Operating Agreement in order to act in the best interest of Gemini and stop Defendant Obeid from acting unilaterally and without regard to Plaintiffs' and the Company's rights.

42. Plaintiff Massaro was properly elected by Gemini's members as Gemini's new

7

Operating Manager at the July 1 meeting.

43.     After the July 1, 2014 meeting, Plaintiffs filed the instant litigation against Defendant Obeid, seeking damages for Defendant Obeid's breach of his fiduciary duties to Gemini while acting as Operating Manager of Gemini and seeking injunctive relief to prevent Defendant Obeid's continued interference with Gemini's business. The Individual Plaintiffs and the Company were forced to bring the instant lawsuit due to Defendant Obeid's clear disregard for his fiduciary duties to the Company.

**Defendant Obeid's Continued Interference with Gemini's Business**

44.     After the July 1 meeting, Defendant Obeid continued to engage in conduct that interfered with Gemini's existing and prospective business relationships.

45.     Defendant Obeid has further intimidated Gemini's employees and created an environment at Gemini which has substantially disrupted Gemini's business

46.     Since removing Defendant Obeid as Operating Manager, the Individual Plaintiffs have attempted to stabilize Gemini and secure the continuity of Gemini's business despite Defendant Obeid's ongoing disruptive conduct.

47.     UBS bank is an important lender for Gemini. UBS loaned Gemini approximately $90 million for two hotel development deals in New York. Without informing or consulting the Individual Plaintiffs, Defendant Obeid made Gemini the guarantor for these loans and agreed to a $2 million liquidity requirement on behalf of Gemini.

48.     Despite being removed as Operating Manager of the Company, on or about July 23, 2014, Defendant Obeid unilaterally contacted UBS, informing it that he was no longer President and Operating Manager of Gemini, and indicating to UBS that Gemini was in distress, thereby putting Gemini's loan and guarantee at risk and generally jeopardizing the business

8

relationship between Gemini and UBS. John Connelly of UBS contacted Plaintiff Massaro and told him that Obeid had relayed this information to him.

49. Defendant Obeid never sought authorization nor discussed his intent to contact UBS with the Individual Plaintiffs, and in particular, Plaintiff Massaro, Gemini's new Operating Manager. Defendant Obeid wrongfully interfered with Gemini's relationship with UBS by making this unauthorized contact.

50. On August 14, 2014, Defendant Obeid filed a retaliatory lawsuit against the Individual Plaintiffs in federal court in New York (the "New York Action") in a further attempt to disrupt Gemini's business and gain leverage over the Individual Plaintiffs to get his unjustified restructuring deal.

51. Defendant Obeid later filed a frivolous motion for temporary restraining order in the New York Action, which he later abandoned due to the fact that the motion was baseless. In his motion for temporary restraining order and in his New York Action, Defendant Obeid has claimed that the Individual Defendants intended to exclude him from a grocery store real estate development deal in South Carolina (the "South Carolina Deal"). Defendant Obeid's claim is false and was intended solely to jeopardize the Company's prospective transaction.

52. Defendant Obeid has always been informed of the South Carolina Deal and in fact approved it as the Operating Manager. On April 29, 2014, Mr. Obeid held an "Investment Committee" meeting via phone to discuss the South Carolina Deal. Mr. La Mack prepared an Investment Memorandum, per Mr. Obeid's direction, to review on the phone call. Besides the three principals of Gemini, the others on the call were Managing Director Bill Stelma, Managing Director Jeff Weismann and Managing Director Paul Harnett. The deal was approved by the Investment Committee as a deal that the Company should pursue.

9

53. On July 2, 2104, Mr. Obeid approved the payment of an additional non-refundable deposit for the South Carolina Deal, via an e-mail.

54. On August 5, 2014, Mr. La Mack sent an e-mail to Judy Limbach at Edwin Mae asking her to form a Delaware entity called "Riverside Crossing, LLC" and that this entity would be "wholly owned by GREA [Gemini] (Chris [La Mack], Dante [Massaro] & Will [Obeid])." The intent was to use Riverside Crossing, LLC as the special purpose entity that would become the borrower under a loan with Asheville Savings Bank.

55. Defendant Obeid knew of the South Carolina Deal and in fact directly approved the payment of a deposit.

56. On or about August 18–19, 2014, Defendant Obeid caused his New York lawyers at the firm of Boies Schiller & Flexner LLP ("Boies Schiller") to send targeted litigation "hold" letters to Asheville Savings Bank and Lowes Foods in an effort to interfere with a real estate development project that the Individual Plaintiffs were pursuing on behalf of Gemini. Boies Schiller and Defendant Obeid have used the New York Action to justify the litigation hold letters even though such letters were targeted and intended to disrupt a specific transaction.

57. Gemini's current investment in this project is approximately $175,000, which will be lost if the deal does not close. On or about August 27, 2014, Lowes Foods informed Gemini that the current lease agreement negotiations between Lowes Foods and Gemini were on hold due to the letter they received from Mr. Obeid's counsel.

58. Upon information and belief, on or about August 20, 2014, Defendant Obeid contacted a representative of Edgewood Capital, which has existing deals with Gemini, despite having been removed as Operating Manager of Gemini over 6 weeks earlier. Mr. Obeid informed Edgewood Capital that he was no longer President and Operating Manager of Gemini,

and indicated that Gemini was in distress. A representative of Edgewood Capital subsequently contacted Gemini expressing concern about the state of Gemini and doubt about Gemini's ability to follow through on existing deals with Edgewood.

59.     Defendant Obeid is using the frivolous New York Action and Boies Schiller to interfere with specific Gemini business transactions. It is clear that Defendant Obeid previously knew and approved of the South Carolina Deal but is using the New York Action to advance unfounded allegations and disrupt the Company's prospective business opportunities.

60.     Defendant Obeid and Boies Schiller's conduct have in fact interfered with Gemini's business and have caused Gemini to suffer irreparable harm.

61.     On or about August 28, 2014, Defendant Obeid interfered with the Individual Plaintiffs' efforts to make personnel changes. Specifically, Defendant Obeid interfered with the Individual Plaintiffs' efforts to terminate a specific employee.

62.     Gemini is the sponsor of a project for a grocery store real estate deal in Edenton Village in Edenton, North Carolina ("Edenton Project"), and the mortgage is held by First State Bank of Northwest Arkansas. Gemini Edenton Village, LLC, an entity wholly owned by Gemini, is a borrower on the mortgage for the Edenton Project along with fourteen other investors in the project. In their positions as members and managers of Gemini, Defendant Obeid and Individual Plaintiffs serve as carve out guarantors on the Edenton Project.

63.     The Edenton Project is currently in default, and First State Bank of Northwest Arkansas has offered the investors a loan modification. Plaintiff Massaro negotiated the loan modification because it is in the best interest of the Edenton Project and Gemini. Without the loan modification, the First State Bank of Northwest Arkansas will foreclose on the Edenton Project.

64.     All of the investors, including the Individual Plaintiffs have signed the loan modification agreement.  Defendant Obeid is currently refusing to sign the loan modification agreement.

65.     Plaintiff Massaro has asked First State Bank of Northwest Arkansas to waive the requirement for Defendant Obeid's signature on the loan modification agreement in an attempt to save the Edenton Project, but the Bank has not agreed to waive the requirement, and the Edenton Project is in danger of being foreclosed on, at which point all of the investors will lose their investments.

66.     Defendant Obeid has no reason for refusing to sign the loan modification agreement, and has done so solely for the purpose of interfering with Gemini's business.

67.     Defendant Obeid's misconduct is an effort to force the Individual Plaintiffs to give Defendant Obeid a restructuring plan to increase his ownership interest in the company.

68.     Defendant Obeid has an unfounded belief that he alone is responsible for Gemini's success, and therefore has the right to ignore the Operating Agreement and his fiduciary obligations to Gemini.

## COUNT ONE
## BREACH OF AMENDED OPERATING AGREEMENT

69.     Plaintiffs hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of this First Amended Complaint.

70.     On or about February 19, 2009, Defendant Obeid executed the Amended Operating Agreement, a valid and enforceable contract governing numerous aspects of Gemini's business, including its operation and management.

71.     The Amended Operating Agreement prohibits Gemini's Managers—including its Operating Manager—from acting on behalf of the Company and executing documents on behalf

12

of the Company unless the other Managers approve execution of the documents. **Amended Operating Agreement § 5.16 (emphasis added).**

72. Moreover, "[n]either any Member nor a successor, representative or assign of such Member, shall have any right, title or interest in or to any Company property," *id.* § 2.7, and "Company funds shall not be commingled with funds from other sources and shall be used solely for the business of the Company," *id.* § 5.1.2.

73. The Amended Operating Agreement also requires the approval of a majority of Gemini's members for "[t]he borrowing of funds, . . . or the pledging of any assets of the Company, in excess of $250,000.00." *Id.* §§ 4.2.1.10; 4.2.1.11.

74. Defendant Obeid breached these and other provisions of the Amended Operating Agreement by engaging in the acts described above, including but not limited to unilaterally causing Gemini to make a nonrefundable deposit on the Miami Hotel Deal without informing the other Member-Managers or seeking their approval of the transaction.

75. Defendant Obeid also breached the Amended Operating Agreement by commingling and/or secreting away Company funds.

76. Defendant Obeid exceeded the scope of his authority under the Amended Operating Agreement and thereby breached the Amended Operating Agreement by unilaterally making decisions related to the hiring, firing, and salaries of Gemini employees, including hiring family and/or friends of Defendant Obeid and firing employees the parties had agreed to retain.

77. Many of these employees were unqualified for the jobs they received, and were paid artificially inflated salaries.

78. Plaintiffs have fully performed all of their obligations under the Amended Operating Agreement.

13

79.     Defendant Obeid's breach of the Amended Operating Agreement has harmed
Gemini as well as the Individual Plaintiffs who are parties to the Amended Operating
Agreement.

## COUNT TWO
## BREACH OF FIDUCIARY DUTY

80.     Plaintiffs hereby incorporate by reference, as if fully stated herein, all the
preceding paragraphs of this First Amended Complaint.

81.     There was a relationship of trust and confidence between Individual Plaintiffs and
Gemini on the one hand and Defendant Obeid as Operating Manager and a Manager of Gemini
on the other hand.

82.     As Operating Manager and Manager of Gemini, Defendant Obeid owed a
fiduciary duty to Gemini and to the other Members/Managers of Gemini, including the
Individual Plaintiffs.

83.     Gemini placed its trust and confidence in Defendant Obeid to act in its best
interest in carrying out his duties as Operating Manager and Manager, and to act in compliance
with the Amended Operating Agreement.

84.     Plaintiffs placed their trust and confidence in Defendant Obeid as Operating
Manager and Manager of Gemini to act in their best interest in managing the Company.

85.     Defendant Obeid breached the trust and confidence placed in him by Gemini and
Plaintiffs by exceeding the scope of his powers as Operating Manager, unilaterally caused the
Company to enter into real estate transactions and expend substantial amounts of Company funds
without seeking Plaintiffs' prior consent, commingling Company funds with his personal funds
and/or transferring Company funds to his private account and/or using Company funds for
purposes unrelated to Company business, interfering with Gemini's existing and prospective

14

business relationships and by abusing his position as Operating Manager to hire his family and friends at inflated salaries.

86.     After removal from his position as Operating Manager, Defendant Obeid continued to breach his fiduciary duties to Gemini by interfering with Gemini's business by interfering with Gemini's existing and prospecting business relationships and business deals, intimidating Gemini employees, creating an environmental at Gemini's office which has disrupted Gemini's business, filing frivolous litigation against the Individual Plaintiffs, contacting Gemini's lenders and business partners, causing his New York counsel to send targeted litigation "hold" letters to lenders and business partners in an effort to interfere with specific business deals, and interfering with the Individual Plaintiffs' efforts to make personnel changes.

87.     Defendant Obeid's actions have caused substantial harm to Gemini and Individual Plaintiffs.

### COUNT THREE
### CONVERSION

88.     Plaintiffs hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of this First Amended Complaint.

89.     The Amended Operating Agreement provides that "[n]either any Member nor a successor, representative or assign of such Member, shall have any right, title or interest in or to any Company property," **Amended Operating Agreement § 2.7**, that "Company funds . . . shall be used solely for the business of the Company," *id.* **§ 5.1.2**, and that Gemini's managers are to use Company assets only "for the Company's purposes," *id.* **§ 5.1.4**.

90.     Without seeking or obtaining Plaintiffs' opinion or approval, or even informing Plaintiffs of the existence of the Miami Hotel Deal, Defendant Obeid intentionally and purposely

15

caused Gemini to pay a nonrefundable deposit toward the purchase.

91.    This act exceeded Defendant Obeid's authority as Operating Manager, and directly caused the conversion of Company property.

92.    Upon information and belief, Defendant Obeid has wilfully and purposely used certain business projects as a means of taking money out of Gemini to an unknown account or location, and/or intermingled such funds with his personal accounts.

93.    Defendant Obeid's actions have caused substantial and irreparable harm to Gemini and Plaintiffs.

## COUNT FOUR
## NEGLIGENT MISREPRESENTATION

94.    Plaintiffs hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of this First Amended Complaint.

95.    Defendant Obeid misled Plaintiffs, concealed from Gemini and Plaintiffs the location and use of missing funds, and concealed the Miami Hotel Deal from Plaintiffs until substantial Company funds had already been expended.

