# EXHIBIT

# 15

# MASTER LOAN AGREEMENT
(Construction Loan Agreement and Contingent Interest Agreement)

DATED AS OF October [ 17 ], 2013

BY AND BETWEEN

## 36 WEST 38TH STREET, LLC,
a Delaware limited liability company,

AS BORROWER,

and

## 36 WEST 38TH STREET HOTEL CAPITAL LLC,
a Delaware limited liability company,

AS LENDER

# TABLE OF CONTENTS

**Page**

1.  Definitions ...................................................................................................................1
2.  Loan and Loan Documents.........................................................................................12
    2.1    The Loan...........................................................................................................12
    2.2    Relationship of Loan and Various Documents.................................................13
    2.3    Amounts in Excess of Loan.............................................................................13
    2.4    Additional Security for Construction Loan; Assignment of Construction
           Documents........................................................................................................13
    2.5    Intentionally Deleted .......................................................................................16
    2.6    Fixed Interest ...................................................................................................16
    2.7    Intentionally Deleted .......................................................................................16
    2.8    Term..................................................................................................................16
    2.9    Default Rate .....................................................................................................16
3.  Representations and Warranties .................................................................................16
    3.1    Organization and Authority of Borrower and Guarantor .................................16
    3.2    Execution and Delivery of Loan Documents ...................................................17
    3.3    Information Supplied by Borrower and Guarantor............................................17
    3.4    No Proceedings.................................................................................................17
    3.5    Approval of Plans; Compliance with Laws.......................................................18
    3.6    Licenses; Permits..............................................................................................18
    3.7    No Defaults........................................................................................................18
    3.8    Access and Utilities ..........................................................................................18
    3.9    Lien Potential....................................................................................................19
    3.10   Flood Hazard Zone ...........................................................................................19
    3.11   Valid Title..........................................................................................................19
    3.12   Easements ..........................................................................................................19
    3.13   Environment ......................................................................................................19
    3.14   Brokers and Finders..........................................................................................20
    3.15   Complete Information.........................................................................................20
    3.16   Title Policy ........................................................................................................20
    3.17   Margin Stock .....................................................................................................20

## TABLE OF CONTENTS
(continued)

Page

|  |  |  |  |
|---|---|---|---|
| | 3.18 | ERISA | 20 |
| | 3.19 | FIRPTA | 21 |
| | 3.20 | Trade Name; Principal Place of Business | 21 |
| | 3.21 | USA Patriot Act | 21 |
| | 3.22 | Ownership of Borrower | 21 |
| | 3.23 | Intentionally Deleted | 21 |
| | 3.24 | Survival | 21 |
| | 3.25 | Effect of Request for Advance | 21 |
| 4. | | Construction Loan Advances | 22 |
| | 4.1 | Advances of Loan Proceeds | 22 |
| | 4.2 | Disbursement Schedule | 22 |
| | 4.3 | Amount of Advance; Retainage | 22 |
| | 4.4 | Reserves of Loan Proceeds | 23 |
| | 4.5 | Right to Require Deposits | 24 |
| | 4.6 | General Conditions for Advances | 24 |
| | 4.7 | Title Policy and Endorsements | 26 |
| | 4.8 | UCC Searches | 26 |
| | 4.9 | Foundation Survey and Certificates | 26 |
| | 4.10 | Special Conditions for Final Advance | 26 |
| | 4.11 | Reserved | 27 |
| | 4.12 | Building Loan Agreement | 27 |
| | 4.13 | Advances for Construction Management Agreement, Developer Agreement, Direct Contracts and Subcontracts | 27 |
| 5. | | Construction Period Covenants | 28 |
| | 5.1 | Use of Loan Proceeds | 28 |
| | 5.2 | Construction of Improvements | 28 |
| | 5.3 | Indemnity | 31 |
| 6. | | Conversion of Construction Loan to Contingent Interest Loan | 31 |
| | 6.1 | Conversion | 31 |
| | 6.2 | Satisfaction of Construction Loan Obligations | 33 |

# TABLE OF CONTENTS
(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | 6.3 | Payments of Additional Interest | 33 |
| | 6.4 | Payments of Appreciation Interest | 39 |
| | 6.5 | Prepayments; Circumvention of Prepayment Provisions | 45 |
| 7. | | Reserved | 46 |
| 8. | | Reserve Accounts and Equity Capital Account | 46 |
| | 8.1 | FF&E Reserve Fund | 46 |
| | 8.2 | Tax Impound Fund | 47 |
| | 8.3 | Insurance Impound Fund | 48 |
| | 8.4 | Equity Capital Account | 49 |
| | 8.5 | Application of Reserve Funds | 50 |
| | 8.6 | Security Interest in Reserve Funds | 50 |
| | 8.7 | Funding of Reserve Funds | 50 |
| 9. | | Additional Covenants | 50 |
| | 9.1 | Restrictions on Use of Gross Receipts | 50 |
| | 9.2 | Management of the Property | 50 |
| | 9.3 | Management Plan | 51 |
| | 9.4 | Title to and Maintenance of Collateral | 51 |
| | 9.5 | Inspection, Audits and Information Regarding Collateral and Loan | 52 |
| | 9.6 | Reserved | 52 |
| | 9.7 | Financial Restrictions on Borrower | 52 |
| | 9.8 | Transfer of Interests in Borrower or Collateral | 52 |
| | 9.9 | Compliance with Governmental Requirements | 54 |
| | 9.10 | Maintenance and Observation of Loan Documents | 54 |
| | 9.11 | Notice of Default or Changed Circumstance | 54 |
| | 9.12 | Casualty | 54 |
| | 9.13 | Cooperate with Lender | 54 |
| | 9.14 | ERISA Certifications | 55 |
| | 9.15 | Financial Information on Guarantor | 55 |
| | 9.16 | Operating Budget | 55 |

# TABLE OF CONTENTS
(continued)

Page

| | | | |
|---|---|---|---|
| 10. | | Events of Default; Remedies | 56 |
| | 10.1 | Events of Default | 56 |
| | 10.2 | Remedies | 57 |
| | 10.3 | Remedies Cumulative | 59 |
| | 10.4 | Waivers | 59 |
| 11. | | Relationship of Lender and Borrower as Creditor and Debtor Only | 59 |
| | 11.1 | Nature of Relationship | 59 |
| | 11.2 | Indemnification by Borrower | 59 |
| | 11.3 | Security | 60 |
| | 11.4 | Exculpation | 60 |
| 12. | | Miscellaneous | 62 |
| | 12.1 | Effect of Waiver | 62 |
| | 12.2 | Notices | 62 |
| | 12.3 | Severability of Provisions | 63 |
| | 12.4 | Successors and Assigns | 63 |
| | 12.5 | Counterparts | 64 |
| | 12.6 | Choice of Law | 64 |
| | 12.7 | Remedies Available | 64 |
| | 12.8 | Time of Essence | 64 |
| | 12.9 | Attorneys' Fees | 64 |
| | 12.10 | No Costs to Lender | 65 |
| | 12.11 | Lender's Relationship to Others | 65 |
| | 12.12 | Captions | 65 |
| | 12.13 | Modifications and Amendments | 65 |
| | 12.14 | Indemnification for Brokers' Fees | 65 |
| | 12.15 | Sign | 66 |
| | 12.16 | Exhibits | 66 |
| | 12.17 | Transactional Costs | 66 |
| | 12.18 | A/B Note Structure | 66 |
| | 12.19 | Intentionally Deleted | 66 |

# TABLE OF CONTENTS
(continued)

**Page**

12.20 Right of First Offer .................................................................................. 66

12.21 Intentionally Omitted ............................................................................... 67

12.22 Insurance .................................................................................................. 68

12.23 Condemnation ........................................................................................... 72

12.24 Sales/Participations .................................................................................. 73

12.25 Assignment Upon Repayment ................................................................... 74

**List of Exhibits**

| | |
|---|---|
| A | Description of Property |
| B | Construction Budget |
| C | Intentionally Deleted |
| D-1 | Request for Advance (Building Loan) |
| D-2 | Request for Advance (Project Loan) |
| E | Ownership of Borrower |
| F | List of Employee Benefit Plans |
| G | Calculation of Internal Rate of Return |
| H | Architect's Certificate of Substantial Completion |
| I | Draw Payment Procedure |
| J | Disbursement Schedule |
| K | Design Agreements |
| K-1 | Anticipated Direct Contracts |
| L | Environmental Reports |
| M | Intentionally Deleted |
| N | Intentionally Deleted |
| O | Form of Contractor's Consent |
| P | Initial Project Loan Costs |

THIS MASTER LOAN AGREEMENT IS SECURED BY, AMONG OTHER THINGS, (I) A CONSOLIDATED, AMENDED AND RESTATED ACQUISITION LOAN MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING, (II) A BUILDING LOAN MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING AND (III) A PROJECT LOAN MORTGAGE, ASSIGNMENT OF RENTS, SECURITY AGREEMENT AND FIXTURE FILING, ENCUMBERING PROPERTY LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK

## MASTER LOAN AGREEMENT
(Construction Loan Agreement and Contingent Interest Agreement)

THIS MASTER LOAN AGREEMENT (this "**Agreement**") is made and dated as of October [*ii*], 2013, by and between **36 WEST 38TH STREET, LLC**, a **Delaware limited liability company** ("**Borrower**"), and **36 WEST 38TH STREET HOTEL CAPITAL LLC**, a **Delaware limited liability company** ("**Lender**").

### RECITALS

A.   Lender has agreed to make a loan to Borrower in the maximum principal amount of up to Fifty Million Five Hundred Twenty Thousand and No/100 Dollars ($50,520,000.00) (the "**Loan**"), comprising (i) an acquisition loan in the amount of Thirteen Million Nine Hundred Ninety-Four Thousand Six Hundred Sixty-Two and No/100 Dollars ($13,994,662.06) (the "**Acquisition Loan**"), (ii) a project loan in the amount of Ten Million Eight Hundred Forty-Six Thousand Eight Hundred Thirty-Two and 58/100 Dollars ($10,846,832.58) (the "**Project Loan**") and (iii) a building loan in the amount of Twenty-Five Million Six Hundred Seventy-Eight Thousand Nine Hundred Fifty-Five and 36/100 Dollars ($25,678,955.36) (the "**Building Loan**"; Acquisition Loan, the Project Loan and the Building Loan, collectively, the "**Construction Loan**").   From and after the Conversion Date (as defined below), the Loan will constitute a shared appreciation and contingent interest loan, and will be repayable upon the terms and conditions set forth herein (herein, the "**Contingent Interest Loan**").

B.   This Agreement provides for the funding of Loan advances for the acquisition of the Property and the construction of the Improvements (as defined below), for the conversion of the Loan from the Construction Loan to the Contingent Interest Loan, and for the repayment of the Loan, all upon and subject to the terms and conditions set forth herein.

C.   The Loan is evidenced by the Note (as defined below), made by Borrower in favor of Lender in the aggregate amount of up to $50,520,000.00.  The Note and this Agreement are secured by the Mortgage (as defined below), made by Borrower, as mortgagor, to Lender, as mortgagee, covering the Property (as defined below).

NOW, THEREFORE, in consideration of the foregoing Recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

1.   **DEFINITIONS**

As used herein, the terms "**Agreement**," "**Borrower**," "**Lender**," and "**Loan**," shall have the meanings set forth above, and the following terms shall have the meanings set forth below:

"**Acquisition Loan**": as defined in Recital A.

"**Acquisition Loan Assignment**":  that certain Acquisition Loan Assignment of Rents and Leases of even date herewith made by Borrower in favor of Lender.

"**Acquisition Loan Mortgage**":  that certain Consolidated, Amended and Restated Acquisition Loan Mortgage, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith made by Borrower in favor of Lender.

"**Acquisition Loan Note**":  that certain Consolidated, Amended and Restated Acquisition Loan Promissory Note of even date herewith made by Borrower in favor of Lender.

"**ADA**":  as defined in Section 9.9.

"**Additional Interest**":  as defined in Section 6.3.1.

"**Affiliate**":  any Person which, directly or indirectly, controls or is controlled by or is under common control with a person and, for the purpose of this definition, "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies, whether through the ownership of voting securities or by contract or otherwise.

"**Annual Audit**":  as defined in Section 6.3.9.

"**Appreciation Interest**":  as defined in Section 6.4.1.

"**Approved Accountant**":  as defined in Section 6.3.9.

"**Architect's Agreement**":  collectively, those certain agreements between Borrower and Borrower's Architect, providing for architectural design and construction inspection services with respect to the Project.

"**Architect's Consent**":  that certain Architect's Consent, Agreement and Certificate executed by Borrower's Architect in favor of Lender.

"**Assignment of Contracts**":  that certain Assignment of Contracts, Licenses and Permits of even date herewith made by Borrower in favor of Lender.

"**Assignment**":  collectively, the Building Loan Assignment, the Acquisition Loan Assignment and the Project Loan Assignment.

"**Borrower's Architect**":  shall mean Gene Kaufman Architect or other architect selected by Borrower and approved by Lender.

"**Borrower's Engineer**":  shall mean, collectively, Ettinger Engineering Associates and Severud Associates.

"**Borrower's Equity Cap**":  $6,500,000 unless increased with Lender's consent.

"**Borrower's Equity Capital IRR**":  as defined in Section 6.4.1(a)(iii).

"**Borrower's Financial Statements**":  those financial statements of Borrower submitted to Lender and showing the financial position of Borrower as of June 30, 2013, together with all further financial statements submitted by Borrower to Lender from time to time as provided in this Agreement or the other Loan Documents.

"**Building Loan**":  as defined in Recital A.

"**Building Loan Agreement**":  that certain Building Loan Agreement of even date herewith made by and between Borrower and Lender.

"**Building Loan Assignment**":  that certain Building Loan Assignment of Rents and Leases of even date herewith made by Borrower in favor of Lender.

"**Building Loan Mortgage**":  that certain Building Loan Mortgage, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith made by Borrower in favor of Lender.

"**Building Loan Note**":  that certain Building Loan Promissory Note of even date herewith made by Borrower in favor of Lender.

"**Business Day**":  all days except Saturdays, Sundays, national holidays, and other days when banks in the State of New York are required or permitted not to transact business.

"**Change Orders**":  any amendments or modifications to the Plans, the Construction Management Agreement or any Direct Contracts, which amendments or modifications (i) either have been approved by Lender in writing or do not require Lender's approval pursuant to Section 5.2.3, and (ii) have been approved by such other parties as required in accordance with Section 5.2.3.

"**Closed Period**":  the period of time beginning on the date hereof and continuing to and including the day before the sixth anniversary of the Closing Date.

"**Closing Costs**":  as defined in Section 6.4.2.

"**Closing Date**":  the date hereof.

"**Code**":  the Internal Revenue Code of 1986, as amended from time to time, and all regulations promulgated thereunder.

"**Completion Date**":  October 31, 2015 as may be extended pursuant to the terms of this Agreement.

"**Completion Guaranty**": that certain guarantee of even date herewith made by Guarantor in favor of Lender pursuant to which Guarantor guarantees completion of construction of the Improvements.

"**Construction Assignments**": collectively, various assignments and agreements, of even date herewith, executed by Borrower relating to the Plans, the Architect's Agreement, the Engineer's Agreement, the Construction Management Agreement, and certain contract and other rights and interests of Borrower with respect to the construction of the Improvements, including, without limitation, all contracts, rights and interests described in Section 2.4 hereof, to the extent in existence on the date of this Agreement, together with any such assignments of such other contracts, rights and interests as are hereafter executed by Borrower in accordance with this Agreement.

"**Construction Budget**": the detailed budget for the Construction Loan, a copy of which is attached hereto as ***Exhibit B***, together with any and all revisions thereto that have been approved by Lender in writing if required pursuant to Section 5.2.5 or that do not require Lender's approval pursuant to said Section 5.2.5.

"**Construction Imprest Reserve Fund**": as defined in Section 8.4.1.

"**Construction Loan**": as defined in Recital A.

"**Construction Management Agreement**": collectively, that certain Standard Form of Agreement between Borrower and Construction Manager [A134-2009] and the General Conditions of the Contract of Construction [A234-2009] ancillary thereto, providing for construction management services with respect to the Project and having a guaranteed maximum price consistent with the Construction Budget for the trades covered thereby, in form and content as approved by Lender.

"**Construction Management Fee**": the fee payable to Construction Manager under the Construction Management Agreement, not to exceed $600,000.00 unless amended pursuant to the terms of the Construction Management Agreement and consented to by Lender in its sole and absolute discretion.

"**Construction Manager**": **ZDG, LLC**, or other construction manager selected by Borrower and approved by Lender.

"**Construction Manager's Consent**": that certain Contractor's Consent, Agreement and Certificate executed by Construction Manager in favor of Lender.

"**Construction Period**": the period of time during which the Improvements are being constructed on the Property, which period shall commence on the date of this Agreement and shall terminate on the Conversion Date.

"**Contingent Interest**": collectively, the Additional Interest and Appreciation Interest payable hereunder.

"**Contingent Interest Loan**": as defined in Recital A.

"**Contractor's Consent**":   collectively, the Architect's Consent, the Engineer's Consent, the Construction Manager's Consent and each additional Contractor's Consent entered into in accordance with the terms and provisions of Section 2.4.2.

"**Conversion Conditions**":  as defined in Section 6.1.

"**Conversion Date**":   the date on which the Construction Loan is converted to the Contingent Interest Loan as provided in Section 6 hereof, which date shall occur not later than the Completion Date.

"**Conversion Notice**":  as defined in Section 6.1.

"**Debt Service Coverage Ratio**":   the ratio of (i) Net Cash Flow for the twelve (12) calendar month period immediately preceding the date of calculation (with Net Cash Flow including, for purposes of this Debt Service Coverage Ratio definition only, the Fixed Interest paid over such twelve (12) month period) to (ii) the Fixed Interest that would be due for the twelve (12) calendar month period immediately following such calculation, as reasonably determined by Lender based upon an assumed interest rate of six percent (6.00%).

"**Default IRR Amount**":  as defined in Section 6.5.3.

"**Default Rate**":   an interest rate per annum equal to five percent (5%) (500 basis points) in excess of the then applicable Fixed Interest rate, or the Maximum Legal Rate of Interest, whichever is less.

"**Developer**":   **Gemini Jade Bryant Park Developer LLC**, or other developer selected by Borrower and approved by Lender.

"**Developer Agreement**":   that certain Developer Agreement between Borrower and Developer, providing for development management services with respect to construction of the Improvements.

"**Developer Overhead Reimbursement**":   the compensation payable to Developer under the Developer Agreement, not to exceed $1,300,000.00 unless amended pursuant to the terms of the Developer Agreement and consented to by Lender in its sole and absolute discretion.

"**Design Agreements**":  as defined in Section 2.4.1.

"**Direct Contract**":  as defined in Section 2.4.2.

"**Direct Costs**":   the total of all construction hard costs for the development of the Property and the construction of the Improvements as shown in the Construction Budget.

"**Disbursement Schedule**":  as defined in Section 4.2.1.

"**Draw Payment Procedure**":  as defined in Section 4.6.1.

"**Enforcement Contest**":  as defined in Section 11.4.2.

"**Engineer's Agreement**":  collectively, the contracts between Borrower and Borrower's Engineer for the performance of engineering services for the Improvements.

"**Engineer's Consent**":  that certain Engineer's Consent, Agreement and Certificate executed by Borrower's Engineer in favor of Lender.

"**Environmental Indemnity**":  that certain Indemnity Agreement of even date herewith made by Guarantor in favor of Lender.

"**Environmental Report**":  means, collectively, the reports listed on *Exhibit L*, attached hereto and made a part hereof.

"**Equity Capital Account**":  as defined in Section 8.5.1.

"**Equity Capital Account Cap**":  Six Million Five Hundred Thousand and No/100 Dollars ($6,500,000.00) or any greater amount required to be deposited into the Equity Capital Account as the result of the terms and provisions of this Agreement which require additional equity capital contributions by Borrower.

"**Equity Capital Account Deficiency**":  as defined in Section 8.5.1.

"**Equity Capital Contributions**":  as defined in Section 8.5.1.

"**ERISA**":  the Employee Retirement Security Act of 1975, as amended.

"**Event of Default**":  as defined in Section 10.

"**Excess FF&E Costs**":  as defined in Section 8.1.4.

"**Expenses**":  as defined in Section 6.3.4.

"**FF&E Fund Deposits**":  as defined in Section 8.1.2.

"**FF&E Reserve Escrow Agreement**":  as defined in Section 8.1.1.

"**FF&E Reserve Fund**":  as defined in Section 8.1.1.

"**Final Audit**":  as defined in Section 6.3.9.

"**First Operating Year Interest Reserve**":  as defined in Section 2.1.4.

"**Fixed Interest**":  means interest accruing on the outstanding principal amount of the Loan at a rate equal to six percent (6.00%) per annum during the term of the Loan.

"**Force Majeure Events**":  strikes, embargoes, new or material changes in governmental regulations, acts of God, war, terrorism, civil commotion or other strife, inability to obtain required materials (provided that Borrower has made reasonable attempts to obtain such required materials and, failing to do so, has attempted to obtain reasonable substitutes for such unavailable materials approved by Lender), governmental action (provided that Borrower,

in the exercise of reasonable diligence, could not have avoided such action), natural disasters, hurricanes and other events beyond the reasonable control of the party whose performance is affected thereby.

"**Full Recovery**":  as defined in Section 6.4.1.

"**Full Recovery Event**":  as defined in Section 6.4.1.

"**GAAP**":  generally accepted accounting principles consistently applied.

"**Governing Instruments**":  (A) the articles or certificates of incorporation or charter of a corporate Borrower, of each corporate Guarantor, and of each corporate constituent business entity of Borrower or Guarantor, all amendments thereto, and resolutions, duly adopted by the board of directors or comparable authority of each such corporation (and the stockholders if required), approving the Loan and the execution and delivery of the Loan Documents; (B) the partnership agreement and the certificate of partnership of Borrower if Borrower is a partnership, of each Guarantor that is a partnership, and of each partnership constituent business entity of Borrower or any Guarantor, together with all amendments thereto; (C) the articles of organization of a limited liability company Borrower, of each limited liability company Guarantor and of each limited liability company constituent business entity of Borrower or any Guarantor, and all amendments thereto, and (D) such instruments, agreements and certificates as Lender may request (i) with respect to Borrower if Borrower is a business entity other than a corporation, partnership or limited liability company, or (ii) with respect to each Guarantor that is a business entity other than a corporation, partnership, limited liability company, or (iii) with respect to any business entity other than a corporation, partnership or limited liability company that is a constituent business entity of Borrower or Guarantor.

"**Governmental Authority**":  the United States of America, the State of New York, the state under the laws of which Borrower is organized, any political subdivision of any of them, and any court, agency, department, commission, board, bureau or instrumentality of any of them.

"**Gross Proceeds**":  as defined in Section 6.4.2.

"**Gross Receipts**":  as defined in Section 6.3.3.

"**Guarantor**":   shall mean Gemini Real Estate Advisors, LLC, a Delaware limited liability company.

"**Guaranty (Recourse Carveouts)**": that certain guarantee of even date herewith made by Guarantor in favor of Lender pursuant to which Guarantor guarantees certain recourse carveouts.

"**Hazardous Substances**" and "**Hazardous Substances Laws**":  as defined in the Environmental Indemnity.

"**Immediate Family Members**":  as defined in Section 9.8 (c).

"**Impositions**":  all real property taxes and assessments, general and special, and all other taxes and assessments of any kind or nature whatsoever, including, without limitation, non-governmental levies or assessments such as maintenance charges, owner association dues or charges or fees, levies or charges resulting from covenants, conditions and restrictions affecting the Property, which are assessed or imposed upon the Property, or become due and payable, and which create or may create a lien upon the Property, or any part thereof, or upon any Personal Property, equipment or other facility used in the operation or maintenance thereof, payments required under any payment in lieu of taxes agreement, and all other governmental and non-governmental charges of like nature.

"**Impound Accounts**":  the Insurance Impound Fund and the Tax Impound Fund.

"**Improvements**":  the improvements to be constructed upon the Property in accordance with the Plans, consisting generally of a 20-story boutique hotel comprising approximately 114 rooms and 1,231 leasable square feet of restaurant space combined to at least 53,000 square feet all in one building and situated on the Land.

"**Indirect Costs**":  the total of all costs and expenses, other than Direct Costs, relating to developing the Property, constructing the Improvements, and the equipping and financing thereof as shown in the Construction Budget.

"**Ineligible Deductions**":  as defined in Section 6.4.2.

"**Insurance Impound Fund**":  the funds deposited with Lender (or Lender's loan servicer or such other financial institution as may be required by Lender) as required under Section 8.3 of this Agreement to pay insurance premiums on the Property.

"**Insurance Policies**":  any and all insurance policies as described in and providing the insurance required by this Agreement, the Mortgage or any other Loan Document.

"**IRR**":  as defined in Section 6.4.1.

"**Land**":  approximately 4,345 square feet of land and rights appurtenant thereto located in the Borough of Manhattan, City of New York, County of New York, State of New York, and described in *Exhibit A* attached hereto.

"**Leases**":  leases, whether oral or written and whether existing as of the date hereof or entered into in the future, of all or any portion of the Property or Improvements.

"**Lender Parties**":  as defined in Section 11.4.2.

"**Lender's Consultant**":  Merritt & Harris, Inc.

"**Lender's IRR**":  as defined in Section 6.4.1.

"**Loan Documents**":  collectively, this Agreement, the Building Loan Agreement, the Project Loan Agreement, the Note, the Mortgage, the Assignment, the Construction Assignments, the Guaranty (Recourse Carveouts), the Recourse Guaranty, the Completion

Guaranty, the Environmental Indemnity and all other documents evidencing, securing or otherwise entered into by Borrower, Principals and/or Guarantor, as applicable, in favor of Lender with respect to the Loan.

"**Major Subcontractor**":  any subcontractor in connection with the Project (i) responsible for work related to the foundation, superstructure, façade, electric, plumbing, HVAC, elevator or (ii) working under a contract in excess of $3,000,000.00.

"**Manager**":  the entity charged with hotel operations and management at the Property, as approved by Lender.  Gemini Property Management, LLC is approved as a Manager by Lender.

"**Management Agreement**":  a management agreement by and between Borrower and Manager, submitted by Borrower and accepted by Lender as of the date hereof.

"**Management Agreement Subordination**":  an agreement subordinating the Management Agreement to the lien of the Mortgage in form and substance reasonably satisfactory to Borrower and Lender.

"**Maturity Date**":  October [__], 2023, or such other date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate of Interest**":  the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Maximum Loan Amount**":  the principal amount of Fifty Million Five Hundred Twenty Thousand and No/100 Dollars ($50,520,000.00).

"**Monthly Statement**":  as defined in Section 6.3.8.

"**Mortgage**":  collectively, the Acquisition Loan Mortgage, the Building Loan Mortgage and the Project Loan Mortgage.

"**Net Cash Flow**":  as defined in Section 6.3.2.

"**Net Proceeds**":  as defined in Section 6.4.4.

"**Net Sales Proceeds**":  as defined in Section 6.4.2.

"**Note**":  collectively, the Acquisition Loan Note, the Building Loan Note and the Project Loan Note.

"**Offer Notice**":  as defined in Section 12.20.1.

"**Open Period**":  the period of time beginning on the sixth anniversary of the Closing Date and continuing thereafter.

