# EXHIBIT

# 22

## LOAN AGREEMENT

Dated as of: March *18*, 2014 (the "date hereof")

| | |
|---|---|
| Lender: | Edgewood MAC V LLC, a Delaware limited liability company |
| Lender's Address: | 132 Old Post Road, Southport, CT 06890 |
| Borrower: | 1775 James Avenue LLC, a Delaware limited liability company |
| Borrower's Address: | c/o Gemini Real Estate Advisors, LLC 200 Park Avenue South, Suite 1305 New York, New York 10003 |
| Guarantor: | William T. Obeid |
| Loan Amount: | $10,000,000.00 |

Borrower and Lender hereby agree as follows:

1.      Structure and Use of Loan:

        (a)      Manner of Utilization.  Upon and subject to the terms and conditions of this Loan Agreement (this "Agreement"), Lender shall make, and Borrower shall accept, a term loan (the "Loan") in a principal amount equal to the Loan Amount.  The Loan is not a revolving credit loan, and Borrower is not entitled to any readvances of any portion of the Loan which it may (or is otherwise required to) prepay pursuant to the provisions of this Agreement and the Note (as defined below).

        (b)      Use of Loan.  Except as otherwise provided in this Agreement, the entire Loan shall be disbursed at or after closing to finance a portion of the acquisition of the Property referred to hereinbelow and to fund the Interest Reserve (as defined below).

2.      Payment Terms.  The Loan shall be evidenced by and paid in accordance with a Promissory Note, dated the date hereof, in the principal amount of the Loan Amount (the "Note") and this Section 2.

        (a)      Interest under the Note shall commence to accrue as of the date of disbursement or wire transfer by Lender, notwithstanding whether the Borrower shall receive the benefit of such monies as of such date and even if such monies are restricted and/or held in escrow pursuant to the terms of this Agreement and/or any escrow arrangement or agreement, including without limitation, the Interest Reserve.  When monies are disbursed by wire transfer, then such monies shall be considered advanced at the time of the transmission of the wire, rather than the time of receipt thereof by the receiving bank.

(b)     Lender is hereby irrevocably authorized (but not required), if and to the extent any payment is not made when due hereunder or under the Note, to charge from time to time against any account or funds maintained by Borrower with Lender any amounts so due.

(c)     Borrower may be required to pay late charges in accordance with, and pursuant to, the terms of the Note.

(d)     Whenever any payment to be made under this Agreement or the Note shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be.

(e)     On or before the date hereof, Borrower shall pay to Lender an origination fee in an amount equal to two percent (2%) of the Loan Amount.

3.     Cash Management Agreement.

(a)     Lender may, at its sole discretion upon notice to Borrower, require Borrower to establish, with a bank designated by Borrower and reasonably acceptable to Lender (the "Cash Management Bank"), a non-interest bearing account whereby Borrower shall deposit all Gross Revenues (as defined below) received by Borrower or the manager of the Property ("Property Manager") or any of their respective affiliates (the "Cash Management Account"). The Cash Management Account shall (i) be entitled "Edgewood MAC V LLC, a Delaware limited liability company, as mortgagee of 1775 James Avenue LLC", (ii) be maintained by Cash Management Bank in accordance with the terms and conditions of a Cash Management Agreement acceptable to Lender, (iii) be assigned the federal tax identification number of Borrower, and (iv) hold all Gross Revenues remitted to the Cash Management Bank pursuant to the Cash Management Agreement. Borrower agrees to pay the fees of Cash Management Bank in accordance with the customary fees charged by such bank for the services described in this Section 3, as such fees are established from time to time.  As used in this Agreement, the term "Gross Revenues" shall mean all receipts, revenues, income and other moneys derived from the ownership and/or operation of the Property, including without limitation, rents, deposits, insurance proceeds, condemnation proceeds and other revenues of any kind whatsoever.

(b)     The Cash Management Account will be subject to the sole dominion, control and discretion of Lender; Lender shall have the sole right to make withdrawals from the Cash Management Account; and neither Borrower nor any other party claiming on behalf of or through Borrower or otherwise shall have any right or authority, whether express or implied, to make use of, or withdraw any funds, investments or other properties from, the Cash Management Account, or to give any instructions with respect to the Cash Management Account.

(c)     Borrower shall pledge, transfer and assign to Lender, and grant to Lender, as additional security for the payment and performance obligations of Borrower under the Loan Documents, a continuing perfected security interest in and to, and a general first lien upon (i) the Cash Management Account and all of Borrower's right, title and interest in and to all cash, property or rights transferred to or deposited in the Cash Management Account from time to time by Borrower or on behalf of Borrower; (ii) all earnings, investments and securities held in the

2

Cash Management Account; and (iii) any and all proceeds of the foregoing. The pledge, assignment and grant of security interest made pursuant to this Section shall secure payment of all amounts payable by Borrower to Lender under the Note and the other obligations of Borrower under the Loan Documents. Borrower further agrees to execute, acknowledge, deliver, file or do at its sole cost and expense, all other acts, assignments, notices, agreements or other instruments as Lender may reasonably require in order to effectuate, assure, convey, secure, assign, transfer and convey unto Lender any and all of the rights granted by this Section 3.

4.    Security. All obligations at any time owed by Borrower to Lender under this Agreement and the Note shall be secured at all times by, among other things, a perfected, first-priority mortgage on, collateral assignment of and security interest in the land described in Exhibit A hereto (the "Land") and the buildings and other improvements thereon (the "Improvements" and, collectively with the Land, the "Property"), all rents and leases relating thereto, all equipment and fixtures at any time located thereon or used in connection therewith, and such other related collateral as Lender may require (all of the foregoing being, collectively, the "Real Estate Collateral" or the "Collateral").

