# EXHIBIT

# 25

# TERM LOAN AGREEMENT

This **TERM LOAN AGREEMENT** is made by and between **GEMINI 280 FRIEND STREET MT, LLC,** a Delaware limited liability company ("Borrower"), with a place of business in Boston, Massachusetts and a mailing address of c/o Gemini Real Estate Advisors, LLC, 200 Park Avenue South, Suite 1305, New York, NY 10003 and **CAMDEN NATIONAL BANK,** a national bank ("Lender"), with a mailing address of 2 Elm Street, P.O. Box 310, Camden, Maine 04843.

## §1.  DEFINITIONS AND RULES OF INTERPRETATION.

**§1.1.  Definitions**.   The following terms shall have the meanings set forth in this §1, in the other provisions of this Agreement or the other Loan Documents referred to below:

Agreement.  This Agreement, including the Schedules and Exhibits hereto.

Appraisal.  An appraisal of the value of the Mortgaged Property, determined on a "fair market value" basis, in form and substance reasonably acceptable to Lender, performed by a qualified independent appraiser reasonably acceptable to Lender, it being acknowledged and agreed that Lender hereby approves that certain appraisal entitled "Appraisal of Real Property, Holiday Inn Express Hotel & Suites Downtown, 280 Friend Street, Boston, Suffolk County, Massachusetts" dated as of April 1, 2012, prepared by Cushman & Wakefield for the purposes hereof.

Assignment of Leases and Rents.   The Assignment of Leases and Rents pursuant to which Borrower assigns to Lender Borrower's interest as landlord in and to the Leases and the rents, income and profits of the Mortgaged Property, to be in form and substance satisfactory to the Lender.

Business Day.  A day, other than a Saturday or a Sunday, on which Lender is open for the transaction of banking business in Camden, Maine.

Capital Leases. Leases entered into by Borrower as the lessee or obligor, the discounted future rental payment obligations under which are required to be capitalized on the Borrower's balance sheet in accordance with generally accepted accounting principles.

City.  The City of Boston, Massachusetts, a municipality.

Closing Date.  The date on which the conditions set forth in §9 have been satisfied and the Loan has been advanced.

Collateral.  All of the property, rights and interests of Borrower that are or are intended to be subject to the Security Documents, including without limitation, the Mortgaged Property.

Default.  A condition or event which would, with the giving of notice or lapse of time or both, would constitute an Event of Default.

Environmental Indemnification Agreement.  The Environmental Indemnification Agreement pursuant to which Borrower and Indemnitor agree to indemnify the Lender with respect to Environmentally Sensitive Materials and Environmental Requirements, such Environmental Indemnification Agreement to be in form and content acceptable to Lender.

Environmental Requirements.  As defined in the Environmental Indemnification Agreement.

Environmentally Sensitive Materials.  As defined in the Environmental Indemnification Agreement.

Event of Default.  See §10.1.

Franchise Agreement.  That certain Holiday Inn Express Hotel and Suites Hotel Conversion License Agreement by and between Franchisor and Borrower, dated November 9, 2007, as the same may be amended from time to time with Lender's consent.

Franchisor.  Holiday Hospitality Franchising, Inc. and any successor franchisee approved by Lender in its discretion.

Generally accepted accounting principles.  Principles that are consistent with the principles promulgated or adopted by the Financial Accounting Standards Board and its predecessors, in effect for the fiscal year ended on the balance sheet date and to the extent consistent with such principles, the prior accounting practices of Borrower reflected in its financial statements.

Governmental Authority.  The United States of America, the State of Maine, any political subdivision thereof, the City of Boston, Massachusetts and any agency, authority, department, commission, board, bureau, or instrumentality of any of them.

Guarantor(s) shall mean William Obeid, Dante Massaro, Christopher La Mack, Gemini Opportunity Fund I, LLC, Gemini New York Hospitality Fund, LLC, Gemini Real Estate Advisors, LLC, and Gemini 280 Friend Street JV, LLC, individually.

Guaranty.  Collectively, the Guaranty Agreements pursuant to which each Guarantor guarantees to the Lender the payment and performance of the Obligations during the term of the Guaranty, such Guaranty to be in form and substance satisfactory to the Lender.

Hotel Manager.  Gemini Property Management, LLC.

Hotel Management Agreement.  That certain Hotel Management Agreement by and between Borrower and Hotel Manager dated May 15, 2009.

Improvements.  Collectively, the building and additions, drainage, utility, infrastructure and all other common improvements constructed on the Land, including that certain 72-room hotel with approximately 5,518 square feet of ground floor retail commercial space.

Indebtedness.  All obligations, contingent and otherwise, that in accordance with generally accepted accounting principles should be classified upon the obligor's balance sheet as liabilities, or to which reference should be made by footnotes thereto, including in any event and whether or not so classified:  (a) all debt and similar monetary obligations, whether direct or indirect; (b) all liabilities secured by any mortgage, pledge, security interest, lien, charge, or other encumbrance existing on property owned or acquired subject thereto, whether or not the liability secured thereby shall have been assumed; and (c) all guarantees, endorsements and other contingent obligations whether direct or indirect in respect of indebtedness of others.

Indemnitor(s) shall mean William Obeid, Dante Massaro, Christopher La Mack, Gemini Opportunity Fund I, LLC, Gemini New York Hospitality Fund, LLC, Gemini Real Estate Advisors, LLC and Gemini 280 Friend Street JV, LLC, individually.

Land.  The real property located on approximately 9,419 square feet, more or less, of land located at 280 Friend Street, Boston, Massachusetts, together with all easements for access, utilities and drainage and described in Exhibit A to the Security Deed.

Lease.   Leases, licenses and agreements, whether written or oral, relating to the use or occupation of space in the Improvements or on the Land by Persons other than Borrower.

Lender.  Camden National Bank, its successors and assigns.

Loan.  The $14,800,000 loan which is the subject of this Agreement.

Loan Amount.  The sum of up to $14,800,000.

Loan Documents.  This Agreement, the Note, the Environmental Indemnification Agreement, the Guaranty, and the Security Documents, and all other agreements, documents and instruments now or hereafter evidencing, securing or otherwise relating to the Loan.

Loan Year.  As set forth in the Note.

Maturity Date.  As set forth in the Note.

Mortgaged Property.  The Land, the Improvements and the Personal Property.

Note.  The Commercial Term Note in the principal face amount of the Loan Amount from Borrower to Lender evidencing the Loan to be in form and substance satisfactory to the Lender.

Obligations.  The indebtedness, obligations and liabilities of Borrower to the Lender existing on the date of this Agreement or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, to the extent that any such obligation arises or is incurred under this Agreement, the Note or any of the other Loan Documents.

Operating Agreement.  That certain Amended and Restated Operating Agreement of Borrower, which has been reviewed and approved by Lender.

Permitted Encumbrances.  Collectively, (i) those matters shown on the Title Policy, (ii) liens for real estate taxes and assessments not yet due and payable, (iii) those matters shown on the Survey, (iv) zoning, subdivision, environmental and building laws, codes, rules and regulations, (v) Leases, (vi) that certain equipment financing with Key Equipment Finance Inc. with respect to the financing of the property management system software required by the Franchisor with an approximate cost of $68,000 as evidenced by the UCC 1 financing statement filed by Key Equipment Finance Inc. as filing no 2010 3084039 and (vii) mechanic's liens against tenants under Leases.

Permitted Transfer.  See § 8.2.

Person.  Any individual, corporation, trust, partnership or other legal entity, and any government or any governmental agency or political subdivision thereof.

Personal Property.  All materials, furnishings, fixtures, furniture, machinery, equipment and all items of tangible personal property now or hereafter owned or acquired by Borrower, wherever located, and either (i) to be located on or incorporated into the Mortgaged Property or (ii) used in connection with the operation or maintenance of the Mortgaged Property, including without limitation all apparatus, fixtures and articles of personal property owned by Borrower now or hereafter attached to or used or procured for use in connection with the operation or maintenance of the Mortgaged Property (except property belonging to lessees or other occupants of the Mortgaged Property), together with any and all replacements thereof and additions thereto.

Pledge Agreement.  The Pledge and Security Agreement pursuant to which Borrower grants security interests in theCapex Replacement Reserve Account, to be in form and substance satisfactory to the Lender.

Property Approvals.  All approvals, consents, waivers, orders, agreements, acknowledgments, authorizations, permits and licenses required under applicable Requirements or under the terms of any restriction, covenant or easement affecting the Mortgaged Property, or otherwise necessary or desirable, for the ownership and operation of the Mortgaged Property for its intended uses, whether obtained from a Governmental Authority or any other Person.

