**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM T. OBEID, directly and derivatively on behalf of GEMINI REAL ESTATE ADVISORS LLC, et al.<br><br>                              Plaintiff,<br><br>    v.<br><br>CHRISTOPHER LA MACK and DANTE MASSARO<br><br>                              Defendants,<br><br>    and<br><br>GEMINI REAL ESTATE ADVISORS LLC, et al.,<br><br>                              Nominal Defendants. | No. 14 CIV. 6498 (LTS)<br><br>**DECLARATION OF DANTE MASSARO IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

I, Dante Massaro, pursuant to 28 U.S.C. § 1746 affirm under penalty of perjury that the following is true and correct:

1. I submit this declaration in opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction which was emailed to my counsel McGuireWoods LLP at 11:33 p.m. on Friday, February 27, 2015 and upon information and belief has been separately provided to this Court.

2. I am the President and Operating Manager of Gemini Real Estate Advisors, LLC.

3. In April 2003, Plaintiff William Obeid, Defendant Christopher La Mack, and I formed Gemini Real Estate Advisors, LLC ("Gemini" or the "Company") and entered into an Operating Agreement which regulates its governance. A true and correct copy of the 2009 Amended Operating Agreement is attached hereto as **Exhibit A**. Each of us is a Member, holding a one-third membership interest in the Company.

4. Prior to July 1, 2014, Mr. Obeid served as President and Operating Manager of Gemini. As a result of Mr. Obeid's ongoing misconduct, a majority of the members of Gemini voted to remove Mr. Obeid as President and Operating Manager of Gemini on July 1, 2014. Also on July 1, 2014, the majority members of Gemini and Gemini initiated a lawsuit against Mr. Obeid in the North Carolina Superior Court's Business Court (Case No. 14-CVS-1210, the "North Carolina Litigation") due to Mr. Obeid's continued breaches of his fiduciary duties to Gemini. An affidavit filed in the first-filed North Carolina Litigation detailing Mr. Obeid's misconduct and self-dealing is attached hereto as **Exhibit B**.

5. I have reviewed Mr. Obeid's Declaration in Support of his Motion for Temporary Restraining Order and Preliminary Injunction, which upon and information and belief has been provided to this Court, and I have determined that it contains numerous misrepresentations regarding the relationships of and duties between the parties as well as the material allegations upon which Mr. Obeid bases his Motion for Temporary Restraining Order and Preliminary Injunction.

6. Mr. Obeid, as a manager of Gemini, owes a fiduciary duty to the company. Mr. Obeid has continuously breached this duty by attempting to subvert the fair, competitive bid process for the Jade Hotel Projects properties. By bringing this Motion for Temporary Restraining Order and Preliminary Injunction, Mr. Obeid is attempting to freeze the bid process and capture the hotel properties at his lower bid offer. Mr. La Mack and I have only strived for a fair, competitive bid process to maximize the proceeds from any potential sale and not be coerced into selling Gemini's valuable hotel assets to Mr. Obeid at less than market value.

7. Mr. Obeid is seeking to use litigation to destroy the fair, competitive bid process we started and use an expedited discovery process to unfairly discover the details of other competitive bids, even though Mr. Obeid is a potential purchaser of the assets and continues to be a Manager of Gemini.

**The Majority Members Have Complied with Gemini's Operating Agreement**

8. The majority members have operated appropriately within the Operating Agreement, have complied with the Delaware LLC Act, and have not breached any fiduciary duty owed to Mr. Obeid or Gemini.

9. In Mr. Obeid's Declaration in Support of Motion for Temporary Restraining Order and Preliminary Injunction, Mr. Obeid mischaracterizes the terms of the Operating Agreement. [Pl's. Decl. ¶ 17.]

10. The Operating Agreement explicitly provides: "A Member shall not be entitled to participate in the day-to-day affairs and management of the Company, but instead, the Member's right to vote or otherwise participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the Act, the Certificate of Formation, or this Agreement vest in the Member the right to so vote or otherwise participate." [Exh. A § 4.1.]

