SUBCONTRACT PROPERTY MANAGEMENT AGREEMENT



This SUBCONTRACT PROPERTY MANAGEMENT AGREEMENT (the "Agreement") is dated as of this 1st day of June, 2006, by and between Gemini Management Company, LLC, a North Carolina limited liability company (the "Property Manager") and CB Richard Ellis, Inc., a Delaware corporation (the "Subcontractor").

Certain tenants in common (collectively, the "Tenants in Common") own multi-tenant retail centers as more particularly described in **Exhibit "A"** attached hereto and incorporated herein (each a "Project" or "Projects"). Throughout the Term of this Agreement, Property Manager may add or delete Projects from Exhibit A by mutual execution by the parties hereto of an amendment to this Agreement. The Tenants in Common have engaged the Property Manager to supervise, manage, lease, operate, and maintain the Project pursuant to a Property and Asset Management Agreement (the "Management Agreement"). The Tenants in Common have entered into a Tenants in Common Agreement (the "Tenants in Common Agreement") concurrently herewith. The Property Manager wishes to subcontract certain of its duties under the Management Agreement and the Subcontractor wishes to perform such duties and receive the fees and other consideration provided for herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Commencement and Termination Dates; Authority of Tenants in Common.

    1.1    Commencement and Termination. The Subcontractor's duties and responsibilities under this Agreement shall begin on the date of this Agreement and shall terminate on the earlier of (i) the sale of the Project or any portion thereof, as to such portion of the Project sold only (other than any sale of an undivided interest held by a Tenant in Common to a party that will acquire such interest subject to the Tenants in Common Agreement and this Agreement), (ii) termination, expiration or the failure of renewal of the Management Agreement, (iii) termination of this Agreement as provided in Section 10, or (iv) December 31, 2011.

    1.2    Authority of the Tenants in Common. The Property Manager and the Subcontractor acknowledge and agree that this Agreement is subject in all respects to the Management Agreement, as amended from time to time. Certain consents from the Tenants in Common for the authority of the Property Manager to act are required under the Management Agreement. The Property Manager and the Subcontractor agree to observe the requirements of such consents and to work together to receive such consents. Wherever this Agreement provides that the consent of the Property Manager, such provision shall be interpreted to mean that, if required by the terms of the Management Agreement, the Property Manager has first obtained the consent of the Tenants in Common to the matter in question (it being agreed that the primary factor in the Property Manager's decisions as to whether to grant or withhold its consent will be the best interests of the Tenants in Common). The Property Manager shall be responsible for all communications with the Tenants in Common, including contacting the Tenants in Common to obtain appropriate consents, and the Subcontractor will make no direct contact with the Tenants in Common. As of the date hereof, the Management Agreement provides as to the authority of the Tenants in Common that:

        1.2.1 Consent of the Tenants in Common. The consent of the Tenants in Common shall be as set forth in Sections 2.2 and 2.3 of the Tenants in Common Agreement.

        1.2.2 Authority of Property Manager. Upon the approval of any item by the Tenants in Common pursuant to Sections 1.2.1 and 1.2.2 above, the Property Manager (and the Subcontractor to the extent of the subcontract of duties under this Agreement) shall have the power and authority to act on behalf of the Tenants in Common with respect to such items.

2. Property Manager's and Subcontractor's Responsibilities.

    2.1    Status of the Property Manager and Subcontractor. The Tenants in Common, the Property Manager and the Subcontractor do not intend to form a joint venture, partnership or similar relationship. Instead, the parties intend that the Property Manager shall act solely in the capacity of an independent contractor for the Tenants in Common and the Subcontractor will act solely as a subcontractor of the Property Manager of certain duties under the Management Agreement. Nothing in this Agreement shall cause the Property Manager, the

Subcontractor and the Tenants in Common to be joint venturers or partners of each other, and none of the parties shall have the power to bind or obligate any other party by virtue of this Agreement, except as expressly provided in this Agreement. Nothing in this Agreement shall deprive or otherwise affect the right of any party to own, invest in, manage, or operate, or to conduct business activities which compete with the business of the Project.

