Master Subcontractor Property Management Agreement 1st Amend.doc

# FIRST AMENDMENT
# TO
# MASTER SUBCONTRACTOR PROPERTY MANAGEMENT AGREEMENT

THIS FIRST AMENDMENT TO MASTER SUBCONTRACTOR PROPERTY MANAGEMENT AGREEMENT ("Amendment") is made and entered into this 30 day of May, 2008, by and between GEMINI PROPERTY MANAGEMENT, LLC, a Delaware limited liability company ("Property Manager"), and ZAMIAS SERVICES, INC. a Pennsylvania corporation (the "Subcontractor").

## WITNESSETH:

WHEREAS, Property Manager and Subcontractor are parties to that certain MASTER SUBCONTRACTOR PROPERTY MANAGEMENT AGREEMENT dated September 21, 2007 (the "Agreement"), whereby the Property Manager subcontracted certain management duties related to the properties described on Exhibit "A" attached to the Agreement; and

WHEREAS, the parties desire to alter the Contract in certain respects;

NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, Property Manager and Subcontractor do hereby amend the Agreement as follows:

1. Exhibit "A" attached to the Agreement, is hereby deleted and Exhibit "A-1" attached hereto, is substituted in lieu thereof. Any and all references to Exhibit A shall mean and refer to Exhibit "A-1".

It is mutually understood and agreed that the Contract shall remain in full force and effect except as the same is specifically modified and amended hereby. All covenants, terms, obligations and conditions of the Contract which are not modified or amended hereby, are hereby ratified and confirmed.

IN WITNESS WHEREOF, Property Manager and Subcontractor have caused this Amendment to be duly executed and sealed, this the day and year first above written.

WITNESSES:

*Racheal Luerdaeb*
Witness

PROPERTY MANAGER:
GEMINI PROPERTY MANAGEMENT, LLC a
Delaware limited liability company

By: *William T. Obeid*
William T. Obeid, President

ATTEST:

*Mindy Harrison*
Witness

SUBCONTRACTOR:
ZAMIAS SERVICES, INC., a Pennsylvania corporation

By: *Samuel C. Zamias*
Authorized Representative

Title: _____

## EXHIBIT "A-1"

## LIST OF PROPERTIES

### Gemini Portfolio List

| | Property | Location | SF | Effective Gross Revenue | Type of Asset |
|---|---|---|---|---|---|
| 1 | Harper Crossing | Lenoir, NC | 45,825 | $ 513,558 | Grocery Anchored Center |
| 2 | Edenton Village | Edenton, NC | 105,900 | $ 979,748 | Grocery Anchored Center |
| 3 | Ranch Lake Plaza | Bradenton, FL | 85,565 | $ 1,564,399 | Grocery Anchored Center |
| 4 | Indian Creek | Roswell, GA | 58,547 | $ 1,176,878 | LA Fitness Anchored Center |
| 5 | College Plaza | Bluefield, VA | 59,250 | $ 564,714 | Grocery Anchored Center |
| 6 | Tamiami East | Miami, FL | 54,864 | $ 1,593,024 | LA Fitness Anchored Center |
| 7 | Lewisville Commons | Lewisville, NC | 75,951 | $ 1,039,677 | Grocery Anchored Center |
| 8 | Ebensburg Plaza | Ebensburg, PA | 124,232 | $ 1,162,456 | Grocery Anchored Center |
| 9 | Boynton Beach | Boynton Beach, FL | 43,000 | $ 1,030,094 | Stand Alone LA Fitness |
| 10 | DuBois Mall | DuBois, PA | 439,451 | $ 4,397,245 | Regional Mall / Power Center |
| 11 | River Ridge | Clemmons, NC | 55,085 | $ 675,072 | Grocery Anchored Center |
| 12 | Franklin Square | Johnson City, TN | 80,500 | $ 1,098,768 | Grocery Anchored Center |
| 13 | Town Center | Oviedo, FL | 64,587 | $ 1,536,784 | LA Fitness Anchored Center |
| 14 | Rowlett Crossing | Rowlett, TX | 56,100 | $ 1,210,000 | LA Fitness Anchored Center |
| 15 | Tinley Park | Tinley Park, IL | 45,000 | $ 1,057,000 | Stand Alone LA Fitness |
| 16 | University Village | Richardson, TX | 108,629 | $ 1,450,270 | LA Fitness Anchored Center |
| * 17 | Youngsville Crossing | Youngsville, NC | 165,000 | $ 1,771,867 | Grocery Anchored Center |
| 18 | Rio Norte Center | Laredo, TX | 257,981 | $ 3,325,142 | Retail Power Center |
| 19 | Parkway Plaza | Norman, OK | 262,624 | $ 3,896,000 | Retail Power Center |
| 20 | Brandon LAF | Brandon, FL | 51,707 | $ 1,146,144 | LA Fitness Anchored Center |
| 21 | Diamond Run Mall | Rutland, VT | 382,990 | $ 5,500,000 | Regional Mall |
| 22 | East-West Shopping Center | Austell, GA | 85,610 | $ 1,675,000 | LA Fitness Anchored Center |
| 23 | Houston County Galleria | Centerville, GA | 473,408 | $ 5,514,209 | Regional Mall |
| 24 | Johnstown Galleria | Johnstown, PA | 711,665 | $ 8,035,242 | Regional Mall |

\* PROPERTY MANAGEMENT ONLY – NO LEASING

MASTER SUBCONTRACT PROPERTY MANAGEMENT AGREEMENT

This MASTER SUBCONTRACT PROPERTY MANAGEMENT AGREEMENT (the "Agreement") is dated as of this _21_ day of September, 2007, by and between Gemini Property Management, LLC, a Delaware limited liability company (the "Property Manager") and Zamias Services, Inc., a Pennsylvania corporation (the "Subcontractor").

Certain entities and/or individuals (collectively, the "Owners") own the properties described in **Exhibit "A"** attached hereto and incorporated herein (individually, a "Property" and collectively, the "Properties"). The Owners have engaged the Property Manager to supervise, manage, lease, operate, and maintain the Properties pursuant to a Property and Asset Management Agreement for each Property (the "Management Agreements"). In addition to the Management Agreement for each Property, the Owners have entered into an Owners Agreement (the "Owners Agreement") for each of the Properties. The Property Manager wishes to subcontract certain of its duties under the Management Agreements, and the Subcontractor wishes to perform such duties and receive the fees and other consideration provided for herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Commencement and Termination Dates; Authority of Owners.

   1.1 Commencement and Termination. The Subcontractor's duties and responsibilities under this Agreement shall begin, with respect to any Property, on the later of (i) the date of this Agreement or (ii) the date any existing property management subcontract on a Property is terminated. The Subcontractor's duties and responsibilities under this Agreement shall terminate, with respect to any Property, on the earlier of (i) the sale of the Property or any portion thereof, as to such portion of the Property sold only (other than any sale of an undivided interest held by an Owner to a party that will acquire such interest subject to any Owners Agreement and this Agreement), (ii) the termination, expiration or the failure of renewal of the Management Agreement, (iii) the termination of this Agreement as provided in Section 10, or (iv) December 31, 2050.

