UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM T. OBEID, directly and derivatively on behalf of GEMINI REAL ESTATE ADVISORS LLC, et al., <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER LA MACK and DANTE MASSARO, <br><br> Defendants, <br><br> and <br><br> GEMINI REAL ESTATE ADVISORS LLC, et al., <br><br> Nominal Defendants. | Civ. Action No. 14-cv-06498-LTS <br><br> **DECLARATION OF** <br> **WILLIAM T. OBEID** |

WILLIAM T. OBEID, being duly sworn, deposes and states:

1. I am a Co-Founder, Member and Manager of plaintiff and nominal defendant Gemini Real Estate Advisors LLC ("GREA," and together, with its Affiliates and Subsidiaries, "Gemini" or the "Company"). I have personal knowledge of the facts detailed below.

2. I respectfully submit this Declaration, on behalf of myself and derivatively on behalf of Gemini, in opposition to the application of defendants Christopher La Mack ("La Mack") and Dante Massaro ("Massaro," and collectively, with La Mack, the "Individual Defendants"), brought by Order to Show Cause, for a protective order (the "Application").

1

### A. Background of Gemini's Business and this Litigation

3. Gemini is a diversified, closely held real estate development business. I co-founded Gemini on April 15, 2003 with La Mack and Massaro and each of us holds a one-third membership interest in GREA. We are each co-equal Members and Managers of Gemini.

4. Gemini develops, owns and operates 11 hotels and 22 retail properties in eleven states having a value in excess of $1 billion. Prior to January 26, 2015, I operated Gemini's profitable and rapidly expanding hotel division out of Gemini's Park Avenue South corporate headquarters. I devoted considerable time and effort on the long-term strategy and execution for two boutique hotel brands – the Jade Hotel and the Gem Hotel collection. Despite a difficult economy after the financial crisis, I consistently continued to find profitable investment projects for Gemini. Currently, there are three Gem Hotels and one Jade Hotel in New York City, and three additional Jade Hotels are now under development.

5. La Mack and Massaro reside in North Carolina and run Gemini's comparatively modest retail shopping center division, which include fitness centers and grocery and department stores, out of Gemini's Huntersville, North Carolina offices. Gemini's retail portfolio has not grown over the last 6 years.

6. From Gemini's inception until July 14, 2014, I served as its President and Operating Manager, overseeing all of Gemini's strategy, investments, operations, and capital raising activities. As Operating Manager of Gemini, I originated and led the execution of the vast majority of Gemini's projects (across both its retail and hospitality portfolios), and I originated the vast majority of its lenders and investors. I conceived of Gemini's successful and renowned hotel brands, the Jade and the Gem, and was personally involved in nearly every aspect of their execution. During my tenure as Operating Manager, Gemini grew dramatically despite the

significant market turmoil in 2008 and 2009. In only eleven years, Gemini has grown its real estate portfolio to over $1 billion.

7. Following a five-year period during which neither La Mack nor Massaro originated a single new project for Gemini, I proposed a restructuring of the Company to better reflect the members' respective contributions and to mitigate risk between its hospitality and retail divisions. On March 28, 2014, La Mack, Massaro and I attended a meeting at the New York offices of Bryan Cave, which was to serve as counsel to Gemini for purposes of documenting the restructuring. At that meeting, I proposed that Gemini's hospitality and retail operations be divided between two newly formed LLCs and that I would retain a greater share of Gemini's hotel operations. La Mack and Massaro agreed to my proposal in principle, we shook hands and instructed Bryan Cave to formally document our agreement.

8. Ultimately, La Mack and Massaro reneged on our restructuring agreement. On June 9, 2014, after consulting with McGuire Woods LLP ("McGuire Woods"), Gemini's long-time outside transactional and corporate counsel, La Mack and Massaro demanded a "business divorce." After weeks of La Mack and Massaro ignoring my repeated requests for even the most basic terms of the proposed "business divorce," I was forced to formally call a Special Meeting of the Gemini Member-Managers.

9. At that meeting, which took place on July 1, 2014, La Mack and Massaro voted to remove me as President and Operating Manager of GREA and replaced me with Massaro. As I would later find out, hours after the meeting, on the afternoon of July 1, 2014, McGuire Woods, on behalf of La Mack and Massaro, filed a frivolous lawsuit in North Carolina state court against me rather than working with me to privately and professionally settle our differences. That suit

3

originally brought derivative claims against me even though Massaro and La Mack owned a two-thirds interest in Gemini.

