UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM T. OBEID, directly and derivatively on behalf of GEMINI REAL ESTATE ADVISORS LLC, et al., <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER LA MACK, DANTE MASSARO, BRIDGETON HOLDINGS, LLC, BRIDGETON HOTEL MANAGEMENT, LLC, BRIDGETON ACQUISITION, LLC, ATIT JARIWALA AND ELEVATION REAL ESTATE GROUP, LLC, <br><br> Defendants, <br><br> and <br><br> GEMINI REAL ESTATE ADVISORS LLC, et al., <br><br> Nominal Defendants. | No. 14-cv-06498-LTS <br><br> **SECOND AMENDED COMPLAINT** |

Plaintiff, William T. Obeid ("Obeid"), by his attorneys, Meister Seelig & Fein, LLP, as and for his Complaint against defendants Christopher F. La Mack ("La Mack") and Dante A. Massaro ("Massaro," and, together, "Individual Defendants"), Elevation Real Estate Group, LLC, Bridgeton Holdings, LLC, Bridgeton Hotel Management, LLC, Bridgeton Acquisitions, LLC (collectively, "Bridgeton) and Atit Jariwala ("Jariwala," and together, with Bridgeton, the "Bridgeton Defendants"), alleges directly and derivatively on behalf of Gemini Real Estate Advisors, LLC ("GREA"), Gemini Property Management, LLC, Gemini Acquisition Company, LLC, Gemini Holdings, LLC, Sprucewood Realty, LLC, Gemini Asset Management, LLC, Gemini Loan Servicing, LLC, Gemini Hotel Manager, LLC, Gemini Equity Partners, LLC, Gemini Realty GP, LLC, Gemini Realty Trust, Inc., Gemini Property Advisor, LLC, Gemini Acquisition Subsidiary, LLC, Gemini Capital Markets, LLC, GCM Olean, LLC, Gemini Dunbar

Mezz Lender, LLC, Gemini Hospitality Management, LLC, Gemini Hospitality Advisors, LLC, GMP Funding, LLC, GMP Parent, LLC, GMP Manger, LLC, Gemini CP Operator, LLC, Gemini Real Estate Partners, LP, EWH Capital, LLC, Gemini Commercial Realty, LLC, Gemini 135 East Houston MT, LLC, Gemini 135 East Houston, LLC, Gemini 135 East Houston H, LLC, Gemini 442 West 36th Street MT, LLC, Gemini 442 West 36th Street, LLC, Gemini 442 West 36th Street H, LLC, Gemini 442 West 36th Street 30, LLC, Gemini 305 West 39th Street MT, LLC, Gemini 305 West 39th Street, LLC, Gemini 305 West 39th Street H, LLC, Gemini 305 West 39th Street 4, LLC, Gemini 449 West 36th Street MT, LLC, 300 West 22 Realty LLC, Gemini 300 West 22nd Street, LLC, 300 West 22 Managing Member, LLC, 300 West 22 Retail, LLC, 52 West 13th P, LLC, 52 West 13th Holding, LLC, The Gem Hotel Union Square, LLC, Gemini 37 West 24th Street MT, LLC, Gemini 37 West 24th Street, LLC, Gemini NYC Hotel, LLC, Gemini JFK Hotel, LLC, Gemini 280 Friend Street MT, LLC, Gemini 280 Friend Street JV, LLC, 36 West 38th Street Holding, LLC, 36 West 38th Street, LLC, 36 West 38th Street Manager, LLC, Gemini Jade Bryant Park Developer, LLC, 33 Peck Slip Acquisition, LLC, 33 Peck Slip Holding, LLC, 33 Peck Slip Manager, LLC, 33 Peck Slip Property Management, LLC, 1775 James Avenue, LLC, 1775 James Avenue Holding, LLC, 1775 James Avenue Manager, LLC, Gemini Boynton Beach S, LLC, Gemini Brandon S, LLC, Gemini Town Center H, LLC, Gemini Town Center M, LLC, Gemini Real Estate Ranch Lake, LLC, Gemini Ranch Lake Member, LLC, Gemini Tamiami, LLC, Gemini Tamiami H, LLC, Gemini Centerville Galleria, LLC, Gemini Centerville Galleria H, LLC, Gemini Centerville Outparcel, LLC, Gemini East West, LLC, Gemini East West H, LLC, Gemini Indian Creek, LLC, Gemini Indian Creek H, LLC, Gemini Real Estate Indian Creek, LLC, Gemini Real Estate Indian Creek Member, LLC, Gemini Tinley Park H, LLC, Gemini DuBois Mall, LLC, Gemini DuBois Mall H, LLC, DuBois

Venture 1, LLC, Gemini Ebensburg Plaza S, LLC, Gemini Johnstown Galleria H, LLC, Gemini Johnstown Galleria, LLC, Gemini Johnstown Galleria S, LLC, Gemini Realty Harper Crossing, LLC, Gemini Realty Harper Crossing Member, LLC, Gemini Lewisville Commons H, LLC, Gemini River Ridge, LLC, Gemini River Ridge H, LLC, Gemini Youngsville Crossing, LLC, Gemini Youngsville Crossing M, LLC, Gemini Youngsville Crossing Manager, LLC, SPEBNE Acquisitions, LLC, Gemini Parkway Plaza, LLC, Gemini Parkway Plaza H, LLC, Gemini Rio Norte H GP, LLC, Gemini Rio Norte, LLC, Gemini Rio Norte H, LLC, Gemini Rowlett Crossing, LP, Gemini Rowlett Crossing GP, LLC, Gemini Rowlett Partners, LLC, Gemini Rowlett Crossing H GP, LP, Gemini Rowlett Crossing S GP, LP, Gemini Rowlett Crossing Holdings, LLC, Gemini Rowlett Crossing H, LLC, Gemini Rowlett Crossing S, LLC, Gemini Richardson Square, LP, Gemini Richardson Square GP, LLC, Gemini Richardson Square Investors, LLC, Richardson Village Holdings, LLC, Gemini OF III Richardson Square, LLC, Gemini College Plaza, LLC, Gemini College Plaza H, LLC, Gemini Opportunity Fund I, LLC, Gemini Opportunity Fund III, LLC, Gemini Opportunity Fund IV, LLC, Gemini New York Hospitality Fund, LLC, Gemini Fund 5, LLC, Gemini Fund 5 Manager, LLC and Gemini Olean Mezz Lender, LLC (collectively, with GREA, "Gemini"), as follows:

## SUMMARY OF ACTION

1.      This action arises out of an extreme case of minority member oppression triggered by Defendants Christopher La Mack and Dante Massaro's jealousy and vindictiveness toward their co-equal member-manager Plaintiff William T. Obeid.

2.      La Mack, Massaro and Obeid are equal one-third Member-Managers of Gemini Real Estate Advisors, LLC ("GREA"), which along with its subsidiaries and affiliates, operate as a single family of closely-held entities under the brand "Gemini."

3.      Gemini owns, manages and develops commercial real estate, with over $1 billion of real estate assets under management consisting largely of hotel and retail properties.  It is best known for its upscale boutique hotels under the "Jade" and "Gem" brands for which Gemini also holds trademarks issued by the United States Trademark Office.  Generally, Gemini's subsidiaries and affiliates are set up as single purpose entities, each relating to a single Gemini project.  Those entities issue membership interests to third-party investors, who receive returns based on that project's performance.

4.      On March 28, 2014, Obeid who served as GREA's Operating Manager proposed a restructuring to the Individual Defendants in which Obeid would receive a larger interest in Gemini's hospitality business to better reflect their respective contributions since Obeid had been the primary revenue generator for Gemini for over a decade and exclusively responsible for Gemini's successful hospitality business.

5.      Despite agreeing to the restructuring proposal offered by Obeid on March 28, 2014, the Individual Defendants plotted their revenge against Obeid for his audacity in requesting an end to his decade long subsidy of the Individual Defendants.  On July 1, 2014, the Individual Defendants called a Special Meeting of GREA's three Member-Managers whereby they introduced a corporate resolution replacing Obeid as GREA's Operating Manager and appointing Massaro as the new Operating Manager.  The Individual Defendants approved the corporate resolution by a 2-1 vote.

6.      Once the Individual Defendants came into control of Gemini through Massaro's appointment as GREA's Operating Manager, they cut-off Obeid from material information and updates concerning Gemini, leaving him in the dark even though he is a one-third co-equal Member Manager of GREA.  Indeed, since July 2014 until the present time, the Individual

Defendants have deliberately concealed material information from Obeid and instructed Gemini employees to withhold information from him.

7.     The Individual Defendants' unlawful concealment of Gemini information from Obeid constitutes a breach of the GREA Operating Agreement and was undertaken by the Individual Defendants to prevent Obeid from discovering that upon taking control of Gemini, La Mack and Massaro immediately embarked on a campaign of self-dealing designed to enrich themselves at Gemini's and Obeid's expense.   Indeed, over the past ten months since the Individual Defendants have controlled Gemini – they have taken all corporate action without Obeid's knowledge or consent and in violation of the governing operating agreements and Delaware law.

8.     Immediately following Massaro's appointment as GREA's Operating Manager, the Individual Defendants began usurping existing Gemini corporate opportunities for the benefit of La Mack and Massaro's newly formed entities. Adding insult to injury, the Individual Defendants even had Gemini pay the expenses associated with the transactions they steered toward their own newly formed entities.

9.     As the months went by and with Obeid in the dark regarding their actions, the Individual Defendants' theft escalated to include using Gemini funds to launch their newly formed entities, including but not limited to Elevation Real Estate Group, LLC ("Elevation"). For example, the Individual Defendants solicited existing Gemini employees and hired them to work for Elevation while continuing to pay them out of Gemini funds, sublet Gemini's office space to Elevation for free, created an entire parallel network and data platform for Elevation through wholesale duplication of Gemini's network and data (also paid for by Gemini) and used

Gemini funds to finance Elevation's marketing initiatives including but not limited to hosting industry conferences and various branding and advertisement initiatives.

10.    The Individual Defendants' corruption did not end with steering Gemini's corporate opportunities to Elevation or using Gemini funds to finance Elevation's launch. To the contrary, the Individual Defendants sought to kill the proverbial "two birds with one stone" by dismantling Gemini's lucrative hospitality business in exchange for disguised kickbacks, which carried the added bonus of destroying the specific business segment that Obeid exclusively built and in which his outside investors had committed their capital into based on Obeid's reputation for excellence in the hospitality industry.

11.    Beginning in August 2014, rather than continuing to work with Obeid and having him manage Gemini's hospitality group, the Individual Defendants decided to circumvent Obeid out of his own company and embarked on a campaign to divest Gemini of its hospitality assets through insider transactions with co-conspirators at below fair market prices (and in some cases for no consideration at all). That is, since neither La Mack or Massaro had any meaningful experience in the hospitality field and were unable to manage Gemini's existing hotels, its three hotel development projects and its portfolio of hotel management contracts for which Gemini served as the hotel operator for eleven hotels – the Individual Defendants proceeded to sell or transfer Gemini's hospitality assets at insider discounted prices to the detriment of Gemini, its investors and Obeid.

12.    The Individual Defendants' dismantlement of Gemini's hospitality business was perpetrated in secret by the Individual Defendants with the assistance they received from a direct Gemini competitor Bridgeton Holdings, LLC ("Bridgeton") and its principal Atit Jariwala. Without Obeid's knowledge or consent, the Individual Defendants lobbied Gemini's lender UBS

Realty ("UBS") to stop funding two of Gemini's hotel development projects (the Jade Seaport and Jade Bryant Park) so that they could then sell them at discounted prices to a third-party developer (the Congress Group) whom the Individual Defendants had pre-selected because of a side-deal they entered into with the Congress Group in which the Individual Defendants would joint venture with the developer to complete and manage those development projects (without Obeid and Gemini and to their investors' financial detriment).

13.     In early November 2014, the Individual Defendants successfully sabotaged Gemini's hotel development projects by convincing UBS to halt its construction loans, leaving one of the projects entirely unfinished with a monthly net loss to Gemini's investors of over $150,000 per month.  However, the Individual Defendants were unable to execute on their scheme when UBS insisted that Obeid be informed of the Individual Defendants' proposals to modify the loans, which otherwise barred early pre-payment and their secret proposal to sell the two hotel development projects to the Congress Group.  Of course, once Obeid discovered the Individual Defendants' proposed giveaway to the Congress Group, he objected to the insider transaction on or about January 30, 2015.

14.     Alarmed at the fact that the Individual Defendants were advocating a fire-sale of the Seaport and Bryant Park hotel development projects to the Congress Group on terms that adversely impacted the Gemini investors, Obeid sought to protect Gemini and its investors and submitted Letters of Intent to purchase both properties on February 4, 2015.  Obeid's offers were vastly superior to those offered by the Congress Group in both price and the fact that they came free of contingencies.  At this time, Obeid's offers were the highest and best offers for both properties and would have not only taken out the UBS loans on both properties but would have

made Gemini's investors whole on their investments. Obeid's offers also met a narrow pre-payment window opened up by UBS Realty that ended on March 31, 2015.

15. Instead of acting in the best interests of Gemini and its investors and accepting Obeid's offers, the Individual Defendants purported to direct their commercial broker RobertDouglas to undertake a sham marketing process to ostensibly market the two hotel development projects plus Gemini's luxury boutique hotel (the Jade Greenwich Village Hotel) for a "confidential public marketing process" requiring third-party bidders to submit final and best offers by February 25, 2015 – an insufficient amount of time to meet UBS Realty's narrow pre-payment window deadline of March 31, 2015.

16. Even though Obeid is an equal one-third Member-Manager of GREA, the Individual Defendants concealed all information concerning the so-called "marketing process" from Obeid, including information concerning the bids themselves. Unbeknownst to Obeid at the time, he remained the highest and superior bidder for the Bryant Park property as of the February 25th 2015 deadline yet the Individual Defendants refused to sell the property to him out of sheer malice even though their vindictiveness caused further financial injury to Gemini, its investors and Obeid. Instead, the Individual Defendants condemned the Bryant Park property to languish for additional months (causing additional losses for the Gemini investors) during which time the Individual Defendants and their brokers attempted unsuccessfully to find a better offer than the one submitted by Obeid.

17. The Individual Defendants' malice toward Obeid is matched only by their own corruption. While the Individual Defendants represented to Obeid that they unilaterally decided to sell the Jade Greenwich Village Hotel pursuant to the so-called public marketing process administered by RobertDouglas, the Individual Defendants had already secretly agreed to sell the

Jade Greenwich Village Hotel to Bridgeton in a side-deal reached between them and Bridgeton's Jariwala in late November 2014 at which time the Individual Defendants granted Bridgeton "rights of first refusal" and "last looks" to acquire at least three Gemini hotels (the Jade Greenwich Village Hotel, the Wyndham Flatiron Hotel and the Boston Holiday Inn).

18.    Jariwala and Bridgeton publicized their "rights of first refusal and last looks" to the marketplace, and, in so doing, Jariwala and Bridgeton intentionally and maliciously chilled and manipulated the market for those three Gemini hotel properties, which had the effect of steeply discounting third-party offers for those properties so that Bridgeton could come in at the end and scoop them up at fire sale prices.