96.    Defendant Obeid intended that Plaintiffs and/or Gemini rely on these misrepresentations and concealments in operating the Company and deciding whether to sign the loan papers for the Miami Hotel Deal.

97.    Defendant Obeid also misled Plaintiffs as to the use and location of missing funds.

98.    The concealment of the location and use of missing funds was wrongful and false because Plaintiffs and Gemini have the right to all financial information concerning the Company and, upon information and belief, Defendant Obeid concealed the location and use of the money in order to hide misappropriation of Company funds or other wrongdoing.

16

99.     The concealment of the Miami Hotel Deal was wrongful because Plaintiffs have the right to approve or disapprove substantial expenditures for such projects.

100.     Under the Amended Operating Agreement, Defendant Obeid had the duty as Operating Manager of providing Plaintiffs with information necessary to evaluate potential projects and of providing Plaintiffs with information concerning the expenditure of Company funds.

101.     Plaintiffs and Gemini actually relied on information provided by Defendant Obeid and concealments made by him in deciding whether to execute the loan documents in connection with the Miami Hotel Deal and participating in Gemini's business.

102.     Defendant Obeid's actions have caused substantial harm to Gemini and Plaintiffs.

## COUNT FIVE
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

103.     Plaintiffs hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of this First Amended Complaint.

104.     Defendant Obeid both directly and through his New York counsel has intentionally interfered with Gemini's existing and prospective business relationships as described in detail above.

105.     Obeid contacted Gemini's lenders and other business partners without seeking authorization from Gemini or the Individual Plaintiffs and in violation of his fiduciary duties to Gemini.

106.     Defendant Obeid intended to harm Gemini through his actions and has in fact harmed Gemini's business.

107.     Gemini has existing and prospective business deals that were disrupted due to Defendant Obeid's conduct.

17

108. Specifically, Gemini had a prospective grocery store, real estate deal that it was pursuing with Lowes Foods in South Carolina.

109. Defendant Obeid and his New York lawyers specifically targeted Gemini's prospective lender in Asheville, North Carolina by sending the bank a "litigation hold" letter for the purpose of interfering with that prospective transaction.

110. Lowes Foods has informed Gemini that the current lease agreement negotiations between Lowes Foods and Gemini are on hold due to the letter they received from Mr. Obeid's counsel.

111. Asheville Savings Bank has also put the lending portion on hold due to Defendant Obeid's communications.

112. Defendant Obeid was previously aware of and approved of the grocery store deal when he was the Company's Operating Manager. Defendant Obeid in retaliation is now interfering with this prospective transaction without justification.

113. Defendant Obeid's conduct did, in fact, interfere with Gemini's prospective real estate deal and caused the deal to not go through, causing Gemini substantial damages.

114. Defendant Obeid's actions have caused substantial harm to Gemini and the Individual Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendant Obeid as follows:

A. Damages in an amount greater than twenty-five thousand dollars;

B. Preliminary and permanent injunctive relief;

C. Any further relief the Court deems appropriate; and

D. Trial by jury.

18

This the 2nd day of September, 2014.

Robert A. Muckenfuss
N.C. State Bar No.: 28212
McGUIREWOODS LLP
201 N. Tryon St., Suite 3000
Charlotte, NC 28202
T: 704-343-2052
F: 704-343-2300
Email: rmuckenfuss@mcguirewoods.com

Elizabeth M.Z. Timmermans
N.C. State Bar No.: 40205
Justin Yedor
N.C. State Bar No.: 44926
McGUIREWOODS LLP
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina 27601
T: 919-755-6600
F: 919-755-6699
Email: eztimmermans@mcguirewoods.com
        jyedor@mcguirewoods.com

## CERTIFICATE OF SERVICE

This is to certify that the undersigned counsel has this day served this **FIRST AMENDED COMPLAINT** in the above-entitled action on all of the parties to this cause by depositing a copy hereof, postage prepaid, in the United States mail, addressed to the following:

C. Bailey King, Jr.
Robert R. Marcus
SMITH MOORE LEATHERWOOD LLP
101 North Tryon Street
Suite 1300
Charlotte, North Carolina 28246
*Attorneys for Defendant William Obeid*

This the 2nd day of September, 2014.

Robert A. Muckenfuss
N.C. State Bar No.: 28212
MCGUIREWOODS LLP
201 N. Tryon St., Suite 3000
Charlotte, NC 28202
T: 704-343-2052
F: 704-343-2300
Email: rmuckenfuss@mcguirewoods.com

Elizabeth M.Z. Timmermans
N.C. State Bar No.: 40205
Justin Yedor
N.C. State Bar No.: 44926
MCGUIREWOODS LLP
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina 27601
T: 919-755-6600
F: 919-755-6699
Email: eztimmermans@mcguirewoods.com
        jyedor@mcguirewoods.com

# EXHIBIT A

## AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

### OF

### GEMINI REAL ESTATE ADVISORS, LLC

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED. UNDER .THE SECURITIES ACT OF 1933 NOR REGISTERED OR QUALIFIED UNDER ANY STATE SECURITIES LAWS. SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINIONS OF COUNSEL SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED. ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, THE TERMS AND CONDITIONS THAT ARE SET FORTH IN THIS AGREEMENT.

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of GEMINI REAL ESTATE ADVISORS, L.L.C., a Limited Liability Company organized pursuant to the Delaware Limited Liability Company Act, hereinafter called the "Company", is executed effective as of the 19th day of February, 2009, by and among the persons designated hereunder as the initial members of the Company, such individuals being hereinafter collectively called the "Members" and individually a "Member".

### STATEMENT OF PURPOSE

WHEREAS, the Members of the Company previously set forth their agreements pursuant to a Limited Liability Company Agreement of the Company executed effective as of the 15th day of January, 2004, which Limited Liability Company Agreement was amended pursuant to documents executed effective as of July 1, 2006 (as amended, the "Original Limited Liability Agreement"); and

WHEREAS, the undersigned, constituting all of the current Members of the Company, desire to amend and restate the Original Limited Liability Company Agreement of the Company in its entirety pursuant to this document, all effective as of the 19th day of February, 2009; and

NOW, THEREFORE, the undersigned parties have executed this agreement and agree as follows:

### ARTICLE 1 - DEFINITIONS

1.1.    **Definitions.** The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein):

**1.1.2** "Additional Capital Contribution" means any additional contribution to the capital of the Company made by a Member pursuant to Section 7.1.2 of this Agreement.

**1.1.3** "Adjusted Capital Account" shall have the meaning ascribed to such term on **Exhibit B** attached hereto.

**1.1.4** "Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State, as amended or restated from time to time.

**1.1.5** "Capital Account" means, for each Member, the account established pursuant to Section 7.2 hereof and maintained in accordance with the provisions of this Agreement.

**1.1.6** "Capital Contribution" means any contribution to the capital of the Company in cash or property by a Member whenever made.

**1.1.7** "Code" means the Internal Revenue Code of 1986, as amended from time to time (and any corresponding provisions of succeeding law).

**1.1.8** "Defaulting Member" means any Member who fails to make a required capital contribution, as more particularly described in Section 7.1.2 of this Agreement.

**1.1.9** "Distributable Cash" means, with respect to the Company for a period of time, all funds of the Company on hand or in bank accounts of the Company as are available for distribution to the Members, including any Sales Proceeds or Refinance Proceeds, after provision has been made for (i) payment of all operating expenses of the Company as of such time, (ii) payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) such reserves as may be necessary or appropriate for Company operations.

**1.1.10** "Fiscal Year" means the calendar year; provided that the first Fiscal Year of the Company shall commence on the later of the date the Certificate of Formation were filed in the office of the Secretary of State and the effective date of the Certificate of Formation, and shall continue through December of such year.

**1.1.11** "Income" means, for each Fiscal Year or other period, each item of income and gain as determined, recognized and classified for federal income tax purposes, provided that any income or gain that is exempt from federal income tax shall be included as if it was an item of taxable income.

**1.1.12** "Initial Capital Contribution" means the initial contribution to the capital of the Company made by a Member pursuant to Section 7.1.1 of this Agreement.

2

1.1.13 **"Lending Member"** means any Member who makes an Additional Capital Contribution in accordance with <u>Section 7.1.2</u> of this Agreement.

1.1.14 **"Loss"** means, for each Fiscal Year or other period, each item of loss or deduction as determined, recognized and classified for federal income tax purposes, increased by (i) expenditures described in Section 705(a)(2)(B) of the Code; (ii) expenditures contemplated by Section 709 of the Code (except for amounts with respect to which an election is properly made under Section 709(b) of the Code); and (iii) expenditures resulting in a deduction for a loss incurred in connection with the sale or exchange of Company property that is disallowed to the Company under Section 267(a)(1) or Section 707(b).

1.1.15 **"Majority in Interest"** means a combination of Members who, in the aggregate, own more than fifty percent (50%) of the Membership Interests owned by all Members (computed with regard to aggregate proportional ownership interests, rather than with regard to the aggregate number of members, but without regard to any Defaulting Members, and without regard to any Non-Voting Members).

1.1.16 **"Manager"** means a person appointed as a Manager of the Company pursuant to Article V. "Managers" refers to such Persons as a group.

1.1.17 **"Member"** means each Person designated as a member of the Company on **Exhibit A** hereto, or any additional member admitted as a member of the Company in accordance with <u>Section 3.2</u> or <u>Section 9.1</u>. "Members" refers to such Persons as a group.

1.1.18 **"Membership Interest"** means all of a Member's rights in the Company, including without limitation, the Member's share of the profits and losses of the Company, the right to receive distributions of the Company's assets, any right to vote (but not with respect to Non-Voting Members) and any right to participate in the management of the Company as provided in the Act (but not with respect to Non-Voting Members) and this Agreement. As to any Member, Membership Interest shall mean the percentage set forth opposite such Member's name on **Exhibit A** hereto. A Person shall cease to be a Member at such time as he no longer owns any Membership Interest (of any Class) of the Company.

1.1.19 **"Net Income"** and **"Net Loss"** means, for each Fiscal Year or other relevant period, (i) the excess of the Income for such period over the Loss for such period, or (ii) the excess of the Loss for such period over the Income for such period, respectively; provided, however, that Net Income and Net Loss for a Fiscal Year or other relevant period shall be computed by excluding from such computation any Income specially allocated under <u>Section 8.1</u>.

3

1.1.20 **"Non-Voting Members"** means the Members who are designated as such on **Exhibit A** attached hereto. The Non-Voting Members shall have no right to participate in the management of the Company and shall not be included in any determination of Members constituting a Majority in Interest of the Members.

1.1.21 **"Person"** means an individual, a trust, an estate, or a domestic corporation, a foreign corporation, a professional corporation, a partnership, a limited partnership, a limited liability company, a foreign limited liability company, an unincorporated association, or another entity.

1.1.22 **"Project Sale"** means a sale for cash of all or substantially all of a Project.

1.1.23 **"Project"** shall mean any lot, tract or parcel of real property, and improvements and personal property associated therewith, to the extent owned by the Company, and/or any interest in any other entity owned by the Company (for example, a membership interest in another limited liability company that is the owner of a fee interest in real property). Attached hereto as **Exhibit D** are descriptions of the real property currently owned by the Company and/or the personal property owned by the Company (including any ownership interest in another entity), which real property (together with any improvements thereon) and/or personal property will constitute the Project(s) for purposes of this Agreement.

1.1.24 **"Refinance Proceeds"** shall mean the net proceeds received by the Company (after payment of all expenses and any refinanced indebtedness) resulting from the refinance of indebtedness secured by a Project.

1.1.25 **"Regulatory Allocations"** shall have the meaning set forth on **Exhibit B** attached hereto.

1.1.26 **"Sales Proceeds"** shall mean the net proceeds received by the Company (after payment of all bona fide expenses and indebtedness, whether owed to third parties or related parties) resulting from a Project Sale or any portion thereof.

1.1.27 **"Secretary of State"** means the Secretary of State of the State of Delaware.

1.1.28 **"Treasury Regulations"** means the Income Tax Regulations and Temporary Regulations promulgated under the Code; as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

1.1.29 **"Unrecovered Capital"** means for each Member an amount equal to the excess if any, of such Member's aggregate Capital Contributions over the aggregate distributions to such Member pursuant to Section 7.2.1.

1.1.30 **"Voting Members"** means Members, and the Personal Representatives or heirs of Deceased Members to the extent that such Personal Representatives or heirs

of Deceased Members are entitled to vote under <u>Section 9.6</u> below, specifically excluding Non Voting Members, Defaulting Members and assignees of Membership Interests who have not been admitted as substitute Members.

## ARTICLE 2 – FORMATION OF THE COMPANY

**2.1.    Formation.** The Company was formed on the date set forth on **Exhibit D** upon the filing with the Secretary of State of the Certificate of Formation of the Company. In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree that the rights and obligations of the parties and the administration and termination of the Company shall be governed by this Agreement, the Certificate of Formation and the Act.

**2.2    Name.** The name of the Company may be changed from time to time by amendment of the Certificate of Formation. The Company may transact business under an assumed name by filing an assumed name certificate in the manner prescribed by applicable law.

**2.3    Registered Office and Registered Agent.** The Company's registered office and registered agent shall be as set forth in the Certificate of Formation or as otherwise provided in the most current annual report filed with the Secretary of State.

**2.4    Principal Place of Business.** The principal place of business of the Company shall be the address as shown on **Exhibit D** attached hereto. The Company may locate its place(s) of business and registered office at any other place or places as a Majority in Interest of the Members may from time to time deem necessary or advisable.