"**Operating Budget**":  as defined in Section 9.16.

"**Other Triggering Event**":  as defined in Section 6.4.1.

"**Partial Recovery**": as defined in Section 6.4.1.

"**Partial Recovery Event**":  as defined in Section 6.4.1.

"**Permits**":  all licenses, permits, authorizations, consents and approvals necessary for the development of the Property, including, without limitation, the demolition of the improvements existing as of the date hereof, and construction of the Improvements.

"**Permitted Encumbrances**":  as defined in Section 9.4.2.

"**Permitted Sale**":  as defined in Section 6.4.1.

"**Person**" or "**Persons**":  any natural person, partnership, corporation, business trust, joint stock company, sole proprietorship, firm, association, trust, unincorporated association, joint venture or other entity, or a government or any agency or political subdivision thereof, and whether acting in an individual, fiduciary or other capacity.

"**Personal Property**":  any equipment, furniture, fixtures, machinery, apparatus, and tangible personal property owned or leased by Borrower and used or to be used in the construction, operation, repair, or maintenance of the Property, including the Reserve Funds.

"**Plans**":  the final plans and specifications for the construction of the Improvements, together with all amendments and modifications thereof made by Change Orders, all supplemental drawings and specifications approved by Borrower and Lender, and all of Borrower's Architect's supplemental instructions approved by Borrower and Lender, and in the event of an inconsistency among the foregoing, the latest in time approved by Borrower and Lender shall control.

"**Principals**":     shall mean William T. Obeid, Dante A. Massaro and Christopher LaMack.

"**Prior Payments**":  as defined in Section 6.4.1.

"**Prohibited Person**":  any person (a) listed in the Annex to, or otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**"), (b) that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order, (c) with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism, money laundering law applicable to Lender, including the Executive Order, (d) who commits, threatens

or conspires to commit or supports "terrorism" as defined in the Executive Order and/or the USA Patriot Act, (e) that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website (http://outbind://41/www.ustreas.gov/offices/enforcement/ofac) or at any replacement website or other replacement official publication of such list, or (f) who is an Affiliate of or affiliated with a person or entity listed above.

"**Project**": the development of the Property in accordance with the Plans.

"**Project Loan**": as defined in Recital A.

"**Project Loan Agreement**": that certain Project Loan Agreement of even date herewith made by and between Borrower and Lender.

"**Project Loan Assignment**": that certain Project Loan Assignment of Rents and Leases of even date herewith made by Borrower in favor of Lender.

"**Project Loan Mortgage**": that certain Project Loan Mortgage, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith made by Borrower in favor of Lender.

"**Project Loan Note**": that certain Project Loan Promissory Note of even date herewith made by Borrower in favor of Lender.

"**Project Site**": as defined in Section 4.3.3.

"**Property**": collectively, the Land and the Improvements.

"**Recourse Guaranty**": that certain guarantee of even date herewith made by Principals in favor of Lender.

"**Recourse Obligations**": as defined in Section 11.4.2.

"**Recovery Amount**": as defined in Section 6.4.3.

"**Recovery Event**": as defined in Section 6.4.1.

"**REIT**": as defined in Section 3.23.

"**Request for Advance**": a Request for Advance (Building Loan), a Request for Advance (Project Loan), or both, as the context shall require.

"**Request for Advance (Building Loan)**": a completed statement in the form attached hereto as *Exhibit D-1*, executed by Borrower, Construction Manager and Borrower's Architect and delivered to Lender prior to each funding of a Building Loan advance.

"**Request for Advance (Project Loan)**": a completed statement in the form attached hereto as *Exhibit D-2*, attached hereto and made a part hereof, delivered to Lender prior to each funding of a Project Loan Advance.

"**Required Equity Capital**": as defined in Section 8.5.1.

"**Requirement of Governmental Authority**": any law, ordinance, order, rule or regulation of a Governmental Authority.

"**Reserve Balance**": as defined in Section 6.4.2.

"**Reserve Funds**": collectively, the FF&E Reserve Fund, the Tax Impound Fund, the Insurance Impound Fund and the Construction Imprest Reserve Fund.

"**Reserve Shortfall**": as defined in Section 8.8.1.

"**Responsible Individual**": as defined in Section 6.3.8.

"**Retainage**": shall mean the amount of retainage required under the Construction Management Agreement or under any applicable Direct Contract that has been approved by Lender.

"**RevPar**": as defined in Section 9.2.

"**Standby Equity Contribution**": as defined in Section 4.1.2.

"**Stipulated Value**": as defined in Section 6.4.5.

"**Substantial Completion**": the substantial completion of the Improvements on the Property as demonstrated by satisfaction of all of the following conditions: (a) certifications by Lender's Consultant that the construction of the Improvements on the Property has been substantially completed in accordance with the final Plans; (b) a punch list and a punch list escrow in the amount of 1.25 times the estimated cost to complete the punch list has been approved by Borrower's Architect, the Construction Manager, and reasonably approved by Borrower and Lender; (c) Borrower's Architect has delivered to Borrower and Lender a certificate of substantial completion in the form attached hereto as *Exhibit H*; and (d) temporary certificates of occupancy, permitting use of the applicable Improvements for their intended purposes, have been issued for all Improvements by the applicable governmental entities.

"**Tax Impound Fund**": the funds deposited with Lender (or Lender's loan servicer or such other financial institution as may be required by Lender) as required under Section 8.2 of this Agreement to pay real property taxes and assessments for the Property, as well as required principal amortization and interest payments owing under any bonds or other assessments payable in connection with the development of the Property.

"**Term**": as defined in Section 2.7 hereof.

"**Title Company**": Fidelity National Title Insurance Company and/or any other title insurance company approved by Lender which is providing title insurance coverage with respect to the Mortgage.

"**Title Policy**":  a Lender's mortgagee's policy of title insurance issued by Title Company pursuant to title order No. 13-7406-30947-NYM, insuring Lender in an amount equal to one hundred percent (100%) of the maximum aggregate principal amount of the Project Loan and Building Loan, including all endorsements to such policy now or hereafter issued to Lender.

"**Treasury Regulations**":  shall mean the income tax regulations promulgated under the Code, whether temporary or finalized, as such regulations may be amended  from time to time (including corresponding provisions of succeeding regulations).

"**Total Costs**":  the sum of Direct Costs and Indirect Costs as shown in the Construction Budget.

"**USA Patriot Act**":  The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act, P.L. 107-56, 115 stat. 272 (2001), as the same may be modified from time to time.

"**Voluntary Bankruptcy Event**":  as defined in Section 11.4.2.

## 2.   LOAN AND LOAN DOCUMENTS

### 2.1   *The Loan*

2.1.1    Subject to all the terms, conditions, and provisions hereof, Lender hereby agrees to lend to Borrower, and Borrower hereby agrees to borrow from Lender, the Loan or so much thereof as may be advanced from time to time as provided herein.  The Loan shall be in the amount of up to $50,520,000 in the aggregate.

2.1.2    On the date hereof, Lender is advancing to Borrower (i) the amount of Thirteen Million Seven Hundred Eighty-Five Thousand Six Hundred Seventy-Seven and No/100 Dollars ($13,785,677.00) under the Acquisition Loan and (ii) the amount of Twenty Million and No/100 Dollars ($20,000,000.00) under the Building Loan, to be used by Borrower only to pay the costs more particularly described on *Exhibit P* attached hereto.  Thereafter, the Project Loan and the Building Loan shall consist of advances, made no more frequently than monthly, of the remaining loan proceeds made in accordance with the provisions of Section 4.6.1.  Advances under the Project Loan shall be made only for Indirect Costs and advances under the Building Loan shall be made only for Direct Costs.  The Acquisition Loan is fully funded as of the date hereof.

2.1.3    The Loan shall be due and payable on the Maturity Date.

2.1.4    *Interest and Operating Expenses*.

(a)   On the date hereof, Lender shall set aside as a line item on the Construction Budget (i) Three Million Five Hundred Eighteen Thousand Four Hundred Sixteen and No/100 Dollars ($3,518,416.00) (the "***Construction Period Interest Reserve***") of the available Loan proceeds to create an interest reserve to be used to pay Fixed Interest during the Construction Period and (ii) Five Hundred Thousand and No/100 Dollars ($500,000.00) (the "***First Operating Year Interest Reserve***") of the available Loan proceeds to create an interest reserve to be used to

pay Fixed Interest to the extent of any cash-flow shortfall during the first year following the Conversion Date. Neither the Construction Period Interest Reserve nor the First Operating Year Interest Reserve shall be deemed disbursed and neither reserve shall accrue interest until actually drawn upon by Lender. Borrower and Lender hereby acknowledge and agree that (x) the monthly Fixed Interest payments during the Construction Period shall be funded from the Construction Period Interest Reserve and (y) to the extent that there is not sufficient cash-flow available from the operation of the Property for Borrower to make any Fixed Interest payment, in whole or in part, during the first year following the Conversion Date, any such deficiency shall be funded from the First Operating Year Interest Reserve (to the extent of funds on deposit therein). Borrower hereby authorizes Lender to advance amounts from the Construction Period Interest Reserve and the First Operating Year Interest Reserve to make payments of Fixed Interest as and when required pursuant to the terms hereof. Any amounts funded by Lender from the Construction Period Interest Reserve and/or the First Operating Year Interest Reserve shall, upon such funding, be added to the outstanding principal amount of the Loan and shall immediately begin accruing interest in accordance with the terms of this Agreement. Amounts advanced from the Construction Period Interest Reserve and the First Operating Year Interest Reserve shall be advanced under the Building Loan. To the extent that the amounts available on deposit in the Construction Period Interest Reserve and/or the First Operating Year Interest Reserve, as applicable, are not sufficient to pay the Fixed Interest payments for which such reserves were established (including, for purposes of such deficiency determination, any amounts re-allocated to the First Operating Year Interest Reserve pursuant to the provisions of Section 4.3.2 hereof), Borrower shall be responsible for funding any such deficiency (and any such amounts so funded by Borrower shall not be credited to the Borrower's Equity Capital Account).

### 2.2    *Relationship of Loan and Various Documents*

The Loan is evidenced by the Note, and repayment of the Note and all other sums due Lender under the terms of any of the Loan Documents (excluding the Recourse Guaranty, the Guaranty (Recourse Carveouts) and the Completion Guaranty) and the performance of all the covenants set forth in the Loan Documents for performance by Borrower are secured by the Mortgage, the Assignment, and any other security or collateral given by Borrower to Lender in connection with the Loan.

### 2.3    *Amounts in Excess of Loan*

After the occurrence of an Event of Default, Lender shall have the right, but not the obligation, in each case following two (2) days written notice to Borrower via email provided in Section 12.2 hereof, to fund amounts in excess of the Loan from time to time to pay accrued and unpaid interest owing on the Loan, to complete construction of the Improvements, or to correct any defaults by Borrower under any of the Loan Documents (Borrower agreeing that the correcting of a default by Lender shall not cure any Event of Default under this Agreement). Such excess amounts when funded shall be deemed evidenced by the Note, shall bear interest at the Default Rate and shall be secured by the Mortgage, the Assignment, and all other security and collateral for the Loan. Borrower hereby agrees to execute additional notes, mortgages, security agreements, and other additional Loan Documents, and modifications thereto, promptly upon request by Lender, in favor of Lender, evidencing and securing any amounts funded in excess of the Loan.

**2.4   *Additional Security for Construction Loan; Assignment of Construction Documents***

2.4.1   *Plans; Architect's Agreement; Engineer's Agreement; Construction Management Agreement*.  As additional security for the payment of the Construction Loan, Borrower hereby transfers and collaterally assigns to Lender all of Borrower's right, title and interest in and to the Plans and all of Borrower's interest in and to the Architect's Agreement, the Engineer's Agreement, the Construction Management Agreement, all subcontracts (now or hereafter entered into) under the Construction Management Agreement and the agreements listed on *Exhibit K* attached hereto and made a part hereof (collectively, the "**Design Agreements**") and agrees to provide Lender with a Contractor's Consent as to each of such agreements.  In connection with the Plans and the Design Agreements, Borrower hereby represents and warrants to and agrees with Lender as follows:

(a)   The Design Agreements, which are attached as Exhibit B to each Contractor's Consent and executed by each contractor party to each Design Agreement, respectively, are true, complete and correct copies of the originals thereof and all amendments thereto, to Borrower's knowledge, Borrower's interest therein is not subject to any claim, setoff or encumbrance;

(b)   Subject to the terms of the applicable Contractor's Consent(s), Lender may use the Plans, whether now in existence or hereafter developed, for any purpose relating to the Improvements described therein, including but not limited to, inspections of construction and completion of the Improvements described therein;

(c)   Neither this collateral assignment nor any action by Lender pursuant to this Agreement shall constitute an assumption by Lender of any obligations under the Design Agreements, and Borrower shall at all times continue to be liable for all obligations of Borrower thereunder.  Borrower hereby agrees to perform all of Borrower's obligations under the Design Agreements.  Borrower agrees to indemnify and hold Lender harmless against and from any loss, cost, liability or expense (including, but not limited to, reasonable attorneys' fees and disbursements) resulting from any failure of Borrower to perform as required by the Design Agreements unless the contractor is in default.

(d)   Lender shall have the right at any time (but shall have no obligation), following  two (2) days written notice to Borrower via email provided in Section 12.2 hereof, to take in Lender's name or in the name of Borrower such action as Lender may at any time determine to be necessary or advisable to cure any default under the Design Agreements or to protect the rights of Borrower or Lender thereunder, provided that such action is taken in accordance with the requirements of the applicable Contractor's Consent. Lender shall incur no liability if any action so taken by Lender or on Lender's behalf shall prove to be inadequate or invalid, and Borrower agrees to hold Lender harmless against and from any loss, cost, liability or expense (including, but not limited to, reasonable attorneys' fees and disbursements) incurred in connection with any such action, except to the extent caused by the gross negligence or willful misconduct of Lender;

(e)     Borrower hereby irrevocably authorizes Lender to enforce all rights of Borrower under the Design Agreements.   This authorization is irrevocable by death, dissolution or otherwise; and

Lender agrees that it will exercise its rights under the foregoing subparagraphs (d) and (e) of this Section 2.4.1 only after and during the continuance of an Event of Default.  Prior to an Event of Default, Borrower shall have the right to exercise Borrower's rights under the Design Agreements, provided that Borrower shall not cancel or amend the Plans (except as otherwise permitted hereunder), or do or suffer to be done any act which would impair the security constituted by this collateral assignment, without the prior written consent of Lender.

2.4.2    *Assignment of Other Contracts.*  As additional security for the payment of the Construction Loan, Borrower hereby transfers and collaterally assigns to Lender all of Borrower's right, title and interest in and to every other direct contract necessary for the development, including, without limitation, the demolition of the improvements existing at the Property as of the date hereof, and construction of the Improvements, between Borrower and a contractor whether entered into before or after the date hereof (each such other direct contract, collectively, the "**Direct Contracts**," and individually, a "**Direct Contract**") and agrees to provide Lender with a Contractor's Consent in the form attached hereto as ***Exhibit O*** with respect to each such Direct Contract.  As of the date hereof, Borrower currently envisions entering into the additional Direct Contracts more particularly described on *Exhibit K-1* attached hereto.  In connection with each Direct Contract, Borrower represents and warrants to and agrees with Lender as follows, such representations, warranties and agreements to be effective upon collateral assignment of each other Direct Contract to Lender:

(a)    The copy of the Direct Contract attached as Exhibit B to the Contractor's Consent is a true, complete and correct copy of the original thereof and all amendments thereto, and, to Borrower's knowledge, Borrower's interest therein is not subject to any claim, setoff or encumbrance;

(b)    Neither this collateral assignment nor any action by Lender pursuant to this Agreement shall constitute an assumption by Lender of any obligations under the Direct Contract, and Borrower shall at all times continue to be liable for all obligations of Borrower thereunder.  Borrower hereby agrees to perform all of Borrower's obligations under the Direct Contract unless the contractor is in default.  Borrower agrees to indemnify and hold Lender harmless against and from any loss, cost, liability or expense (including, but not limited to, reasonable attorneys' fees and disbursements) resulting from any failure of Borrower to perform as required by the Direct Contract unless the contractor is in default;

(c)    Lender shall have the right (but shall have no obligation), following two (2) days' written notice to Borrower via email provided in Section 12.2 hereof, to take in Lender's name or in the name of Borrower such action as Lender may determine to be necessary or advisable to cure any default under the Direct Contract or to protect the rights of Borrower or Lender thereunder.  Lender shall incur no liability if any action so taken by Lender or on Lender's behalf shall prove to be inadequate or invalid, and Borrower agrees to hold Lender harmless against and from any loss, cost, liability or expense (including, but not limited to, reasonable attorneys' fees and disbursements) incurred in connection with any such action;

(d)   Borrower hereby irrevocably authorizes Lender to enforce all rights of Borrower under the Direct Contract.  This authorization is irrevocable by death, dissolution or otherwise; and

Lender agrees that Lender will exercise Lender's rights under the foregoing subparagraphs (c) and (d) of this Section 2.4.2 only after and during the continuance of an Event of Default.  Prior to an Event of Default, Borrower shall have the right to exercise Borrower's rights under each Direct Contract, provided that Borrower shall not cancel or materially amend such Direct Contract except by Change Order, or do or suffer to be done any act which would impair in any material respect the security constituted by this collateral assignment, without the prior written consent of Lender.  Notwithstanding the foregoing, however, with the prior written consent of Lender, which shall not be unreasonably withheld, delayed or conditioned, Borrower shall be permitted to terminate a Direct Contract for default by the contractor thereunder.

2.4.3   *Other Collateral*.  Borrower irrevocably assigns to and grants to Lender a security interest in, as security for the performance of Borrower's obligations under this Agreement, the Note, the Mortgage, the Assignment, and all other Loan Documents, all funds deposited by Borrower with Lender under or pursuant to this Agreement, all governmental permits obtained for the lawful construction and/or operation of the Improvements and all reserves, deferred payments, deposits, refunds, cost savings and payments of any kind relating to the construction and/or operation of the Improvements and in which Borrower may now or hereafter have or acquire any interest.  Upon an Event of Default and the continuation thereof of Borrower, Lender may use any of the foregoing for any purpose for which Borrower could have used them under this Agreement or with respect to the construction of the Improvements. Lender will also have all other rights and remedies as to any of the foregoing which are provided under applicable law or in equity.

**2.5**   *Intentionally Deleted*

**2.6**   *Fixed Interest*

Borrower shall pay the Fixed Interest to Lender, in arrears, on the first $(1^{st})$ day of November, 2013 and on the first $(1^{st})$ day of each and every month thereafter up to and including the Maturity Date.  Fixed Interest shall be calculated at all times during the term of this Note on the daily unpaid principal balance of the Loan based on a three hundred sixty (360) day year and paid for the actual number of days elapsed for any whole or partial month in which Fixed Interest is being calculated.  Such payments of Fixed Interest shall be in addition to, and not in reduction of, any and all payments of Additional Interest and Appreciation Interest.

**2.7**   *Term*

The term of the Loan (the "**Term**") shall be a term of ten (10) years, including up to thirty (30) months for the Construction Period before the Conversion Date and the balance as a permanent loan.

### 2.8   *Default Rate*

In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by law, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, calculated from the date such payment was due.

### 3.   REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into and execute this Agreement and to make the Loan to Borrower, Borrower hereby represents and warrants to Lender as follows, each representation and warranty being reaffirmed on submission of a Request for Advance:

### 3.1   *Organization and Authority of Borrower and Guarantor*

Borrower is duly organized, validly existing and in good standing under the laws of the State of Delaware as a limited liability company with full power and authority to enter into the Loan.  Borrower's federal tax identification number is **46-1656842**.

Guarantor is duly organized, validly existing and in good standing under the laws of the State of Delaware as a limited liability company with full power and authority to enter into the Recourse Guaranty, the Completion Guaranty, and the Environmental Indemnity.

### 3.2   *Execution and Delivery of Loan Documents*

The execution and delivery of the Loan Documents executed or delivered by Borrower, the execution and delivery of the Guaranty (Recourse Carveouts), the Completion Guaranty and the Environmental Indemnity by Guarantor, the execution and delivery of the Recourse Guaranty by Principals, and the consummation of the transactions contemplated thereby:  (i) have been duly authorized by all actions required under the terms and provisions of their Governing Instruments, the laws of their respective States of formation and any applicable Requirement of a Governmental Authority; (ii) create legal, valid and binding obligations of Borrower and Guarantor, respectively, enforceable in accordance with their terms, subject to bankruptcy and similar laws; (iii) do not require the approval or consent of any Person, including, without limitation, any Governmental Authority having jurisdiction over any of Borrower, Guarantor or the property of any of them; (iv) do not and will not constitute a violation of, or default under, the Governing Instruments of Borrower, or any Requirement of a Governmental Authority applicable to Borrower or Guarantor; and (v) will not be in contravention of any court or administrative order or ruling applicable to Borrower, Guarantor or the Property, or to Borrower's knowledge any mortgage, indenture, agreement, commitment or instrument to which Borrower or Guarantor is a party or by which any of them or their assets are bound, nor create or cause to be created any mortgage, lien, encumbrance, or charge against the assets of Borrower or Guarantor other than those created pursuant to the Loan Documents.

### 3.3   *Information Supplied by Borrower and Guarantor*

(a)   Borrower's financial statements delivered to Lender before the date of this Agreement are true and correct in all material respects and fairly present the financial condition

of Borrower (including all of Borrower's contingent liabilities), as of the respective dates thereof. No material adverse change has occurred in the financial condition of Borrower between the date of such financial statements and the date of this Agreement and no borrowings, guaranties, or granting of security interests have been made by Borrower between the date of such financial statements and the date of this Agreement other than the borrowings contemplated hereby or approved in writing by Lender.

(b)  Guarantor's Financial Statements delivered to Lender before the date of this Agreement are true and correct in all material respects and fairly present the financial condition of Guarantor (including all of Guarantor's contingent liabilities other than the recourse liabilities under the Completion Guaranty and the Recourse Guaranty), as of the respective dates thereof. No material adverse change has occurred in the financial condition of Guarantor between the date of such financial statements and the date of this Agreement and no borrowings, guaranties, or granting of security interests have been made by Guarantor between the date of such financial statements and the date of this Agreement other than the borrowings contemplated hereby or approved in writing by Lender.

### 3.4  *No Proceedings*

There are no actions, suits or proceedings pending, or, to the knowledge of Borrower threatened, against or affecting Borrower, Guarantor, the Property, the Improvements, or any other collateral covered by the Loan Documents, or involving the validity or enforceability of the Loan Documents or the priority of the liens created thereby, at law or in equity, or before or by any Governmental Authority, except actions, suits and proceedings (i) which have been fully disclosed to and approved by Lender in writing, (ii) which are fully covered by insurance or which, if adversely determined, would not individually or in the aggregate materially, in the determination of Lender in its reasonable discretion, impair the ability of Borrower to pay when due any amounts which may become payable in respect of the Loan or evidenced or secured by any of the Loan Documents, and (iii) which would not materially reduce the value of the security provided by the Loan Documents (including, but not limited to, any adverse effect on title to the Property or any adverse change in the permitted use of the Property).

### 3.5  *Approval of Plans; Compliance with Laws*

The Plans, as and when prepared, have been or will be submitted to Lender, and, to the extent required by applicable law or any restrictive covenant, each Governmental Authority and the beneficiaries of each such covenant, respectively. The anticipated use of the Property and the Improvements complies with applicable zoning ordinances, regulations and restrictive covenants affecting the Property and Improvements and all other Requirements of Governmental Authority relating to the Property, and all requirements for such use have been satisfied consistent with the stage of construction of the Improvements. To Borrower's knowledge, there are no violations of laws or of the requirements of any Governmental Authorities relating to the Property that will not be corrected as part of the construction of the Improvements.

### 3.6   *Licenses; Permits*

The construction and operation of the Improvements will not violate (a) any zoning, building code, subdivision, or land use ordinance, regulation or law promulgated by any Governmental Authority (including, without limitation, the United States Environmental Protection Agency and the United States Department of Housing and Urban Development), or (b) any material restriction of any kind affecting the Property.

### 3.7   *No Defaults*

No event has occurred and is continuing which, with the giving of notice or the passage of time or both, would constitute an Event of Default under any of the Loan Documents; Borrower has not received written notice of, and to Borrower's knowledge is not in, default in the payment of any indebtedness for borrowed money or under the terms and provisions of any agreement or instrument evidencing any such indebtedness; Borrower has not received written notice of, and to Borrower's knowledge is not in, default under any contracts or agreements relating to construction of the Improvements; and Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or, to Borrower's knowledge, any other Requirement of a Governmental Authority.

### 3.8   *Access and Utilities*

The Property has rights of access to public ways and all water, sanitary sewer and storm drain facilities necessary for the Improvements. All utilities and services necessary to the full use and enjoyment of the Property and Improvements (including, without limitation, gas, electricity, cable service and telephone) are available at the boundaries of the Property. All roads necessary for the full utilization of the Property and Improvements for their intended purposes have either been completed or the necessary rights of way therefor have been acquired by Borrower or appropriate Governmental Authority, and all necessary steps have been taken by Borrower and said Governmental Authority to ensure the complete construction and installation thereof prior to the Completion Date. There is unrestricted access for the passage of motor vehicles to and from the Property to and from West 38th Street, New York, New York.

### 3.9   *Lien Potential*

Borrower has made no contract or arrangement of any kind which has given rise to, or the performance of which by the other party thereto would give rise to, a lien or claim of lien on the Property, Improvements, or other collateral covered by the Loan Documents, except for the Mortgage, Assignment and Uniform Commercial Code financing statements filed in connection with the Loan, and except for its arrangements with Borrower's Architect, Borrower's Engineer and the contractors under any Direct Contract.

### 3.10   *Flood Hazard Zone*

No part of the Property is located in an area designated as having special flood hazards on any maps entitled: "Flood Insurance Rate Map," "Flood Hazard Floodway Boundary Map," "Flood Hazard Boundary Map," or "Flood Boundary and Floodway Map" published by the

Federal Emergency Management Agency or a "Flood Hazard Boundary Map" published by the United States Department of Housing and Urban Development.

### 3.11  *Valid Title*

Borrower is the true, sole and lawful owner of the Property, and is lawfully seized and possessed of the same, subject only to the exceptions and other matters shown on the Title Policy (or the commitment for the Title Policy issued by Title Company on the date hereof). Borrower has good right, full power and lawful authority to mortgage, grant, bargain, sell and convey the same, and the Mortgage, when properly recorded, will create a valid first lien on the Property, subject only to the exceptions and other matters shown on the Title Policy (or the commitment for the Title Policy issued by Title Company on the date hereof).

### 3.12  *Easements*

All proposed easements, permits, licenses, and other instruments which would or might affect the title to the Property have been, or shall be, submitted to Lender for Lender's approval prior to the execution thereof by Borrower, accompanied by a survey showing the exact proposed location thereof and such other information as Lender shall reasonably require. Borrower shall not subject the Property or any part thereof to any restrictive covenant (including any restriction or exclusive use provision in any lease or other occupancy agreement) without the prior written approval of Lender. All such easements, permits, licenses, restrictive covenants, and other instruments that are proposed to be executed after the date hereof and are so approved by Lender, shall be subordinated to by Lender, except to the extent they create monetary liens on the Property that could attain a priority higher than the lien of the Mortgage. In granting its approval under this Section 3.12, Lender shall not unreasonably withhold, condition, or delay such approval.