5.    Conditions Precedent. As a condition precedent to Lender's obligation to disburse the Loan, Borrower shall, at its expense, deliver the following items to Lender, each of which must be satisfactory to Lender in both form and content (the documents referred to in paragraphs (a) through (c) below, together with this Agreement and whatever other documents are delivered or intended to be delivered in connection the Loan, are sometimes referred to hereinafter as the "Loan Documents"):

    (a)    The Note duly executed by Borrower.

    (b)    A Limited Guaranty duly executed by Guarantor.

    (c)    A Mortgage, Security Agreement and Assignment of Rents and Leases (the "Mortgage"), an Assignment of Rents and Leases, an Environmental Compliance and Indemnification Agreement, and related documents, each duly executed by Borrower and covering the Real Estate Collateral (collectively, the "Mortgage Security Documents").

    (d)    Evidence of the completion of all recordings and filings as may be necessary, or, in the opinion of Lender, desirable, to perfect the security interests and liens created by the Mortgage Security Documents.

    (e)    Evidence of the issuance of all insurance policies and mortgagee endorsements required by the terms of the Mortgage Security Documents.

    (f)    (i) a current, fully-paid for, ALTA-form title insurance commitment (the "Title Commitment"), which is issued by a nationally recognized title insurance company satisfactory to Lender (the "Title Company"), contains "gap coverage" and binds the Title Company to issue an ALTA-form, extended coverage mortgage title insurance policy (the "Title Policy") which is in the Loan Amount, which insures that the aforesaid Mortgage is a valid first lien on the Property subject only to exceptions, if any, which Lender approves in writing and which contains a Florida Form 9 endorsement, an environmental endorsement, a survey endorsement, a variable rate endorsement, a contiguity endorsement and whatever other endorsements are required by

Lender; and (ii) hard copies of whatever items are referred to in Schedule B-2 or B-II of the commitment referred to above.

(g)     A current ALTA survey of the Property certified to the Title Company and Lender.

(h)     Evidence that the Property is zoned so as to permit its current uses and otherwise complies with all zoning, parking, building code, handicapped access, environmental and other law and regulations.

(i)     A Phase I environmental report addressed and certified to Lender, prepared by an environmental engineering firm approved by Lender and showing that the Property is completely free of hazardous or toxic materials and, if the Phase I report recommends, or, in Lender's reasonable judgment, justifies it, a Phase II report by the same environmental engineering firm showing the Property to be in that condition.

(j)     Copies of all licenses and contracts relevant to the Property's use or operation.

(k)     Whatever certificates, resolutions, consents and other evidence Lender may reasonably require regarding the organization and existence of Borrower and regarding its authority and power to enter into and perform the Loan Documents to which it is a party.

(l)     Current financial statements and income verifications for Borrower and Guarantor.

(m)     UCC, tax lien, bankruptcy and judgment searches in all appropriate offices disclosing that no financing statements, bankruptcy filings, tax liens or judgment liens are outstanding against Borrower or Guarantor; and a litigation search in Miami-Dade County disclosing that neither Borrower nor any Guarantor is the defendant in litigation an unfavorable outcome in which could have a material, adverse effect on Borrower's or Guarantor's financial condition.

(n)     A favorable opinion of counsel for Borrower and Guarantor, covering such matters as Lender may request.

(o)     Such other approvals, certificates, opinions and documents as are required by any commitment letter or closing checklist regarding the Loan or as Lender may reasonably request.

No failure by Lender to insist on fulfillment before it disburses the Loan of any condition precedent specified in this Section shall operate as a waiver of such condition, and any failure to fulfill such condition precedent promptly upon demand shall constitute a breach of a covenant or agreement hereunder.

6.     Representations and Warranties.

Borrower represents and warrants (and, as long as this Agreement is in effect or any indebtedness of Borrower to Lender remains outstanding, shall be deemed continuously to represent and warrant) to Lender as follows:

4

(a)     Borrower is duly organized, validly existing and in good standing under the laws of the state of its formation or existence, and is in compliance with all legal requirements applicable to doing business in the state in which the Property is located.

(b)     The execution, delivery and performance by Borrower of the Loan Documents to which it is a party are within Borrower's powers, have been duly authorized by all necessary company and other action, do not contravene (i) Borrower's governing agreements, or (ii) law or any contractual restriction binding on or affecting Borrower.

(c)     The Borrower has full power and authority to enter into the Loan Documents and consummate the transactions contemplated hereby, and the facts and matters expressed or implied in the opinions of its legal counsel are true and correct.

(d)     No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by Borrower of any Loan Document to which it is or will be a party.

(e)     This Agreement is, and each other Loan Document to which Borrower will be a party will be, legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms.

(f)     The financial statements furnished Lender by Borrower and Guarantor in connection with this Agreement fairly represent the financial condition of Borrower or Guarantor (as the case may be) as of the date thereof and the results of the operations of Borrower or Guarantor (as the case may be) for the period ended on such date; and since that date there has been no material, adverse change in such condition or operations. Other than as indicated by those financial statements, Borrower and Guarantor have no direct or contingent obligations or liabilities which would be material to their financial positions or conditions.