Real Estate.  All real property at any time owned, leased (as lessee or sublessee) or operated by Borrower.

Cap Ex <u>Replacement Reserve Account</u>. See § 7.13(c)4.

<u>Reserve Account</u>. The Capex Replacement Reserve Account.

<u>Requirements</u>. Any law, ordinance, code, order, rule or regulation of any Governmental Authority relating in any way to the ownership occupancy and operation of the Mortgaged Property, including those relating to subdivision control, zoning, building, use and occupancy, fire prevention, health, safety, sanitation, handicapped access, historic preservation and protection, tidelands, wetlands, flood control, access and earth removal, and all Environmental Requirements.

<u>Security Deed</u>. The Mortgage, Security Agreement and Assignment pursuant to which Borrower grants a mortgage lien and security interest in and to the Mortgaged Property, such Security Deed to be in form and substance satisfactory to the Lender.

<u>Security Documents</u>. The Security Deed, Security Agreement, the Collateral Assignment of Leases and Rents, the Financing Statement, the Guaranties, Indemnification Agreement, Pledge Agreements and any other agreement, document or instrument now or hereafter securing the Note.

<u>Survey</u>. That certain ALTA/ASCM Land Title Survey entitled "101 Causeway Street, Boston (Boston Proper), Mass.," prepared by Feldman Professional Land Surveyors, dated June 27, 2007, last updated May 1, 2012, and certified on June 19, 2012.

<u>Surveyor Certificate</u>. With respect to the Survey, a certificate (which may be shown on the Survey) executed by Feldman Professional Land Surveyors dated as of a recent date and containing such information relating to the Mortgaged Property as the Lender or the Title Insurance Company may require, such certificate to be satisfactory to the Lender in form and substance.

<u>Taking</u>. Any condemnation for public use of, or damage by reason of, the action of any Governmental Authority, or any transfer by private sale in lieu thereof, either temporarily or permanently.

<u>Title Insurance Company</u>. First American Title Insurance Company.

<u>Title Policy</u>. An ALTA standard form title insurance policy issued by the Title Insurance Company in an amount not less than the Loan Amount insuring the priority of the Security Deed and that Borrower holds marketable fee simple title to the Mortgaged Property, subject only to such exceptions as the Lender may reasonably approve and which shall not contain exceptions for persons in occupancy (other than tenants under Leases) or matters which would be shown by a survey, shall not insure over any matter except to the extent that any such affirmative insurance is reasonably acceptable to the Lender, and shall contain such endorsements including, but not limited to a zoning endorsement and affirmative insurance as the Lender may reasonably require.

Transfer.  See § 8.2.

## §2.  THE LOAN FACILITY.

**§2.1   Commitment to Lend**.  Subject to the terms and conditions set forth in  this Agreement and the other Loan Documents, the Lender agrees to lend to the Borrower on the Closing Date the principal sum of up to Fourteen  Million Eight Hundred Thousand Dollars ($14,800,000),  of which amount, $14,000,000  shall be advanced on the Closing Date.  Upon delivery to the Lender and its subsequent satisfactory review of (i) the 2012 CPA "reviewed" income tax basis financial statement or, if applicable, subsequent interim financial statements during the 2013 calendar year, certified as true and correct by Borrower; (ii) receipt of satisfactory documented debt service coverage of 1.30 to 1 as hereinafter defined in Section 7.13(c)1 on a trailing 36-months basis;  and (iii)  receipt of documentation satisfactory to the Bank that the Borrower's minimum satisfactory overall franchise OSAT score of 81 and a satisfactory overall Quality Assurance Score, Lender shall advance additional loan proceeds up to the maximum amount of $800,000.  Two incremental draw downs are permitted.  The additional loan availability shall expire if not drawn down in compliance with the above requirements by July 1, 2013.

**§2.2   Loan Facility**.  The Loan shall be evidenced by the Note.  The proceeds of the Loan shall be used by the Borrower to refinance the Camden National Bank existing loan for the Mortgaged Property, fund certain Cap Ex expenditures and provide for repayment of preferred equity investors to the extent of net available loan proceeds.

The Maturity Date of the Loan shall be as provided in the Note, on which date the Borrower promises to pay all unpaid principal of the Loan under the Note in full with accrued and unpaid interest and any other amounts then due hereunder and under the Note.

In the event the Note is lost, destroyed, or mutilated at any time prior to the payment in full of the obligations thereunder, then upon execution by Lender of an affidavit and indemnification agreement evidencing the loss of the Note, the Borrower shall execute a new note substantially in the form of the Note at Lender's sole cost and expense.  The Note shall not be necessary to establish the indebtedness of the Borrower to the Lender on account of such loans, advances and repayments.

**§2.3   Borrower's Accounts**.  The Lender may charge any account which the Borrower maintains with the Lender for any payments which the Borrower may make hereunder or which the Borrower is obligated to make to the Lender from time to time in connection with the Loan.

**§2.4   Statements**.  Any Loan statement rendered by the Lender to the Borrower shall be considered correct and accepted by the Borrower and shall be conclusively binding upon the Borrower unless the Borrower provides the Lender written objection thereto within thirty (30) days from the mailing of such Loan statement, which written objection shall indicate, with particularity, the reason for such objection.

**§3.   COMMITMENT FEE; PAYMENTS AND COMPUTATIONS**.

**§3.1.   Commitment and Underwriting Fee**.  Borrower shall pay Lender a commitment fee in the amount of $50,000 of which amount the Borrower has previously paid the sum of $25,000.

**§3.2.   Funds for Payments**.  All payments of principal, interest, fees and any other amounts due under the Note shall be made in accordance with the Note.

**§3.3   Compensating Balance Accounts; Interest Rate Adjustment**.  Borrower shall maintain with Lender a comprehensive deposit account relationship.

**§4.   COLLATERAL SECURITY**.  The Obligations shall be secured by a perfected first priority mortgage lien and security interest in the Collateral, whether now owned or hereafter acquired, pursuant to the terms of the Security Documents.

**§5.  CERTAIN RIGHTS OF LENDER**.

**§5.1.   Right to Obtain Appraisals**.  Commencing twelve (12) months after the Closing Date, Lender shall have the right to obtain from time to time, at Borrower's cost and expense, updated Appraisals of the Mortgaged Property; provided however if the Borrower is not then in default, Lender will not have the right to obtain an Appraisal more often than one (1) time every eighteen (18) months during the term of the Loan.  The costs and expenses incurred by the Lender in obtaining such Appraisals shall be paid by Borrower forthwith upon billing or request by the Lender for reimbursement therefor.

**§5.2.   Publicity**.  Lender, at Lender's sole cost and expense shall have the right to prepare and publish tombstone ads in such publications as Lender may desire announcing the financing of the project and Borrower and to prepare such other announcements and publicity concerning the Loan as Lender may, in its discretion, desire.

**§6.  REPRESENTATIONS AND WARRANTIES**.  Borrower represents and warrants to the Lender as follows:

**§6.1.   Organization; Authority; Etc**.

(a)   **Organization; Good Standing**.  Borrower is a limited liability company duly organized and is validly existing under the laws of the State of Delaware and in good standing under the laws of the Commonwealth of Massachusetts.  Borrower has all requisite power to own its property and conduct its business as now conducted and as presently contemplated.

(b)   **Authorization**.  The execution, delivery and performance of this Agreement and the other Loan Documents and the transactions contemplated hereby by Borrower, and by Guarantors (i) are within the authority of such Person, (ii) have been duly authorized by all

necessary proceedings on the part of such Person, (iii) to Borrower's knowledge, do not conflict with or result in any breach or contravention of any provision of law, statute, rule or regulation to which such Person is subject or any judgment, order, writ, injunction, license or permit applicable to such Person and (iv) do not conflict with any provision of the articles of organization or operating agreement of, or any agreement or other instrument binding upon, such Person.

(c)     **Enforceability**.  The execution and delivery of this Agreement and the other Loan Documents to which Borrower and/or each Guarantor is a party will result in valid and legally binding obligations of such Person enforceable against it in accordance with the respective terms and provisions hereof or thereof, except as enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting generally the enforcement of creditors' rights and except to the extent that availability of the remedy of specific performance or injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.