11. Furthermore, the Operating Agreement does not require that the Operating Manager solicit and obtain Manager approval for the "sale or other disposition of a Project" or "the borrowing of funds, including a refinance of existing indebtedness." Instead, such actions require "approval of a Majority in Interest of the Members." [*Id*. § 4.2.1.]

12. Neither the Operating Agreement nor the Delaware LLC Act require a formal vote to approve the "sale or other disposition of a Project." *See* Del. Code § 18-404(d) ("Unless otherwise provided in a limited liability company agreement, meetings of managers may be held by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in

a meeting pursuant to this subsection shall constitute presence in person at the meeting. Unless otherwise provided in a limited liability company agreement, on any matter that is to be voted on, consented to or approved by managers, the managers may take such action without a meeting, without prior notice and without a vote if consented to, in writing or by electronic transmission, by managers having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all managers entitled to vote thereon were present and voted. . . .").

13. At all relevant times, the majority members of Gemini appropriately approved any material transactions.

14. Since his removal as President and Operating Manager of Gemini, Mr. Obeid has had access to Gemini's server, which contains all company files and every investor report, information on the recently completed Centerville deal (a $20.35 million deal that closed on February 20, 2015), and all other company files.  In addition, Obeid receives a weekly (and sometimes daily) accounting of the balances of all Gemini bank accounts as well as a list of all Gemini checks written.

**Mr. Obeid Continues to Breach His Fiduciary Duties to Gemini by Interfering with the Marketing of Gemini's Jade Hotel Projects in an Attempt to a Secure Discounted Price for the Hotels for Himself and at Gemini's Expense**

15. In or about March 2014, Mr. Obeid proposed a restructuring of Gemini's business in which Gemini's retail and hotel projects would be separated into a Retail LLC and a Hospitality LLC.  Mr. Obeid proposed that Gemini would continue to own wholly the Retail LLC with the individual members' shares remaining at 1/3.  With regard to the Hospitality LLC, however, Mr. Obeid proposed that Gemini's stake be reduced to 30% and that he alone hold the remaining 70% interest in the Hospitality LLC.

16. Because such a proposal would not be in Gemini's best interest, the majority members of Gemini rejected Mr. Obeid's proposal.

17. Since the majority members rejected Mr. Obeid's proposal reducing Gemini's share in its hotel projects, Mr. Obeid has engaged in a campaign to hijack the hotel projects and coerce the majority members to sell the hotel projects to him at reduced prices and to Gemini's detriment.

18. Despite Mr. Obeid's previous mismanagement of the hotel projects, the majority members have maintained the profitability of the hotel management division since Mr. Obeid's termination as President and Operating Manager of Gemini.  All payments received from the recently engaged subcontractor go to Gemini, which then distributes a 1/3 interest to each member.  Neither Gemini nor its majority members have engaged in any deal related to the hotel projects that does not include Mr. Obeid.

**Sale of the Jade Hotel Projects Is in Gemini's Best Interest**

19. On September 25, 2014, I met with Gemini lender UBS Realty Advisors LLC ("UBS") about resolving outstanding financing issues associated with the Jade Seaport Project, and the Jade Bryant Park Project (the "UBS Hotel Projects"). Mr. Obeid was aware that UBS was requesting a meeting. At the conclusion of the meeting, UBS invited Gemini to make a proposal to resolve the outstanding issues with the UBS Hotel Projects.

20. In or about October 2014, Gemini proposed a structure to sell the UBS Hotel Projects which would result in repayment of UBS's loan and interest and payment of proceeds to UBS and the project investors. See correspondence attached hereto as **Exhibit C**. Gemini did not propose selling the UBS Hotel Projects to The Congress Group; rather it merely sought consent to market the properties to the public. I asked for UBS to keep the proposal confidential during consideration in order to protect the interests of Gemini and its investors.

21. In or about November 2014, UBS responded to Gemini's proposal approving the proposal with several refinements. See correspondence attached hereto as **Exhibit D**. Also in November 2014, UBS separately approved Gemini's proposed retention of RobertDouglas, an expert firm in hospitality asset transactions, to assist Gemini with the marketing and sale of the UBS Hotel Projects.