        2.2        Management. The Subcontractor shall manage, operate and maintain the Project in an efficient, economic, and satisfactory manner and shall arrange the performance of everything reasonably necessary for the proper operation of the Project for the tenants thereof, subject to (a) applicable governmental requirements and (b) the terms and provisions of this Agreement. At the expense of the Tenants in Common, the Subcontractor shall keep the Project clean and in good repair, shall order and supervise the completion of such repairs as may be required and shall generally do and perform, or cause to be done or performed, all things necessary, required or desirable for the proper and efficient management, operation, and maintenance of the Project; provided the Tenants in Common, in a manner reasonably satisfactory to the Subcontractor, make available to the Subcontractor such sums as are reasonably necessary to pay the costs thereof. The Property Manager shall have exclusive responsibility for interfacing and communicating with the Tenants in Common and holder of any deed of trust or mortgage upon the Project (a "Lender") in connection with the loan secured by such deed of trust or mortgage ("Loan"), including, without limitation, Barclays Capital Real Estate, Inc. (the holder of the initial mortgage representing the initial Loan on the Project (the "Initial Loan")) and its successors and assigns (the "Initial Lender"), except to the extent the Property Manager directs the Subcontractor to assist in these matters or as otherwise provided herein. As and to the extent directed by the Property Manager, the Subcontractor shall assist in interfacing with Lender by providing (subsequent to the Property Manager's review) regular monthly (or other frequency) reporting to the Lender as directed by the Property Manager (which shall generally include delivering copies of summary income statements, balance sheets, rent rolls, stacking plans, and other such activity reports), completing regular escrow draw requests on designated forms when desired by the Property Manager, conducting regular tours and site inspections of buildings required by the Lender's personnel, cooperating with any desired audits or record review required by the Lender, as requested by the Property Manager, submitting to the Lender for payment regular documentation regarding the property taxes and insurance associated with the Project, depositing rents or other revenues in any lockbox account maintained under such loan documents, receiving into an operating account to be maintained by Subcontractor on behalf of Property Manager for the benefit of the Tenants in Common all disbursements made out of any such lockbox to the Tenants in Common as the borrower thereunder for the payment of operating expenses of the Project, or otherwise to be made to or to the account of the Tenants in Common as such borrower, requesting and receiving any amounts out of any reserve accounts or escrow accounts maintained by such lender on account of repairs, capital improvements, tenant improvements, leasing commissions, real estate taxes and assessments and insurance proceeds or otherwise. The Subcontractor shall perform all services in a diligent and professional manner. Notwithstanding anything to the contrary contained herein, the Subcontractor shall only provide customary services to tenants of the Project and shall provide no other services to the tenants on behalf of the Tenants in Common.

        2.3        Employees: Independent Contractor. The Subcontractor shall, subject to the limitations of the Budget (as defined in Section 2.5.1) employ, directly or through third party contractors (e.g. employee leasing company), at all times a sufficient number of capable employees and/or independent contractors to enable the Subcontractor to properly, adequately, safely and economically manage, operate and maintain the Project. All matters pertaining to the supervision of such employees shall be the responsibility of the Subcontractor. All salaries and benefits and positions of employees who perform work in connection with the Project shall be consistent with the Budget (as defined in Section 2.5.1).

        2.4        Compliance with Laws, Mortgages and Other Matters.

        2.4.1 The Subcontractor shall, at the Tenants In Common's expense, use reasonable efforts to comply with any deed of trust, mortgage or other loan documents affecting the Project and all governmental requirements, relative to the performance of its duties hereunder and cause the Project to comply with any deed of trust, mortgage or other loan documents affecting the Project and all governmental requirements of which Subcontractor is aware. The Subcontractor may implement such procedures with respect to the Project as the Property Manager may deem advisable for the more efficient and economic management and operation thereof. However, Subcontractor shall not be obligated to remedy violations of law (or perform other obligations under this Agreement for which expenditure of the Tenants In Common's funds are required) if sufficient funds are not available in the Operating Account or if the Tenants in Common do not provide sufficient additional funds to do so.

3707614.1

2.4.2 The Subcontractor shall furnish to the Property Manager, promptly after receipt, any notice of violation of any material governmental requirement or order issued by any governmental entity, any notice of default from the holder of any mortgage or deed of trust encumbering the Project or any notice of termination or cancellation of any insurance policy.

2.5    Budgets and Operating Plan.

2.5.1 The Subcontractor shall prepare and submit to the Property Manager (so that the Property Manager may submit it to the Tenants in Common) annually an annual capital and operating budget ("Budget") for the promotion, operation, leasing, repair, maintenance and improvement of each Project for each calendar year. The Budgets for each Project for the initial calendar year are attached hereto as **Exhibit "B"** and has been approved. The Budgets are and shall be presented on a monthly, cash basis and shall cover the calendar year. The Subcontractor shall deliver each subsequent Budget for each subsequent calendar year prior to November 15th of the calendar year before the budget year. The Subcontractor shall use best efforts to promptly incorporate into the Budget any change that the Property Manager may request in order to submit it for approval by the Tenants in Common. In the event that the Tenants in Common do not approve the Budget, the Subcontractor shall work with the Property Manager to negotiate with the Tenants in Common in good faith to obtain an acceptable Budget. The Property Manager, and therefore the Subcontractor, may proceed under the terms of the proposed Budget for items that are not objected to and may take any action with respect to items not approved for Permitted Expenditures (as defined in Section 2.5.2). In the event that the items that are objected to are operational expenditures, as opposed to capital expenditures, the Subcontractor shall be entitled to operate the Project using the prior year's budget for such items plus 5% until the approval is obtained. The Subcontractor shall provide the Property Manager for delivery to the Tenants in Common with such information regarding the Budget as may be, from time to time, reasonably requested by the Tenants in Common. The Property Manager may at any time submit a revised Budget to the Tenants in Common for their approval consistent with the terms of this Section.