   1.2 Authority of the Owners. The Property Manager and the Subcontractor acknowledge and agree that this Agreement is subject in all respects to the Management Agreements, as amended from time to time. Certain consents from the Owners for the authority of the Property Manager to act are required under the Management Agreements. The Property Manager and the Subcontractor agree to observe the requirements of such consents and to work together to receive such consents. Wherever this Agreement provides that the consent of the Property Manager, such provision shall be interpreted to mean that, if required by the terms of any Management Agreement, the Property Manager has first obtained the consent of the Owners of the applicable Property to the matter in question (it being agreed that the primary factor in the Property Manager's decisions as to whether to grant or withhold its consent will be the best interests of the Owners). The Property Manager shall be responsible for all communications with the Owners, including contacting the Owners to obtain appropriate consents, and the Subcontractor will make no direct contact with the Owners. As of the date hereof, the Management Agreement provides as to the authority of the Owners that:

      1.2.1 Consent of the Owners. The consent of the Owners shall be as set forth in Sections 2.2 and 2.3 of the Owners Agreements.

      1.2.2 Authority of Property Manager. Upon the approval of any item by the Owners pursuant to Sections 1.2.1 and 1.2.2 above, the Property Manager (and the Subcontractor to the extent of the subcontract of duties under this Agreement) shall have the power and authority to act on behalf of the Owners with respect to such items.

2. Property Manager's and Subcontractor's Responsibilities.

   2.1 Status of the Property Manager. The Owners, the Property Manager and the Subcontractor do not intend to form a joint venture, partnership or similar relationship. Instead, the parties intend that the Property Manager shall act solely in the capacity of an independent contractor for the Owners and the

1

3707614.1

Subcontractor will act solely as a subcontractor of the Property Manager of certain duties under the Management Agreements. Nothing in this Agreement shall cause the Property Manager, the Subcontractor and the Owners to be joint venturers or partners of each other, and none of the parties shall have the power to bind or obligate any other party by virtue of this Agreement, except as expressly provided in this Agreement. Nothing in this Agreement shall deprive or otherwise affect the right of any party to own, invest in, manage, or operate, or to conduct business activities which compete with the business of the Properties.

        2.2      <u>Management</u>. The provisions of this Section 2.2 shall only apply to the Subcontractor. The Subcontractor shall manage, operate and maintain the Properties in an efficient, economic, and satisfactory manner and shall arrange the performance of everything reasonably necessary for the proper operation of the Properties for the tenants thereof, subject to (a) applicable governmental requirements and (b) the terms and provisions of this Agreement. At the expense of the Owners, the Subcontractor shall keep the Properties clean and in good repair, shall order and supervise the completion of such repairs as may be required and shall generally do and perform, or cause to be done or performed, all things necessary, required or desirable for the proper and efficient management, operation, and maintenance of the Properties. The Property Manager shall have exclusive responsibility for interfacing and communicating with the Owners and holder of any deed of trust or mortgage upon the Properties (a "Lender") in connection with the loan secured by such deed of trust or mortgage (a "Loan" or the "Initial Loan") and its successors and assigns (the "Initial Lender"), except to the extent the Property Manager directs the Subcontractor to assist in these matters or as otherwise provided herein. As and to the extent directed by the Property Manager, the Subcontractor shall assist in interfacing with Lender by providing (subsequent to the Property Manager's review) regular monthly (or other frequency) reporting to the Lender as directed by the Property Manager (which shall generally include delivering copies of summary income statements, balance sheets, rent rolls, lease plans, site plans, and other such activity reports), completing regular escrow draw requests on designated forms when desired by the Property Manager, conducting regular tours and site inspections of buildings required by the Lender's personnel, cooperating with any desired audits or record review required by the Lender, as requested by the Property Manager, submitting to the Lender for payment regular documentation regarding the property taxes and insurance associated with the Properties, , requesting and receiving any amounts out of any reserve accounts or escrow accounts maintained by such lender on account of repairs, capital improvements, tenant improvements, leasing commissions, real estate taxes and assessments and insurance proceeds or otherwise. The Subcontractor shall perform all services in a diligent and professional manner. Notwithstanding anything to the contrary contained herein, the Subcontractor shall only provide customary services to tenants of the Properties and shall provide no other services to the tenants on behalf of the Owners.

        2.3      <u>Employees: Independent Contractor</u>. The Subcontractor shall, subject to the limitations of the Budget (as defined in Section 2.5.1) employ, directly or through third party contractors (e.g. employee leasing company), at all times a sufficient number of capable employees and/or independent contractors to enable the Subcontractor to properly, adequately, safely and economically manage, operate lease, and maintain the Properties. All matters pertaining to the supervision of such employees shall be the responsibility of the Subcontractor. All salaries and benefits and positions of employees who perform work in connection with the Properties shall be consistent with the Budget (as defined in Section 2.5.1).

        2.4      <u>Compliance with Laws, Mortgages and Other Matters</u>.

        2.4.1      The Subcontractor shall use reasonable efforts to comply with any deed of trust, mortgage or other loan documents affecting the Properties and all governmental requirements, relative to the performance of its duties hereunder and cause the Properties to comply with any deed of trust, mortgage or other loan documents affecting the Properties and all governmental requirements. The Subcontractor may implement such procedures with respect to the Properties as the Property Manager may deem advisable for the more efficient and economic management and operation thereof. Only to the extent directed by the Property Manager, the Subcontractor shall pay from the Operating Account (defined in Section 6.1) expenses incurred to remedy violations of laws. However, Subcontractor shall not be obligated to remedy violations of law if sufficient funds are not available in the Operating Account or if the Owners do not provide sufficient additional funds to do so.

        2.4.2      The Subcontractor shall furnish to the Property Manager, promptly after receipt, any notice of violation of any material governmental requirement or order issued by any governmental entity, any notice of default from the holder of any mortgage or deed of trust encumbering the Properties or any notice of termination or cancellation of any insurance policy.

3707614.1

2.5     Budgets and Operating Plan. The provisions of this Section 2.5 shall only apply to the Subcontractor.

2.5.1   The Subcontractor shall prepare and submit to the Property Manager (so that the Property Manager may submit it to the Owners) annually an annual capital and operating budget ("Budget" or "Budgets") for the promotion, operation, leasing, repair, maintenance and improvement of the Properties for each calendar year. The Budgets for the current calendar year are attached hereto as **Exhibit "B"** and have been approved by the Owners. The Budget is and shall be presented on a monthly, cash basis and shall cover the calendar year. The Subcontractor shall deliver each subsequent Budget for each subsequent calendar year prior to November 1st of the calendar year before the budget year. The Subcontractor shall use best efforts to promptly incorporate into the Budget any change that the Property Manager may request in order to submit it for approval by the Owners. In the event that the Owners do not approve the Budget, the Subcontractor shall work with the Property Manager to negotiate with the Owners in good faith to obtain an acceptable Budget. The Property Manager, and therefore the Subcontractor, may proceed under the terms of the proposed Budget for items that are not objected to and may take any action with respect to items not approved for Permitted Expenditures (as defined in Section 2.5.2). In the event that the items that are objected to are operational expenditures, as opposed to capital expenditures, the Subcontractor shall be entitled to operate the Properties using the prior year's budget for such items plus 5% until the approval is obtained. The Subcontractor shall provide the Property Manager for delivery to the Owners with such information regarding the Budget as may be, from time to time, reasonably requested by the Owners. The Property Manager may at any time submit a revised Budget to the Owners for any Property for their approval consistent with the terms of this Section.