10. Following an additional month of stonewalling from La Mack and Massaro, I felt I had no choice but to commence this action.

11. Although I was not aware of it until December 2014, in late October 2014, La Mack and Massaro began exploring a disposition or restructuring of the Jade Bryant Park Hotel and the Jade Seaport Hotel, two of Gemini's most lucrative hotel development projects, on terms highly unfavorable to Gemini and its investors.

12. On January 26, 2015, I learned, for the first time, via press release issued by Massaro on behalf of Gemini that, "effective immediately," Gemini had assigned its lucrative hotel management contracts to Bridgeton Hotel Management, LLC ("Bridgeton"), a fledgling hotel management company formed by a former Gemini minority member, Atit Jariwala. The press release further informed me that, "effective immediately," the majority of Gemini's hospitality employees would "immediately become staff members of Bridgeton," and would be "relocat[ing] to the Bridgeton office in Rockefeller Center."

13. Setting aside the devastating loss of revenue and all of its hospitality employees, Massaro and La Mack's reckless actions constitute a breach of the loan documents for each of the loans on Gemini's hotel properties, all of which require the borrower to obtain the lender's consent prior to transferring or assigning the hotel management agreements.

14. Via press release dated February 9, 2015, I learned, for the first time, that Gemini had officially relocated its New York City headquarters to Bridgeton's offices in Rockefeller Center, and that, "[e]ffective immediately, all Capital Markets, Investor Relations and Marketing related deliverables" should be directed to Bridgeton.

### B. McGuire Woods' Representation

15. McGuire Woods has acted as outside counsel to Gemini for nearly a decade on a wide range of engagements. Such engagements include: (a) acting as corporate counsel to Gemini in drafting a July 2006 amendment to GREA operating agreement and related resolutions of the member-managers, to admit Atit Jariwala (the owner of Bridgeton) as a minority member; (b) acting as transactional counsel to Gemini in connection with the acquisition of 11 of the 22 properties in Gemini's retail portfolio; and (c) advising Gemini and Obeid in connection with several hotel acquisition opportunities.

16. McGuire Woods also acted as counsel to me personally. For example, in or about March 2006, McGuire Woods advised me of my rights and obligations under a personal guaranty executed in connection with Gemini's acquisition of River Ridge Shopping Center. Similarly, in April 2009, I consulted extensively with McGuire Woods regarding his personal liability under a personal guaranty related to Gemini's acquisition of the Boardwalk Shopping Center in Austin, Texas.

17. Throughout this ten-year period, I served as Gemini's Operating Manager, overseeing all of Gemini's strategy, investment, operational and capital-raising activities. In my capacity as Operating Manager, I worked closely with Craig Harmon, a partner in McGuire Woods' Richmond, Virginia offices, and came to regard him as both a trusted legal advisor and a friend. Up until June 11, 2014, I was in regular contact with Mr. Harmon and, throughout this period, Mr. Harmon continued to actively solicit Gemini's business on behalf of McGuire Woods.

18. On June 9, 2014, notably, the same day that La Mack and Massaro demanded a "business divorce," Mr. Harmon emailed me following up on a previous conversation. On June

5

11, 2014, I called Mr. Harmon and advised him that, to my surprise, McGuire Woods appeared to be representing La Mack and Massaro against me. Mr. Harmon seemed troubled at what he called a "clear conflict of interest" and promised to look into it and get back to me. Although I followed up with him several times by phone and email, I never received a meaningful response. Neither McGuire Woods nor Harmon ever contacted me regarding a conflict waiver.

C.  **Mr. Massaro's Declaration**

19.  I have reviewed the declaration of Dante Massaro, dated March 2, 2015, in support of the Individual Defendants' application for a protective order ("Massaro Decl."). Mr. Massaro makes several misstatements that I wish to bring to the Court's attention. Mr. Massaro claims that I "unlawfully" obtained the documents attached to my February 27, 2015 declaration in support of my motion to disqualify McGuire Woods (the "DQ Declaration"). (*See* Massaro Decl., ¶¶6, 13.) That is false. With the exception of Exhibits T and U, which are press releases drafted by the Individual Defendants that are accessible on Gemini's website, I obtained every exhibit to my DQ Declaration from Gemini's server.