19.    This is exactly what happened with the Jade Greenwich Village Hotel – Gemini's premier luxury boutique hotel.  On March 9, 2015, the Individual Defendants accepted a Letter of Intent from Bridgeton to acquire the Jade Greenwich Village Hotel for $78 million. This insider transaction was never disclosed to Obeid.  In fact, Obeid (despite being an equal one-third Member-Manager of GREA) only discovered this fact within the last month in the course of fact-discovery.

20.    Bridgeton did not participate in the public marketing process, which had a February 25, 2015 deadline for "final and best offers" on the listed hotel properties.  Rather, Bridgeton (consistent with its "right of first refusal and last look rights") submitted its offer two weeks after the February 25, 2015 deadline and offered to acquire the hotel at a deep discount off of its fair market valuation.  Notably, the Individual Defendants' own commercial brokers at RobertDouglas performed two separate valuations of the Jade Greenwich Village and determined that the hotel's mid-point valuation constituted $90 million yet the Individual Defendants

accepted Bridgeton's late and below market offer of $78 million (without even informing Obeid or soliciting his vote).

21.     The Individual Defendants' malfeasance was not limited to simply giving away hotel properties to Bridgeton in exchange for undisclosed kickbacks. Incredibly, the Individual Defendants also transferred Gemini's most profitable business segment in the entire company – its hospitality group and hotel management contracts - to Bridgeton for free.

22.     Aside from developing and owning its own hotels, Gemini's hospitality group also operated hotels for third-parties for which it received management fees in exchange for its services. The hotel management contracts were the most profitable business segment within Gemini and the hospitality group itself was well-known and established in the industry.

23.     On January 26, 2015, while Obeid was attending a hospitality conference in California, the Individual Defendants issued a Press Release announcing that Gemini retained Bridgeton to manage its hotel properties effective immediately.

24.     On the same day, the Individual Defendants abruptly transferred all of Gemini's hospitality employees located in Gemini's corporate headquarters in New York City to Bridgeton's New York office and completed a massive data transfer from Gemini to Bridgeton of all Gemini confidential information concerning its hospitality business compiled over the last decade, including all contacts, communications, historical files, financials, business plans, investor lists, customer lists, costing data, legal documents, financial models, marketing plans and strategies, buying practices, personnel files, operational information and various proprietary know-how and trade secret information. This also included valuable customized system infrastructure that belonged to Gemini which consisted of accounting, revenue management, operations and sales and marketing software. This valuable infrastructure took a decade to build

at Gemini's expense and with great effort by Obeid.  Yet the Individual Defendants transferred it to Bridgeton for free.

25.     The Individual Defendants conspired with Bridgeton's Jariwala for approximately three months in planning the logistics for stealing Gemini's hospitality business. In fact, the Individual Defendants and Jariwala directed Gemini employees who were all bound by Gemini Loyalty and Confidentiality Agreements ("Loyalty Agreements") to violate those Loyalty Agreements and assist the Individual Defendants and Bridgeton to unlawfully download Gemini's confidential information from its secure and protected network onto a parallel network created by the Individual Defendants for the ultimate transfer of Gemini's confidential information to Bridgeton.

26.     Throughout this entire time, the Individual Defendants kept Obeid in the dark. In fact, in an effort to prevent Obeid from investigating the circumstances concerning the theft of Gemini's hotel management contracts, employees, data platform and proprietary information – the Individual Defendants cut-off Obeid from even being able to access the old Gemini network thereby precluding any forensic analysis concerning the Individual Defendants' malfeasance.

27.     There was no economic justification for the transfer of Gemini's hospitality business to Bridgeton (beyond the Individual Defendants' receipt of kickbacks in return from Bridgeton).  The hospitality group was the most profitable business segment at Gemini and had been operating without issue.  At the time of the transfer, Gemini managed eleven hotels and maintained a leading market presence in the hotel management industry led by Obeid.  By contrast, Bridgeton only managed three hotels at the time of the transfer and had a dramatically smaller infrastructure and footprint in the hospitality industry.

28.     In fact, the terms of the deal the Individual Defendants' struck with Bridgeton are outrageous.   Bridgeton now serves as a sub-manager to Gemini on the existing hotel management contracts and receives approximately 65% of the historical revenues that originally flowed directly to Gemini.

29.     Bridgeton did not assume any of Gemini's overhead from the hospitality group even though Gemini's experienced hospitality employees were transferred to Bridgeton's office and rebranded as Bridgeton employees to the outside world.   In fact, Gemini's overhead remains approximately the same after the hospitality group's transfer to Bridgeton as it did prior to the transfer except that Gemini now receives only about 35% of the historical revenues from the hotel management contracts it previously managed on its own.   Since Gemini remains the official "hotel manager" on all the existing hotel management contracts – Gemini (and not Bridgeton) also maintains all the risk of liability in the event of a dispute with a hotel owner concerning the management of its hotel property.  In essence, Bridgeton is a middle-man offering nothing to Gemini that it did not already have but taking two-thirds of the revenue generated from the hotel management contracts.

30.     Therefore, not only did Bridgeton fail to pay anything, let alone a fair market price, for acquiring an entire business line (complete with a backlog of contracts, skilled employees, an existing infrastructure and a wealth of market information) but the net profits for Gemini from Bridgeton's sub-management of the hotels are lower than those when Gemini managed the hotels directly.

31.     In the meantime, Gemini's brand and reputation in the hospitality industry has been tarnished since the Individual Defendants and Bridgeton have publicized to the marketplace that Bridgeton now operates Gemini's hospitality business. Bridgeton, on the other hand, has

acquired new cash-flow and has tripled its hospitality platform, which it now leverages to expand its brand and reputation in the marketplace.

32.     Indeed, Bridgeton has embarked on a campaign of false and deceptive advertising in which it has represented to investors and lenders through marketing and investor teasers that Bridgeton's founder Atit Jariwala is responsible for the acquisition, development and management of Gemini's hotel properties – all in an effort to gain credibility and market share in the hospitality marketplace (which has come at Gemini's and Obeid's expense).  In addition, Bridgeton's marketing materials falsely portray Gemini's hotels as properties currently owned by Bridgeton so much so that Bridgeton's advertising materials overwhelmingly feature Gemini's upscale properties (and not Bridgeton's low-end properties) including Gemini's trademarked Jade and Gem hotel properties (for which Bridgeton never received a license to use those marks). These materials have been widely publicized in the hospitality industry from investors, lenders, hotel flags and developers to job search companies that recruit and place hospitality candidates with employment opportunities.  The marketing materials are designed to further confuse the recipients of these materials into believing that Bridgeton developed these hotels and owns the brands.

33.     Incredibly, it was not enough for the Individual Defendants to circumvent Obeid out of his own company but they also have irreparably damaged his personal reputation and Gemini's track record through their assistance and ratification of Bridgeton's actions in falsely ascribing to itself Gemini's properties, accomplishments and services.  In doing so, Gemini's and Obeid's personal reputation have been irreparably injured from the marketplace's confusion concerning Bridgeton's false designation of origin and misrepresentations of facts concerning Gemini's hospitality assets and track record.

## THE PARTIES

34.     Plaintiff William T. Obeid is an individual residing at 159½ E 94th Street, New York, New York 10128.

35.     Defendant Christopher F. La Mack is an individual with a residence at 369 Montibello Drive, Mooresville, North Carolina 28117.

36.     Defendant Dante A. Massaro is an individual with a residence at 12829 Shamley Court, Huntersville, North Carolina 28078.

37.     Defendant Elevation Real Estate Group, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

38.     Defendant Bridgeton Holdings, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

39.     Defendant Bridgeton Hotel Management, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

40.     Defendant Bridgeton Acquisitions, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

41.     Defendant Atit Jariwala is an individual with a residence at 208 West 23rd Street, Apartment 1000, New York, New York 10011.

42.     Nominal Defendant Gemini Real Estate Advisors, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

43.     Nominal Defendant Gemini Property Management, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

44.     Nominal Defendant Gemini Acquisition Company, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

45.     Nominal Defendant Gemini Holdings, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

46.     Nominal Defendant Sprucewood Realty, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

47.     Nominal Defendant Gemini Asset Management, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

48.     Nominal Defendant Gemini Loan Servicing, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

49.     Nominal Defendant Gemini Hotel Manager, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

50.     Nominal Defendant Gemini Equity Partners, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

51.     Nominal Defendant Gemini Realty GP, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

52.     Nominal Defendant Gemini Realty Trust, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

53.     Nominal Defendant Gemini Property Advisor, LLC a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

54.     Nominal Defendant Gemini Acquisition Subsidiary, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

55.     Nominal Defendant Gemini Capital Markets, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

56.     Nominal Defendant GCM Olean, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

57.     Nominal Defendant Gemini Dunbar Mezz Lender, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

58.     Nominal Defendant Gemini Hospitality Management, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

59.     Nominal Defendant Gemini Hospitality Advisors, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

60.     Nominal Defendant GMP Funding, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

61.     Nominal Defendant GMP Parent, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

62.     Nominal Defendant GMP Manager, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

63.     Nominal Defendant Gemini CP Operator, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

64.     Nominal Defendant Gemini Real Estate Partners, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

65.     Nominal Defendant EWH Capital, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

66.     Nominal Defendant Gemini Commercial Realty, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

67.     Nominal Defendant Gemini 442 West 36th Street MT, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

68.     Nominal Defendant Gemini 442 West 36th Street, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

69.     Nominal Defendant Gemini 442 West 36th Street H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

70.    Nominal Defendant Gemini 442 West 36th Street 30, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

71.    Nominal Defendant Gemini 305 West 39th Street MT, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

72.    Nominal Defendant Gemini 305 West 39th Street, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

73.    Nominal Defendant Gemini 305 West 39th Street H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

74.    Nominal Defendant Gemini 305 West 39th Street 4, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

75.    Nominal Defendant 300 West 22 Realty, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

76.    Nominal Defendant Gemini 300 West 22nd Street, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

77.     Nominal Defendant Gemini 300 West 22 Managing Member, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

78.     Nominal Defendant Gemini 300 West 22 Retail, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

79.     Nominal Defendant Gemini 449 West 36th Street MT, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

80.     Nominal Defendant Gemini 135 East Houston, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

81.     Nominal Defendant Gemini 135 East Houston MT, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

82.     Nominal Defendant Gemini 135 East Houston H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

83.     Nominal Defendant 52 West 13th P, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

84.    Nominal Defendant 52 West 13th Street Holding, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

85.    Nominal Defendant The Gem Hotel Union Square, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

86.    Nominal Defendant Gemini 37 West 24th Street MT, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

87.    Nominal Defendant Gemini 37 West 24th Street, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

88.    Nominal Defendant Gemini NYC Hotel, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010

89.    Nominal Defendant Gemini JFK Hotel, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

90.    Nominal Defendant Gemini 280 Friend Street JV, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

91.     Nominal Defendant Gemini 280 Friend Street MT, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

92.     Nominal Defendant 1775 James Avenue Manager, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

93.     Nominal Defendant 1775 James Avenue Holding, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

94.     Nominal Defendant 1775 James Avenue, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

95.     Nominal Defendant Gemini Boynton Beach S, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

96.     Nominal Defendant Gemini Brandon S, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

97.     Nominal Defendant Gemini Town Center H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

98.     Nominal Defendant Gemini Town Center M, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

99.     Nominal Defendant Gemini Real Estate Ranch Lake, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

100.     Nominal Defendant Gemini Ranch Lake Member, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

101.     Nominal Defendant Gemini Tamiami, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

102.     Nominal Defendant Gemini Tamiami H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

103.     Nominal Defendant Gemini Centerville Galleria, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

104.     Nominal Defendant Gemini Centerville Galleria H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

105.    Nominal Defendant Gemini Centerville Outparcel, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

106.    Nominal Defendant Gemini East West, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

107.    Nominal Defendant Gemini East West H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

108.    Nominal Defendant Gemini Indian Creek, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

109.    Nominal Defendant Gemini Indian Creek H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

110.    Nominal Defendant Gemini Real Estate Indian Creek, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

111.    Nominal Defendant Gemini Real Estate Indian Creek Member, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

112.    Nominal Defendant Gemini Tinley Park H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

113.    Nominal Defendant Gemini DuBois Mall, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

114.    Nominal Defendant Gemini DuBois Mall H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

115.    Nominal Defendant DuBois Venture 1, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

116.    Nominal Defendant Gemini Ebensburg Plaza S, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

117.    Nominal Defendant Gemini Johnstown Galleria H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

118.    Nominal Defendant Gemini Johnstown Galleria, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

119.    Nominal Defendant Gemini Johnstown Galleria S, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

120.    Nominal Defendant Gemini Realty Harper Crossing, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

121.    Nominal Defendant Gemini Realty Harper Crossing Member, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

122.    Nominal Defendant Gemini Lewisville Commons H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

123.    Nominal Defendant Gemini River Ridge, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

124.    Nominal Defendant Gemini River Ridge H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

125.    Nominal Defendant Gemini Youngsville Crossing, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

126.    Nominal Defendant Gemini Youngsville Crossing Manager, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

127.    Nominal Defendant Gemini Youngsville Crossing M, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

128.    Nominal Defendant SPEBNE, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

129.    Nominal Defendant Gemini Parkway Plaza, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

130.    Nominal Defendant Gemini Parkway Plaza H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

131.    Nominal Defendant Gemini Rio Norte H GP, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

132.    Nominal Defendant Gemini Rio Norte H, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

133.    Nominal Defendant Gemini Rio Norte, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

134.    Nominal Defendant Gemini Rowlett Crossing, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

135.    Nominal Defendant Gemini Rowlett Crossing GP, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

136.    Nominal Defendant Gemini Rowlett Partners, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

137.    Nominal Defendant Gemini Rowlett Crossing H GP, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

138.    Nominal Defendant Gemini Rowlett Crossing S GP, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

139.    Nominal Defendant Gemini Rowlett Crossing Holdings, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

140.    Nominal Defendant Gemini Rowlett Crossing H, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

141.    Nominal Defendant Gemini Rowlett Crossing S, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

142.    Nominal Defendant Gemini Richardson Square, LP is a limited partnership organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

143.    Nominal Defendant Gemini Richardson Square GP, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

144.    Nominal Defendant Gemini Richardson Square Investors, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

145.    Nominal Defendant Richardson Village Holdings, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

146.    Nominal Defendant Gemini OF III Richardson Square, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

147.    Nominal Defendant Gemini College Plaza, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

148.    Nominal Defendant Gemini College Plaza H, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

149.    Nominal Defendant Gemini Opportunity Fund I, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

150.    Nominal Defendant Gemini Opportunity Fund III, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

151.    Nominal Defendant Gemini Opportunity Fund IV, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

152.    Nominal Defendant Gemini New York Hospitality Fund, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

153.    Nominal Defendant Gemini Fund 5, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

154.    Nominal Defendant Gemini Fund 5 Manager, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

155.    Nominal Defendant Gemini Olean Mezz Lender, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 16740 Birkdale Commons Parkway, Suite 200, Huntersville, North Carolina 28078.

156.    Nominal Defendant 36 West 38th Street Holding, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

157.    Nominal Defendant 36 West 38th Street, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

158.    Nominal Defendant 36 West 38th Street Manager, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

159.    Nominal Defendant Gemini Jade Bryant Park Developer, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

160.    Nominal Defendant 33 Peck Slip Acquisition, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

161.    Nominal Defendant 33 Peck Slip Holding, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

162.    Nominal Defendant 33 Peck Slip Manager, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

163.    Nominal Defendant 33 Peck Slip Property Management, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 220 Fifth Avenue, 13th Floor, New York, New York 10010.