**2.5    Term.** Except as otherwise provided in the Company's Certificate of Formation, the duration of the Company shall be perpetual, unless the Company is earlier dissolved and its affairs wound up in accordance with the provisions of this Agreement or the Act.

**2.6    Purposes and Powers.**

**2.6.1.** Subject to <u>Section 2.8</u> below, the Company may engage, as the Managers may from time to time deem to be in the best interest of the Company, in any lawful business for which Limited Liability Companies may be organized under the Act unless a more limited purpose is stated in the Certificate of Formation; provided, however, that the business purposes of the Company as set forth in <u>Section 2.8</u> below may not be changed without the unanimous consent of all the Members.

**2.6.2.** The Company shall have any and all powers which are necessary or desirable to carry out the purposes and business of the Company, to the extent the same may be legally exercised by Limited Liability Companies under the Act. The Company shall carry out the foregoing activities pursuant to the arrangements set forth in the Certificate of Formation and this Agreement.

**2.7     Nature of Members' Interests.**  The Membership Interests in the Company shall be personal property for all purposes. Legal title to all Company assets shall be held in the name of the Company. Neither any Member nor a successor, representative or assign of such Member, shall have any right, title or interest in or to any Company property or the right to partition any real property owned by the Company. Membership Interests may be evidenced by a Certificate of Membership Interest issued by the Company, in such form as the Managers may determine.

**2.8     Statement of Background.**  The Members have formed the Company for the business purposes set forth in **Exhibit D** attached hereto.

<h2 style="text-align:center">ARTICLE 3 – MEMBERS</h2>

**3.1     Names, Addresses, Membership Interests and Voting Status of Members.**  The names, addresses, Membership Interests and voting status of the Members are as reflected in **Exhibit A** attached hereto and made a part hereof, which Schedule shall be as amended by the Company as of the effective date of any transfer or subsequent issuance of any Membership Interest.  Such persons designated on **Exhibit A** shall constitute the initial Members of the Company.

**3.2     Admission of Members.**

In the case of a Person acquiring a Membership Interest directly from the Company, the Person shall become a Member with respect to such Membership Interest on compliance with the following requirements:

      **3.2.1**  Furnishing to the Company the written consent of the Managers approving the admission of such Person as a Member;

      **3.2.2**  Furnishing to the Company the acceptance, in a form satisfactory to the Company, of all the terms and conditions of this Agreement;

      **3.2.3**  Making of the Capital Contributions required of such Person as specified in Section 7.1 of this Agreement; and

      **3.2.4**  Payment of such reasonable expenses as the Company may incur in connection with the admission of such Person as a Member.

      **3.2.5**  An assignee of a Membership Interest shall become a Member on compliance with the requirements of Section 9.1.

Any Person may become a Member unless such Person lacks capacity or is otherwise prohibited from being admitted by applicable law.

<div style="text-align:center">6</div>

The undersigned Members expressly acknowledge that the issuance of additional Membership Interests in the Company to outside third parties will have the effect of diluting the existing Members' Membership Interests in the Company.

## ARTICLE 4 - VOTING POWERS, MEETINGS, ETC. OF MEMBERS

**4.1     In General.** A Member shall not be entitled to participate in the day-to-day affairs and management of the Company, but instead, the Member's right to vote or otherwise participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the Act, the Certificate of Formation, or this Agreement vest in the Member the right to so vote or otherwise participate.

**4.2     Actions Requiring Approval of Members.**

    **4.2.1**   Except as otherwise provided in this Agreement, the approval of a Majority in Interest of the Members shall be required in order for any of the following actions to be taken on behalf of the Company:

        **4.2.1.1**   Amending the Certificate of Formation or this Agreement in any manner that materially alters the preferences, privileges or relative rights of the Members.

        **4.2.1.2**   Electing the Managers as provided in <u>Article 5</u> hereof.

        **4.2.1.3**   Taking any action that would make it impossible to carry on the ordinary business of the Company.

        **4.2.1.4**   Confessing a judgment against the Company in excess of Five Thousand Dollars ($5,000.00).

        **4.2.1.5**   Filing or consenting to filing a petition for or against the Company under any Federal or state bankruptcy, insolvency or reorganization act.

        **4.2.1.6**   Loaning Company funds in excess of Twenty-Five Thousand Dollars ($25,000.00) or for a term in excess of one (1) year to any Member.

        **4.2.1.7**   Subject to <u>Section 4.15.2</u> below, pledging or encumbering any assets of the Company to secure the repayment of any indebtedness owed by any person or entity other than the Company.

7

    **4.2.1.8**  Subject to <u>Section 11.2</u> below, structuring the sale or other voluntary disposition of one or more Projects of the Company such that such disposition of a Company Project may qualify for tax-free like-kind exchange treatment under Section 1031 of the Internal Revenue Code.

    **4.2.1.9**  The sale or other disposition of a Project.

    **4.2.1.10**  The borrowing of funds, including a refinance of existing indebtedness, or the pledging of any assets of the Company, in excess of $250,000.

    **4.2.1.11**  The pledging of any assets of the Company with a value in excess of $250,000.

**4.2.2**  Furthermore, the approval of all of the Members shall be required in order for any of the following actions to be taken on behalf of the Company:

    **4.2.2.1**  Effecting a material change in the purpose of the Company as defined in <u>Section 2.8</u> above.

    **4.2.2.2**  Altering the rights of Voting Members to vote on matters affecting the Company as set forth herein.

    **4.2.2.3**  Decreasing the Membership Interests of any Member, except as otherwise provided in <u>Section 3.2</u> and <u>Section 7.1.2</u> herein.

**4.2.3**  Unless the express terms of this Agreement specifically provide otherwise, the affirmative vote of a Majority in Interest of the Members shall be necessary and sufficient in order to approve or consent to any of the matters set forth in <u>Section 4.2.1</u> above or any other matters which require the approval or consent of the Members.

**4.3**    **Annual Meetings of Members.** An annual meeting of the Members will be held at such time and date at the principal office of the Company or at such other place within or without the State of Delaware as shall be determined by the Managers from time to time and stated in the notice of the meeting. The purposes of the annual meeting need not be enumerated in the notice of such meeting.

**4.4**    **Special Meetings of Members.** Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Managers, and shall be called by the Managers at the request of the holders of not less than ten percent (10%) of all the Membership Interests. Business transacted at all special meetings shall be confined to the purpose or purposes stated in the notice.

<div align="center">8</div>

**4.5     Notice of Meetings of Members.** Written notice stating the place, day and hour of the meeting and, additionally in the case of special meetings, stating the principal place of business of the Company as the location and the purpose or purposes for which the meeting is called, shall be delivered not less than ten (10) nor more than sixty (60) days before the date of the meeting, either personally or by mail to the addresses as shown on Company records, by or at the direction of the Managers, to each Member of record.

**4.6     Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which such distribution is declared, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**4.7     Quorum.** A Majority in Interest of the Members shall constitute a quorum at all meetings of the Members, except as otherwise provided by law or this Agreement. Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member prior to adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting. If, however, such quorum shall not be present at the opening of any meeting of the Members, the Members shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until the holders of the requisite amount of Membership Interests shall be present or represented.

**4.8     Conduct of Meetings.** All meetings of the Members shall be presided over by a chairperson of the meeting, who shall be a Manager, or a Member designated by the Managers. The chairperson of any meeting of the Members shall determine the order of business and the procedure at the meeting, including the regulation of the manner of voting and the conduct of discussion, and shall appoint a secretary of such meeting to take minutes thereof.

**4.9     Actions by Members.** All actions of the Members provided for herein may be taken by written consent without a meeting. Any such action which may be taken by the Members without a meeting shall be effective only if the consents are in writing, set forth the action so taken, and are signed by a Majority In Interest of the Members.

**4.10   Participation by Telephone or Similar Communications.** Members may participate and hold a meeting by means of conference telephone or similar communications equipment by means of which all participating Members can hear and be heard, and such participation shall constitute attendance and presence in person at such meeting.

**4.11   Waiver of Notice.** When any notice of a meeting of the Members is required to be given, a waiver thereof in writing signed by a Member entitled to such notice, whether given before, at,

9

or after the time of the meeting as stated in such notice, shall be equivalent to the proper giving of such notice.

**4.12    List of Members Entitled to Vote.** If requested by any Member, at least ten (10) days before each meeting of Members, a complete list of the Members entitled to vote at such meeting, or any adjournment of such meeting, arranged in alphabetical order, with the address of and the Membership Interest held by each, shall be prepared by the Managers and such list, for a period of ten (10) days prior to such meeting, shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to inspection of any Member during the whole time of the meeting. However, failure to comply with the requirements of this Section shall not affect the validity of any action taken at such meeting.

**4.13    Registered Members.** The Company shall be entitled to treat the holder of record of any Membership Interest of any class as the holder in fact of such Membership Interest for all purposes, and accordingly shall not be bound to recognize any equitable or other claim to or interest in such Membership Interest on the part of any other person, whether or not it shall have express or other notice of such claim or interest, except as expressly provided by the Act or this Agreement.

**4.14    Action by Members to Remove or Appoint Managers.** Except as otherwise provided herein, for purposes of voting on the removal or appointment of Managers, Managers shall be removed or appointed at any meeting of the Members at which a quorum is present by an affirmative vote of a Majority in Interest of the Members present and voting at the meeting. The Members may designate any number of Managers. Notwithstanding the foregoing, however, the Members agree that each Member (other than any Nonvoting Member) shall be a Manager for so long as he or she is a Member of the Company and is living and competent, provided that any such authority of such a Manager may be subject to such restrictions or limitations determined by action of the Managers as provided herein. For purposes of the foregoing, a Member shall be deemed to be competent until such Member shall be adjudicated to be incompetent by a court of proper jurisdiction.

**4.15    Additional Rights Of Members to Be Bought Out.**

        **4.15.1   "Put" Rights of Non-Voting Members.** At any time after the 10th anniversary of the Effective Date of the Organization of the Company (as set forth on **Exhibit D** attached hereto), any Non Voting Member (the "Selling Non Voting Member") shall have the right to require the Company to purchase all (and not less than all) of such Non Voting Member's Membership Interest in the Company. Within sixty (60) days of the issuance of written notice by a Selling Non Voting Member to the Company, the Company shall purchase and the Selling Non Voting Member shall sell all of the Selling Non Voting Member's

10

Membership Interest in the Company. The purchase price and terms of payment shall be determined in accordance with Section 9.5 of this Agreement.

4.15.2 **Dissent Rights Upon Pledge of Company's Assets.** The undersigned acknowledge that the Managers, upon the prior approval of a Majority in Interest of the Members as set forth in Section 4.2.1 herein, are authorized to pledge one or more of the Projects to secure the repayment of indebtedness owed by other third parties affiliated with or related to the Company. Notwithstanding the foregoing, however, the undersigned also expressly agree that, in the event any Member ("Dissenting Member") shall vote his Membership Interest in opposition to the pledging of assets of the Company to secure indebtedness owed by such third party, then any such Dissenting Member shall have a "put" option to require the Company to purchase the Membership Interest of the Dissenting Member at the price and on the terms as provided below, provided that such "put" option must be exercised within thirty (30) days of the vote of the Members approving such pledge of Company assets, and provided further that in such event the closing of any purchase of a Dissenting Member's Membership Interest shall take place no later than one hundred twenty (120) days after the date of the notice to the Company of the Dissenting Member's exercise of such "put" option. The parties agree that the price and the terms for the sale and purchase of a Dissenting Member's Membership Interest shall be as provided in Section 9.5 below, except that the 20% cash payment required by Section 9.5 shall be 65%, and that the balance of the Note shall be payable over one (1) year (in two equal semi-annual installments being due six (6) months and then one (1) year after closing), rather than five (5) years, and that such Note shall be personally guaranteed by the remaining Members, and provided further that until the Note is paid and satisfied in full, the Dissenting Member shall continue to have voting rights with respect to such sold Membership Interest based upon the proportionate unpaid principal balance of the Note (for example, if the total paid by the purchasing party to the Dissenting Member, including the initial amounts paid, plus subsequently paid principal and interest of the Note, represents 80% of the total purchase price owed to the Dissenting Member, and if such Dissenting Member previously owned a 50% Membership Interest in the Company, then the Dissenting Member shall still have a Member's voting interest, which is equal to 20% percent of the Dissenting Member's initial voting interest, or a 10% voting interest).

4.15.3 **Section 1031 Tax Free Like-Kind Exchange Transactions.** Notwithstanding the provisions of Section 5.6.1 herein, and as further provided in Section 4.2.1.8 herein, the undersigned acknowledge that, upon the consent of a Majority in Interest of the Members, the Managers may, on behalf of the Company, structure the sale or other voluntary disposition of one or more Projects of the

11

Company such that such a disposition of a Company Project may qualify for tax-free like-kind exchange treatment under Section 1031 of the Internal Revenue Code. The undersigned agree that, in the event the Company engages in such a tax-free like-kind exchange, such a transaction shall not constitute a "material change in the business of the Company" as referenced in <u>Section 5.6.1</u> herein; provided, however, that if any Member of the Company does not vote in favor of such like-kind exchange, the Company may make an in-kind distribution of a tenants-in-common interests in such Project to such Member, pro rata in proportion to such Member's Membership Interest in the Company, provided that such Member joins in the conveyance of the Project pursuant to the terms as determined by the Managers; and provided, further, that in lieu of such an in-kind distribution of property to such Member, the Company may elect to redeem the interest of such Member, make a pro-rata distribution of cash to such Member, or take any other steps necessary to enable the Company to structure such a Section 1031 tax-free exchange in a manner so as to ensure that any Member who does not desire to participate in such Section 1031 tax-free like-kind exchange will receive an amount of cash equal to what such Member would have received had such Project been sold.