### 3.13  *Environment*

3.13.1  Except as described in the Environmental Report:  (i) the Property is in a clean, safe and healthful condition and is free of all Hazardous Substances; (ii) Borrower has not caused or permitted any Hazardous Substances to be placed, held, located or disposed of on, under, at or in a manner to affect the Property, or any part thereof, in violation of any of the Hazardous Substances Laws, and, to Borrower's knowledge, the Property has never been used (whether by Borrower or by any other person or entity) for any activities involving, directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Substances in violation of any of the Hazardous Substances Laws; (iii) to Borrower's knowledge neither Borrower nor the Property is subject to any existing, pending, or threatened investigation or inquiry by any Governmental Authority, and  the Property is not subject to any remedial obligations under any applicable Laws pertaining to health or the environment; and (iv)  to Borrower's knowledge there are not now any underground tanks, vessels, or similar facilities for the storage, containment or accumulation of Hazardous Substances of any sort on or affecting the Property.

3.13.2   Nothing in this Section 3.13 shall in any way limit or otherwise affect the representations and warranties contained in any other provision of this Agreement or in any other Loan Document.

### 3.14  *Brokers and Finders*

No Person, other than Michael Stoler is entitled to claim or receive any broker's or finder's fee or commission as a result of or in connection with the acquisition of the Land by Borrower and/or the making of the Loan by Lender on account of any agreement, contract or other commitment, whether written or oral, made or entered into by or on behalf of Borrower.

### 3.15  *Complete Information*

No representation or warranty of Borrower or Guarantor contained in any of the Loan Documents, and no statement contained in any certificate, schedule, list, financial statement or other instrument furnished to Lender by or on behalf of Borrower or Guarantor to the extent that such information was prepared by Borrower or Guarantor, contains any untrue statement of a material fact, or to the knowledge of Borrower, omits to state a material fact necessary to make the statements contained therein not misleading.

### 3.16  *Title Policy*

There is no agreement or arrangement between Title Company and Borrower (or any person affiliated with Borrower) relative to Title Company's not setting forth in the Title Policy or any endorsement issued pursuant to Section 4.8 an exception for any matter, lien or encumbrance on or affecting the Property and/or Improvements, unless such agreement or arrangement has been disclosed to and consented to by Lender in writing prior to the date hereof.  No such agreement or arrangement will hereafter be entered into without the prior written consent of Lender.

### 3.17  *Margin Stock*

The Loan is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation G, T, U or X issued by the Board of Governors of the Federal Reserve System, and Borrower agrees to execute all instruments necessary to comply with all the requirements of Regulation U of the Federal Reserve System.

### 3.18  *ERISA*

Neither Borrower, any Guarantor nor any of their Affiliates is (i) a party in interest as defined in Section 3(14) of ERISA, or (ii) a disqualified person, as defined in Section 4975(e)(2) of the Code, with respect to Lender or any plan, as defined or as regulated by ERISA; and the assets of Borrower are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Code.

### 3.19  *FIRPTA*

Borrower is not a "foreign person" within the meaning of Sections 1445 or 7701 of the Code.

### 3.20   *Trade Name; Principal Place of Business*

Borrower uses no trade name other than its actual name set forth herein. The Borrower will operate under the name Jade Hotel Bryant Park. The principal place of business of Borrower is 200 Park Avenue South, Suite 1305, New York, New York 10003. Borrower shall provide written notice to Lender of any change of its principal place of business within thirty (30) days of the effective date of such change.

### 3.21   *USA Patriot Act*

(a) At all times throughout the term of the Loan, Borrower and all of its Affiliates shall (i) not be a Prohibited Person, and (ii) be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.

(b) Neither the making of the Loan nor, to Borrower's knowledge, Borrower's receipt or use of the Loan proceeds violates any law applicable to Borrower, and by reason of Borrower's identity or the membership of Borrower, there is no issue, to Borrower's knowledge, that would prohibit lending to Borrower for the purposes described herein under any applicable provision of the USA Patriot Act.

(c) None of Borrower or any Lender of any direct or indirect equitable, legal or beneficial interest in Borrower is the subject of any law blocking or prohibiting transactions with such person, including the USA Patriot Act, and no portion of the Loan proceeds will be used, disbursed or distributed by Borrower or any such Lender in violation of the USA Patriot Act.

### 3.22   *Ownership of Borrower*

A true and correct copy of Borrower's ownership structure is shown on *Exhibit E* attached hereto.

### 3.23   *Intentionally Deleted*

### 3.24   *Survival*

Each of the foregoing representations and warranties shall survive the making of the Loan and each advance hereunder and thereunder, and Borrower hereby agrees to indemnify and hold harmless Lender from and against any loss, damage or liability attributable to the breach thereof, including all expenses and fees (including, but not limited to, reasonable attorneys' fees and disbursements) incurred in the defense or settlement of any claim arising therefrom against Lender.

### 3.25   *Effect of Request for Advance*

The submittal of each Request for Advance hereunder shall constitute an affirmation that Borrower's representations and warranties set forth in this Agreement remain true and correct in all material respects as of the date thereof, and, unless Lender is notified to the contrary in writing prior to the disbursement of the requested advance or any portion thereof, shall constitute

an affirmation that the same remain true and correct in all material respects on the date of such disbursement.

## 4.   CONSTRUCTION LOAN ADVANCES

### 4.1   *Advances of Loan Proceeds*

4.1.1   Lender shall make advances of Project Loan proceeds and Building Loan proceeds from time to time to pay Indirect Costs and Direct Costs, respectively, actually incurred by Borrower in the development of the Property and the construction of the Improvements, all strictly in accordance with the terms and conditions set forth in this Agreement and the Project Loan Agreement and the Building Loan Agreement. Interest and any other payments due and payable to Lender shall be deducted or retained by Lender and any request for interest draws shall be approved by Lender, to the extent of unadvanced funds in the line item. Lender shall make special advances of Project Loan Proceeds to cover interest and any other payments due to Lender at any time after said payments are due notwithstanding Borrower's failure to submit a Request for Advance or the occurrence of an Event of Default (and provided that no such special advance shall be deemed to cure or remedy any Event of Default). At its option during the continuance of an Event of Default, Lender may make advances of Direct Costs in accordance with a Request for Advance (Building Loan) jointly to Borrower and Construction Manager or other contractors under Direct Contracts, and the execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable direction and authorization to so advance the Building Loan funds. No further direction or authorization from Borrower shall be necessary to warrant such advances and all such advances shall satisfy the obligations of Lender hereunder and shall be secured by the Mortgage and the other Loan Documents as fully as if made to Borrower, regardless of the disposition thereof by the Construction Manager or by any other contractor. Interest on each advance shall accrue from the date of such advance by Lender.

4.1.2   To the extent cost overruns in excess of amounts set forth in the Construction Budget exist after budgeted contingency allowances have been used, Borrower shall contribute up to One Million and No/100 Dollars ($1,000,000.00), in cash, from Borrower's own funds, toward the payment of such cost overruns ("**Standby Equity Contribution**").

### 4.2   *Disbursement Schedule*

4.2.1   Borrower and Lender have approved a disbursement schedule for the Construction Loan, attached hereto as *Exhibit J* (the "**Disbursement Schedule**"). In the event that Borrower becomes aware of any event, condition or occurrence that is reasonably likely to cause any material delay in the construction of the Improvements, Borrower shall promptly provide written notice thereof to Lender.

4.2.2   Borrower shall be entitled to, and shall, submit one Request for Advance, each calendar month. Each Request for Advance shall be delivered to Lender in accordance with the Draw Payment Procedure.

### 4.3    *Amount of Advance; Retainage*

4.3.1    Provided all conditions precedent to advances set forth herein have been satisfied, Lender shall make advances in amounts up to the amounts and for the items designated in the Construction Budget.

4.3.2    No advance for a specific Construction Budget item will exceed the line item therefor in the Construction Budget and, in the aggregate, all Loan advances will not exceed the maximum principal sum of the Loan.  Notwithstanding the foregoing, any actual cost savings in any "hard cost" line item of the Construction Budget which is verified to the reasonable satisfaction of Lender may be used to offset a cost increase in any other "hard cost" line item and any actual cost savings in any "soft cost" line item in the Construction Budget which is verified to the reasonable satisfaction of Lender may be used to offset a cost increase in any "soft cost" line item; provided that no such cost savings (whether in "hard costs" or "soft costs") shall be used to increase the amount of the line items for the Developer Fee or the Construction Management Fee shown in the initial approved Construction Budget.  In the event that, following the Conversion Date, Lender reasonably determines that there are any actual cost savings attributable to a particular line item of the Construction Budget, and such savings are not reallocated to another line item of the Construction Budget pursuant to the terms and provisions of the immediately preceding sentence, then such savings shall be applied to reduce the outstanding Loan amount.

4.3.3    If a Request for Advance includes a request to pay Direct Costs, Borrower shall be entitled to receive in respect of said Direct Costs, subject to Section 4.3.2 above, an amount equal to the value of all work which has been completed, less amounts theretofore advanced, and less the amount of the Retainage.  Except as provided in Section 4.3.4, the Retainage shall be disbursed only upon the final advance of the Construction Loan proceeds as provided in Section 4.10 below.   Subject to Section 4.3.2 above, Lender will advance one hundred percent (100%) of the amount of any Indirect Costs indicated on a Request for Advance upon approval of such Request for Advance by Lender and Borrower's delivery to Lender of reasonably satisfactory written substantiation that all sums so requested are then due and payable on account of such Indirect Costs.  After acquisition of such materials Borrower shall cause all materials supplied for, or intended to be utilized in the construction of, the Improvements, but not yet affixed to or incorporated into the Improvements or the Land, to be stored on the Land, including on any easements on adjacent property granted to Borrower for such purpose, in a bonded warehouse reasonably acceptable to Lender located within the City of New York, or at such other location of which Borrower shall have provided Lender with written notice in each instance, with adequate safeguards as reasonably required by Lender to prevent loss, theft, damage or commingling with other materials or projects (all such locations, collectively, the "**Project Site**").  Borrower shall insure or cause to be insured all stored materials upon such terms and coverage as Lender shall reasonably deem acceptable.

4.3.4    Upon completion by a contractor other than the Construction Manager of all of the work to be performed by such contractor on the Property or the Improvements (so certified by Borrower's Architect and by Lender's Consultant if Lender so requires), and upon inspection and approval by Lender's Consultant and by any other parties who have the right to approve construction, the Retainage held back by Lender with respect to such contractor pursuant to

Section 4.3.2 shall be advanced. In the event any part of any advance requested hereunder includes the Retainage held back for any contractor, Borrower shall concurrently notify Lender of such fact and shall state the identity of such contractor and the amount to be paid to such contractor. Anything herein to the contrary notwithstanding, Lender may withhold advances for the payment of Retainage to any contractor if in Lender's reasonable opinion a dispute exists as to the proper completion by such contractor of its work on the Property or Improvements or as to the amount due to such contractor. Lender shall notify Borrower of its belief that such a dispute exists as part of its response to the Request for Advance.

### 4.4 *Reserves of Loan Proceeds*

Anything contained herein to the contrary notwithstanding, Lender may, at its option, during the continuance of an Event of Default, establish reserves from the undisbursed portion of the Construction Loan (which shall not be considered drawn for purpose of calculating interest or otherwise) in such amounts which, in Lender's sole opinion, are necessary to complete the Improvements and sufficient to pay or satisfy, in whole or in part, (i) any stop notice or any lien or claim prejudicial to the liens or security interests of Lender, (ii) any expenditure or allocation of funds shown on the Construction Budget, and (iii) interest yet to accrue on the Construction Loan prior to the Conversion Date. The aggregate amount of any such reserves shall be deducted from the proceeds of the Construction Loan otherwise available for advance in accordance with this Agreement, and any such reserved funds, when advanced by Lender, shall be deemed to be proceeds of the Construction Loan advanced under this Agreement, whether or not advanced to Borrower.

### 4.5 *Right to Require Deposits*

In the event Lender shall at any time reasonably determine that the Total Costs estimated by Lender to be required to complete the Improvements in accordance with the Plans will exceed the sum of (i) Construction Loan proceeds available for advance, (ii) funds held in reserve or set aside pursuant to Section 4.4, (iii) the amount of the Standby Equity Contribution not yet advanced, and (iv) income from the Property anticipated to be received prior to the Completion Date, whether such deficiency is attributable to changes in the work of construction or in the Plans, or to anticipated delays in construction or delivery of materials, or any other cause, Lender may, at its option, refuse to make or approve further advances and may deliver written notice to Borrower via email (provided in Section 12.2 hereof) requiring Borrower to make a cash deposit of an amount equal to such deficiency with Lender for disbursement in accordance herewith. Borrower shall deposit the required funds with Lender within fifteen (15) business days after the date of Lender's written demand; and without limiting any rights or remedies of Lender under this Agreement for any failure by Borrower to make such deposit, Lender shall not be obligated to make any further advances of the Construction Loan until such funds are so deposited with Lender. Lender may commingle such deposited amounts with its own funds and such deposited amounts shall earn no interest. Whenever Lender has any such funds on deposit from Borrower, all sums advanced to Borrower hereunder shall be considered to be made first from such deposited funds until such funds are exhausted. The deposit requirements of this Section 4.5 are in addition to all other deposit or escrow requirements in the Mortgage or in the other Loan Documents.

**4.6     General Conditions for Advances**

4.6.1     *Receipt of Request for Advances.*  It shall be a condition of all advances of the Building Loan and the Project Loan that Lender shall have received a Request for Advance, fully executed, together with all required supporting documentations, in form and substance satisfactory to Lender, and all other conditions to the making of such advance, as set forth herein shall have been satisfied or waived.  Each Request for Advance shall be submitted in accordance with the Draw Payment Procedure attached hereto as *Exhibit I* (the "**Draw Payment Procedure**") and shall include evidence reasonably satisfactory to Lender that all applicable Permits, if any, for construction of the Improvements to the level of work evidenced by such Request for Advance have been duly issued.

4.6.2     *Representations True.*  No representation or warranty of Borrower contained herein or in any of the Loan Documents shall be or have become inaccurate in any material respect as of the date when made (unless corrected and approved by Lender) and shall also be true and correct in all material respects on the date of such advance except to the extent Lender is notified of any facts rendering a representation or warranty inaccurate and such disclosure is approved by Lender in its reasonable discretion.

4.6.3     *No Defaults.*  No Event of Default under the terms of any of the Loan Documents shall have occurred and be continuing, and no default shall have occurred and be continuing which, with notice or the passage of time or both, would constitute an Event of Default under any of the Loan Documents.

4.6.4     *Construction Inspections Complete.*  Lender shall have received, in form reasonably satisfactory to Lender, an inspection report from Lender's Consultant stating that development of the Property and the construction of the Improvements have been completed to the extent indicated in the applicable Request for Advance, in a manner satisfactory to Lender's Consultant and substantially in accordance with the Plans.  Lender shall have received evidence reasonably satisfactory to it that all work and Improvements completed on the date of the applicable Request for Advance have been inspected and approved by each Governmental Authority, by the appropriate insurance, rating or inspection offices, and by any other Persons having the right to inspect and approve construction to the extent required by all such Persons; that each such Governmental Authority shall have accepted dedication of roads, sewers and other facilities where necessary; and that all Requirements of each Governmental Authority (given the stage to which construction has commenced) shall have been satisfied up to such stage. Notwithstanding anything herein to the contrary, Borrower acknowledges and agrees that it shall be responsible for making inspections and shall determine to its own satisfaction that all work at the Property, for which payment is due, has been done properly and in accordance with the contractual obligations of the Persons responsible for such work.  Lender or Lender's Consultant may make inspections as provided herein.  Any inspections by Lender or Lender's Consultant shall not impose any duty on the part of Lender to inspect, any liability on the part of Lender for not inspecting or for any defects or deficiencies in construction whether or not discovered by Lender or Lender's Consultant, or any guaranty of completion of the Improvements or of the funding of any advances of the Loan.  Borrower acknowledges that Lender has not assumed any liability for the completion of the Improvements, nor for the adequacy of funds advanced in accordance herewith to complete the Improvements.  Any and all provisions herein for the

benefit of Lender may be waived by Lender without notice to anyone, and no one shall have the right to rely upon Lender's doing or not doing or having done or not having done anything that Lender is entitled to do under the provisions hereof.

4.6.5 *Direct Contracts.* Borrower shall have delivered to Lender true, correct and complete copies of all Direct Contracts entered into prior to the making of such advance and not already the subject of executed Contractor's Consents, together with a duly executed Contractor's Consent with respect thereto, and such payment and performance bonds as Lender shall require.

4.6.6 *Guaranty.* Borrower confirms the Minimum Financial Criteria (as defined in the Completion Guaranty) of the Guarantor and Principals have been met.

4.6.7 *Other Conditions Satisfied.* All conditions to the obligation of Lender to make an advance as set forth herein shall have been satisfied in all material respects. If requested by Lender, Borrower shall furnish to Lender a certificate, dated the date of such advance and executed by Borrower in such detail as Lender may reasonably require, as to the satisfaction of any one or more of the conditions of this Section 4.6.

Lender may, in Lender's sole discretion, make the first advance or subsequent advances on the Loan without having received all items required by this Section 4.6, but Lender may, at any time, require that Borrower provide Lender with all items specified in this Section 4.6 as a condition precedent to any further advance.

4.6.8 *Payment of Advances.* Lender shall make advances within 20 calendar days of the receipt of the information set forth in Section 4.6, or, within such 20 calendar day period, shall inform Borrower of any deficiencies in the Request for Advance submitted by Borrower that need to be provided to Lender before such Advance can be paid.

## 4.7 *Special Conditions for Initial Advances*

4.7.1 *Special Conditions for Demolition Advance.* In addition to the satisfaction of all other conditions set forth in this Section 4, the obligation of Lender to make the first advance after the Closing Date ("**Demolition Advance**") under the Construction Loan is also conditioned upon the receipt by Lender of the following:

(a) *Receipt of Permits.* Lender shall have received copies of all required Permits relating to the demolition of the improvements at the Property.

(b) *Approved Agreements.* Lender shall have reviewed and approved the Direct Contracts in connection with the demolition of the improvements at the Property.

(c) *Insurance.* Lender shall have received evidence that Borrower has obtained all insurance required in connection with the demolition of the improvements at the Property.

4.7.2 *Special Conditions for First Construction Advance.* In addition to the satisfaction of all other conditions set forth in this Section 4, the obligation of Lender to make the

first advance after the Demolition Advance ("**First Construction Advance**") under the Construction Loan is also conditioned upon the receipt by Lender of the following:

(a)    *Approved Plans.* Lender shall have reviewed and approved the Plans.

(b)    *Approved Agreements.* (i) Lender shall have reviewed and approved the Design Agreements, and (ii) Borrower shall have delivered duly executed Contractor's Consents with respect thereto along with such payment and performance bonds as Lender shall require.

(c)    *Receipt of Permits.* Lender shall have received copies of all Permits.

(d)    *Buy-Out Requirement.* Borrower shall provide written evidence satisfactory to Lender that (i) a minimum of seventy percent (70%) of Direct Costs are under contract and (ii) Borrower shall have received bids for an additional fifteen (15%) of the cost to complete all Direct Costs.

(e)    *Insurance.* Lender shall have received evidence that Borrower has obtained all insurance required in Section 12.22.1 hereof.

The Borrower shall have six (6) months to satisfy the conditions set forth above in Section 4.7, and submit evidence to Lender thereof. In the event the Borrower does not satisfy the conditions above in Section 4.7, Lender shall have the right, at its sole option, to declare all sums secured hereby immediately due and payable. In the event that Lender exercises its option to accelerate the Loan in accordance with this Section 4.7, Borrower will have three (3) months from Lender's written notice to repay the Loan, including payment of the unpaid principal balance, accrued Fixed Interest, Additional Interest, Appreciation Interest, and any other sums due under the Loan Documents.

### 4.8    *Title Matters*

4.8.1    *Title Policy and Endorsements.* The obligation of Lender to make any advance under the Building Loan or the Project Loan, including, without limitation, the final advance, is also conditioned upon the receipt by Lender of an endorsement to the Title Policy (i) insuring (A) against unfiled mechanics' liens, except for mechanics' liens being contested by Borrower in accordance with the terms of the Loan Documents, and (B) that, since the date of the last preceding advance, there has been no change in the state of title and no survey exceptions not approved by Lender have been added, (ii) extending the effective date of such Title Policy through the date of the applicable advance, and (iii) reflecting the increased outstanding principal amount of the Building Loan or the Project Loan, as applicable.

4.8.2    *UCC Searches.* The obligation of Lender to make any Construction Loan advance, including, without limitation, the final advance, is also conditioned upon the receipt by Lender of a Uniform Commercial Code search report from the New York Secretary of State, dated effective as of a date not earlier than fourteen (14) days prior to the date of the respective advance, and stating that no liens or encumbrances against any property or assets of Borrower appeared of record as of the effective date of such search report, other than those in favor of Lender.

4.8.3   *Mortgage Recorded.*   Upon clean title searches and disbursement of funds, Borrower authorizes Lender to record a mortgage in the amount of any such advance under the Building Loan and/or the Project Loan, as applicable.   Borrower shall execute any further documentation as may be required to do so.

**4.9   *Foundation Survey and Certificates***

If there is any material change in the foundations and footings after the date hereof, the obligation of Lender to make any Loan advance(s) for foundations and footings for the Improvements shall also be conditioned on Lender having received a foundation survey satisfactory to Lender showing the location of all foundations and footings completed through the date of the immediately preceding advance to be in conformity with the requirements of Section 5.2.2 below, Title Company having issued an endorsement to the Title Policy to the same effect, and Borrower's Architect (and, if requested by Lender, Lender's Consultant) having issued a certificate stating, on the basis of personal inspection, that the foundations and footings have been completed in substantial accordance with the Plans and are satisfactory in all respects.

**4.10   *Special Conditions for Final Advance***

In addition to the satisfaction of all other conditions set forth in this Section 4, the obligation of Lender to make the Construction Loan final advance is also conditioned upon the receipt by Lender of the following:

4.10.1   *Temporary Certificate of Occupancy.*   The issuance by all appropriate Governmental Authorities of one or more temporary certificates of use and occupancy for all Improvements shown on the Plans prior to the use or occupancy of the same by Borrower's tenants or any other Persons.

4.10.2   *Final Survey.*   A final as-built survey satisfactory to Lender in its reasonable discretion showing the completed Improvements.

4.10.3   *Completion Certificates.*   A certificate by Borrower's Architect (and, if required by Lender, by Lender's Consultant) in the form attached hereto as ***Exhibit H*** stating that the Improvements have been completed substantially in accordance with the Plans, and any other evidence reasonably required by Lender that the Improvements have been completed in compliance with all Requirements of Governmental Authority applicable to Borrower or the Property, free of all liens and claims, and that all items of a "punch list" nature which Lender has identified have been corrected to Lender's satisfaction.

4.10.4   *Borrower's Affidavit.*   An affidavit duly executed by Borrower stating that each Person providing any material or performing any work in connection with the Property for Borrower has been paid in full or will be paid in full from the proceeds of such advance, and that all withholding taxes have been paid and that lien waivers have been received from all contractors under Direct Contracts and suppliers who have performed work or supplied materials under Direct Contracts in connection with the construction of the Improvements for Borrower.

4.10.5 *Plans and Specifications*.  A final set of plans and specifications for the completed Improvements, marked to show all changes made during the course of construction, in a clean and legible manner, reasonably satisfactory to Lender.

4.10.6 *Warranties and Guaranties*.  Copies of all warranties and guaranties issued in connection with the Property (which warranties and guaranties shall have been collaterally assigned to Lender).

4.10.7 *Event of Default*.  No Event of Default shall have occurred and be continuing, nor shall any default have occurred and be continuing which, with the passage of time or the giving of notice or both, would become an Event of Default.

### 4.11   *Building Loan Agreement*

All advances for Direct Costs shall be made in compliance with the terms and conditions of the Building Loan Agreement.  To the extent there are any inconsistencies between the terms and conditions of this Article 4 and the terms and conditions of the Building Loan Agreement, the terms and conditions of the Building Loan Agreement shall govern.

### 4.12   *Advances for Construction Management Agreement, Developer Agreement, Direct Contracts and Subcontracts*

Notwithstanding anything to the contrary contained herein, no advances shall be made by Lender to Borrower in connection with the payment of any Direct Costs, Indirect Costs or other fees or expenses under the Construction Management Agreement, the Developer Agreement, any Direct Contracts between Borrower and contractors approved by Lender, or any subcontracts between Construction Manager and a Major Subcontractor unless Lender has received true and accurate copies of the applicable contracts with respect to which a Request for Advance has been presented to Lender, in form and substance reasonably satisfactory to Lender and executed by the parties thereto, together with Contractor Consents signed by the applicable contractors and such payment and performance bonds as Lender shall reasonably require, issued in dual obligee form and naming Lender as an obligee, for each such contractor and any applicable subcontractors, in form and amount acceptable to Lender.  Advances for general conditions under the Construction Management Agreement or the Developer Agreement shall be advanced on a percentage of completion basis.

### 5.   CONSTRUCTION PERIOD COVENANTS

### 5.1   *Use of Loan Proceeds*

Borrower shall receive the advances of Construction Loan proceeds hereunder, shall hold same in trust solely for, and shall expend same solely for the purpose of paying or reimbursing Borrower for Direct Costs and Indirect Costs identified in the Construction Budget.  Borrower represents that it will not require and agrees that it will not avail itself of any additional extension of credit for the development of the Property or the construction of the Improvements.

### 5.2 *Construction of Improvements*

5.2.1 *Construction.* Borrower (a) shall construct the Improvements in a good and workmanlike manner and substantially in accordance with the Plans, commence demolition of the existing building no later than forty-five (45) days after the date hereof, and thereafter pursue construction diligently to completion not later than the Completion Date, and (b) shall not permit cessation of the work of construction for a period in excess of sixty (60) consecutive days without the prior written consent of Lender. Notwithstanding the foregoing, the Completion Date and/or the aforesaid sixty (60) day period shall be extended for the period of any delays in construction caused by Force Majeure Events; provided, however, in the case of a Force Majeure Event, that neither the Completion Date nor such sixty (60) day period shall be so extended unless Borrower shall deliver to Lender notice of such Force Majeure Event within twenty (20) days after its occurrence, shall proceed with reasonable diligence to mitigate, remove or correct the cause of such delays, and shall otherwise use its best efforts to diligently pursue and complete construction of the Improvements; and provided, further, that in no event shall the Completion Date be extended on account of any or all of such Force Majeure Events by more than ninety (90) days in the aggregate nor shall such sixty (60) day period be extended on account of any or all of such Force Majeure Events by more than thirty (30) days in the aggregate, in each case without Lender's prior written consent, which consent shall not be unreasonably withheld.

5.2.2 *Compliance with Laws.* Borrower shall construct the Property and Improvements in accordance with all applicable Requirements of Governmental Authority. Without limiting the foregoing, Borrower shall construct the Improvements entirely on the Property, including appurtenant easements, and so as not to unlawfully encroach upon any easement, right-of-way or land of others, and so as not to violate any set-back lines applicable under public or private use restrictions, other restrictions or regulations, or any Requirement of Governmental Authority. Borrower will comply with and keep in effect all permits and approvals obtained from any Governmental Authority that relate to the lawful construction of the Improvements.