(g)     There are no actions, suits, proceedings, or investigations of any kind pending or threatened against Borrower or any Guarantor before any court, tribunal or administrative agency or board which, if adversely determined, might either in each individual case or in the aggregate, adversely affect the properties, assets, financial condition or business of Borrower or any Guarantor or impair the right of any of them to carry on its or his business substantially as now conducted, or adversely affect the value or commercial viability of the Property.

(h)     Borrower has not previously operated under another name or a trade name.

(i)     Upon execution and recording of the Mortgage and Assignment of Rents and Leases, Lender shall have a perfected, first-priority lien on all the Collateral.

(j)     Borrower has duly filed, paid and/or discharged all taxes or other claims that may become a lien on any of its property or assets, except to the extent that such items are being appropriately contested in good faith and an adequate reserve for the payment thereof is being maintained.

(k)     The Property and its current (and intended) use complies with all zoning, parking, building code, handicap access, environmental and other governmental regulations and to all

5

covenants, conditions and restrictions contained in any deed or deeds covering or affecting all or any portion of the Property. The Property has concurrency, parking and paved road access and utility services available to it that are adequate for the Property and comply with all applicable laws and ordinances.

(l)     Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(m)     Borrower is not, and after consummation of this Agreement and after giving effect to all indebtedness incurred and liens created by Borrower in connection with the Note and any other Loan Documents, will not be, insolvent within the meaning of 11 U.S.C. § 101, as in effect from time to time. No bankruptcy or insolvency proceedings are pending or contemplated by or against Borrower.

(n)     There is no fact which Borrower has not disclosed to Lender in writing which materially and adversely affects nor, as far as Borrower can now foresee, is reasonably likely to prove to materially and adversely affect, the business or financial condition of Borrower, or that of Guarantor, the value of the Collateral as security for the Loan or the ability of Borrower or any Guarantor to perform any Loan Document to which it or he intended to be a party.

(o)     There are no contracts or agreements for design, architect or engineering services relating to the development (or redevelopment) of all or any portion of the Property, other than that certain Agreement between Borrower and Kobi Karp Architecture & Interior Design, Inc., dated December 11, 2013 (the "Architect Agreement"). Borrower has delivered to Lender true, correct and complete copy of the Architect Agreement.

(p)     To the best of Borrower's knowledge, the Property violates no law, regulation or ordinance relating to persons with disabilities and Borrower has received no notification or allegation that it does.

7.     Additional Covenants. At all times while this Agreement is in effect or any indebtedness of Borrower to Lender remains unpaid, Borrower shall, unless Lender otherwise consents in writing:

(a)     Pay, perform and discharge all of its obligations, covenants and agreements set forth in this Agreement, the Note, the Mortgage and all other Loan Documents.

(b)     Comply in all material respects with all applicable laws, rules, regulations, codes and orders, and pay, before they become delinquent, all taxes, assessments and governmental charges imposed upon it or upon the Property.

(c)     Give Lender written notice of (a) a judgment entered against Borrower or Guarantor, (b) the commencement of any action, suit, claim, counterclaim or proceeding against or investigation of Borrower or Guarantor claiming damages of greater than $50,000.00, which, if adversely determined, would materially adversely affect the business of Borrower, or which

6

questions the validity of this Agreement, the Note, the Mortgage or any of the other Loan Documents, or any other actions or agreements taken or to be made pursuant to any of the foregoing, (c) any material proceedings at law or in equity against the Property, including but not limited to any proceedings to assert or to enforce mechanic's, materialmen's or other involuntary liens, and (d) any action or proceeding by or against the Borrower or Guarantor, or any notice of default, termination, or other notice, relating to, arising from or in connection with any of the leases.

(d)　　Comply with all of the provisions of any agreements, covenants and restrictions affecting the Property, including, but not limited to all agreements, covenants and restrictions between Borrower and any governmental authority.

(e)　　Not directly or indirectly engage in any business other than owning and operating the Property.

(f)　　Maintain and preserve all of its properties necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted.

(g)　　Keep proper books of record and account in which full and correct entries will be made of all financial transactions and the assets and business of Borrower.

(h)　　Maintain insurance with responsible and reputable insurance companies in such amounts and covering such risks as are usually carried by companies engaged in similar businesses and owning similar properties in the same general area in which the Property is located, provided that such insurance shall in addition comply with the insurance requirements contained in the Mortgage Security Documents.

(i)　　Do or cause to be done all things necessary to preserve and maintain in full force and effect all qualifications or licenses required for the conduct of its business under the laws of Florida.

(j)　　At any reasonable time and from time to time, with reasonable advance notice, permit Lender, and any agents or representatives of Lender to inspect and make audits of any of the Collateral, to examine and make copies of and abstracts from the records and books of account of and visit the properties of, Borrower, and to discuss the affairs, finances and accounts of Borrower with any of its officers or accountants.

(k)　　Not dissolve, liquidate, merge into or consolidate with any entity, or sell, merge, pool, transfer or otherwise dispose of any of its properties (except to Lender) except obsolete equipment which is replaced with comparable equipment of equal or greater value (if needed in Borrower's operations) or otherwise removed in connection with redevelopment of the Property upon Lender's consent to such redevelopment, or own any real estate other than the Property.

(l)　　Not enter into any management or operating agreement with respect to Borrower's business or any part of the Property unless it is first approved by Lender in writing, which approval shall not to be unreasonably withheld, conditioned or delayed. Lender acknowledges that, provided no Event of Default shall occur and be continuing, Gemini Property Management LLC is approved by Lender.

(m)     Cause Guarantor as well as each of Borrower's stockholders, members or partners, to whom Borrower is or may become indebted, to subordinate to the Loan any and all existing and future obligations and indebtedness of Borrower to any of such persons or entities.