**§6.2.     Title to Mortgaged Property and other Properties**.  Except for the Permitted Encumbrances, Borrower holds good clear record and marketable fee simple absolute title to the Mortgaged Property and the Personal Property, subject to no other mortgages, leases, conditional sale agreements, title retention agreements, liens or other encumbrances.

**§6.3.     Financial Statements**.  There has been furnished to the Lender a balance sheet of Borrower and a balance sheet or personal financial statement, as applicable, for each Guarantor. Such balance sheet and personal financial statement have been prepared on a compiled basis in accordance with sound accounting principles and fairly present in all material respects the financial condition of Borrower as at the date thereof.  As of the date of this Agreement, there are no known liabilities or contingent liabilities of Borrower and the Guarantor that could reasonably be excepted to have a material adverse effect on Borrower's or Guarantor's ability to perform under the Loan Documents which are not disclosed in said balance sheet and the related notes thereto and said personal financial statement, respectively, other than the Obligations.

Since the date of the foregoing financial statements, there has occurred no material adverse change in the financial condition or business of Borrower or any Guarantor that would have a material adverse effect on Borrower's or any Guarantor's ability to perform under the Loan Documents, other than changes in the ordinary course of business that have not had any such material adverse effect.

**§6.5.     Franchises, Patents, Copyrights, Etc**.  Borrower possesses all franchises, patents, copyrights, trademarks, trade names, licenses and permits, and rights in respect of the foregoing, adequate for the conduct of its business substantially as now conducted, without known conflict with any rights of others, except to the extent the same are owned by Franchisor under the Franchise Agreement or Hotel Manager under the Hotel Management Agreement.

**§6.6.     Litigation**.  Except as disclosed in Schedule 6.5 attached hereto, there are no actions, suits, proceedings or investigations of any kind pending or, to Borrower's knowledge, threatened against Borrower or any Guarantor before any court, tribunal or administrative agency

or board that, if adversely determined, might, either in any case or in the aggregate, materially and adversely affect the properties, assets, financial condition or business of Borrower or Guarantor or materially impair the right of Borrower to carry on business substantially as now conducted by it, or result in any material liability not adequately covered by insurance, or for which adequate reserves are not maintained on the balance sheet of such Person, or which otherwise affect Borrower's or Guarantor's ability to perform under the Loan Documents or which question the validity of this Agreement or any of the other Loan Documents.

§6.7. **No Materially Adverse Contracts, Etc**. To Borrower's knowledge, Borrower is not subject to any judgment, decree, order, rule or regulation that has or is expected to have a materially adverse effect on the business, assets or financial condition of Borrower or on Borrower's ability to perform under the Loan Documents. To Borrower's knowledge, Borrower is not a party to any contract or agreement that has or is expected to have a materially adverse effect on Borrower or Borrower's ability to perform under the Loan Documents.

§6.8. **Compliance With Other Instruments, Laws, Etc**. To Borrower's knowledge, Borrower is not in violation of the Operating Agreement, or any agreement or instrument to which it may be subject or by which it or any of its properties may be bound or any decree, order, judgment, statute, license, rule or regulation, in any of the foregoing cases in a manner that could result in the imposition of material penalties or materially and adversely affect the financial condition, properties or business of Borrower or Borrower's ability to perform under the Loan Documents.

§6.9. **Tax Status**. Borrower (a) has made or filed all federal and state income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject and, (b) has paid all taxes and other governmental assessments and charges shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and by appropriate proceedings pursued with diligence. To Borrower's knowledge, there are no unpaid taxes in any material amount claimed to be due by any taxing authority, and Borrower knows of no basis for any such claim.

§6.10. **No Event of Default**. No Default or Event of Default has occurred and is continuing under the Loan Documents or any other loan obligations or documents to which Borrower is a party.

§6.11. **Absence of Other Liens, Etc**. To Borrower's knowledge, except for the security documents to be discharged or terminated with the proceeds of this Loan, there is no financing statement, security agreement, chattel mortgage, real estate mortgage or other document (except as any of the same may relate to software systems under lease with Franchisor) filed or recorded with any filing records, registry, or other public office, that purports to cover, affect or give notice of any present or possible future lien on, or security interest in any Collateral or any rights relating thereto.

§6.12. **Setoff, Etc.** The Collateral and the Lender's rights with respect to the Collateral are not subject to any setoff, claims, withholdings or other defenses. Except for the security

documents to be discharged or terminated with the proceeds of this Loan, Borrower is the owner of the Collateral (excluding software systems under lease with Franchisor) free from any lien, security interest, encumbrance and any other claim or demand except as permitted in the Security Deed.

**§6.13.  Environmental Compliance**.  Except as set forth in Schedule 6.13 attached hereto, Borrower is in full compliance with the representations, covenants and warranties regarding the Environmental Requirements and Environmentally Sensitive Materials as set forth in the Environmental Indemnification Agreement.

**§6.14.  Intentionally Omitted**.

**§6.15.  Availability of Utilities**.  To Borrower's knowledge, all utility services necessary and sufficient for the operation of the Mortgaged Property for its intended purposes are presently available to the boundaries of the Land with respect to which the Security Deed creates a valid and enforceable first lien, including, but not limited to, water supply, storm and sanitary sewer, electric and telephone facilities, and drainage.

**§6.16.  Access/Separate Tax Lot**.  (a)  The Mortgaged Property has rights of access to public ways adequate to service the Mortgaged Property for its intended uses.

(b)  The Land is separately assessed for purposes of real estate tax assessment and payment.

**§6.17.  Condition of Mortgaged Property**.  To Borrower's knowledge, neither the Mortgaged Property nor any part thereof is now damaged or injured as result of any fire, explosion, accident, flood or other casualty or has been the subject of any Taking, and no Taking is pending or contemplated.

**§6.18.  Compliance with Requirements**.  To Borrower's knowledge, the use and occupancy of the Mortgaged Property complies with all Requirements.

**§6.19.  Property Approvals**.  To Borrower's knowledge, Borrower has obtained or caused to be obtained all Property Approvals which can be issued or granted by the applicable Governmental Authorities having or claiming jurisdiction over the Mortgaged Property and are necessary for the operation of the Mortgaged Property.  To Borrower's knowledge, all Property Approvals obtained, or caused to be obtained, by Borrower hereto have been validly issued and are in full force and effect.

**§6.20.  Real Property Taxes; Special Assessments**.  There are no overdue, unpaid or outstanding real estate or other taxes or assessments on or against the Mortgaged Property or any part thereof which are payable by Borrower or any prior owner.  No abatement proceedings are pending with reference to any real estate taxes assessed against the Mortgaged Property.

**§6.21.** **Violations**.  Borrower has received no written notice from any Governmental Authority of, and has no knowledge of, any violations of any applicable Requirements or any Property Approvals.

**§6.21.** **Leases**.  The Mortgaged Property contains approximately 5,518 square feet of ground floor retail commercial space.

**§6.22.** **Other Material Real Property Agreements; No Options**.  There are no material agreements pertaining to the Mortgaged Property, the Improvements or the operation or maintenance of either thereof other than as described in this Agreement (including the Schedules hereto) or otherwise disclosed in writing to the Lender by Borrower; and no person or entity has any right or option to acquire the Mortgaged Property or any portion thereof or interest therein.

**§7.** **AFFIRMATIVE COVENANTS OF BORROWER**.  Borrower covenants and agrees that, so long as the Loan is outstanding or the Lender has any obligation to make any Advances:

**§7.1.** **Punctual Payment**.  Borrower will duly and punctually pay or cause to be paid the principal and interest on the Loan and all other amounts provided for in the Note, this Agreement, and the other Loan Documents.

**§7.2.** **Accounts**.  Borrower shall maintain, or cause to be maintained, accounts and reserves for all taxes (including income taxes) and other reserves as required under this Agreement.