22. Since UBS's approval of Gemini's proposed sale of the UBS Hotel Projects in November 2014, Gemini's majority members have made Mr. Obeid aware of Gemini's decision to market the UBS Hotel Projects to the public for purchase. Gemini's correspondence with UBS and the listing agreement with RobertDouglas were provided to Mr. Obeid. In response, Mr. Obeid issued a litigation hold letter to RobertDouglas.

23. UBS continues to fund necessary costs on the loan, such as the demolition of the Jade Bryant Park Project, but it has ceased to fund soft costs that would increase Gemini's cost basis without adding value for the ultimate buyer, unless that buyer is Mr. Obeid.

24. On November 7, 2014, Gemini provided Mr. Obeid with thirty days to purchase the Jade Greenwich Village Project, the Jade Seaport Project, and the Jade Bryant Park Project (the "Jade Hotel Projects") before they were listed with the public. Mr. Obeid declined to exercise this option.

25. On or about December 16, 2014, RobertDouglas announced to all its potential buyers that Gemini's Jade Hotel Projects were being made available for sale.

26. On that same day, UBS requested that Gemini refrain from marketing the UBS Hotel Projects for one week, and RobertDouglas stopped marketing the properties in conformance with UBS's request.

27. On January 15, 2015, offering memoranda were released for the Jade Greenwich Village Hotel Project.

28. On or about February 4, 2015, Mr. Obeid, through his entity, Arcade Capital, made offers to purchase the Jade Seaport and Jade Bryant Park projects from Gemini.

29. A call for offers on the Jade Hotel Projects was sent to prospective purchasers, with a due date of February 25, 2015.

30. Neither Gemini nor its majority members are attempting to sell Gemini's hotel projects at discounted prices or to The Congress Group pursuant to an undisclosed side deal. Rather, Gemini has been attempting to dispose of these assets through a public marketing process in an effort to obtain the highest and best bid for the hotel projects.

31. Dissatisfied with Gemini's open marketing of the hotel deals, Mr. Obeid is attempting to purchase the Jade Bryant Park Project and the Jade Seaport Project for his own benefit and at below-market prices to Gemini's detriment through his newly created and wholly owned entity Arcade Capital and with the assistance of hedge fund Elliott Management Corporation.

32. With regard to Mr. Obeid's offer to purchase the Jade Bryant Park Hotel project referenced in Paragraphs 94 & 95 of his Declaration in Support of Motion for Temporary Restraining Order and Preliminary Injunction, on February 12, 2015. Gemini did not respond to the offer pending the call for offers date of February 25, 2015 because the offer was not sufficient to return all monies to investors.

33. With regard to Mr. Obeid's offer to purchase the Jade Seaport Hotel project referenced in Paragraphs 96 & 97 of his Declaration in Support of Motion for Temporary Restraining Order and Preliminary Injunction, counsel for 33 Peck Slip Holding LLC transmitted to Mr. Obeid a proposed Agreement for Mr. Obeid to purchase the Jade Seaport Hotel through his entity Arcade Capital from 33 Peck Slip Holding LLC, an entity in which all of the investors had an interest. Contrary to Mr. Obeid's representations, counsel for 33 Peck Slip Holding LLC did not inform Mr. Obeid that he represented Mr. La Mack or myself. See correspondence attached hereto as **Exhibit E**. To date, Mr. Obeid has provided no response to the proposed terms of the Agreement, and Gemini has received higher offers from other parties.

34. Since the Jade Hotel Projects were released for public sale, the majority members have not consulted with Mr. Obeid regarding the offers for sale received from other entities as Mr. Obeid is a potential purchaser. Providing Mr. Obeid with the details relating to other bids would be a conflict of interest that is not in Gemini's best interest.

35. Mr. Obeid has approached investors in an effort to persuade them to put pressure on Gemini to accept his offers. For example, an investor named Sumeer Kakar told me that Mr. Obeid sent him a form letter to send Gemini asking us to accept Mr. Obeid's offer on the Jade Seaport Project. Mr. Kakar refused to comply with his request. I believe Mr. Obeid has breached his fiduciary duty as a manager of Gemini by trying to manipulate the bidding process for his own gain.