2.5.2 INTENTIONALLY OMITTED.

2.5.3 During each calendar year, the Subcontractor shall inform the Property Manager of any material increases in costs and expenses not foreseen and not included in the Budget promptly after the Subcontractor learns of such changes.

2.5.4 Together with the submission of the Budget, the Subcontractor shall submit each year to the Property Manager an operating plan for the general operation of the Project, including a proposed list of improvements to the Project, general insurance plan, marketing plan and plan for the general operation and maintenance of the Project which shall be subject to the approval of the Property Manager (the "Operating Plan"). The Subcontractor may submit a revised Operating Plan to the Property Manager at any time for the Property Manager's approval.

2.5.5 INTENTIONALLY OMITTED.

2.6    Leasing.

2.6.1 The Subcontractor shall use commercially reasonable efforts to obtain tenants for all leasable space in the Project and to renew leases and rental agreements (collectively, "Leases") as provided herein. The Subcontractor shall have the authority to negotiate new and renewal Leases on behalf of the Tenants in Common and to deliver to the Tenants in Common, for execution, any Leases that are approved by the Tenants in Common pursuant to Section 2.2 of the Tenants in Common Agreement. In connection with its leasing efforts, the Subcontractor may advertise the Project for lease.

2.6.2 The Subcontractor shall not, without the prior written approval of the Tenants in Common, give free rental or discounts or rental concessions to any employees, officers or shareholders of the Subcontractor or anyone related to such employees, officers or shareholders unless such discounts or concessions are in lieu of salaries or other benefits to which they would be contractually entitled. The Subcontractor shall not lease any space in the Project to itself or to any of its affiliates or subsidiaries, unless otherwise approved by the Tenants in Common.

          2.6.3 The Subcontractor shall reasonably investigate all prospective tenants. Each prospective tenant (other than nationally recognized tenants determined by the Subcontractor to have acceptable credit) shall be required to complete an application for lease and financial statement. The Subcontractor shall retain such information for the duration of this Agreement, and shall make it available to the Tenants in Common upon reasonable notice, subject to compliance with any confidentiality restrictions required by any tenant or credit check company. The Subcontractor does not guarantee the accuracy of any such information or the financial condition of any tenant.

          2.6.4 The Subcontractor and the Property Manager agree that there shall be no discrimination against or segregation of any person or group of persons on account of age, race, color, religion, creed, handicap, sex or national origin in the leasing of the Project, nor shall the Subcontractor or the Property Manager permit any such practice or practices of discrimination or segregation with respect to the selection, location, number or occupancy of tenants.

    2.7        INTENTIONALLY OMITTED.

    2.8        Repairs and Maintenance. The Subcontractor shall maintain the buildings, appurtenances and common areas of the Project other than the areas that are the responsibility of the tenants.

    2.9        INTENTIONALLY OMITTED

    2.10       Service Contracts, Supplies and Equipment.

          2.10.1 Subject to any contrary direction by the Property Manager, the Subcontractor may enter into or renew any contract for cleaning, maintaining, repairing or servicing the Project or any of the constituent parts of the Project (including contracts for fuel oil, security or other protection, extermination, landscaping, architectural or engineering services) contemplated by the Budget, and consistent with the Operating Plan, with any unrelated third party without the consent of the Tenants in Common. Each such service contract shall (a) be in the name of the Tenants in Common or in the name of Subcontractor as agent for the Tenants in Common, (b) be assignable to the nominee of the Tenants in Common and (c) be for a term not to exceed one (1) year. Unless the Tenants in Common specifically waive such requirements or approve a particular contract, all service contracts for amounts in excess of $50,000 per year shall be subject to the bidding requirements specified by Property Manager.

          2.10.2 If this Agreement terminates or is not renewed pursuant to Section 10, the Subcontractor, at the option of the Property Manager, shall assign to the Property Manager or the nominee of the Tenants in Common all of the Subcontractor's interest in all service agreements pertaining to the Project, if any.

          2.10.3 At the expense of the Tenants in Common, the Subcontractor may purchase, provide, and pay for all needed janitorial and maintenance supplies, tools and equipment, restroom and toilet supplies, light bulbs, paints, and similar supplies necessary to the efficient and economical operation and maintenance of the Project. Such supplies and equipment shall be the property of the Tenants in Common. All such supplies, tools, and equipment shall be delivered to and stored at the Project and shall be used only in connection with the management, operation, and maintenance of the Project.