2.5.2   The Subcontractor shall charge all expenses to the proper account as specified in the Budget, provided that with the Property Manager's consent the Subcontractor may reallocate savings from one line item to other line items. The Subcontractor shall submit (subject to the same procedures as set forth in Section 2.5.1) a revised Budget to the Owners before making any expenditure not within the Budget unless the expenditure is (a) less than Fifty Thousand Dollars ($50,000), or (b) is, in the Subcontractor's reasonable judgment, required to avoid personal injury, significant property damage, a default under any loan encumbering the Properties, a violation of applicable law or the suspension of a service (collectively, "Permitted Expenditures"); provided that the Subcontractor shall attempt to notify the Property Manager in advance of any payment made under this clause (b) and in any event will notify the Property Manager as soon as practicable.

2.5.3   During each calendar year, the Subcontractor shall inform the Property Manager of any material increases in costs and expenses not foreseen and not included in the Budget promptly after the Subcontractor learns of such changes.

2.6     Together with the submission of the Budget, the Subcontractor shall submit each year to the Property Manager an operating plan for the general operation of the Properties, including a proposed list of improvements to the Properties, general insurance plan, marketing plan and plan for the general operation and maintenance of the Properties which shall be subject to the approval of the Property Manager (the "Operating Plan"). The Subcontractor may submit a revised Operating Plan to the Property Manager at any time for the Property Manager's approval.

2.6.1   The Subcontractor shall, at the direction of the Property Manager, assist the Property Manager in providing the Initial Lender all budgets or reports required in any loan documents entered into with the Initial Lender (the "Initial Loan Documents") and in complying with the provisions applicable to the Property Manager set forth in the Initial Loan Documents.

2.6.2   Subcontractor shall use commercially reasonable efforts to obtain tenants for all leasable space in the Properties and to renew leases and rental agreements (collectively, "Leases") as provided herein. The Subcontractor shall have the authority to negotiate new and renewal Leases on behalf of the Owners, with the terms being subject to the approval of the Property Manager. The Property Manager shall provide the Subcontractor with the process of how Ownership shall approve leases and shall have the right to change said process from time to time as Property Manager sees fit.

3

2.6.3    The Subcontractor shall not, without the prior written approval of the Owners, give free rental or discounts or rental concessions to any employees, officers or shareholders. The Subcontractor shall not lease any space in the Properties to itself or to any of its affiliates or subsidiaries.

2.6.4    The Subcontractor shall reasonably investigate all prospective tenants, and shall not rent to persons not meeting credit standards reasonable for the market. Each prospective tenant (other than nationally recognized tenants reasonably determined by the Subcontractor to have acceptable credit) shall be required to complete an application for lease and financial statement. The Subcontractor shall retain such information for the duration of the tenancy, and shall make it available to the Owners upon reasonable notice, subject to compliance with any confidentiality restrictions required by any tenant or credit check company. The Subcontractor does not guarantee the accuracy of any such information or the financial condition of any tenant.

2.6.5    The Subcontractor and the Property Manager agree that there shall be no discrimination against or segregation of any person or group of persons on account of age, race, color, religion, creed, handicap, sex or national origin in the leasing of the Properties, nor shall the Subcontractor or the Property Manager permit any such practice or practices of discrimination or segregation with respect to the selection, location, number or occupancy of tenants.

2.6.6    Only to the extent directed by the Property Manager in writing, the Subcontractor shall assist the Property Manager in the engagement of contractors, engineers, architects and other consultants on behalf of the Owners to design and construct customary tenant improvements contemplated by the Leases that are in accordance with the approved leases or the Budget. If requested to do so by the Property Manager, the Subcontractor shall oversee the design and construction of such tenant improvements and shall receive a fee for such services as set forth in Section 9.4 herein. For any contract requiring payment in excess of $50,000, the Subcontractor shall receive bids from a minimum of three qualified contractors or vendors and Property Manager shall have final approval over the selected contractor/vendor.

2.7    Collection of Rents and Other Income.    Unless otherwise required by any Loan Documents affecting the Properties, the Subcontractor shall bill all tenants and shall use its commercially reasonable efforts to collect all rent and other charges due and payable from any tenant or from others for services provided in connection with the Properties. The Subcontractor shall deposit all monies so collected in the Operating Account (as defined in Section 6.2). The Subcontractor shall assist the Property Manager to allocate all income, revenue and expense from the Properties to the Owners as set forth in the Owners Agreement.

2.8    INTENTIONALLY OMITTED.

2.9    Repairs and Maintenance.    The Subcontractor shall maintain the buildings, appurtenances and common areas of the Properties other than the areas that are the responsibility of the tenants. The Subcontractor shall pay actual and reasonable expenses for materials and labor for such purposes from the Operating Account.

2.10    Capital Expenditures.    The Subcontractor may make any capital expenditure within any Budget approved by the Owners without any further consent, provided that the Subcontractor follows the bidding requirements set forth in this Section 2.6.6 for a capital expenditure in excess of $50,000. All other capital expenditures other than Permitted Expenditures shall be subject to submittal of a revised Budget to the Property Manager and its subsequent submittal of the revised Budget to the Owners. Unless the Owners specifically waive such requirements, or approve a particular contract, the Subcontractor shall award any contract for a capital improvement exceeding $50,000 in cost on the basis of competitive bidding, selected from a minimum of two (2) written bids. The Subcontractor shall accept the bid of the lowest bidder determined by the Subcontractor in its sole discretion to be responsible, qualified and capable of completing such improvements on a reasonable schedule and as bid.

2.11    INTENTIONALLY OMITTED

2.12    Service Contracts, Supplies and Equipment.

2.12.1    Subject to any contrary direction by the Property Manager, the Subcontractor may enter into or renew any contract for cleaning, maintaining, repairing or servicing the Properties or any of the

4

3707614.1

constituent parts of the Properties (including contracts for fuel oil, security or other protection, extermination, landscaping, architectural or engineering services) contemplated by the Budget, and consistent with the Operating Plan, with any unrelated third party without the consent of the Owners. Each such service contract shall (a) be in the name of the Owners or in the name of the Subcontractor as agent for the Owners, (b) be assignable to the nominee of the Owners and (c) be for a term not to exceed one (1) year. Unless the Owners specifically waive such requirements or approve a particular contract, all service contracts for amounts in excess of $50,000 per year shall be subject to the bidding requirements in Section 2.6.6 or as otherwise specified by Property Manager.