20.  As Massaro is well aware, and as he attested in a declaration submitted to the Court when it was in his interest to do so, as a Member-Manager and co-equal owner of Gemini, I have always had unfettered access to Gemini's server, which contains all Company files. (*See* Declaration of Dante Massaro, dated March 2, 2015, in opposition to Plaintiff's Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, at ¶14.) In fact, all Gemini employees also have access to Gemini's server.

21.  In addition, as the Individual Defendants are also well aware, all email correspondence sent using Gemini email accounts is subject to Gemini's written "Electronic Mail Monitoring" Policy, rendering it readily accessible to each of Gemini's Member-Managers.

True and accurate copies of the relevant pages of that policy are attached hereto as **Exhibit A**.

22.     Gemini's Electronic Mail Monitoring Policy explicitly states that Gemini email accounts are "intended for business purposes only," that all passwords "must be made available to the company at all times." (*See* Ex. A at pp. 1-2.) It provides that Gemini's Member-Managers "reserve the right to enter, search and/or monitor the company's private e-mail system," that Gemini personnel "should expect that communications they send and receive by the company's private e-mail system will be disclosed to management," and that Gemini personnel "should not assume that communications that they send and receive" using Gemini email accounts "are private or confidential." (*Id.*, at p. 2.)

23.     The Individual Defendants' allegations that I installed "spy software" are false and intentionally misleading. (Massaro Decl., at ¶¶7-8.) Last summer, after La Mack and Massaro began freezing me out of the Company, in accordance with Gemini's Electronic Mail Monitoring Policy, at my request, Gemini's longtime IT contractor, Madison Technology ("Madison") gave me enhanced access and permissions to Gemini's server, and installed standard corporate monitoring software on Gemini's system enabling the Member-Managers to view Gemini corporate email and desktops. Madison has served as Gemini's IT provider for approximately 4 years and, to my knowledge, it continues to provide IT services to Gemini to this day. Madison perceived no issue granting me Company-wide access to Gemini email accounts, as this is a standard request from corporate clients.

24.     In August 2014 (and not "late 2014" as Massaro attests), after I caught Massaro and La Mack red-handed trying to exclude me from a Greenville, South Carolina-based retail project, they confronted Madison regarding the software. (Massaro Decl., ¶7.) After Massaro and La Mack revised the Greenville documents to include me in the Greenville project, in or

7

about late August or early September 2014, Madison uninstalled the monitoring software and system wide email permissions at my request. The install and uninstall was later confirmed by Madison to Massaro and La Mack.

25. Though, as a result of these events, Massaro and La Mack knew I had access to their Gemini email accounts last summer, they have never asked me what materials I had acquired (other than the proof that they had tried to cut me out of the Greenville project), and (prior to making this Application) never asked me to return any such materials – a tacit admission that I had the right to review and access such materials under Gemini's Electronic Mail Monitoring Policy.

26. For the avoidance of doubt, I was not the only one with the authority and right to access documents and communications maintained on the Gemini server. Massaro and La Mack (as co-equal Member-Managers of Gemini) also had the right to do so and, in fact, they recently exercised that right.

27. As previously stated in my declaration in support of my application for a temporary restraining order and preliminary injunction, on February 4, 2015, Madison contacted the Manager-Members to report suspicious activity the unauthorized removal of a large volume of data from the Gemini network. A true and accurate copy of Madison's email is annexed hereto as **Exhibit B**. As it turns out, Individual Defendants surreptitiously downloaded all of Gemini's electronically stored information and established a parallel information technology platform (presumably at Bridgeton). Notably, Massaro does not deny this allegation in his declaration in opposition to my application.

28. Massaro also claims that I and my counsel "threatened" to publicly disclose Gemini documents, purportedly "in an apparent attempt to waive Gemini's attorney-client

privilege" and to "intimidate" the Individual Defendants into agreeing to my settlement terms. (Massaro Decl., ¶4.) That is preposterous. I never intended that any Gemini documents be disclosed to the public, let alone "threatened" to disclose them publicly. It is clearly in Gemini's interest to be represented by independent counsel and it should be able to use its own documents to demonstrate that is not what is going on here.

29. Pursuant to 28 U.S.C. §1746, I declare, certify, verify and state, under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       March 9, 2015

*[signature]*

WILLIAM T. OBEID