## JURISDICTION AND VENUE

164.    This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 1367 because this action arises out of violations of the federal laws.

165.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

166.    This Court also has jurisdiction over Defendants because, as more fully described herein, Plaintiff's claims arise in whole or in part out of Defendants' contacts with and conducting of business in the State of New York, whereby Defendants purposefully availed themselves of the benefits of New York law.  Defendants also committed torts, in whole or in part, in the State of New York, which torts were directed toward Gemini whose principal place of business is New York and Mr. Obeid who is a New York resident.

167.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

# BACKGROUND

## Gemini's Structure And Historical Operations

168.    Obeid co-founded GREA in 2003 along with La Mack and Massaro.  GREA has always been a member-managed LLC controlled by an LLC agreement, which was most recently amended in 2009 (a copy of the Amended and Restated Limited Liability Company Agreement of Gemini Real Estate Advisors LLC, dated 2009 [the "Operating Agreement], is attached herein as **Exhibit 1**).

169.    GREA is the ultimate parent company of all of the Subsidiaries.  On July 1, 2014, La Mack and Massaro took control of GREA and replaced Obeid as the Operating Manager.  As a result of their control over GREA, La Mack and Massaro also now control each of the Subsidiaries.

170.    Separate and apart from La Mack's and Massaro's control of GREA's Subsidiaries, they also now control all of the Affiliates, which are also limited liability companies operating in the real estate industry and that Obeid formed with La Mack and Massaro (with each of them owning directly or indirectly one-third of each Affiliate).

171.    Gemini's commercial real estate activity is broad. It simultaneously acquires, develops, finances, manages, and operates investments in various real estate projects across multiple states. On the acquisition side, Gemini sources potential investments, performs due diligence, obtains financing, and executes investments. On the development side, Gemini coordinates the projects' financial, entitlements, and design elements and also oversees construction.  On the financing side, Gemini identifies potential investors, generates investor presentations, including compiling financial projections, and secures financing from equity investors and lenders for its projects. On the operations side, Gemini operates and manages a

wide variety of retail, hospitality and fixed-income investments for its projects as well as projects owned by third-parties.

172.    In total, Gemini owns and operates eleven hotels and twenty-two retail and commercial properties throughout the United States.    Gemini has two principal places of business. The New York office has always served as Gemini's corporate headquarters, where Gemini's accounting, tax, audit, investor relations, fixed income, and asset management functions were under Obeid's day-to-day supervision.    Gemini's hospitality division for which Obeid was responsible for its day-to-day operations was until the Individual Defendants' abrupt move on January 27, 2015 based out of Gemini's corporate headquarters in New York City. Gemini's retail property division, of which La Mack and Massaro were primarily responsible for, operates out of its Huntersville, North Carolina office.

173.    As a result of Gemini's scope of business, the GREA Operating Agreement required the Operating Manager to engage in a range of activities including involvement in acquisitions, development, operations and financing.

174.    Although Section 5.1 of the Operating Agreement provides the Operating Manager with authority to run GREA on a day-to-day basis – the Operating Manager's authority is not unfettered but rather is subject to the restrictions contained in the Operating Agreement requiring that the remaining Member-Managers be informed of the Operating Manager's actions that materially affect GREA.    The Operating Agreement further requires certain material decisions to be approved by a formal vote by the Member-Managers.    For example, §§ 4.1 & 4.2 require that the Operating Manager solicit and obtain Member-Manager approval for certain actions including but not limited to "the sale or other disposition of a Project" or "the borrowing of funds, including a refinance of existing indebtedness, or the pledging of any assets of the

Company, in excess of $250,000." *See* Operating Agreement §§ 4.2.1.9 & 4.2.1.10. Moreover, § 5.16 of the Operating Agreement authorizes the Operating Manager "to act on behalf of the Company [GREA] and to execute any and all documents, instruments and agreements," but only if "the execution of such documents has been approved by the [Member] Managers."

175.    Section 4.9 of the Operating Agreement provides that the Operating Manager cannot take any material action on behalf of GREA without holding a meeting or obtaining written consent from the GREA Member-Managers. Section 4.9 further provides that: "[a]ny such action which may be taken by the Members without a meeting shall be effective only if the consents are in writing, set forth the action so taken, and are signed by a Majority In Interest of the Members."

176.    While the GREA Operating Agreement expressly permits the Member-Managers to engage in "competitive" real estate activities (*See* GREA Operating Agreement at Sections 5.13 and 11.1), that does not mean that the Individual Defendants can misappropriate Gemini funds in order to finance their own competing real estate entities and engage in other self-dealing such as looting Gemini's hospitality business in favor of Bridgeton in exchange for undisclosed kickbacks.

177.    When Obeid served as GREA's Operating Manager, he kept La Mack and Massaro informed of all material developments concerning Gemini. However, as discussed below, Massaro (who is now the Operating Manager of GREA) along with La Mack have concealed material Gemini developments from Obeid in order to carry out their self-dealing without Obeid's knowledge.

178.    Prior to Obeid's replacement as Operating Manager of GREA, the three Member-Managers focused on the portions of Gemini's business that best suited their particular skills. La

Mack and Massaro focused on Gemini's retail projects, including commercial spaces for such uses as grocery stores, fitness centers and department stores.

179.    Obeid focused on hospitality projects, with a primary focus on independent and boutique hotels.  Obeid developed Gemini's well-known hotel brands the "Jade" and "Gem." Specifically, Obeid obtained for GREA registered trademarks for the "Gem" on August 4, 2009 and for the "Jade" on September 3, 2013 giving Gemini exclusive rights to use these marks. While both the Jade and Gem branded hotels in Gemini's portfolio are independent and boutique hotels, the Jade brand was developed by Obeid as the unique and upscale luxury boutique hotel brand within Gemini's portfolio.

180.    The "Jade" and "Gem" marks are well-known and recognizable to, among others, consumers, travel agents, those engaged in the business of promoting, reviewing and booking hotels, and the general public.  Moreover, the "Jade" and "Gem" marks are highly distinctive and extremely valuable because they are associated with numerous hotels, which provide an authentic guest experience centered on the unique hotel's location and charm.

181.    In addition to launching and building Gemini's hospitality business, Obeid also served as GREA's Operating Manager whereby he oversaw all of Gemini's projects and capital raising activities, ensuring their efficient operation and productivity.

182.    Since its inception in 2003 until the time that Obeid was removed as the Operating Manager of GREA, Gemini grew dramatically despite the significant market turmoil in 2008 and 2009.  In only eleven years, Gemini has grown from $0 to over $1 billion in real estate assets under management.

183.    Gemini's success was primarily attributable to Obeid's success in the real estate industry and his successful efforts at procuring lenders, equity investors and originating projects

for all of Gemini's business segments (i.e. hospitality, retail and fixed income).  By comparison, La Mack and Massaro's achievements were modest and had consisted of simply maintaining an existing retail portfolio with a lackluster leasing effort.  This disparate performance among the three Gemini members set the table for their eventual dispute between Obeid and the Individual Defendants.

**La Mack and Massaro Replace Obeid as**
**Operating Manager of GREA**

184.    In March 2014, Obeid proposed a restructuring to La Mack and Massaro that would benefit Gemini by mitigating risk as between its retail and hospitality businesses, and by modifying the members' interest percentages to better reflect their respective contributions to Gemini since Obeid had been the primary revenue generator for Gemini for nearly a decade.

185.    Under Obeid's restructuring plan, GREA would form two new LLC's.  First it would create an LLC dedicated to Gemini's retail business (the "Retail LLC").  The Retail LLC would focus on the sort of retail projects that La Mack and Massaro primarily had experience with.  Second, it would create an LLC dedicated to Gemini's hospitality business (the "Hospitality LLC").  The Hospitality LLC would focus on the hotel projects that Obeid primarily had experience and success with.  In addition, GREA would wholly own the Retail LLC, with La Mack and Massaro retaining their combined 66.666% interest in the Retail LLC through their membership interest in Gemini, while Obeid would retain his 33.333% interest.  By contrast, GREA would hold a 30% interest in the Hospitality LLC and Obeid would hold the remaining 70% interest.

186.    Obeid, La Mack and Massaro met to discuss the restructuring plan on March 28, 2014, and La Mack and Massaro initially agreed to Obeid's proposal, but a written agreement was never signed.  On June 9, 2014, La Mack and Massaro reneged on their agreement and

informed Obeid that they opposed his restructuring plan.  Instead La Mack and Massaro proposed a separation and informed Obeid that they would provide him with a "business divorce" plan very soon.

187.    On June 25, 2014, after waiting weeks for La Mack and Massaro to put forward any type of business divorce plan (and repeatedly requesting as much), Obeid called for a special meeting of the GREA Member-Managers on July 1, 2014 to discuss the terms of the proposed business divorce (the "Special Meeting") at the New York offices of the law firm Bryan Cave LLP – one of Gemini's corporate counsel.

188.    At the July 1, 2014 Special Meeting, instead of offering a "business divorce" plan, La Mack and Massaro introduced a corporate resolution to replace Obeid as Operating Manager of GREA with Massaro (the "Corporate Resolution"), and approved it in a 2-1 vote.

**Litigation Between Obeid and La Mack and Massaro**
**Ensues in North Carolina and New York**

189.    Just hours after the Special Meeting, La Mack and Massaro filed – but did not serve – a meritless complaint against Obeid in the Superior Court of Mecklenburg County, North Carolina, alleging disagreements with his management style.  La Mack and Massaro filed the frivolous action only for leverage over Obeid in buyout discussions and in an attempt to venue the inevitable litigation that would follow their removal of Obeid in their home state.

190.    After discovering that La Mack and Massaro were breaching their fiduciary duties by usurping Gemini corporate opportunities concerning retail real estate development opportunities (but before Obeid discovered that La Mack and Massaro began conspiring with Bridgeton and Congress and began misappropriating Gemini funds for the benefit of the Individual Defendants' own newly formed entities), on August 14, 2014, Obeid commenced this action.

191.    On March 5, 2015, the North Carolina trial court stayed La Mack and Massaro's action in favor of Obeid's action pending the Southern District of New York.

**Individual Defendants Have Abused Their Positions Of Control**
**Over Gemini And Have Breached Their Fiduciary Duties**

192.    Since the Individual Defendants took control over GREA and Gemini, Obeid has been frozen out of every decision concerning Gemini's operations even though Individual Defendants have an obligation under the GREA Operating Agreement to keep him informed of material developments regarding Gemini and to set material actions down for a vote among all three of the GREA Member-Managers.

**A.    The Individual Defendants Immediately Attempt To Lock-Out Obeid From Gemini And Then Concealed All Material Company Information From Him**

193.    Within three weeks of taking control of Gemini – the Individual Defendants' first order of business was to manufacture a pretext to remove Obeid from any participation in Gemini even though the GREA Operating Agreement required all Member-Managers to be informed of material corporate decisions and to be given an opportunity to vote on proposed corporate actions.

194.    The Individual Defendants were desperate to remove Obeid from having any role in Gemini out of vindictiveness and in retaliation for his prior request that Gemini be restructured.    Moreover, Gemini's investors and lenders expressed their alarm over the Individual Defendants' removal of Obeid as the Operating Manager of GREA since Obeid had been the investors' and lenders' primary Gemini contact and they had invested in Gemini because of Obeid's track record at the helm of the company.    The Gemini investors and lenders expressed their skepticism over the Individual Defendants' experience and competency to manage Gemini and they demanded Obeid's reinstatement as GREA's Operating Manager.

195.    In an effort to quash the investor and lender revolt, the Individual Defendants concocted a plan to remove Obeid from any participation in Gemini by alleging that he had engaged in "misconduct" by "interfering" with the Individual Defendants' management of Gemini and sought a temporary restraining order ("TRO") from the North Carolina State Court enjoining Obeid from "interfering" with the Individual Defendants' management of Gemini.

196.    In furtherance of this scheme, the Individual Defendants also hired an outside public relations firm – Forge Communications – at Gemini's expense to provide the public relations and "messaging" concerning Obeid's removal from Gemini in the event they were successful on their TRO application.

197.    Forge Communications, however, never had an opportunity to show off its "messaging" skills since the North Carolina State Court denied the Individual Defendants' TRO application in August 2014 finding that there was no evidence of malfeasance, misconduct or interference by Obeid.

198.    Undeterred and unashamed of their frivolous and malicious actions, the Individual Defendants proceeded to cut-off Obeid from all material Gemini information in piece-mail fashion.  First, in or about August 2014, the Individual Defendants directed Gemini staff to cease forwarding to Obeid Gemini's customary business reports for the corporate, retail and hospitality groups.  Second, the Individual Defendants stopped hosting the weekend Member-Manager conference calls during which material Gemini developments and action items were historically discussed and approved.  Third, in September 2014, Massaro instructed Gemini's New York employees (which consisted of both Gemini's hospitality and corporate employees) to cease communications with Obeid and withhold all information concerning Gemini activities.  In order to ensure that Obeid was left isolated and in the dark concerning Gemini's activities, the

Individual Defendants then proceeded to unilaterally terminate employees with whom Obeid had longstanding relationships and replaced them with their own loyalists. As a result of Individual Defendants' actions, additional Gemini employees quit in protest.

199. In sum, during the ten-month period of time that the Individual Defendants have controlled Gemini, they have withheld from Obeid information updates and reports regarding their actions. For the first time on May 8, 2015, the Individual Defendants provided Obeid with a cursory update on Gemini's financials and business developments – two weeks before the Individual Defendants were scheduled for their depositions in this action. As explained below, the Individual Defendants cut-off Obeid from all material Gemini information so that they could carry out their corporate looting without Obeid's resistance.

**B.     The Individual Defendants Usurp Gemini's Corporate Opportunities**

200. In August 2014, the Individual Defendants began usurping Gemini's corporate opportunities for themselves.

201. For example, in August 2014, Obeid discovered that a retail development project in Greenville, South Carolina ("Greenville Project") originally sourced and promoted by Gemini's retail development team had been co-opted by Individual Defendants for their own personal pecuniary gain.

202. The Greenville Project originally involved GREA (through one of its Gemini subsidiaries) purchasing 15 acres of land to construct a 60,000 square foot retail center anchored by Lowes Food (a national grocer). The Greenville Project was originally conceptualized and promoted in the first quarter of 2014 by Gemini's retail employees.

203.    Although Obeid was not personally involved in this deal, Gemini's employees were actively involved in promoting this development project and he was aware that Gemini resources were being committed to bring the Greenville Project into the Gemini "deal pipeline."

204.    Once Obeid was replaced as GREA's Operating Manager, the Individual Defendants deliberately kept him in the dark on all projects including the Greenville Project. As of the date of his removal (i.e. July 1, 2014), Obeid was under the impression that Gemini was seeking lenders to finance the Greenville Project and that Gemini was pushing ahead with the project.