## ARTICLE 5 - MANAGERS

**5.1.    Powers of Manager.** Except as expressly provided otherwise in the Act, the Certificate of Formation or this Agreement, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed by, one or more Managers. The powers so exercised shall include but not be limited to the following:

**5.1.1**    Entering into, making and performing contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in furtherance of the purposes of the Company.

**5.1.2**    Opening and maintaining bank accounts, investment accounts and other arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements. Company funds shall not be commingled with funds from other sources and shall be used solely for the business of the Company.

**5.1.3**    Collecting funds due to the Company.

**5.1.4**    Acquiring, utilizing for the Company's purposes, maintaining and disposing of any assets of the Company.

12

**5.1.5** To the extent that funds of the Company are available therefor, paying debts and obligations of the Company.

**5.1.6** Borrowing money or otherwise committing the credit of the Company for Company activities, and voluntarily prepaying or extending any such borrowings.

**5.1.7** Employing from time to time persons, firms or corporations for the operation and management of various aspects of the Company's business, including, without limitation, managing agents, contractors, subcontractors, architects, engineers, laborers, suppliers, accountants and attorneys on such terms and for such compensation as the Managers shall determine, notwithstanding the fact that the Managers or any Member may have a financial interest in such firms or corporations.

**5.1.8** Making elections available to the Company under the Code.

**5.1.9** Registering the Company as a tax shelter with the Secretary of the Treasury and furnishing to such Secretary lists of investors in the Company, if required pursuant to applicable provisions of the Code.

**5.1.10** Obtaining general liability, property and other insurance for the Company, as the Managers deem proper.

**5.1.11** Taking such actions as may be directed by the Members in furtherance of their approval of any matter set forth in Section 4.2.1 hereof.

**5.1.12** Doing and performing all such things and executing, acknowledging and delivering any and all such instruments as may be in furtherance of the Company's purposes and necessary and appropriate to the conduct of its business.

## 5.2. Election, Etc. of Managers.

**5.2.1** The individuals listed on **Exhibit C** shall serve as the initial Managers of the Company until their successor(s) shall be duly elected and qualified. Furthermore, the undersigned agree that each of the Managers as shown on **Exhibit C** shall be entitled to serve as a Manager of the Company for so long as he is a Member of the Company, and is living and competent.

**5.2.2** The Members may elect one or more Persons to serve as additional Managers at each annual meeting of the Members to serve until the next annual meeting of the Members and until their respective successors are duly elected and qualified. In addition, if any Person resigns or otherwise vacates the office of Manager, the Members shall elect a replacement Manager to serve the remaining term of such

13

office, unless one or more other Persons then serve as Managers and the Members determine not to fill such vacancy. Except as otherwise provided in Section 5.2.1 above, a Person may be removed as a Manager by the Members with or without cause at any time. A Manager may, but shall not be required to, be elected from among the Members.

**5.3.     Place of Managers Meeting.** The Managers of the Company may hold meetings, both regular and special, at any place within or outside the State of Delaware.

**5.4.     Notice of Managers Meetings.** The first meeting of the initial Managers shall be held immediately following the adjournment of the first annual meeting of the Members. The Managers may otherwise meet at such intervals and at such time and place, as they shall schedule. The first meeting of the Managers, and any scheduled meetings of the Managers, may be held without notice. Special meetings of the Managers may be called at any time by any Manager for any purpose or purposes. Notice of such special meetings, unless waived by attendance or by written consent to the holding of the special meeting, shall be given at least three (3) days before the date of such meeting to all Managers not calling the meeting. Notice of such special meeting shall state that it shall be held at the principal place of business of the Company and the date and hour of the special meeting.

**5.5.     Action by Managers; Quorum; Voting; Action Without a Meeting.**

    **5.5.1**    A number of Managers representing a Majority in Interest of the Members shall be necessary to constitute a quorum for the transaction of business. Every act or decision done or made by the Managers present at a meeting duly held at which a quorum is present shall be regarded as the act of the Company, unless a greater number is required by law or by the Certificate of Formation.

    **5.5.2**    Managers may participate in any meeting of the Managers by means of conference telephone or similar communications equipment, provided all persons participating in the meeting can hear one another, and such participation in a meeting shall constitute presence in person at the meeting.

    **5.5.3**    All votes required of Managers hereunder may be by voice vote unless a written ballot is requested, which request may be made by any one Manager.

    **5.5.4**    Except for a matter for which the affirmative vote of a greater number of Managers is required by law, the Certificate of Formation or this Agreement, the act of Managers shall be the affirmative vote of the Managers represented and voting at a duly constituted meeting. Each Manager shall vote in proportion to his or her Membership Interest. Accordingly, the Managers shall take action by the vote of those Managers who are a Majority in Interest of the Members.

14

**5.6      Limitation on Action of Managers.** Notwithstanding anything herein to the contrary, the Managers shall not take any of the actions as set forth in <u>Section 4.2.1</u> without the approval of a Majority in Interest of the Members, and shall not take any of the actions set forth in <u>Section 4.2.2</u> without the written consent of all of the members.

**5.7      Adjournment.** A Majority of the Managers present may adjourn any Managers' meeting to meet again at a stated day and hour or until the time fixed for the next regular meeting of the Managers.

**5.8      Written Consent.** The Managers may take any action or adopt any resolution (either prospectively or retroactively) which may be taken or adopted at a duly called and constituted meeting by formal written consent executed by all of the Managers.

**5.9      Execution of Documents and Other Actions; Restrictions on Actions of Individual Managers.** The Managers may delegate to one or more of their number the authority to execute any documents or take any other actions deemed necessary or desirable in furtherance of any action that they have authorized on behalf of the Company as provided in <u>Section 5.1</u> hereof. In addition, the Managers may restrict or limit the power or authority of any one or more of the Managers to such extent as deemed advisable by the Managers. Furthermore, the Managers may designate one or more Managers of the Company as the Company's duly appointed representative with specific authority to take certain actions on behalf of the Company.

**5.10      Single Manager.** If at any time there is only one Person serving as a Manager, such Manager shall be entitled to exercise all powers of the Managers set forth in this Article, and all references in this Article and otherwise in this Agreement to "Managers" shall be deemed to refer to such single Manager.

**5.11      Reliance by Other Persons.** Any Person dealing with the Company, other than a Member, may rely on the authority of a particular Manager or Managers in taking any action in the name of the Company, if such Manager or Managers provide to such Person a copy of the applicable provision of this Agreement and the resolution or written consent of the Managers or Members granting such authority, certified in writing by such Manager or Managers to be genuine and correct and not to have been revoked, superseded or otherwise amended.

**5.12      Manager's Expenses and Fees.** A Manager shall be entitled, but not required, to receive a reasonable salary for services rendered on behalf of the Company or in its capacity as a Manager. The amount of such salary shall be determined by the Managers and consented to by a Majority in Interest of the Members, which consent shall not be unreasonably withheld. The Company shall reimburse any Manager for reasonable out-of-pocket expenses which were or are incurred by the Manager on behalf of the Company with respect to the start-up or operation of the Company, the on-going conduct of the Company's business, or the dissolution and winding up of the Company and its business.

**5.13   Competition.** During the existence of the Company, a Manager shall devote such time to the business of the Company as may reasonably be required to conduct its business in an efficient and profitable manner. A Manager, for its own account and for the account of others, may engage in business ventures, including the acquisition of real estate properties or interests therein and the development, operation, management and/ or syndication of real estate properties or interests therein, which may compete with the business of the Company. In furtherance and not in limitation of the foregoing, the Members recognize that one or more of the Managers may own or have an interest in other real estate projects, some of which may be in the vicinity of and may compete with the business of the Company. Each Member hereby expressly consents to the continued and future ownership and operation by other Members or a Manager of such properties and waives any claim for damages or otherwise or rights to participate therein or with respect to the operation and profits or losses thereof.

**5.15   Participation by Telephone or Similar Communications.** Managers may participate and hold a meeting by means of conference telephone or similar communications equipment by means of which all participating Managers can hear and be heard, and such participation shall constitute attendance and presence in person at such meeting.

**5.16   Operating Manager.** The Managers, in furtherance of their management authority, may designate an Operating Manager who shall be empowered to carry out the management and operational policies of the Company as set forth and determined by the Managers. The Managers also may designate one or more Assistant Operating Managers whose duties shall be to carry out the objectives of the Managers and to assist the Operating Manager as determined by the Managers. Accordingly, the Operating Manager (or Assistant Operating Manager) shall have the power to carry out the management and operational policies of the Company as determined by the Managers. The Operating Manager shall be subject to the control and direction of the Managers, and the Managers may at any time replace the Operating Manager or remove the Operating Manager without replacement. The Operating Manager shall have the power to act on behalf of the Company and to execute any and all documents, instruments and agreements, including, but not limited to, deeds, promissory notes, deeds of trust, financing documents and the like, provided the execution of such documents has been approved by the Managers. In addition, the Operating Manager shall have the authority to manage the Projects generally and to enter into appropriate leases, on the Company's behalf with Project tenants. The initial Operating Manager of the Company shall be William T. Obeid. The Operating Manager shall also be known as the President. Christopher F. La Mack and Dante A. Massaro shall each be an Assistant Operating Manager. An Assistant Operating Manager shall also be known as a Vice President.

Furthermore, and except as otherwise provided in this Agreement, the Managers may delegate to any Manager the power, acting alone, to bind the Company and to carry out the directives of the Managers; provided, however, that any such delegation of authority may be revoked by the Managers upon notice to such Manager.

16

## ARTICLE 6 - LIMITATION OF LIABILITY AND
## INDEMNIFICATION OF MEMBERS AND MANAGERS

**6.1.    Limitation of Liability.** Except as otherwise provided herein, no Manager or Member of the Company shall be liable to the Company or its Members for monetary damages for an act or omission in such person's capacity as a Manager or a Member, except for acts or omissions constituting willful misconduct or gross negligence or breach of fiduciary duty, and further except for breaches of contractual obligations or agreements, including breaches of this Agreement, between the Manager, or Member, and the Company. If the Act is amended to authorize action further eliminating or limiting the liability of Managers and Members, then the liability of a Manager or Member of the Company shall be eliminated or limited to the fullest extent permitted by the Act as so amended. Any repeal or modification of this Section shall not adversely affect the right or protection of a Manager or Member existing at the time of such repeal or modification.

## 6.2    Indemnification.

      **6.2.1**    Every Person, and his heirs, executors and administrators, who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding of any kind, whether civil, criminal, administrative, arbitrative or investigative, or was or is the subject of any claim, and whether or not by or in the right of the Company, by reason of his being or having been a Manager or Member of the Company, or by reason of his serving or having served at the request of the Company as a director, officer, manager, employee or agent of another Entity, or at the request of the Company in any capacity that under Federal law regulating employee benefit plans would or might constitute him a fiduciary with respect to any such plan, whether or not such plan is or was for employees of the Company, shall be indemnified by the Company against expenses (including attorneys' fees), judgments, fines, penalties, awards, costs, amounts paid in settlement and liabilities of all kinds, actually and reasonably incurred by him in connection with, or resulting from, such action, suit, proceeding or claim, if he acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful, provided that no indemnification shall be made in respect of any claim, issue or matter as to which he shall have been adjudicated to be liable to the Company for willful misconduct, gross negligence, breaches of fiduciary duty, or breaches of contractual obligations or agreements, including breaches of this Agreement.    The termination of any such action, suit or proceeding by judgment, order or conviction, or upon a plea of *nolo contendere* or its equivalent, or by settlement, shall not of itself create a presumption that any

17

such person did not act in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interest of the Company.

6.2.2    Any indemnification under Section 6.2 (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of such person is proper in the circumstances because the Manager or Member had met the applicable standard of conduct set forth in such paragraph. Such determination may be made either (i) by the Members by a majority vote of a quorum consisting of Members who were not parties to such action, suit or proceeding, or (ii) if a quorum of disinterested Members so directs, by independent legal counsel in a written opinion.

6.2.3    Expenses (including attorneys' fees) incurred by or in respect of any such person in connection with any such action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative, may be paid by the Company, in the sole discretion of the Members, in advance of the final disposition thereof upon receipt of an undertaking by, or on behalf of, such person to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Company.

6.2.4    The Members of the Company shall have the power, generally and in specific cases, to indemnify its other employees and agents to the same extent as provided in this Section with respect to its Managers and Members.

**6.3    Other Rights.** The indemnification provided by this Agreement shall: (i) be deemed exclusive of any other rights to which a person seeking indemnification may be entitled under any statute, agreement, vote of Members, or otherwise, both as to action in official capacities and as to action in another capacity while holding such office; (ii) continue as to a person who ceases to be a Member; (iii) inure to the benefit of the estate, heirs, executors, administrators or other successors of an indemnitee; and (iv) not be deemed to create any rights for the benefit of any other person or entity.

**6.4    Report to Members.** The details concerning any action taken by the Company to limit the liability, indemnify or advance expenses to a Member or Manager shall be reported in writing to the Members with or before the notice or waiver of notice of the next Members' meeting or with or before the next submission to Members of a consent to action without a meeting or, if sooner, separately within ninety (90) days immediately following the date of the action.