5.2.3 *Compliance with Plans.* Borrower shall not deviate from the Plans as approved by Lender in any material respect, or issue any Change Order(s) without the prior written approval of Lender, except for Change Order(s) that are required by any Governmental Authority and provide for only minor variations in the Plans and the Construction Budget. Notwithstanding the preceding sentence, however, Borrower shall be unilaterally permitted to approve Change Orders that provide for changes in the work, the absolute value of which does not exceed $50,000.00 in any one instance or $250,000.00 in the aggregate for the then-current and all prior changes, except that the foregoing authority unilaterally to approve change orders shall not apply to any Change Order (i) that reduces the aggregate area of income producing space, (ii) that changes the finish details to be installed in the hotel rooms in any material respect, (iii) that changes the overall quality or design of the Improvements or the quality of the materials, methods, and equipment used in constructing the Improvements in any material respect, or (iv) that changes any building systems or the structural integrity of the Project. Any Change Orders requiring Lender's consent shall be submitted to Lender with a Request for Advance and responded to by Lender at the same time as required pursuant to Section 4.6.8. In addition to Lender's approval where required in accordance with this Section 5.2.3, Borrower

will also obtain approval of any change in the Plans and for any Change Order from all Persons whose approval is required by law or under the terms of any recorded instrument affecting the Property or under any other agreement relating to the Property, including, without limitation, approval of Borrower's Engineer as to any Change Order that affects the structure of the Improvements. Lender will not be required to approve any such changes unless all other approvals that are required from other Persons have been obtained. If it appears to Lender that any change which is approved by Lender may increase the Total Costs of completing the Improvements, Lender may require Borrower to deposit funds sufficient to cover the increased costs, in accordance with and to the extent provided in Section 4.5 as a condition to giving its approval.

5.2.4    *Correction of Defects or Departures from Plans.* In the event Lender determines in good faith that any work or materials on or for the Improvements does not substantially conform to the Plans or has not been performed in a good and workmanlike manner or otherwise departs from any requirements of this Agreement in any material respect, then Lender may elect to stop any further disbursement of Construction Loan funds until the condition is corrected to the reasonable satisfaction of Lender, and Lender may require Borrower, by written notice to Borrower, to stop the work of construction and/or take any other actions that may be necessary, as determined in good faith by Lender, to correct or remedy such nonconformance or departure. Borrower shall promptly undertake such actions as may be so required and shall complete the same within forty-five (45) days after Borrower's receipt of Lender's notice or if such actions cannot reasonably be completed within thirty (30) days, then Borrower shall be allowed such period of time as reasonably would be required to complete such actions with diligence, provided that Lender believes, in the exercise of its reasonable judgment, that such action will not prevent the Conversion Conditions from being satisfied prior to the Completion Date.

5.2.5    *Construction Budget.*

(a)    Borrower shall not make or permit any change in the Construction Budget approved by Lender, in excess of $50,000.00 for any one line item or $250,000.00 in the aggregate as set forth in the Construction Budget without first obtaining Lender's prior written consent, which shall not be unreasonably withheld, conditioned or delayed, provided that if Lender has approved a Change Order or a change in the Plans, Lender agrees not to withhold its consent to a reasonable modification to the Construction Budget required to implement such Change Order or change in the Plans; and provided, further, that if Borrower issues any Change Order which does not require Lender's approval under Section 5.2.3, then Borrower shall have the right to make a reasonable change in the Construction Budget required to implement such Change Order. Borrower will promptly notify Lender in writing of any event, occurrence or condition that could reasonably be expected to lead to any material change in the Construction Budget.

(b)    Notwithstanding anything to the contrary contained in Section 5.2.5(a) above, Borrower shall update the Construction Budget on a monthly basis during the term of the Construction Loan and shall provide Lender with a copy of each such monthly update; provided, however, that no such update shall be deemed or construed to constitute a revision or modification to or of the Construction Budget unless Lender expressly approves (to the extent

such approval is required under Section 5.2.5(a)) such update in writing and expressly agrees in writing that the Construction Budget shall be deemed modified to the extent shown in such update.

(c)    Any changes to the Budget requiring Lender's consent shall be submitted to Lender with a Request for Advance and responded to by Lender at the same time as required pursuant to Section 4.6.8.

5.2.6    *Maintenance and Observation of Construction Documents*.  Borrower shall observe, perform and satisfy all the terms, covenants and conditions of, and without limitation, subject to Borrower's right to contest under Section 5.2.8, shall pay when due all costs, fees and expenses as required by, the Construction Management Agreement and all other documents, instruments and agreements related to the development of the Property and the construction of the Improvements unless such other party is in default.  Without Lender's prior reasonable consent, Borrower shall not cause, suffer or permit any material modification or amendment of, or deviation from, the terms and provisions of the Construction Management Agreement, the Architect's Agreement, the Engineer's Agreement or the Direct Contracts.  Borrower shall furnish to Lender from time to time on request in a form reasonably acceptable to Lender, current correct lists of all contractors, subcontractors, and material suppliers retained by Borrower, Developer, or Construction Manager in connection with construction of the Improvements and true and correct copies of all executed contracts, subcontracts and purchase orders with such contractors, subcontractors and material suppliers.  Lender may contact any contractor, subcontractor or supplier to verify any facts disclosed in such lists or any terms of such contracts, subcontracts or purchase orders.

5.2.7    *Books and Records*.  Borrower shall keep true and correct financial books and records on a cash basis for the construction of the Improvements.  If required by Lender, Borrower will submit to Lender at such times as Lender requires (which will in no event be more often than monthly) a statement which accurately shows the application of all funds expended to date for construction of the Improvements and the source of those funds as well as Borrower's best estimate of the funds needed to complete the Improvements and the source of those funds. Borrower will promptly supply Lender with any financial statements or other information covering its affairs and properties as Lender may reasonably request, and will promptly notify Lender of any material adverse change in its financial condition or in the physical condition of the Property or the Improvements.  Lender, its agents and representatives, shall have the right to examine, copy and audit the books, records, accounting data and other documents of Borrower and its contractors relating to the Property or the Improvements at reasonable times and upon reasonable advance notice to Lender.  However, Lender shall be under no duty to inspect construction or examine any books and records of Borrower or its contractors in connection therewith.  Any such inspection or examination by Lender is for the sole purpose of protecting Lender's security and preserving Lender's rights under this Agreement.  No default of Borrower will be waived by any such inspection or examination by Lender.  In no event will any such inspection or examination by Lender be a representation that there has been or will be compliance with the Plans or that the construction is free from defective materials or workmanship.  The information that Lender receives from Borrower shall be held confidential by Lender except the extent Lender is legally required or advised to disclose.

5.2.8   *Liens and Claims*.  Borrower will promptly pay, bond or otherwise discharge all claims and liens for labor done and materials and services furnished in connection with construction of the Improvements (in the case of payment, with Loan proceeds to the extent of the relevant line item).  Notwithstanding the preceding sentence, however, Borrower will have the right to contest in good faith any claim or lien, provided that it does so diligently and without prejudice to Lender's security and otherwise complies with all requirements of this Agreement and the Mortgage relating to any such contest.  Upon Lender's request, Borrower will promptly provide a bond, release bond, cash deposit or other security reasonably satisfactory to Lender to secure payment of the contested lien or claim, together with any interest or penalties thereon should the contest be unsuccessful.  So long as Borrower is diligently contesting such claim or lien, the filing or recording of such claim or lien shall not constitute an Event of Default.

### 5.3   *Indemnity*

Borrower agrees to indemnify and hold Lender harmless from and against any and all liabilities, claims, damages, costs and expenses (including, but not limited to, reasonable legal fees and disbursements but excluding punitive or consequential damages) arising out of or resulting from any third party claims attributable to any defective workmanship or materials occurring in the construction of the Improvements, except for Lender's willful misconduct or gross negligence.  Upon demand by Lender, Borrower will defend any action or proceeding brought against Lender alleging any defective workmanship or materials, or if there is a conflict of interest with Borrower or its counsel, Lender may elect to conduct its own defense at the expense of Borrower.  The provisions of this Section 5.3 will survive the termination of this Agreement and the repayment of the Loan.

## 6.   CONVERSION OF CONSTRUCTION LOAN TO CONTINGENT INTEREST LOAN

### 6.1   *Conversion*

Upon satisfaction or express waiver by Lender of each and every of the following conditions precedent (the "**Conversion Conditions**"), the Construction Loan shall be converted to the Contingent Interest Loan, and the Contingent Interest Loan shall have the terms specified herein and in the other Loan Documents as applicable to the Contingent Interest Loan.  Lender shall have the right to waive any of the Conversion Conditions in its absolute discretion.

6.1.1   All conditions precedent to the making of the final advance of loan funds under this Agreement shall have been satisfied in all material respects, and such advance shall have been made, or shall be made concurrently with such conversion.

6.1.2   Borrower shall have reached Substantial Completion with respect to the construction of the Improvements in accordance with the terms of this Agreement.

6.1.3   To the extent not previously provided to satisfy the requirements of Section 5.2.8 hereof Lender shall receive such lien waivers and certificates as Lender may reasonably require from Borrower's Architect, Borrower's Engineer, the General Contractor and other material contractors, subcontractors and material suppliers with which Borrower has entered into direct contracts to perform work on the Improvements or to provide labor, materials or supplies in connection therewith (except any such contractor, subcontractor or material suppliers involved

in a lien contest to which Section 5.2.8 applies) certifying receipt of the final payment of all sums owing to each of such parties from Borrower with respect to the Improvements.

6.1.4    Borrower shall have paid all reasonable out-of-pocket transaction costs and expenses incurred by Lender in connection with the conversion of the Construction Loan to the Contingent Interest Loan as contemplated in this Agreement, including, without limitation, costs of inspection and verification of completion of construction and attorneys' fees and disbursements.

6.1.5    Lender shall have received evidence that all permits, licenses and contracts required to open the hotel have been obtained by Borrower.

6.1.6    Guarantor shall execute and deliver to Lender a reaffirmation of the Recourse Guaranty, as and to the extent the same shall apply by its terms to the Contingent Interest Loan.

6.1.7    Borrower shall have submitted to Lender, and Lender shall have approved, the initial Operating Budget, in a form satisfactory to Lender, for the operation of the Property, which Operating Budget shall include anticipated capital and operating expenditures for the 12 month period following the Conversion Date, and Borrower shall have delivered to Lender an initial rent roll for the Property, in a form reasonably approved by Lender, showing all Leases then in effect.

6.1.8    Borrower shall have delivered to Lender evidence reasonably satisfactory to Lender that all property damage, business interruption, liability and other insurance coverage for the completed Improvements, as required under the provisions of the Loan Documents from and after the Conversion Date, is in full force and effect with all initial premiums paid.

6.1.9    Lender shall receive such certificates of completion from Borrower's Architect, Borrower's Engineer and Lender's Consultant as Lender may reasonably require, which certificates shall include, without limitation, certifications that the Improvements have been substantially completed in accordance with the Plans and all applicable Requirements of Governmental Authorities.

6.1.10    Lender shall have received evidence reasonably satisfactory to Lender that all Improvements are ready for occupancy and comply with all applicable building, zoning, regulatory, subdivision and other laws, codes, ordinances and regulations of all governmental authorities having jurisdiction over the Property (it being agreed that issuance of a temporary certificate of occupancy shall satisfy the foregoing).

6.1.11    There is no Event of Default under this Agreement or any of the other Loan Documents.

Borrower shall advise Lender in writing (such writing being herein referred to as a "**Conversion Notice**") when all of the foregoing conditions to conversion of the Construction Loan to the Contingent Interest Loan have been satisfied, provided that in no event shall the Conversion Date occur later than the Completion Date, as such date may be extended pursuant to Section 5.2.1 hereof or ninety (90) days after the date of the Conversion Notice, whichever is sooner.

Prior to the conversion to the Contingent Interest Loan, (i) Developer shall have been paid the Developer Overhead Reimbursement in accordance with the terms of the Developer Agreement, (ii) Construction Manager shall have been paid the Construction Management Fee in accordance with the terms of the Construction Management Agreement and (iii) the amounts payable to Developer for overhead and general conditions as set forth in the approved Construction Budget shall have been paid.

Upon the conversion to the Contingent Interest Loan, Lender shall have the right (but shall not be obligated) to consolidate all then existing notes and mortgages into a single consolidated note (on the terms of this Agreement) and a single consolidated mortgage (on a form similar to those recorded under the Construction Loan). Borrower, at Borrower's cost and expense, shall execute and deliver such customary forms as are required, in Lender's reasonable discretion, to effect such consolidation. All costs and expenses for any other structuring of the existing notes and mortgages (including, but not limited to, splitting or severing the notes for co-lenders or otherwise) shall be at Lender's cost.

### 6.2   *Satisfaction of Construction Loan Obligations*

From and after the Conversion Date, any obligations of Borrower hereunder or under the other Loan Documents which by their terms apply only to the Construction Loan or only during the period in which the Construction Loan is in effect shall terminate, provided that any accrued but unperformed obligations of Borrower under or with respect to the Construction Loan as set forth in this Agreement or any of the other Loan Documents shall not be discharged by such conversion, unless Lender expressly waives the same in writing, and Borrower shall perform the same in accordance with the terms of this Agreement and the other Loan Documents.

### 6.3   *Payments of Additional Interest*

6.3.1   On the 15th day of each calendar quarter, from and after the first day of the calendar quarter following the Conversion Date, and each 15th day of each calendar quarter thereafter for the term of the Loan, Borrower shall pay to Lender, in addition to the Fixed Interest payable by Borrower under this Agreement and the Note, as additional interest ("**Additional Interest**") an amount equal to forty percent (40%) of the Net Cash Flow from the Property for the prior quarter. Such payments of Additional Interest shall be based on the amount of Net Cash Flow (defined below) realized in respect of the calendar quarter in question, subject to annual reconciliation as provided in Section 6.3.7 hereof. Payments made by Borrower to holders of direct and indirect holders of interests in Borrowers (i) shall not be made prior to corresponding payment of Additional Interest paid to Lender and (ii) shall not exceed sixty percent (60%) of Net Cash Flow as projected or determined as a basis for the corresponding payment of Additional Interest to Lender. Any remaining amount may be distributed to Borrower after the annual reconciliation provided in Section 6.3.7.

6.3.2   Borrower shall be entitled to retain the portion of the Net Cash Flow remaining after making such payments of Additional Interest to Lender and, except if an Event of Default shall have occurred and be continuing, to distribute such amounts to the members of Borrower. For the purpose of computing such Additional Interest, "**Net Cash Flow**" shall mean, for any period, all Gross Receipts (actual or projected within the same audit year, as appropriate)

for the applicable period *minus* all Expenses (actual or projected within the same audit year, as appropriate) for such period, with each calendar month (or portion thereof) being treated as a separate calculation period. In the event that additional funds are needed to pay operating expenditures as opposed to capital expenditures in any calendar quarter, and such funds are advanced by Borrower, then prior to the determination and payment of any Net Cash Flow for any subsequent calendar quarter (and prior to the payments required under Sections 6.4.1(a)(iv), 6.4.1(b)(iv) and 6.4.1(c)(iv)), Borrower shall first be repaid for such prior advances for such prior periods.

      6.3.3    (a)    For purposes of this Agreement, the term "**Gross Receipts**" shall mean all gross income, rentals, revenues and consideration, of whatever form or nature (but excluding revenues received and retained by tenants or subtenants), received by or paid to or for the account or for the benefit of Borrower, from any and all sources (including from Property Manager), resulting from or attributable to the ownership, operation, use, leasing or occupancy of all or any part of the Property, specifically including, without limitation, (a) all income derived from guest rooms (including advanced booking deposits to the extent non-refundable and attributable to periods during the term of the Loan), meeting rooms, business services, food and beverage facilities including bars and restaurants, spa and recreation facilities, vending machines, telephone and television systems, internet or recreational gaming systems, guest laundry, conference facilities, and any other items of revenue, receipts or other income as identified in the Uniform System of Accounts for Hotels, 10th Edition, International Association of Hospitality Accountants, as amended from time to time; (b) any rents, percentage rents, fees, charges and tenant reimbursements paid under any lease or other agreement relating to the Property and all other payments for use or occupancy of all or any part of the Property or for any services, equipment or furnishings provided in connection with any such use or occupancy, whether as rent, fees, charges, expense recoveries or otherwise, and any administrative surcharge applied by Borrower to such rents, fees, charges, tenant reimbursements and other payments; (c) any excess subrentals paid to Borrower over rents paid by a tenant or subtenant under any lease; (d) any proceeds of any rental loss or business interruption insurance paid with respect to the Property; (e) the amount by which the consideration or rental paid to Borrower by any Affiliate of Borrower for any goods, services or space supplied or leased by Borrower to such Affiliate is less than the fair market value thereof; (f) the amount by which the consideration or rental paid by Borrower to any Affiliate of Borrower for any goods, services or space supplied or leased by such Affiliate to Borrower exceeds the fair market value thereof; (g) any parking fees or amounts paid in respect of any concessions, franchises or other operations on or from the Property or other miscellaneous income (including any amounts paid pursuant to any telephone or other telecommunications agreements affecting the Property); (h) any income from the sale of materials, supplies and personalty; (i) any income from rentals of fixtures, equipment and other items; (j) any amounts in the nature of refunds, rebates and reimbursements of any Expenses previously paid, including all tax refunds and other proceeds constituting a refund or reduction of real property taxes or assessments affecting the Property; (k) all licensing and advertising revenues; and (l) any cancellation, termination or similar amounts, or damages or other recoveries, paid under or in respect of any such lease or other agreement relating to the Property (and attributable to periods during the term of this Loan); and (m) all income, rents, room rates, cash and credit card receipts collected from guest rooms, restaurants, bars, mini-bars, meeting rooms, banquet rooms and recreational facilities and otherwise, health club and/or spa membership fees, food and beverage wholesale and retail sales, service charges, vending

machine sales. Notwithstanding anything set forth herein, in no event shall Borrower accept any non-cash consideration in payment for any goods, services or space supplied or leased by Borrower to any party without Lender's prior written consent (which may be withheld in Lender's sole and absolute discretion).

In no event shall Gross Receipts include (a) the proceeds from any sale or other disposition of all or any part of the Property, or any insurance proceeds (other than rental loss or business interruption insurance) paid in connection with any loss or casualty at the Property or any condemnation awards paid in connection with any taking for public or quasi public purposes (including a conveyance in lieu thereof) of any part of the Property, in each case, net of the costs incurred in obtaining such proceeds or awards, to the extent that such proceeds are taken into account in calculating Appreciation Interest pursuant to Section 6.4 hereof, or are used in connection with the restoration of the Property, or (b) any security deposits received from any of the tenants of the Property unless and until the same are applied to rent or any other of the tenant's obligations in accordance with the terms of such tenant's lease or sales or use tax.

6.3.4

(a)   For purposes of this Agreement, the term "Expenses" shall mean only the following items, to the extent actually incurred by Borrower with respect to the Property and without duplication of any item, and no other expense items shall be recognized for the purposes of this definition unless specifically agreed to in writing by Lender in its sole and absolute discretion:

(i)   Fixed Interest payments paid pursuant to Section 2.6 of this Agreement (excluding any late charges or default interest);

(ii)   (a) Any deposits paid into the Reserve Funds and/or the Impound Accounts, and (b) any real estate taxes and municipal assessments in respect of the Property, any utility costs in respect of the Property, and any premiums for insurance coverages required pursuant to the Loan Documents but, in each case, with respect to the items described in this subsection (b), only to the extent such items are not paid from the Reserve Accounts or the Impound Accounts, and (c) the cost of the Annual Audit;

(iii)   The management fee paid to the Manager, but only to the extent such fee is not in excess of four percent (4.00%) of the sum of Gross Receipts;

(iv)   The central reservation fee paid to the Manager equal to one percent (1%) of revenue collected from room fees;

(v)   Ordinary and customary non-capital costs paid by or for the account of Borrower in connection with the maintenance or operation of the Property, including, but not limited to, amounts paid for (i) payroll and benefits for personnel directly related to the Property, (ii) repairs and maintenance, janitorial services, trash disposal, landscaping, exterminating, inspection fees, and security services, but only to the extent such costs are directly related to the maintenance or operation of the Property (and not to the operation of Borrower) and are set forth in an approved Operating Budget or are otherwise approved by Lender, acting in a commercially reasonable manner, in accordance with this Agreement, (iii) customary leasing commissions paid to third

party brokers and agents who procure tenants for the restaurant space and (iv) professional and other services to the extent set forth in an approved Operating Budget;

(vi) Expenditures which, in Borrower's good faith judgment are necessary to (i) prevent an immediate threat to the health, safety or welfare of any person in the immediate vicinity of its Property, (ii) prevent immediate damage or loss to its Property, or (iii) avoid the suspension of any necessary service in or to its Property;

(vii) Expenditures required to maintain brand standard or level of quality other than expenditures that were in the Construction Budget and were part of the original construction of the hotel.

(b)  Notwithstanding anything contained herein to the contrary, Expenses shall not include (i) any amounts paid out of the Impound Accounts or the Reserve Accounts or any other capital expenditures, (ii) any fees paid for services rendered by Borrower or by Affiliates of Borrower which are in excess of those set forth in the Construction Budget or, if not set forth in the Construction Budget, which would have been incurred on an arm's length basis, except as submitted to and approved by Lender in writing, (iii) any non-cash items or expenses (including depreciation or amortization, (iv) any amounts or expenses paid or required to be paid in connection with or relating to the closing of the Loan or the development of, or permitting activities for development of, the Property, (v) any payments made or required to be made pursuant to the Recourse Guaranty or the Environmental Indemnity, including amounts paid in connection with or in respect of any remediation, investigation, clean-up or removal of any Hazardous Substance present at, in, on, under, about or emanating from the Property, (vi) any increases in Impositions, any transfer taxes and any other costs or expenses resulting from, attributable to or incurred in connection with a sale, transfer or other conveyance of the Property or any portion thereof or any interest, direct or indirect, in Borrower, (vii) any late penalty charges or default interest incurred by Borrower pursuant to the Loan Documents, (viii) ordinary and customary general, administrative and overhead costs paid to Borrower or an Affiliate of Borrower as part of the operation of the Property (other than the management fee referred to in Section 6.3.3(a)(iii) above); and (ix) the amount by which the consideration or rental paid by Borrower to any Affiliate of Borrower for any goods, services or space supplied (excluding the onsite management office, if any) or leased by such Affiliate to Borrower exceeds the fair market value thereof.

(c)  No Fixed Interest or debt service of any kind or nature shall be included in Expenses except for the payments specifically described in Section 6.3.4(a).  Costs deducted under any category described in Section 6.3.4(a) cannot be deducted again under any other category of such Section.

(d)  In the event that there is a dispute as to whether any of the expenditures of the Borrower constitute Expenses in the calculation of Additional Interest, Lender and Borrower shall look to the Annual Audit or the Final Audit for proper categorization, subject to the provisions of Section 6.3.11.

6.3.5    At such time as the principal balance of the Loan is repaid in full, Additional Interest shall be due and payable for any calendar month with regard to which such payment has

not yet been paid and for the then current calendar month to date on a prorated basis (subject to adjustment as set forth in this Section).

6.3.6    Notwithstanding any of the foregoing provisions or any other provision of this Agreement, Lender shall not be responsible for nor be liable in any respect to Borrower or any other person or entity for or with respect to any operating loss or deficit of the Property, and, except in connection with a reconciliation made pursuant to this Section, there shall be no deduction or offset for any negative amount of Additional Interest.

6.3.7    Gross Receipts and Expenses shall be calculated on an accrual basis, with the exception of any fixed income and expense items which are normally paid less frequently than quarterly (such as real estate taxes, special assessments, insurance, and such additional expenditure or income items, if any, as Borrower shall request and Lender shall approve in writing for similar treatment). Such income and expense items shall be deducted or credited on a pro-rata (accrued) basis based on the total expense or income for such item over the period to which such item applies and reconciled annually pursuant to this Section. Prepaid rents (as distinct from payments made by tenants of the Property in connection with the surrender of a Lease) received by Borrower from tenants of the Property shall be treated as collected in the month(s) for which such rents are actually due under the terms of the relevant leases (provided that nothing contained herein shall be deemed to authorize Borrower to collect prepaid rents from tenants other than in accordance with the terms of this Agreement and the Assignment).

6.3.8    On or before the twentieth (20th) day of each month, Borrower shall furnish to Lender a statement of operations of the Property for the immediately preceding calendar month (a "**Monthly Statement**") in the form reasonably requested by Lender, showing in reasonable detail the actual Gross Receipts, actual Expenses, Net Cash Flow, and Additional Interest for such calendar month and year to date as well as all data necessary for the calculation of any such amounts, which statement shall be certified by Borrower or any authorized representative of Borrower permitted by Lender to make such certification (each, a "**Responsible Individual**") to have been prepared in accordance with the terms of this Agreement and to present correctly in accordance with such terms the items shown therein. Included with each Monthly Statement shall be (i) a current income statement, a balance sheet, a cash flow statement and a statement of Net Cash Flow for the Property for such calendar month and the portion of the year ended as of such calendar month, (ii) an accounts receivable and payable report, (iii) a summary of all FF&E Reserve Fund transactions during the related calendar month, and (iv) such other information as Lender shall reasonably request. Each Monthly Statement shall also be provided via e-mail transmission using spreadsheet files or such other electronic or file formats as reasonably required from time to time by Lender. In addition to the foregoing, no later than the twentieth (20th) day of each month commencing with the first month following the month in which the Conversion Date occurs, Borrower shall furnish to Lender current monthly statements and bank reconciliations for the Property bank accounts (including, to the extent available to Borrower, the Reserve Accounts, the Impound Accounts and the operating account for the Property). No later than twenty (20) days following the completion of the Annual Audit referred to in Section 6.3.9 below, Borrower shall provide to Lender a reconciliation of such audited financial statements to the December Monthly Statement.