(n)     Maintain its existence as a limited liability company, corporation or partnership (as applicable) in good standing under the laws of the state or country of its creation and qualification to transact business in the State of Florida.

(o)     Not create, incur or permit to exist any Lien upon any of the property or assets of Borrower, whether now owned or hereafter acquired, except for Permitted Liens and not permit to remain of record any financing statement covering any property of Borrower and listing anyone other than Lender as secured party (as used herein, "Lien" means any lien, security interest, or other charge or encumbrance, or any other type of preferential arrangement, upon or with respect to any property or assets of Borrower, and "Permitted Lien" means at any time (i) any lien or security interest in favor of Lender or lien for real estate taxes or governmental special assessments, which are not then due, (ii) leases executed in accordance with this Agreement and the Loan Documents, and/or (iv) any other matters approved by Lender in writing, including those matters set forth in the Title Policy issued pursuant to the endorsed or "marked up" commitment therefor).

(p)     Not make or permit any investments in or credit extensions to any of the partners of Borrower or any Affiliate.

(q)     Not declare or pay any distribution with respect to any direct or indirect beneficial ownership interest in Borrower (whether by redemption or return of capital, distribution of profits, dividend or otherwise); provided that Borrower may, on a yearly basis, make distributions to the members in an amount not to exceed the income tax liability accrued during such period so long as (i) no Event of Default then exists, (ii) no event has occurred which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, and (iii) such distributions would not unreasonably impact Borrower's ability to pay debt service on the Loan and customary operating expenses for the Property, including without limitation, taxes and insurance. ,.

(r)     Not incur or permit any Indebtedness other than (i) Indebtedness owed to Lender, (ii) current liability for taxes and assessment incurred in the ordinary course of business, (iii) Indebtedness in respect of current accounts payable or accrued (other than for borrowed funds or purchase money obligations) and incurred in the ordinary course of business (provided that such accounts shall be promptly paid and discharged when due or in conformity with customary trade practices) and (iv) Indebtedness resulting from the endorsement of negotiable instruments for collection in the normal course of business (as used herein, "Indebtedness" means all indebtedness and obligations for borrowed money or for the deferred purchase price of property or services purchased, all obligations in respect of any letter of credit or acceptance issued or made for Borrower's account and all obligations in respect of any capital lease or guarantee).

(s)     Not, without the prior written consent of Lender (which consent shall not to be unreasonably withheld, conditioned or delayed) enter into any new lease of a space unless it is a Qualified Lease or materially modify any lease of a space unless the lease as modified is a

8

Qualified Lease.  The lease of a space shall be considered to be a "Qualified Lease" if, but only if, it is on arm's length, market terms, subordinate to Lender's lien, the tenant is not an Affiliate of Borrower, the lease is on a form approved by Lender and the lease contains no purchase option.

8.      Reporting Covenants.  At all times while this Agreement is in effect or any indebtedness of Borrower to Lender remains unpaid, Borrower shall furnish (or caused to be furnished) to Lender the following, all in form and substance and with a degree of detail, reasonably satisfactory to Lender:

        (a)     as soon as available and in any event within thirty (30) days after filing, a complete copy of (i) Borrower's annual federal and state (if applicable) income tax returns, together with all supporting schedules thereto, each of which shall be signed by the accountant who prepared the return(s), and (ii) if an extension to file any tax return is filed, a copy of the such extension as soon as available and in any event within thirty (30) days after filing;

        (b)     as soon as available and in any event within thirty (30) days after the end of each calendar month, a current (as of the calendar month just ended) balance sheet, a detailed operating statement (showing monthly activity and year-to-date) stating operating revenues, operating expenses, and net cash flow for the calendar month just ended, an average daily rate, a rent roll and occupancy reports for the Property, and, as requested by Lender, a general ledger, copies of bank statements and bank reconciliations and other documentation supporting the information disclosed in the most recent financial statements; and the STR report, if any, promptly after received by Borrower;

        (c)     as soon as possible and in any event within five (5) Business Days after occurrence thereof, notice of any event which has or may have a material adverse effect upon the financial condition of Borrower or Guarantor or the viability or value of the Collateral as collateral for the Loan;

        (d)     as soon as possible and in any event within five (5) Business Days after the commencement thereof or any adverse determination therein, notice of all actions, suits and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality materially affecting Borrower, Guarantor or the Collateral;

        (e)     as soon as possible and in any event within five (5) Business Days of the occurrence of each Event of Default or event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default, a statement of the chief financial officer of Borrower setting forth the details of such Event of Default or event and the action which Borrower proposes to take with respect thereto;

        (f)     within the time specified therein, any information which Borrower agreed in the Mortgage Security Documents to furnish (or cause to furnish) to Lender; and

        (g)     within a reasonable time, such other information respecting the condition or operations, financial or otherwise, of Borrower, Guarantor or the Collateral as Lender may from time to time reasonably request.