**§7.3.** **Records, Financial Statements, Certificates and Information**.  Borrower will keep, or cause to be kept, at all times at Borrower's address stated in this Agreement  or such other place as Lender may approve in writing, true and accurate records and books of account in which full, true and correct entries will be made in accordance with generally accepted accounting principles and the Uniform System of Accounts for Hotels reflecting the results of the operation of the Mortgaged Property, and copies of all written contracts, rent rolls, leases and other instruments which affect the Mortgaged Property.  Such records, books of account, contracts, rent rolls, leases and other instruments shall be subject to examination, inspection and copying by Lender at any reasonable time by Lender upon request of Borrower or Hotel Manager.  Upon request by Lender, Borrower and its Hotel Manager shall provide copies of all reports due from or due to each other and its franchise licensor.  Borrower will deliver to the Lender:

(a) **Annual Financial Statements of Borrower**.  As soon as practicable, but in any event not later than the 120th day after the end of each succeeding fiscal year of the Borrower, the balance sheet of the Borrower as of the end of such year, and the related statements of income and cash flow for such year, each setting forth in comparative form the figures for the previous fiscal year (except in the case of such statements prepared for Borrower's first fiscal year) with all such statements to be prepared in accordance with GAAP or with modified federal income tax cash basis accounting, and accompanied by at least a "reviewed

report" prepared without qualification by a firm of independent certified public accountants acceptable to the Lender together with a written statement from such accountant to the effect that it has read a copy of this Agreement and that, in making the examination necessary to said certification, they have obtained no knowledge of any Default or Event of Default or, if such accountants shall have obtained knowledge of any then existing Default or Event of Default, they shall disclose in such statement any such Default or Event of Default.  If requested by Lender, Borrower shall resubmit the financial analysis in Borrower's business plan to reflect the actual status of Borrower's results of operations.

(b)     Simultaneously with the delivery of the financial statement referred to in paragraph (a) above, a statement certified by Borrower to the effect that Borrower has read a copy of this Agreement and that it has no knowledge of any existing Default or Event of Default, or if it has such knowledge it shall disclose in such statement the nature of any such Default or Event of Default.

(c)     **Quarterly Covenant Compliance Calculations**. Simultaneously with the delivery of the financial statements referred to in paragraph (a) above and within thirty (30) days of the end of each quarter, a statement signed by Borrower and setting forth in reasonable detail computations evidencing compliance with the financial covenants contained herein.

(d)     **Tax Returns**.  Complete Federal Tax Returns of Borrower within thirty (30) days of filing.

(e)     **Interim Reports**.  Borrower shall submit management prepared financial statements on the hotel, including a detailed balance statement and profit and loss statement in comparative and in standard industry hotel format with occupancy, ADR and RevPar results within thirty (30) days following the end of each month and the end of Borrower's fiscal year, together with comparative performance to its monthly and year to date budgets.  Further, Borrower shall cause Hotel Manager on request by Lender to provide Lender all copies of financial reports prepared by Hotel Manager including a quarterly cash flow forecast and copies of reports prepared for the Owner and Franchisee including all property improvement requirements and plans.

(f)     **Annual Cap Ex Budget and Annual Operating Budget.**  Borrower shall submit its proforma annual Cap Ex budget and Operating Budget for the succeeding fiscal year within thirty (30) days prior to Borrower's fiscal year end in standard industry hotel format and a copy of the complete annual plan of Hotel Manager.

(g)     **Rent Roll.**  Borrower shall submit annually a written rent roll of all leases and subleases in form and content reasonably acceptable to Lender thirty (30) days prior to each fiscal year and within ten (10) days of any other Lender request.

(h)   **STR Reports.**  Borrower shall submit its STR Reports within 30 days of each month end.

(i)   **Guarantor Financial Information.**   Borrower shall cause each individual Guarantor to submit to Lender annually within ten days of filing CPA prepared complete federal income tax returns  accompanied by certified self prepared personal financial statements; and shall cause each limited liability company Guarantor to submit to Lender accountant prepared complete Federal Tax Returns within ten days of filing.

(j)   **Other**. From time to time such other interim financial statements, financial data and information, rent rolls and other information, in such form and at such times as Lender deems appropriate and as the Lender may  reasonably request and including Customer Satisfaction Surveys (OSAT scores), Quality Assurance Evaluation Reports and Medallion Reports from and to the franchisee, rent rolls, leases and other information, in such form and at such times as Lender deems appropriate (including accountants' management letters) as the Lender may reasonably request.

Failure to deliver financial statements and income tax returns to Lender when due, which is not cured within thirty (30) days from written notice from Lender to Borrower, shall constitute an Event of Default entitling Lender to charge the default rate of interest under the Note.

### §7.4. Notices.

(a) Notification of Claims against Collateral.  Borrower will, promptly upon receipt of written notice thereof, notify the Lender in writing of any setoff, claims, withholdings or other defenses to which any of the Collateral, or the Lender's rights with respect to the Collateral, are subject.

(b) Notice of Nonpayment.  Borrower will promptly notify Lender in writing if Borrower receives any written notice of default as a result of nonpayment under a contract with any laborer, subcontractor or materialman for any labor or materials furnished in connection with the Improvements.

(c) Notice of Litigation and Judgments.  Borrower will give notice to the Lender in writing within fifteen (15) days of receiving written notice of any threatened litigation or proceedings or any pending litigation and proceedings affecting the Mortgaged Property or Borrower or to which Borrower is or is to become a party involving an uninsured claim against Borrower that could have a materially adverse effect on Borrower's ability to perform under the Loan Documents. Borrower's notice to Lender of the same shall state the nature and status of such litigation or proceedings.  Borrower will give notice to the Lender, in writing, in form and detail reasonably satisfactory to the Lender, within ten (10) days of the issuance of any judgment not covered by insurance, final or otherwise, against Borrower in an amount in excess of $25,000.

§7.5.  **Existence; Maintenance of Properties.**  Borrower will do or cause to be done all things necessary to preserve, and keep in full force and effect, its existence as a Delaware limited liability company.  Borrower will do, or cause to be done, all things necessary to preserve and keep in full force all of its rights and franchises.

Borrower (a) will cause the Land and Improvements to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment, (b) will cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the judgment of Borrower may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times, and (c) will continue to engage primarily in the businesses now conducted by it and in related businesses.

§7.6.  **Insurance**.

Borrower will obtain and maintain insurance with respect to the Mortgaged Property as required by the Security Deed.

§7.7.  **Taxes/Liens**.  Borrower will pay all taxes, assessments and other governmental charges in accordance with the Security Deed.  Borrower will promptly pay and discharge (by bonding or otherwise) all claims for labor, material or supplies that if unpaid might by law become a lien or charge against the Mortgaged Property or any part thereof or might affect the priority of the lien created by the Security Deed unless the same are contested in good faith and with due diligence by Borrower.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceedings, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any taxes or other similar charges, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable laws; (iii) no part of the Property will be in danger of being sold, forfeited or lost on account of such contest; and (iv) Borrower shall promptly, upon final determination thereof, pay the amount of any such taxes, together with all costs, interest and penalties which may be payable in connection therewith.

§7.8.  **Inspection of Mortgaged Property, Other Properties and Books**.

(a)     Upon reasonable prior written notice from Lender to Borrower and subject to the rights of guests at the hotel and tenants leasing the retail commercial space at the Mortgaged Property, Borrower shall permit Lender, at Borrower's expense, to visit and inspect the Mortgaged Property during business hours and will cooperate with the Lender during such inspections; provided that this provision shall not be deemed to impose on the Lender any obligation to undertake such inspections.

(b)     Borrower shall permit the Lender to examine the books of account of Borrower (and to make copies thereof and extracts therefrom) and to discuss the affairs, finances

and accounts of Borrower with, and to be advised as to the same by, its officers, all at such reasonable times and intervals as the Lender may reasonably request.

**§7.9.  Compliance with Laws, Contracts, Licenses, and Permits**.  Borrower will comply with (a) the applicable laws and regulations wherever its business is conducted, including all Requirements, (b) the provisions of the Operating Agreement and other organizational documents, (c) all agreements and instruments by which it or the Mortgaged Property may be bound, including the Leases and all restrictions, covenants and easements affecting the Mortgaged Property, (d) all applicable decrees, orders and judgments, and (e) all Property Approvals.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any legal requirement, the applicability of any legal requirement to Borrower or the Mortgaged Property or any alleged violation of any legal requirement, provided that (i) no Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable laws; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost on account of contesting such matter; (iv) Borrower shall promptly, upon final determination thereof, comply with any such legal requirement determined to be valid or applicable or cure any violation of any Requirement; and (v) such proceeding shall suspend the enforcement of the contested Requirement against Borrower of the Property.

**§7.10.  Property Approvals**.  Borrower shall comply with the Requirements and Property Approvals, and upon Lender's written request will furnish Lender with evidence thereof.

**§7.11.  Omitted**.

**§7.12.  Further Assurances**.  Borrower will cooperate with, do such further acts, and execute such further instruments and documents, as the Lender shall reasonably request to carry out to its satisfaction the transactions contemplated by this Agreement and the other Loan Documents, and will do such further acts as may be necessary or desirable to establish, preserve and protect the Collateral, as the Lender may reasonably require

**§7.13.  Financial Covenants**.  Borrower covenants and agrees that, so long as the Loan is outstanding:

(a)     Financial Statements.  See Section 7.3 hereof.