36. As a manager of Gemini, Mr. Obeid should strive for a fair, competitive bid process so that Gemini can maximize any potential sale. Instead, Mr. Obeid is attempting to scare

   away any competitive bidders through litigation and use the expedited discovery process to discover the details of other bids.

37. Mr. Obeid's attempts to coerce Gemini's lenders and investors into accepting his below-market bids—most glaringly demonstrated by his instant Motion for Temporary Restraining Order and Preliminary Injunction threatened two days after Gemini's call for offers on the Jade Hotel Projects—threatens to chill the market and drive away potential competitors, at Gemini's expense.

**Per Gemini's Regular Practice, Gemini Retained Bridgeton Hotel Management, LLC to Sub-Manage a Majority of Its Hotel Projects**

38. On January 26, 2015, Gemini subcontracted the management of 9 of its 12 hotel projects to Bridgeton Hotel Management, LLC ("Bridgeton") because it was in the best interests of Gemini, the hotel projects, and the investors.

39. Gemini has sub-contracted hotel management before, and numerous of the existing hotel projects were sub-managed from 2005 to 2007 by Atit Jariwala, who currently runs Bridgeton. Mr. Jariwala was Gemini's first hotel partner and was responsible for seven of Gemini's existing hotel deals.

40. Gemini regularly engages third-parties to sub-manage its various real estate projects. In fact, at Mr. Obeid's direction, all of Gemini's retail properties were sub-managed by CBRE and Zamias Services, Inc. from June 1, 2006 to February, 2009. See agreements attached hereto as **Exhibits F and G**.

41. Bridgeton and Gemini agreed that Bridgeton would offer employment positions to numerous members of Gemini's hotel management team, which would save Gemini substantial costs on employee salaries and benefits while allowing the management team to remain available to work on Gemini hotels and providing continuity for the hotel project management.

42. Gemini terminated the employment of two employees during the transition to Bridgeton. One was a hotel accountant whose performance was not up to reasonable standards. The other, the hotel Art Director, was offered a position with Bridgeton but communicated with Gemini's HR Director that he had already been offered a position with Arcade Capital, Mr. Obeid's new company.

43. Numerous members of Gemini's former hotel management team expressed concerns with Mr. Obeid's lack of experience with hotel projects and his management style. In fact, every employee that was offered, except one, from the hotel management team happily accepted employment with Bridgeton.

44. Contrary to Mr. Obeid's assertions in Paragraph 110 of his Declaration, it has been necessary for both Gemini and Bridgeton to communicate with lenders to effectuate the transition and approval. Gemini and its investors have not suffered any damage.

45. Contrary to Mr. Obeid's assertions in Paragraph 111 of his Declaration, the majority members of Gemini have not "continued to dismantle Gemini's hospitality business through its wholesale transfer of assets, infrastructure and staff." Rather, Mr. La Mack and I have made prudent business decisions to make the company more efficient and secure. For example, Gemini hired a third-party security company on January 26, 2015 for the safety and security of the Gemini employees. The security company had no authority whatsoever to communicate or act on behalf of Gemini, except in the case of a safety threat.

46. Contrary to Mr. Obeid's assertions in paragraph 112 of his declaration, the office transfer was not done in secret and was accomplished to pursue the best business interests of Gemini. The transition of the Gemini team was immediately followed by a press release and post on Gemini's website noticing the new address. A total of 17 current and former Gemini employees—not 24—relocated to the new address with Bridgeton. Six of these individuals remain Gemini employees, and Gemini is sub-leasing work space from Bridgeton for these employees at a cost of $2,250 per month. In contrast, the office at 200 Park Avenue costs $26,000 monthly and currently has only three employees.

47. Upon information and belief Mr. Obeid is using the 200 Park Avenue office space that Gemini still maintains and funds for his new company, Arcade Capital. The current Gemini employees relocating to the Bridgeton location and for which Gemini sub-leases Bridgeton workspace, have since been denied access to Gemini's office at 200 Park Avenue South. Upon information and belief, Mr. Obeid has denied access to Gemini to its own office space. The majority members of Gemini have notified Mr. Obeid that he can take over the lease through Arcade Capital or we will list the space with ABS Management for sub-lease since Gemini no longer needs the space.