    2.11       INTENTIONALLY OMITTED

    2.12       Miscellaneous Duties. The Subcontractor shall (a) maintain at the Subcontractor's office at the Subcontractor's address as set forth in Section 12 or at the Project and readily accessible to the Tenants in Common, orderly files containing insurance policies, leases and subleases, correspondence, and all other documents and papers pertaining to the Project or the operation thereof; (b) provide to the Property Manager information about the Project necessary for the preparation and filing by each of the Tenants in Common of their individual income or other tax returns required by any governmental authority; (c) consider and record tenant service requests in systematic fashion showing the action taken with respect to each, and thoroughly investigate and promptly report to the Property Manager with appropriate recommendations all complaints of a nature which might have a material adverse effect on

the Project or the Budget; (d) supervise the moving in and out of tenants and subtenants; arrange, to the extent possible, the dates thereof to minimize disturbance to the operation of the Project and inconvenience to other tenants or subtenants; (e) check all bills received for the services, work and supplies ordered in connection with maintaining and operating the Project; and (f) not knowingly permit the use of the Project for any purpose that might void any policy of insurance held by the Tenants in Common or which might render any loss thereunder uncollectible. All such records are the property of the Tenants in Common and will be delivered to the Tenants in Common upon request. All records will also be delivered to the Property Manager upon its request.

        2.13     Hazardous Materials. For purposes of this Agreement, the term "Hazardous Materials" includes, but is not limited to, asbestos, PCB transformers, other toxic or hazardous substances, underground storage tanks, underground water contamination, and any other substance that may cause health or safety hazards.

        (a)     Property Manager or the Tenants in Common shall be responsible for determining whether the Property complies with environmental laws, regulations and ordinances and, if required, to cause prompt compliance therewith. Property Manager and the Tenants in Common acknowledges that Subcontractor does not have the expertise or qualifications technically to supervise subcontractors for work regarding Hazardous Materials, and Subcontractor shall not be required to do so.

        (b)     If Property Manager or the Tenants in Common has previously obtained any inspection reports regarding Hazardous Materials at or in the Property, such reports shall be listed on Exhibit "D" to this Agreement and made a part hereof. In addition, Property Manager shall state on Exhibit "D" any other information Property Manager or the Tenants in Common has regarding Hazardous Materials at or in the Property.

        (c)     Property Manager, on behalf of the Tenants in Common, authorizes Subcontractor to advise prospective tenants that all such reports should be examined by them and that they should reach an independent decision with respect to the presence of any Hazardous. Property Manager further agrees to notify Subcontractor and prospective tenants at any time Hazardous Materials are discovered or reports are obtained addressing Hazardous Materials in or about the Property.

        (d)     In connection with the foregoing, Property Manager hereby agrees to and shall indemnify, protect, defend, save, and hold harmless the Subcontractor, its affiliates and each of their respective officers, directors, representatives, agents, principals, insurers and employees from any claim, cause of action, liability, loss, demand, damages (including damages associated with any environmental law), fine, penalty, injury, cost, or expense (including attorney's fees and expenses) arising out of or relating in any way to (i) the actions, or failure to act, by the Subcontractor in following Property Manager's, the Tenants In Common's and the Property Manager's environmental consultant's directions; (ii) the Property Manager's or the Tenants In Common's failure or refusal to employ an environmental consultant with respect to the Property (and in such event, Subcontractor shall have absolutely no responsibility or liability for enforcing compliance with Hazardous Materials Laws at the Property, and Property Manager specifically releases Subcontractor therefrom); (iii) the failure of Property Manager or the Tenants in Common to authorize and fully fund expenses for the fulfillment of the recommendations contained in any environmental assessment reports and any updates; (iv) the acts, omissions, or negligence of the Property Manager, Tenants in Common, Property Manager's or Tenants in Common's environmental consultant, or the failure of such environmental consultant, to fulfill its obligations with respect to the Property; (v) any violation, or alleged violation, of all, or any portion, of the Property with any Hazardous Materials Laws and/or Subcontractor's efforts to enforce the Property's compliance with such laws; and (vi) any attempt by any person, group, entity, or governmental agency to designate Subcontractor as "operator" or "regulated facility" under the Resource Conservation and Recovery Act (RCRA), or a Potentially Responsible Party (PRP) under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), or otherwise liable as a party under any other environmental law, or as a party in any claim for contribution, cost recovery or indemnity against Subcontractor, or its insurer arising out of the foregoing.

    3.     Basic Insurance.

        3.1     Insurance.

        3.1.1 The Property Manager, at the Tenants in Common's expense, will obtain and keep in force adequate insurance against physical damage (such as fire with extended coverage endorsement,

boiler and machinery) and against liability for loss, damage or injury to property or persons that might arise out of the occupancy, management, operation or maintenance of the Project, as contemplated by the Operating Plan and any Loan Documents affecting the Project (including the Initial Loan Documents) and to the extent available at commercially reasonable rates. The Property Manager shall not be required to maintain earthquake or flood insurance unless expressly directed to do so by a specific written notice from the Tenants in Common or as required by any Loan Documents affecting the Project, but may do so with the Property Manager's approval. The Property Manager and the Subcontractor shall be a named insured on all property damage insurance and an additional insured on all liability insurance maintained with respect to the Project. In the event the Subcontractor receives insurance proceeds for the Project, the Subcontractor will take any required actions as set forth in any Loan Documents affecting the Project. In the event that the Subcontractor receives insurance proceeds that are not governed by the terms of any Loan Documents affecting the Project, the Subcontractor will either (i) use such proceeds to replace, repair or refurbish the Project or (ii) distribute such proceeds to the Tenants in Common, as directed by the Tenants in Common. Any insurance proceeds distributed to the Tenants in Common will be distributed subject to the fees owed to the Property Manager pursuant to the Management Agreement and fees payable to the Subcontractor pursuant to this Agreement.