2.12.2   If this Agreement terminates or is not renewed pursuant to Section 10, the Subcontractor, at the option of the Property Manager, shall assign to the Property Manager or the nominee of the Owners all of the Subcontractor's interest in all service agreements pertaining to the Properties, if any.

2.12.3   At the expense of the Owners, the Subcontractor may purchase, provide, and pay for all needed janitorial and maintenance supplies, tools and equipment, restroom and toilet supplies, light bulbs, paints, and similar supplies necessary to the efficient and economical operation and maintenance of the Properties. Such supplies and equipment shall be the property of the Owners. All such supplies, tools, and equipment shall be delivered to and stored at the Properties and shall be used only in connection with the management, operation, and maintenance of the Properties.

2.13   Taxes, Mortgages.   The Subcontractor, unless otherwise requested, shall obtain and verify bills for real estate and personal property taxes, general and special real property assessments and other like charges (collectively "Taxes") which are or may become liens against the Properties and appeal such Taxes as the Subcontractor or the Property Manager may decide in their reasonable judgment. The Subcontractor shall report any such Taxes that materially exceed the amounts contemplated by the Budget to the Property Manager so that the Property Manager may subsequently report to the Property Manager, if requested by the Owners prior to the Subcontractor's payment thereof. The Subcontractor, if requested by the Property Manager, will cooperate to prepare an application for correction of the assessed valuation (in cooperation with representatives of the Owners) to be filed with the appropriate governmental agency. The Subcontractor, unless otherwise requested and to the extent funds are available in the Operating Account, shall pay, within the time required to obtain discounts, from funds provided by the Owners or from the Operating Account, all utilities, Taxes and payments due under each lease, mortgage, deed of trust or other security instrument, if any, affecting the Properties. To the extent contemplated by the Budget and in conformance with the Operating Plan (as either may be revised from time to time), the Subcontractor may make any such payments.

2.14   INTENTIONALLY OMITTED

2.15   Miscellaneous Duties.   The Subcontractor shall (a) maintain at the Subcontractor's office at the Subcontractor's address as set forth in Section 12 or at the Properties and readily accessible to the Owners, orderly files containing rent records, insurance policies, leases and subleases, correspondence, bank statements, canceled checks and all other documents and papers pertaining to the Properties or the operation thereof; (b) provide to the Property Manager information about the Properties necessary for the preparation and filing by each of the Owners of their individual income or other tax returns required by any governmental authority, including annual statements, identifying each Owner's undivided percentage of all expenses paid and income received by such Owner (or, if requested by an Owner, all expenses of and income from the Properties allocable to such Owner's undivided interest in the Properties); (c) consider and record tenant service requests in systematic fashion showing the action taken with respect to each, and thoroughly investigate and promptly report to the Property Manager with appropriate recommendations all complaints of a nature which might have a material adverse effect on the Properties or the Budget; (d) supervise the moving in and out of tenants and subtenants; arrange, to the extent possible, the dates thereof to minimize disturbance to the operation of the Properties and inconvenience to other tenants or subtenants; (e) check all bills received for the services, work and supplies ordered in connection with maintaining and operating the Properties and, except as otherwise provided in this Agreement, pay such bills when due and payable; and (f) not knowingly permit the use of the Properties for any purpose that might void any policy of insurance held by the Owners or which might render any loss thereunder uncollectible. All such records are the property of the Owners and will be delivered to the Owners upon request. All records will also be delivered to the Property Manager upon its request.

5

3.      Basic Insurance.

    3.1     Insurance.

        3.1.1   The Property Manager, at the expense of the Owners, will obtain and keep in force adequate insurance against physical damage (such as fire with extended coverage endorsement, boiler and machinery) and against liability for loss, damage or injury to property or persons that might arise out of the occupancy, management, operation or maintenance of the Properties, as contemplated by the Operating Plan and any Loan Documents affecting the Properties (including the Initial Loan Documents) and to the extent available at commercially reasonable rates. The Property Manager shall not be required to maintain earthquake or flood insurance unless expressly directed to do so by a specific written notice from the Owners or as required by any Loan Documents affecting the Properties, but may do so with the Property Manager's approval. The Property Manager and the Subcontractor shall be a named insured on all property damage insurance and an additional insured on all liability insurance maintained with respect to the Properties. In the event the Subcontractor receives insurance proceeds for the Properties, the Subcontractor will take any required actions as set forth in any Loan Documents affecting the Properties. In the event that the Subcontractor receives insurance proceeds that are not governed by the terms of any Loan Documents affecting the Properties, the Subcontractor will either (i) use such proceeds to replace, repair or refurbish the Properties or (ii) distribute such proceeds to the Owners, as directed by the Owners. Any insurance proceeds distributed to the Owners will be distributed subject to the fees owed to the Property Manager pursuant to the Management Agreements and the fees payable to the Subcontractor pursuant to this Agreement.

        3.1.2   The Subcontractor shall investigate and submit, as soon as reasonably possible, a written report to the insurance carrier and the Property Manager as to all accidents, claims for damage relating to the ownership, operation and maintenance of the Properties, any damage to or destruction of the Properties and the estimated costs of repair thereof, and prepare and file with the insurance company in a timely manner required reports in connection therewith.

    3.2     Additional Insurance. Any insurance obtained by the Subcontractor for its own account and not for the benefit of the Owners or the Properties shall be at the Subcontractor's own expense and for its sole benefit.

        3.2.1   Contractor's and Subcontractor's Insurance. The Subcontractor shall settle all claims against insurance companies arising out of any policies, including the execution of proofs of loss, the adjustment of losses, signing and collection of receipts and collection of money, except that the Subcontractor shall not settle claims in excess of $50,000 without the prior approval of the Owners as set forth in Section 1.2.2.

    3.3     Additional Insurance. Any insurance obtained by the Subcontractor for its own account and not for the benefit of the Owners or the Properties shall be at the Subcontractor's own expense and for its sole benefit.

    3.4     Contractor's and Subcontractor's Insurance. The Subcontractor shall require all contractors and subcontractors entering upon the Properties to perform services to have insurance coverage at the contractor's or subcontractor's expense, in the following minimum amounts: (a) worker's compensation - statutory amount; (b) employer's liability (if required under applicable law) - $500,000 (minimum); and (c) comprehensive general liability insurance, including comprehensive auto liability insurance covering the use of all owned, non-owned and hired automobiles, with bodily injury and property damage limits of $1,000,000 per occurrence. The Subcontractor may waive such requirements with the approval of the Property Manager. The Subcontractor shall obtain and keep on file a certificate of insurance that shows that each contractor and subcontractor is so insured.

    3.5     Waiver of Subrogation. To the extent available at commercially reasonable rates, all property damage insurance policies required hereunder shall contain language whereby the insurance carrier thereunder waives any right of subrogation it may have with respect to the Owners, the Property Manager or the Subcontractor.