205.    In August 2014, however, Obeid discovered that the Individual Defendants had co-opted the Greenville Project for their personal profit at Gemini's expense.  Specifically, Individual Defendants had approached Ashville Savings Bank in June 2014 for a construction loan in the amount of up to $9.5 million to construct the Greenville Project's retail center.  In their dealings with Ashville Savings Bank, Individual Defendants kept the appearance that they were acting in their capacities as Member-Managers of GREA and that this development project was yet another Gemini venture.  The Individual Defendants used Gemini's extensive track record and financials as the credible window dressing necessary to obtain the construction loan. In reality, however, Individual Defendants had formed another limited liability company (Riverside Crossing, LLC), a single purpose entity functioning as the borrower of the construction loan and the owner of the 15 acre property subject to development into the Greenville Project.

206.    That is, Individual Defendants used Gemini's staff, resources and its brand name to induce Ashville Savings Bank into a commitment to finance the Greenville Project through a $9.5 million construction loan.  The Individual Defendants succeeded in doing so by

misrepresenting to the bank that this project was a Gemini project when, in reality, the borrower and developer Riverside Crossing, LLC was an entity owned only by the Individual Defendants (and had no legal affiliation with Gemini or Obeid).

207.    Obeid discovered Individual Defendants' malfeasance concerning the Greenville Project on or about August 7, 2014.  At this time, Obeid became concerned that Individual Defendants were also steering other Gemini projects to newly formed entities that they owned. Accordingly, Obeid's predecessor counsel took action and questioned Individual Defendants' counsel concerning the particulars of the Greenville Project including the fact that Obeid was in possession of documentary evidence clearly indicating that Riverside Crossing, LLC (and not Gemini) would be the owner of the Greenville Project.

208.    After being caught red-handed trying to usurp this corporate opportunity from Gemini, Individual Defendants back-pedaled and informed Obeid that the draft loan documents between Ashville Savings Banks and Riverside Crossing, LLC (which omitted Obeid as a member) were "mistakes."  On August 7, 2014 Individual Defendants (through one of their Gemini retail analysts Garrett Giusti) informed Ashville Savings Bank that the borrower on the construction loan would be Riverside Crossing, LLC but that the entity would not be owned by La Mack and Massaro but would be a wholly-owned subsidiary of GREA.  The bank acknowledged Individual Defendants' abrupt change in course and even referenced their departure from the prior deal structure in which Individual Defendants had intended to circumvent Obeid out of the deal.

209.    Although the Individual Defendants assured Obeid on or about August 26, 2014 that they would close this deal as a Gemini project with GREA as the parent entity to Riverside Crossing, LLC thereby including him in the transaction – the Individual Defendants

subsequently told Obeid in late September 2014 that the "deal was dead" without any further specifics or information.  When Obeid questioned the Individual Defendants about the ongoing expenses being incurred by Gemini for the Greenville Project totaling in excess of $150,000 – the Individual Defendants told Obeid that those expenses were "dead deal costs" and would not provide any further explanation.

210.    The Individual Defendants fraudulently concealed from Obeid the fact that they struck a side-deal with Roger Henderson of Lowes Foods (the project's anchor tenant) to develop the Greenville Project at a later date through one of the Individual Defendants' new entities.  In other words, even though the development opportunity was sourced by Gemini and over $150,000 in expenses were incurred and paid by Gemini to bring the Greenville Project to fruition – the Individual Defendants entered a side-deal with Lowes Foods and its special purpose entity Ryland Corporation to exclude Gemini and Obeid altogether.  The Individual Defendants convinced Lowes Foods to acquire the parcel and hold onto it until a future date after the Gemini partnership dispute was resolved at which point the Individual Defendants (through their new entities) would develop the project for Lowes Foods.  This is in fact what ultimately happened.  Lowes Foods closed on the property in October 2014 and has held the development project in abeyance in order for the Individual Defendants to develop it into the retail shopping center originally designed by the Gemini retail team.  The Individual Defendants are now developing the Greenville Project through their new company Elevation.

211.    The Greenville Project is simply representative of Individual Defendants' self-dealing in usurping Gemini business opportunities that already were in the Gemini deal pipeline and for which Gemini resources were expended in identifying and procuring the target projects.  In total, thirteen additional retail development projects were in various stages of financing or

development at the time Obeid was cut-off from critical Gemini information.  These projects were diverted by the Individual Defendants to their newly formed entities including Elevation.

212.    For example, Elevation usurped a Gemini retail development project in Apple Valley, Minnesota for a shopping center where LA Fitness serves as the anchor tenant.  This project was originally sourced and stickhandled by the Gemini retail team, which performed all the work evaluating and preparing the investment opportunity.  Instead of having Gemini close on this investment, the Individual Defendants steered the investment opportunity to Elevation, which closed on it in the beginning of April 2015.

213.    Similarly, Elevation is close to closing on two other retail projects that were sourced and stickhandled by Gemini and for which Gemini expended considerable resources pursuing.   These two projects are the Lowes Foods/Lee Vaughn retail project in Simpsonville, South Carolina and the Edgewater Place shopping center in Raleigh, North Carolina.

**C.    The Individual Defendants Misappropriate Gemini Funds To Finance Their Newly Formed Competing Entities**

214.    The Individual Defendants not only secretly diverted Gemini's corporate opportunities to their newly formed company Elevation while sticking Gemini with those projects' costs, but they also misappropriated additional Gemini resources to help launch their own newly formed competing real estate entities.

215.    From the outset of Massaro's appointment as Gemini Operating Manager, the Individual Defendants directed the Gemini employees to work on the necessary preparations for the Individual Defendants' transition from Gemini to a new entity owned solely by La Mack and Massaro.   As explained below, beginning in July 2014 and continuing to the present, the Individual Defendants directed the Gemini employees (without Obeid's knowledge) to work on La Mack and Massaro's secret plans to divest Gemini of its hospitality assets.

216.    In addition, during this period of time, the Gemini employees were continuing to source new development deals except they were doing so for the ultimate benefit of the Individual Defendants' new competing entities and not Gemini.  In fact, Obeid was completely in the dark concerning the fact that from July 2014 until at least April 2015, Gemini was paying for its employees to source and explore new development projects for the Individual Defendants (and not Gemini).

217.    For example, Gemini incurred significant costs in August 2014 for exploring the development of a NASCAR themed Richard Petty hotel in North Carolina, which the Individual Defendants intended on developing on their own.  Similarly, in March and April 2015, Gemini paid for its own employees to explore Elevation's participation in a series of hotel development projects for Cambria Suites hotels.

218.    By November 2014, however, the Individual Defendants also directed the Gemini employees to assist them with the actual mechanics of launching and forming their new competing entities.  Between November 2014 and April 2015, the Individual Defendants were busy forming at least eight new entities with the assistance they received from Gemini's employees.

219.    For example, Gemini employees such as Carolyn Kellogg, Rachael Feurtado and Barbara Guillote were actively involved in assisting the Individual Defendants market and brand their new competing entities and secured various domain names centered on the "Gemini" brand. Barbara Guillote went further and was responsible for establishing the competing entities' infrastructure including establishing new bank accounts, payroll, health and benefit plans, insurance, office phone systems and computers and worked with a new I.T. vendor to effectuate the wholesale data transfer from Gemini's existing network to a new network used by the

Individual Defendants' new entities.  During this time, Gemini employees Garrett Guisti, Paul Harnett and Chris Melling continued working on sourcing real estate investment opportunities for the Individual Defendants' new entities.

220.     The Individual Defendants initially operated their primary competing entity under the name G2 Real Estate Advisors, LLC – a clear attempt at leveraging Gemini's goodwill in the marketplace by forming a competing entity with a name nearly identical to Gemini's parent company - Gemini Real Estate Advisors, LLC.

221.     On or about April 2, 2015, the Individual Defendants formed Elevation and decided to abandon their predecessor entities in favor of Elevation.  Indeed, Elevation has been the primary recipient of Gemini's corporate opportunities and also received the benefit of ten months of Gemini resources surreptitiously poured into the Individual Defendants' efforts at launching their own competing real estate entity.

222.     Moreover, the Individual Defendants directly solicited Gemini employees Garrett Guisti, Chris Melling, Barbara Guillote and Carolyn Kellogg to leave Gemini and join Elevation. As of April 2015, all four former Gemini employees now work for Elevation. However, the Individual Defendants' corporate looting of Gemini in favor of Elevation continues even now. The Individual Defendants have sublet Gemini's office space in Huntersville, North Carolina to Elevation for free.  Furthermore, Gemini has subsidized Elevation's soft launch by paying for expensive and high profile conferences like the International Conference of Shopping Centers in Las Vegas, Nevada where Gemini paid over $20,000 to host a booth and party for industry professionals attended by the Individual Defendants and Elevation employees.

**D.    The Individual Defendants Immediately Attempt To Sell Gemini's Hotel Properties At Discounted Prices Pursuant To A Side-Deal With Congress Group**

223.    Within three weeks of taking control of Gemini on July 1, 2014, the Individual Defendants decided to sell off Gemini's hotel properties. Like all of their other actions, the Individual Defendants concealed their decisions to divest Gemini of its hotel properties from Obeid.

224.    On or about August 24, 2014, the Individual Defendants decided to sell at least five of Gemini's twelve hotel properties.  Specifically, the Individual Defendants approached Douglas Hercher and Evan Hurd of RobertDouglas (a commercial broker) in late July 2014 and requested that they perform financial modeling and additional analyses concerning the potential sale of (1) the Jade Bryant Park hotel development project, (2) the Jade Seaport hotel development project; (3) the Jade Greenwich Village Hotel; (4) The Jade Miami Hotel development project and (5) the Boston Holiday Inn.

225.    The Individual Defendants were particularly focused on selling the Bryant Park and Seaport hotel development projects and instructed RobertDouglas to prioritize its analyses on those two hotel projects and to provide a preliminary valuation for both properties.

226.    The Individual Defendants were motivated to sell the Bryant Park and Seaport hotel development projects to spite Obeid and because they found a buyer in the Congress Group who would allow them to reenter the development projects through a joint-venture and share in the projects' future profits.

227.    For Obeid, the Bryant Park and Seaport hotel development projects were important to fulfill his vision of expanding Gemini's luxury boutique "Jade" brand.

228.    The principal common equity investors in the Bryant Park hotel development project are Obeid, his family and outside investors with whom Obeid has dealt for over a decade.

The preferred equity investors placed their investment into the project through Gemini Fund 5 LLC (a structure Obeid created for capital raising efforts) and are high net worth individuals. In total, these equity investors have invested $5.65 million in the Bryant Park project. Obeid also procured a participating loan from UBS Realty Advisors LLC ("UBS Realty") in the amount of up to $50.5 million and worked tirelessly from the beginning up to the time of his removal as President of Gemini Equity Partners, LLC ("GEP")[1] with the general contractor, architects, lawyers and lender to make this project a world-class boutique hotel within the upscale Jade brand of hotels.

229.    The Seaport hotel[2] development project's equity investors also comprise of high net worth individuals (some of these investors and their advisors have known Obeid for more than a decade) who invested in this project based on Obeid's involvement and leadership in this project. In total these equity investors have invested $4.5 million in the Jade Seaport Hotel project. UBS Realty is also the lender on this project as well and issued a construction loan in the amount of $36.5 million. Like the Bryant Park project, Obeid selected and worked with the Seaport's general contractor, architects, lawyers and lender to bring this project to fruition (until his removal as President of GEP by the Individual Defendants).

230.    UBS Realty itself was so bullish on the profitability of these two hotel development projects that its participating loans had a lockout period barring pre-payment of the loans until March 14, 2018 for Seaport and October 17, 2019 for Bryant Park to ensure that UBS Realty maximized its return on these two hotel projects.

---

[1]   GEP is an Affiliate of GREA in which Obeid, La Mack and Massaro are one-third Member-Managers. GEP is the ultimate entity in control of the Bryant Park and Seaport hotel development projects. The Individual Defendants removed Obeid as the President of GEP on November 1, 2014.

[2]   Currently, the property is being operated as a Best Western Hotel.

231.    The Individual Defendants contributed nothing to either the Bryant Park or Seaport hotel development projects.  They did not invest their own money, did not procure investors or lenders and had no involvement with the design, approvals or construction of the two projects.

232.    Accordingly,   the   Individual   Defendants   immediately   began   exploring opportunities to prevent Obeid from completing these two hotel development projects while simultaneously enriching themselves in the process – even if it meant taking actions against Gemini's and its investors' interests.

233.    In August 2014, the Individual Defendants approached Tom Zaccagnino of the Congress Group to explore his interest in acquiring the Seaport and Bryant Park properties since the Congress Group (a developer) had "ground-up" commercial and mixed-use development experience.

234.    Zaccagnino and Congress Group were no strangers to the Individual Defendants. The Congress Group had agreed to serve as the Individual Defendants' capital partner on the Greenville Project a few months earlier in June 2014 when the Individual Defendants first attempted to circumvent Gemini and Obeid out of that retail development project.

235.    The Individual Defendants' proposal was simple. They would sabotage the two hotel development projects by convincing UBS Realty to stop funding the construction loans and convince UBS Realty to allow the projects to be sold to the Congress Group who would then step in and complete the projects.  In exchange, the Individual Defendants requested to be brought in by Congress at a later date as a participating junior partner in the projects.

236.    Zaccagnino expressed interest in the Individual Defendants' proposal and the Individual Defendants (through Gemini employee Garrett Guisti) sent the Congress Group

internal confidential information concerning the Seaport and Bryant Park projects' financial modeling, revenue projections and preliminary valuations. In other words, the Individual Defendants who owed fiduciary duties to act in Gemini's best interests and obtain the best price on its hotel properties chose not to involve its commercial brokers at RobertDouglas in this transaction and sent the Congress Group internal confidential information on the two hotel development properties. Throughout August and September 2014, the Individual Defendants and Congress Group worked collaboratively to determine how they could jointly pursue the two hotel development projects for themselves – hardly an arms-length transaction as one would expect from the Individual Defendants serving as Gemini's controlling Member-Managers.

237. Zaccagnino and his partners liked the investment opportunity and decided to pursue it with the Individual Defendants along the terms of their side-deal. Accordingly, the Individual Defendants instructed RobertDouglas to arm them with sufficient data and projections in order to convince UBS Realty to modify the two participating construction loans and allow Gemini to sell the projects to the Congress Group. In exchange, the Individual Defendants promised RobertDouglas the listings for both hotel development projects and the Jade Greenwich Village Hotel.

238. The Individual Defendants (unbeknownst to Obeid) contacted John Connolly, Jr., Executive Director of Acquisitions for UBS Realty and requested an in-person meeting (without Obeid present) to discuss UBS Realty's significant investment in the Bryant Park and Seaport projects. The in-person meeting took place on September 25, 2014 in Hartford, Connecticut.

239. At the meeting, La Mack and Massaro requested that UBS Realty agree to renegotiate the terms of its two participating loans on the Bryant Park and Seaport projects as well as provide UBS Realty's consent to the projects' sale to the Congress Group whom Massaro

represented to UBS Realty was a developer with whom he and La Mack had been "discussing the projects for some time."

240.    In an attempt to convince the skeptical UBS Realty team  (consisting of John Connelly and Brent Hall) to renegotiate the loans and consent to the sale of the projects or recapitalization of the projects with the Congress Group, La Mack and Massaro portrayed Gemini as having a chaotic and uncertain future (including by highlighting the pending lawsuits in North Carolina and New York) and that renegotiating the loans and assenting to the properties' sale to the Congress Group would be the only way for UBS Realty to recoup its investments.