## ARTICLE 7 - CONTRIBUTIONS TO CAPITAL AND CAPITAL ACCOUNTS; LOANS

**7.1    Capital Contribution; Loans.**

18

7.1.1 Upon execution of this Agreement, each Member agrees to contribute cash or other property to the Company in the amount set forth as the Initial Capital Contribution of such Member on **Exhibit A** attached hereto. To the extent any Member contributes property other than cash, its value shall be as agreed upon by all of the Members, or if all of the Members do not agree on the value, such property shall be deemed to have no value and shall be returned to the contributing Member.

7.1.2 If the Managers determine that the Initial Capital Contributions are insufficient to carry out the purposes of the Company, the Managers of the Company may (a) seek investment funds from outside third party investors (in which case the Membership Interests of the Members (both Voting and Non Voting) will be diluted pro rata to the extent of Membership Interests given to such third party for his or her investment) or (b) request that the Voting Members make additional contributions to the capital of the Company. In the event that the Managers elect to request additional contributions to the capital of the Company from the Voting Members, then upon such request, each of the Voting Members shall be obligated to make such additional contributions (each an "Additional Capital Contribution") to the Company, ratably in accordance with such Voting Member's then existing pro rata Membership Interest based upon the Membership Interests owned by all Voting Members, within the time period approved by the Majority in Interest of the Members. In the event any such Voting Member fails to fulfill any commitment to contribute additional capital (the "Defaulting Member"), the Company may allow the remaining Voting Members (the "Lending Members") to contribute to the Company, pro rata by Membership Interest, such Additional Capital Contribution. All amounts so contributed by the Lending Members shall be considered a loan to the Defaulting Member bearing interest at the prime rate, as set out in The Wall Street Journal on the date of the loan, plus three percent (3%) simple interest, until repaid. In addition, until all of such loans are repaid by the Defaulting Member, all distributions from the Company which would have been paid to the Defaulting Member shall be paid to the Lending Members in proportion to the then outstanding interest and principal of such loans. No Defaulting Member shall have any personal liability with respect to such loans and shall have no obligation to make repayment of such loans except from distributions from the Company, but may have his or her Membership Interest subject to reduction as provided below.

(i) Notwithstanding the foregoing, however, in the event that any such loans to a Defaulting Member shall remain outstanding for ninety (90) days or more, then in such event, any Lending Member thereafter may at any time elect to forgive the Lending Member's loan to the Defaulting Member in which event the Membership Interests of the Lending and Defaulting Members shall be adjusted to reflect the Additional Capital Contribution made by the Lending Member, based on total unreturned Capital Contributions made by

19

the Lending and Defaulting Members, with the Membership Interests of the Lending Members being increased and the Membership Interests of the Defaulting Members being decreased to reflect the new relative Capital Contribution balances of such Members.

(ii) To illustrate the foregoing provisions, assume that A, B and C are all of the Members of the Company, and that A and B own 40% of the outstanding Membership Interests of the Company and that C owns the remaining 20% Membership Interest. Also assume that A and B each have unreturned Capital Contribution balances of $50,000 each and that C's capital account balance is $25,000. In the event that the Managers determine that $200,000 of additional working capital is needed for the Company, then the Managers may request that A and B each contribute $80,000 and that C contribute $40,000 (each such amount representing the proportionate share of each Member's requested capital contribution based upon each Member's proportionate Membership Interest in the Company) as additional capital contributions to the Company. In such event, if C is unable or unwilling to contribute additional capital to the Company, then A or B (or both) may elect to advance C's required capital contribution to the Company on C's behalf, and in such event any such advances shall considered a loan to C bearing interest at the Wall Street Journal prime rate of interest, plus three percent (3%) simple interest, until repaid, and until all of such loans are repaid by C to A and B, all distributions from the Company which would have been paid to C shall be paid to A and B in proportion to the then outstanding interest and principal of such loans by A and B to C. In addition, assuming that C fails to repay such loans within 90 days, and assuming that A and B each have advanced $20,000 to the Company as C's capital contribution, then A and B may elect to forgive their loans to C in which event the Membership Interests of A, B and C shall be adjusted to reflect the Additional Capital Contributions made by A and B, based on total unreturned Capital Contributions made by A, B and C, such that, thereafter, A and B each shall have their Membership Interest increased to 46.15% ($150,000/$325,000) and that C shall have its Membership Interest decreased to 7.70% ($25,000/$325,000).

**7.1.3**   No Member shall be paid interest on any Capital Contribution to the Company.

**7.1.4**   In addition to the loans to the Defaulting Member provided for in Section 7.1.2 above, upon approval of the terms thereof by the Managers, any Member may make a loan to the Company upon commercially reasonable terms. Loans by a Member to the Company shall not be considered Capital Contributions.

**7.1.5**   Except as expressly described in Section 7.1.2 hereinabove, no Member shall have individual or personal liability to make any Additional Capital

20

Contribution to the Company. Accordingly, the sole remedy of the Company and the other Members with respect to any Defaulting Member shall be for the other Members to make Additional Capital Contributions in the manner set forth above. A Defaulting Member shall have no liability for damages to the Company, the other Members or any creditor of the Company by reason of his failure to make Additional Capital Contributions.

**7.2    Capital Accounts.**

7.2.1    The Company shall maintain a separate capital account (each a "Capital Account") for each Member pursuant to the principles of this Section 7.2 and Treasury Regulation Section 1.704-1(b)(2)(iv). The Initial Capital Account of each Member shall be the Initial Capital Contribution of such Member. Such Capital Account shall be increased by (i) the amount of the subsequent Capital Contributions of such Member to the Company under Section 7.1.2 and (ii) such Member's allocable share of Company Income and Net Income pursuant to Section 8.1. Such Capital Account shall be decreased by (i) the amount of cash or value of property (with such value as determined by agreement of all of the Members or, in the event the Members cannot agree, by an independent qualified appraiser selected by the Company and acceptable to the distributee Member or its representative) distributed to the Member by the Company pursuant to Section 8.2 and (ii) such Member's allocable share of Company Loss and Net Loss pursuant to Section 8.1.

7.2.2    The provisions of this Section 7.2 and other portions of this Agreement relating to the proper maintenance of Capital Accounts are designed to comply with the requirements of Treasury Regulation Section 1.704-1(b). The Members intend that such provisions be interpreted and applied in a manner consistent with such Treasury Regulations. The Company is authorized to modify the manner in which the Capital Accounts are maintained if the Company determines that such modification (i) is required or prudent to comply with the Treasury Regulations and (ii) is not likely to have a material effect on the amounts distributable to any Member upon the dissolution of the Company.

**7.2.3**    No Member shall have any obligation to restore a deficit balance in his Capital Account.

**7.3    Withdrawal or Reduction of Members' Contributions to Capital.**

**7.3.1**    No Member shall have the right to withdraw all or any part of his Capital Contribution or to receive any return on any portion of his Capital Contribution, except as may be otherwise specifically provided in this Agreement. In the event

21

of a return of any Capital Contribution, no Member shall have the right to receive property other than cash.

7.3.2   No Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Income, Net Losses or distributions; provided that this subsection shall not apply to loans (as distinguished from Capital Contributions) which a Member has made to the Company.

7.3.3   No Member, simply by virtue of his or her status as a Member, shall be liable for the debts, liabilities or obligations of the Company beyond his or her respective Initial Capital Contribution and any Additional Capital Contribution required of such Member pursuant to Section 7.1.2 above (provided, however, that the Members may have personal liability with respect to their own actions or inactions, including, but not limited to for example, personal liability arising out of personal guarantees of indebtedness of the Company to outside third parties). Except as otherwise expressly provided herein, no Member shall be required to contribute to the capital of, or to loan any funds to, the Company.

## ARTICLE 8 - ALLOCATIONS, DISTRIBUTIONS, ELECTIONS AND REPORTS.

**8.1.   Allocations.**   Subject to the provisos below, for purposes of maintaining Capital Accounts and in determining the rights of the Members among themselves, Net Income, or Net Loss, if any, for a Fiscal Year or other period, shall be allocated to the Members in proportion to their respective Membership Interests; provided, however, notwithstanding the provisions of the preceding clause of this Section 8.1, any Regulatory Allocations required by the provisions of **Exhibit B** attached hereto shall be made in accordance therewith.

**8.2.   Distributions.**   The Company shall distribute Distributable Cash and other property at such times and in such amounts as the Managers may determine, in their sole discretion. All distributions of Distributable Cash or other property shall be made to the Members in proportion to their respective Capital Accounts up to the positive balances in such Capital Accounts and then in proportion to their Membership Interests subject to the provisions of Section 7.1.2. Except as provided in Section 8.3, all distributions of Distributable Cash and property shall be made at such time as may be determined from time to time by the Managers. Notwithstanding the foregoing, for each Fiscal Year of the Company, the Company shall distribute to the Members, within ninety (90) days of the close of each such Fiscal Year, an amount, from the Company's then available Distributable Cash, equal to the federal and state income taxes imposed on the Members (assuming the Members are in the highest federal and state marginal income tax brackets prevailing in such Fiscal Year) by reason of their distributive share for income tax purposes of the Company's income for such Fiscal Year.

22

**8.3.    Limitation Upon Distributions.**  No distribution shall be declared and paid if payment of such distribution would cause the Company to violate any limitation on distributions provided in the Act.

**8.4.    Allocations for Tax Purposes.**  Except as otherwise provided herein, each item of Income, Net Income or Net Loss of the Company shall be allocated to the Members in the same manner as such allocations are made for book purposes pursuant to Section 8.1. In the event of a transfer of, or other change in, an interest in the Company during a Fiscal Year, each item of taxable income and loss shall be prorated in accordance with Section 706 of the Code, using any convention permitted by law and selected by the Managers.

**8.5.    Tax Status, Elections and Modifications to Allocations.**

**8.5.1**    Notwithstanding any provision contained in this Agreement to the contrary, solely for federal income tax purposes, each of the Members hereby recognizes that the Company will be subject to all provisions of Subchapter K of the Code; provided, however, that the filing of all required returns thereunder shall not be construed to extend the purposes of the Company or expand the obligations or liabilities of the Members.

**8.5.2**    The Company may elect pursuant to Section 754 of the Code and the Treasury Regulations to adjust the basis of the Company's assets as provided by Section 743 or 734 of the Code and the Treasury Regulations thereunder. The Company shall make such elections for federal income tax purposes as may be determined by the Managers.

**8.5.3**    This Agreement shall be amended in any manner necessary for the Company to comply with the provisions of Treasury Regulations Sections 1.704-1(b), 1.704-1(c) and 1.704-2 upon the happening of any of the following events: (i) incurring any liability which constitutes a "nonrecourse liability" as defined in Treasury Regulations Section 1.704-2(b)(3) or a "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4); (ii) a constructive termination of the Company pursuant to Code Section 708(b)(1)(B); or (iii) the contribution or distribution of any property, other than cash, to or by the Company.

**8.5.4**    The Company shall designate one of the Managers as the "Tax Matters Manager" for federal income tax purposes.  The Tax Matters Manager is authorized and required to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Tax Matters Manager shall have the final decision making authority with respect to all federal income tax matters involving the Company. The Members agree to cooperate with the

23

Tax Matters Manager and to do or refrain from doing any or all things reasonably required by the Tax Matters Manager to conduct such proceedings. Any direct out-of-pocket expense incurred by the Tax Matters Manager in carrying out its obligations hereunder shall be allocated to and charged to the Company as an expense of the Company for which the Tax Matters Manager shall be reimbursed. The initial Tax Matters Manager shall be William T. Obeid.

8.5.5 The Company shall maintain records and accounts of all operations and expenditures of the Company. The Company shall keep at its principal place of business the records required by the Act to be maintained there.

### 8.6. Books of Account.

**8.6.1** The Company shall maintain the Company's books and records and shall determine all items of Income, Loss, Net Income and Net Loss in accordance with the method of accounting selected by a Majority in Interest of the Members, consistently applied. All of the records and books of account of the Company, in whatever form maintained, shall at all times be maintained at the principal office of the Company and shall be open to the inspection and examination of the Members or their representatives during reasonable business hours. Such right may be exercised through any agent or employee of a Member designated by it or by an attorney or independent certified public accountant designated by such Member. Such Member shall bear all expenses incurred in any examination made on behalf of such Member.

**8.6.2** All expenses in connection with the keeping of the books and records of the Company and the preparation of audited or unaudited financial statements required to implement the provisions of this Agreement or otherwise needed for the conduct of the Company's business shall be borne by the Company as an ordinary expense of its business.

**8.7 Company Tax Return and Annual Statement.** The Company shall file a federal income tax return and all other tax returns required to be filed by the Company for each Fiscal Year or part thereof, and shall provide to each person who at any time during the Fiscal Year was a Member with an annual statement (including a copy of Schedule K-1 to Internal Revenue Service Form 1065) indicating such Member's share of the Company's income, loss, gain, expense and other items relevant for federal income tax purposes. Such annual statement may be audited or unaudited as required by a Majority in Interest of the Members.

**8.8 Bank Accounts.** The bank account or accounts of the Company shall be maintained in the bank approved by a Majority in Interest of the Members. The terms governing such accounts shall be determined by the Managers and withdrawals from such bank accounts shall only be made by such parties as may be approved by the Managers.