6.3.9    Borrower shall, not later than the thirtieth (30th) day of each April commencing with the first month of April following the end of the calendar year in which the Conversion Date occurs, furnish to Lender, in addition to the materials and statements described in Section 6.3.8, audited financial statements, in triplicate, setting forth the results of the operations of the Property for the preceding Calendar Year (being defined as the twelve month period beginning January 1 and ending on the next December 31 or, with respect to the calendar year in which the Conversion Date occurs, the period beginning on the Conversion Date and ending on the next December 31), which statements shall be in such detail and such format as Lender shall reasonably require and shall include (i) a balance sheet of the Property at the end of such preceding Calendar Year, (ii) an income statement and a statement of cash flows for such preceding Calendar Year, and (iii) a schedule showing (x) the annual reconciliation of Additional Interest (including Gross Receipts, Expenses and Net Cash Flow for the Property during such preceding Calendar Year), (y) an annual reconciliation of transactions involving the Reserve Accounts and Impound Accounts during such preceding Calendar Year, and (z) a schedule of cash flows for the Property including all information necessary for the calculation of Additional Interest and Appreciation Interest, in each case, accompanied by an unqualified opinion thereon of an Approved Accountant (as hereinafter defined), which opinion shall state that such financial statements fairly present the financial condition of the Property being reported upon, have been prepared on an accrual tax basis and that the examination of such accountants in connection with such financial statements has been made in accordance with generally accepted auditing standards, except that the provisions of FASB 13 as applicable to the straight lining of rents shall not apply. Each such annual statement shall also include a certification by such accounting firm that Borrower's calculations of Gross Receipts, Expenses, Net Cash Flow and Additional Interest have been made in accordance with this Agreement. In addition, an Approved Accountant must state that the computations used to derive the information presented in such financial statements and the computations contained in such financial statements have been fairly presented during the audit period, and that the information included in the most recent rent roll furnished to Lender is accurate. The statements required to be submitted by Borrower pursuant to this Section 6.3.9 are hereinafter collectively referred to as the "**Annual Audit**." No losses for any Calendar Year shall be carried forward to, or included in, any financial statements or reports for any subsequent Calendar Year.    An Annual Audit shall also be provided within one hundred (120) days after the payment in full of the Loan, with such Annual Audit applying to that portion of the then current Calendar Year occurring prior to such repayment (the "**Final Audit**"). As used herein, "**Approved Accountant**" means any of PricewaterhouseCoopers LLP, KPMG LLP, Deloitte & Touche LLP, Ernst & Young LLP, Granet & Associates, BDO Siedman or such other certified public accounting firm approved by Lender, acting in a commercially reasonable manner. Each Annual Audit and Final Audit shall include detail from the Approved Accountant with respect to internal control related matters identified during the Approved Accountant's audit or other communications with Borrower concerning significant matters related to the audit.

6.3.10    Borrower shall pay Lender, upon delivery of the Final Audit and each such Annual Audit not later than the dates specified above, any additional amount of Additional Interest owing with respect to the applicable Calendar Year.    For the purpose of such reconciliation, Net Cash Flow shall be calculated by subtracting the actual Expenses for the applicable Calendar Year from the actual Gross Receipts for the applicable Calendar Year. If Borrower's payments to Lender for the preceding Calendar Year exceed the amount actually due

Lender, then the amount of any such overpayment (without allowance of interest thereon) shall be deducted from the next payment(s) of Additional Interest due until the credit has been depleted in full, provided that if Borrower is then no longer obligated to make payments of Additional Interest, then such overpayment shall be credited against any other amount then payable to Lender in connection with the Loan, or if no such amounts are payable, promptly refunded to Borrower.

6.3.11 Within the 90 day period immediately following Lender's receipt of an Annual Audit or the Final Audit, Lender may notify Borrower that Lender disputes any computation or item contained in any portion of such Annual Audit or Final Audit. In the event Lender so notifies Borrower, the parties shall meet in good faith within twenty (20) days after Lender's notice to Borrower to resolve such disputed items between themselves. If, despite such good faith efforts, the parties are unable to resolve the dispute at such meeting or within ten (10) days thereafter, the items shall be submitted to arbitration, which shall be performed by an independent certified public accountant with a nationally recognized accounting firm selected by Lender. The determination of such accountant shall be final, and the parties shall endeavor to cause the accountant to render a determination within twenty (20) days after appointment. The fees of such accountant shall be paid by Lender unless such review shall indicate that the computation resulted in an underpayment of Additional Interest in an amount exceeding five percent (5%) of the amount actually owing to Lender for such Calendar Year, in which case Borrower shall pay all such fees (but not in excess of the unpaid Additional Interest), together with interest on the amount of Additional Interest so due at the Default Rate from the date such Additional Interest should have been paid pursuant to this Agreement until paid in full. Upon resolution of any such dispute, payment of Additional Interest shall be adjusted based upon the calculation of the actual Net Cash Flow for each month of the Calendar Year (or part thereof). Borrower shall pay any additional amount of Additional Interest (together with interest thereon, if applicable) found to be due to Lender within ten (10) days after the resolution of such dispute by the parties or the accountant's determination, as applicable. If such accountant determines that Borrower has overpaid Additional Interest with regard to the applicable Calendar Year (or part thereof), such overpayment (without allowance of interest thereon) shall be deducted from the next payment(s) of Additional Interest due until the credit has been depleted in full, provided that if Borrower is then no longer obligated to make payments of Additional Interest, then such overpayment shall be credited against any other amount then payable to Lender in connection with the Loan, or if no such amounts are payable, refunded to Borrower.

6.3.12 Borrower shall keep and maintain at all times full and accurate books of account and records adequate to reflect correctly Gross Receipts and Expenses and all such books and records shall be kept at Borrower's place of business set forth in the Loan Documents or such other place approved by Lender in writing. Such books and records shall be available for at least ten (10) years following the relevant Calendar Year. Lender shall have the right to inspect, copy and audit such books of account and records at Lender's expense, during reasonable business hours, and upon reasonable notice to Borrower whether such books and records are in the possession of Borrower or any agent of Borrower, for the purpose of verifying the accuracy of the payments made on account of Additional Interest. All statements required under this Agreement shall be in addition to any other financial or operating statements required by Lender from Borrower pursuant to this Agreement or the other Loan Documents.

6.3.13 Concurrently with Borrower's payment of Additional Interest on the date the Loan is repaid in full (subject to the adjustment described below), Borrower shall submit to Lender the Monthly Statement applicable to the then-current Monthly Period and all other Monthly Statements which have not been theretofore submitted to Lender. The Additional Interest so paid pursuant to Section 6.3.5 shall be subsequently adjusted as contemplated by Section 6.3.10 above based on the Annual Audit for the preceding Calendar Year (if the same has not yet been delivered) and the Final Audit, and Borrower's obligations and rights hereunder with respect to any Additional Interest that might be due or overpaid as a result of such Final Audit shall survive the satisfaction (or assignment in lieu of satisfaction) of the Mortgage.

**6.4** *Payments of Appreciation Interest*

6.4.1 In addition to the principal, Fixed Interest and Additional Interest payable by Borrower under this Agreement and the payment of all other sums under the Loan Documents, Borrower shall pay to Lender, as additional interest on the Loan ("**Appreciation Interest**"), the amounts payable to Lender under this Section 6.4, at the times and in the manner set forth below.

(a) In the event of a Permitted Sale, after Borrower first pays to Lender the outstanding principal balance of the Loan and all accrued and outstanding Fixed Interest and Additional Interest thereon, the Net Sales Proceeds shall be paid to Lender or retained by Borrower in the following order until such Net Sales Proceeds have been distributed in full:

(i) First, Borrower shall pay to Lender an amount which, taking into account any principal previously paid to Lender pursuant to this Agreement, all Fixed Interest previously paid to Lender pursuant to this Agreement, all Additional Interest previously paid to Lender pursuant to this Agreement, and any Appreciation Interest previously paid to Lender pursuant to this Agreement (collectively, the "**Prior Payments**") (but specifically excluding the Loan Fee), would yield to Lender an internal rate of return (calculated in accordance with *Exhibit G*) on the Loan equal to seven and seventy-five hundredths percent (7.75%) per annum ("**Lender's IRR**") for the period from the date hereof through the date of such Permitted Sale;

(ii) Second, Borrower shall be entitled to retain from Net Sales Proceeds an amount equal to the remaining balance, if any, of Borrower's Equity Capital Account;

(iii) Third, Borrower shall be entitled to retain from Net Sales Proceeds an amount which, taking into account all Net Cash Flow received by Borrower during the term of the Loan, all contributions to Borrower's Equity Capital Account, and any other amounts received by Borrower in reduction of Borrower's Equity Capital Account as specifically set forth in this Agreement would yield to Borrower an internal rate of return (calculated in accordance with *Exhibit G*) on Borrower's Equity Capital Account equal to ten percent (10%) per annum ("**Borrower's Equity Capital IRR**") for the period from the date hereof through the date of such Permitted Sale; and

(iv) Fourth, the remainder of the Net Sales Proceeds shall be split such that Borrower shall pay to Lender forty percent (40%) of such remaining Net Sales Proceeds and Borrower shall be entitled to retain sixty percent (60%) of such remaining Net Sales Proceeds.

As used herein, "**Permitted Sale**" means a sale, transfer or other conveyance of the Property (other than a transfer of the Property to a condemning authority), which such sale, transfer or other conveyance, during the Closed Period, must be consented to by Lender in writing in the exercise of its discretion, acting in a commercially reasonable manner. In all instances, Borrower shall provide Lender with not less than ninety (90) days prior written notice of any proposed Permitted Sale.

(b) In the event that Borrower or Lender receives insurance proceeds or condemnation awards paid in connection with any taking for public or quasi public purposes (including a conveyance in lieu thereof) or any damage, loss or casualty with respect to all or substantially all of the Property (a "**Full Recovery)** and such proceeds are not to be used in connection with the restoration of the Property in accordance with the Loan Documents (collectively, a "**Full Recovery Event**"), then after application of such proceeds or awards to repayment of all or a portion of the outstanding principal balance of the Loan and all accrued and outstanding Fixed Interest and Additional Interest thereon in accordance with the terms of Section 12.22 or Section 12.23 hereof, as applicable, the Recovery Amount shall be allocated as if paid to Lender or retained by Borrower in the following order until the Recovery Amount has been distributed in full and Borrower shall pay to Lender the amount due Lender as follows:

(i) First, Borrower shall pay to Lender an amount which, taking into account the Prior Payments (but specifically excluding the Loan Fee), would yield to Lender the Lender's IRR for the period from the date hereof through the date of distribution of such portion of the Recovery Amount;

(ii) Second, Borrower shall be entitled to retain from the Recovery Amount an amount equal to the remaining balance, if any, of Borrower's Equity Capital Account;

(iii) Third, Borrower shall be entitled to retain from the Recovery Amount an amount which, taking into account all Net Cash Flow received by Borrower during the term of the Loan, all contributions to Borrower's Equity Capital Account, and any other amounts received by Borrower in reduction of Borrower's Equity Capital Account, as specifically set forth in this Agreement, would yield to Borrower the Borrower's Equity Capital IRR for the period from the date hereof through the date of distribution of such portion of the Recovery Amount; and

(iv) Fourth, the remainder of the Recovery Amount shall be split such that Borrower shall pay to Lender forty percent (40%) of such remaining Recovery Amount and Borrower shall be entitled to retain sixty percent (60%) of such remaining Recovery Amount.

In the event of damage, loss or casualty to, or a taking of, any portion of the Property not constituting a Full Recovery (a "**Partial Recovery Event**", and together with a Full Recovery Event, a "**Recovery Event**"), the insurance proceeds or condemnation award, to the extent not used for restoration and associated expenses and costs, shall be used to pay down the principal of the Loan without penalty.

(c) Upon the occurrence of any other event (other than a Permitted Sale or a Recovery Event) which results in the Loan being repaid or becoming due and payable ("**Other Triggering Event**"), including, without limitation, any prepayment in accordance with Section

6.5 hereof (other than in connection with a Permitted Sale or Recovery Event), any refinancing of the Loan or the occurrence of the Maturity Date (by acceleration or otherwise), and after Borrower first pays to Lender the outstanding principal balance of the Loan and all accrued and outstanding Fixed Interest and Additional Interest thereon, the Net Proceeds shall be allocated as if paid to Lender or retained by Borrower in the following order until the total amount of such Net Proceeds have been paid or retained in full, and Borrower shall pay to Lender the amount due Lender as follows:

(i)     First, Borrower shall pay to Lender an amount which, taking into account the Prior Payments (but specifically excluding the Loan Fee), would yield to Lender the Lender's IRR, or, in the event Section 6.5.3 is applicable, the Default IRR Amount (hereinafter defined) for the period from the date hereof through the date of distribution of such portion of the Net Proceeds;

(ii)     Second, Borrower shall be entitled to retain from the Net Proceeds an amount equal to the remaining balance, if any, of Borrower's Equity Capital Account;

(iii)     Third, Borrower shall be entitled to retain from the Net Proceeds an amount which, taking into account all Net Cash Flow received by Borrower during the term of the Loan, all contributions to Borrower's Equity Capital Account, and any other amounts received by Borrower in reduction of Borrower's Equity Capital Account, would yield to Borrower the Borrower's Equity Capital IRR for the period from the date hereof through the date of distribution of such portion of the Net Proceeds; and

(iv)     Fourth, the remainder of the Net Proceeds shall be split such that Borrower shall pay to Lender forty percent (40%) of such remaining Net Proceeds and Borrower shall be entitled to retain sixty percent (60%) of such remaining Net Proceeds.

In all instances, other than a repayment of the Loan on the Maturity Date, Borrower shall provide Lender with not less than thirty (30) days prior written notice, of any proposed Other Triggering Event.

6.4.2     In the event of a Permitted Sale, the amount of "**Net Sales Proceeds**" shall be determined by adding (a) the gross proceeds payable or credited to Borrower on account of any such Permitted Sale (including, without limitation, the present value of any non-cash proceeds; provided, however, that Borrower shall not be permitted to accept any non-cash proceeds in payment for such Permitted Sale without Lender's express written approval, in Lender's sole and absolute discretion), as adjusted (increased or decreased) to take into account typical closing apportionments or prorations customarily adjusted in sales to third parties of hotel properties in the Metropolitan New York area (the "**Gross Proceeds**"), plus (b) the cash balance of the Reserve Funds and the Impound Accounts (the "**Reserve Balance**"), and then deducting therefrom the sum of (x) the outstanding principal balance of the Loan and all Fixed Interest and Additional Interest thereon payable pursuant to this Agreement; plus (y) transfer taxes, recording fees, escrow charges and actual third party brokerage costs incurred by Borrower in connection with such Permitted Sale, but only to the extent such costs are commercially reasonable; plus (z) other actual out-of-pocket costs, reasonable legal fees, and other commercially reasonable

closing fees and expenses required to be incurred in connection with such Permitted Sale (the items included in subparagraphs (y) and (z) referred to collectively as the "**Closing Costs**").

6.4.3    In the event of a Recovery Event, the **Recovery Amount** shall be determined as follows:   (a) in the case of a Partial Recovery, an amount equal to the result of (I) an appropriate portion (based on the portion of the Property so affected) of the Reserve Balance, if in Lender's judgment, acting in a commercially reasonable manner, the entire Reserve Balance is not still appropriate to be maintained as a continuing reserve, *plus* (II) the amount of the gross insurance proceeds or condemnation awards of whatever form or nature which are payable or which would have been payable if Borrower had not failed to comply with its obligations under the Loan Documents relating to or in respect of such Recovery Event (including, without limitation, a failure by Borrower prior to the Conversion Date to maintain insurance with respect to the Property as required under the Loan Documents and/or a failure by Borrower from and after the Conversion Date to deposit the Insurance Impound Fund Deposits with Lender as and when required pursuant to the terms and provisions of Section 8.3 hereof) on account of or otherwise attributable to such Recovery Event, *minus* (III) the actual costs, if any, of repairing, restoring, or replacing such portion of the Property, including, without limitation, all structures and all fixtures, utilities, systems and equipment therein, so that the condition thereof is equivalent, to the extent reasonably possible, to the condition thereof as it existed before the Recovery Event, but only to the extent such repair, restoration or replacement is permitted by Lender pursuant to the Loan Documents, *minus* (IV) the aggregate principal amount of the Loan required to be prepaid in connection with such Recovery Event based upon the proportionate value of the Property following the occurrence of such Recovery Event, but only to the extent the same is actually paid to Lender in connection with such Recovery Event, and *minus* (V) the actual out-of-pocket costs incurred by Borrower in obtaining the proceeds payable on account of or otherwise attributable to such Recovery Event, including, without limitation, court costs and attorney's fees incurred, but only to the extent such costs and fees are reasonable and only if there is no Event of Default by Borrower under the Loan Documents relating to or in respect of such Recovery Event; and (b) in the case of a Full Recovery, an amount equal to the result of (I) the Reserve Balance, *plus* (II) the amount of the gross insurance proceeds or condemnation awards of whatever form or nature which are payable or which would have been payable if Borrower had not failed to comply with its obligations under the Loan Documents with respect to such Recovery Event (including, without limitation, a failure by Borrower prior to the Conversion Date to maintain insurance with respect to the Property as required under the Loan Documents and/or a failure by Borrower from and after the Conversion Date to deposit the Insurance Impound Fund Deposits with Lender as and when required pursuant to the terms and provisions of Section 8.3 hereof) on account of or otherwise attributable to such Recovery Event, *plus* (III) the Stipulated Value (after the Full Recovery Event), as determined in accordance with Section 6.4.5 in the event of a casualty or equal to the amount of the award determined by the condemning authority in the condemnation proceeding, *minus* (IV) the aggregate principal amount of the Loan required to be prepaid in connection with such Recovery Event, but only to the extent the same is actually paid to Lender in connection with such Recovery Event, and *minus* (V) the actual out-of-pocket costs incurred by Borrower in obtaining the proceeds payable on account of or otherwise attributable to such Recovery Event, including court costs and attorney's fees incurred, provided, however, that any negative amount resulting from application of such definition of Recovery Amount shall be deemed to be equal to zero (0).

6.4.4    Upon any Other Triggering Event, Lender shall determine the "**Net Proceeds**" by adding (a) the Stipulated Value of the Property, as determined in accordance with Section 6.4.5, *plus* (b) the Reserve Balance, and then deducting therefrom the outstanding principal balance of the Loan and all accrued and outstanding Fixed Interest and Additional Interest thereon.

6.4.5    "**Stipulated Value**" for the Property will be determined as follows:

Lender, in its sole discretion, shall present Borrower with a list of three (3) third party appraisers who have more than ten (10) years' experience appraising similar properties in the New York metropolitan area, and Borrower shall select one (1) of the three (3). Such selected appraiser (the "**Selected Appraiser**") shall determine the value of the Property as of the applicable Stipulated Value Date in accordance with the standards and procedures for market value as determined by the Appraisal Institute. For purposes of this Article 6, Stipulated Value Date shall mean the date of the Full Recovery Event, if determined pursuant to Section 6.4.3 hereof, or the date of the Other Triggering Event, if determined pursuant to Section 6.4.4 hereof. Upon receipt of the Selected Appraiser's valuation, Borrower, if such valuation is due to Borrower opting to prepay the Loan in accordance with Section 6.5 hereof may elect to (i) retire the Loan at such valuation in accordance with the terms of this Article 6 or (ii) withdraw such request for valuation. If Borrower selects option (ii), and pays for the appraisal made by the Selected Appraiser, the Borrower shall have the right to re-select the option to voluntarily prepay the Loan in accordance with Section 6.5 hereof no earlier than ninety (90) days after the request to withdraw such prepayment notice. Nothing in this Section 6.4.5 shall have the effect of extending the Maturity Date.

6.4.6    Borrower shall provide written notice to Lender with respect to the repayment of all or any portion of the Loan and shall pay Lender any applicable Appreciation Interest as follows:

(a)    In the case of a Permitted Sale, Borrower shall give Lender not less than thirty (30) days prior written notice of such Permitted Sale. Any Appreciation Interest (together with any Fixed Interest, Additional Interest and other amounts payable hereunder or under the other Loan Documents) due Lender on account of such Permitted Sale shall be paid to Lender on the closing date of such Permitted Sale.

(b)    In the case of any Recovery Event, Borrower shall give Lender written notice of the Recovery Event as required in Section 12.22 or Section 12.23 hereof, as applicable, but in any event within ten (10) days after Borrower's receipt of notice or actual knowledge of the occurrence of such Recovery Event. Borrower shall pay Lender any Appreciation Interest (together with any Fixed Interest, Additional Interest and other amounts payable hereunder or under the other Loan Documents) due on account of a Recovery Event at the time any proceeds are paid to Borrower; provided, however, if the Stipulated Value of the Property must be determined prior to payment of Appreciation Interest, as required by Section 6.4.1 above, and the Stipulated Value determination has not been made at the time the proceeds are paid to Borrower: (a) the Recovery Amount available shall be initially determined on the basis of the gross proceeds payable on account of such Recovery Event; (b) Appreciation Interest shall be paid at such time on such basis; and (c) within five (5) days after the Stipulated Value has been

determined in accordance with Section 6.4.5, the Appreciation Interest due to Lender on account of such Recovery Event shall be recalculated on the basis of such Stipulated Value and on such date any additional sums payable to Lender based upon such recalculation of Appreciation Interest shall be so paid (or, if applicable, refunded by Lender to Borrower). Unless (at the request of Lender), the Loan is repaid in full in connection with a Recovery Event, the payment of Appreciation Interest with respect to such Recovery Event shall not preclude collection by Lender of (and Borrower shall have an obligation to pay) Appreciation Interest in connection with an additional Recovery Event or in connection with a Permitted Sale or an Other Triggering Event in accordance with this Section 6.4.5.

(c)   In the case of any Other Triggering Event other than an Event of Default and acceleration of the Loan or payment of the Loan on the Maturity Date, Borrower shall give Lender written notice of the same at least thirty (30) days before such prepayment. Borrower shall in such event pay Lender any Appreciation Interest (together with any Fixed Interest, Additional Interest and other amounts payable hereunder or under the other Loan Documents, including any prepayment fee as described in Section 6.5 hereof) due on account of such Other Triggering Event on the date the outstanding principal amount of the Loan is repaid.

(d)   In the case of an Event of Default and acceleration of the Loan, an Other Triggering Event shall be deemed to have occurred, without notice. In such event, payment of any and all Appreciation Interest (together with any Fixed Interest, Additional Interest and other amounts payable hereunder or under the other Loan Documents) shall be immediately due and payable when the Loan becomes due, and the calculation of the Stipulated Value of the Property in accordance with Section 6.4.5 shall, at Lender's option, relate back to the date the Event of Default first occurred.

6.4.7   Nothing contained in this Section 6.4 shall be deemed or construed to waive, restrict, impair, or in any manner affect Lender's rights under this Agreement or under any provisions of any of the Loan Documents to consent or withhold its consent (to the extent applicable) to: (i) any prepayment of the Loan, in whole or in part (except for prepayments made in connection with a Recovery Event or with a Permitted Sale (or other sale consented to in writing by Lender) or a prepayment otherwise permitted under this Agreement or the Loan Documents); (ii) sales or other transfers of all or a portion of the Property or any interest therein; (iii) sales or other transfers of any ownership interests in Borrower or in any other entity owning any direct or indirect interest in Borrower; (iv) refinancing of all or any portion of the Loan; (v) any junior financing; or (vi) any other matters which require Lender's consent. In no event shall Borrower undertake any such actions without Lender's written consent as and to the extent required under this Agreement or any other of the Loan Documents.

6.4.8   As soon as reasonably possible, but in any event not less than ten (10) days prior to the date Appreciation Interest is to be paid in accordance with this Section 6.4, Borrower shall furnish to Lender a detailed breakdown, certified as true, correct and complete by a Responsible Individual, of all items necessary for the calculation of the Recovery Amount, the Net Sales Proceeds or the Net Proceeds, as applicable, and Appreciation Interest.

6.4.9   Notwithstanding any provisions to the contrary in this Agreement, Lender shall not be responsible nor liable in any respect to Borrower or any other Person for any

reduction in the market value of the Property or for any contingency, condition or occurrence that might result in a negative number for Appreciation Interest. If at any time it is calculated, Appreciation Interest shall be a negative amount, no Appreciation Interest shall at that time be payable to Lender, Lender shall in no way be liable for any such negative amount and there shall be no deduction or offset for such negative amount at any time when Appreciation Interest (or any other amount due in connection with the Loan) shall be subsequently calculated.

### 6.5 *Prepayments; Circumvention of Prepayment Provisions*

6.5.1    Except as otherwise expressly provided for in this Agreement, no privilege is reserved to prepay all or any portion of the Loan. Borrower acknowledges that Lender, in making the Loan, is relying on Borrower's agreement to repay the Loan in accordance with the terms set forth in this Agreement. Borrower acknowledges that Lender would not make the Loan without full and complete assurance by Borrower of its agreement to make the repayment of principal, Fixed Interest, Additional Interest and Appreciation Interest under this Agreement provided above and its further agreement not to prepay all or any part of the principal of the Loan, except as expressly provided herein. Borrower has been advised and acknowledges that Lender is relying on the receipt of payments under this Agreement to, among other things, receive, subject to the inherent contingencies applicable with respect to the payment of Additional Interest and Appreciation Interest, a market rate of return for the full scheduled term of the Loan which is anticipated to be in excess of the Fixed Interest to be paid under this Agreement. Therefore, Borrower further acknowledges and agrees that any prepayment of the Loan (except with respect to a Recovery Event), whether occurring as a voluntary prepayment by Borrower or occurring upon an acceleration of the principal balance of the Loan by Lender on account of an Event of Default, could (x) prejudice Lender and result in loss and additional expenses to Lender, the extent of which is extremely difficult and impractical to ascertain, and (y) entitle Lender to recover as liquidated damages the sums described in Section 6.5.2 hereof.

6.5.2    During the Closed Period, Borrower shall have no right to prepay the Loan in whole or in part, with or without premium. During the Open Period, so long as no Event of Default is in existence, Borrower shall have the right to prepay the outstanding principal balance of the Loan in whole, but not in part, by paying Lender, in addition to such outstanding principal balance, all accrued Fixed Interest and Additional Interest, together with Appreciation Interest due under this Agreement calculated as follows:

(a)    if the prepayment occurs during the twenty-four (24) month period immediately following the Closed Period then, for the purpose of Section 6.4.1(c)(i), the Other Triggering Event (and notwithstanding anything to the contrary contained therein), the Lender's IRR shall be 8.5%; and

(b)    if the prepayment occurs during the twenty-fifth (25th) through the thirty-sixth (36th) month period immediately following the Closed Period, then, for the purpose of Section 6.4.1(c)(i) (and notwithstanding anything to the contrary contained therein), the Lender's IRR shall be 8.25%.

(c)  subject to the paragraph below in this Section 6.5.2, if the prepayment occurs after the thirty-sixth (36th) month period immediately following the Closed Period, the Lender's IRR shall be 8.00%.

All prepayments may be made only upon not less than thirty (30) days' prior written notice to Lender (in addition to all other notices required by this Agreement and the other Loan Documents) of Borrower's intention to repay the Loan.  Notwithstanding the foregoing, no such increased Appreciation Interest and increases in Lender's IRR under this Section 6.5.2 shall be required if the Loan is repaid from and after the 117th month following the Closing Date, but Appreciation Interest at the rate set forth in Section 6.4.1 hereof shall still be payable.

6.5.3    Borrower acknowledges that in establishing the Fixed Interest rate, the Additional Interest and the Appreciation Interest obligations hereunder, Lender has assumed and taken into account the fact that the Loan will not be prepaid except as provided for above, and that there will be no event which would entitle Lender to accelerate the Maturity Date, and further acknowledges that the following provisions of this Section relating to Borrower's payment of a premium in the event of an acceleration are intended to compensate Lender in the event that this assumption proves to be incorrect.  Borrower further acknowledges that in the event of an acceleration during the Closed Period, Lender will not realize the full benefit assumed in making the Loan, and but for such prepayment during the Closed Period, Lender would have been entitled to additional sums under this Agreement.  Borrower further agrees that the amounts set forth below are a reasonable estimate of Lender's damages as a result of such acceleration.  In the event that Lender exercises its option to accelerate the entire unpaid principal balance due and payable upon the occurrence of an Event of Default during the Closed Period, in addition to the unpaid principal balance, accrued Fixed Interest, Additional Interest, Appreciation Interest, and any other sums due under the Loan Documents, Lender's IRR shall be 10% (such amount, the **"Default IRR Amount"**).