9.      Interest Reserve.  At closing, the Lender shall fund the amount of $500,000.00 (the "Interest Reserve") from the proceeds of the Loan into an interest-bearing account in Lender's name which Lender shall be deemed to hold in trust (subject to disbursements made to Lender pursuant to the terms hereof) for the benefit of Borrower during the term of the Loan and any renewal or extension thereof.  All interest accrued on the Interest Reserve shall be added to the Interest Reserve and made available to Borrower pursuant to the terms of this Section.  Borrower hereby authorizes Lender, and Lender hereby agrees, to disburse and charge the Interest Reserve for interest due under this Note on each date that interest payments become due; provided however that the maximum monthly amount to be disbursed from the Interest Reserve shall not exceed the difference between the monthly interest due under this Note and the amount of the actual net operating income generated by the Property.  The projected monthly operating budget for the Property is attached as Exhibit B hereto.  Borrower acknowledges and agrees that the amount of the Interest Reserve represents only a portion of the interest due during the entire term of the Loan.  Interest shall accrue on Loan proceeds allocated to the Interest Reserve as of the date hereof.  Upon the occurrence of an Event of Default and notwithstanding anything to the contrary contained herein, Lender shall have the right, but not the obligation, and is hereby expressly authorized by Borrower, to disburse all or any part of the Interest Reserve for the payment of principal and/or interest and any other sums due and payable under the Loan.  The depletion in whole of the Interest Reserve shall in no manner relieve Borrower of the obligation to pay interest on the dates specified in the Note.

10.     Default.

        (a)      Each and any of the following events or conditions shall constitute an Event of Default (as used herein, the term "Loan Party" means and includes Borrower and Guarantor):

                 (i)      If (a) any payment of principal, interest or other amounts due under this Note (other than the final payment due described in (b) immediately below) is not paid within five (5) days from the date when such payment is due, (b) the entire outstanding principal balance hereof, together with all accrued but unpaid interest thereon and all other sums due under the Loan Documents is not paid on the Maturity Date (as defined in the Note) or upon earlier maturity by acceleration or otherwise, or (c) any other sum (other than any payment described in (a) and (b) immediately above) due hereunder or under any of the Loan Documents, is not paid within ten (10) days after written notice of same to Borrower and/or Guarantor, as applicable;

                 (ii)     Either Loan Party's failure to perform or observe any condition or agreement contained in any Loan Document to which it is a party, other than any condition or agreement requiring the payment of money pursuant to Subsection 10(a)(i) above or the occurrence of any event described in Subsections 10(a)(iii) – 10(a)(xv), inclusive, below and, if such failure is capable of being cured, the continuance of such failure for fifteen (15) days after notice from Lender, provided that if such cure cannot reasonably be accomplished with such fifteen (15) day period and Borrower commences such cure within such fifteen (15) day period and is diligently pursuing such cure, Borrower shall have additional time as may be necessary to complete such cure, but in no event greater than an additional sixty (60) days;

(iii)    Lender's discovery that any representation or warranty made to it by either Loan Party, or furnished to Lender at the request of either Loan Party, is materially false or misleading;

(iv)    A final, unappealable judgment, writ or garnishment or the like in excess of $150,000 is entered against either Loan Party or with respect to any deposit account of Borrower with Lender and not satisfied or bonded off within thirty (30) days;

(v)    Borrower's dissolution, or death of Guarantor, provided that in the event of the death of Guarantor, there shall be no Event of Default if (i) a replacement Guarantor whose creditworthiness and real estate experience and skills are comparable to those of the original Guarantor and who is otherwise acceptable to Lender in its sole discretion, and (ii) such substitute Guarantor executes a replacement Limited Guaranty and Environmental Compliance and Indemnification Agreement in substantially the same form as the Limited Guaranty Environmental Compliance and Indemnification Agreement delivered by Guarantor in connection with the Loan;

(vi)    The institution of a bankruptcy, insolvency, reorganization or similar proceeding by or against either Loan Party in any jurisdiction (and, in the case of one filed against a Loan Party, such proceeding is not dismissed within sixty (60) days after its filing), the appointment of a receiver for either Loan Party's business or a substantial part of its assets or an assignment for the benefit of any Loan Party's creditors;

(vii)    Either Loan Party's failure to pay when due any obligation or liability of such Loan Party to Lender (other than ones based on the Loan) or to perform any agreement made by it in any document (other than a Loan Document) and the continuance of such failure for thirty (30) days after notice from Lender;

(viii)    Either Loan Party's failure to pay when due any obligation or liability of such Loan Party to any other financial institution or other lender in excess of $50,000;

(ix)    Guarantor transfers (directly or indirectly) any equity interest in Borrower in violation of the terms of Section 12 of the Mortgage;

(x)    Guarantor is convicted of or pleads guilty or no contest to a felony;

(xi)    An Event of Default as defined in the Note, the Mortgage Security Documents, or in any agreement referred to in clause (a)(vii) above occurs;

(xii)    Any Loan Document fails or ceases to be valid or binding on a Loan Party that is or is intended to be a party to it or a Loan Party so contends or asserts; or Guarantor tries to revoke the Guaranty;

(xiii)    Any action to foreclose a lien (other than one in favor of Lender) on the Property is instituted (it being understood, however, that the foregoing shall not be read to imply that the existence of any such lien is permissible) and is not dismissed or bonded off within sixty (60) days;

11

(xiv)    There occurs a material adverse change in either Loan Party's financial condition; and

(xv)    The occurrence of an Event of Default as defined in any other credit or loan agreement between Borrower and Lender.