(b)     Negative Pledge.   Borrower will not, during the term of the Loan, create, incur, assume or suffer to exist, any Indebtedness or any mortgage, deed of trust, pledge, lien, security interest, charge or encumbrance on any of the Collateral, nor will it file, or permit to be filed, any financing statement naming it as a debtor except with respect to one vehicle/van lease or , purchase money financing for one vehicle/van.  Borrower will have the right to bond or insure over involuntary liens.

(c)     Financial Covenants. Borrower shall comply with the following financial requirements during the term of the Loan:

1)      Debt Service Coverage Ratio ("DSCR") on Mortgaged Property. Borrower must generate earnings, before interest, depreciation and amortization ("EBITDA") plus or minus non-recurring items (in Lender's sole discretion) less a capital expenditure adjustment reserve of 4% of revenues sufficient to meet its DSCR requirements of 1.30 to 1 on a trailing 12-month basis measured quarterly beginning June 30, 2012. EBITDA shall be further defined as total operating revenues for Borrower's fiscal year less all operating expenses, both direct and indirect, including management fees adjusted to equal not less than 4% of total revenues. Debt service shall be defined as all principal and interest payments on debt and all Capital Lease payments including operating leases, if any.

2)      If annual DSCR coverage falls below 1.30 to 1, as tested quarterly by Lender, it will constitute an Event of Default unless Borrower, within ten (10) business days of receipt of Lender's written notice, deposits with Lender funds an amount equal to twice the amount of the shortfall.  Such funds shall be pledged to Lender and shall be released to Borrower when Borrower is in compliance with the DSCR covenant.

3)      Absent an Event of Default, distributions will be permitted to equity investors on a quarterly basis, subsequent to the quarterly notice and documentation covenant to the Bank that (i) debt service coverage of 1.30 to 1 is achieved based on the trailing twelve month of operations and (ii) all capex reserves are fully funded. Releases of funds deposited with Lender to Borrower pursuant to paragraph 2 of this Section 7.13(c) shall not be deemed distributions for the purposes of this paragraph 3.

4)      Commencing at the closing, Borrower shall deposit with Lender as a capital reserve in a Cap Ex Replacement Reserve Account which shall be an interest bearing account in the name of Borrower (the "Cap Ex Replacement Reserve Account") and thereafter, on a quarterly basis commencing on September 30, 2012 and quarterly thereafter, Four Percent (4%) of Gross Operating Revenues.  As long no Event of Default under the Loan Documents exists and is continuing, Borrower shall be entitled to periodic withdrawals of amounts in the Replacement Reserve Account, upon Borrower's request, to pay for third-party furniture, fixtures and equipment purchases and capital improvements, repairs and maintenance relating to the Mortgaged Property, all in accordance with the applicable Pledge Agreement.

5)    At closing, subject to the terms of the remainder of this subparagraph 5, Borrower shall deposit and pledge the following in the Capex Replacement Reserve Account: $405,375 consisting of $299,800 for elevator improvements, $65,575 for a HVAC roof chiller, $40,000 for the outdoor canopy and signage and any current unfunded quarterly reserve deposits due on June 30, 2012 less documented expense reimbursement credits due Borrower. Lender and Borrower hereby agree that notwithstanding the terms of the immediately preceding sentence, during calendar year 2012, Borrower has made certain improvements, replacements and repairs on account of the items set forth above in this subparagraph, as further detailed on Schedule 7.13 attached hereto. Consequently, the amount of the initial deposit into the Capex Replacement Reserve Account shall be reduced to $227,562.87 consisting of $159,000.00 for elevator improvements, $32,787.50 for a HVAC roof chiller and $35,775.37 for the outdoor canopy and signage. The Capex Replacement Reserve Account shall be pledged to the Bank. Provided the Borrower is not then in default, beyond any applicable notice and cure periods, the Bank shall release funds for their stated purposes upon submission to Bank of invoices with respect to cost.

6)    During the term of the Loan, Borrower shall demonstrate cash availability for working capital of $200,000, which shall be tested quarterly beginning September 30, 2012. Compliance with this covenant shall be met by Borrower having cash in its operating account of $200,000 at any one time during such quarter. This is exclusive of all funds in the reserve account.

7)    As set forth in the Operating Agreement, Borrower shall be a single purpose entity, engaging only in the ownership and operation of the Mortgaged Property.

8)    Loan to Value. Borrower shall maintain a maximum loan to value ratio of seventy percent (70%) or less based upon the most current real estate only Appraisal, and if Borrower is notified in writing by Lender of receipt of an Appraisal which results in a failure of this loan covenant, Borrower shall be in default unless, within ten (10) Business Days of receipt of such written notice, Borrower deposits with Lender funds sufficient so that, when such funds are added to the appraised value of the Mortgaged Property, the required loan to value ratio of seventy percent (70%) or less is met. Such funds shall be pledged to Lender and shall be released by Lender to Borrower when Borrower is once again in compliance with this covenant as demonstrated in a subsequent Appraisal. Subject to Section 5.1 above, all appraisals shall be paid for by Borrower prior to ordering of such Appraisal by Lender. Borrower shall be in default if such appraisal fee is not paid to Lender within ten (10) Business Days of Borrower's receipt of Lender's written notice setting forth the costs of such Appraisal.

> Notwithstanding anything to the contrary set forth in this paragraph or elsewhere in this Agreement, Lender agrees that Lender shall not order a new appraisal within twelve (12) months of the date hereof, unless an Event of Default has occurred and is then continuing.

(d)     Deposits.  All deposits for the Borrower, except for the petty cash account located at Bank of America, shall be held in accounts with Lender.

**§7.14.  Cash Collateral Account(s)**.  Deposit accounts, including the Cap Ex Replacement Reserve Account, shall be established with and pledged to Lender pursuant to the Pledge Agreements as additional security for the Obligations of Borrower.

**§8.  NEGATIVE COVENANTS OF BORROWER**.  Borrower covenants and agrees that, so long as the Loan is outstanding:

**§8.1.  Restriction on Leases**.  Borrower will not become a party to or agree to any Lease of the Mortgaged Property without the prior approval of the Lender, which approval shall not be unreasonably withheld, conditioned or delayed.  Borrower will not, unless required to do so under the terms of a Lease, amend, supplement or otherwise modify, or terminate or cancel, or accept the surrender of, or grant any concessions to or waive the performance of any material obligations of any tenant under, any Lease of the Mortgaged Property, without the prior approval of the Lender, which approval shall not be unreasonably withheld, conditioned or delayed.

**§8.2.  Merger; Consolidation; Sale or Lease of Assets**.  Without Lender's prior written consent, Borrower shall not effect or permit any sale, lease or other disposition of the Collateral or the transfer or distribution of any interest, direct or indirect, in Borrower (each, a "Transfer"), other than:  (a) leases of vacant space in the Mortgaged Property in the ordinary course of business to third parties at current market rates and terms, (b) sales of used assets being replaced in kind in the ordinary course of business, and (c) sales of assets no longer required for the conduct of their business having a value less than five percent (5%) in the aggregate of consolidated net worth of Borrower in any year.  Notwithstanding the foregoing, the following Transfers (each, a "Permitted Transfer") shall be permitted hereunder without Lender's consent:

(a)     A Transfer by any Person owning a direct or indirect interest in Borrower as of the Closing Date of all or any portion of its direct or indirect interest in Borrower to any other Person owning a direct or indirect interest in Borrower as of the Closing Date, or any other such Transfer that occurs pursuant to the terms of the Operating Agreement;

(b)     A Transfer of any Person's direct or indirect interest in Borrower to an immediate family member (which shall include a spouse, parent, sibling, child or grandchild or a trust or other entity set up for the sole benefit of such family member) of that Person including, without limitation, such a Transfer for the purposes of estate planning;

(c)     Without limiting the terms of Section 8.2(a) above, a transfer of up to forty-nine percent (49%) of the direct or indirect ownership interests in Borrower to any third party, so long as the Persons that own direct or indirect interests in Borrower as of the Closing Date maintain in the aggregate the controlling interest in Borrower; provided, however, if any such Transfer occurs after the date hereof that results in any Person obtaining direct ownership of twenty percent (20%) or more of the interests in Borrower, such Person shall individually, jointly and severally guaranty the payment and performance of the Obligations pursuant to an agreement substantially in the same form as the Guaranty;

(d)     Notwithstanding the foregoing, both Gemini Opportunity Fund I, LLC and Gemini New York Hospitality Fund, LLC shall be entitled to transfer one hundred percent (100%) of each such entity's membership interests in Borrower to an entity controlled by Gemini Real Estate Advisors, LLC (or its principals) upon  the satisfaction of each of the following conditions: (A) thirty (30) days prior written notice of the transfer is provided to Lender, (B) as of the effective date of the transfer, control of Gemini Real Estate  Advisors, LLC is unchanged relative to the date of Loan closing, (C) Lender is provided with a copy of all organization documents of the transferee, together with any other document reasonably requested by Lender concerning the transfer or the transferee, (D) the transferee executes a Guaranty in the same form as executed by the applicable transferor, and (E) the financial condition and  creditworthiness of the transferee shall be satisfactory to Lender in its sole and absolute discretion.