48. In Paragraph 114 of his Declaration, Mr. Obeid acknowledges the new address for Gemini but makes issue in his Motion for Temporary Restraining Order and Preliminary Injunction that my counsel could not recite the specific address while on a phone call. Mr. Obeid has at all times been aware of Gemini's new office location and has never indicated any confusion about this to me.

49. The management team under Bridgeton is largely the same as it was with Gemini. As is customary in third-party management relationships, Gemini provided information required to maintain and run the properties. No proprietary information was provided to Bridgeton and the Bridgeton employees continue to be under strict confidentiality obligations to maintain privacy in connection with Gemini's projects. Gemini and Bridgeton do not, nor have they at any time, shared an information technology platform. Only information pertaining to the specific properties under management was shared with Bridgeton.

**Mr. Obeid Has Already Admitted that his Allegations Pertaining to the Greenville Project Are Moot**

50. In Paragraphs 49–62 of his Declaration in Support of Motion for Temporary Restraining Order and Preliminary Injunction, Mr. Obeid attempts to reargue his baseless allegations

50. [cont.] that Gemini's majority members attempted to usurp the Greenville Project from Gemini and for their own benefit.

51. As previously set forth in my August 25, 2014 Declaration in Opposition to Mr. Obeid's previous Motion for Temporary Restraining Order and Preliminary Injunction, the Greenville Project was initiated solely to pursue the business and real estate interest of Gemini and not for the personal commercial ventures of the majority members. [Dkt. No. 11.]

52. Based on my previous declaration filed with this Court, Mr. Obeid has already admitted to this Court through his former counsel, Boies, Schiller & Flexner LLP, that his allegations relating to the Greenville Project are moot. [Dkt. Nos. 13, 14.]

**Mr. Obeid Has Illegally Obtained and Threatened to Release Attorney-Client Privileged Communications Belonging to Gemini and to Me**

53. In late 2014, the majority members of Gemini discovered that Mr. Obeid had installed or had caused to be installed software onto Gemini's email servers that allowed him to access the majority members' email communications. Upon discovery of this software, I immediately instructed that it be removed from Gemini's servers.

54. Upon information and belief, Mr. Obeid used this spy software to obtain copies of privileged communications between the Individual Defendants and our counsel as well as other privileged documents pertaining to this litigation.

55. Additionally, Mr. Obeid obtained privileged communications between Gemini and its counsel related to this litigation and prior representations.

56. Mr. Obeid then threatened to publicly file many of these privileged documents with the Court by attaching them to his Declaration in support of his Order to Show Cause to Disqualify Defendants' Counsel.

57. Neither Gemini nor the Individual Defendants authorized disclosure to Mr. Obeid or to the public of the documents attached to Mr. Obeid's Declaration. Rather, Gemini and the Individual Defendants took all reasonable measures to prevent disclosure of our communications with counsel, including using password-protected email accounts and keeping electronic and paper records related to the representation securely filed.

58. I do not know the full extent of the privileged communications obtained by Mr. Obeid; however, I am concerned that, unless the Court prevents him from doing so, Mr. Obeid will continue to steal Defendants' confidential and privileged communications with counsel, causing irreparable harm to me, Mr. La Mack, and Gemini.

59. At 10:31 a.m. on March 2, 2015, just one hour before the threatened deadline by which Mr. Obeid and his counsel planned to publicly disclose Defendants' confidential communications, Mr. Obeid's counsel contacted the Court to indicate he would redact certain exhibits to his Declaration. However, Mr. Obeid unlawfully obtained these

communications to begin with, and this last minute change of course does not rectify his behavior.  I remain concerned that he will continue to steal Defendants' confidential and privileged communications with counsel, causing irreparable harm to me, Mr. La Mack, and Gemini.

60. I object to Mr. Obeid's unilateral redactions of Defendants' privileged and confidential communications, as the right to redact such communications belongs exclusively to Defendants.