      3.1.2 The Subcontractor shall investigate and submit, as soon as reasonably possible, a written report to the insurance carrier and the Property Manager as to all accidents, claims for damage relating to the ownership, operation and maintenance of the Project, any damage to or destruction of the Project and the estimated costs of repair thereof, and prepare and file with the insurance company in a timely manner required reports in connection therewith.

    3.2   Additional Insurance. Any insurance obtained by the Subcontractor for its own account and not for the benefit of the Tenants in Common or the Project shall be at the Subcontractor's own expense and for its sole benefit.

    3.3   Contractor's and Subcontractor's Insurance. The Subcontractor shall require all contractors and subcontractors entering upon the Project to perform services to have insurance coverage at the contractor's or subcontractor's expense, in the following minimum amounts: (a) worker's compensation - statutory amount; (b) employer's liability (if required under applicable law) - $500,000 (minimum); and (c) comprehensive general liability insurance, including comprehensive auto liability insurance covering the use of all owned, non-owned and hired automobiles, with bodily injury and property damage limits of $1,000,000 per occurrence. The Subcontractor may waive such requirements with the approval of the Property Manager. The Subcontractor shall obtain and keep on file a certificate of insurance that shows that each contractor and subcontractor is so insured.

    3.4   Waiver of Subrogation. To the extent available at commercially reasonable rates, all property damage insurance policies required hereunder shall contain language whereby the insurance carrier thereunder waives any right of subrogation it may have with respect to the Tenants in Common, the Property Manager or the Subcontractor.

    4.   INTENTIONALLY OMITTED.

    5.   INTENTIONALLY OMITTED.

    6.   INTENTIONALLY OMITTED.

    7.   INTENTIONALLY OMITTED.

    8.   Subcontractor's Costs Not to Be Reimbursed.

    8.1   Non-reimbursable Costs. The following expenses or costs incurred by or on behalf of the Subcontractor in connection with the management and leasing of the Project shall be at the sole cost and expense of the Subcontractor and shall not be reimbursed by the Tenants in Common: (a) costs attributable to losses arising from gross negligence, willful misconduct or fraud on the part of the Subcontractor, the Subcontractor's associates or employees; and (b) cost of insurance purchased by the Subcontractor for its own account.

3707614.1

        8.2      Litigation. The Subcontractor will be responsible for and hold the Tenants in Common harmless from, all costs relating to disputes with employees for worker's compensation (to the extent not covered by insurance), discrimination or wrongful termination, including legal fees and other expenses.

      9.      Compensation.

        9.1      Property Management Fee. The Subcontractor shall receive, for its services in managing the day-to-day operations of the Project in accordance with the terms of this Agreement, a monthly property management fee (the "Property Management Fee") as set forth on **Exhibit "C"** attached hereto. The Property Management Fee shall be payable monthly from the Operating Account. Upon termination of this Agreement, the parties will prorate the Property Management Fee on a daily basis to the effective date of such cancellation or termination. Notwithstanding anything herein to the contrary, the Property Management Fee shall be payable solely by the Property Manager.

        9.2      Leasing Commissions. The Subcontractor shall receive, for its services in leasing the Project in accordance with the terms of this Agreement, a leasing commission (the "Leasing Commission") equal to a percentage of the value of any lease entered into during the term of this Agreement and a percentage of the value of any lease renewals or renegotiation entered into during the term of this Agreement as set forth on **Exhibit "D"**. If the Subcontractor engages another broker with respect to any such lease or lease renewal, the commissions payable to such broker shall be deducted from the Leasing Commission payable to the Subcontractor and the Subcontractor shall pay any commissions to such broker but not in excess of the Leasing Commission paid. The value of the lease shall be calculated by totaling the minimum monthly rent (or similar rent) for the term of the lease. The term of the lease shall be exclusive of option periods. Leasing Commissions shall be payable as follows (i) 50% at the time the lease or lease renewal is signed and (ii) 50% at the time the tenant begins occupying its space at the Project.

        9.3      Payment of Fees. The Subcontractor acknowledges that payment of the fees due to Subcontractor pursuant to this Agreement shall be paid solely by the Property Manager and the Subcontractor shall not look to the Tenants in Common for payment of such fees.

      10.      Termination.

        10.1      Termination by the Property Manager and Subcontractor. Either the Property Manager or the Subcontractor shall have the right to terminate this Agreement for any reason upon thirty (30) days written notice.