3707614.1

4. Financial Reporting And Record Keeping.

    4.1    Books of Accounts. The Subcontractor shall maintain adequate and separate books and records for the Properties with the entries supported by sufficient documentation to ascertain their accuracy with respect to the Properties. Such books and records shall contain a separate accounting of all items of income and all items of expenses so that the Property Manager can provide necessary information to the Owners. The Property Manager shall assure that the Owners agree to provide to the Subcontractor any financial or other information reasonably requested by Subcontractor to carry out its services hereunder. The Subcontractor shall maintain such books and records, at the Property Contractor's office at the Subcontractor's address as set forth in Section 12 or at the Properties. The Subcontractor shall bear losses arising from the fraud or gross negligence of the Subcontractor or any of its employees or agents. Notwithstanding anything herein to the contrary, Subcontractor shall use its best efforts to maintain books and records using the accounting software platform designated by Property Manager to keep books and records.

    4.2    Financial Reports. On or about the fifteenth (15th) day after the end of each calendar quarter, the Subcontractor shall furnish to the Property Manager a report of all significant transactions occurring during such prior quarter. These reports shall include a cash flow statement, a current rent roll, an accounting of all amortization and depreciation of all capital items, and a Subcontractor update on the status of the Properties. The Subcontractor also shall deliver to the Property Manager within a reasonable time after (i) the close of a calendar year and (ii) the termination of this Agreement, an operating statement, a cash flow statement, a balance sheet for the Properties and such other financial information as the Subcontractor prepares or that Property Manager may request. Financial reports, to the extent practible, will be prepared using the accounting software platform designated by Property Manager. The financial statements and reports shall be prepared on a cash basis and in compliance with all reporting requirements relating to the operations of the Properties and required under any deed of trust or mortgage affecting the Properties. If requested by the Property Manager, the Subcontractor shall provide financial statements prepared on an accrual basis according, to the extent possible, to the generally accepted accounting principles.

    4.3    Supporting Documentation. At the expense of the Owners, the Subcontractor shall maintain and make available at the Subcontractor's office at the Subcontractor's address as set forth in Section 12, at the Properties, copies of the following: (a) all bank statements and bank reconciliations; (b) detailed cash receipts and disbursement records; (c) rent roll of tenants; (d) paid invoices (or copies thereof); and (e) market study of competition (annually). Subcontractor agrees to deliver copies of such supporting documentation to Property Manager if Property Manager so requests. In addition, Subcontractor shall deliver to the Property Manager with the quarterly financial statement a copy of the rent roll. The Subcontractor shall deliver a copy of the document described above to the Property Manager request. The Subcontractor shall maintain income and expense accounts in a manner so that the Property Manager can provide the necessary information to the Owners.

    4.4    Tax Information. The Subcontractor shall provide the Property Manager with sufficient information so that the Owners can prepare their income tax returns on the cash method of accounting or, if requested, with appropriate adjustment to convert the information to an accrual basis.

    5.    Right to Audit. Each of the Property Manager and the Owners and their representatives may examine all books, records and files maintained for the Owners by the Subcontractor. The Property Manager and/or the Owners may perform any audit or investigations relating to the Subcontractor's activities at any office of the Subcontractor if such audit or investigation relates to the Subcontractor's activities for the Owners. Should any of the Property Manager and/or Owners discover defects in internal control or errors in record keeping, the Subcontractor shall undertake with all appropriate diligence to correct such discrepancies either upon discovery or within a reasonable period of time. The Subcontractor and the Property Manager shall inform the Owners in writing of the action taken to correct any audit discrepancies.

    6.    Bank Accounts.

    6.1    Bank Account. The Subcontractor shall establish and maintain, in reputable banks or financial institutions designated by Property Manager, separate bank accounts in trust for, or in the name of, the Owners (the "Bank Accounts"). All moneys collected from, or in connection with, the Properties shall be deposited

7

3707614.1

in the Bank Accounts. Any bank accounts maintained by a third party property manager shall be for, or in the name of, the Owners.

6.2     Operating Account. To the extent funds are not required to be placed in a lockbox pursuant to any loan documents affecting the Properties, the Subcontractor shall be permitted to deposit and make withdrawals from a property account (such property account together with and any interest earned thereon, shall hereinafter be referred to as the "Operating Account"). The Subcontractor shall pay from the Operating Account, on behalf of each Owner with respect to their share of Properties operating expenses, based on their undivided interests in the Properties, the operating expenses of the Properties and any other payments relating to the Properties as required by this Agreement. If more than one bank account is necessary to operate the Properties, each account shall have a unique name. The Subcontractor shall, with funds obtained from the Owners, manage the Operating Account so that an amount at least as great as the Budgeted expenses for such month is in such Operating Account as of the first of each month. To the extent that funds must be deposited in the Operating Account for the operation of the Properties or as otherwise required by the terms of this Agreement, the Subcontractor shall promptly notify the Property Manager so that it may request that the Owners deposit such funds in the Operating Account. Within three (3) months after receipt by the Subcontractor, all rents and other funds collected in the Operating Account after payment of all operating expenses, debt service and such amounts as may be determined by the Subcontractor, with the approval of the Property Manager, to be retained for reserves or improvements, shall be paid to the Owners in proportion to their respective interests in the Properties as directed by the Property Manager.

6.3     Security Deposit Account. If applicable law, Property Manager requests, or a Lender requires a segregated account of security deposits, the Subcontractor will open a separate account at a reputable bank or other financial institution. The Subcontractor shall maintain such account in accordance with applicable law and/or the applicable Loan agreement. The Subcontractor may return such deposits to any tenant in the ordinary course of business in accordance with the terms of the applicable lease.

6.4     Access to Account. As authorized by signature cards, representatives of the Subcontractor shall have access to and may draw upon all funds in the accounts described in Sections 6.1, 6.2 and 6.3 without the approval of the Owners or the Property Manager. Additionally, representatives of the Subcontractor shall have access to and may draw upon any funds escrowed or held in reserve for capital expenditures without the approval of the Owners, provided that the requirements of Section 2.9 and any additional Lender requirements with respect to such amounts are satisfied. The Owners may not withdraw funds from such accounts without the Property Manager's prior written consent, except following the Property Manager or the Subcontractor's default after expiration of any applicable notice and cure period or the termination of this Agreement or the Management Agreements.