241.    Massaro pressed John Connelly, Jr. of UBS Realty on this issue by letter, dated October 14, 2014.  In his letter, Massaro summarized the substance of his and La Mack's meeting with UBS Realty and further outlined their proposal for renegotiating the UBS Realty loans and obtaining its consent to the sale of or recapitalization of the two projects to or with the Congress Group.  A true and correct copy of Massaro's October 14, 2014 letter to UBS Realty is attached herein as **Exhibit 2.**

242.    Massaro's letter to UBS Realty opened and closed with a request that UBS Realty keep his secret solicitation confidential from Obeid – a wholly unprofessional and alarming behavior from the President of a borrower entity vis-à-vis its lender on two major loans.

243.    Next, Massaro shockingly lobbied UBS Realty to stop funding Gemini's two leading hotel projects by ceasing all future loan disbursements.  Instead, Massaro requested that UBS Realty provide its consent for Massaro and La Mack's sale of the two projects to the Congress Group or another third-party through a commercial property listing with a broker they recommended at RobertDouglas (Doug Hercher). In exchange, Massaro promised that UBS

Realty's two loans would be repaid with interest accruing through the date of closing plus a profit sharing of any remaining proceeds after the Gemini equity investors recovered their investment and a return. That is, Massaro's proposal offered a significantly worse financial return for UBS Realty (as well as for the equity investors) than the existing Gemini investment projections from the two hotel development projects.

244. In order to convince UBS Realty to consider walking away from its attractive long-term investment, and breaching its funding obligations under its loans, Massaro proceeded to falsely portray a doomsday scenario for UBS Realty in which it would lose its investment if it continued funding the projects as it was obligated to do under its existing loan agreements with Gemini. Massaro misrepresented to UBS Realty that its loans were in danger of a future default given the unmanageable and dire situation at Gemini arising from the pending lawsuits between the parties over control of Gemini and that both projects suffered from significant cost overruns.

245. Massaro's letter succeeded in sufficiently alarming UBS Realty. As a result, UBS Realty improperly ceased disbursing any additional funds in early November 2014 for either project (other than to complete demolition at the Bryant Park Hotel project site) until it further investigated the claims asserted by Massaro. Obeid was not aware of the Individual Defendants' sabotage of the Bryant Park and Seaport projects until late November 2014 when UBS Realty informed him of its secret communications with Massaro and La Mack.

246. Obeid was shocked to discover that La Mack and Massaro would sabotage their own company's projects to further their side-deal with the Congress Group. Moreover, UBS Realty's Jack Connelly informed Obeid that Massaro had misrepresented to them that the Individual Defendants were keeping Obeid informed of their decisions concerning the two hotel development projects.

247.    La Mack and Massaro were unable to hoodwink UBS Realty into consenting to the sale of the two projects to the Congress Group.  UBS Realty's Brent Hall informed Obeid that it did not consent to the sale of the two projects but that it had serious concerns over the perceived dysfunctionality at Gemini (based on Massaro's communications) and as a result would not continue funding the two projects until such time as La Mack, Massaro and Obeid reached an agreement for moving forward with the two projects.

248.    Fearful over the prospect of having two of Gemini's primary development projects languishing as a result of an abrupt cut-off in lender financing caused exclusively by Massaro's and La Mack's sabotage, Obeid immediately demanded answers from them.

249.    On December 1, 2014 Massaro responded to Obeid's inquiries and informed him that he and La Mack entered into an exclusive listing agreement on November 13, 2014 with RobertDouglas for the sale of the two hotel development projects and the Jade Greenwich Village Hotel.

250.    Obeid was stunned at Massaro's response not only because he once again took unilateral and unauthorized actions without keeping Obeid informed, but also because La Mack, Massaro and Obeid had commenced discussions in the beginning of November 2014 concerning a separation along the contours Obeid had originally proposed (i.e. Obeid would keep the hotel investments and La Mack and Massaro would retain the retail property investments).  The Individual Defendants' unilateral and secretive decision to sell the Jade Bryant Park and Jade Seaport hotel projects removed two of Gemini's most valuable development projects from a potential future separation agreement between the partners.

251.    Even worse, however, was the prospect that the equity investors Obeid procured into these two Gemini projects pursuant to an understanding that they were investing in a long-

term and lucrative development project were now at risk of losing their investment since both projects grounded to a halt as a result of the cutoff in funding and the recoupment of their principal investment now hinged on the successful sale of these two stalled projects.

252.    Obeid requested that the Individual Defendants withdraw the listing and to reach an agreement on Gemini's sale of the two projects to him as part of a negotiated separation agreement.  La Mack and Massaro refused to withdraw the listing.  Instead, Massaro told Obeid that the RobertDouglas brokers were actively marketing both projects and that the brokers represented the best chance to procure the highest offers for the properties.

253.    In reality, however, La Mack and Massaro were doing everything in their power to discourage bona-fide offers to buy the two projects so that they could sell or recapitalize the Bryant Park and Seaport projects to or with the Congress Group "on the cheap" (based on the side-deal they struck with Congress). The proof that the Individual Defendants were not serious about obtaining genuine fair-market offers for the two properties was manifest when Massaro abruptly and inexplicably intervened on January 26, 2015 to demand that the RobertDouglas brokers recall their blast emails marketing the two properties.

254.    La Mack's and Massaro's conduct vis-à-vis the two hotel projects was orchestrated so as to provide the appearance of Gemini's effort to sell them but La Mack and Massaro intentionally refused to provide any meaningful follow-up or strategy to close out a deal to either Obeid or a third-party because they had already committed to sell the two properties to the Congress Group whom they first identified and suggested to UBS Realty at the September 25, 2014 meeting.

255.    Indeed, on January 30, 2015, La Mack forwarded an email to Obeid attaching the Individual Defendants' new proposal to UBS Realty for the disposition of the two projects – both

involved the participation of the Congress Group. Per UBS Realty's earlier admonishment that it would not consider any proposals if they were not reached in agreement by all three Member-Managers – La Mack sought Obeid's assent to their proposal, which could only be charitably characterized as a giveaway to the Congress Group to the detriment of Gemini's existing investors.

256.    First, the Individual Defendants' proposal concerning the Bryant Park project simply proposed a "recapitalization" of the UBS Realty loan on this project from a participating loan to a construction loan and a transfer of the development rights from Gemini to Congress (in which Gemini would lose its development fees). In addition, La Mack and Massaro proposed that Congress infuse an additional $5 million in equity into the project – a clear attempt to dilute and subordinate the existing Gemini equity investors' position in the project. In essence, La Mack and Massaro proposed an inferior "recapitalization" plan that would adversely affect Gemini's existing investors in the project but handsomely reward the Congress Group by giving it control over the project (along with the development fees).

257.    Second, La Mack and Massaro proposed selling the Seaport project to the Congress Group for conversion into a "high-end luxury condominium" development. This proposal was even more ambiguous than the Bryant Park project and omitted such basic terms like the purchase price. In fact, the miniscule deposit offered by Congress ($1,250,000) and the absence of a concrete purchase price underscored the conspiracy between the Congress Group and La Mack and Massaro and the Individual Defendants' own self-dealing in promoting Congress' substandard offer, which did nothing to protect the Gemini investors' rights.

258.    Obeid objected to the Congress Group's offers. Alarmed at having been kept in the dark by La Mack and Massaro before they made these weak proposals to UBS Realty and

confident that he could (on his own) procure a vastly superior offer to purchase the two projects (and protect the Gemini investors' rights) – Obeid submitted two concrete offers to purchase both projects on February 4, 2015.

259.    Unlike the Individual Defendants' proposal for the Bryant Park project, Obeid actually submitted an offer to buy the project for $24.9 million. Moreover, Obeid's offer was a firm one with a hefty 10 percent deposit (i.e. $2.49 million), no due diligence period (which was a component of the Congress Group's offer thereby making the already weak offer a conditional one) and a closing date no later than 45 days after signing of the Purchase and Sale Agreement.

260.    Similarly, Obeid also made an offer to purchase the Seaport hotel project for $36 million (unlike the Congress Group who failed to actually provide a purchase price in its offer). Like the Bryant Park offer, Obeid's Seaport offer was a firm one with a 10 percent deposit (i.e. $3.6 million), no due diligence period (which was also a component of the Congress Group's offer for this project) and a closing date no later than 45 days after signing of the Purchase and Sale Agreement.

261.    Since Obeid and the Individual Defendants did not reach an agreement concerning the Congress Group's offers – UBS Realty declined to modify its loans and assent to the sale and recapitalization to Congress. At this time, Obeid's offers were the highest and best offers for both properties and would have not only satisfied the UBS loans on both properties but would have made Gemini's investors whole on their investments.

262.    Instead of acting in the best interests of Gemini and its investors and accepting Obeid's offers, the Individual Defendants declined to accept them. Instead, the Individual Defendants informed Obeid and UBS Realty that they instructed RobertDouglas to solicit final and best offers by February 25, 2015 for the Bryant Park and Seaport projects and the Jade

Greenwich Village Hotel pursuant to a "confidential public marketing process" administered by the commercial brokers.

**The Sham "Marketing Process" And Side-Deal With Bridgeton**

263.    Even though Obeid is an equal one-third Member-Manager of GREA, the Individual Defendants concealed all information concerning the so-called "marketing process" from Obeid, including information concerning the bids themselves.

264.    As of the February 25, 2015 deadline, Obeid still presented the two best offers for the Seaport and Bryant Park properties although he himself did not know this since the Individual Defendants continued to keep him in the dark.  However, the Individual Defendants rejected both of Obeid's superior offers out of spite and instead agreed to sell the properties on inferior terms that could not meet the narrow pre-payment window opened up by UBS Realty that expired on March 31, 2015.

265.    With respect to the Seaport property, the Individual Defendants agreed to sell the property to Atlantic Pearl Investments ("Atlantic Pearl") even though its ostensible $38 million purchase price offer was subject to a litany of contingencies including an onerous due diligence condition.  Moreover, Atlantic Pearl's Letter of Intent failed to offer a non-refundable deposit. Accordingly, the Individual Defendants selected an offer with only a marginally higher offer price that was easily subject to a price adjustment downward because of the extensive contingencies associated with the Letter of Intent and the absence of a non-refundable deposit.

266.    With respect to the Bryant Park property, Obeid remained the best offer for the property by the February 25, 2015 deadline by almost $2.4 million than the next offer with the added bonus that Obeid's offer included no contingencies and a hard non-refundable 10% deposit.   Although Obeid's bid came in at $2.4 million higher than the next highest bid, instead

of accepting it as one would expect in an "open and transparent" bidding process – to spite Obeid, and without regard to the impact on Gemini and its investors, the Individual Defendants invited only the three lower bidders to a clandestine second round of bidding in hopes of surpassing Obeid's offer.

267.    Had the Individual Defendants accepted Obeid's Letter of Intent for Bryant Park and proceeded to closing, Gemini could have paid off UBS Realty's loan while an opening still existed carving out the pre-payment prohibition and paid back its investors in full.  Unfortunately for Gemini and its investors, the Individual Defendants refused to sell Bryant Park to Obeid and instead accepted an inferior offer one month later from the Hansji Corporation, which was riddled with contingencies and was at least $582,750 lower than Obeid's offer when compared on an "apples to apples" basis.  Hansji's offer would not have paid back the investors even if it was timely submitted before the UBS prepayment window closed. However, Hansji's inferior offer was submitted late (April 2, 2015) and on a date when the UBS loan became (once again) locked out to prepayment. As such, the Bryant Park property continues to languish and cost the Gemini investors approximately $150,000 of debt service per month.

268.    While the Individual Defendants kept Obeid entirely in the dark – they provided Bridgeton's Jariwala with all the confidential information concerning the competing bids for the hotel properties being marketed (i.e. Bryant Park, Seaport and the Jade Greenwich Village hotel).

269.    Bridgeton's Atit Jariwala was a former Gemini minority Member-Manager from 2005 until his separation from the company in February 2009.  Jariwala reported to Obeid during his time with Gemini.  In February 2009, Jariwala sought to escape potential liability on his personal guarantees on Gemini loans and asked Obeid, La Mack and Massaro to buy-back his 17.5% minority membership interest, which they did in exchange for a Separation Agreement

that was negotiated and executed by Jariwala and Gemini (signed by all three GREA Member-Managers). The Separation Agreement and its accompanying Intellectual Property Assignment prohibits Jariwala from using or disclosing any of Gemini's confidential information or from using any of Gemini's intellectual property including but not limited to Gemini's brands and marks. The Separation Agreement is binding on Jariwala and Gemini's successors and assigns.

270.    Jariwala ultimately founded Bridgeton – a direct market competitor to Gemini. As explained in more detail below, the Individual Defendants contacted Atit Jariwala in August 2014 to explore his interest in acquiring Gemini's hotel properties or hospitality assets. Jariwala expressed interest in Gemini's hospitality platform, which he ultimately received for free from the Individual Defendants in exchange for undisclosed kickbacks. However, in November 2014, Jariwala also expressed interest in acquiring three existing Gemini hotels: (a) the Jade Greenwich Village Hotel; (b) the Wyndham Flatiron Hotel and (c) the Boston Holiday Inn.

271.    Although the Individual Defendants represented to Obeid that they decided to sell the Jade Greenwich Village Hotel pursuant to the so-called public marketing process administered by RobertDouglas, the Individual Defendants had already secretly agreed to sell the Jade Greenwich Village Hotel to Bridgeton in a side-deal reached between them and Bridgeton's Jariwala in November 2014 at which time the Individual Defendants granted Bridgeton "rights of first refusal" and "last looks" to acquire three Gemini hotels (the Jade Greenwich Village Hotel, the Wyndham Flatiron Hotel and the Boston Holiday Inn).

272.    Jariwala and Bridgeton publicized their "rights of first refusal and last looks" to the marketplace, and, in so doing, Jariwala and Bridgeton intentionally and maliciously chilled and manipulated the market for those three Gemini hotel properties, which had the effect of steeply discounting third-party offers for those properties so that Bridgeton could come in at the

end and scoop them up at fire sale prices.  For example, Bridgeton's investor marketing materials indicated that the Jade Greenwich Village Hotel, the Wyndham Flatiron Hotel and the Boston Holiday Inn were "being sold off-market" to Bridgeton at a fixed price of "approximately $166 million."  A true and correct copy of the Bridgeton investment teaser along with the cover email are attached herein as **Exhibit 3.**

273.    This is exactly what happened with the Jade Greenwich Village Hotel – Gemini's premier luxury boutique hotel.  On March 9, 2015, the Individual Defendants accepted a Letter of Intent from Bridgeton to acquire the Jade Greenwich Village Hotel for $78 million.  This insider transaction was never disclosed to Obeid.  In fact, Obeid (despite being an equal one-third Member-Manager of GREA) only discovered this fact within the last month in the course of fact-discovery.

274.    Bridgeton did not participate in the public marketing process, which had a February 25, 2015 deadline for "final and best offers" on the listed hotel properties.  Rather, Bridgeton (consistent with its "right of first refusal and last look rights") submitted its offer two weeks after the February 25, 2015 bid deadline expired and offered to acquire the hotel at a deep discount off of its fair market valuation.  Notably, the Individual Defendants' own commercial brokers at RobertDouglas performed two separate valuations of the Jade Greenwich Village and determined that the hotel's mid-point valuation constituted $90 million yet the Individual Defendants accepted Bridgeton's late and obscenely low $78 million offer (without even informing Obeid or soliciting his vote).