24

## ARTICLE 9 – TRANSFERABILITY OF MEMBERSHIP INTERESTS; TRANSFER OF MEMBERSHIP INTEREST UPON OCCURRENCE OF CERTAIN EVENTS; AND ADMISSION OF MEMBERS

**9.1    Transferability of Membership Interests.**    The term "transfer" when used in this Agreement with respect to a Membership Interest includes a sale, assignment, gift, pledge, exchange or other disposition. A Member shall not at any time transfer his Membership Interest except in accordance with the conditions and limitations set out in this Article 9. Any transfer of a Membership Interest in the Company permissible under this Article 9 shall be effective to give the transferee only the right to receive the share of income, losses, and distributions to which the transferor would otherwise be entitled, and shall not be effective to constitute the transferee as a Member of the Company, and shall not entitle the transferee to vote on Company matters. For all other purposes under this Agreement, the transferor Member shall continue to be considered a Member of the Company until its transferee has been admitted as a Member of the Company. A transferee who does not become a Member of the Company shall have no voting rights, no right to examine the books and records of the Company, and no rights of any kind whatsoever except as described in the preceding sentence. Any transferee of a Membership Interest shall be admitted as a Member of the Company only after the following conditions are satisfied:

**9.1.1**    A Majority in Interest of the Members, other than the transferor, consents in writing to the admission of the transferee as a Member;

**9.1.2**    The duly executed and acknowledged instrument of assignment has been filed with the Company, setting forth the intention of the transferor that the transferee become a Member;

**9.1.3**    The transferee has consented in writing in a form satisfactory to the Members, other than the transferor, to be bound by all of the terms of this Agreement in the place and stead of the transferor; and

**9.1.4**    The transferor and the transferee have executed and acknowledged such other instruments as the Members may deem necessary or desirable to effect such admission.

Any transferee of a Membership Interest who does not become a Member and desires to further transfer or encumber such Membership Interest shall be subject to all of the provisions of this Article 9 to the same extent and in the same manner as any Member desiring to transfer or encumber his Membership Interest.

Any transfer or encumbrance or purported sale or transfer of a Membership Interest shall be null and void unless made strictly in accordance with the provisions of this Article 9. The transferee

of a Membership Interest, whether a Member or not, shall be subject to all of the terms, conditions, restrictions, and obligation of this Article 9.

**9.1A   Effect of Incompetence or Disability.**  Notwithstanding the foregoing, however, in the event of a Member's incompetence or disability, such Member shall continue to be a Member of the Company, and the duly appointed guardian, attorney-in-fact or personal representative of a disabled or incompetent Member shall have the right to continue to vote the Membership Interest of an incompetent or disabled Member until such Member's death.

**9.2      Voluntary Transfer of Membership Interest to Third Party.**  If any Member desires to transfer or encumber all or any part of his Membership Interest in the Company (such Member hereinafter called the "Transferor") to any person or entity, then the Transferor shall offer to sell to the Company and the remaining Members the Membership Interest proposed to be transferred or encumbered, and such offer shall be in writing and shall set forth the intention of the Transferor to transfer or encumber (as the case may be) his Membership Interest, the name and address of the prospective transferee or lienor, the portion of the Membership Interest in the proposed transfer or encumbrance, and the terms of such proposed transfer or encumbrance. Within sixty (60) days after the receipt of such written offer, the Company or the remaining Members may, at its or their option (as set forth in Section 9.4 below) elect to purchase all, but not less than all, of the Membership Interest in the Company which the Transferor proposes to transfer or encumber. The purchase price for such Membership Interest shall be the lesser of (1) the purchase price or the encumbrance amount offered by the prospective transferee or lienor, or (2) the purchase price determined in accordance with Section 9.5 below. The purchase price shall be paid as set forth in Section 9.5 below. The Company or the remaining Members, as the case may be, shall exercise the election to purchase by giving written notice thereof to the Transferor within the said sixty (60) day period. Such notice shall specify a date for the closing of the purchase which shall not be more than ninety (90) days after the date of such exercise.

> **9.2.1**   If the offer to sell is not accepted by the Company or the remaining Members within the said sixty (60) day period, then the Transferor may make a bona fide transfer or encumbrance to the prospective transferee or lienor named in the offer, such transfer or encumbrance to be made only in strict accordance with the terms stated in the offer. However, if the Transferor shall fail to make such transfer or encumbrance within sixty (60) days following the expiration of the time for the election by the Company and the remaining Members, then such Membership Interest shall again become subject to all of the restrictions of this Agreement.

> **9.2.2**   Notwithstanding the foregoing, however, and subject to Section 9.6 below, a Member shall not be required to offer to sell his or her Membership Interest to the Company prior to transferring such Membership Interest to an inter vivos revocable trust, the sole beneficiaries of which are such Member and his or her family members, provided that the transferring Member is also the Trustee of such trust, and in the event of a Member's transfer of his membership Interest to such a revocable inter vivos trust, the transferring Member shall continue to be

26

treated as a Member and Manager of the Company for purposes of this Agreement.

**9.3** **Bankruptcy of Member.** Upon the bankruptcy of any Member, the Company shall have an option to purchase all, but not less than all, of the Membership Interest in the Company owned by such bankrupt Member at the time of his bankruptcy at the price and in the manner provided for in Section 9.5 below. The Company shall make such election only with the consent of a Majority in Interest of the Members other than the bankrupt Member or his successors. Notice of the exercise of such option must be provided to the bankrupt Member or his successors within ninety (90) days of the other Members learning of such event.   The closing of any purchase of a Membership Interest under this Section 9.3 shall take place within sixty (60) days after the date of the notice of the exercise of such option.   For purposes of this Section, "bankruptcy" shall mean the commencement of proceedings by or against a Member under any insolvency, bankruptcy, creditor adjustment, or debtor rehabilitation law, which proceeding is not dismissed within sixty (60) days from the date of its commencement.

**9.4** **Purchase By Company or Remaining Members.** The Company shall have the first right to purchase the Membership Interest of any Member who desires to transfer or encumber his or her Membership Interest (under Section 9.2). If the Company does not exercise its prior option to purchase such Membership Interest, then the remaining Members shall have the right to proportionately (or in such proportions as all of the remaining Members may agree) purchase the Membership Interest of such selling Member.

**9.5** **Purchase Price and Terms of Closing.**

**9.5.1** The Members shall, from time to time (at least once each year), by resolution adopted by the affirmative vote of a Majority in Interest of the Members, fix the value of the outstanding Membership Interests in the Company. Such resolution shall be in the form of a "Certificate of Agreed Value" in the form of **Exhibit E** attached hereto, and shall be kept as an attachment to this Agreement. Upon the Members' determination of the value of the outstanding Membership Interests in the Company, the Managers shall mail a copy of such Certificate of Agreed Value to each of the Members. Any Member who fails to object to the valuation as reflected on the Certificate of Agreed Value within thirty (30) days after the Company mails the Certificate of Agreed Value shall be deemed to have accepted the value as determined by the Members and as reflected on the Certificate of Agreed Value. However, in the event that a Member (the "Objecting Member") objects to the valuation as reflected on the Certificate of Agreed Value within thirty (30) days after mailing of the Certificate of Agreed Value by the Company, then the Objecting Member shall select a real estate appraiser with the MAI designation who shall appraise all of the Projects as of that date, and who shall then determine the value of the outstanding Membership Interests. If the value as determined by the Objecting Member's appraiser is no more than 110%, and no less than 90%, of the valuation as reflected on the Certificate of Value, then the

27

valuation as reflected on the Certificate of Agreed Value shall be conclusive on the Company and all of the Members until a new Certificate of Agreed Value is determined by a Majority in Interest of the Members. However, if the value as determined by the Objecting Member's appraiser is more than 110%, or less than 90%, of the valuation as reflected on the Certificate of Value, then in such event the Company and the Objecting Member each shall select an appraiser with the MAI designation, and the two (2) appraisers so selected shall select a third appraiser with the MAI designation, and the third appraiser so selected shall appraise all of the Projects as of that date, and shall then determine the value of the outstanding Membership Interests, and in such event the values as determined by the third appraiser shall be conclusive on the Company and all of the Members until a new Certificate of Agreed Value is determined by a Majority in Interest of the Members.

9.5.1.1 The Members agree that, so long as the most recent valuation was established within twelve (12) months prior to the occurrence of an event under Section 9.2 or Section 9.3 above, giving rise to the purchase of a Membership Interest, the purchase price for a Membership Interest which is purchased pursuant to this Agreement shall be equal to the value last agreed upon by the Members pursuant to this Section 9.5.1, minus any distributions paid by the Company with respect to such Membership Interest from the date of such valuation to the date of closing. Notwithstanding the foregoing, however, if no such valuation has been established within such twelve (12) month period and the parties are unable to agree on a fair purchase price, then the value of the Membership Interest to be purchased, and accordingly the purchase price for such Membership Interest, shall be determined as follows. The Company shall select a real estate appraiser with the MAI designation who shall appraise all of the Projects as of the date which is 30 days before the earliest permissible date for closing hereunder. The purchase price for the interest in the Company to be sold shall be the amount the seller would receive pursuant to the distribution provisions hereof if the Company's real property were sold at such date at 95% of its appraised value and the Company liquidated.

9.5.1.2 The terms of payment shall be as mutually agreed upon by the selling and purchasing parties except that, in the event the parties cannot agree, the purchase price shall be payable by (i) a cash payment to the selling party at closing in the amount of twenty percent (20%) of the purchase price, and (ii) the delivery of a promissory note (the "Note") secured by the Membership Interest transferred. The Note shall provide for the payment of the principal balance in not more than five (5) equal annual installments at the option of the purchasing parties, the first such installment to be due and payable one (1) year after the date of the

28

closing, and the remaining installments to be due and payable annually thereafter on the anniversary date of the closing. The Note shall bear interest on the unpaid balance at one-half (½) of the prime rate published in The Wall Street Journal, as of the date of closing. The Note shall further provide that the purchasing parties shall have the right at any time to prepay without penalty the principal amount due thereon, in whole or in part, with interest to the date of prepayment, that a default of thirty (30) days in the payment of any installment shall, at the option of the holder, cause the remaining balance to become immediately due and payable, and that the purchasing parties shall be liable for reasonable attorney's fees incurred by the selling party in collecting said balance in the event of default.

The Note shall be secured by a pledge of the Membership Interest transferred. The pledged Membership Interest shall be held by selling party as collateral only (with the purchasing party having the right to vote such Membership Interest and receive any distributions thereon except in the event of default in payment) until the entire purchase price, together with accrued interest, is fully paid.

## 9.6   Death of a Member.

### 9.6A   Intentionally Omitted.

### 9.6B   Option to Purchase Deceased Member's Membership Interest Where No Life Insurance Is Owned On the Life of a Deceased Member.
Notwithstanding any of the foregoing provisions, however, the parties also agree that, in the event that neither the Company nor the other Members should own such life insurance on the life of such Deceased Member, then in such event, the Company thereafter shall merely have the option, and not the obligation, to purchase the Membership Interest of a Deceased Member, in which case, if not immediately repurchased, the Membership Interest of the Deceased Members shall pass to the heirs of the Deceased Member pursuant to the Deceased Member's last will and testament (or pursuant to intestacy laws if the Deceased Member should die without a will). The undersigned also agree that the Company's option to purchase the Membership Interest of a Deceased Member must be exercised within two (2) years from the date of the death of the Deceased Member, and that until such purchase option is exercised by the Company, the heirs or Personal Representative of the Deceased Member shall continue to have and exercise all rights and benefits of the Deceased Member as a Member of the Company, including the right to vote the Membership Interest of the Deceased Member, but not the right to serve as a Manager of the Company. The Company shall exercise its option to purchase hereunder by sending written notice to the Personal Representative of the Deceased Member

29

> (or directly to the heirs of the Deceased Member), and after receipt of the notice by the Deceased Member's heirs or Personal Representative, the Company shall buy and the Deceased Member's heirs or personal representative shall sell all of the Deceased Member's Membership.

**9.6C    Voting Rights of Heirs and Personal Representative of Deceased Members.** Finally, the parties agree that, if the Membership Interests of a Deceased Member pass to the heirs of such Deceased Member, then the Deceased Member's heirs shall be treated as individual members and not as one Voting Member for voting purposes, such that the Deceased Member's heirs shall be permitted to exercise their voting rights as individual Members voting whatever fractional shares they own, and not merely as a group.

**9.6D    Intentionally Omitted.**

**9.7    Option to Purchase Upon Involuntary Transfer.** If any Member's Membership Interest in the Company is involuntarily transferred to a receiver of a Member, a secured creditor, a purchaser at any creditor's sale or court ordered sale, the guardian of the estate of an incompetent Member ("Transferee") or to a spouse of a Member ("Transferee Spouse") pursuant to the terms of a Separation Agreement or a court ordered equitable distribution of marital property, then the following shall be observed:

**9.8    Spousal Transfer.** In the event of a transfer to a Transferee Spouse pursuant to the terms of a Separation Agreement or pursuant to a court ordered equitable distribution of marital property, the transferring Member shall have the first option to purchase such Membership Interests from the Transferee Spouse, which shall be exercised by the said transferring Member by delivery of written notice to the Transferee Spouse within sixty (60) days after the said transfer. The sale contemplated in this Section shall be at the price and in the manner provided for in Section 9.5.