7.    **RESERVED**

8.    **RESERVE ACCOUNTS AND EQUITY CAPITAL ACCOUNT**

    **8.1**    *FF&E Reserve Fund*

        8.1.1    A reserve escrow account acceptable to Lender in its reasonable discretion and in which Lender shall be granted and shall at all times have a first priority, perfected security interest (the "**FF&E Reserve Fund**") shall be established by Borrower concurrently with the conversion of the Construction Loan to the Contingent Interest Loan.  The FF&E Reserve Fund account shall be satisfactory to Lender and shall be an interest-bearing account at Lender's loan servicer or such other financial institution as may be required by Lender.  Interest on said funds shall remain in the FF&E Reserve Fund and be treated as part of the FF&E Reserve Fund.  As a condition of the final advance, Borrower shall enter into an escrow and security agreement in form and substance satisfactory to Lender and Borrower in their reasonable discretion and negotiated in a commercially reasonable manner (the "**FF&E Reserve Escrow Agreement**").

8.1.2 From and after the Conversion Date, on the first (1ˢᵗ) day of each calendar month, Borrower shall make equal monthly deposits (collectively, the "**FF&E Fund Deposits**") into the FF&E Reserve Fund as follows:

(a) For the first twelve (12) full calendar months following the Conversion Date, an amount equal to 2% of Gross Receipts;

(b) Thereafter, at the commencement of the subsequent period of twelve (12) months, the amount of the required equal monthly deposits made by Borrower pursuant to this Section 8.1.2 shall increase to an amount equal to three percent (3%) of Gross Receipts;

(c) Thereafter, at the commencement of each subsequent period of twelve (12) months so long as the Contingent Interest Loan is outstanding, the amount of the required equal monthly deposits made by Borrower pursuant to this Section 8.1.2 shall increase to an amount equal to four percent (4%) of Gross Receipts.

All FF&E Fund Deposits shall be made by Borrower regardless of whether there is Net Cash Flow (computed for these purposes, net of deposits into the FF&E Reserve Fund to be made for such month) available in that month. In the event that Borrower makes payment of any FF&E Deposits from Borrower's own funds in order to facilitate expenditure from the FF&E Reserve Fund, Borrower shall be entitled to recover such payment, without interest, from the FF&E Reserve Fund. In the event Borrower fails to make any FF&E Fund Deposits when due hereunder, then notwithstanding anything to the contrary contained in the Loan Documents, interest shall accrue on the Loan at the Default Rate from the date 30 days after such FF&E Fund Deposits were due until the date they are paid in full, all without the taking of any action by Lender hereunder.

8.1.3 Funds, including accrued interest held in the FF&E Reserve Fund, may be withdrawn from the FF&E Reserve Fund to cover the cost of fixtures, furniture and equipment at the Property, but solely to the extent such amounts are provided for in a current Operating Budget approved by Lender or otherwise approved by Lender in writing in its reasonable discretion. Provided no Event of Default has occurred and is continuing, withdrawals from the FF&E Reserve Fund may be made by Borrower upon written notice to, but without Lender's consent, provided that (a) such withdrawals are not made more frequently than once every calendar month, (b) no more than Twenty-Five Thousand Dollars ($25,000.00) is withdrawn from the FF&E Reserve Fund during any such month unless consented to in writing by Lender, and (c) amounts withdrawn are applied toward the costs of fixtures, furniture and equipment provided for in, and in accordance with, a current approved Operating Budget. Withdrawals from the FF&E Reserve Fund shall also be permitted to pay the escrow costs associated with the FF&E Reserve Fund.

8.1.4 The cost of all of fixtures, furniture and equipment in excess of the amounts available in the FF&E Reserve Fund ("**Excess FF&E Costs**") shall be paid by Borrower out of its own funds, and such Excess FF&E Costs shall not be deducted as Expenses for the purpose of determining Net Cash Flow; provided, however, that Lender shall not fail to approve an Operating Budget because it believes FF&E Costs should be in excess of the funds in the FF&E Reserve Fund.

52

**8.2** *Tax Impound Fund*

8.2.1    From and after the Conversion Date, on the first (1st) day of each calendar month, Borrower shall deposit with Lender an amount equal to one-twelfth of the Impositions (including payments required under any payment in lieu of taxes agreement) that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate sufficient funds to pay all such Impositions (or payments in lieu thereof) at least ten (10) days prior to their respective due dates.  Amounts deposited pursuant to this Section 8.2.1 are referred to herein as the "**Tax Impound Fund Deposits**".  If at any time Lender reasonably determines that the Tax Impound Fund Deposits will not be sufficient to pay the Impositions (or payments in lieu thereof), Lender shall notify Borrower of such determination and the monthly deposits for Impositions (or payments in lieu thereof) shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least ten (10) days prior to the respective due dates therefor; provided that if Borrower receives notice of any deficiency after the date that is ten (10) days prior to the date that such Impositions (or payments in lieu thereof) are due, Borrower will deposit such amount within one (1) Business Day after its receipt of such notice.  The Tax Impound Fund Deposits shall be held in an interest-bearing reserve escrow account (the "**Tax Impound Fund**"), with interest accruing thereon being added back into such Tax Impound Fund, pursuant to an escrow and security agreement in form and substance satisfactory to Lender and Borrower (the "**Impound Escrow Agreement**")

8.2.2    Lender shall have the right to apply the Tax Impound Fund Deposits to payments of Impositions (or payments in lieu thereof).  In making any such payments, Lender may do so according to any bill, statement or estimate procured from the appropriate public office without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If the amount of the Tax Impound Fund Deposits shall exceed the amounts due for Impositions (or payments in lieu thereof), Lender shall, return any excess to Borrower or credit such excess against future payments to be made to the Tax Impound Funds.  Any amounts remaining on deposit in the Tax Impound Fund after the repayment in full of the Loan (together with all Fixed Interest and Contingent Interest accrued thereon) shall be returned to Borrower.

8.2.3    Nothing contained herein shall cause Lender to be deemed a trustee of the Tax Impound Fund or to be obligated to pay any amounts in excess of the amount of funds deposited with Lender pursuant to this Section 8.2.  Lender may commingle amounts on deposit in the Tax Impound Fund with any other sums held by Lender.  The receipt, use or application of any such sums paid by Borrower to Lender hereunder shall not be construed to affect the maturity of any indebtedness hereunder or any of the rights or powers of Lender under the terms of the Loan Documents or any of the obligations of Borrower under any of the Loan Documents.

8.2.4    Borrower shall cause copies of all bills, statements or other documents relating to Impositions to be sent or mailed directly to Lender.  If, pursuant to this Agreement, Borrower shall at any time not be obligated to make Tax Impound Fund Deposits, then during such period (i) Borrower shall pay all Impositions at least ten (10) days prior to the date due and provide Lender promptly thereafter with official receipts of the appropriate taxing authority, or other proof reasonably satisfactory to Lender evidencing the payments thereof and (ii) Lender may, at Borrower's cost and expense, retain a tax reporting service covering the Property.

8.2.5    If at any time after the date hereof there shall be assessed or imposed (i) a tax or assessment on the Property in lieu of or in addition to the Impositions payable by Borrower pursuant to this Section 8, or (ii) a license fee, tax or assessment on Lender and measured by or based in whole or in part upon the amount of the obligations secured hereby, then all such taxes, assessments or fees shall be deemed to be included within the term "Impositions" and Borrower shall pay and discharge the same as herein provided with respect to the payment of Impositions; provided, however, that in no event shall Borrower have any obligation to pay any franchise, estate, inheritance, income, excess profits or similar tax levied on Lender.

**8.3    *Insurance Impound Fund***

8.3.1    From and after the Conversion Date, on the first (1st) day of each calendar month, Borrower shall deposit with Lender's loan servicer or such other financial institution as may be required by Lender an amount equal to one-twelfth of the insurance premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Insurance Policies upon the expiration thereof in order to accumulate sufficient funds to pay all such insurance premiums at least thirty (30) days prior to the expiration of the Insurance Policies. Amounts deposited pursuant to this Section 8.3.1 are referred to herein as the "**Insurance Impound Fund Deposits**". If at any time Lender reasonably determines that the Insurance Impound Fund Deposits will not be sufficient to pay the insurance premiums, Lender shall notify Borrower of such determination and the monthly deposits for insurance premiums shall be increased by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Insurance Policies. The Insurance Impound Fund Deposits shall be held in an interest-bearing reserve escrow account (the "**Insurance Impound Fund**"), with interest accruing thereon being added back into such Insurance Impound Fund, pursuant to the Impound Fund Escrow Agreement.

8.3.2    Lender shall have the right to apply the Insurance Impound Fund Deposits to payment of the insurance premiums required to maintain the Insurance Policies. In making any payment relating to insurance premiums, Lender may do so according to any bill, statement or estimate procured from the insurer or its agent, without inquiry into the accuracy of such bill, statement or estimate. If the amount of the Insurance Impound Fund Deposits shall exceed the amounts due for insurance premiums, Lender shall, return any excess to Borrower or credit such excess against future payments to be made to the Insurance Impound Fund. Any amounts remaining on deposit in the Insurance Impound Fund after the repayment in full of the Loan (together with all Fixed Interest and Contingent Interest accrued thereon) shall be returned to Borrower.

8.3.3    Nothing contained herein shall cause Lender to be deemed a trustee of the Insurance Impound Fund or to be obligated to pay any amounts in excess of the amount of funds deposited with Lender pursuant to this Section 8.3. Lender may commingle amounts on deposit in the Insurance Impound Fund with any other sums held by Lender. The receipt, use or application of any such sums paid by Borrower to Lender hereunder shall not be construed to affect the maturity of any indebtedness hereunder or any of the rights or powers of Lender under the terms of the Loan Documents or any of the obligations of Borrower under any of the Loan Documents.

**8.4**    *Construction Imprest Reserve Fund*

8.4.1    A reserve escrow account acceptable to Lender in its reasonable discretion and in which Lender shall be granted and shall at all times have a first priority, perfected security interest (the "**Construction Imprest Reserve Fund**") shall be established by Borrower concurrently with the first advance under the Construction Loan.  The Construction Imprest Reserve Fund account shall be satisfactory to Lender and shall be in an interest-bearing account with all interest credited to the Construction Imprest Reserve Fund at a financial institution as may be required by Lender, or if at Lender's loan servicer, in a non-interest bearing account.  As a condition of the final advance, Borrower shall enter into an escrow and security agreement in form and substance satisfactory to Lender and Borrower in their reasonable discretion and negotiated in a commercially reasonable manner (the "**Construction Imprest Reserve Escrow Agreement**").

8.4.2    Provided no Event of Default has occurred and is continuing, Borrower may draw down at any time up to $500,000.00, pursuant to the Construction Imprest Reserve Fund. The Construction Imprest Reserve Fund may be used by Borrower at any time to satisfy any payments required under the Direct Contracts.  Any amounts remaining on deposit in the Construction Imprest Reserve Fund after the repayment in full of the Loan (together with all Fixed Interest and Contingent Interest accrued thereon) shall be returned to Borrower.

8.4.3    Nothing contained herein shall cause Lender to be deemed a trustee of the Construction Imprest Reserve Fund or to be obligated to pay any amounts in excess of the amount of funds deposited with Lender.  Lender may commingle amounts on deposit in the Construction Imprest Reserve Fund with any other sums held by Lender.  The receipt, use or application of any such sums paid by Borrower to Lender hereunder shall not be construed to affect the maturity of any indebtedness hereunder or any of the rights or powers of Lender under the terms of the Loan Documents or any of the obligations of Borrower under any of the Loan Documents.

**8.5**    *Equity Capital Account*

8.5.1    Lender acknowledges and agrees that, as of the date hereof, Borrower has contributed not less than Five Million and No/100 Dollars ($5,000,000.00), in cash, from Borrower's own funds, toward the payment of items set forth in the Construction Budget (the "**Required Equity Capital**"), and Borrower is further permitted to contribute an additional Five Hundred Thousand and No/100 ($500,000.00) after the Completion Date to pay capital costs related to the enhancement of the Project (collectively, the "**Equity Capital Contributions**"). Such Equity Capital Contributions, together with the Standby Equity Contribution (to the extent necessary and actually spent), shall be reflected by Lender as book entry contributions to Borrower's equity capital account (the "**Equity Capital Account**").  In the event that, as of the Conversion Date, the Equity Capital Account balance shall be less than the Required Equity Capital (the amount by which the Equity Capital Account balance is less than the Required Equity Capital is hereinafter referred to as the "**Equity Capital Account Deficiency**"), then on the Conversion Date, and as a condition to any such conversion, Borrower shall deliver to Lender written evidence reasonably satisfactory to Lender that Borrower has actually contributed

the Equity Capital Account Deficiency in cash, from Borrower's own funds, toward the payment of items set forth in the Construction Budget.

### 8.6    *Application of Reserve Funds*

8.6.1    During the continuance of an Event of Default, Lender, at its option, may withdraw amounts from the Reserve Funds and apply such amounts to the items for which the Reserve Funds were established or upon acceleration of the Loan, Lender, at its option, may apply such amounts to payment of the Loan in such order, proportion and priority as Lender may determine in its sole discretion.  Lender's right to withdraw and apply amounts from the Reserve Funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

### 8.7    *Security Interest in Reserve Funds*

8.7.1    Borrower hereby pledges, assigns and grants a security interest to Lender, as security for payment of the Loan and the performance of all other terms, conditions and covenants of the Loan Documents on Borrower's part to be paid and performed, in all of Borrower's right, title and interest in and to the Reserve Funds.  The Reserve Funds shall be under the sole dominion and control of Lender (or, in Lender's sole discretion, Lender's servicer).

8.7.2    Borrower shall report on its federal, state and local income tax returns all interest or income accrued on the Reserve Funds.

8.7.3    Borrower shall not, without the prior consent of Lender, further pledge, assign or grant any security interest in the Reserve Funds or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

### 8.8    *Funding of Reserve Funds*

8.8.1    Borrower shall be liable for the funding of all required deposits to the Reserve Funds, whether or not the cash flow available from the operation of the Property is sufficient to fund such required deposits.  In the event that such cash flow is insufficient to fund any such required deposits to the Reserve Funds, Borrower shall be required to fund such deposits from its own separate funds and any shortfall amount so funded by Borrower (the "**Reserve Shortfall**") shall be added to Borrower's Equity Capital Account up to the Borrower's Equity Cap.

## 9.    ADDITIONAL COVENANTS

At all times during the term of the Loan, Borrower shall comply with all of the following covenants and agreements:

**9.1**   *Restrictions on Use of Gross Receipts*

Borrower shall not use any of the Gross Receipts of the Property to pay, or to reimburse Borrower for payment of, costs attributable to any Release of any Hazardous Substance or any Claims relating thereto (as such capitalized terms are defined in the Environmental Indemnity) that Borrower is required to pay as the Indemnitor under the Environmental Indemnity if such Release was a result of Borrower's willful misconduct or gross negligence.

**9.2**   *Management of the Property*

9.2.1   *Management Agreement.*  As of the date hereof, the Management Agreement, duly executed by the parties thereto, has been delivered to Lender together with the Management Agreement Subordination.

9.2.2   Borrower hereby agrees to employ Manager to operate and manage the Property in a first class, professional, and competent manner at all times prior to the full repayment by Borrower of the Loan and all other sums payable under the Loan Documents. The management fee paid to Manager shall be four percent (4.00%) of Gross Receipts. Without limiting the foregoing, commencing after the second anniversary of the Conversion Date and continuing thereafter, if (a) at the end of any two (2) consecutive calendar quarters, the annualized revenue per available room ("**RevPar**") for the Property is less than seventy-five percent (75%) of the average annualized RevPar for the competitive set of hotels (as presented by Borrower and approved by Lender at or before the Conversion Date), or (b) payments of operating cash flow to Lender pursuant to this Agreement are not producing cash flow at least equal to the Fixed Interest rate for any four (4) consecutive calendar quarters prior to maturity, then Lender has the right, upon written notice to Borrower, to cause Borrower to:  (i) replace Manager with a reputable, experienced, manager, which manager shall not be affiliated in any manner with Borrower and shall be reasonably approved by Lender in writing; and (ii) cause such manager to execute a management agreement and a subordination agreement reasonably acceptable to Lender in form and substance. In the event Borrower receives written notice from Lender with respect to clause (b) above, Borrower shall have two (2) additional three-month periods after Borrower's receipt of written request from Lender to meet such requirement before the Manager has to be replaced. Except as otherwise specifically provided in the immediately preceding sentence, Borrower shall not replace the Manager or amend the Management Agreement without the prior written consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed.

**9.3**   *Management Plan*

Borrower shall deliver to Lender, at least thirty (30) days prior to the beginning of each calendar year beginning no later than three (3) months prior to the Conversion Date, a proposed management plan for the Property for such succeeding year. The management plan shall include, without limitation, a proposed schedule of income. Lender shall have the right after receipt of such information to approve or disapprove the same, which approval shall not be unreasonably withheld, delayed or conditioned. If Lender disapproves such management plan, then Borrower and Lender shall work in good faith for a period of thirty (30) days to attempt to reach agreement on the management plan. Until such agreement is reached the management

plan from the prior calendar year shall remain in effect. Any request for Lender's approval or consent to a proposed management plan shall be accompanied by a cover letter from Borrower containing a legend in not less than sixteen (16) point bold type stating that Lender's failure to respond to such request within ten (10) Business Days shall be deemed consent or approval of such management plan. If Lender fails to respond to such request within ten (10) Business Days following Lender's receipt of such management plan, Lender shall be deemed to have approved or consented thereto.

### 9.4    *Title to and Maintenance of Collateral*

9.4.1    *Maintenance and Use of Collateral.*    Borrower shall use commercially reasonable efforts to maintain, preserve and keep the Property and all other collateral covered by the Loan Documents as provided in the Mortgage or other applicable Loan Document, and shall use commercially reasonable efforts to maintain, preserve and keep the materials, fixtures, and equipment appurtenant thereto or used in connection therewith, and each and every part and parcel thereof, in good repair and working order and in safe condition at all times.

Without limiting the foregoing, Borrower shall not, without Lender's prior written approval, which shall not be unreasonably withheld, delayed or conditioned:    (i) remodel, add to, reconstruct, improve or demolish any material part of the Property or other collateral covered by the Loan Documents, except as contemplated by and in accordance with the Plans (or, from and after the Conversion Date, as may be contemplated by and in accordance with a current, approved Operating Budget), or as may be required to comply with legal requirements; (ii) permit the use or operation of the Property for any purpose except as a hotel or retail or such other use as shall hereafter be expressly approved by Lender in writing; or (iii) undertake or suffer any material work to be done upon the Property other than the development of the Property and construction of the Improvements provided for herein and maintenance and repair of the Property.

9.4.2    *Title to Collateral.*    Borrower shall not permit any mortgages, liens, encumbrances or charges upon the Property, Personal Property, or any other collateral covered by the Loan Documents or any part thereof, except (i) as permitted by the Mortgage; or (ii) as approved by Lender in writing; or (iii) as accepted by Lender in the Title Policy; or (iv) liens being contested in accordance with Section 5.2.8 ("**Permitted Encumbrances**"). Borrower shall not, without Lender's written consent or consistent with the Operating Budget, purchase or acquire any materials, fixtures or equipment for use on or in connection with the Property or other Collateral covered by the Loan Documents upon leases, conditional sale or other type of title retention or security agreement.

9.4.3    *Notice of Liens.*    Borrower shall promptly notify Lender in writing should Borrower, in the exercise of reasonable diligence, become aware that any mortgage, lien, encumbrance or charge or any other security instrument whatsoever be recorded or filed against the Property, Improvements, Personal Property, or other collateral covered by the Loan Documents or any part thereof.

### 9.5   *Inspection, Audits and Information Regarding Collateral and Loan*

Borrower shall permit Lender and its duly authorized agents free access to the Property upon reasonable notice (except in the case of an emergency, in which event no notice shall be required) and shall make available for audit and inspection by Lender or its duly authorized agents, from time to time at any reasonable time upon reasonable notice (except in the case of an emergency, in which event no notice shall be required), all property, equipment, books, contracts, records, detailed plans, shop drawings, specifications and other papers relating to the Improvements, Property, Personal Property, or other collateral covered by the Loan Documents, or materials, fixtures and equipment appurtenant thereto or used in connection therewith. Borrower shall promptly respond to any inquiry from Lender for information with respect to the Improvements or Property, which information shall be subject to verification by Lender; provided, however, that Lender shall at all times be entitled to rely upon any statements or representations made by Borrower or any officer or representative thereof.

### 9.6   *Reserved*

### 9.7   *Financial Restrictions on Borrower*

Without limiting Borrower's agreement regarding other financing of the Improvements contained in Section 5.1 hereof, Borrower agrees that from and after the occurrence of and during the continuance of an Event of Default, it shall not, without Lender's prior written approval, (i) pay any loans payable to any of its officers, directors, partners, shareholders or members, or to any person or entity affiliated with any of them or with Borrower, or to any family member of any of them or of Borrower; (ii) declare, make or pay any dividends or distributions on or of capital or make any loans or gifts; or (iii) liquidate, terminate, consolidate, merge or voluntarily dissolve.

### 9.8   *Transfer of Interests in Borrower or Collateral*

(a)   Except in accordance with the terms and conditions of Section 12.20 hereof or as otherwise specifically set forth in this Agreement, Borrower shall not, without Lender's prior written consent, make or permit any conveyance, sale, transfer, assignment, pledge or hypothecation of any direct or indirect ownership interest in Borrower, or transfer, convey, mortgage, sell, assign, pledge or hypothecate the Property, the Improvements, or any collateral covered by the Loan Documents, or any interest therein or part thereof.

(b)   Borrower acknowledges that, in making the Loan, Lender has relied to a material extent upon the business reputation and individual net worth of Borrower and has relied to a material extent upon the business reputation and individual net worth of Guarantor. An Event of Default shall occur hereunder, and Lender shall have the right, at its sole option, to declare all sums secured hereby immediately due and payable if, without the prior written consent of Lender or except in accordance with the terms and conditions of Section 12.20 hereof or as otherwise specifically set forth in this Agreement: (i) Borrower (or any subsequent Lender of an interest in the Property following a transfer to which Lender consents or which is otherwise permitted hereby) (A) sells, conveys, transfers, disposes of, or otherwise alienates the Property, or any part thereof, or any interest therein, including a ground lease entered into after the date hereof,

whether voluntarily, by operation of law, or otherwise, or (B) executes a contract to do any of the foregoing (unless the contract is conditioned on Lender's consent or the pay-off of the Loan at closing, the Loan being then open to prepayment); or (ii) Borrower executes or records any condominium declaration, or causes the Property or any portion thereof to be converted into condominiums; or (iii) there occurs a change, whether directly or indirectly, in the composition, control, ownership or structure of Borrower (or any subsequent Lender of an interest in the Property following a transfer to which Lender consents other than by death or disability) except as permitted hereunder, or (iv) Borrower changes its form of business association, or dissolves or liquidates, or otherwise terminates its existence as a legal entity.  Consent to a transfer of an interest in the Property or consent to any other event requiring consent in accordance with the foregoing, if granted, shall be in writing and shall not constitute a waiver of the requirement of consent for subsequent transfers or other events.

(c)   Notwithstanding the provisions of this Section 9.8 to the contrary, so long as no Event of Default has occurred and is then continuing, the owners of direct or indirect ownership interests in Borrower shall have the right, without the consent of Lender, to transfer their direct or indirect ownership interests in Borrower from time to time (i) to each other, or to their respective immediate family members (or to trusts created for the benefit of such family members) for bona fide estate planning purposes, or to entities wholly owned by them or by such family members or trusts and/or (ii) to any other Person, so long as with respect to each such transfer in clauses (i) and (ii) above (A) William T. Obeid, Dante A. Massaro and Christopher LaMack, directly or indirectly, continue(s) to Control Borrower and continue(s) at all times to control the day-to-day operation and management of Borrower, (B) if the proposed transferee is a person or entity who did not previously have an ownership interest in Borrower, Lender confirms that such proposed transferee is not a Prohibited Person, (C) Borrower pays all of the costs and expenses of Lender in connection with such transfer and (D) Borrower provides Lender with written notice of such transfer (including the identity of the transferee) within ten (10) days following the occurrence thereof.  In connection with any such transfer of ownership interests in Borrower, no transferee of such ownership interests shall be obligated to execute any Loan Documents, including, without limitation, the Recourse Guaranty, the Guaranty (Recourse Carveouts) or the Completion Guaranty.  As used herein, "**Immediate Family Members**" means, as to any Person, such Person's spouse, significant others, children, grandchildren, parents, grandparents and in-laws.  As used herein, "**Control**" shall mean the power to exercise, directly or indirectly, control over the management and policies of Borrower.

(d)   Notwithstanding the provisions of this Section 9.8 to the contrary, transfers of the Property (or the relevant portion thereof) to the condemning authority upon actual condemnation of all or any portion of the Property shall be permitted without the consent of Lender.  Lender shall be entitled to receive upon the consummation of any transfer permitted under this Section 9.8(d) any and all Loan principal, interest, Contingent Interest, and other sums as are provided to be received by Lender on account of such Recovery Event under Section 6.4.  No prepayment fee shall be due as a result of payment to Lender of condemnation proceeds.

(e)   No transfer permitted hereunder or otherwise permitted by Lender shall release Borrower or any Guarantor from any personal liability hereunder, under the Loan Documents, or under any other agreement executed in connection with any obligations secured hereby, without Lender's prior written consent at the time of such transfer.

**9.9** *Compliance with Governmental Requirements*

Borrower shall at all times use commercially reasonable efforts to comply, with all laws and regulations of each Governmental Authority having jurisdiction over the Property as the same relate to the development, ownership, leasing and operation of the Property, including, without limitation, the federal Americans With Disabilities Act ("**ADA**") and any State of New York counterpart to the ADA, applicable building, fire and health and safety codes, and all governmental requirements relating to the marketing and leasing of space at the Property.

**9.10** *Maintenance and Observation of Loan Documents*

Borrower shall observe, perform and satisfy all the terms, covenants and conditions of, and without limitation, shall pay when due all costs, fees and expenses as required by, the Loan Documents.

**9.11** *Notice of Litigation*

Borrower shall promptly inform Lender of any litigation or any claim or controversy which comes to Borrower's attention and which in Borrower's judgment is likely to become the subject of litigation affecting Borrower, the Property or the Improvements.

**9.12** *Casualty*

In the event that the Improvements shall be damaged or destroyed by fire or any other casualty, Borrower shall proceed with the restoration thereof and diligently prosecute the work of restoration to completion as expeditiously as reasonably possible and in full compliance with all requirements of this Agreement and, subject to the condition precedent set forth in Section 12.22.3 (c) that Lender makes the insurance proceeds available for restoration.

**9.13** *Cooperate with Lender*

Borrower shall cooperate in a commercially reasonable way with Lender with respect to any proceedings before any court, board or governmental agency which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings, which participation shall be at Borrower's cost.

**9.14** *ERISA Certifications*

Borrower shall, from time to time upon written request by Lender, execute and deliver to Lender a certification confirming that neither Borrower nor any Affiliate of Borrower is a "party in interest," within the meaning of ERISA to any employee benefit plan which has a ten percent (10%) or greater interest in any separate account or fund that has any interest in the Loan and which is listed on *Exhibit F* attached hereto, as such list may be amended by notice from Lender to Borrower. Borrower agrees to keep (and cause to be kept) strictly confidential the identity of any employee benefit plan listed on *Exhibit F*.