(b)    At any time after the occurrence of an Event of Default, Lender may, by notice to Borrower, (i) declare terminated any obligation to disburse any part of the Loan not theretofore disbursed, whereupon any such obligation shall immediately terminate, (ii) declare the Note and all interest accrued thereon and all other amounts owing under the Loan Documents to be immediately due and payable, whereupon the Note, all such interest and all such other amounts shall become and be immediately due and payable, without presentment, demand, protest, notice of intent to accelerate or further notice of any kind, all of which are expressly waived by Borrower; provided, however, that upon the occurrence of an Event of Default described in clause (a)(vi) above, such obligations of Lender shall automatically terminate and the Note, all such interest and all such other amounts shall automatically become and be due and payable in full without presentment, demand, protest or notice of any kind, and (iii) exercise its rights and remedies under this Agreement, the Note, the Mortgage Security Documents and any other agreement between Borrower and Lender, including, but not limited to, the Loan Documents, in accordance with the respective terms thereof.

(c)    No failure on the part of Lender to exercise, and no delay in exercising, any right under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. Lender's rights hereunder shall be cumulative with and not in lieu of whatever rights are provided to Lender by any commitment letter from Lender to Borrower regarding the Loan, by the other Loan Documents or by law.

11.    Exculpation; Indemnification. (a) Lender (and its directors, officers, employees, attorneys and agents) shall not incur any liability to Borrower (other than, in the case of Lender itself, for its (or their) own acts or omissions amounting to gross negligence or willful misconduct as finally determined pursuant to applicable law by a United States court of competent jurisdiction) for acts or omissions arising out of or related directly or indirectly to the Loan, any Loan Document or the Collateral; and Borrower hereby expressly waives any and all claims and actions (other than those attributable to Lender's (or any of its directors, officers, employees, attorneys or agents) own acts or omissions amounting to gross negligence or willful misconduct as finally determined pursuant to applicable law by a United States court of competent jurisdiction) against Lender (and its officers, employees, attorneys and agents) arising out of or related directly or indirectly to any and all of the foregoing acts, omissions and circumstances. In no event shall Lender be liable for (and Borrower hereby waives any claim for) any punitive, consequential or indirect damages relating to the Loan, any Loan Document or the Collateral.

(b)    Lender (and its directors, officers, employees, attorneys and agents) shall be indemnified, reimbursed, held harmless and, at the request of Lender, defended by Borrower from and against any and all claims, liabilities, losses and expenses that may be imposed upon, incurred by, or asserted against Lender (or its directors, officers, employees, attorneys and agents) arising out of or related directly or indirectly to the Loan, any Loan Document or the

Collateral (except such as are occasioned by the indemnified person's own gross negligence or willful misconduct as finally determined pursuant to applicable law by a United States court of competent jurisdiction).

12.     Cost, Expenses and Taxes. Borrower shall pay (or, if appropriate, reimburse Lender for) on demand all reasonable costs and expenses in connection with the preparation, execution, delivery, filing, recording and administration of the Loan Documents and the other documents to be delivered under the Loan Documents, including the reasonable fees and out-of-pocket expenses of counsel for Lender, with respect thereto, with respect to any modifications thereof and with respect to advising Lender as to its rights and responsibilities under the Loan Documents after an Event of Default, and all reasonable costs and expenses (including reasonable counsel fees and expenses, including those incurred at the appellate level) in connection with the enforcement of the Loan Documents. In addition, Borrower shall pay (or, if appropriate, reimburse Lender for) on demand any and all documentary stamp, intangibles and other taxes and fees payable or determined to be payable in connection with the execution, delivery, filing or recording of any of the Loan Documents or any indebtedness contemplated hereby, and shall indemnify Lender and hold it harmless from and against any and all liabilities (including penalties and interest) with respect to or resulting from any delay in paying or omission to pay such taxes and fees. Lender is hereby authorized to deduct any amount due under this Section from the proceeds of the Loan or from any bank account of Borrower maintained with Lender.

13.     Certain Collateral. As security for all of Borrower's obligations to Lender hereunder or under the Note, Borrower hereby grants Lender a continuing lien on and security interest in, and right of setoff against, all deposit accounts of Borrower with Lender (whether now existing or hereafter established) and all other property of Borrower that is now or hereafter owed by or in the possession or control of Lender.

14.     Notices. All notices, requests, approvals, consents and other communications provided for hereunder shall be in writing and, if to Borrower, mailed or hand-delivered at Borrower's Address, Attention William T. Obeid; and, if to Lender, mailed or hand-delivered at Lender's Address, Attention: _____; or, as to each party, at such other address as shall be designated by such party in a written notice to the other party. All such communications shall, when hand-delivered, be effective when received and, when mailed, be effective when deposited in the mails, addressed as aforesaid.

15.     Brokerage. Each party acknowledges and represents to the other that it has not engaged or dealt with any broker with respect to the Loan, other than Mission Capital, except as disclosed in writing to Lender. Except as otherwise agreed to in writing by Lender, Borrower shall pay all brokerage commissions due and payable based on Borrower's dealings with any broker in connection with the Loan and shall indemnify Lender from the claims of any such broker.

16.     Assignment. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns; provided, however, this Agreement may not be assigned by Borrower without Lender's prior consent and any such assignment or attempted assignment without such prior written consent shall be null and void. Lender may, without Borrower's or Guarantor's consent, assign in whole or in part, and may issue

13

participating interests in and to, this Agreement, any other Loan Document and the Loan and in connection therewith may make whatever disclosures regarding the Loan, either Loan Party or any collateral it wishes. Lender shall provide written notice to Borrower of any such assignment.