(e)     Borrower shall have the right to Transfer the Property to another party (the "Transferee Borrower") and have the Transferee Borrower assume all of Borrower's obligations under the loan documents, and have  replacement guarantors and indemnitors assume all of the obligations of the indemnitors and guarantors of the loan documents in the sole and absolute discretion of Lender and upon terms acceptable to lender and upon payment of an assumption fee as determined by Lender.

**§8.3.  Sale and Leaseback**.  Borrower shall not enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any Collateral owned by it in order to lease such property or lease other property that is used for substantially the same purpose as the property being sold or transferred.

**§9. CONDITIONS TO INITIAL ADVANCE**.  The obligation of the Lender to make the Loan shall be subject to the satisfaction of the following conditions precedent:

**§9.1.  Loan Documents**.  Each of the Loan Documents shall have been duly executed and acknowledged, as required, and delivered by the respective parties thereto, shall be in full force and effect, and shall be in form and substance satisfactory to the Lender.

**§9.2.  Certificate of Occupancy**.  The City of Boston shall have issued a Certificate of Occupancy or a Temporary Certification of Occupancy acceptable to Lender for the Improvements.

**§9.3.  Certified Copies of Organization Documents**.  The Lender shall have received a certificate of good standing with respect to Borrower from the Secretary of State of the State of Delaware and true copies of Borrower's certificate of organization, operating agreement and any other of its organizational documents.

**§9.4.  Resolutions**.  All action necessary for the valid execution, delivery and performance by Borrower of this Agreement and the other Loan Documents have been duly and effectively taken, including without limitation delivery to Lender of resolutions adopted by its members and managers, if any, authorizing the transactions described herein, each certified by as of a recent date to be in full force and effect.

**§9.5.  Incumbency Certificate; Authorized Signers**.  The Lender shall have received from Borrower an incumbency certificate, dated as of the Closing Date, signed by a duly authorized officer, member or manager of Borrower and giving the name of each individual who shall be authorized to act on behalf of Borrower.

**§9.6.  Validity of Liens**.  The Security Documents shall be effective to create in favor of the Lender, on the Closing Date (or, in the case of the Security Deed, if Borrower provides Lender and Title Insurance Company with a gap indemnity in form and substance reasonably satisfactory to Lender and the Title Company, on the date the Security Deed is recorded or filed with the appropriate office), a legal, valid and enforceable first security interest in the Collateral, subject to the Permitted Encumbrances.

**§9.7.  Deliveries**.  The following items or documents shall have been delivered to the Lender by Borrower and shall be in form and substance reasonably satisfactory to the Lender:

    (a)  The commitment for the Title Policy with an update of title;

    (b)  Duplicate originals or certified copies of all policies of insurance required to be obtained or certificates from the insurer or an independent insurance broker evidencing such insurance;

    (c)  Evidence of access, availability of utilities and Property Approvals as required by this Agreement;

    (d)  An environmental site assessment report or reports of one or more qualified environmental engineering or similar inspection firms approved by the Lender, which

report or reports shall indicate a condition of the Land and any existing improvements thereon in all respects satisfactory to the Lender in its sole discretion and upon which report or reports the Lender is expressly entitled to rely, it being acknowledged and agreement that that certain report entitled, "Phase I Environmental Site Assessment Report, Holiday Inn Express, 280 Friend Street, Boston, Massachusetts," dated October 31, 2008, prepared by LandAmerica Commercial Services is approved by Lender for the purposes hereof

(e)  The Survey and Surveyor's Certificate.

**§9.8.  Legal Opinions**.  The Lender shall have received favorable opinions addressed to the Lender and dated as of the Closing Date from Borrower's counsel in form and substance reasonably satisfactory to Lender and Lender's counsel (i) stating that all Loan Documents have been duly authorized, executed and delivered by Borrower and, to the extent enforceable, are valid and binding on the Borrower; and (ii) indicating the due organization, legal existence and good standing of Borrower.

**§9.9.  Lien Search**.  The Lender shall have received a certification from Title Insurance Company or counsel satisfactory to the Lender (which shall be updated from time to time at Borrower's expense upon request by the Lender) that a search of the public records disclosed no liens, security agreements, mortgages, leases, financing statements, agreements or other matters which affect the Collateral and that no real estate taxes or other assessments are past due.

**§9.10.  Intentionally Omitted**.

**§9.11.  Performance; No Default**.  Borrower shall have performed and complied with this Agreement and no Event of Default exists.

**§9.12.  Representations and Warranties**.  The representations of warranties made in the Loan Documents shall be true and correct in all respects on the Closing Date (except for those representations that, by their nature, are given as of a particular date or that have changed in the ordinary course of business).

**§9.13.  Proceedings and Documents**.  All proceedings in connection with this Agreement and the other Loan Documents shall be satisfactory to the Lender in form and substance, and the Lender shall have received all information and such counterpart originals or certified copies of such documents and such other certificates, opinions or documents as the Lender and the Lender's counsel may reasonably require.

## §10.  EVENTS OF DEFAULT AND REMEDIES.

**§10.1.  Events of Default**.  The occurrence of any one or more of the conditions or events specified in the Note, the Security Documents or any other Loan Document, including this Agreement for which a grace or cure period is provided and after notice to Borrower (if applicable) and after the expiration of the applicable grace period, shall constitute an "Event of

Default". Further, Borrower shall be in default if Borrower shall continue to be in default under any of the other terms, covenants or conditions herein or any other Loan Document for which there is no specific stated cure period if Borrower shall fail to cure such default within thirty (30) days next following the giving of written notice from Lender; provided, however, that if such default cannot in the reasonable opinion of Lender be reasonably cured within such thirty (30) day period and provided further that Borrower shall have commenced to cure such default within such thirty (30) day period and thereafter diligently and expeditiously proceeds, in the reasonable opinion of Lender, to cure the same, such 30 day period shall be extended for such time as the Lender shall reasonably determine is reasonably necessary for Borrower in the exercise of due diligence to cure such default, such additional period not to exceed one hundred and twenty (120) days. Notwithstanding any other provision in the Loan Documents or the foregoing, Lender shall have the right to immediately take such actions as it deems necessary or convenient to protect its interests in the event of trustee process, attachment or the placement of any lien on the assets of Borrower, or upon the filing of any bankruptcy petition by or against Borrower.

§10.2. **Acceleration**. If any one or more of the Events of Default shall occur, the Lender may declare the Note together with any other amounts owing under the Loan Documents, to be due and payable.

§10.3 **Other Remedies**. If an Event of Default has occurred and is continuing, then regardless of any other actions taken by Lender, the Lender may proceed to protect and enforce its rights and remedies under this Agreement, the Note or any of the other Loan Documents by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, including the appointment of a receiver. No remedy under this Agreement or in any of the other Loan Documents is intended to be exclusive of any other remedy. Each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or thereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

§10.4 **Waivers**. Borrower hereby waives to the extent not prohibited by applicable law (a) all presentments, demands for performance, notices of nonperformance (except to the extent required by the provisions hereof or of any of the other Loan Documents), protests and notices of dishonor, (b) any requirement of diligence or promptness on the Lender's part in the enforcement of its rights (but not fulfillment of its obligations) under the provisions of this Agreement or any of the other Loan Documents, and (c) any and all notices of every kind and description which may be required to be given by any statute or rule of law and any defense of any kind which Borrower may now or hereafter have with respect to its liability under this Agreement or under any of the other Loan Documents on the basis of any matter set forth in this Section 10.4.