**Granting Mr. Obeid's Motion for Temporary Restraining Order and Preliminary Injunction Would Irreparably Harm Gemini**

61. Mr. Obeid has failed to demonstrate to this Court that allowing Gemini to market its Jade Hotel Projects to the public is likely to cause irreparable harm to Gemini.  Mr. Obeid wants to avoid a fair bidding process and instead wants to force Gemini to sell the hotel properties to him at his chosen price.

62. Mr. Obeid has failed to demonstrate to this Court that he is likely to succeed on the merits with regard to any alleged impropriety relating to Gemini's marketing and ultimate sale of the Jade Hotel Projects to the public.

63. Mr. Obeid has failed to demonstrate to this Court that he has a right to purchase or operate the Jade Hotel Projects.

64. To the contrary, granting the Motion for Temporary Restraining Order and Preliminary Injunction would allow Mr. Obeid to continue to interfere with the marketing and sale of Gemini's Jade Hotel Projects, would eliminate other competing offers on the Jade Hotel Projects through the call for offer period, and would allow Mr. Obeid to deflate artificially the price of the Jade Hotel Projects to his own benefit and to the detriment of Gemini.

65. Prior to Mr. Obeid engaging his current counsel, we were actively engaged in settlement discussions with Mr. Obeid and his previous counsel.  We actually submitted a proposed settlement offer to Mr. Obeid on January 26, 2015 to which he refuses to respond.

66. After Mr. Obeid switched his litigation counsel, my counsel at McGuireWoods contacted Mr. Obeid's new counsel on February 16, 2015 to discuss the case and the status of any settlement response.  Mr. Obeid's counsel claimed that they had not gotten up to speed on the case and had not yet received the case files from Boies Schiller.  Mr. Obeid's new counsel did not mention anything about problems with the hotel marketing process nor suggest that they would be seeking a temporary restraining order with this Court.

67. In his declaration, Mr. Obeid claims we have caused him harm by moving offices and seeking to sub-lease the current, expensive space where Mr. Obeid maintains his office.  The majority members of Gemini have specifically offered for Mr. Obeid to take over this space if he wants to use it for Arcade Capital's business.  However, it is my business judgment that that space is too expensive for Gemini to maintain and unnecessary for its business.

68. Mr. Obeid has proven time and again with litigation hold letters and misleading and self-serving e-mails inciting panic with investors, employees, lenders, and broker-dealers that he cannot be trusted to act in the best interest of Gemini. This motion for a temporary restraining order is a clear example by virtue of the fact that he stands to solely benefit his new company, Arcade Capital, by eliminating the fairness of the competitive bidding process.

69. Mr. Obeid and his new company, Arcade Capital, will solely benefit if his Motion for Temporary Restraining Order and Preliminary Injunction is granted. The higher offers currently on the table will be eliminated due to the time delay, and granting the motion would lead to negative market feedback during the critical marketing period.

70. Chilling the competitive bid process does not benefit Gemini. Instead, Mr. Obeid's new company stands to benefit by eliminating any competition, bringing harm to the Gemini investors and potential litigation against the company due to monetary losses.

71. Gemini, under the leadership of myself and Mr. La Mack, is running in a more efficient and profitable manner due to the reduction of bloated overhead rampant under Mr. Obeid's direction. Gemini's employees are able to perform their jobs skillfully and productively without fear that they will be chastised or belittled by the former management tactics of Mr. Obeid.

72. Mr. Obeid's request for a TRO is a clear example of manipulating the competitive bid process for his own gain. He has been aware of the marketing process since November 2014 and has strategically filed for a temporary restraining order to stop the process only after learning that we have received competitive offers. We ask that the Court uphold the standard real estate marketing and sale process by denying the temporary restraining order and allowing Gemini to proceed with the highest qualified offer for the benefit of our investors.

73. It is my belief that Mr. Obeid wants this Court to manage every business decision made by Gemini with respect to the hotel properties. Any temporary restraining order issued by this Court will chill the market and drive away potential buyers. The potential loss to Gemini would be almost $155 million, based on the current offers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 2, 2015
New York, NY

Respectfully submitted,

*Dante Massaro*

Dante Massaro