        10.2      Final Accounting. Within forty-five (45) days after termination of this Agreement for any reason, the Subcontractor shall: (a) transfer to any account indicated by the Property Manager any balance or monies of the Tenants in Common or tenant security deposits held by the Subcontractor with respect to the Project (or transfer the accounts in which such sums are held as instructed by the Property Manager); and (b) deliver to a subsequent property manager or other agent indicated by the Property Manager all materials and supplies, keys, books and records, contracts, leases, unpaid bills and other papers or documents that pertain to the Project. For a period of forty-five (45) days after such expiration or cancellation for any reason other than the Property Manager's default, the Subcontractor shall be available, through its senior executives familiar with the Project, to consult with and advise the Property Manager, the Tenants in Common or any person or entity succeeding to the Tenants in Common as owner of the Project or such other person or persons selected by the Property Manager or the Tenants in Common regarding the operation and maintenance of the Project. In addition, the Subcontractor shall cooperate with the Property Manager and the Tenants in Common in notifying all tenants of the Project of the expiration and termination of this Agreement, and shall use reasonable efforts to cooperate with the Property Manager and the Tenants in Common to accomplish an orderly transfer of the operation and management of the Project to a party designated by the Property Manager and the Tenants in Common. The Subcontractor shall receive its monthly Property Management Fee for such services. The Subcontractor shall, at its cost and expense, promptly remove all signs wherever located indicating that it is the property manager of the Project and replace and repair any damage resulting therefrom. Termination of this Agreement shall not release either party from liability for failure to perform any of the duties or obligations as expressed herein and required to be performed by such party for the period before the termination.

11.     Conflicts. The Subcontractor shall not deal with or engage, or purchase goods or services from, any subsidiary or affiliated company of the Subcontractor in connection with the management of the Project for amounts above market rates.

12.     Notices. Any notice to be given or other document or payment to be delivered by any party to any other party hereunder shall be addressed to the party for whom intended, as follows:

> To the Property Manager at:
>
> Gemini Management Company, LLC
> 16740 Birkdale Commons Parkway; Suite 301
> Huntersville, North Carolina 28078
> Attn: Dante A. Massaro
>
> To the Subcontractor at:
>
> CB Richard Ellis, Inc.
> 201 E. Kennedy Blvd.
> Suite 1500
> Tampa, FL 33602
> Attn: Randy Buddemeyer

Any party hereto may from time to time, by written notice to the others, designate a different address which shall be substituted for the one above specified. Unless otherwise specifically provided for herein, all notices, payments, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly given and received (i) upon personal delivery, or (ii) as of the third business day after mailing by United States mail, with postage prepaid, addressed as set forth above, or (iii) the immediately succeeding business day after deposit with Federal Express or other similar overnight delivery system.

13.     Miscellaneous.

13.1     Assignment. The Subcontractor may not assign this Agreement without the prior written consent of the Property Manager, which consent may be withheld in the Property Manager's sole and absolute discretion. The Property Manager shall provide the Subcontractor with prior written notice, in the event of an assignment of this Agreement by the Property Manager.

13.2     Gender. Each gender shall include each other gender. The singular shall include the plural and vice-versa.

13.3     Amendments. Except as otherwise provided, each amendment, addition or deletion to this Agreement shall not be effective unless approved by the parties in writing.

13.4     Attorneys' Fees. In any action or proceeding between the Property Manager and the Subcontractor arising from or relating to this Agreement or the enforcement or interpretation hereof, the party prevailing in such action or proceeding shall be entitled to recover from the other party all of its reasonable attorneys' fees and other costs and expenses of the action or proceeding.

13.5     Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any choice of law rules.

13.6     Venue. Any action relating to or arising out of this Agreement shall be brought only in a court of competent jurisdiction located in New York, New York.

13.7     Headings. All headings are only for convenience and ease of reference and are irrelevant to the construction or interpretation of any provision of this Agreement.

13.8     Representations. The Subcontractor represents and warrants that it is fully qualified and licensed, to the extent required by law, to manage and lease real estate and perform all obligations assumed by the Subcontractor hereunder. The Subcontractor shall use reasonable efforts to comply with all such laws now or hereafter in effect.

13.9     Indemnification by the Subcontractor.

13.9.1 The Subcontractor shall indemnify, defend and hold the Property Manager and the Tenants in Common and their shareholders, officers, directors, members and employees harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, sustained or incurred by or asserted against the Property Manager or the Tenants in Common where it is determined by final judicial determination that such loss, cost or expense was the result of the acts of the Subcontractor which arise out of the gross negligence, willful misconduct or fraud of the Subcontractor, its agents or employees or the Subcontractor's breach of this Agreement. If any person or entity makes a claim or institutes a suit against the Property Manager or the Tenants in Common on a matter for which the Property Manager or the Tenants in Common claim the benefit of the foregoing indemnification, then (a) the Property Manager or the Tenants in Common shall give the Subcontractor prompt notice thereof in writing; (b) the Subcontractor may defend such claim or action by counsel of its own choosing provided such counsel is reasonably satisfactory to the Property Manager or the Tenants in Common; and (c) the Subcontractor shall not settle any claim without the written consent of the Property Manager and the Tenants in Common.