7.     Payments of Expenses.

7.1     Costs Eligible for Payment from Operating Account. The Subcontractor shall pay all expenses of the operation, maintenance and repair of the Properties contemplated by the Budget directly from the Operating Account or shall be reimbursed by the Owners, subject to the conditions set forth in Section 2.5, including the following: (a) costs of the gross salary and wages or proportional shares thereof, payroll taxes, worker's compensation insurance, and all other benefits of employees (for example, on-site personnel) required to manage, operate and maintain the Properties properly, adequately, safely and economically, subject to this Agreement, provided that the Subcontractor shall not pay such employees in advance; (b) cost to correct the violation of any governmental requirement relating to the leasing, use, repair and maintenance of the Properties, or relating to the rules, regulations or orders of the local Board of Fire Underwriters or other similar body, if such cost is not the result of the Subcontractor's gross negligence or willful misconduct; (c) actual and reasonable cost of making all repairs, decorations and alterations if such cost is not the result of the Subcontractor's gross negligence or willful misconduct; (d) cost incurred by the Property Manager or Subcontractor in connection with all service agreements; (e) cost of collection of delinquent rents collected by a collection agency or attorney; (f) legal fees of attorneys (not including Subcontractor's "in-house" attorney); (g) cost of capital expenditures subject to the restrictions in Section 2.9 and in this Section; (h) cost of printed checks for each account required for the Properties and the Owners; (i) cost of utilities; (j) cost of advertising; (k) cost of printed forms and supplies required for use at the Properties; (l) management compensation set forth in Section 9; (m) the cost of tenant improvements to the Properties, which have been first approved by the Property Manager; (n) broker's commissions which have been first approved by the Property Manager; (o) debt service; (p) the cost of utilities, services, contractors and insurance; (q) reimbursement of the Property Manager's or Subcontractor's out-of-pocket costs and expenses to the extent not prohibited by

8

Section 8; (r) general accounting and reporting services within the reasonable scope of the Subcontractor's responsibilities hereunder; (s) cost of forms, papers, ledgers, and other supplies and equipment used in connection with the Properties for the preparation of reports, information and returns to be prepared by the Subcontractor under the terms of this Agreement; (t) all expenses of the Subcontractor's on-site office (if applicable); (u) all other costs directly related to the Properties, including, but not limited to, communication costs (telephone, postage, etc.), computer rentals or time, supplies (paper, envelopes, business forms, checks, payroll forms and record cards, forms for governmental reports, etc.), printing, insurance, fidelity bonds, taxes and license fees, and general office expenses allocable to the Properties; and (v) cost of routine travel by the Subcontractor's employees or associates to and from Properties as contained in the approved budget. All other amounts not directly related to the Properties or the Owners shall be payable solely by Subcontractor, and shall not be paid out of the Operating Account or reimbursed by the Owners. Except with respect to any expenses that are determined to be properly allocable on other than a pro rata basis, all expenses of the Properties shall be allocated to the Owners on a pro rata basis. In no event shall the Subcontractor be required to expend any of its own funds for the operation or maintenance of the Properties; however, should it do so, the Subcontractor shall be entitled to reimbursement from the Owners within thirty (30) days after such advance. All payments to ZSI for services rendered in accordance with this Agreement must be invoiced to the individual Property, and accounted for as any other third party payment would be invoiced, paid, and accounted for.

    7.2  Operating Account Deficiency. If there are not sufficient funds in the Operating Account to make any such payment, Subcontractor shall notify the Property Manager for notification to the Owners, if possible, at least ten (10) days prior to any delinquency so that the Owners have an opportunity, based on their interests in the Properties, to deposit sufficient funds in the Operating Account to allow for such payment prior to the imposition of any penalty or late charge.

  8.  INTENTIONALLY OMITTED.

  9.  INTENTIONALLY OMITTED.

  10.  INTENTIONALLY OMITTED.

  11.  INTENTIONALLY OMITTED.

  12.  Subcontractor's Costs Not to Be Reimbursed.

    12.1  Non-reimbursable Costs. The following expenses or costs incurred by or on behalf of the Subcontractor in connection with the management and leasing of the Properties shall be at the sole cost and expense of the Subcontractor and shall not be reimbursed by the Owners: (a) costs attributable to losses arising from gross negligence, willful misconduct or fraud on the part of the Subcontractor, the Subcontractor's associates or employees; and (b) cost of insurance purchased by the Subcontractor for its own account.

    12.2  Litigation. The Subcontractor will be responsible for and hold the Owners harmless from, all costs relating to disputes with employees for worker's compensation (to the extent not covered by insurance), discrimination or wrongful termination, including legal fees and other expenses.

  13.  Compensation.

    13.1  Property Management Fee. The Subcontractor shall receive, for its services in managing the day-to-day operations of the Properties in accordance with the terms of this Agreement, a monthly property management fee (the "Property Management Fee") equal to two percent (2%) of the Gross Revenues (Diamond Run Mall, DuBois Mall, Ebensburg Plaza and all other properties sold to Gemini by Zamias which shall equal three percent (3%) of Gross Revenues) (defined below) and any out-of-pocket and on-site personnel costs that are reimbursable pursuant to Section 7. "Gross Revenues" shall be all gross monthly tenant collections. The Property Management Fee shall be earned and payable monthly from the Operating Account starting the first month that the Subcontractor takes over the accounting and reporting functions of this Agreement as described in Section 4. In no event shall the Subcontractor earn the Property Management Fee until the Subcontractor has begun to handle all of the day to day accounting and reporting functions for each of the Properties. Upon termination of this Agreement, the parties will prorate the Property Management Fee on a daily basis to the effective date of such cancellation or termination.

Notwithstanding anything herein to the contrary, the Property Management Fee shall be payable solely by the Property Manager. ZSI shall invoice and write a check from each Property for the corresponding Property Management Fee on a monthly basis. Under guidelines and a schedule to be provided by Gemini, ZSI shall calculate, invoice, and make write a check from each Property to Gemini on a monthly basis for Gemini's Asset Management Fee.

        13.2        Leasing Commissions. The Subcontractor shall receive, for its services in leasing the Properties in accordance with the terms of this Agreement, a leasing commission (the "Leasing Commission") equal to six percent (6%) of the value of any lease entered into during the term of this Agreement and three percent (3%) of the value of any lease renewals or renegotiation entered into during the term of this Agreement. If the Subcontractor engages another broker with respect to any such lease or lease renewal, the commissions payable to such broker shall be deducted from the Leasing Commission payable to the Subcontractor and the Subcontractor shall pay any commissions to such broker but not in excess of the Leasing Commission paid. The value of the lease shall be calculated by totaling the minimum monthly rent (or similar rent) for the term of the lease. The term of the lease shall be exclusive of option periods. Leasing Commissions shall be payable as follows (i) 50% at the time the lease or lease renewal is signed and (ii) 50% at the time the tenant begins occupying its space at the Properties. Notwithstanding any other provision of this Agreement, the Subcontractor will be reimbursed for its legal fees, whether incurred by its in-house attorneys or outside counsel, in connection the negotiation of any Properties tenant lease which amount shall be (x) $1,000 for a new lease for a tenant occupying less than 15,000 square feet, (y) $2,000 for a new lease for a tenant occupying 15,000 square feet or more, and (z) $750 for any lease renewal, regardless of the size of the space leased.

        13.3        Payment of Fees. The Subcontractor acknowledges that payment of the fees due to Subcontractor pursuant to this Agreement shall be paid solely by the Property Manager and the Subcontractor shall not look to the Owners for payment of such fees.