**The Individual Defendants Give Away Gemini's**
**Hospitality  Business To Bridgeton For Free**

275.    Aside from developing and owning its own hotels, Gemini also operates hotels for third-parties and its own hotels through its hospitality group.  Gemini's hotel management

contracts were the most profitable source of revenue for Gemini's hospitality business (until their transfer to Bridgeton).

276.    Gemini's hospitality group was also a well-known and established market participant in the hospitality industry.  The hospitality group generated the largest cash flow for Gemini company-wide because of the strength of the hotel management contracts themselves and the expertise of the hospitality employees who operated the hotel properties.

277.    For example, Gemini had separate hotel management contracts in place with each hotel owner.  As such, the hotel management fees for each hotel property varied and ranged from 3% - 4% of the hotel's gross revenue.  However, Gemini's profit margins were particularly high on the hotel management contracts because Obeid and his hospitality team were in demand as a result of their talent and Gemini was able to negotiate into each of the hotel management contracts a provision requiring the hotel owners to cover a portion of the costs associated with the actual management of the hotels.

278.    In other words, while Gemini maintained fifteen hospitality employees – ten of those employees and their associated overhead were paid by the hotel owners through direct reimbursements to Gemini because of their direct involvement in the operations of the hotels. This translated into approximately 66% of the Gemini hospitality group's overhead being paid by the hotel owners directly, which made the hotel management contracts a gold mine for Gemini and netted the company over $1.2 million per year in net annual profits.   These net profits were poised for even higher returns with the expected completion of the Bryant Park and Seaport development projects.

279.    Obeid was therefore stunned to discover on January 26, 2015 that the Individual Defendants had transferred all of Gemini's valuable hotel management contracts to Bridgeton (a direct competitor) for free.

280.    Obeid was kept in the dark regarding the Individual Defendants' indiscriminate transfer of Gemini's assets to a competitor like Bridgeton.  The first time Obeid learned of the scale of Defendants' actions (i.e. their wholesale transfer of all eleven Gemini hotel management contracts to Bridgeton) was when he received the January 26, 2015 Gemini Press Release announcing that Gemini "has retained New York-based Bridgeton Hotel Management (Bridgeton) to manage its hotel properties, effective immediately" while he was speaking at a hospitality conference in California.  A true and correct copy of the January 26ᵗʰ 2015 Gemini Press Release is attached herein as **Exhibit 4.**

281.    On the same day, the Individual Defendants also abruptly transferred all of Gemini's hospitality and corporate employees located in Gemini's New York headquarters to Bridgeton's New York office and completed a massive data transfer from Gemini to Bridgeton of all Gemini confidential information concerning its hospitality business compiled over the last decade, including all contacts, communications, historical files, financials, business plans, investor lists, customer lists, costing data, legal documents, financial models, marketing plans and strategies, buying practices, personnel files, operational information and various proprietary know-how and trade secret information.  This theft included valuable system infrastructure that was used to manage the accounting, revenue management, operations and sales and marketing functions.  The system infrastructure took ten years to develop at a great expense to Gemini.

282.    Therefore, not only did the Individual Defendants transfer Gemini's single largest revenue generating asset (i.e. the hotel management contracts) but they also transferred Gemini's

skilled hospitality employees and all of Gemini's supporting infrastructure, including all of its confidential and proprietary information.

283.    Even though Jariwala was bound by his Separation Agreement from using or disclosing confidential or proprietary Gemini information, the Individual Defendants conspired with him for approximately three months in planning the logistics for stealing Gemini's hospitality business.

284.    In fact, the Individual Defendants and Jariwala directed Gemini employees who were all bound by Gemini Loyalty and Confidentiality Agreements ("Loyalty Agreements") to violate their Loyalty Agreements and assist the Individual Defendants and Bridgeton to unlawfully steal Gemini's confidential information by downloading password protected confidential information from Gemini's secure network and transferring the data onto a parallel network created by the Individual Defendants for ultimate production to Bridgeton.

285.    In fact, the Individual Defendants and Bridgeton's Atit Jariwala used Gemini employee Ritesh Jariwala as a corporate spy in the three months leading up to the January 26, 2015 wholesale free-transfer of Gemini's hospitality group to Bridgeton.  Atit Jariwala and the Individual Defendants delegated Ritesh Jariwala with the responsibilities for ensuring that Gemini's proprietary information was being regularly transferred to Bridgeton on schedule so that the Individual Defendants and Bridgeton could pull off their theft of Gemini's entire hospitality business.

286.    Throughout this entire time, the Individual Defendants kept Obeid in the dark.  In fact, in an effort to prevent Obeid from investigating the circumstances concerning the theft of Gemini's hotel management contracts, employees, data platform and proprietary information –

the Individual Defendants cut-off Obeid from even being able to access the old Gemini network thereby precluding any forensic analysis concerning the Individual Defendants' actions.

287.    There was no economic justification for the transfer of Gemini's hospitality business to Bridgeton (beyond the Individual Defendants personally receiving kickbacks from Bridgeton for their thievery).  The hospitality group was the most profitable business segment at Gemini and had been operating without issue.  At the time of the transfer, Gemini managed eleven hotels and maintained a market presence in the hotel management industry led by Obeid. By contrast, Bridgeton had a minor footprint in the hospitality industry at the time of the transfer. Bridgeton only operated three low-end hotels and had a dramatically smaller infrastructure than Gemini at the time of the transfer.  Bridgeton was desperate to scale its operations and to enter the upscale luxury boutique hotel market.  Rather than work its way up, Bridgeton instead chose to steal the hotel management contracts, employees, system infrastructure and proprietary information from Gemini.

288.    The terms of the deal the Individual Defendants' struck with Bridgeton are outrageous.  Gemini (through the Individual Defendants' unlawful actions) and Bridgeton entered into a Subcontract effective January 26, 2015 whereby Bridgeton now serves as a sub-manager to Gemini on the existing hotel management contracts and receives approximately 65% of the historical revenues that originally flowed directly to Gemini.

289.    Bridgeton did not assume any of Gemini's overhead from the hospitality group even though Gemini's experienced hospitality employees were transferred to Bridgeton's office and rebranded as Bridgeton employees to the outside world.  The Gemini hospitality employees transferred to Bridgeton continued to largely be paid the hotel owners themselves pursuant to the

existing hotel management contracts, which remained in place between Gemini and the hotel owners.

290.    In fact, Gemini's overhead remains approximately the same after the hospitality group's transfer to Bridgeton as it did prior to the transfer except that Gemini now receives only about 35% of the historical revenues from the hotel management contracts it previously managed on its own.

291.    Since Gemini remains the official "hotel manager" on all the existing hotel management contracts – Gemini (and not Bridgeton) also maintains all the risk of liability in the event of a dispute with a hotel owner concerning the management of its hotel property.  In essence, Bridgeton is a middle-man offering nothing to Gemini that it did not already have but taking two-thirds of the revenue generated from the hotel management contracts.

292.    Therefore, not only did Bridgeton fail to pay anything, let alone a fair market price, for acquiring an entire business line (complete with a backlog of contracts, skilled employees, an existing infrastructure and a wealth of market information) but the net profits for Gemini from Bridgeton's unnecessary sub-management of the hotels are lower than those when Gemini managed the hotels directly.

293.    The Individual Defendants and Bridgeton's actions are tantamount to grand larceny.  Gemini's hospitality business had a valuation of approximately $60 - $65 million.  The Individual Defendants gave it away for free to spite Obeid and line their own pockets with kickbacks running back to them from Bridgeton's Jariwala.

294.    In the meantime, Gemini's brand and reputation in the hospitality industry has been tarnished since the Individual Defendants and Bridgeton have publicized to the marketplace that Bridgeton now operates Gemini's hospitality business.

295.    Bridgeton, on the other hand, has without paying Gemini a dime acquired new cash-flow and has tripled its hospitality platform, which it now leverages to expand its brand and reputation in the marketplace.

**Bridgeton Is Engaging In False And Deceptive
Advertising To Gemini's And Obeid's Detriment**

296.    Since its theft of Gemini's hospitality group, Bridgeton has embarked on a campaign of false and deceptive advertising in which it has represented to investors and lenders through marketing and investor teasers that Bridgeton's founder Atit Jariwala is responsible for the acquisition, development and management of Gemini's hotel properties – all in an effort to gain credibility and market share in the hospitality industry (which has come at Gemini's expense).

297.    Bridgeton's marketing materials falsely portray Gemini's hotels as properties currently owned by Bridgeton so much so that Bridgeton's advertising materials overwhelmingly display Gemini's properties (as opposed to Bridgeton properties) including Gemini's trademarked Jade and Gem hotel properties (for which Bridgeton never received a license to use those marks).  These materials have been widely publicized in the hospitality industry from investors, lenders, hotel flags and developers to job search companies that recruit and place hospitality candidates with employment opportunities.

298.    Incredibly, the Individual Defendants not only were aware of Bridgeton's conduct but encouraged and assisted Bridgeton's Jariwala to prepare these materials.  The Individual Defendants have irreparably damaged Obeid's personal reputation and Gemini's track record through their assistance and ratification of Bridgeton's actions in falsely ascribing credit to itself for Gemini's properties, accomplishments and services.  In doing so, Gemini's and Obeid's personal reputation have been irreparably injured from the marketplace's confusion concerning

Bridgeton's false designation of origin and misrepresentations of facts concerning Gemini's hospitality assets and track record.

299.    For example, Bridgeton's investment teaser to outside investors concerning its proposed acquisition of Gemini's Jade Greenwich Village Hotel, Wyndham Flatiron Hotel and Boston Holiday Inn falsely advertises that "Bridgeton principal [Jariwala] oversaw the acquisition and development of all hotels in the Portfolio.  Also Bridgeton's management team opened each hotel and has been responsible for the day-to-day operations of the Portfolio since then."  See **Exhibit 3.**

300.    Jariwala never oversaw the development of the Jade Greenwich Village Hotel.  In fact, the Jade Greenwich Village Hotel was built by Gemini under Obeid's direct leadership.  Construction began in 2010 and the hotel opened in 2013 – more than four years after Jariwala had left Gemini (i.e. February 2009).  Moreover, "Bridgeton's management team" did not open the three hotels.  As previously noted, Jariwala was not even a member of Gemini when the Jade Greenwich Village Hotel was built and opened, let alone present for its day-to-day management of the hotel since its opening. Moreover, it was Obeid that was responsible for the day-to-day management of the three hotels since their inception.  Since Obeid is not a member of Bridgeton – the advertisements are false and designed to cause confusion in the marketplace and harming Obeid's reputation in the process.

301.    Similarly, Bridgeton's corporate brochures are rife with false and deceptive statements and advertisements that it is the developer, owner and operator of all of Gemini's hotels.   Indeed, Bridgeton's entire brochure overwhelmingly features Gemini hotels including the Jade and Gem branded hotels even though Bridgeton does not have a license to use those marks.  A true and correct copy of Bridgeton's corporate brochure is attached herein as **Exhibit**

**5.**    Bridgeton has never developed any of Gemini's hotels nor is it an owner of any of Gemini's hotels.  Moreover, Gemini has remained the "manager" and "operator" for all of the hotel properties contained in Bridgeton's brochure.   Bridgeton simply serves as Gemini's subcontractor under those hotel management contracts.  Adding insult to injury, Bridgeton's brochure refers to Gemini as a junior partner by referencing the Gem Hotel Soho as a Bridgeton "Associate."

302.    In its hiring and promotional materials, Bridgeton again falsely advertises that its expertise lies in the development and management of premium-branded and independent hotels.  The promotional materials then contain images of only Gemini hotels but with a "Bridgeton Holdings" logo pasted next to the images of the hotels even though Bridgeton never developed a single one of the hotels.  A true and correct copy of Bridgeton's hiring and promotional materials are attached herein as **Exhibit 6.**

303.    The Individual Defendants not only knew about Bridgeton's false and deceptive advertisements, but they assisted Bridgeton in creating these materials.  Prior to Bridgeton's release of its marketing materials, including its corporate brochure featuring Gemini hotels as examples of properties Bridgeton owned and developed – Jariwala sent drafts of these materials to the Individual Defendants in February 2015 for their comment and approval.  The Individual Defendants who only six years earlier had demanded iron-clad intellectual property protections for Gemini as part of Jariwala's Separation Agreement – encouraged Jariwala to use the deceptive and false advertisement content contained in Bridgeton's materials.

**Demand is Futile**

304.    Obeid brings the derivative causes of action in this Complaint for the benefit of Gemini and its investors to redress the injuries suffered, and to be suffered, by Gemini as a result

of Individual Defendants' wrongdoing and who have acted in concert with Co-Defendants Jariwala and Bridgeton.

305.    Obeid was a member of Gemini (including GREA and GEP) during the Individual Defendants' wrongful course of conduct and continues to be a member of the date of this Complaint.  Obeid adequately and fairly represents Gemini's and its investors' interests in enforcing and prosecuting their rights.

306.    Despite Obeid's insistence that the Individual Defendants act lawfully, La Mack and Massaro have failed to do so because they suffer from conflicts of interest and divided loyalties that preclude them from exercising their independent business judgment on this matter. In addition, the Individual Defendants have acted in a manner that is detrimental to the Gemini entities themselves, Gemini's investors and Obeid personally.

307.    In sum, the Individual Defendants are unable to consider a demand independently and impartially and therefore a demand is rendered futile.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty – Derivative Claim against La Mack and Massaro)

308.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

309.    Individual Defendants La Mack and Massaro owed and continue to owe fiduciary duties of the utmost loyalty and care to Gemini.  As such, La Mack and Massaro were obligated, and continue to be obligated, to act at all times in the best interests of Gemini.

310.    Individual Defendants La Mack and Massaro have breached, and are continuing to breach, their fiduciary duties owed to Gemini by, among other conduct: (a) usurping Gemini's corporate opportunities in favor of their own newly formed entities such as Elevation, (b) looting Gemini's resources to underwrite the formation and launch of their newly formed entities

including Elevation, (c) dismantling Gemini's hospitality business, (d) seeking to elevate their own personal pecuniary interests over those of the Gemini investors; (e) engaging in a sham "confidential public marketing process" for the sale of a portion of Gemini's hotel properties; (f) refusing to sell the Bryant Park and Seaport hotel properties to Obeid out of vindictiveness even though he offered superior bids to acquire those properties; (g) granting Bridgeton and Jariwala "last look rights" and "rights of first refusal" to purchase the Jade Greenwich Village Hotel, the Wyndham Flatiron Hotel and Boston Holiday Inn "off-market" and ultimately agreeing to sell the Jade Greenwich Village Hotel to Bridgeton and Jariwala at a deeply discounted price of $78 million when the fair market value of the hotel is at least $90 million, (h) transferring the entire Gemini hospitality platform to Bridgeton including Gemini's lucrative hotel management contracts, the hospitality employees and all of Gemini's confidential and proprietary information for free and in exchange for undisclosed kickbacks from Bridgeton and Jariwala, (i) aiding Bridgeton and Jariwala to publicize false and deceptive advertisements concerning Gemini's hospitality business, its hotel properties and its intellectual property. The foregoing conduct violated all of Gemini's applicable operating agreements and Delaware law.