**9.9    Option to Other Members.** The remaining Members shall have the right to proportionately (or in such proportions as all of the remaining Members may agree) purchase all of the Membership Interests of the Transferee (or the Transferee Spouse in the event of the failure of the transferring Member to elect to exercise his or her option to purchase under subparagraph (a) above) and may exercise this option to purchase by giving written notice of exercise, within one hundred eighty (180) days of the transfer to the Transferee (or Transferee Spouse). After receipt of the notice by the Transferee (or Transferee Spouse), the Member wishing to exercise his or her option to purchase (hereinafter referred to as the "Electing Member") shall purchase and the Transferee (or Transferee Spouse) shall sell all of the Membership Interests of the Transferee (or Transferee Spouse) at the price and in the manner provided for in Section 9.5.

30

**9.10    Option to Company.** Should the Members (including the transferring Member in the case of a transfer to the Transferee Spouse) fail to exercise their option to purchase the Membership Interests of the Transferee or Transferee Spouse within the specified time, then the Company shall have the option to purchase the said Membership Interests. The Company shall exercise its option by sending written notice to the Transferee or Transferee Spouse of the Member of its intention to buy all of the Membership Interests of the Transferee or Transferee Spouse, at any time within two (2) years after receipt of notice of the transfer to the Transferee or Transferee Spouse. After receipt of the notice by the Transferee or Transferee Spouse, the Company shall buy and the Transferee or Transferee Spouse shall sell the Membership Interests specified in the Company's notice at the price and in the manner provided for in Section 9.5 below.

**9.11    Legend for Certificate.** The Members agree that no Membership Interest shall be issued unless made subject to all of the terms and provisions of this Agreement; and each Certificate representing a Membership Interest (if any), whether now outstanding or hereafter issued, shall be endorsed on the face or back of such Certificate as follows:

> "The transfer of the Membership Interest represented by this Certificate is subject to the restrictions, prohibitions, and rights of prior refusal imposed by a Limited Liability Company Agreement, which may be amended from time to time, between the Company and its Members, a copy of which is on file with the Company.
>
> By accepting the Membership Interest represented by this Certificate, the transferee of the Membership Interest does expressly accept and agree to all the provisions and commitments of the said Limited Liability Company Agreement."
>
> "The Membership Interest represented by this Certificate has not been registered under the Securities Act of 1933, as amended (the "Act"), or under the securities laws of any state. The Membership Interest has been acquired for investment and may not be pledged, hypothecated, sold, or otherwise transferred in the absence of an effective registration statement for the Membership Interest under the Act and any applicable state securities laws or assurance satisfactory to the Company that such registration is not required."

31

**9.12**     **Further Restrictions on Transfer.** Notwithstanding any provisions of this Agreement to the contrary, no Membership Interest in the Company may be transferred unless:

> **9.12.1**     Such transfer will not cause a termination of the Company for federal tax purposes within the meaning of Section 708 of the Code;
>
> **9.12.2**     Such Membership Interest is registered under the applicable federal and state securities laws and regulations or the Company is furnished with an opinion of counsel (at the Transferor's expense) satisfactory to the Members that such registration is not required; and
>
> **9.12.3**     The Members determine that such transfer will not adversely affect the Company.

## ARTICLE 10 - DISSOLUTION AND TERMINATION

**10.1**     **Withdrawal.** Except as otherwise provided in this Agreement, no Member shall at any time withdraw from the Company or withdraw any amount out of his Capital Account. Any Member withdrawing in contravention of this Section 10.1 shall indemnify, defend and hold harmless the Company and all other Members (other than a Member who is, at the time of such withdrawal, in default under this Agreement) from and against any losses, expenses, judgments, fines, settlements or damages suffered or incurred by the Company or any such other Member arising out of or resulting from such withdrawal.

**10.2**     **Dissolution.**

The Company shall not be dissolved as set forth in the Act, but only upon the first of the following to occur:

> **10.2.1**     The period fixed for the duration of the Company in the Certificate of Formation shall expire;
>
> **10.2.2**     The written consent of a Majority in Interest of the Members;
>
> **10.2.3**     The bankruptcy of any Member, unless there is then at least one remaining Member and the business of the Company is continued by the written consent of the remaining Members holding a Majority in Interest (excluding the Membership Interest of the bankrupt Member) within ninety (90) days of such bankruptcy; or
>
> **10.2.4**     The entry of a decree of judicial dissolution or the issuance of a certificate for administrative dissolution under the Act.

32

**10.2.5** Notwithstanding the foregoing, in the event the Company's attorneys or other representatives filed the Certificate of Formation as the initial organizers of the Company, and as such were the initial members of the Company, then the withdrawal of the organizers, by resignation, assignment or otherwise, in favor of the Members, shall not constitute an event of withdrawal within the meaning of Section 10.1.

**10.2.6** Upon dissolution of the Company, the business and affairs of the Company shall terminate and be wound up, and the assets of the Company shall be liquidated under this Article 10.

**10.2.7** Dissolution of the Company shall be effective as of the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until there has been a winding up of the Company's business and affairs, and the assets of the Company have been distributed as provided in Section 10.4.

**10.2.8** Upon dissolution of the Company, any part or all of the assets of the Company may be sold in such manner as a Majority in Interest of the Members shall determine in an effort to obtain the best prices for such assets; provided, however, that the Company may distribute assets of the Company in kind to the Members to the extent practicable.

**10.3 Certificate of Cancellation.** Upon the dissolution and commencement of the winding up of the Company, a Certificate of Cancellation shall be executed on behalf of the Company and filed with the Secretary of State, and an authorized Member shall execute, acknowledge and file any and all other instruments necessary or appropriate to reflect the dissolution of the Company.

**10.4 Distribution of Assets Upon Dissolution.** In settling accounts after dissolution, the assets of the Company shall be paid in the following order:

**10.4.1** First, to creditors (including any Members who are creditors), in the order of priority as provided by law, except distributions to Members on account of their Capital Contributions;

**10.4.2** Second, an amount equal to the then remaining credit balances in the Capital Accounts of the Members shall be distributed to the Members in proportion to the amount of such balances; and

**10.4.3** Third, any remainder shall be distributed to the Members of the Company, pro rata, to their respective Membership Interests.

**10.5 Distributions in Kind.** If any assets of the Company are distributed in kind, such assets shall be distributed to the Members entitled thereto as tenants-in-common in the same proportions as the Members would have been entitled to cash distributions if such property had

33

been sold for cash and the net proceeds thereof distributed to the Members. In the event that distributions in kind are made to the Members upon dissolution and liquidation of the Company, the Capital Account balances of such Members shall be adjusted to reflect the Members' allocable share of gain or loss which would have resulted if the distributed property had been sold at its fair market value.

## ARTICLE 11 - MISCELLANEOUS PROVISIONS

**11.1    Competing Business.** Except as otherwise expressly provided in this Agreement or the Act, neither a Member, nor any of its shareholders, directors, officers, employees, partners, agents, family members or affiliates, shall be prohibited or restricted in any way from investing in or conducting, either directly or indirectly, and may invest in and/or conduct, either directly or indirectly, businesses of any nature whatsoever, including the ownership and operation of businesses or properties similar to or in the same geographical area as those held by the Company. Except as otherwise provided in this Agreement or the Act, any investment in or conduct of any such businesses by any such person or entity shall not give rise to any claim for an accounting by any Member or the Company or any right to claim any interest therein or the profits therefrom.

**11.2    Member Representations and Agreements.** Notwithstanding anything contained in this Agreement to the contrary, each Member hereby represents and warrants to the Company and to each other that: (a) the Membership Interests are not "securities" for purposes of federal and state securities laws, (b) the Membership Interest of such Member is acquired for investment purposes only, for the Member's own account, and not with a view to or in connection with any distribution, re-offer, resale or other disposition not in compliance with the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "1933 Act") and applicable state securities laws; (c) such Member, alone or together with the Member's representatives, possesses such expertise, knowledge and sophistication in financial and business matters generally, and in the type of transactions in which the Company proposes to engage in particular, that the Member is capable of evaluating the merits and economic risks of acquiring and holding the Membership Interest and the Member is able to bear all such economic risks now and in the future; (d) such Member has had access to all of the information with respect to the Membership Interest acquired by the Member under this Agreement that the Member deems necessary to make a complete evaluation thereof and has had the opportunity to question the other Members concerning such Membership Interest; (e) such Member's decision to acquire the Membership Interest for investment has been based solely upon the evaluation made by the Member; (f) such Member is aware that the Member must bear the economic risk of an investment in the Company for an indefinite period of time because Membership Interests have not been registered under the 1933 Act or under the securities laws of various states and, therefore, cannot be sold unless such Membership Interests are subsequently registered under the 1933 Act and any applicable state securities laws, or unless an exemption from registration is available; (g) such Member is aware that only the Company can take action to register Membership Interests and the Company is under no such obligation and does not propose to attempt to do so; (h) such Member is aware

34

that this Agreement provides restrictions on the ability of a Member to sell, transfer, assign, mortgage, hypothecate or otherwise encumber the Member's Membership Interest; (i) such Member agrees that the Member will truthfully and completely answer all questions, and make all covenants, that the Company may, contemporaneously or hereafter, ask or demand for the purpose of establishing compliance with the 1933 Act and applicable state securities laws; and (j) if such Member is an organization, that it is duly organized, validly existing, and in good standing under the laws of its state of organization and that it has full organizational power and authority to execute and agree to this Agreement and to perform its obligations hereunder.

**11.3** **Notice.**

    **11.3.1** All notices, demands or requests provided for or permitted to be given pursuant to this Agreement must be in writing.

    **11.3.2** All notices, demands and requests to be sent to any Member pursuant to this Agreement shall be deemed to have been properly given or served if addressed to such Member at the address as it appears on the Company records and (i) personally delivered, (ii) deposited for next day delivery by Federal Express, or other similar overnight courier services, (iii) deposited in the United States mail, prepaid and registered or certified with return receipt requested or (iv) transmitted via telecopier or other similar device to the attention of such Member with receipt acknowledged.

    **11.3.3** All notices, demands and requests so given shall be deemed received: (i) when actually received, if personally delivered, deposited for next day delivery with an overnight courier or telecopied, or (ii) as indicated upon the return receipt if deposited in the United States Mail.

    **11.3.4** The Members shall have the right from time to time, and at any time during the term of this Agreement, to change their respective addresses by delivering to the other parties written notice of such change in the manner prescribed in Section 10.3.2.

    **11.3.5** All distributions to any Member shall be made at the address at which notices are sent unless otherwise specified in writing by any such Member.

**11.4** **No Action.** No Member shall have any right to maintain any action for partition with respect to the property of the Company.

**11.5** **Amendment.** This Agreement or the Certificate of Formation may only be amended or modified by a writing executed and delivered by a Majority in Interest of the Members, except that a Member's Majority in Interest may not be changed without such Member's written consent; provided, however, that the Company's obligation to purchase the Membership Interest

35

of a Deceased Member and the provisions of Section 10.2.1 may not be altered or amended without the written consent of all of the Members.

**11.6    Power of Attorney.** Each Non-Voting Member hereby makes, constitutes and appoints Operating Manager, with full power of substitution, as the Member's true and lawful attorney-in-fact, for such Member and in such Member's name, place and stead and for the Member's use and benefit to sign and acknowledge, file and record, any amendments hereto among the Members and for the further purpose of executing and filing on behalf of each Member, any documents necessary to constitute the continuation of the Company, the admission or withdrawal of a Member, the qualification of the Company in a foreign jurisdiction (or amendment to such qualification), the admission of substitute Members or the dissolution or termination of the Company, provided such continuation, admission, withdrawal, qualification, or dissolution and termination are in accordance with the terms of this Agreement. The foregoing power of attorney is a special power of attorney coupled with an interest, is irrevocable and shall survive the legal incapacity or mental incompetence of a Member. The power of attorney shall survive the delivery of an assignment by a Member of the whole or any portion of his Membership Interest. In those cases in which the assignee of, or the successor to, a Member owning a Membership Interest has been approved by the Members for admission to the Company as a substitute Member, the power of attorney shall survive such substitution for the aforesaid purposes.

**11.7    Governing Law.** The rights and obligations of the Members hereunder shall be interpreted, construed and enforced in accordance with the laws of the State of Delaware (excluding only its choice of law rules).

**11.8    Entire Agreement.** This Agreement, including all Schedules to this Agreement, as amended from time to time in accordance with the terms of this Agreement, contains the entire agreement among the parties relative to the subject matter hereof and supersedes all prior or contemporaneous promises, agreements, representations, and understandings, whether written or oral, of the parties with respect to the subject matter hereof.

**11.9    Waiver.** No consent or waiver, express or implied, by any Member to or for any breach or default by any other Member in the performance by such other Member of his obligations under this Agreement shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Member of the same or any other obligations of such other Member under this Agreement. Failure on the part of any Member to complain of any act or failure to act of any of the other Members or to declare any of the other Members in default, regardless of how long such failure continues, shall not constitute a waiver by such Member of his rights hereunder.

**11.10    Severability.** If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected

36

thereby, and the intent of this Agreement shall be enforced to the greatest extent permitted by law.

**11.11 Binding Agreement.** Subject to the restrictions on transferability set forth in this Agreement, this Agreement shall inure to the benefit of and be binding upon the undersigned Members and their respective legal representatives, successors and assigns.

**11.12 Tense and Gender.** Unless the context clearly indicates otherwise, the singular shall include the plural and vice versa. Whenever the masculine, feminine or neuter gender is used inappropriately in this Agreement, this Agreement shall be read as if the appropriate gender was used.

**11.13 Captions.** Captions are included solely for convenience of reference and if there is any conflict between captions and the text of this Agreement, the text shall control.