### 9.15   *Financial Information on Guarantor*

Prior to the date hereof, Borrower has caused Guarantor to furnish to Lender a financial statement for Gemini Real Estate Advisors, LLC dated as of June 30, 2013, setting forth the aggregate amount of all contingent claims and liabilities (whether asserted or unasserted) against or affecting Guarantor as of such date.  Borrower agrees to cause Guarantor to furnish Lender, not later than March 31 of each year during the term of the Loan, an updated financial statement setting forth the aggregate amount of all contingent claims and liabilities (whether asserted or unasserted) against or affecting Guarantor, each such financial statement to be current as of a date within forty-five (45) days of Lender's receipt thereof (such financial statement to be accompanied by a certification of Guarantor that such financial statement is in all material respects an accurate statement of all such contingent claims and liabilities as of the date of such financial statement).

### 9.16   *Operating Budget*

At least sixty (60) days prior to the Conversion Date and at least thirty (30) days prior to the end of each calendar year thereafter, Borrower shall submit to Lender a proposed budget for operation of the Property (the "**Operating Budget**") during the first partial calendar year after the Conversion Date and each full calendar year thereafter, respectively.  The Operating Budget shall be in a form reasonably approved by Lender and shall set forth Borrower's anticipated operating budget for the applicable period, including anticipated rental and other income comprising Gross Receipts and anticipated costs of items constituting Expenses, and further including a calculation of estimated Net Cash Flow.  The Operating Budget shall include a line item for Capital Fund Deposits, which shall not be less than the minimum amount shown in Section 8.1.

After receipt of the proposed Operating Budget, Borrower and Lender shall work in good faith to agree on an approved Operating Budget.  If the parties reach agreement, then the mutually-approved Operating Budget shall be the Operating Budget for the applicable period.  If the parties do not reach agreement on the Operating Budget or by January 1 of the second full calendar year after the Conversion Date and each calendar year thereafter, then unless and until such agreement is reached, the approved Operating Budget shall be the prior year's Operating Budget, increased as to each line item by four percent (4%), except that line items for real property taxes, insurance, utilities and other non-discretionary expenses approved by Lender in its reasonable discretion, shall be set based on known amounts, if any, or reasonable projections by Borrower until such items are known.  When an Operating Budget is approved, Borrower shall use commercially reasonable efforts to operate the Property within the Operating Budget and shall not exceed budgeted expenditures for capital improvements without Lender's prior written consent, which shall not be unreasonably withheld, delayed or conditioned.

Notwithstanding the foregoing, Lender's approval of a proposed (i) Operating Budget as set forth in this Section 9.16 or (ii) management plan as set forth in Section 9.3, shall not be delayed, conditioned or withheld on the basis that the proposed Operating Budget or management plan provides for inadequate capital expenditures or inadequate FF&E expenditures.

## 10.  EVENTS OF DEFAULT; REMEDIES

### 10.1  *Events of Default*

The following events are referred to herein collectively as "**Events of Default**" and individually as an "**Event of Default**":

10.1.1  *Failure to Make Payment.*  Borrower shall default in the due and punctual payment of principal, interest or any other amounts due, or required to be deposited, under this Agreement (including, without limitation, deposits into the Tax Impound Fund, the  Insurance Impound Fund, the FF&E Reserve Fund and/or the Equity Capital Account).

10.1.2  *Breach of Covenant.*  Borrower shall fail to perform or observe any of its other covenants, agreements or obligations contained in this Agreement, other than any covenant, agreement or obligation referred to in any other subparagraph of this Section 10.1, and fails to fully cure or remedy such failure within thirty (30) days after written notice from Lender, except that if such failure cannot reasonably be remedied in thirty (30) days, then so long as Borrower commences cure during such thirty (30) day period and diligently prosecutes such cure to completion Borrower shall have a reasonable time to complete such cure, not to exceed one hundred thirty-five (135) days.

10.1.3  *Other Loan Documents.*  An Event of Default shall occur under the Note, the Mortgage or any of the other Loan Documents, and any cure periods applicable thereto shall have expired.  In the event a cure right is not specifically designated the cure right set forth in Section 10.1.2 shall apply.

10.1.4  *Inaccurate Representation.*   Any representation, warranty or certification made in writing by or on behalf of Borrower or any Guarantor under any of the Loan Documents or any report, certificate or financial statement prepared by Borrower in connection with any of the Loan Documents, shall be inaccurate in any material respect on the date as of which made, provided that if any such false or inaccurate representation, warranty or certification was not knowingly false when made and can be made true and correct in all material respects by corrective action taken by Borrower or such Guarantor, as applicable, then Borrower or Guarantor, as applicable, shall have a period of thirty (30) days following written notice to Borrower to undertake and complete such corrective action.

10.1.5  *Failure to Complete Construction.*  If construction of the Improvements is not completed on or before the Completion Date (subject to permitted extensions thereof pursuant to Section 5.2.1).

10.1.6  *Discontinued Construction.*  If construction of the Improvements is not carried on diligently, or is at any time discontinued for sixty (60) or more consecutive days (subject to permitted extensions thereof pursuant to Section 5.2.1), and Lender reasonably concludes that the Improvements cannot be completed on or before the Completion Date (subject to permitted extensions thereof pursuant to Section 5.2.1).

10.1.7  *Bankruptcy, etc. of Borrower or Guarantor.*  If Borrower or Guarantor shall file a voluntary petition in bankruptcy or shall be adjudicated as bankrupt or insolvent, or shall

file any petition or answer seeking or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors; or if Borrower or Guarantor shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator (other than it required by Lender) for itself or of all or any part of the Property, Improvements or other collateral covered by the Loan Documents, or of any or all of the royalties, revenues, rents, issues or profits thereof, or shall make any general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due; or if a court of competent jurisdiction shall enter an order, judgment or decree approving a petition filed against Borrower or Guarantor, seeking any reorganization, dissolution or similar relief under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, and such order, judgment or decree shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the first date of entry thereof; or if any trustee, receiver or liquidator of Borrower or Guarantor, or all or any part of the Property, Improvements, or other collateral covered by the Loan Documents, or any or all of the royalties, revenues, rents, issues or profits of the Property, Improvements, or other collateral covered by the Loan Documents, shall be appointed without the consent or acquiescence of Borrower or Guarantor, and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive).

10.1.8 *Involuntary Liens.* If a writ of execution or attachment or any similar process shall be issued or levied against all or any part of or interest in the Property, Improvements, or other collateral covered by the Loan Documents, or any judgment involving monetary damages shall be entered against Borrower which shall become a lien on the Property, Improvements, or other collateral covered by the Loan Documents, or any portion thereof or interest therein, and such execution, attachment or similar process or judgment is not released, bonded, satisfied, vacated or stayed within sixty (60) days after its entry or levy.

**10.2 *Remedies***

If any Event of Default shall occur, then at the sole option of Lender:

10.2.1 *Completion of Improvements.* If such Event of Default occurs prior to the Conversion Date or occurs thereafter at a time when any construction is being performed at the Property, Lender may elect, upon 10 days' written notice to Borrower via email (provided in Section 12.2 hereof), and only if Borrower is not completing said construction to enter into possession of the Property and Improvements and, with or without such entry, perform any and all work and labor necessary to complete construction substantially according to the Plans (or such other plans as shall be approved by Lender and Borrower) and take all appropriate steps to secure and protect the Property, Improvements and other collateral covered by the Loan Documents if Borrower is failing to do so, except that if such Event of Default occurs while the Completion Guaranty is in effect and applies to completion of such construction, then Lender shall give written notice to Guarantor and shall exercise the foregoing right only if, after such notice, Guarantor does not perform such work in a timely manner. All sums expended by Lender for such purpose shall be deemed to have been paid to Borrower and to be secured by the Mortgage and the other Loan Documents. Borrower hereby appoints and constitutes Lender its

true and lawful attorney-in-fact (said appointment to be exercised only after the happening of any such Event of Default) with full power of substitution in Lender to complete any such construction in the name of Borrower in accordance with this Agreement, and hereby further empowers Lender as said attorney-in-fact as follows:  (a) to use any funds of Borrower, including any funds which may remain unadvanced under the Construction Loan, and, in addition, to advance funds in excess of the amount of the Construction Loan for the purpose of completing such construction substantially in accordance with the Plans (or such other plans); (b) to make such additions, changes and corrections in the Plans which may be necessary or desirable to complete such construction in the manner contemplated by this Agreement; (c) to employ the existing contractors, subcontractors and agents, architects and inspectors, or to dismiss the same or any of them and employ others in their stead; (d) to execute all applications and certificates on behalf of Borrower which may be required by any contract documents relating to such construction; (e) to prosecute and defend all actions or proceedings in connection with such construction or in any respect relating to the Property, Improvements and other collateral covered by the Loan Documents; and/or (f) to do any and every act which Borrower could be required by Lender to do in its own behalf as contemplated by this Agreement or any of the other Loan Documents.  This power of attorney is coupled with an interest and is irrevocable by death or otherwise.  Borrower hereby indemnifies and holds harmless Lender from any and all losses, costs, liabilities, damages, fees and expenses (including, without limitation, reasonable attorneys' fees and disbursements) whatsoever associated with the exercise of this power of attorney and releases Lender from all liability whatsoever arising out of or in any manner connected with the exercise of this power of attorney and all actions taken pursuant thereto except to the extent of Lender's gross negligence or willful misconduct.  Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies, Lender may use all materials purchased by Borrower in the development of the Property and construction of any improvements, but Lender shall be free to dispose of the balance of such material as it sees fit, and no liability shall accrue in favor of Borrower against Lender as a result thereof except to credit any consideration received by Lender therefor as a payment against the Loan.  In addition, upon such Event of Default, all of Borrower's right, title and interest in and to all licenses, permits and authorizations relating to the development, construction, or operation of the Property or Improvements, shall be deemed assigned, transferred and set-over to Lender to the extent permitted by law, and Borrower agrees to evidence said assignment, transfer and setting over by an appropriate instrument in writing, at Lender's request.

10.2.2  *Termination of Advances and Conversion*.  Lender may elect to terminate any obligation to make any Construction Loan advances and/or convert the Construction Loan to the Contingent Interest Loan, anything contained in this Agreement, the Note or any other Loan Document to the contrary notwithstanding, except that if such Event of Default occurs while the Completion Guaranty is in effect and applies to completion of such construction that has not been completed, then Lender shall not exercise such remedy until Lender has given notice to Guarantor and Guarantor fails to perform such work in a timely manner.

10.2.3  *Acceleration of Loan*.  Lender may, without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived, declare all sums and other obligations owing to Lender under this Agreement and/or any of the other Loan Documents to be forthwith due and payable, whereupon the same shall become immediately due and payable, and Lender may pursue any and all remedies set forth in the Loan Documents and enforce all

obligations of Borrower to it under this Agreement and the other Loan Documents, and exercise any and all other remedies granted to it at law, in equity or otherwise, all of which rights and remedies shall be cumulative. In the event Lender so elects to declare such sums and obligations immediately due and payable, interest at the Default Rate shall accrue on all Contingent Interest payable hereunder from the date of such declaration until the date paid; provided, however, that if there is a maximum legal rate of interest applicable to such Contingent Interest, then the interest payable thereon shall not exceed simple interest at such maximum rate permitted by law.

10.2.4 *Other Remedies.* Lender may elect to enforce, or avail itself of any and all remedies provided in, any or all of the Loan Documents, specifically including, but not limited to, foreclosure of the Mortgage.

### 10.3 *Remedies Cumulative*

All powers and remedies given in this Section 10 to Lender shall be cumulative and not exclusive of one another or of any other right or remedy or of any other powers and remedies available to Lender under the Loan Documents. Lender may elect, by judicial proceedings or otherwise, to enforce the performance or observance of the covenants and agreements of Borrower contained in this Agreement, and no delay or omission of Lender to exercise any right or power accruing upon any default or Event of Default shall impair any other or subsequent default or Event of Default or impair any rights or remedies consequent thereto. Every power and remedy given to Lender by this Section 10 or by law may be exercised from time to time, and as often as may be deemed expedient.

### 10.4 *Waivers*

Borrower does hereby expressly waive in favor of Lender and its assigns, to the fullest extent allowed by law, any and all exemptions from seizure provided by any applicable law, rule or regulation of any Governmental Authority.

## 11. RELATIONSHIP OF LENDER AND BORROWER AS CREDITOR AND DEBTOR ONLY

### 11.1 *Nature of Relationship*

The relationship between Lender and Borrower in connection with the Loan shall be solely that of creditor and debtor. Nothing contained in this Agreement or in any other Loan Documents, including, without limitation, Lender's right to receive Contingent Interest, shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership between Lender and Borrower. Lender shall not be in any way responsible or liable for the debts, losses, obligations or duties of Borrower with respect to the Property or otherwise by virtue of the Loan. All obligations to pay real property or other taxes, assessments, insurance premiums, and all other fees and charges arising from the ownership, operation, use or occupancy of the Property and to perform obligations under all Leases and other agreements and contracts relating to the Property shall be the sole responsibility of Borrower. Borrower makes no representation regarding the treatment of the Loan for Federal income tax purposes or accounting purposes.

## 11.2  *Indemnification by Borrower*

Borrower agrees to indemnify and hold Lender harmless from and against any and all claims and liabilities, losses, injuries, costs, damages and expenses (including, without limitation, reasonable attorneys' fees and disbursements) arising therefrom, which Lender may incur in administering or enforcing the Loan as a result of any act taken by Lender hereunder or pursuant hereto and of and from any and all claims or demands whatsoever which may be instituted against Lender by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants or agreements contained in any Lease or any other agreement made by Borrower relating to the Property to the extent not covered by the Lender's gross negligence or willful misconduct.  Should Lender incur any such liability under any Lease, or under or by virtue of this Agreement, the Note, the Mortgage, the Assignment, any other Loan Document, or any other agreement made by Borrower relating to the Property, or in defense of any claims or demands related thereto, not caused by the Lender's gross negligence or willful misconduct the amount thereof, including, without limitation, out-of-pocket costs and expenses and reasonable attorneys' fees, shall be secured by the Mortgage, the Assignment and all other instruments of security made in connection with the Loan, and Borrower agrees to reimburse Lender therefor immediately upon demand together with interest thereon at the Default Rate from the later of the date the demand therefor is received by Borrower or the date such amounts were incurred by Lender, to the date reimbursed.  Upon the failure of Borrower to so reimburse and the expiration of any applicable cure periods, Lender may declare all sums due hereunder and under the Note, Mortgage and the other Loan Documents immediately due and payable.

## 11.3  *Security*

The obligations of Borrower under this Agreement are secured by the Mortgage, the Assignment, and all other security held by Lender for the Loan.  The Mortgage and the Note are each incorporated herein by reference.

## 11.4  *Exculpation*

11.4.1  Except as expressly provided otherwise herein below, collection of the indebtedness evidenced by the Note and of any other monetary sums owing under this Agreement and/or any of the other Loan Documents, and collection of any judgment rendered in any action, suit or other proceeding for the breach of any representation, warranty, covenant, undertaking or other agreement in this Agreement, the Note or any of the other Loan Documents, shall be enforced solely against the Property described in the Mortgage and any other collateral given to further secure the Loan; provided, however, that nothing herein shall be deemed to be a release or impairment of the indebtedness evidenced by the Note or the security therefor provided by the Mortgage and any other Loan Documents, nor shall anything provided herein preclude Lender from proceeding against the assets of any guarantor (including, without limitation, the Principals) of any part of the obligations and indebtedness of Borrower under any of the Loan Documents (including, without limitation, the assets of Guarantor under and to the extent provided in the Guaranty (Recourse Carveouts), the Environmental Indemnity, and the Completion Guaranty) or from foreclosing (judicially or nonjudicially) or otherwise enforcing any lien or security interest provided by the Mortgage and/or any other Loan Documents, or from

obtaining a receiver as and when permitted by applicable law or pursuant to the provisions of the Mortgage and/or any other Loan Documents, or from bringing any action to obtain or protect any income or revenues arising from the Property or to restrain or enjoin any action by Borrower or its successors which would impair Lender's security for the Loan or would otherwise be in violation of the terms of this Agreement, the Note, the Mortgage, or any of the other Loan Documents, or from proceeding directly against Borrower and any assets of Borrower to recover sums owing under the Recourse Guaranty, Guaranty (Recourse Carveouts), the Completion Guaranty, and the Environmental Indemnity.

11.4.2   Notwithstanding the foregoing:

(a)   Lender shall have the right to seek a personal judgment against Borrower (but not against any member of Borrower or any principal of a member or member of a member of Borrower, except as provided in the Recourse Guaranty and the Guaranty (Recourse Carveouts) on the Note and under this Agreement or any other Loan Document with respect to any and all indebtedness secured hereby or thereby in the event that (i) Borrower breaches any of the transfer and encumbrance restrictions set forth in Section 9.8 hereof, (ii) Borrower or Guarantor shall voluntarily file or commence, or shall consent to, acquiesce in the filing or commencement of, a petition, case or application for any bankruptcy, reorganization, dissolution or other relief for Borrower or Guarantor under any present or future federal, state or other statute, law or regulation relating to bankruptcy, insolvency or other relief for debtors, or any Affiliate, officer, director, or representative which controls, directly or indirectly, Borrower files, commences or joins in the filing of, an involuntary petition against Borrower, or solicits or causes to be solicited petitioning creditors for any involuntary petition against Borrower from any Person (herein collectively referred to as a "**Voluntary Bankruptcy Event**"), or (iii) Borrower shall take any actions to contest, challenge, delay or interfere with any action taken by Lender to enforce its rights under the Loan Documents (including, without limitation, the seeking by Lender of a receiver for the Property and/or the initiation, prosecution and/or completion of a judicial or nonjudicial foreclosure of the Property) so that such course of conduct was finally determined by a court of competent jurisdiction to be frivolous for purposes of Rule 11 of the Federal Rules of Civil Procedure (collectively, an "**Enforcement Contest**"); and

(b)   Borrower (but not any member of Borrower or any principal of a member or member of a member of Borrower, except as provided in the Recourse Guaranty, the Guaranty (Recourse Carveouts), the Completion Guaranty, and the Environmental Indemnity) shall indemnify, defend, protect and hold Lender and its members, managers, officers, directors, shareholders, partners, employees, principals, agents and Affiliates) (collectively, the "**Lender Parties**") harmless from and against, and shall be personally liable to Lender but only to the extent of any and all loss, damage, out-of-pocket costs, or expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred by Lender and/or any of the Lender Parties as a result of any of the following events, conditions or occurrences:  (A) Borrower's failure to make required deposits into the Reserve Accounts and/or the Impound Accounts (or, if Lender waives Borrower's obligation to make deposits into the Impound Accounts or such obligation is not yet effective, Borrower's failure to pay when due any Impositions coming due with respect to the Property or any insurance premiums for any policies of insurance required to be maintained hereunder or under any of the other Loan Documents) or, if applicable, to pay such Impositions and insurance premiums, and any misuse, misappropriation, or misapplication

of funds withdrawn from the Reserve Accounts and/or the Impound Accounts, or the application of such funds other than as expressly permitted under the Loan Documents, but in all cases only to the extent of rents and revenues available from the operation of the Property; (B) any fraud, intentional misrepresentation and/or criminal act of Borrower or any of its Principals in connection with the Project or the Loan including the funding conditions and the Conversion Conditions; (C) in an Event of Default and the continuance thereof, any intentional retention, diversion, misuse, misappropriation or misapplication by Borrower of rents, revenues and/or security deposits from the Property except to the extent prohibited by law or any court; (D) any misapplication of insurance proceeds, condemnation awards or any similar compensation relating to the Property, except to the extent prohibited by law or any court; (E) failure to make any deposits into the Reserve Funds to the full extent of rents and revenues received from the Property as required pursuant to the terms of this Agreement or any of the other Loan Documents; and (F) any failure to comply with an environmental law or the discovery, misuse or disposal of Hazardous Substances at the Property to the extent not paid for by environmental insurance provided to Lender and paid for by Borrower and/or Guarantor.  Borrower's obligations and liabilities under this Section 11.4.2 are herein referred to collectively as the **"Recourse Obligations."**   Notwithstanding anything to the contrary contained in this Agreement, the Note, the Mortgage, any other Loan Document, Borrower's liability under clause (a) of this Section 11.4.2 and Borrower's obligation to indemnify, defend, protect and hold harmless Lender as aforesaid with respect to any Recourse Obligations shall be a personal obligation of Borrower (but not any of its direct or indirect members, or any principal of a direct or indirect member, except as provided in the Recourse Guaranty, Guaranty (Recourse Carveouts), Completion Guaranty, or Environmental Indemnity), and in the event Borrower breaches any such obligation, Lender shall have the right to proceed directly against Borrower and any and all of Borrower's assets to recover the related indebtedness, and the further right to obtain a deficiency judgment after foreclosure for so much of the related indebtedness as remains unpaid.  Anything contained herein to the contrary notwithstanding, Lender shall have the right to seek a judgment on the Note or with respect to the indebtedness evidenced by this Agreement and the Note or secured by the Mortgage or any other Loan Document; however, except as expressly provided in this Section 11.4, in the event any suit or other proceeding is brought on this Agreement or the Note or concerning any indebtedness evidenced by this Agreement or the Note or other monetary sums owing under any of the other Loan Documents or any obligation under this Agreement, the Note, or any other Loan Document, no attachment, execution or other process shall be sought, issued or levied upon any property other than the Property and any other collateral conveyed or pledged to secure the Loan.  The provisions of this Section 11.4 do not limit the liability of Borrower as to any provisions that call for it to pay Lender's attorneys' fees.  Notwithstanding the foregoing, none of the provisions of this Section 11.4, other than Section 11.4.1, shall apply to any member of Borrower or to any principal of a member or member of a member of Borrower, except as provided for pursuant to the Recourse Guaranty, Guaranty (Recourse Carveouts), Completion Guaranty, or Environmental Indemnity.

## 12.  MISCELLANEOUS

### 12.1  *Effect of Waiver*

No failure to exercise, and no delay in exercising any right, power or remedy hereunder or under any document delivered pursuant hereto shall impair any right, power or remedy which

Lender may have, nor shall any such delay be construed to be a waiver of any of such rights, powers or remedies, or an acquiescence in any breach or default under this Agreement or any document delivered pursuant hereto, nor shall any waiver of any breach or default hereunder be deemed a waiver of any default or breach subsequently occurring.  The rights and remedies herein specified are cumulative and not exclusive of any rights or remedies which Lender would otherwise have.

### 12.2  *Notices*

Whenever Lender or Borrower shall desire to give or serve any notice, demand, request or other communication with respect to this Agreement or any of the other Loan Documents, each such notice, demand, request or other communication shall be in writing and, unless otherwise specified herein, shall be given by United States certified or registered mail (return receipt requested), or by UPS, Federal Express or other reputable overnight courier service, or by telecopy (with electronic confirmation) addressed as follows:

|  |  |
|---|---|
| *Borrower:* | 36 West 38th Street, LLC<br>200 Park Avenue South, Suite 1305<br>New York, NY 10003<br>Attention:  William T. Obeid<br>Telephone:  (212) 871-6283<br>Telecopy:<br>wobeid@gemini-re.com |
| *With a copy to:* | Gemini Real Estate Advisors, LLC<br>200 Park Avenue South, Suite 1305<br>New York, NY 10003<br>Attention:  Philip Hospod<br>Telephone:  (212) 823-0850<br>Telecopy:<br>phospod@gemini-re.com |
| *With a copy to:* | DLA Piper LLP (US)<br>4365 Executive Drive, Suite 1100<br>San Diego, California 92121-2133<br>Attention:  Darryl Steinhause<br>Telephone:  (858) 638-6702<br>Telecopy:  (858) 638-5002<br>darryl.steinhause@dlapiper.com |

| | |
|---|---|
| *Lender:* | 36 West 38th Street Hotel Capital LLC<br>c/o UBS Realty Investors LLC<br>242 Trumbull Street<br>Hartford, Connecticut 06103<br>Attention:  Mr. John R. Connelly, Jr.<br>Telephone: (860) 616-9040<br>Telecopy:  (860) 616-9008 |
| *With a copy to:* | UBS Realty Investors LLC<br>242 Trumbull Street<br>Hartford, Connecticut 06103<br>Attention:  General Counsel<br>Telephone: (860) 616-9000<br>Telecopy:  (860) 616-9104 |
| *And a copy to:* | Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, New York 10178<br>Attention:  Robert D. Bickford, Jr., Esq.<br>Telephone:  (212) 808-7638<br>Telecopy:  (212) 808-7897 |

Notices given in accordance herewith shall be deemed delivered upon personal delivery or on the date of delivery shown on the return receipt, as applicable, except that notices given by telecopy shall not be effective unless a copy of the telecopy, addressed as required above, is mailed to the intended recipient substantially concurrently with the sending of the telecopy and receipt of the telecopy is confirmed either:  (i) by telephone by calling the applicable telephone number set forth above; or (ii) by the sender's telecopy machine.  Any party may change its address for notices by a notice given in accordance with this Section 12.2, except that any such notice of a change in address for notices shall not be effective until actual receipt.

### 12.3   *Severability of Provisions*

In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

### 12.4   *Successors and Assigns*

This Agreement shall be binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns; provided, however, that, except as expressly permitted in this Agreement, Borrower may not, directly or indirectly, sell, assign or otherwise transfer all or any part of the Property or any interest therein, or any of Borrower's rights and obligations under this Agreement, without the prior written consent of Lender, which Lender may give or withhold in its sole and absolute discretion.  Borrower hereby agrees that Lender may grant participations in the Loan, or assign or otherwise transfer the Loan or any interests therein, and in connection

therewith Lender shall have the right to disclose to any such participant, assignee or transferee any and all financial and other information, documents and materials which Lender may now have or hereafter obtain regarding Borrower, Guarantor, the Property, the Improvements and any other collateral or security for the Loan. Without limiting the foregoing, Lender may disclose any and all information in its possession concerning Borrower, Guarantor, the Property, the Improvements and any other collateral or security for the Loan to any actual or prospective purchaser of any securities issued or to be issued by Lender.

### 12.5   *Counterparts*

This Agreement may be executed in any number of counterparts all of which taken together shall constitute one agreement, and any party hereto may execute this Agreement by signing any such counterpart.

### 12.6   *Choice of Law*

This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

### 12.7   *Remedies Available*

The remedies of Lender, as provided herein or in the Note, the Mortgage, the Assignment or any other Loan Document shall be cumulative and concurrent, and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as occasion therefor shall arise. No act of omission or commission of Lender, including specifically any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver or release of the same, and any waiver or release with reference to any one event shall not be construed as continuing or as a bar to, or as a waiver or release of, any subsequent right, remedy or recourse as to a subsequent event.

### 12.8   *Time of Essence*

Time is of the essence of all obligations under this Agreement.