17.     Jurisdiction.  Borrower hereby irrevocably agrees that any action or proceeding relating hereto or any other document relating to this Agreement or other Loan Documents that is brought by Borrower shall be tried by the courts of the State of Florida sitting in or for Miami-Dade County, Florida or any other county in which the Property is located or the United States district courts sitting in or for such county. Borrower hereby irrevocably submits, in any such action or proceeding that is brought by Lender, to the non-exclusive jurisdiction of each such court and irrevocably waives the defense of an inconvenient forum with respect to any such action or proceeding. Borrower shall cause Guarantor to appoint (in a manner satisfactory to Lender) and maintain at all times an agent that is domiciled in Florida and is acceptable to Lender to receive service of process in any such action or proceeding on Guarantor's behalf.

18.     Further Assurances.  Borrower shall, upon request of Lender, execute and deliver such further documents and do such further acts as Lender may reasonably request in order to fully effectuate the purposes of this Agreement and other Loan Documents. Without limiting the generality of the foregoing, Borrower shall promptly do whatever Lender requests to cure any omission of or in, or error in, any of the Loan Documents.

19.     Usury Negation.  It is the intention of Borrower and Lender that interest not be charged or collected hereunder or under the Note at a rate or in an amount greater than the maximum allowed by applicable law, and nothing herein shall be construed or operate so as to require Borrower to pay, or to allow Lender to collect or charge, interest hereunder or under the Note at a rate greater than the maximum allowed by applicable law. Should any interest or other charges paid or to be paid hereunder or under the Note results in the computation of earning of interest in excess of the maximum rate or amount of interest which is permitted under applicable law, any and all such excess interest paid shall be (and the same hereby is) waived by Lender, and the amount of such excess interest paid shall be automatically credited against, and be deemed as in payment in reduction of, the principal then due hereunder, and any portion of such excess interest paid which exceeds the principal then due hereunder and under the Note shall be paid by Lender to Borrower.

20.     Certain Definitions.  As used herein, an "Affiliate" of a person means any person directly or indirectly controlling or controlled by or under common control with that person; and "Business Day" means any day other than a Saturday, a Sunday or a holiday on which most banks in Miami-Dade County, Florida are closed for general commercial business.   Terms defined at the head of this Agreement shall be used herein as thus defined.

21.     Miscellaneous.  The invalidity or unenforceability of any provision hereof shall not affect the validity or enforceability of any other provision hereof. If any provision hereof is capable of more than one interpretation, it shall be interpreted, if possible, so as to render it enforceable. In order to be effective, any addition hereto or any modification or waiver of any provision or provisions hereof must be expressly consented to by Lender in writing. "Hereof," "hereunder," "herein" and words of similar import refer to this Agreement as a whole and not just the paragraph in which  they appear. The indemnity obligations herein shall survive repayment of

14

the Loan and the cancellation hereof. No delay or omission by Lender in exercising any right or remedy hereunder shall operate as a waiver thereof or of any other right or remedy, nor shall any single or partial exercise thereof preclude any further exercise thereof or the exercise of any other right or remedy. Whenever used herein, the phrase "acceptable to Lender" or "satisfactory to Lender" means "acceptable and satisfactory to Lender in its sole and absolute discretion" and "in Lender's discretion" means "in Lender's sole and absolute discretion", unless otherwise expressly provided in the applicable provision; and, to be enforceable against Lender, any consent or approval by Lender must be in writing. Whenever used herein, the word "including" shall be read as "including without limitation." Borrower acknowledges that the terms hereof have been reviewed and negotiated by its counsel and agrees that no ambiguity in any provision hereof or in any other Loan Document shall be construed against Lender by reason of the fact it was drafted by Lender or its counsel. This Agreement is solely for the benefit of Lender and Borrower and may not be relied on by any third party.

22.  Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF FLORIDA, WITHOUT REGARD TO ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT WOULD GIVE EFFECT TO THE LAW OF ANOTHER JURISDICTION.

23.  Waiver of Jury Trial. LENDER AND BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION (INCLUDING ANY COUNTERCLAIM) BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE AGREEMENT OR ANY OTHER LOAN DOCUMENT, THE LOAN, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER TO ENTER INTO THIS AGREEMENT.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Signed as of the date set forth at the head of this Agreement.

**LENDER**:

EDGEWOOD MAC V LLC, a Delaware limited
liability company

By: _____

Name: ___ $J_{o}N$ ___ $LJ \vee 12NP$ ___

Title: ___ $VP$ ___

**BORROWER**:

1775 JAMES AVENUE LLC, a Delaware limited
liability company

By: _____

      William T. Obeid, President

16

Signed as of the date set forth at the head of this Agreement.

**LENDER**:

EDGEWOOD MAC V LLC, a Delaware limited liability company

By: _____

Name: _____

Title: _____

**BORROWER**:

1775 JAMES AVENUE LLC, a Delaware limited liability company

By: _____

William T. Obeid, President

Exhibit A

Legal Description

Lots 11 and 12, in Block 27 of FISHER'S FIRST SUBDIVISION OF ALTON BEACH, according to the Plat thereof as recorded in Plat Book 2, Page 77, of the Public Records of Miami-Dade County, Florida.