§11. **SETOFF**. Regardless of the adequacy of any collateral, during the continuance of any Event of Default, any deposits (general or specific, time or demand, provisional or final, regardless of currency, maturity, or the branch of the Lender where such deposits are held) or other sums credited by or due from the Lender to Borrower and any securities or other property of Borrower in the possession of the Lender may be applied to or set off against the payment of the

Obligations and any and all other liabilities, direct, or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of Borrower to the Lender. Lender agrees to promptly notify Borrower of any such set off or application by Lender.

**§12. <u>EXPENSES</u>.** Borrower agrees to pay all reasonable, actual third-party costs in connection with: (a) the costs of producing and reproducing this Agreement, the other Loan Documents and the other agreements and instruments mentioned herein, (b) any recording, mortgage or intangibles taxes in connection with the Security Deed, or other taxes payable on or with respect to the transactions contemplated by this Agreement, including any such taxes payable by the Lender after the Closing Date, (c) all title insurance premiums, and the reasonable fees, expenses and disbursements of the Lender's counsel incurred in connection with the preparation or interpretation of the Loan Documents and other instruments mentioned herein, and any amendments, modifications, approvals, consents or waivers hereto or hereunder, (d) the fees, expenses and disbursements of the Lender incurred in connection with the preparation or interpretation of the Loan Documents and other instruments mentioned herein, (including all appraisal fees and surveyor fees), (e) all reasonable out-of-pocket expenses (including reasonable attorneys' fees and costs), and the fees and costs of consultants, accountants, auctioneers, receivers, brokers, property managers, appraisers, investment bankers or other experts retained by the Lender in connection with (i) the enforcement of or preservation of rights under any of the Loan Documents against Borrower or the administration thereof after the occurrence of a Default or Event of Default and (ii) any litigation, proceeding or dispute whether arising hereunder or otherwise, in any way related to the Lender's relationship with Borrower or defending any counterclaims or attacks against Lender by Borrower or any other Person, and (f) all reasonable fees, expenses and disbursements of the Lender incurred in connection with UCC searches, UCC filings, title rundowns, title searches or mortgage recordings. The covenants of this §12 shall survive payment or satisfaction of payment of all amounts owing with respect to the Note.

**§13. <u>INDEMNIFICATION</u>.** Borrower agrees to indemnify and hold harmless the Lender from and against any and all claims, actions and suits, whether groundless or otherwise, and from and against any and all liabilities, losses, damages and expenses of every nature and character arising out of this Agreement or any of the other Loan Documents or the transactions contemplated hereby and thereby (except to the extent that any of the foregoing arise from or are due to Lender's gross negligence or willful misconduct) including, without limitation, (a) any brokerage, leasing, finders or similar fees, (b) any disbursement of the proceeds of the Loan, (c) any condition of the Mortgaged Property whether related to the quality of construction or otherwise, (d) any actual or proposed use by Borrower of the proceeds of the Loan, (e) any actual or alleged violation of any Requirements or Property Approvals, (f) Borrower's entering into or performing this Agreement or any of the other Loan Documents, or (g) with respect to Borrower and the Mortgaged Property, the violation of any Environmental Requirement, the release or threatened release of any Environmentally Sensitive Materials, or any action, suit, proceeding or investigation brought or threatened with respect to any Environmentally Sensitive Materials (including, but not limited to, claims with respect to wrongful death, personal injury or damage to property), in each case including, without limitation, the reasonable fees and disbursements of counsel incurred in connection with any such investigation, litigation or other proceeding. In litigation, or the preparation therefor, the Lender shall be entitled to select its own counsel and, in

addition to the foregoing indemnity, Borrower agrees to pay promptly the reasonable fees and expenses of such counsel. If, and to the extent that the obligations of Borrower under this §13 are unenforceable for any reason, Borrower hereby agrees to make the maximum contribution to the payment in satisfaction of such obligations which is permissible under applicable law.

§14. **LIABILITY OF THE LENDER**. No action shall be commenced by Borrower for any claim against the Lender under the terms of this Agreement unless written notice thereof, specifically setting forth the claim of Borrower, shall have been given to the Lender at least fifteen (15) Business Days prior to the commencement of such action. The liability of the Lender to Borrower for any breach of the terms of this Agreement by the Lender shall not exceed the outstanding principal balance of the Loan, together with interest thereon at the rate payable by Borrower under the terms of the Note. In no event shall the Lender be liable to Borrower, or anyone claiming by, under or through Borrower, for any special, exemplary, punitive or consequential damages, whatever the nature of the breach of the terms of this Agreement by the Lender, such damages and claims therefor being expressly waived by Borrower. Upon request of Borrower, no more often than once per Loan Year, Lender shall deliver a certification providing that Borrower, to Lender's knowledge, is not in default, or if Borrower is in default, specifying the nature thereof, and stating the outstanding Indebtedness hereunder and under the other Loan Documents and the amounts in the Reserve Accounts.

§15. **RIGHTS OF THIRD PARTIES**. This Agreement including without limitation the obligation to make the Advance, is solely and exclusively for the benefit of the Lender; no other Person may enforce or shall be deemed to be a beneficiary thereof. In particular, the Lender makes no representations and assumes no obligations as to third parties concerning the quality of the construction of the Improvements or the absence therefrom of defects or Lender's requirement of compliance with this Agreement or the Loan Documents.

§16. **SURVIVAL OF COVENANTS, ETC**. All covenants, agreements, representations and warranties made herein, in the Note or in any of the other Loan Documents shall be deemed to have been relied upon by the Lender, notwithstanding any investigation heretofore or hereafter made by Lender, shall survive the making of the Loan, and shall continue in full force and effect so long as any amount due under this Agreement or the Note or any of the other Loan Documents remains outstanding.

§17. **PARTICIPATION; ETC.**

§17.1. **Participations**. The Lender may sell participations to one or more banks or other entities (each, whether a proposed or an existing participant, a "Participant", and collectively, the "Participants") in all or a portion of the Lender's rights and obligations under this Agreement and the other Loan Documents; provided that any such sale or participation shall not affect the rights and duties of the Lender hereunder to Borrower. Lender may furnish to such Participants any information concerning Borrower and Guarantor, including, but not limited to, all financial information and tax returns in its possession from time to time to any proposed or existing Participant, provided, however, that any such information shall be provided to each and every Participant pursuant to a confidentiality agreement in which such Participant agrees that such

information shall be provided only to such Participant and its advisors and shall be kept confidential. Notwithstanding anything in the Loan Documents about Borrower's obligation to pay Lender's costs, Borrower shall not be required to pay any costs associated with Lender's selling participations in the Loan, including, without limitation, any attorneys' fees incurred in connection with the negotiation, preparation, execution or delivery of any documents that may be required in connection therewith.

§17.2.  **Pledge by the Lender**.  The Lender may at any time pledge all or any portion of its interest and rights under this Agreement (including all or any portion of the Note) to any of the twelve Federal Reserve Banks organized under §4 of the Federal Reserve Act, 12 U.S.C. §341. No such pledge or the enforcement thereof shall release the Lender from its obligations hereunder or under any of the other Loan Documents.

§17.3.  **No Assignment by Borrower**.  Borrower shall not assign or transfer any of its rights or obligations under any of the Loan Documents without the prior approval of the Lender.

§18.  **RELATIONSHIP**.  The relationship between the Lender and Borrower is solely that of a lender and borrower, and nothing contained herein or in any of the other Loan Documents shall in any manner be construed as making the parties hereto joint venturers or any other relationship other than lender and borrower.

§19.  **NOTICES**.  Each notice, demand, election or request provided for or permitted to be given pursuant to this Agreement shall be given as specified in the Note.

§20.  **GOVERNING JURISDICTION.**

(a)   Substantial Relationship.  It is understood and agreed that the payment obligations of Borrower are to be performed in the State of Maine, which state the parties agree has a substantial relationship to the parties and to the underlying transactions embodied by this Agreement and the loan documents.

(b)   Governing Law.  Except as otherwise provided in this section, this Agreement and each of the other loan documents shall in all respect be governed, construed, applied and enforced in accordance with the internal laws of the State of Maine without regard to principles of conflicts of law.