13.9.2 The Subcontractor acknowledges that the Tenants in Common have or will be entering into loan documents, which may include provisions for personal liability for the Tenants in Common on certain "nonrecourse carve-outs." The Subcontractor hereby agrees that to the extent that the Tenants in Common are required to make payments on such indemnification as a direct result of (i) the Subcontractor's fraud, willful misconduct or misappropriation, (ii) the Subcontractor's commission of a criminal act, (iii) the misapplication by Subcontractor of any funds derived from the Project received by the Subcontractor, including any failure to apply such proceeds in accordance with the requirements of any existing loan documents applicable to the Project, or (iv) damage or destruction to the Project caused by acts of the Subcontractor that are grossly negligent, the Subcontractor will indemnify the Tenants in Common for any such liability that was caused by such actions.

13.10     Indemnification by the Property Manager. The Property Manager shall indemnify, defend and hold the Subcontractor and its shareholders, officers, directors, members and employees harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, sustained or incurred by or asserted against the Subcontractor by reason of the operation, management, and maintenance of the Project and the performance by the Subcontractor of the Subcontractor's obligations under this Agreement, except those which arise from the Subcontractor's gross negligence, willful misconduct or fraud. If any person or entity makes a claim or institutes a suit against the Subcontractor on a matter for which the Subcontractor claim the benefit of the foregoing indemnification, then (a) the Subcontractor shall give the Property Manager prompt notice thereof in writing; (b) the Property Manager may defend such claim or action by counsel of its own choosing provided such counsel is reasonably satisfactory to the Subcontractor; and (c) the Property Manager shall not settle any claim without the written consent of the Subcontractor.

13.11     Complete Agreement. This Agreement shall supersede and take the place of any and all previous agreements entered into between the parties with respect to the Project.

13.12     Severability. If any provisions of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement, where the application of such provisions or circumstances other than those as to which it is determined to be invalid or unenforceable shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

13.13     No Waiver. The failure by either party to insist upon the strict performance of or to seek remedy of any one of the terms or conditions of this Agreement or to exercise any right, remedy, or election set forth herein or permitted by law shall not constitute or be construed as a waiver or relinquishment for the future of such term, condition, right, remedy or election, but such item shall continue and remain in full force and effect. All rights

9

or remedies of the parties specified in this Agreement and all other rights or remedies that they may have at law, in equity or otherwise shall be distinct, separate and cumulative rights or remedies, and no one of them, whether exercised or not, shall be deemed to be in exclusion of any other right or remedy of the parties.

        13.14      <u>Binding Effect</u>. This Agreement shall be binding and inure to the benefit of the parties and their respective successors and assigns.

        13.15      <u>Enforcement of the Subcontractor's Rights</u>. In the enforcement of its rights under this Agreement, the Subcontractor shall not seek or obtain a money judgment or any other right or remedy against any shareholders or disclosed or undisclosed principals of the Property Manager or the Tenants in Common. The Subcontractor shall enforce its rights and remedies solely against the Property Manager.

        13.16      <u>Counterparts</u>. This Agreement may be executed in several counterparts, and all so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

        13.17      <u>Loan Requirements</u>. The Subcontractor agrees that it will comply with the terms of any loan documents applicable to the Project.

        13.18      <u>Waiver of Lien Rights</u>. Notwithstanding anything herein to the contrary, the Subcontractor acknowledges and agrees that, so long as the Initial Loan remains outstanding and not paid in full, Subcontractor subordinates to the Initial Lender in all respects any lien rights which the Subcontractor may have against the Project.

3707614.1

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

PROPERTY MANAGER:

Gemini Management Company, LLC, a North Carolina limited liability company

By: _____
Dante A. Massaro, Vice President

SUBCONTRACTOR:

CB Richard Ellis, Inc. a Delaware corporation

By: _____
Randy Buddemeyer
Managing Director

11

3707614.1

EXHIBIT "A"

SCHEDULE OF PROJECTS

| PROPERTY | LOCATION | SQUARE FOOT |
|---|---|---|
| Tamiami East | Miami, FL | 54,864 |
| Ranch Lake Plaza | Bradenton, FL | 85,565 |
| Town Center Shoppes | Oviedo, FL | 64,587 |
| Indian Creek | Roswell, GA | 58,547 |
| Harper Crossing | Lenoir, NC | 45,825 |
| Lewisville Commons | Lewisville, NC | 75,951 |
| | TOTAL | 385,339 |

PROPERTY MANAGER:

Gemini Management Company, LLC,
a North Carolina limited liability company

By: _____
Dante Massaro
Vice President

SUBCONTRACTOR:

CB Richard Ellis, Inc.,
a Delaware corporation

By: _____
Randy Buddemeyer
Managing Director

3707614.1

EXHIBIT "B"

INITIAL BUDGETS

EXHIBIT "C"

PROPERTY MANAGEMENT FEE

| PROPERTY | % of Monthly Gross Revenue | Monthly Minimum |
| --- | --- | --- |
| Tamiami East | 2% | $1,900 |
| Ranch Lake Plaza | 2% | $2,500 |
| Town Center Shoppes | 2% | $1,500 |
| Indian Creek | 2% | $1,600 |
| Harper Crossing | 2% | $1,200 |
| Lewisville Commons | 2% | $1,500 |
| | | |
| | | |
| | | |
| | | |
| | | |

The Property Management Fee shall be the greater of the specified % of Monthly Gross Revenue OR the specified Monthly Minimum amount.