        13.4        Construction Management Fee. Only to the extent directed by the Property Manager in writing, the Subcontractor shall receive, for its services in supervising any construction or repair Properties in or about the Properties, a construction management fee (the "Construction Management Fee") equal to 3% of any amount (including related professional services) that is expended for construction, tenant improvement or repair Properties over $100,000, and 6% for those items greater than $10,000.00 but less than $100,000.00.

        13.5        Specialty Leasing. The Subcontractor shall receive, for its services in specialty leasing the Properties in accordance with the terms of this Agreement, a leasing commission (the "Specialty Leasing Commission") equal to fifteen percent (15%) of the gross revenue collected on all temporary leases that are under twelve (12) months in duration.

        14.        Termination.

        14.1        Termination. After the 365th day following the date of this Agreement, this Agreement shall terminate on each December 31 unless renewed by the Property Manager and the Subcontractor.

        14.2        Termination by the Property Manager and Subcontractor. Either the Property Manager or the Subcontractor shall have the right to terminate this Agreement for any reason upon sixty (60) days written notice.

        14.3        Final Accounting. Within forty-five (45) days after termination of this Agreement for any reason, the Subcontractor shall: (a) deliver to the Property Manager a final accounting, setting forth the balance of income and expenses on the Properties as of the date of termination; (b) transfer to any account indicated by the Property Manager any balance or monies of the Owners or tenant security deposits held by the Subcontractor with respect to the Properties (or transfer the accounts in which such sums are held as instructed by the Property Manager); and (c) deliver to a subsequent property manager or other agent indicated by the Property Manager all materials and supplies, keys, books and records, contracts, leases, receipts for deposits, unpaid bills and other papers or documents that pertain to the Properties. For a period of forty-five (45) days after such expiration or cancellation for any reason other than the Property Manager's default, the Subcontractor shall be available, through its senior executives familiar with the Properties, to consult with and advise the Property Manager, the Owners or any person or entity succeeding to the Owners as owner of the Properties or such other person or persons selected by the Property Manager or the Owners regarding the operation and maintenance of the Properties. In addition, the Subcontractor shall cooperate with the Property Manager and the Owners in notifying all tenants of the Properties of the expiration and termination of this

10

Agreement, and shall use reasonable efforts to cooperate with the Property Manager and the Owners to accomplish an orderly transfer of the operation and management of the Properties to a party designated by the Property Manager and the Owners. The Subcontractor shall receive its monthly Property Management Fee for such services. The Subcontractor shall, at its cost and expense, promptly remove all signs wherever located indicating that it is the property manager of the Properties and replace and repair any damage resulting therefrom. Termination of this Agreement shall not release either party from liability for failure to perform any of the duties or obligations as expressed herein and required to be performed by such party, including payment of Leasing Fees for leases procured for the period before the termination.

15. Conflicts. The Subcontractor shall not deal with or engage, or purchase goods or services from, any subsidiary or affiliated company of the Subcontractor in connection with the management of the Properties for amounts above market rates.

16. Notices. Any notice to be given or other document or payment to be delivered by any party to any other party hereunder shall be addressed to the party for whom intended, as follows:

> To the Property Manager at:
>
> Gemini Property Management, LLC
> 200 Park Avenue South, Suite 1305
> New York, NY 10003
> Attn: Joe Scala
>
> With a copy to:
>
> Gemini Property Management, LLC
> 200 Park Avenue South, Suite 1305
> New York, NY 10003
> Attn: William T. Obeid
>
> With a copy to:
>
> Gemini Property Management, LLC
> 16740 Birkdale Commons Parkway
> Huntersville, NC 28078
> Attn: Dante A. Massaro
>
>
> To the Subcontractor at:
>
> Zamias Services, Inc.
> 300 Market Street
> Johnstown, PA 15901
> Attn: Samuel G. Zamias
>
> With a copy to:
>
> Zamias Services, Inc.
> 300 Market Street
> Johnstown, PA 15901
> Attn: Joseph Anthony, Esq.

Any party hereto may from time to time, by written notice to the others, designate a different address which shall be substituted for the one above specified. Unless otherwise specifically provided for herein, all notices, payments, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly given and received (i) upon personal delivery, or (ii) as of the third business day after mailing by United States mail, with postage prepaid, addressed as set forth above, or (iii) the immediately succeeding business day after deposit with Federal Express or other similar overnight delivery system.

11

3707614.1

17.     Miscellaneous.

        17.1     Assignment. The Subcontractor may not assign this Agreement without the prior written consent of the Property Manager, which consent may be withheld in the Property Manager's sole and absolute discretion.

        17.2     Gender. Each gender shall include each other gender. The singular shall include the plural and vice-versa.

        17.3     Amendments. Except as otherwise provided, each amendment, addition or deletion to this Agreement shall not be effective unless approved by the parties in writing.

        17.4     Attorneys' Fees. In any action or proceeding between the Property Manager and the Subcontractor arising from or relating to this Agreement or the enforcement or interpretation hereof, the party prevailing in such action or proceeding shall be entitled to recover from the other party all of its reasonable attorneys' fees and other costs and expenses of the action or proceeding.

        17.5     Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any choice of law rules.

        17.6     Venue. Any action relating to or arising out of this Agreement shall be brought only in a court of competent jurisdiction located in New York, New York.

        17.7     Headings. All headings are only for convenience and ease of reference and are irrelevant to the construction or interpretation of any provision of this Agreement.

        17.8     Representations. The Subcontractor represents and warrants that it is fully qualified and licensed, to the extent required by law, to manage and lease real estate and perform all obligations assumed by the Subcontractor hereunder. The Subcontractor shall use reasonable efforts to comply with all such laws now or hereafter in effect.

        17.9     Indemnification by the Subcontractor.

        17.9.1   The Subcontractor shall indemnify, defend and hold the Property Manager and the Owners and their shareholders, officers, directors, members and employees harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasouable attorneys' fees and court costs, sustained or incurred by or asserted against the Property Manager or the Owners where it is determined by final judicial determination that such loss, cost or expense was the result of the acts of the Subcontractor which arise out of the gross negligence, willful misconduct or fraud of the Subcontractor, its agents or employees or the Subcontractor's breach of this Agreement. If any person or entity makes a claim or institutes a suit against the Property Manager or the Owners on a matter for which the Property Manager or the Owners claim the benefit of the foregoing indemnification, then (a) the Property Manager or the Owners shall give the Subcontractor prompt notice thereof in writing; (b) the Subcontractor may defend such claim or action by counsel of its own choosing provided such counsel is reasonably satisfactory to the Property Manager or the Owners; and (c) the Subcontractor shall not settle any claim without the written consent of the Property Manager and the Owners.