311.    Individual Defendants La Mack and Massaro's bad-faith and ulterior motives drove their misconduct and wrongdoing. In addition, their wrongdoing was the product of their willful or, at the very least, grossly negligent misconduct.

312.    Individual Defendants La Mack and Massaro's breaches of their fiduciary duties have caused damages to Gemini, its Members and Gemini's investors in an amount to be determined at trial but not less than $100 million and threaten to cause irreparable harm to the same.

## SECOND CAUSE OF ACTION
**(Breach of Fiduciary Duty – Direct Claim against La Mack and Massaro)**

313.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

314.    Individual Defendants La Mack and Massaro owed and continue to owe fiduciary duties of the utmost loyalty and care to Obeid as a one-third co-equal member of Gemini (including as a one-third Member-Manager of GREA and GEP). As such, La Mack and Massaro were obligated, and continue to be obligated, to act at all times in Obeid's best interests.

315.    Individual Defendants La Mack and Massaro have breached, and are continuing to breach, their fiduciary duties owed to Obeid by, among other conduct: (a) usurping Gemini's corporate opportunities in favor of their own newly formed entities such as Elevation, (b) looting Gemini's resources to underwrite the formation and launch of their newly formed entities including Elevation, (c) dismantling Gemini's hospitality business, (d) seeking to elevate their own personal pecuniary interests over those of the Gemini investors; (e) engaging in a sham "confidential public marketing process" for the sale of a portion of Gemini's hotel properties; (f) refusing to sell the Bryant Park and Seaport hotel properties to Obeid out of vindictiveness even though he offered superior bids to acquire those properties; (g) granting Bridgeton and Jariwala "last look rights" and "rights of first refusal" to purchase the Jade Greenwich Village Hotel, the Wyndham Flatiron Hotel and Boston Holiday Inn "off-market" and ultimately agreeing to sell the Jade Greenwich Village Hotel to Bridgeton and Jariwala at a fire-sale deeply discounted price of $78 million when the fair market value of the hotel is at least $90 million, (h) transferring the entire Gemini hospitality platform to Bridgeton including Gemini's lucrative hotel management contracts, the hospitality employees and all of Gemini's confidential and proprietary information for free and in exchange for undisclosed kickbacks from Bridgeton and

Jariwala, (i) aiding Bridgeton and Jariwala to publicize false and deceptive advertisements concerning Gemini's hospitality business, its hotel properties and its intellectual property.  As a one-third member of Gemini, the Individual Defendants' aforementioned conduct caused Obeid damages as outlined below.

316.    The Individual Defendants further breached their fiduciary duties to Obeid by engaging in deliberate and vindictive minority member oppression by among other things: (a) concealing all material information concerning Gemini from Obeid; (b) targeting and firing Gemini employees with whom Obeid maintained long-standing relationships; (c) removing Obeid from any participation in the management of Gemini even though the applicable Gemini operating agreements and Delaware law provide that Obeid had a right to be informed of material Gemini developments and vote on those actions; (d)  locking Obeid out of Gemini's New York office and network; (e) inflicting incalculable reputational injury to Obeid by maliciously interfering with the Seaport and Bryant Park development projects in which Obeid personally procured the overwhelming number of investors, who now stand to lose millions of dollars because of the Individual Defendants' misconduct;  (f) inflicting incalculable reputational injury to Obeid through the Individual Defendants' disparagements, defamatory statements and misrepresentations concerning Obeid's management of Gemini and track record; (g) inflicting incalculable reputational injury to Obeid through the Individual Defendants' assistance provided to Jariwala in falsely publicizing throughout the marketplace that he was responsible for developing and building Gemini's hospitality platform and business segment.    All of the foregoing conduct was undertaken by the Individual Defendants in violation of the applicable Gemini operating agreements and Delaware law.

317.    Individual Defendants La Mack and Massaro's bad-faith and ulterior motives drove their misconduct and wrongdoing.  In addition, their wrongdoing was the product of their willful or, at the very least, grossly negligent misconduct.

318.    Individual Defendants La Mack and Massaro's breaches of their fiduciary duties have caused damages to Obeid in an amount to be determined at trial but not less than $100 million and threaten to cause him irreparable harm.

### THIRD CAUSE OF ACTION
**(Unfair Competition/Reverse Palming Off – Lanham Act Violation,**
**15 U.S.C. § 1125(a)(1)(A)  – Derivative Claim against Bridgeton and Jariwala)**

319.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

320.    Gemini owns, develops and operates independent and boutique hotels under the luxury Jade brand and the Gem brand.  GREA obtained registered trademarks for the "Gem" on August 4, 2009 and for the "Jade" on September 3, 2013 giving Gemini exclusive rights to use these marks.

321.    The "Jade" and "Gem" marks are well-known and recognizable to, among others, consumers, travel agents, those engaged in the business of promoting, reviewing and booking hotels, and the general public.  Moreover, the "Jade" and "Gem" marks are highly distinctive and extremely valuable because they are associated with numerous hotels, which replicate an authentic guest experience centered on the unique hotel's location and charm.

322.    Separate and apart from Gemini's Jade and Gem hotels, Gemini also owns and operates five other hotels under the names of other hotel franchise flags.  In total, Gemini has a portfolio of ten existing hotels and two existing hotel development projects.

323.    Gemini is also the "manager" or "operator" of nine hotel properties for which it has entered into long-term hotel management contracts.

324.    As alleged above, Bridgeton and Jariwala (in various publications, marketing and investor materials) have improperly identified and falsely advertised Gemini's hotel properties as having been developed, owned and managed by Bridgeton and further that Jariwala was personally responsible for the Jade Greenwich Village Hotel's development and day-to-day operation since its opening.

325.    Bridgeton's and Jariwala's acts constitute the use, in interstate commerce, of a word, term, name, symbol or device or combination thereof, or false designation of origin, false or misleading description of fact, or false or misleading representation of fact which is likely to cause confusion, or to cause mistake, or to deceive as to the nature and extent of the affiliation, connection, or association of Gemini with Bridgeton and Jariwala, or as to the origin, sponsorship or approval of Gemini's or Bridgeton's services, or other commercial activities in violation of 15 U.S.C. § 1125(a)(1)(A).

326.    Bridgeton and Jariwala's acts were intentional, deliberate, willful and done with full knowledge.

327.    Bridgeton and Jariwala's acts have caused and will continue to cause irreparable harm and injury to Gemini.  Unless Bridgeton and Jariwala are enjoined from further actions as such, under 15 U.S.C. § 1116(a), Bridgeton and Jariwala will continue their illegal acts and cause immeasurable damage to the goodwill and reputation of Gemini through their continuing acts. Therefore, Gemini's remedy at law is not adequate to compensate it for the irreparable injury which has already been inflicted on Gemini and which will be inflicted on it in the future by virtue of Bridgeton and Jariwala's conduct.

328.    In addition, as a result of Bridgeton and Jariwala's improper acts, Gemini has been damaged in an amount to be determined at trial but not less than $100 million.  In addition to actual damages and Bridgeton and Jariwala's profits derived from their improper acts, Gemini is entitled to treble damages in an amount equal to three times the amount of actual damages or profits, whichever is greater, plus attorneys' fees and costs under 15 U.S.C. § 1117(a), (b).

### FOURTH CAUSE OF ACTION
**(Contributory Unfair Competition/Reverse Palming Off – Lanham Act Violation,
15 U.S.C. § 1125(a)(1)(A)  – Derivative Claim against La Mack and Massaro)**

329.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

330.    La Mack and Massaro, through their actions, encouraged and induced Bridgeton and Jariwala to commit acts of unfair competition/reverse palming off in violation of the Lanham Act.

331.    La Mack and Massaro, through their actions, supplied Bridgeton and Jariwala with the instruments by which Bridgeton and Jariwala committed acts of unfair competition/reverse palming off in violation of the Lanham Act.

332.    La Mack and Massaro's actions were intentional, deliberate, willful and done with full knowledge.

333.    La Mack and Massaro knew, or could have reasonably anticipated or expected, that their actions would cause Bridgeton and Jariwala to commit acts of unfair competition/reverse palming off in violation of the Lanham Act.

334.    La Mack and Massaro's actions have caused and will continue to cause irreparable harm and injury to Gemini.  Unless La Mack and Massaro are enjoined from further actions as such, under 15 U.S.C. § 1116(a), La Mack and Massaro will continue their illegal acts

and cause immeasurable damage to the goodwill and reputation of Gemini through their continuing acts. Therefore, Gemini's remedy at law is not adequate to compensate it for the irreparable injury which has already been inflicted on Gemini and which will be inflicted on it in the future by virtue of La Mack and Massaro's conduct.

335.    In addition, as a result of La Mack and Massaro's improper acts, Gemini has been damaged in an amount to be determined at trial but not less than $100 million. In addition to actual damages and La Mack and Massaro's profits derived from their improper acts, Gemini is entitled to treble damages in an amount equal to three times the amount of actual damages or profits, whichever is greater, plus attorneys' fees and costs under 15 U.S.C. § 1117(a), (b).

**FIFTH CAUSE OF ACTION**
**(False Advertising – Lanham Act Violation,**
**15 U.S.C. § 1125(a)(1)(B)  – Derivative Claim against Bridgeton and Jariwala)**

336.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

337.    Bridgeton's and Jariwala's acts constitute the use, in interstate commerce, of a word, term, name, symbol or device or combination thereof, or false designation of origin, false or misleading description of fact, or false or misleading representation of fact which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of Bridgeton and Jariwala's goods, services or commercial activities in violation of 15 U.S.C. § 1125(a)(1)(b).

338.    Bridgeton and Jariwala's acts were intentional, deliberate, willful and done with full knowledge.

339.    Bridgeton and Jariwala's acts have caused and will continue to cause irreparable harm and injury to Gemini. Unless Bridgeton and Jariwala are enjoined from further actions as

such, under 15 U.S.C. § 1116(a), Bridgeton and Jariwala will continue their illegal acts and cause immeasurable damage to the goodwill and reputation of Gemini through their continuing acts. Therefore, Gemini's remedy at law is not adequate to compensate it for the irreparable injury which has already been inflicted on Gemini and which will be inflicted on it in the future by virtue of Bridgeton and Jariwala's conduct.

340. In addition, as a result of Bridgeton and Jariwala's improper acts, Gemini has been damaged in an amount to be determined at trial but not less than $100 million. In addition to actual damages and Bridgeton and Jariwala's profits derived from their improper acts, Gemini is entitled to treble damages in an amount equal to three times the amount of actual damages or profits, whichever is greater, plus attorneys' fees and costs under 15 U.S.C. § 1117(a), (b).

**SIXTH CAUSE OF ACTION**
**(Contributory False Advertising – Lanham Act Violation,**
**15 U.S.C. § 1125(a)(1)(A) – Derivative Claim against La Mack and Massaro)**

341. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

342. La Mack and Massaro, through their actions, encouraged and induced Bridgeton and Jariwala to commit acts of false advertising in violation of the Lanham Act.

343. La Mack and Massaro, through their actions, supplied Bridgeton and Jariwala with the instruments by which Bridgeton and Jariwala committed acts of false advertising in violation of the Lanham Act.

344. La Mack and Massaro's actions were intentional, deliberate, willful and done with full knowledge.

345.    La Mack and Massaro knew, or could have reasonably anticipated or expected, that their actions would cause Bridgeton and Jariwala to commit acts of false advertising in violation of the Lanham Act.

346.    La Mack and Massaro's actions have caused and will continue to cause irreparable harm and injury to Gemini.  Unless La Mack and Massaro are enjoined from further actions as such, under 15 U.S.C. § 1116(n), La Mack and Massaro will continue their illegal acts and cause immeasurable damage to the goodwill and reputation of Gemini through their continuing and confirming acts.  Therefore, Gemini's remedy at law is not adequate to compensate it for the irreparable injury which has already been inflicted on Gemini and which will be inflicted on it in the future by virtue of La Mack and Massaro's conduct.

347.    In addition, as a result of La Mack and Massaro's improper acts, Gemini has been damaged in an amount to be determined at trial but not less than $100 million.  In addition to actual damages and La Mack and Massaro's profits derived from their improper acts, Gemini is entitled to treble damages in an amount equal to three times the amount of actual damages or profits, whichever is greater, plus attorneys' fees and costs under 15 U.S.C. § 1117(a), (b).

## SEVENTH CAUSE OF ACTION
### (Breach of the GREA Operating Agreement – Derivative Claim against La Mack and Massaro)

348.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

349.    GREA is the ultimate parent company of all the Subsidiaries.  The GREA Operating Agreement is a valid and binding agreement containing the respective Member-Managers' rights and obligations to GREA and to each Member-Manager.

350.    Section 5.1 of the GREA Operating Agreement provides the Operating Manager with authority to run GREA on a day-to-day basis provided that the remaining Member-Managers be informed of the Operating Manager's actions that materially affect GREA.

351.    The GREA Operating Agreement further requires certain material decisions to be approved by a formal vote by the Member-Managers.  For example, §§ 4.1 & 4.2 require that the Operating Manager solicit and obtain Member-Manager approval for certain actions including but not limited to "the sale or other disposition of a Project" or "the borrowing of funds, including a refinance of existing indebtedness, or the pledging of any assets of the Company, in excess of $250,000."  *See* Operating Agreement §§ 4.2.1.9 & 4.2.1.10.

352.    Moreover, § 5.16 of the GREA Operating Agreement authorizes the Operating Manager "to act on behalf of the Company [GREA] and to execute any and all documents, instruments and agreements," but only if "the execution of such documents has been approved by the [Member] Managers."

353.    Section 4.9 of the GREA Operating Agreement further provides that the Operating Manager cannot take any material action on behalf of GREA without holding a meeting or obtaining written consent from the GREA Member-Managers.  Section 4.9 also provides that: "[a]ny such action which may be taken by the Members without a meeting shall be effective only if the consents are in writing, set forth the action so taken, and are signed by a Majority In Interest of the Members."

354.    Finally, the GREA Operating Agreement Section 5.13 also requires each Member-Manager to "devote such time to the business of the Company as may be required to conduct its business in an efficient and profitable manner."

355.    The Individual Defendants have breached the GREA Operating Agreement by withholding material Gemini information from Obeid and taking secretive and unilateral actions without holding the required meetings or votes to approve the disposition of valuable Gemini projects and assets.

356.    Moreover, the Individual Defendants have further breached the GREA Operating Agreement by failing to devote sufficient time and fidelity to Gemini matters and instead spending their time on launching their various new and competing entities including but not limited to Elevation.

357.    As a result of the Individual Defendants' breach of the GREA Operating Agreement, Gemini has been damaged in an amount to be determined at trial but not less than $100 million.

## EIGHTH CAUSE OF ACTION
### (Breach of the GREA Operating Agreement  – Direct Claim against La Mack and Massaro)

358.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

359.    GREA is the ultimate parent company of all the Subsidiaries.  The GREA Operating Agreement is a valid and binding agreement containing the respective Member-Managers' rights and obligations to GREA and to each Member-Manager.

360.    Section 5.1 of the GREA Operating Agreement provides the Operating Manager with authority to run GREA on a day-to-day basis provided that the remaining Member-Managers be informed of the Operating Manager's actions that materially affect GREA.