**11.14 Benefits of Agreement.** Nothing in this Agreement expressed or implied, is intended or shall be construed to give to any creditor of the Company or any creditor of any Member or any other person or entity whatsoever, other than the Members and the Company, any legal or equitable right, remedy or claim under or in respect of this Agreement or any covenant, condition or provisions herein contained, and such provisions are and shall be held to be for the sole and exclusive benefit of the Members and the Company.

**11.15 Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which when taken together shall constitute a single counterpart instrument. Executed signature pages to any counterpart instrument may be detached and affixed to a single counterpart, which single counterpart with multiple executed signature pages affixed thereto constitutes the original counterpart instrument. All of these counterpart pages shall be read as though one and they shall have the same force and effect as if all of the parties had executed a single signature page. It is intended that the initial Non-Voting Members of the Company shall execute separate signature pages. If no such signature pages are executed by any Non-Voting Member, his Membership Interest shall be disregarded.

37

**IN WITNESS WHEREOF,** the undersigned, being all of the Members of the Company (other than the Non-Voting Members), have caused this Agreement to be duly adopted by the Company as of the date and year first above written and do hereby assume and agree to be bound by and to perform all of the terms and provisions set forth in this Agreement.

William T. Obeid

Dante A. Massaro

Christopher F. La Mack

## EXHIBIT A

The following are the voting Members:

| Names and Addresses of Voting Members | Initial Capital Contribution | Membership Interest |
|---|---|---|
| Christopher F. La Mack 161 Kilborne Road Mooresville, NC 28117 | $ 50.00 | 33.333% |
| Dante A. Massaro 12829 Shamley Court Huntersville, NC 28078 | $ 50.00 | 33.333% |
| William T. Obeid 71 West 12th Street New York, NY 10011 | $ 50.00 | 33.333% |
| Total | $150.00 | 100.00% |

The following are the Non-Voting Members:

None

39

**EXHIBIT B**
**TO THE LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**GEMINI REAL ESTATE ADVISORS, LLC**
a Delaware Limited Liability Company

**REGULATORY ALLOCATIONS**

(a)     Definitions Applicable to Regulatory Allocations. For purposes of this Agreement, the following terms shall have the meanings indicated:

(i)     "Adjusted Capital Account" means, with respect to any Member, such Member's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(1)     credit to such Capital Account any amounts which such Member is obligated to restore, or is deemed to be obligated to restore pursuant to the next to last sentences of Treasury Regulation § 1.704-2(g)(1) (share of minimum gain) and 1.704-2(i)(5) (share of partner nonrecourse debt minimum gain); and

(2)     debit to such Capital Account the items described in Treasury Regulation § 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

The foregoing definition of Adjusted Capital Account is intended to comply with the provisions of Treasury Regulation § 1.704-1(b)(2)(ii)(d) (alternative test for economic effect) and shall be interpreted consistently therewith.

(ii)     "Nonrecourse Deductions" shall mean losses, deductions, or Code § 705(a)(2)(B) expenditures attributable to Nonrecourse Liabilities (see Treasury Regulation § 1.704-2(b)(1)). The amount of Nonrecourse Deductions for a taxable year shall be determined pursuant to Treasury Regulation § 1.704-2(c), and shall generally equal the net increase, if any, in the amount of Minimum Gain for that taxable year, determined according to the provisions of Treasury Regulation § 1.704-2(d), reduced (but not below zero) by the aggregate distributions during the year of proceeds of Nonrecourse Liabilities that are allocable to an increase in Minimum Gain, with such other modifications as provided in Treasury Regulation § 1.704-2(c).

(iii)     "Nonrecourse Liability" means any Company liability (or portion thereof) for which no Member bears the economic risk of loss under Treasury Regulation § 1.752-2.

    (iv)   "Membership Minimum Gain" has the meaning set forth in Treasury Regulation § 1.704-2(d), and is generally the aggregate gain the Company would realize if it disposed of its property subject to Nonrecourse Liabilities for full satisfaction of each such liability, with such other modifications as provided in Treasury Regulation § 1.704-2(d).

    (v)   "Member Nonrecourse Deductions" has the meaning and the amount thereof shall be as set forth in Treasury Regulation § 1.704-2(i)(2).

    (vi)  Member Nonrecourse Debt" means any Company liability to the extent the liability is "nonrecourse" for purposes of determining the amount realized upon the sale or exchange of property securing such liability, but with respect to which a Member or related person to a Member bears the economic risk of loss within the meaning of Treasury Regulation § 1.752-2, because such Member or related person is, for example, the lender or a guarantor of the liability.

    (vii)  "Member Nonrecourse Debt Minimum Gain" shall mean the minimum gain attributable to Member Nonrecourse Debt as determined pursuant to Treasury Regulation § 1.704-2(i)(3).

    (viii)  "Regulatory Allocations" shall mean allocations of Nonrecourse Deductions provided in Subsection (b) below, allocations of Member Nonrecourse Deductions provided in Subsection (c) below, the minimum gain chargeback provided in Subsection (d) below, the partner nonrecourse debt minimum gain chargeback provided in Subsection (e) below, the qualified income offset provided in Subsection (f) below, the gross income allocation provided in Subsection (g) below, and the curative allocations provided in Subsection (j) below.

    (b)   Nonrecourse Deductions. All Nonrecourse Deductions for any taxable year shall be allocated among the Members in proportion to their relative Membership Interests.

    (c)   Member Nonrecourse Deductions. All Member Nonrecourse Deductions for any taxable year shall be allocated to the Member who bears the economic risk of loss (as set forth in Treasury Regulation § 1.752-2) with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulation § 1.704-2(i)(1).

    (d)   Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain for a Company taxable year, each Member shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of such net decrease in Company Minimum Gain, determined in accordance with Treasury Regulation § 1.704-2(g)(2). Such allocation shall consist first of gains recognized from the

41

disposition of property subject to Nonrecourse Liabilities and then a pro rata portion of the Company's other items of income and gain for that year; provided, however, that gain from the disposition of Company property subject to a Member Nonrecourse Debt shall be allocated to satisfy the nonrecourse debt minimum gain chargeback pursuant to this Subsection only to the extent such gain is not allocated to satisfy the partner minimum gain chargeback requirement pursuant to the immediately following Subsection. This Subsection shall not apply to a Member to the extent (i) the Member's share of the net decrease in Company Minimum Gain is caused by a guarantee, refinancing, or other change in a debt instrument causing it to become partially or wholly recourse debt or a Member Nonrecourse Debt and the Member bears the economic risk of loss (within the meaning of Treasury Regulation § 1.752-2) for the newly guaranteed, refinanced, or otherwise changed liability (see Treasury Regulation § 1.704-2(f)(2)); (ii) the Member contributes capital to the Company that is used to repay the Nonrecourse Liability, and the Member's share of the net decrease in Company Minimum Gain results from such repayment (see Treasury Regulation § 1.704-2(f)(3)); (iii) the Company obtains from the Internal Revenue Service a waiver of the minimum gain chargeback requirement (see Treasury Regulation § 1.704-2(f)(4)); or (iv) permitted by revenue rulings published by the Internal Revenue Service (see Treasury Regulation § 1.704-2(f)(5)). This provision is intended to comply with the minimum gain chargeback requirement in Treasury Regulation § 1.704-2(f) and shall be interpreted consistently therewith.

(e) Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt for any Company taxable year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt as of the beginning of the Company's taxable year, determined in accordance with Treasury Regulation § 1.704-2(i)(5), shall be allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations §§ 1.704-2(i)(4) and (5). Such allocation shall consist first of gains recognized from the disposition of property subject to Member Nonrecourse Debt, and then a pro rata portion of the Company's other items of income and gain for that year; provided, however, that (i) items of Company income and gain that are allocated to satisfy the minimum gain chargeback pursuant to the immediately preceding Subsection shall not be allocated to satisfy the partner nonrecourse debt minimum gain chargeback pursuant to this Subsection, and (ii) gain from the disposition of property subject to Nonrecourse Liabilities shall be allocated to satisfy the partner nonrecourse debt minimum gain chargeback requirement pursuant to this Subsection only to the extent not allocated to satisfy the minimum gain chargeback requirement pursuant to the immediately preceding Subsection. This Subsection shall not apply to a Member to the extent (i) the net decrease in Member Nonrecourse Debt Minimum Gain arises because the liability ceases to be Member Nonrecourse Debt due to a conversion, refinancing, or other change in the debt instrument that causes it to become partially or wholly a Nonrecourse Liability (in such case, the amount that would otherwise be subject to the partner nonrecourse debt minimum gain chargeback pursuant to this Subsection shall be added to the Member's share of the Company Minimum Gain) in accordance with Treasury Regulation § 1.704-2(i)(4); (ii) the

Member contributes capital to the Company that is used to repay the Member Nonrecourse Debt, and the Member's share of the net decrease in the Member Nonrecourse Debt Minimum Gain results from the repayment (see Treasury Regulations §§ 1.704-2(i)(4) and 1.704-2(f)(3)); (iii) the Company obtains from the Internal Revenue Service a waiver of the partner nonrecourse debt minimum gain chargeback requirement (see Treasury Regulations §§ 1.704-2(i)(4) and 1.704-2(f)(4)); or (iv) permitted by revenue rulings published by the Internal Revenue Service (see Treasury Regulations §§ 1.704-2(i)(4) and 1.704-2(f)(5)). This Subsection is intended to comply with the partner nonrecourse debt minimum gain chargeback requirement in Treasury Regulation § 1.704-2(i)(4) and shall be interpreted consistently therewith.

(f)     Gross Income Allocation. In the event any Member has a deficit in its Adjusted Capital Account at the end of any Company taxable year, each such Member shall be allocated items of Company gross income and gain, in the amount of such Adjusted Capital Account deficit, as quickly as possible.

(g)     Waiver of Minimum Gain Chargeback Provisions.   If the General Member determines in good faith that (i) either of the two minimum gain chargeback provisions contained in this Exhibit would cause a distortion in the economic arrangement among the Members, (ii) it is not expected that the Company will have sufficient other items of income and gain to correct that distortion, and (iii) the Members have made Capital Contributions or received net income allocations that have restored any previous Nonrecourse Deductions or Member Nonrecourse Deductions, a Majority in Interest of the   Members shall have the authority, but not the obligation, after giving notice to the other Members, to request on behalf of the Company that the Internal Revenue Service waive the minimum gain chargeback or partner nonrecourse debt minimum gain chargeback requirements pursuant to Treasury Regulations §§ 1.704-2(f)(4) and 1.704-2(i)(4). The Company shall pay the expenses (including attorneys' fees) incurred to apply for the waiver. The General Member shall promptly copy all Members on all correspondence to and from the Internal Revenue Service concerning the requested waiver.

(h)     Code Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code § 734(b) or Code § 743(b) is required, pursuant to Treasury Regulation § 1.704-l(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations.

(i)     Ordering: Curative Allocations. The allocations in this Exhibit shall be made before any other allocations and in the order specified in Treasury Regulation § 1.704-2(j). The allocations in this Agreement are intended to comply with the safe-harbor economic effect requirements of Treasury Regulation § 1.704-l(b) and shall be interpreted consistently therewith. The allocations in this Exhibit shall be taken into account in allocating Profits, Losses, and items of income, gain, loss and deduction among the Members so that, to the extent possible, the net

43

amount of such other allocations and the Regulatory Allocations under this Exhibit to each Member shall equal the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred. Notwithstanding the preceding sentence, Regulatory Allocations relating to (a) Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Company Minimum Gain that would trigger the minimum gain chargeback, and (b) Member Nonrecourse Deductions shall not be taken into account except to the extent that there has been a reduction in Member Nonrecourse Debt Minimum Gain that would trigger the partner nonrecourse debt minimum gain chargeback.

44

## EXHIBIT C

### Managers

Christopher F. La Mack
161 Kilborne Road
Mooresville, NC 28117

Dante A. Massaro
12829 Shamley Court
Huntersville, NC 28078

William T. Obeid
71 West 12th Street
New York, NY 10011

. 45

## EXHIBIT D
## SCHEDULE OF ADDITIONAL INFORMATION

### Descriptions of the Projects:

Attached hereto are legal descriptions describing, or plans showing, the real property owned by the Company, which such real property, together with any improvements thereon, will constitute the Projects for purposes of this Agreement: None

The Company owns the following ownership interest in another entity: None

### Effective Date of Organization:

The Company was formed on the following date upon the filing with the Secretary of State of the Certificate of Formation of the Company:

### Principal Place of Business of the Company:

The principal place of business of the Company shall be as follows:

200 Park Avenue South
Suite 1305
New York, New York 10003

### Business Purpose of the Company:

The Business Purpose of the Company is to: 1) acquire, own, operate, develop, improve, manage and dispose of commercial real estate, 2) own and/or operate any subsidiaries and/or affiliates deemed necessary to the purposes stated in the previous clause, and 3) and an other lawful act or activity for which a Limited Liability Company may be formed under the laws of the State of Delaware.

## EXHIBIT E

### CERTIFICATE OF AGREED VALUE

The undersigned mutually agree on this _____ day of _____, 20____, that for the purpose of <u>Section 9.5.1</u> of the Limited Liability Agreement of the Company executed among the undersigned, the Company shall have a total value of $15,000, and that the purchase price for a Member's Membership Interest in the Company shall be equal to (A) the said total value of the Company of $15,000, <u>multiplied</u> by (B) the Selling Member's proportionate Membership Interest in the Company.


_____
Christopher F. La Mack


_____
Dante A. Massaro


_____
William T. Obeid


47