### 12.9   *Attorneys' Fees*

Borrower hereby agrees to pay all out-of-pocket costs of collection hereunder, under the Recourse Guaranty, the Guaranty (Recourse Carveouts), and under the Completion Guaranty, including attorneys' fees, whether or not litigation is actually commenced. In the event litigation is commenced by a party hereto to enforce or interpret any provision of this Agreement, or to collect any amount due hereunder, the prevailing party in such litigation shall be entitled to receive, in addition to all other sums and relief, its out-of-pocket costs and attorneys' fees incurred both at and in preparation for trial and any appeal or review, such amount to be set by the court(s) before which the matter is heard. Borrower also agrees to pay any out-of-pocket attorneys' fees incurred by Lender in connection with any bankruptcy or similar proceeding wherein Borrower is the "debtor." If Borrower fails to pay any such costs, expenses and attorney fees within ten (10) days after written demand by Lender, then Borrower shall pay Lender

interest at the Default Rate on all such costs, expenses and attorneys' fees advanced pursuant hereto.

### 12.10 *No Costs to Lender*

Borrower shall reimburse Lender from time to time for Lender's out-of-pocket costs for the preparation and negotiation of the Loan Documents and the origination and administration of the Loan, including, but not limited to, any reasonable out-of-pocket costs incurred by Lender in connection with the making of any periodic inspections of the Property contemplated or permitted hereunder or under the other Loan Documents, reasonable attorneys' fees of Lender, other reasonable professional fees, and intangible taxes. Such administrative expenses shall be payable during the period prior to the final advance. After the Final Advance, the foregoing limitation on administrative expenses shall not apply to actual out-of-pocket expenses and reasonable legal fees incurred by Lender for reviewing and determining requests by Borrower for consents or approvals by Lender hereunder.

### 12.11 *Lender's Relationship to Others*

The relationship of Lender and Borrower is that of a creditor and debtor only. Lender is not a partner or joint venturer in any manner whatsoever with Borrower or any other party in the building or operation of the Improvements or the development of the Property, and nothing contained in this Agreement is intended to derogate from the foregoing. Lender shall not in any manner whatsoever be liable or responsible by reason of the provisions hereof, or otherwise, for the payment of any claims arising from the construction or operation of the Improvements. Lender shall not be responsible for the solvency of any company issuing any policy of insurance pursuant to any of the Loan Documents whether or not approved by it, or for the collection of any amounts due under any such policy, and shall be responsible and accountable only for such money as may be actually received by it, and then only in accordance with the terms of the Loan Documents. Nothing contained in any of the Loan Documents shall be construed as making Lender liable in any way for any loss, damage, or injury resulting from the non-insurance of any Improvements or any other property located on the Property.

### 12.12 *Captions*

The captions herein are for ease of reference only and shall in no way define or limit the provisions hereof.

### 12.13 *Modifications and Amendments*

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**12.14** *Indemnification for Brokers' Fees*

Borrower agrees to indemnify and hold Lender harmless from and against any and all claims, demands, losses, damages, liabilities, and expenses (including, without limitation, reasonable attorneys' fees and disbursements) resulting from or arising out of a claim for any brokerage or finder's fee or commission alleged to be due as a result of any actions on the part of or commitment made by Borrower.

**12.15** *Sign*

During construction of the Improvements, Lender may, at its own cost and expense, place a sign of reasonable size on the Land, indicating that Lender is providing financing for the Project, and/or may otherwise publicize its involvement with the Project, including, but not limited to, issuing press releases. Borrower shall not indicate that Lender is providing financing for the Project, by posting a sign or otherwise and hereby agrees to keep such information confidential unless expressly consented to in writing by Lender.

**12.16** *Exhibits*

All exhibits attached to this Agreement are incorporated herein by reference for all purposes.

**12.17** *Transactional Costs*

All reasonable third party transactional costs and expenses, including engineering, environmental, construction loan monitoring, survey, title insurance, reasonable Lender's attorney's fees, mortgage taxes, recording fees and other due diligence and closing costs of Lender and Borrower incurred in connection with the origination and closing of the Loan shall be paid by Borrower, but funded under the Loan as a construction cost.

**12.18** *A/B Note Structure*

At Lender's option, the Loan may be structured with an "A Note" for the fixed interest rate portion of the Loan and a "B Note" for the participating portion of the Loan. Borrower, at Borrower's cost and expense, shall cooperate with Lender in effectuating any such A/B note structure and shall execute all documentation reasonably requested by Lender in connection therewith.

**12.19** *Intentionally Deleted*

**12.20** *Right of First Offer*

12.20.1 If, during the Open Period, Borrower desires to sell the Property or to transfer by sale fifty percent (50%) or more of the legal or beneficial direct or indirect ownership interests in Borrower to a third party purchaser (other than by death or permitted transfer as permitted under this Agreement), then Borrower shall give Lender written notice that Borrower desires to sell the Property (or such direct or indirect ownership interests in Borrower). The Lender shall have 45 days to provide written notice (the "**Offer Notice**") that the Lender desires

to purchase the Property (or such direct or indirect ownership interests in Borrower) and the Offer Notice shall contain the price at which Lender desires to purchase the Property (or such direct or indirect ownership interests in Borrower). If Borrower accepts such offer to purchase the Property (or such direct or indirect ownership interests in Borrower), Borrower shall notify Lender of such acceptance within 45 days of the receipt of the Offer Notice. The closing of the purchase shall occur within 90 days of Borrower's acceptance of Lender's offer. If Borrower does not accept Lender's offer and irrespective of the provisions of Section 9.8, Borrower may market the Property (or such direct or indirect ownership interests in Borrower) for sale to third parties and may actually close the sale of the Property (or such direct or indirect ownership interests in Borrower) during the six (6) month period after the Offer Notice was sent by Lender for a gross price which is equal to or greater than ninety-seven percent (97%) of the price set forth in the Offer Notice and otherwise on terms and conditions that Borrower shall deem appropriate. If a sale satisfying the foregoing conditions does not actually close within the aforesaid six (6) month period, then all of the terms of this Section 12.20.1 be reinstated and shall again apply. Nothing contained in this Section 12.20.1 shall be deemed or construed to permit any prepayment of the Loan during any period prior to the Open Period and then only in accordance with the terms and conditions of Section 6.5 of this Agreement. In the event that the Borrower intends to sell the Property as part of a larger portfolio and/or as part of a sale involving compensation other than cash (for instance, a sale to a real estate investment trust in exchange for units in the same or a sale of the Property in exchange for another property), Lender shall agree to waive the rights conferred to it under this Section 12.20, provided that the Loan is repaid in full (together with all Fixed Interest and Additional Interest accrued thereon) and Lender's Appreciation Interest is paid at closing of such sale and is computed based on the Stipulated Value or another method mutually agreed to by the parties. Upon the closing of Lender's purchase of the Property (or such direct or indirect ownership interests in Borrower) for the Offer Amount as contemplated hereunder, the Loan shall be deemed satisfied. If Borrower shall default in its obligation to sell to Lender, Lender shall be entitled to seek specific performance.

### 12.21 *Intentionally Deleted*

### 12.22 *Insurance*

12.22.1 Required Insurance

Borrower, at its sole expense, shall obtain for, deliver to, assign to and maintain for the benefit of Lender, for so long as any portion of the Construction Loan shall remain outstanding, insurance policies (including renewals as provided below) in such amounts as Lender may reasonably require insuring the Project. Such insurance shall include, but is not limited, to:

(a) All-Risk Property (Special Cause of Loss) Insurance in the broadest form of coverage available including, without limitation, coverage for loss or damage by fire and other perils not limited to windstorm, earthquake/earth movement, malicious mischief, flood, terrorism, collapse, building ordinance (including cost of demolition, increased costs of construction and the value of the undamaged portion of the building and soft costs coverage), and boiler and machinery coverage, including loss of income, as applicable. The policy shall be in an amount not less than the full insurable value on a replacement cost basis of the insured Real

Property and Improvements and personal property related thereto without deduction for depreciation. During any construction period, such policy shall be written in the so-called "Builder's Risk Completed Value Non-Reporting Form" with no coinsurance requirement for the completed building's full replacement cost and shall contain a provision granting the insured permission to occupy prior to completion with a deductible of not more than $25,000.00;

(b)   Commercial General Liability (CGL) and, if necessary, commercial umbrella insurance with total limits of not less than $50,000,000 each occurrence. If such CGL insurance contains a general aggregate limit, it shall apply separately to the project in the policy period and with acceptable deductibles. CGL insurance shall be written on ISO occurrence form CG 00 01 04 13 (or a substitute form providing equivalent coverage) and shall at least cover liability arising from premises, operations, independent contractors, products-completed operations, and personal injury and advertising injury. There shall be no endorsement or modification of the CGL insurance limiting the scope of coverage for liability arising from products and completed operations, pollution, demolition, explosion, cross suits, collapse or underground coverages. Products and completed operations covering at least the statute of repose term following substantial completion of the project. (Owner/ Lender) shall be included as an additional named insured under the CGL, or additional insured using ISO Additional Insured Endorsement CG 20 10 04 13, or a substitute providing equivalent coverage, and under the commercial umbrella, if any;

(c)   Worker's compensation insurance (including employer's liability insurance) for all employees engaged on or with respect to the Property in statutory amounts and Employer's Liability Insurance in minimum amounts of $500,000 per accident, and $500,000 each employee by disease and $500,000 policy limit by disease covering each and every worker at the project;

(d)   Automobile Liability including coverage on owned, hired, and non-owned automobiles and other vehicles, if used in connection with the performance of the work, with Bodily Injury and Property Damage limits of not less than $1,000,000.00 combined single limit;

(e)   Pollution and remediation legal liability coverage with a limit of liability of not less than $10,000,000 each incident and $10,000,000 aggregate; and

(f)   Such other insurance, and in such amounts, as may from time to time reasonably be required by Lender against the same or other hazards as is customarily carried by owners of similar properties in similar locations.

Borrower waives all rights against Lender and its agents, officers, directors and employees for recovery of damages to the extent these damages are covered by the commercial general liability or commercial umbrella liability insurance; Borrower shall cause the Architect (and the Engineer, if applicable) to obtain, maintain and evidence Architect's or Engineer's, as the case may be, professional liability insurance during the period commencing on the date of the Architect's Agreement and/or the Engineer's Agreement, respectively, and expiring no earlier than three (3) years after occupancy of the Project. Such insurance shall be on a per claim and aggregate basis, but not less than $10,000,000 per claim and in the aggregate; Borrower shall

require that all subcontractors to contractor maintain CGL insurance consistent in amounts customarily maintained by prudent contractors and subcontractors, and add contractor, developer and owner as additional insured to their CGL policies. All parties engaged in work on the project shall evidence and maintain statutory workers' compensation and, if required by law, disability insurance in force for all workers on the project.

12.22.2 Delivery of Policies, Payment of Premiums

All policies of insurance shall be issued by companies reasonably satisfactory to Lender and which have Best's ratings of not less than A-/IX. All policies of insurance shall contain an endorsement or agreement by the insurer that any loss shall be payable in accordance with the terms of such policy notwithstanding any act or negligence of Borrower which might otherwise result in forfeiture of said insurance, and the further agreement of the insurer waiving all rights of setoff, counterclaim or deductions against Borrower. All policies of insurance shall name Lender as "Mortgagee," property policies shall have attached thereto a lender's loss payable endorsement for the benefit of Lender in form satisfactory to Lender, shall name Lender as an additional insured, and shall provide that, if the proceeds thereof are in excess of five percent (5%) of the outstanding principal balance of the Loan, all of such proceeds shall be payable to Lender (to the extent of its interest) and that, if the proceeds are equal to or less than five percent (5%) of the outstanding principal balance of the Loan, such proceeds shall be paid to Borrower. Borrower shall furnish Lender with a certificate evidencing the coverage under all policies of required insurance or, at the request of Lender, originals of all such policies of insurance. If Borrower provides any of the required insurance through blanket policies carried by Borrower and covering more than one (1) location, then Borrower shall furnish Lender with a certificate of insurance for each such policy setting forth the name and address of the Property, the coverage as to the Property, the limits of liability as to the Property, the replacement value of the Property, the name of the carrier, the policy number and the expiration date. At least thirty (30) days prior to the expiration of each such policy, Borrower shall furnish Lender with evidence satisfactory to Lender of the payment of premium (unless such premium is being paid by Lender pursuant to Section 8.3 hereof) and the reissuance of a policy continuing insurance in force as required by this Agreement. Borrower shall cause all bills, statements or other documents relating to the foregoing insurance premiums to be sent or mailed directly to Lender. All such policies shall contain a provision that such policies will not be canceled or materially amended, which terms shall include any reduction in the scope or limits of coverage, without at least thirty (30) days' prior written notice to Lender, in care of UBS Realty Investors LLC, 242 Trumbull Street, Hartford, Connecticut 06103, Attention: Asset Manager, Jade Hotel Bryant Park. In the event Borrower fails to provide, maintain or keep in force, or, if requested by Lender, to deliver and furnish to Lender, the policies of insurance required by this Agreement, Lender may procure such insurance or single-interest insurance for such risks covering Lender's interest, and Borrower will pay all premiums thereon promptly upon demand by Lender, such amounts shall be deemed to be evidenced by the Note and until such payment is made by Borrower the amount of all such premiums together with interest thereon as provided in this Agreement shall be secured by the Mortgage.

12.22.3 Insurance Proceeds

Borrower covenants that after the happening of any casualty to the Property or any part thereof, Borrower shall give prompt written notice thereof to Lender.

(a)    In the event of any damage or destruction of the Improvements, (x) if the award is equal to or less than five percent (5%) of the outstanding principal balance of the Loan, Borrower shall make all decisions regarding settlement of such claim, and such award shall be disbursed to Borrower for repair and restoration, and (y) if the award is in excess of five percent (5%) of the outstanding principal balance of the Loan, Lender and Borrower shall agree upon any settlement and the determination of how such proceeds shall be used. If such proceeds are not used to restore the Property, such amounts shall be distributed (i) to any reasonable costs and expenses incurred by Lender in connection with such damage or destruction, including attorneys' fees, (ii) except as hereinafter provided, to any indebtedness secured hereby and in accordance with Section 6.4.1(b) hereof, (iii) to the restoration of the Improvements, or (iv) to Borrower. Any such election may be made by Lender without regard to the adequacy of its security. Notwithstanding anything to the contrary contained herein or in the other Loan Documents, no prepayment premium shall be due upon any prepayment of principal out of insurance proceeds from a casualty loss.

Notwithstanding anything to the contrary contained herein, provided there is then no Event of Default hereunder or under any of the other Loan Documents which was not the direct or indirect result of such damage or destruction, Lender shall make the insurance proceeds available to Borrower (after reimbursement to Lender of any reasonable costs and expenses of Lender in connection with such damage or destruction, including attorneys' fees) for repair and restoration, provided:

(i)    If the proceeds are in excess of five percent (5%) of the outstanding principal balance of the Loan, such proceeds are deposited with Lender.

(ii)    The insurance carrier does not properly deny liability to a named insured.

(iii)    The Improvements have been damaged or destroyed in an amount that does not exceed twenty-five percent (25%) of the fair market value thereof immediately prior to the occurrence of such damage or destruction as determined by Lender in its reasonable judgment.

(iv)    Lender shall be furnished with an estimate of the cost of restoration accompanied by an architect's certificate as to such costs and appropriate final plans and specifications for reconstruction of the Improvements, all of which shall be subject to approval of Lender, which shall not be unreasonably withheld. The Improvements so restored or rebuilt shall be of at least equal value and substantially the same character as prior to such damage or destruction. Borrower shall furnish Lender with evidence reasonably satisfactory to Lender that all Improvements once so restored and/or reconstructed and their use will fully comply with all zoning and building laws, ordinances and regulations, and with all other applicable federal, state, and municipal laws and requirements.

(v)    If the estimated cost of reconstruction shall exceed at any time the proceeds available, together with the undisbursed proceeds of the Loan and any sums deposited pursuant to Section 4.5 and not previously disbursed, Borrower shall deliver to Lender cash in the amount

of such excess cost, or furnish a satisfactory Letter of Credit, completion bond or other security reasonably satisfactory to Lender to support Borrower's obligation to meet such excess costs.

(vi) Disbursement of the proceeds during the course of reconstruction shall be under Lender's control and in accordance with loan disbursement procedures comparable to those contained in this Agreement. All work must be completed free and clear of liens (other than Permitted Encumbrances), subject to the terms of this Agreement and the other Loan Documents.

(vii) Periodic payments shall be made upon architect's certifications and shall be subject to retentions in accordance with customary disbursement procedures consistent with those set forth herein for disbursing Building Loan or Project Loan proceeds, as applicable, as determined by Lender in its sole but reasonable discretion. Final payment shall be upon an architect's certificate as to completion in substantial accordance with the approved plans and specifications and delivery of final mechanic's and materialmen's lien waivers.

(viii) Lender shall be reasonably satisfied that Substantial Completion can be achieved not later than twelve (12) months prior to the Maturity Date.

(ix) (A) Lender shall be reasonably satisfied that, during the period following such casualty loss and prior to the completion of such restoration, the Property shall be generating sufficient income, together with the proceeds of business interruption or rental loss insurance and additional sums deposited with Lender by Borrower, to pay all operating expenses for the Property and all monthly payments due during such period under the Loan Documents, until rental income from the Property is sufficient to do so, and (B) Lender shall be reasonably satisfied that, following the completion of such restoration and rebuilding, Borrower's projected income to be derived from the Property, together with any proceeds of business interruption or rental loss insurance and additional sums deposited with Lender by Borrower, shall be sufficient to pay all operating expenses of the Property and all monthly payments due under the Loan Documents. All projected net income and expenses referred to above shall be subject to Lender's review and approval, such approval not to be unreasonably withheld, conditioned or delayed.

(b) In the event the proceeds of insurance are to be deposited with Lender, Borrower hereby authorizes and directs any affected insurance company to make payment of such proceeds directly to Lender. Borrower is hereby authorized to settle, adjust or compromise any claims for loss, damage or destruction under any policy or policies of insurance up to $500,000, and such settlement, adjustment or compromise as to claims in excess of such amount shall be made solely with the prior, written consent of Lender, which shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the provisions of the preceding sentence, however, if in Lender's reasonable opinion Borrower is not proceeding diligently to settle any such claim and, within ten (10) days after receipt of notice from Lender of such dissatisfaction does not, in the reasonable opinion of Lender, proceed diligently to prosecute such claim, then Lender shall have the right, after further written notice to Borrower via email, to take over prosecution of such claim and settle or compromise such claim in its absolute discretion.

(c) Nothing herein contained shall be deemed to excuse Borrower from repairing or maintaining the Property as provided in this Agreement and the Mortgage or restoring all

damage or destruction to the Property, regardless of whether or not there are insurance proceeds available or whether any such proceeds are sufficient in amount, and the application or release by Lender of any insurance proceeds shall not cure or waive any default or notice of default under this Mortgage or invalidate any act done pursuant to such notice. Without limitation of the foregoing, it shall be a condition precedent to Borrower's obligation to restore the Improvements hereunder that Lender shall make the net insurance proceeds received following a casualty available to Borrower for use in restoration of the Improvements (provided, however, that the insufficiency of any such proceeds shall not obviate such restoration obligation).

12.22.4 Assignment of Policies upon Foreclosure

Borrower covenants that in the event of foreclosure of the Mortgage or other transfer of title or assignment of the Property in extinguishment, in whole or in part, of the debt secured thereby, all right, title and interest of Borrower in and to all policies of insurance required by this Agreement (or, with respect to any blanket policies carried by Borrower in accordance with this Section 12.22, the coverage as to the Property) shall inure to the benefit of and pass to the successor in interest of Borrower, or the purchaser or grantee of the Property.

**12.23 *Condemnation***

Borrower covenants that after the happening of any condemnation or taking of the Property or any part thereof, Borrower shall give prompt written notice thereof to Lender.

(a)   In the event of any condemnation or taking of the Improvements, Lender shall have the option in its sole discretion of applying all or part of the condemnation award (i) to any costs and expenses incurred by Lender in connection with such condemnation or taking, including attorneys' fees, (ii) except as hereinafter provided, to any indebtedness secured hereby and in accordance with Section 6.4.1(b) hereof, (iii) to the restoration of the Improvements, or (iv) to Borrower. Any such election may be made by Lender without regard to the adequacy of its security. Notwithstanding anything to the contrary contained herein or in the other Loan Documents, no prepayment premium shall be due upon any prepayment of principal out of a condemnation award.

Notwithstanding anything to the contrary contained herein, provided there is then no Event of Default hereunder or under any of the other Loan Documents which was not the direct or indirect result of such condemnation or taking, Lender shall make the condemnation award available to Borrower (after reimbursement to Lender of any reasonable costs and expenses of Lender in connection with such condemnation or taking, including attorneys' fees) for repair and restoration, provided:

(i)    If the award is in excess of five percent (5%) of the outstanding principal balance of the Loan, such award is deposited with Lender.

(ii)   The Improvements have been condemned or taken in an amount that does not exceed twenty-five percent (25%) of the fair market value thereof immediately prior to the occurrence of such condemnation or taking as determined by Lender in its reasonable judgment.

(iii)   Lender shall be furnished with an estimate of the cost of restoration to the same level of productivity as existed prior to the taking, accompanied by an architect's certificate as to such costs and appropriate final plans and specifications for reconstruction of the Improvements, all of which shall be subject to approval of Lender, which shall not be unreasonably withheld. The Improvements so restored or rebuilt shall be of at least equal value and substantially the same character as prior to such condemnation or taking.  Borrower shall furnish Lender with evidence reasonably satisfactory to Lender that all Improvements once so restored and/or reconstructed and their use will fully comply with all zoning and building laws, ordinances and regulations, and with all other applicable federal, state, and municipal laws and requirements.

(iv)   If the estimated cost of reconstruction shall exceed at any time the proceeds available, together with the undisbursed proceeds of the Loan and any sums deposited pursuant to Section 4.5 and not previously disbursed, Borrower shall deliver to Lender cash in the amount of such excess cost, or furnish a satisfactory Letter of Credit, completion bond or other security reasonably satisfactory to Lender to support Borrower's obligation to meet such excess costs.

(v)   Disbursement of the award during the course of reconstruction shall be under Lender's control and in accordance with loan disbursement procedures comparable to those contained in this Agreement.  All work must be completed free and clear of liens (other than Permitted Encumbrances), subject to the terms of this Agreement and the other Loan Documents.

(vi)   Periodic payments shall be made upon architect's certifications and shall be subject to retentions in accordance with customary disbursement procedures, as determined by Lender in its sole but reasonable discretion.   Final payment shall be upon an architect's certificate as to completion in substantial accordance with the approved plans and specifications and delivery of final mechanic's and materialmen's lien waivers.

(vii)   Lender shall be reasonably satisfied that Substantial Completion can be achieved not later than twelve (12) months prior to the Maturity Date.

(viii) (A) Lender shall be reasonably satisfied that, during the period following such condemnation or taking and prior to the completion of such restoration, the Property shall be generating sufficient income, together with the proceeds of business interruption or rental loss insurance and additional sums deposited with Lender by Borrower, to pay all operating expenses for the Property and all monthly payments due during such period under the Loan Documents, until rental income from the Property is sufficient to do so, and (B) Lender shall be reasonably satisfied that, following the completion of such restoration and rebuilding, Borrower's projected income to be derived from the Property, together with the proceeds of business interruption or rental loss insurance and additional sums deposited with Lender by Borrower, shall be sufficient to pay all operating expenses of the Property and all monthly payments due under the Loan Documents.   All projected net income and expenses referred to above shall be subject to Lender's review and approval, such approval not to be unreasonably withheld, conditioned or delayed.

(b)   In the event the condemnation award is to be deposited with Lender, Borrower hereby authorizes and directs any condemning authority to make payment of such proceeds directly to Lender.  Borrower may adjust or compromise any claims for any condemnation award

up to $500,000, and such adjustment or compromise as to claims in excess of such amount shall be made only with the prior written consent of Lender, which consent shall not be unreasonably withheld, delayed or conditioned.  Notwithstanding the provisions of the preceding sentence, however, if in Lender's reasonable opinion Borrower is not proceeding diligently to settle any such claim and, within ten (10) days after receipt of notice from Lender of such dissatisfaction does not, in the reasonable opinion of Lender, proceed diligently to prosecute such claim, then Lender shall have the right, after further written notice to Borrower via email, to take over prosecution of such claim and settle or compromise such claim in its absolute discretion.

### 12.24 *Sales/Participations*

Lender shall have the right to sell the Loan or participation interests therein, and in connection with any actual or proposed sale of the Loan or any participation therein to deliver to such actual or prospective purchaser or participant any and all information which Lender may have with respect to the Loan Documents, the Borrower, the Project and/or the business of Borrower with respect thereto, including, without limitation, the Loan Documents, all information obtained by Lender in performing its due diligence in making the Loan or otherwise and all reports, statements, notices and other material delivered to Lender pursuant to the requirements of this Agreement or otherwise.  Whenever under any provision of this Agreement Borrower is required to deliver any report, statement, notice or other material to Lender following demand, including, without limitation, quarterly reports on operations, copies of Leases, Contracts and other agreements and estoppel certificates, Borrower shall, if Lender so requests, deliver the same, certified as herein provided, to such actual or prospective purchaser or participant as Lender shall designate.  If requested by Lender, Borrower will execute such documentation as Lender reasonably requests (including, without limitation, separate notes for each lender) so long as such documentation does not increase the financial obligations of Borrower under the Loan Documents or increase in any material respect the non-financial obligations of Borrower under the Loan Documents or decrease in any material respect the rights of Borrower.

### 12.25 *Assignment Upon Repayment*

Upon repayment or prepayment of the Loan in full by Borrower in accordance with the terms of this Agreement and the other Loan Documents, Lender shall, on a one-time basis, assign the Note and the Mortgage, each without recourse, covenant or warranty of any nature, express or implied, to such new mortgagee designated by Borrower (other than Borrower or a nominee of Borrower); *provided* that Borrower (i) has caused to be paid the reasonable out-of-pocket expenses of Lender incurred in connection therewith and Lenders' reasonable attorneys' fees for the preparation and delivery of such an assignment, and (ii) has caused the delivery of an executed Statement of Oath under Section 275 of the New York Property Law.  Borrower shall be responsible for all mortgage recording taxes (if any), recording fees and other charges payable in connection with any such assignment.

[Signatures are on the following page.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

*BORROWER:*   **36 WEST 38TH STREET, LLC**, a Delaware limited liability company

By: 36 West 38th Street Holding, LLC, a Delaware limited liability company, its sole member

By: 36 West 38th Street Manager, LLC, a Delaware limited liability company, its Manager

By: _____
William T. Obeid, President

*LENDER:*   **36 WEST 38TH STREET HOTEL CAPITAL LLC,** a Delaware limited liability company

By: UBS Realty Investors LLC, a Massachusetts limited liability company, its Manager

By:_____
Name:
Title:

(Signature Page to Master Loan Agreement)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

*BORROWER:*    **36 WEST 38TH STREET, LLC,** a Delaware limited liability company

By: 36 West 38th Street Holding, LLC, a Delaware limited liability company, its sole member

    By: 36 West 38th Street Manager, LLC, a Delaware limited liability company, its Manager

        By: _____
            William T. Obeid, President

*LENDER:*    **36 WEST 38TH STREET HOTEL CAPITAL LLC,** a Delaware limited liability company

By: TPI REIT Operating Partnership LP, its sole member

    By: TPI REIT Operating Partnership GP LLC, its general partner

        By: _____
            John R. Connelly, Jr.
            Executive Director

        By: _____
            Luanne Matarangas
            Director

*Approved for Execution Initialed By: LM*

(Signature Page to Master Loan Agreement)