EXHIBIT B

**Hotel 18 - 1775 James Ave, Miami Beach, FL**
**Projected Monthly Operating Budget 2014 - Year 1 Post-Acquisition**

| | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Room Nights Available | 868 | 840 | 868 | 840 | 868 | 868 | 840 | 868 | 840 | 868 | 868 | 784 | 10,220 | |
| Room Nights Sold | 825 | 697 | 556 | 672 | 677 | 677 | 664 | 729 | 722 | 651 | 833 | 745 | 8,448 | |
| Occupancy Rate | 95.0% | 83.0% | 64.0% | 80.0% | 78.0% | 78.0% | 79.0% | 84.0% | 86.0% | 75.0% | 96.0% | 95.0% | 82.7% | |
| ADR | $181.00 | $147.00 | $163.00 | $159.00 | $137.00 | $128.00 | $118.00 | $135.00 | $135.00 | $185.00 | $156.00 | $154.00 | $150.09 | |
| RevPAR | $171.95 | $122.01 | $104.32 | $127.20 | $106.86 | $99.84 | $93.22 | $113.40 | $116.10 | $138.75 | $149.76 | $146.30 | $124.06 | |
| **Revenues** | | | | | | | | | | | | | | |
| Room Revenue | 149,253 | 102,488 | 90,550 | 106,848 | 92,754 | 86,661 | 78,305 | 98,431 | 97,524 | 120,435 | 129,982 | 114,699 | 1,267,940 | 84% |
| Rental Income [1] | 20,731 | 20,731 | 20,731 | 20,731 | 20,731 | 20,731 | 20,731 | 20,731 | 20,731 | 20,731 | 20,731 | 20,731 | 248,772 | 16% |
| **Total Revenues** | 169,984 | 123,219 | 111,281 | 127,579 | 113,486 | 107,392 | 99,036 | 119,162 | 118,255 | 141,166 | 150,723 | 135,430 | 1,516,713 | 100% |
| **Departmental Expenses** | | | | | | | | | | | | | | |
| Room Revenue Expense | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 488,331 | 32% |
| **Total Departmental Expenses** | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 40,694 | 488,331 | 32% |
| **Departmental Income** | 129,289 | 82,525 | 70,587 | 86,885 | 72,751 | 66,698 | 58,342 | 78,468 | 77,561 | 100,472 | 110,028 | 94,736 | 1,028,381 | 68% |
| **Undistributed Expenses** | | | | | | | | | | | | | | |
| Administrative & General Expense | 9,408 | 9,408 | 9,408 | 9,408 | 9,408 | 9,408 | 9,408 | 9,408 | 9,408 | 9,408 | 9,408 | 9,408 | 112,890 | 7% |
| Sales & Marketing Expense | 1,203 | 1,203 | 1,203 | 1,203 | 1,203 | 1,203 | 1,203 | 1,203 | 1,203 | 1,203 | 1,203 | 1,203 | 14,436 | 1% |
| Property Operations & Maintenance | 5,443 | 5,443 | 5,443 | 5,443 | 5,443 | 5,443 | 5,443 | 5,443 | 5,443 | 5,443 | 5,443 | 5,443 | 65,311 | 4% |
| Utilities | 4,132 | 4,132 | 4,132 | 4,132 | 4,132 | 4,132 | 4,132 | 4,132 | 4,132 | 4,132 | 4,132 | 4,132 | 49,579 | 3% |
| Management Fees | 3,792 | 3,792 | 3,792 | 3,792 | 3,792 | 3,792 | 3,792 | 3,792 | 3,792 | 3,792 | 3,792 | 3,792 | 45,501 | 3% |
| **Total Undistributed Expenses** | 23,976 | 23,976 | 23,976 | 23,976 | 23,976 | 23,976 | 23,976 | 23,976 | 23,976 | 23,976 | 23,976 | 23,976 | 287,717 | 19% |
| **House Profit** | 105,313 | 58,549 | 46,610 | 62,908 | 48,815 | 42,721 | 34,365 | 54,492 | 53,584 | 76,495 | 86,052 | 70,760 | 740,664 | 49% |
| **Fixed Expenses** | | | | | | | | | | | | | | |
| Real Estate Taxes | - | | | | | | | | 58,249 | | | | 58,249 | 4% |
| Insurance Expense | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 137,000 | 9% |
| **Total Fixed Expenses** | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 11,417 | 69,666 | 11,417 | 11,417 | 11,417 | 195,249 | 13% |
| **Net Operating Income** | 93,896 | 47,132 | 35,193 | 51,492 | 37,398 | 31,305 | 22,948 | 43,075 | (16,082) | 65,079 | 74,635 | 59,343 | 545,415 | 36% |
| Debt Service [2] | - | 87,500 | 90,417 | 87,500 | 90,417 | 90,417 | 87,500 | 90,417 | 87,500 | 90,417 | 90,417 | 81,667 | 974,167 | |
| **Interest Reserve Account** | | | | | | | | | | | | | | |
| Beginning Balance | 500,000 | 500,000 | 500,000 | 498,305 | 462,297 | 409,278 | 350,166 | 285,615 | 238,273 | 134,691 | 109,353 | 93,572 | | |
| **Operating Reserve** | | | | | | | | | | | | | | |
| Beginning Balance | 0 | 93,896 | 53,528 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| CF After DS (Inflow) | 93,896 | (40,368) | (53,528) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Draw from Operating Reserve (Outflow) | 0 | 53,528 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Ending Balance | 93,896 | 53,528 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Draw from Interest Reserve | 0 | 0 | (1,695) | (36,008) | (53,019) | (59,112) | (64,552) | (47,342) | (103,582) | (25,338) | (15,781) | (22,324) | | |
| Ending Balance | 500,000 | 500,000 | 498,305 | 462,297 | 409,278 | 350,166 | 285,615 | 238,273 | 134,691 | 109,353 | 93,572 | 71,248 | | |

**Notes**

1) 15 of the units are rented out as apartments.

2) Loan amount is $10,000,000 with an interest rate of 10.5%. Debt service from 3/17/14 - 3/31/14 is paid at close.

3) Real Estate Taxes are prorated from 3/17/14 - 12/31/14