(c)   Exceptions.  Notwithstanding the foregoing choice of law:

(1)   The procedures governing the enforcement by secured party of its foreclosure and other remedies against Borrower under the Security Deed and under the Note and the other Loan Documents with respect to the Mortgaged Property or other assets of Borrower, including by way of illustration, but not in limitation, actions for foreclosure, for injunctive relief or for the appointment of a receiver shall be

      governed by the laws of the state where such property or other assets are located;

(2)    Lender shall comply with applicable law in the state where the Mortgaged Property or other assets are located to the extent required by the law of such jurisdiction in connection with the foreclosure of the security interests and liens created under the Security Documents and other Loan Documents with respect to the Mortgaged Property or other Collateral; and

(3)    Provisions of federal law and the law of the state where the property is located shall apply in defining the terms hazardous materials, hazardous materials legal requirements, environmental legal requirements and legal requirements as such terms are used in the Loan Documents, with respect to the Mortgaged Property and Borrower.

Nothing contained herein or any other provisions of the Loan Documents shall be construed to provide that the substance of laws of the state of where the property or Borrower's other assets are located shall apply to any parties' rights and obligations under any of the Loan Documents, which, except as expressly provided in clauses (1), (2) and (3) of this section, are and shall continue to be governed by the substantive law of the State of Maine. in addition, the fact that portions of the Loan Documents may include provisions drafted to conform to the law of the state where the property is located is not intended, nor shall it be deemed, in any way, to derogate the parties' choice of law as set forth or referred to in this Note or in the other Loan Documents. The parties further agree that the Lender may enforce its rights under the Loan Documents including, but not limited to, its rights to sue Borrower or to collect any outstanding indebtedness in accordance with applicable law.

**§21.  <u>CONSENT TO JURISDICTION; WAIVERS</u>.**  BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY (A) SUBMITS TO PERSONAL JURISDICTION IN THE STATE OF MAINE OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, AND (B) WAIVES ANY AND ALL PERSONAL RIGHTS UNDER THE LAWS OF ANY STATE TO OBJECT TO JURISDICTION WITHIN THE STATE OF MAINE OR VENUE IN ANY PARTICULAR FORUM WITHIN THE STATE OF MAINE. NOTHING CONTAINED HEREIN, HOWEVER, SHALL PREVENT THE LENDER FROM BRINGING ANY SUIT, ACTION OR PROCEEDING OR EXERCISING ANY RIGHTS AGAINST ANY COLLATERAL AND AGAINST BORROWER, AND AGAINST ANY PROPERTY OF BORROWER, IN ANY OTHER STATE. INITIATING SUCH SUIT, ACTION OR PROCEEDING OR TAKING SUCH ACTION IN ANY STATE SHALL IN NO EVENT CONSTITUTE A WAIVER OF THE AGREEMENT CONTAINED HEREIN THAT THE LAWS OF THE STATE OF MAINE SHALL GOVERN THE RIGHTS AND OBLIGATIONS OF BORROWER AND THE LENDER HEREUNDER OR THE SUBMISSION HEREIN BY BORROWER TO PERSONAL JURISDICTION WITHIN THE STATE OF MAINE.

**§22.  HEADINGS**.  The captions in this Agreement are for convenience of reference only and shall not define or limit the provisions hereof.

**§23.  COUNTERPARTS**.  This Agreement and any amendment hereof may be executed in several counterparts and by each party on a separate counterpart originals.

**§24.  ENTIRE AGREEMENT, ETC**.  The Loan Documents and any other documents executed in connection herewith or therewith express the entire understanding of the parties with respect to the transactions contemplated hereby.  Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated, except as provided in §26.

**§25.  WAIVER OF JURY TRIAL AND CERTAIN DAMAGE CLAIMS**.  THE BORROWER AND THE LENDER AND ANY OTHER PARTY LIABLE FOR THE BORROWER'S OBLIGATIONS RESPECTIVELY EACH HEREBY WAIVES ITS RIGHTS RESPECTIVELY TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, THE NOTE OR ANY OF THE OTHER LOAN DOCUMENTS, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER OR THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS (WHETHER SUCH ACTION OR CLAIM IS INITIATED BY OR AGAINST THE LENDER OR IN WHICH THE LENDER IS JOINED AS A PARTY LITIGANT THERETO), WHICH ACTION OR CLAIM ARISES OUT OF, OR IS IN RESPECT TO, ANY RELATIONSHIP AMONGST OR BETWEEN THE BORROWER, ANY SUCH PERSON, AND THE LENDER.  EXCEPT TO THE EXTENT EXPRESSLY PROHIBITED BY LAW, THE BORROWE HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION REFERRED TO IN THE PRECEDING SENTENCE ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.  THE BORROWER (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS AND (B) ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY BY, AMONG OTHER THINGS, THE WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.  The Borrower makes the foregoing waiver (in which the Lender joins) knowingly, voluntarily, and intentionally, and understands that the Lender, in the establishment and maintenance of the Lender's relationship with the Borrower, is relying thereon.

**§26.  CONSENTS, AMENDMENTS, WAIVERS, ETC**.  Except as otherwise expressly set forth in any particular provision of this Agreement, any consent or approval required or permitted to be given by the Lender may be given, and any term of this Agreement or of any other Loan Document may be amended, and the performance or observance by Borrower of this Agreement or such other Loan Documents, the continuance of any Default or Event of Default may be waived with, but only with, the written consent of the Lender.  No waiver shall extend to or affect any obligation not expressly waived or impair any right consequent thereon.  No course of dealing

or delay or omission on the part of the Lender in exercising any right shall operate as a waiver thereof or otherwise be prejudicial thereto. No Advance made by the Lender hereunder during the continuance or any Default or Event of Default shall constitute a waiver thereof. No notice to or demand upon Borrower shall entitle Borrower to other or further notice or demand in similar or other circumstances.

**§27. TIME OF THE ESSENCE**. Time is of the essence.

**§28. SEVERABILITY**. The provisions of this Agreement are severable, and if any one clause or provision hereof shall be held invalid or unenforceable in whole or in part, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, and shall not in any manner affect any other clause or provision of this Agreement.

**§29. NOTICE**. Under Maine law, no promise, contract or agreement to lend money, extend credit, forbear from collection of a debt or make any other accommodation for the repayment of a debt for more than Two Hundred and Fifty Thousand Dollars ($250,000) may be enforced in court against the Lender unless the promise, contract or agreement is in writing and signed by the Lender. Accordingly, Borrower cannot enforce any oral promise unless it is contained in a loan document signed by the Lender, nor can any change, forbearance or other accommodation relating to the Loan, this Agreement or any other Loan Document be enforced, unless it is in writing and signed by the Lender.

**[Signatures contained on the following page.]**

[Signature page for Gemini 280 Friend Street MT, LLC Term Loan Agreement by and between Gemini 280 Friend Street MT, LLC and Camden National Bank.]

**IN WITNESS WHEREOF**, the undersigned have duly executed this Agreement as a sealed instrument as of June 26, 2012.

**GEMINI 280 FRIEND STREET MT, LLC**,
a Delaware limited liability company

By:     Gemini 280 Friend Street JV, LLC,
        a Delaware limited liability company,
        its managing member

_____                 By: _____
Witness                                       William T. Obeid,
                                              its President


**CAMDEN NATIONAL BANK**

_____                 By: _____
Witness                                       its Senior Vice President
                                              Richard E. Littlefield

Schedule 6.5

Litigation, Adverse Contracts, Etc.

NONE

Schedule 6.13

Hazardous Materials

NONE

P:\RHS\Spencer\Camden National Bank\Holiday Inn Express, Boston MA, 2012 Loan\Loan Agreement - RL - RHS - 6-18-12.DOC

<u>SCHEDULE 7.13</u>

[See attached]

**Gemini 280 Friend Street**
**Holiday Inn Express Boston**
**Capital Expenditure 2012**

| Capital Expenditures | | | |
|---|---|---|---|
| **Elevator** | **Contract** | **Disbursed To Date** | **To Complete** |
| Eagle Elevator Contract | 179,800.00 | 40,800.00 | 139,000.00 |
| Village Forge (Steel Shaft Work) | 45,000.00 | 41,000.00 | 4,000.00 |
| P Donovan (Concrete and Supervision) | 75,000.00 | 59,000.00 | 16,000.00 |
| **Total Elevator** | **299,800.00** | **140,800.00** | **159,000.00** |
| | | | |
| **Air Conditioning Chiller Repair** | | | |
| Unico | 65,575.00 | 32,787.50 | 32,787.50 |
| Signage and Canopy (Estimated) | 40,000.00 | 4,224.63 | 35,775.37 |
| | | | |
| **Total Capital Expenditures** | **405,375.00** | **177,812.13** | **227,562.87** |