PROPERTY MANAGER:

Gemini Management Company, LLC,
a North Carolina limited liability company

By: _____
Dante A. Massaro
Vice President

SUBCONTRACTOR:

CB Richard Ellis, Inc.,
a Delaware corporation

By: _____
Randy Buddemeyer
Managing Director

3707614.1

EXHIBIT "D"

LEASING COMMISSIONS

| PROPERTY | TRANSACTION | COMMISSION % |
|---|---|---|
| Tamiami East | Direct – New Lease (Years 1 – 5) | 6% |
|  | Direct – New Lease (Years 6 – 10) | 4% |
|  | Direct – Renewals | 3% |
| Ranch Lake Plaza | Direct – New Lease (Years 1 – 5) | 6% |
|  | Direct – New Lease (Years 6 – 10) | 4% |
|  | Direct – Renewals | 3% |
| Town Center Shoppes | Direct – New Lease (Years 1 – 5) | 6% |
|  | Direct – New Lease (Years 6 – 10) | 4% |
|  | Direct – Renewals | 3% |
| Indian Creek | Direct – New Lease (Years 1 – 5) | 4% |
|  | Direct – New Lease (Years 6 – 10) | 4% |
|  | Direct – Renewals | 3% |
| Harper Crossing | Direct – New Lease (Years 1 – 5) | 4% |
|  | Direct – New Lease (Years 6 – 10) | 4% |
|  | Direct – Renewals | 2% |
| Lewisville Commons | Direct – New Lease (Years 1 – 5) | 4% |
|  | Direct – New Lease (Years 6 – 10) | 4% |
|  | Direct – Renewals | 2% |

PROPERTY MANAGER:

Gemini Management Company, LLC,
a North Carolina limited liability company

By: _____
Dante A. Massaro
Vice President

SUBCONTRACTOR:

CB Richard Ellis, Inc.,
a Delaware corporation

By: _____
Randy Buddemeyer
Managing Director

EXHIBIT "B"

INITIAL BUDGETS

3707614.1

EXHIBIT "C"

PROPERTY MANAGEMENT FEE

| PROPERTY | % of Monthly Gross Revenue | Monthly Minimum |
|---|---|---|
| Tamiami East | 2% | $1,900 |
| Ranch Lake Plaza | 2% | $2,500 |
| Town Center Shoppes | 2% | $1,500 |
| Indian Creek | 2% | $1,600 |
| Harper Crossing | 2% | $1,200 |
| Lewisville Commons | 2% | $1,500 |

The Property Management Fee shall be the greater of the specified % of Monthly Gross Revenue OR the specified Monthly Minimum amount.

PROPERTY MANAGER:

Gemini Management Company, LLC,
a North Carolina limited liability company

By: _____
Dante A. Massaro
Vice President

SUBCONTRACTOR:

CB Richard Ellis, Inc.,
a Delaware corporation

By: _____
Randy Buddemeyer
Managing Director

EXHIBIT "D"

LEASING COMMISSIONS

| PROPERTY | TRANSACTION | COMMISSION % |
|---|---|---|
| Tamiami East | Direct – New Lease (Years 1 – 5) | 6% |
| | Direct – New Lease (Years 6 – 10) | 4% |
| | Direct – Renewals | 3% |
| Ranch Lake Plaza | Direct – New Lease (Years 1 – 5) | 6% |
| | Direct – New Lease (Years 6 – 10) | 4% |
| | Direct – Renewals | 3% |
| Town Center Shoppes | Direct – New Lease (Years 1 – 5) | 6% |
| | Direct – New Lease (Years 6 – 10) | 4% |
| | Direct – Renewals | 3% |
| Indian Creek | Direct – New Lease (Years 1 – 5) | 4% |
| | Direct – New Lease (Years 6 – 10) | 4% |
| | Direct – Renewals | 3% |
| Harper Crossing | Direct – New Lease (Years 1 – 5) | 4% |
| | Direct – New Lease (Years 6 – 10) | 4% |
| | Direct – Renewals | 2% |
| Lewisville Commons | Direct – New Lease (Years 1 – 5) | 4% |
| | Direct – New Lease (Years 6 – 10) | 4% |
| | Direct – Renewals | 2% |

PROPERTY MANAGER:

Gemini Management Company, LLC,
a North Carolina limited liability company

By: _____
Dante A. Massaro
Vice President

SUBCONTRACTOR:

CB Richard Ellis, Inc.,
a Delaware corporation

By: _____
Randy Buddemeyer
Managing Director

3707614.1