        17.9.2   The Subcontractor acknowledges that the Owners have or will be entering into loan documents, which may include provisions for personal liability for the Owners on certain "nonrecourse carve-outs." The Subcontractor hereby agrees that to the extent that the Owners are required to make payments on such indemnification as a direct result of (i) the Subcontractor's fraud, willful misconduct or misappropriation, (ii) the Subcontractor's commission of a criminal act, (iii) the misapplication by Subcontractor of any funds derived from the Properties received by the Subcontractor, including any failure to apply such proceeds in accordance with the requirements of any existing loan documents applicable to the Properties, or (iv) damage or destruction to the Properties caused by acts of the Subcontractor that are grossly negligent, the Subcontractor will indemnify the Owners for any such liability that was caused by such actions.

17.10    Indemnification by the Property Manager.  The Property Manager shall indemnify, defend and hold the Subcontractor and its shareholders, officers, directors, members and employees harmless from any and all claims, demands, causes of action, losses, damages, fines, penalties, liabilities, costs and expenses, including reasonable attorneys' fees and court costs, sustained or incurred by or asserted against the Subcontractor where it is determined by final judicial determination that such loss, cost or expense was the result of the Subcontractor performing its responsibilities under this Agreement, other than those claims which arise out of Subcontractor's gross negligence, willful misconduct or fraud.  If any person or entity makes a claim or institutes a suit against the Subcontractor on a matter for which the Subcontractor may claim the benefit of the foregoing indemnification, then (a) the Subcontractor shall give the Property Manager prompt notice thereof in writing; (b) the Property Manager may defend such claim or action by counsel of its own choosing provided such counsel is reasonably satisfactory to the Subcontractor; and (c) the Property Manager shall not settle any claim without the written consent of the Subcontractor.

17.11    Complete Agreement.  This Agreement shall supersede and take the place of any and all previous agreements entered into between the parties with respect to the Properties.  This Agreement shall not be modified by any subsequent oral agreements, notwithstanding the common law in New York.  Any future modifications must be in writing to be valid.

17.12    Severability.  If any provisions of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement, where the application of such provisions or circumstances other than those as to which it is determined to be invalid or unenforceable shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

17.13    No Waiver.  The failure by either party to insist upon the strict performance of or to seek remedy of any one of the terms or conditions of this Agreement or to exercise any right, remedy, or election set forth herein or permitted by law shall not constitute or be construed as a waiver or relinquishment for the future of such term, condition, right, remedy or election, but such item shall continue and remain in full force and effect.  All rights or remedies of the parties specified in this Agreement and all other rights or remedies that they may have at law, in equity or otherwise shall be distinct, separate and cumulative rights or remedies, and no one of them, whether exercised or not, shall be deemed to be in exclusion of any other right or remedy of the parties.

17.14    Binding Effect.  This Agreement shall be binding and inure to the benefit of the parties and their respective successors and assigns.

17.15    Enforcement of the Subcontractor's Rights.  In the enforcement of its rights under this Agreement, the Subcontractor shall not seek or obtain a money judgment or any other right or remedy against any shareholders or disclosed or undisclosed principals of the Property Manager or the Owners.  The Subcontractor shall enforce its rights and remedies solely against the Property Manager and such remedy shall be limited to the fees received by the Property Manager pursuant to the Management Agreements.

17.16    Counterparts.  This Agreement may be executed in several counterparts, and all so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

17.17    Loan Requirements.  The Subcontractor agrees that it will comply with the terms of any loan documents applicable to the Properties.

17.18    Waiver of Lien Rights.  Notwithstanding anything herein to the contrary, the Subcontractor acknowledges and agrees that, so long as the Initial Loan remains outstanding and not paid in full, Subcontractor waives and subordinates to the Initial Lender in all respects any lien rights which the Subcontractor may have against the Properties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the date and year first above written.

PROPERTY MANAGER:

Gemini Property Management, LLC, a Delaware limited liability company

By: _____
William T. Obeid, President

SUBCONTRACTOR:

Zamias Services, Inc., a Pennsylvania corporation

By: _____
Samuel G. Zamias, President

Name: _____
Title: _____

14

3707614.1

EXHIBIT "A"

LIST OF PROPERTIES

**Gemini Portfolio**

| | Property | Location | SF | Effective Gross Revenue | Type of Asset |
|---|---|---|---|---|---|
| 1 | Harper Crossing | Lenoir, NC | 45,825 | $ 513,558 | Grocery Anchored Center |
| 2 | Edenton Village | Edenton, NC | 105,900 | $ 979,748 | Grocery Anchored Center |
| 3 | Ranch Lake Plaza | Bradenton, FL | 85,565 | $ 1,564,399 | Grocery Anchored Center |
| 4 | Indian Creek | Roswell, GA | 58,547 | $ 1,176,878 | LA Fitness Anchored Center |
| 5 | College Plaza | Bluefield, VA | 59,250 | $ 564,714 | Grocery Anchored Center |
| 6 | Tamiami East | Miami, FL | 54,864 | $ 1,593,024 | LA Fitness Anchored Center |
| 7 | Lewisville Commons | Lewisville, NC | 75,951 | $ 1,039,677 | Grocery Anchored Center |
| 8 | Ebensburg Plaza | Ebensburg, PA | 124,232 | $ 1,162,456 | Grocery Anchored Center |
| 9 | Boynton Beach | Boynton Beach, FL | 43,000 | $ 1,030,094 | Stand Alone LA Fitness |
| 10 | DuBois Mall | DuBois, PA | 439,451 | $ 4,397,245 | Regional Mall / Power Center |
| 11 | River Ridge | Clemmons, NC | 55,085 | $ 675,072 | Grocery Anchored Center |
| 12 | Franklin Square | Johnson City, TN | 80,500 | $ 1,098,768 | Grocery Anchored Center |
| 13 | Town Center | Oviedo, FL | 64,587 | $ 1,536,784 | LA Fitness Anchored Center |
| 14 | Rowlett Crossing | Rowlett, TX | 56,100 | $ 1,210,000 | LA Fitness Anchored Center |
| 15 | Tinley Park | Tinley Park, IL | 45,000 | $ 1,057,000 | Stand Alone LA Fitness |
| 16 | University Village | Richardson, TX | 108,629 | $ 1,450,270 | LA Fitness Anchored Center |
| 17 | Youngsville Crossing | Youngsville, NC | 165,000 | $ 1,771,867 | Grocery Anchored Center |
| 18 | Rio Norte Center | Laredo, TX | 257,981 | $ 3,325,142 | Retail Power Center |
| 19 | Parkway Plaza | Norman, OK | 262,624 | $ 3,896,000 | Retail Power Center |
| 20 | Brandon LAF | Brandon, FL | 51,707 | $ 1,146,144 | LA Fitness Anchored Center |
| 21 | Diamond Run Mall | Rutland, VT | 382,990 | $ 5,500,000 | Regional Mall |
| 22 | East-West Shopping Center | Austell, GA | 85,610 | $ 1,675,000 | LA Fitness Anchored Center |

**Total**     2,708,398    $ 38,363,840

3707614.1

EXHIBIT "B"

INITIAL BUDGETS

To Be Attached as Approved by Manager

3707614.1