361.    The GREA Operating Agreement further requires certain material decisions to be approved by a formal vote by the Member-Managers.  For example, §§ 4.1 & 4.2 require that the

Operating Manager solicit and obtain Member-Manager approval for certain actions including but not limited to "the sale or other disposition of a Project" or "the borrowing of funds, including a refinance of existing indebtedness, or the pledging of any assets of the Company, in excess of $250,000." *See* Operating Agreement §§ 4.2.1.9 & 4.2.1.10.

362.    Moreover, § 5.16 of the GREA Operating Agreement authorizes the Operating Manager "to act on behalf of the Company [GREA] and to execute any and all documents, instruments and agreements," but only if "the execution of such documents has been approved by the [Member] Managers."

363.    Section 4.9 of the GREA Operating Agreement further provides that the Operating Manager cannot take any material action on behalf of GREA without holding a meeting or obtaining written consent from the GREA Member-Managers.   Section 4.9 also provides that: "[a]ny such action which may be taken by the Members without a meeting shall be effective only if the consents are in writing, set forth the action so taken, and are signed by a Majority In Interest of the Members."

364.    Finally, the GREA Operating Agreement Section 5.13 also requires each Member-Manager to "devote such time to the business of the Company as may be required to conduct its business in an efficient and profitable manner."

365.    The Individual Defendants have breached the GREA Operating Agreement by withholding material Gemini information from Obeid and taking secretive and unilateral actions without holding the required meetings or votes to approve the disposition of valuable Gemini projects and assets.

366.    Moreover, the Individual Defendants have further breached the GREA Operating Agreement by failing to devote sufficient time and fidelity to Gemini matters and instead

spending their time on launching their various new and competing entities including but not limited to Elevation.

367.    As a result of the Individual Defendants' breach of the GREA Operating Agreement, Obeid has been damaged in an amount to be determined at trial but not less than $100 million.

## NINTH CAUSE OF ACTION
### (Common Law Unfair Competition – Derivative Claim against Bridgeton and Jariwala)

368.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

369.    Bridgeton and Jariwala's acts, as described above, constitute unfair competition in violation of the common law of New York because their conduct has and is likely to continue to cause confusion, mistake or to deceive as to the nature and extent of the affiliation, connection, or association of Bridgeton with Gemini, or as to the origin, sponsorship or approval of Gemini's or Bridgeton's services, or other commercial activities.

370.    Bridgeton and Jariwala's actions constitute the misappropriation of a commercial advantage belonging to Gemini.

371.    Bridgeton and Jariwala's acts were part of a common scheme designed to cause injury to Gemini's business.

372.    Bridgeton and Jariwala's acts were intentional, deliberate, willful and done with full knowledge.

373.    Bridgeton and Jariwala's acts amount to gross, wanton or willful fraud or other morally culpable conduct.

374.    Bridgeton and Jariwala's acts were committed with a wanton or reckless disregard of Gemini's rights.

375.    Bridgeton and Jariwala's acts have caused and will continue to cause irreparable harm and injury to Gemini.  Unless Bridgeton and Jariwala are enjoined from further actions as such, Bridgeton and Jariwala will continue their illegal acts and cause immeasurable damage to the goodwill and reputation of Gemini through their continuing acts.  Therefore, Gemini's remedy at law is not adequate to compensate it for the irreparable injury which has already been inflicted on Gemini and which will be inflicted on it in the future by virtue of Bridgeton and Jariwala's conduct.

376.    As a result of Bridgeton and Jariwala's improper acts, Gemini has been damaged in an amount to be determined at trial plus interest.  In addition, Bridgeton and Jariwala's conduct is so outrageous that Gemini is entitled to punitive damages and the recovery of its attorneys' fees.

### TENTH CAUSE OF ACTION
**(Conversion – Derivative Claim against Bridgeton and Jariwala)**

377.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

378.    At all relevant times, Gemini was the beneficial owner its hospitality platform, which included its hotel management contracts, hospitality employees, data platform and its confidential and proprietary information, which was accumulated and protected for over a decade.

379.    By their wrongful actions, Bridgeton and Jariwala have intentionally stolen and converted Gemini's hotel management contracts, employees and Gemini's confidential and proprietary information to the exclusion of Gemini's rights.

380.    As a result, Gemini is entitled to compensatory damages in an amount to be determined at trial but not less than $100 million plus punitive damages and the recovery of its attorneys' fees and costs.

## ELEVENTH CAUSE OF ACTION
### (Conversion – Derivative Claim against Elevation, La Mack and Massaro)

381.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

382.    At all relevant times, Gemini was the beneficial owner of its cash reserves and corporate funds.  Moreover, at all relevant times Gemini was the beneficial owner of its own data platform and confidential information that the company had accumulated and protected for over a decade.

383.    By their wrongful actions, Elevation, La Mack and Massaro have intentionally stolen and converted Gemini funds to form and launch their new entity Elevation.  Moreover, Elevation, La Mack and Massaro have also unlawfully copied and duplicated Gemini's entire network and created a parallel network that hosts Gemini's stolen confidential information, which is now used by Elevation, La Mack and Massaro to the exclusion of Gemini's rights.

384.    As a result, Gemini is entitled to compensatory damages in an amount to be determined at trial but not less than $100 million plus punitive damages and the recovery of its attorneys' fees and costs.

## TWELFTH CAUSE OF ACTION
### (Breach of Jariwala/Gemini Separation Agreement – Derivative Claim against Jariwala)

385.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

386.    On February 18, 2009, Jariwala and Gemini entered into a valid, binding and enforceable Separation Agreement whereby Jariwala's minority membership interest was bought out by Obeid, La Mack and Massaro in exchange for, among other things, Jariwala's agreement to safeguard Gemini's confidential information and his agreement and representation that he would not use or disclose Gemini's confidential information for any purpose. *See* Separation Agreement at Section 13.  A true and correct copy of the Separation Agreement is attached herein as **Exhibit 7.**

387.    Moreover, the parties executed an Intellectual Property Assignment in conjunction with the Separation Agreement whereby Jariwala (in consideration for being bought out by the three remaining GREA Member-Managers) – assigned all of his rights to Gemini's intellectual property (including but not limited to all patents, trademarks, service marks, trade dress, trade secrets, copyrights and registrations) to GREA and further agreed that he would not publish, display, disclose, copy or otherwise use the Gemini Intellectual Property without prior consent from GREA. *See* Intellectual Property Assignment at Sections 1-7.  A true and correct copy of the Intellectual Property Assignment is attached herein as **Exhibit 8.**

388.    Jariwala has breached the Separation Agreement by stealing Gemini's confidential and proprietary information as part of his conspiracy with the Individual Defendants to acquire Gemini's hospitality platform on January 26, 2015, which included the wholesale transfer of Gemini's proprietary information to Jariwala and Bridgeton.

389.    Jariwala has further breached the Separation Agreement by breaching the accompanying Intellectual Property Assignment through his repeated false and deceptive Bridgeton advertisements and investment materials showcasing Gemini's branded Jade and Gem hotels as being developed, owned and managed by Jariwala's Bridgeton.  At a minimum,

Jariwala reviewed and published these false materials in the marketplace even though he was precluded from using the Jade and Gem marks without obtaining GREA's prior approval. GREA has never granted Jariwala a license to use either the Jade or Gem mark.

390. As a result of the Individual Defendants' breach of the GREA Operating Agreement, Obeid has been damaged in an amount to be determined at trial but not less than $100 million plus punitive damages.

<strong><u>THIRTEENTH CAUSE OF ACTION</u></strong><br><strong>(Violation of the Computer Fraud and Abuse Act – Derivative Claim against Jariwala, Bridgeton, La Mack, Massaro and Elevation)</strong>

391. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

392. Gemini's computers and computer systems are "protected computers" under the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).

393. By their wrongful actions, Jariwala, Bridgeton, La Mack, Massaro and Elevation (and various Gemini employees working under their direction and at their express instruction) intentionally accessed Gemini's protected computer system, without valid corporate authorization and/or in excess of authorized access, and thereby obtained confidential and proprietary information from Gemini's protected computer system.

394. By their wrongful actions, Jariwala, Bridgeton, La Mack, Massaro and Elevation knowingly and with intent to defraud, accessed Gemini's protected computer system, without authorization and/or in excess of authorized access.

395. By their wrongful action, Jariwala, Bridgeton, La Mack, Massaro and Elevation furthered the intended fraud, obtained unauthorized use of Gemini's protected computer system,

and obtained Gemini's proprietary information, the value of such exceeding $5,000 in value in any one year period.

396.    By their wrongful actions, Jariwala, Bridgeton, La Mack, Massaro and Elevation intentionally accessed Gemini's protected computer system without authorization, and as a result of such conduct, caused Gemini damage and loss.

397.    The wrongful actions of Jariwala, Bridgeton, La Mack, Massaro and Elevation have caused loss to Gemini that exceeds $5,000 in value during any one year period, in that Gemini has spent and/or will spend in excess of $5,000 in responding to the offense and conducting a damage assessment.

398.    The activity of Defendants constitutes a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C.A. § 1030(a)(2)(C), (a)(5)(C), and Gemini is entitled to full compensatory damages under that Act in an amount to be determined at trial but not less than $100 million plus punitive damages.

### FOURTEENTH CAUSE OF ACTION
### (Unjust Enrichment Claim – Derivative Claim against Jariwala and Bridgeton)

399.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

400.    By their wrongful actions, Jariwala and Bridgeton have been unjustly enriched at Gemini's expense.

401.    It is against equity and good conscience to permit Jariwala and Bridgeton to retain the benefits of their wrongful conduct.

402.    As a direct and proximate result of the wrongful conduct of Jariwala and Bridgeton, Gemini has suffered and continues to suffer financial injury.  Accordingly, Gemini is

entitled to damages in an amount to be determined at trial but not less than $100 million plus punitive damages.

### FIFTEENTH CAUSE OF ACTION
**(Unjust Enrichment Claim – Derivative Claim against Elevation, La Mack and Massaro)**

403.     Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

404.     By their wrongful actions, Elevation, La Mack and Massaro have been unjustly enriched at Gemini's expense.

405.     It is against equity and good conscience to permit Elevation, La Mack and Massaro to retain the benefits of their wrongful conduct.

406.     As a direct and proximate result of the wrongful conduct of Elevation, La Mack and Massaro, Gemini has suffered and continues to suffer financial injury.  Accordingly, Gemini is entitled to damages in an amount to be determined at trial but not less than $100 million plus punitive damages.

WHEREFORE, Plaintiff, individually and derivatively, demands the entry of a judgment:

(a)     Count One – an award of money damages for Obeid's derivative claim against Defendants La Mack and Massaro for their breach of fiduciary duties, including an award of punitive damages in an amount to be determined at trial;

(b)     Count Two – an award of money damages for Obeid's direct claim against Defendants La Mack and Massaro for their breach of fiduciary duties, including an award of punitive damages in an amount to be determined at trial;

(c)     Count Three – on Obeid's derivative claim for Lanham Act violation of unfair competition/reverse palming, 15 U.S.C. § 1125(a)(1)(A) – (i) an order enjoining Defendants Bridgeton and Jariwala from any further acts constituting unfair

competition/reverse palming off, and awarding (ii) actual damages and profits resulting from Bridgeton's and Jariwala's illegal acts, in an amount to be determined at trial, plus interest, (iii) treble damages, and (iv) attorneys' fees and costs;

(d)      Count Four – on Obeid's derivative claim for Lanham Act violation of contributory unfair competition/reverse palming off, 15 U.S.C. § 1125(a)(1)(A) – (i) an order enjoining Defendants La Mack and Massaro from any further acts constituting unfair competition/reverse palming off, and awarding (ii) actual damages and profits resulting from La Mack and Massaro's illegal acts, in an amount to be determined at trial, plus interest, (iii) treble damages, and (iv) attorneys' fees and costs;

(e)      Count Five – on Obeid's derivative claim for Lanham Act violation of false advertising, 15 U.S.C. § 1125(a)(1)(A) – (i) an order enjoining Defendants Bridgeton and Jariwala from any further acts constituting false advertising, and awarding (ii) actual damages and profits resulting from Bridgeton and Jariwala's illegal acts, in an amount to be determined at trial, plus interest, (iii) treble damages, and (iv) attorneys' fees and costs;

(f)      Count Six – on Obeid's derivative claim for Lanham Act violation of contributory false advertising, 15 U.S.C. § 1125(a)(1)(A) – (i) an order enjoining Defendants La Mack and Massaro from any further acts constituting contributory false advertising, and awarding (ii) actual damages and profits resulting from La Mack and Massaro's illegal acts, in an amount to be determined at trial, plus interest, (iii) treble damages, and (iv) attorneys' fees and costs;

(g)      Count Seven – an award of money damages for Obeid's derivative claim against Defendants La Mack and Massaro for their breach of the GREA Operating Agreement;

(h)      Count Eight – an award of money damages for Obeid's direct claim against Defendants La Mack and Massaro for their breach of the GREA Operating Agreement;

(i)      Count Nine – on Obeid's derivative claim for common law unfair competition against Bridgeton and Jariwala – (i) an order enjoining Bridgeton and Jariwala from further acts constituting common law unfair competition, and awarding (ii) actual damages resulting from Bridgeton and Jariwala's acts, in an amount to be determined at trial, plus interest, and (iii) punitive damages.

(j)      Count Ten – an award of money damages for Obeid's derivative claim of conversion against Defendants Bridgeton and Jariwala, including an award of punitive damages to be determined at trial;

(k)      Count Eleven – an award of money damages for Obeid's derivative claim of conversion against Defendants Elevation, La Mack and Massaro, including an award of punitive damages to be determined at trial;

(l)      Count Twelve – an award of money damages for Obeid's derivative claim for breach of the Jariwala/Gemini Separation Agreement against Defendant Jariwala;

(m)      Count Thirteen – on Obeid's derivative claim for Violation of the Computer Fraud and Abuse Act against Defendants Bridgeton, Jariwala, La Mack, Massaro and Elevation – (i) an order enjoining Bridgeton, Jariwala, La Mack, Massaro and Elevation from any further use or disclosure of Gemini's proprietary and confidential information and directing that all Gemini information in Defendants' custody or control be purged and destroyed, and awarding (ii) actual damages in an amount to be determined at trial, plus interest, and (iii) awarding punitive damages in an amount to be determined at trial;

(n)     Count Fourteen – an award of money damages for Obeid's derivative claim for unjust enrichment against Bridgeton and Jariwala;

(o)     Count Fifteen – an award of money damages for Obeid's derivative claim for unjust enrichment against Elevation, La Mack and Massaro;

(p)     Awarding Plaintiff pre-judgment and post-judgment interest to the maximum extent provided by law;

(q)     Awarding to Nominal Defendants and Plaintiff Obeid all costs and fees incurred in connection with this action including reasonable attorneys' fees; and

(r)     Awarding all such other and further relief as the Court deems appropriate.

Dated: New York, New York
        June 17, 2015

                                        **MEISTER SEELIG & FEIN LLP**


                                        By:   /s/ Stephen B. Meister
                                                Stephen B. Meister, Esq.
                                                Alexander D. Pencu, Esq.
                                                Remy J. Stocks, Esq.
                                        125 Park Avenue, 7th Floor
                                        New York, New York 10017
                                        Tel: (212) 655-3500
                                        E-Mail: sbm@msf-law.com
                                                adp@msf-law.com
                                                rjs@msf-law.com