**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| WILLIAM T. OBEID, directly and derivatively on behalf of GEMINI REAL ESTATE ADVISORS LLC, et al. |
| Plaintiff, |
| v. |
| CHRISTOPHER LA MACK; DANTE MASSARO; BRIDGETON HOTEL MANAGEMENT, LLC; ELEVATION REAL ESTATE GROUP, LLC; BRIDGETON ACQUISITIONS, LLC; ATIT JARIWALA; and BRIDGETON HOLDINGS, LLC, |
| Defendants, |
| and |
| GEMINI REAL ESTATE ADVISORS LLC, et al., |
| Nominal Defendants. |

No. 14 CIV. 6498 (LTS)

### INDIVIDUAL DEFENDANTS' AMENDED COUNTERCLAIMS
### AGAINST PLAINTIFF WILLIAM T. OBEID

Defendants Christopher La Mack and Dante Massaro (the "Individual Defendants"), by and through their undersigned counsel, state as follows for their Amended Counterclaims against Plaintiff William T. Obeid ("Plaintiff" or "Obeid") based on his ongoing misconduct in connection with his role as a manager of Gemini Real Estate Advisors, LLC ("GREA") and Gemini Equity Partners LLC ("GEP" and together with GREA, "Gemini" or the "Company").

### SUMMARY AND NATURE OF ACTION

1.     Obeid is a "trust fund kid" who believes he is entitled to control GREA and singularly own 90% of its assets despite his one-third interest in the company and his misconduct as GREA's operating manager. Obeid's megalomania backed by his family's money has

resulted in a campaign to take over Gemini or, in the alternative, burn it to the ground. Unlike the Individual Defendants, Obeid is not concerned with earning a living but rather is focused on humiliating the Individual Defendants and giving himself all of the credit for Gemini's successes.

2.      The Individual Defendants bring these Amended Counterclaims against Obeid based on his ongoing misconduct in connection with his role as a manager of Gemini. This misconduct includes: blocking the sales of Gemini's assets; encumbering Gemini's assets with liens and encumbrances; unilaterally entering into letters of intent to sell Gemini properties without authorization; surreptitiously using Gemini employees to advance projects for an entirely separate company owned and controlled exclusively by Obeid; using Gemini employees to funnel inside information to Obeid regarding properties he sought to purchase from Gemini; and unauthorized spying on his fellow partners and Gemini employees to gain an advantage in this litigation.

3.      Despite entering into an operating agreement providing each member a one-third membership interest in Gemini, Obeid has testified that his "presence," "gravitas," and "ability to fill a room" entitle him to a unilateral taking of Gemini's hotel portfolio, which is owned through its various subsidiaries and affiliates named as nominal defendants in this action. Obeid's arrogance and obsession with his own personal gain led him to spy on his fellow partners and Gemini employees by monitoring their email communications without their knowledge or consent. Obeid, in fact, took steps to hide his misconduct and recruited others to assist him in this massive breach of trust. Obeid conducted this illegal surveillance over the course of several months and even obtained attorney-client communications of the Individual Defendants that he retains on his personal laptop to this day.

4.      When the Individual Defendants became aware of Obeid's spying and shut it down, Obeid formed a cabal of Gemini employees to provide him with inside information concerning various hotel properties he sought to purchase from the Gemini.  He also caused these employees to perform research and analysis, attend meetings with potential investors, and carry out other tasks on behalf of Arcade Capital LLC, an entirely separate entity owned solely by Obeid.  This work occurred on Gemini's time and came at great expense to Gemini and the Individual Defendants, both in terms of lost productivity and chilling the market for the hotel properties.

5.      Notwithstanding the fact that the Individual Defendants constituted the majority in interest in Gemini at all relevant times, during his time as Gemini's President and Operating Manager, Obeid ignored the votes of the majority in interest, selectively chose what and when the majority in interest would be informed of regarding his actions binding Gemini, often misrepresented facts to the majority in interest, and defamed the Individual Defendants to Gemini employees and outside parties in order to maintain control.  Obeid abused his former position as Operating Manager for personal gain at the expense of the Individual Defendants and Gemini; caused unauthorized transfers of Company funds; interfered with Gemini's lending and business transactions; sought to obtain Gemini real estate assets at below-market cost at the expense of Gemini, the Individual Defendants, and investors; and otherwise acted outside the scope of his authority under Gemini's operating agreement and in breach of his fiduciary duties.

6.      Even after his termination as Operating Manager, Obeid continued to act as though he exercised exclusive control over Gemini, unilaterally retaining real estate agents to sell Gemini properties and entering into unauthorized letters of intent with potential buyers, even

where properties were already under contract for sale. Obeid lacked authority to take these actions under Gemini's operating agreement.

7.    This action arose after Obeid grew dissatisfied with sharing profits with the Individual Defendants, despite the excessive bonuses Obeid demanded and collected just before his ultimate power play. In March, 2014, Obeid laid out his plan to rewrite the operating agreement and take control of 90% of the Company's assets. When Defendants resisted, Obeid threatened a lawsuit and began to accuse the Individual Defendants of jeopardizing the very existence of Gemini. Litigation then ensued.

8.    Throughout these disputes and in order to keep tabs on the Individual Defendants' litigation strategy and to interfere with Gemini's business operations, Obeid unlawfully spied on the Individual Defendants' business and personal electronic communications, including privileged communications with their counsel, which Obeid then used to gain litigation advantage and threatened, through his counsel, to disseminate to the public unless the Individual Defendants consented to his demands.

9.    For all of these various acts of wrongdoing, as set forth more fully below, the Individual Defendants seek to recover against Obeid on several causes of action, each of which is set forth below.

## PARTIES

10.    At all times hereinafter mentioned, GREA was and is a closely held Delaware limited liability company.

11.    At all times hereinafter mentioned, GEP was and is a closely held Delaware limited liability company.

12.     At all times hereinafter mentioned, Christopher La Mack was and is a resident of Iredell County, North Carolina.

13.     At all times hereinafter mentioned, Dante A. Massaro was and is a resident of Mecklenburg County, North Carolina.

14.     At all times hereinafter mentioned, Obeid was and is a resident of New York, New York.

15.     At all times hereinafter mentioned, Obeid was and is a member and manager of GREA and GEP.

16.     At all times hereinafter mentioned, the Individual Defendants were and are members and managers of GREA and GEP.

17.     GREA is a closely held limited liability company in which the only members are the Individual Defendants and Obeid.

18.     GEP is a closely held limited liability company in which the only members are the Individual Defendants and Obeid.

19.     Obeid and the Individual Defendants are the only managers of GREA.

20.     The Individual Defendants are the only managers of GEP.

21.     Subject to the Individual Defendants' affirmative defenses and denials, this Court has jurisdiction over the subject matter of these Amended Counterclaims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

22.     There is complete diversity of citizenship between Obeid and the Individual Defendants and the amount in controversy in these Amended Counterclaims exceeds $75,000.00, exclusive of interest and costs.

23.     Subject to the Individual Defendants' affirmative defenses and denials, venue for these Amended Counterclaims is proper in this District pursuant to 28 U.S.C. § 1391.

## BACKGROUND

### Formation of GREA and GEP

14.     The Individual Defendants and Obeid worked together at Brookline Development Company, LLC ("Brookline") until February 2003.  Defendant Massaro was the President of Brookline at the time.

15.     On or about April 15, 2003, the Individual Defendants and Obeid formed GREA in order to acquire, own, operate, improve, manage and dispose of commercial real estate.

16.     Obeid and the Individual Defendants entered into an initial operating agreement for the governance of GREA in 2004.  Defendant Massaro came into the partnership with a degree in Hotel Administration from Cornell University, a law degree, experience as a managing partner of a law firm, experience as a partner in another real estate development company, and experience as President of Brookline.  Defendant La Mack came into the partnership as a licensed architect and with more than a dozen years' experience developing and building real estate projects (including hotels).  Obeid came into the partnership with an economics degree and a few years' experience as a Wall Street analyst.

17.     From 2004 until the Great Recession of 2008, Gemini acquired several retail properties, and developed or redeveloped four other retail properties, amassing a portfolio in excess of 4,000,000 square feet.  Defendants Massaro and La Mack were responsible for the great majority of the deals—both sourcing them and executing their acquisition and/or development.  Obeid's contributions were modest, as he was in charge of the sales team that raised the money for the projects.  Obeid would only rarely raise money directly for a project, mostly by bringing his parents and/or his family's trusts into a deal or investment vehicle.

18.     On or about February 19, 2009, Obeid and the Individual Defendants entered into an Amended and Restated Limited Liability Company Agreement of GREA (the "Amended Operating Agreement") in order to document the removal of minority owner and Defendant Atit Jariwala ("Jariwala") from the Company.

19.     Pursuant to the Amended Operating Agreement, the Individual Defendants and Obeid each hold a one-third interest in GREA.

20.     The Amended Operating Agreement provides that "[n]either any Member nor a successor, representative or assign of such Member, shall have any right, title or interest in or to any Company property."  Amended Operating Agreement § 2.7.

21.     It further provides that the "sale or other disposition" of any property owned by Gemini requires the approval of a majority of Gemini's members.  *Id*. § 4.2.1.9.

22.     In July 2012, Obeid and the Individual Defendants formed GEP and entered into the GEP Operating Agreement, which regulates its governance.

23.     GEP was established in order to acquire, own, operate, improve, manage and dispose of commercial real estate in parallel with GREA.

24.     At all times, the Individual Defendants and Obeid each had a one-third interest in GEP.

25.     By vote of GEP's members, Obeid was removed as a manager and director of GEP in September 2015.

**The Beginning of Gemini's Hotel Business**

26.     In 2005, Obeid introduced Jariwala to the Company.  Jariwala was working with a company that shared office space with GREA at the time.  Through a joint venture with Jariwala and companies controlled by Jariwala, GREA began to acquire and develop hotel properties.

27.     On July 1, 2007, Jariwala was made a partner in Gemini, made a capital contribution of $325,000, and received a 17.5% interest in GREA.  The Individual Defendants and Obeid agreed that each would receive a 27.5% interest in Gemini at that time. Obeid tried to obtain a higher percentage for himself, but relented when the Individual Defendants did not agree.  Jariwala worked in Gemini's New York office alongside Obeid.

28.     Between 2005 and September 2008, Jariwala led the acquisition and development of eight of Gemini's thirteen hotel properties, and was primarily responsible for the site acquisition for a ninth hotel.  Obeid was primarily responsible for the completion of one hotel and the acquisition and/or development of four other hotels.  With regard to these four hotels, three of them were projects that were mismanaged, not completed and had loans that were in default.

29.     On or about September 14, 2008, Jariwala contacted the Individual Defendants via telephone and suggested that they join Jariwala in removing Obeid from Gemini for the good of GREA.  Massaro, being loyal to his partner Obeid, informed Obeid of Jariwala's telephone call to Massaro.

30.     Obeid then threatened Jariwala with litigation, and threatened to cut Jariwala off from Gemini's cash, intimidating Jariwala to leave GREA.

31.     On November 13, 2008, Jariwala resigned as a manager and officer of Gemini via an email in which he stated "I have been excluded from many management and business decisions. . . .  I do not believe that I have been provided with all necessary, relevant and accurate information."

32.     In February 2009, Jariwala, Obeid and the Individual Defendants executed a Separation Agreement in which Jariwala relinquished all his interest in Gemini in exchange for,

among other things, $50,000 in cash.

**Obeid's Abuse of his Position as Operating Manager of Gemini**

33.     Obeid unilaterally caused Gemini to enter into business deals without seeking or obtaining input or approval from the majority in interest in direct violation of the Operating Agreement.  One such deal was the acquisition of a hotel in Miami, Florida (the "Miami Hotel Deal").  Without seeking or obtaining the Individual Defendants' opinion or approval, or even informing the Individual Defendants of the existence of the Miami Hotel Deal, Obeid intentionally and purposely caused Gemini to pay a nonrefundable deposit of $250,000.00 toward the purchase of the Hotel.  Obeid took this unauthorized action despite knowing that the Miami Hotel Deal constituted a highly risky investment for Gemini.

34.     Obeid willfully and purposely kept the Individual Defendants completely unaware of the Miami Hotel Deal until approximately two weeks before the Miami Hotel Deal was scheduled to close, at which time, Obeid had already caused Gemini to pay the nonrefundable deposit.

35.     When Obeid eventually approached the Individual Defendants regarding the Miami Hotel Deal, he did so only because the sellers were insisting on an additional payment, and he could not obtain the necessary funds without the Individual Defendants' signatures. Obeid attempted to coerce the Individual Defendants into personally co-signing for a $1,000,000 line of credit from Bank of America in order to fund the additional required deposit.

36.     Because Obeid had already caused Gemini to pay a nonrefundable deposit, the Individual Defendants' only choice was to execute loan documents on behalf of Gemini and allow the Miami Hotel Deal to close or refuse to sign, in which case, Gemini would lose its deposit.

37.     When questioned as to why he did not inform the Individual Defendants in advance of entering into the Miami Hotel Deal, Obeid told them that he "forgot" about it.

38.     Obeid also willfully and purposely misrepresented to the Individual Defendants the amount of the investment in the Miami Hotel Deal.

39.     Obeid represented to the Individual Defendants that they would need to invest a total of $500,000 to preserve the previously undisclosed $250,000 deposit.  In fact, Obeid invested a total of $1,078,000 of Gemini's funds, through Gemini and through entities partially owned by Gemini, without the authorization or consent of the majority in interest of Gemini.

40.     Bank loans for the Miami Hotel Deal are currently in default due to Obeid's mismanagement of the project, including his failure to obtain necessary government approvals for construction, and the lender commenced a foreclosure of its loan.

41.     On July 9, 2014, Obeid requested a "true up" of the Gemini members' capital accounts in order to withdraw $100,281.93 from Gemini.  Upon information and belief, his purpose in seeking to withdraw these funds was to further consolidate power in himself and deplete Gemini's capital reserves despite substantial upcoming capital requirements.  Many of the projects requiring outlays of capital from Gemini—such as the Miami Hotel Deal—were initiated by Obeid without consultation with the other member-managers of Gemini.  Despite a majority of the Gemini members opposing Obeid's proposed withdrawal from the capital account, Obeid unilaterally directed Gemini's accountant to distribute the funds without obtaining approval from the Individual Defendants.

42.     On numerous occasions, Obeid hired and fired employees of Gemini, including senior managers, without informing, consulting, or obtaining the approval of the majority in interest.

43.    For example, without consulting with the Individual Defendants, Obeid hired persons to work for Gemini, who included personal contacts of Obeid, many of whom were not qualified for the jobs for which they were hired.

44.    As an example, in May 2012, Obeid convinced the Individual Defendants to bring in an acquaintance of Obeid, Stan Vukmer ("Vukmer"), as a 25% partner in a new entity called Gemini Global Investors, LLC.  The Individual Defendants had only spoken to Vukmer once or twice before and were told that Vukmer would raise money from around the world and find real estate projects in other countries.  After having financed Vukmer's trips around the world, the Individual Defendants were told in March 2013 by an email from Obeid: "This isn't working with Stan.  He has been AWOL for 2 months.  I'm going to cancel him."

45.    Obeid has also unilaterally caused the termination of the employment of Gemini employees despite agreement among the Individual Defendants and Obeid that these employees should remain employed by Gemini.

46.    Obeid has systematically sought to consolidate control of Gemini in himself despite owning only one third of the Company, and abused his position during the time he served as Gemini's Operating Manager.

47.    As an example, beginning in 2005, Obeid brought all accounting, banking, sales and corporate functions under his control. The Individual Defendants were not allowed to sign a Company check until 2014.

**The July 1, 2014 Meeting**

48.    Plaintiff repeatedly demanded that Gemini pay him additional "bonus" payments beginning in late 2012.  From that time through July 1, 2014, Obeid received approximately $250,000 in additional payments from Gemini.

49.     On March 28, 2014, Obeid arranged a meeting in New York with the Individual Defendants during which a company attorney outlined a restructuring plan to satisfy Obeid's stated desire to own 90% of Gemini hotel operations and 40% of Gemini's retail operations.

50.     On or about June 3, 2014, Obeid and the Individual Defendants were on a telephone call discussing Defendant La Mack's proposal to increase partner distributions by $3,000 per month.  The Individual Defendants voted for the proposal.  Obeid responded that the discussion was not a vote and that Gemini would not be making these distributions.  He also belittled and insulted the Individual Defendants, calling them "stupid."  It was at that time that the Individual Defendants realized that Obeid should no longer be Gemini's Operating Manager because he was never going to allow the Individual Defendants (the majority in interest) to have any meaningful say in Gemini's affairs—contrary to the Amended Operating Agreement.

51.     On July 1, 2014, Obeid called a meeting of Gemini's member-managers for the purpose of demanding that the Individual Defendants provide him with a restructuring proposal to increase his ownership in Gemini.  At this meeting, Obeid did not attempt to discuss any of the Company's business and expressed no interest in moving the Company forward.  He was focused solely on his self-interested demand of receiving an increased ownership interest in the Company.

52.     On July 1, 2014, the Individual Defendants voted to remove Obeid as the Operating Manager of GREA pursuant to the Operating Agreement in order to protect GREA and stop Obeid from acting unilaterally and without regard to the Individual Defendants' and GREA's rights.

53.     On August 14, 2014, Obeid filed the instant lawsuit against the Individual Defendants in a further attempt to disrupt Gemini's business and gain leverage over the

Individual Defendants to get his unjustified restructuring deal.

54.    Upon information and belief, Obeid filed the above-captioned lawsuit in retaliation for a lawsuit previously filed by the Individual Defendants and GREA in North Carolina based on Obeid's ongoing abuses of his position as GREA's President and Operating Manager.

**Obeid's Formation of His Competing Entity, Arcade Capital LLC**

55.    Unbeknownst to the Individual Defendants, almost immediately after his termination from his position as Gemini's Operating Manager, Obeid formed a company that did not include them and would soon be competing with Gemini.  He called this company Arcade Capital LLC ("Arcade").

56.    Although Obeid testified at his deposition in this case that he formed Arcade in "[a]pproximately September" of 2014, the records of the Delaware Secretary of State make clear that Obeid formed Arcade on July 10, 2014, just nine days after his removal as Gemini's operating manager.

57.    After forming Arcade, Obeid used it to further projects that benefitted only him and harmed the Individual Defendants and Gemini.  These included attempting to coerce the sale of properties from Gemini to Arcade at below-market prices, causing Gemini employees to work on Arcade projects while employed and paid by Gemini, and contacting investors and lenders to sabotage deals the Individual Defendants sought to pursue.

**Obeid's Continued Interference with Gemini's Business**

58.    Obeid has filed numerous frivolous motions in this lawsuit, including a baseless motion for temporary restraining order, which he eventually abandoned.  In his motion for temporary restraining order, Obeid claimed that the Individual Defendants intended to exclude

him from a grocery store real estate development deal in South Carolina (the "South Carolina Deal"). Obeid's claim is false and was intended solely to jeopardize the Company's prospective transaction.

59.    Obeid has always been informed of the South Carolina Deal and in fact approved it while he was Operating Manager. On April 29, 2014, Obeid held an "Investment Committee" meeting via phone to discuss the South Carolina Deal. Mr. La Mack prepared an Investment Memorandum, per Obeid's direction, to review on the phone call. Besides the three principals of GREA, the others on the call were Managing Director Bill Stelma, Managing Director Jeff Weismann and Managing Director Paul Harnett. The deal was approved by the Investment Committee as a deal that GREA should pursue.

60.    On July 2, 2014, Obeid approved the payment of an additional non-refundable deposit for the South Carolina Deal, via an e-mail.

61.    On August 5, 2014, Mr. La Mack sent an e-mail to Judy Limbach at Edwin Mae asking her to form a Delaware entity called "Riverside Crossing, LLC" and that this entity would be "wholly owned by GREA (Chris [La Mack], Dante [Massaro] & Will [Obeid])." The intent was to use Riverside Crossing, LLC as the special purpose entity that would become the borrower under a loan with Asheville Savings Bank.

62.    On or about August 18–19, 2014, Obeid caused his former lawyers at the firm of Boies Schiller & Flexner LLP ("Boies Schiller") to send targeted litigation "hold" letters to Asheville Savings Bank and anchor tenant Lowes Foods in an effort to interfere with the South Carolina Deal. Litigation hold letters were also sent to Gemini's capital partner on the deal. Boies Schiller and Obeid used this lawsuit to justify the litigation hold letters even though such letters were targeted and intended to disrupt a specific transaction.

63.     Gemini lost its financing with Asheville Savings Bank because of the litigation hold letter and lost the deal.  The anchor tenant Lowes Foods purchased the property itself. Gemini invested approximately $115,000 in the project, which was lost because the deal fell apart.

64.     Through tremendous effort, Mr. La Mack convinced Lowes Foods to give him, Mr. Massaro, and Mr. Obeid a second chance at completing the South Carolina Deal.

65.     On or about May 8, 2015, Mr. La Mack emailed Obeid and offered him the opportunity to participate in the renewed South Carolina Deal.  Under this proposal, the Individual Defendants and Obeid each would receive equal participation in the deal.  Obeid, however, declined to participate.

66.     The Individual Defendants therefore decided to pursue the deal on their own through their newly formed limited liability company, Elevation Real Estate Group, LLC.

67.     Apparently discontented to see the Individual Defendants succeed when he had gone to such lengths to sabotage their previous efforts, Obeid again set out on a campaign to attempt to destroy the South Carolina Deal.

68.     As another example, Gemini is the sponsor of a project for a grocery store real estate deal in Edenton Village in Edenton, North Carolina ("Edenton Project"), and the mortgage is held by First State Bank of Northwest Arkansas.  Gemini Edenton Village, LLC, an entity wholly owned by Gemini, is a borrower on the mortgage for the Edenton Project along with fourteen other investors in the project.  In their positions as members and managers of Gemini, Obeid and the Individual Defendants serve as carve-out guarantors on the Edenton Project.

69.     The Edenton Project was in default, and First State Bank of Northwest Arkansas offered the investors a loan modification.  Massaro negotiated the loan modification because it is

in the best interest of the Edenton Project and Gemini.  Without the loan modification, First State Bank of Northwest Arkansas could foreclose on the Edenton Project.

70.    All of the investors, including the Individual Defendants signed the loan modification agreement.  Obeid refused to sign the loan modification agreement.

71.    Obeid had no reason for refusing to sign the loan modification agreement, and did so solely for the purpose of interfering with Gemini's business.

**Gemini Retains Bridgeton Hotel Management LLC to Subcontract the Management of Gemini's Hotel Portfolio After Obeid's Continued Mismanagement.**

72.    Because of Obeid's continued mismanagement of Gemini's hotel properties, in or about January 2015, Gemini entered into a contract with Bridgeton Hotel Management LLC ("Bridgeton") whereby Bridgeton was retained as a subcontractor to direct, supervise and manage the operations of Gemini's existing hotel portfolio (the "Bridgeton Agreement").

73.    By virtue of the Bridgeton Agreement, Gemini was able to retain a percentage of the monthly management fees of the hotels while reducing substantial management costs associated with management staff salaries and office space in Manhattan.

74.    By ensuring the long-term management and stability of the hotel properties, Gemini will be able to maximize hotel values, profits, and sales of the properties.

75.    Gemini, under Obeid's direction, has previously entered into similar subcontractor agreements with regard to the management of its real estate assets.

**Gemini Engages in a Public Marketing Process to Sell Gemini's Hotel Properties to the Benefit of Gemini and Its Investors.**

76.    As part of its real estate portfolio, Gemini, through its various subsidiaries and affiliates manages and/or owns various hotel properties including 33 Peck Slip, New York, New York wholly owned by investors as 33 Peck Slip Acquisition, which is managed by a GEP

subsidiary (the "Best Western Seaport Hotel"); 34–36 West 38th Street, New York, New York wholly owned by nominal Defendant 36 West 38th Street Holding, LLC, which is managed by a GEP subsidiary (the "Bryant Park Development Site"); 52–54 West 13th Street, New York, New York wholly owned by nominal Defendant 52 West 13th P, LLC, which is managed by GREA (the "Greenwich Village Hotel"); and 37–39 West 24th, New York, New York wholly owned by nominal Defendant Gemini 37 West 24th Street MT, LLC, which is managed by GREA (the "Wyndham Flatiron Hotel").

77.    On September 5, 2014, Gemini lender UBS Realty Advisors LLC ("UBS") sent a letter to Obeid and the Individual Defendants stating: "The Lender has obvious concerns regarding the litigations and requests a meeting to, among other things, understand how the Borrowers intend to fulfill their respective obligations under the [Best Western Seaport Hotel and Bryant Park Development Site] Loans and how the litigations impact Gemini's obligations under its guarantees."

78.    On September 25, 2014, the Individual Defendants met with UBS about resolving outstanding financing issues associated with the Best Western Seaport Hotel and the Bryant Park Development Site.  Obeid was aware that UBS requested a meeting.  At the conclusion of the meeting, UBS invited Gemini to make a proposal to resolve the outstanding issues with the Best Western Seaport Hotel and the Bryant Park Development Site.

79.    In or about October 2014, Gemini proposed a structure to UBS to sell the Best Western Seaport Hotel and the Bryant Park Development Site which would result in repayment of UBS's loan and interest and payment of proceeds to UBS and the project investors.

80.    In September 2014, Gemini contacted RobertDouglas, an expert firm in hospitality asset transactions, to assist Gemini with the marketing and sale of the Best Western

Seaport Hotel and the Bryant Park Development Site. Gemini signed a listing agreement with RobertDouglas in November 2014. Gemini also retained RobertDouglas to assist it with marketing the Greenwich Village Hotel.

81.    In or about November 2014, UBS agreed in general to Gemini's proposal to market and sell the Best Western Seaport Hotel and the Bryant Park Development Site with several revisions to the proposal.

82.    Because of Obeid's mismanagement of the Bryant Park Development Site, the project went almost $5 million over budget, and UBS refused to make further disbursements for the Bryant Park Development Site, other than to complete demolition on the property to maximize value.

83.    In or about November 2014, Brent Hall at UBS separately approved Gemini's retention of RobertDouglas as the broker to market the Best Western Seaport Hotel and the Bryant Park Development Site for sale.

84.    After UBS's approval, RobertDouglas was engaged on an exclusive basis to market the Best Western Seaport Hotel and the Bryant Park Development Site.

85.    Prior to marketing the Best Western Seaport Hotel and the Bryant Park Development Site for public sale, the Individual Defendants provided Obeid with a thirty-day option to submit bids to purchase the properties.

86.    After the expiration of the thirty-day period, and after Gemini received no bid from Obeid, RobertDouglas marketed the properties to investors around the world. RobertDouglas sent a call for final offers to prospective purchasers of the Best Western Seaport Hotel and the Bryant Park Development Site, with a due date of February 25, 2015.

87.    On or about February 4, 2015, Obeid, through Arcade, and in an attempt to

preempt the marketing process and cause it to terminate prematurely, made offers to purchase the Best Western Seaport Hotel for $36 million and the Bryant Park Development Site for $24.9 million (the "Obeid LOIs"). Obeid stated that the Obeid LOIs expired at the close of business on February 11, 2015.

88.    After submitting the Obeid LOIs, Obeid approached the Best Western Seaport Hotel and the Bryant Park Development Site investors and UBS in an effort to persuade them to put pressure on Gemini to accept his offers, rather than proceed to the final call for offers.

89.    On February 11, 2015, Mr. La Mack sent an e-mail to UBS copying Obeid and providing an update regarding the marketing and sale process of the Best Western Seaport Hotel and the Bryant Park Development Site: "By completing the ongoing sale process, the intent is to maximize the sales price for both of these deals. We believe it is in the best interest of everyone to complete the marketing process. Once we receive all offers February 25th we can finalize the best deal and move toward closing expeditiously."

90.    The Obeid LOIs expired later that day, and Obeid did not renew his offers during the bidding period.

91.    On February 12, 2015, counsel for 33 Peck Slip Acquisition transmitted to Obeid a proposed Agreement for Obeid to purchase the Best Western Seaport Hotel through Arcade. Obeid provided no response to the proposed terms of the Agreement, and Gemini subsequently received higher offers from other parties on the Best Western Seaport Hotel.

92.    After the conclusion of the open, public call for offer period, 33 Peck Slip Acquisition accepted the highest offer for the Best Western Seaport Hotel from Atlantic Pearl Investments ("Atlantic Pearl") in the amount of $38 million.

93.    The $38 million offer would have satisfied the UBS loan and paid out all of the

investors in the Best Western Seaport Hotel.

94.    In addition, GEP would have received disposition fees and promote fees from Peck Slip Holding upon sale of the Best Western Seaport Hotel.  Obeid, as a member of GEP, would have benefited from these fees.

95.    Atlantic Pearl's $38 million offer for the Best Western Seaport Hotel was higher than Arcade's offer of $36 million.

96.    Moreover, as became clear during the course of this lawsuit, Arcade did not have sufficient financial backing to support its offer to purchase the Best Western Seaport Hotel. After the conclusion of the open, public call for offer period, 36 West 38th Street, LLC accepted the highest offer for the Bryant Park Development Site from Hansji Corporation ("Hansji") in the amount of $25.5 million.

97.    The $25.5 million offer would have satisfied the UBS loan and avoided any further default situations with UBS on that loan.

98.    Hansji's $25.5 million offer for the Bryant Park Development Site was higher than Arcade's offer of $24.9 million.

99.    Moreover, as became clear during the course of this lawsuit, Arcade did not have sufficient financial backing to support its offer to purchase the Bryant Park Development Site.

100.    Because the Bryant Park Development Site is not an operating hotel, Gemini and its investors are not receiving management fees to cover the monthly interest charges associated with the property.  As a result, the potential recovery of the investors and Gemini decreases with each passing month that the property is not sold.

101.    On January 15, 2015, RobertDouglas released offering memoranda for the Greenwich Village Hotel.

102.   Obeid never made an offer to purchase the Greenwich Village Hotel.

103.   After the conclusion of the open, public call for offer period, 52 West 13th Street accepted the highest offer for the Greenwich Village Hotel from Bridgeton Holdings, LLC ("Bridgeton") in the amount of $78 million.

104.   On April 2, 2015, 52 West 13th Street and Bridgeton entered into a purchase and sale agreement for the Greenwich Village Hotel in the amount of $78 million.  The Greenwich Village purchase and sale agreement required a closing by May 2, 2015, unless otherwise agreed by the parties.

105.   The $78 million purchase price would have satisfied the loan on the property with lender Cornerstone Real Estate Advisers LLC and paid out all of the investors in the Greenwich Village Hotel.

106.   In addition, GREA would have received substantial disposition fees and promote fees upon sale of the Greenwich Village Hotel in excess of $2 million.  Obeid, as a member of GREA, would have benefitted from these fees.

107.   In April 2015, GREA retained RobertDouglas to assist GREA with the marketing and sale of the Wyndham Flatiron Hotel.

**Obeid Derails Gemini's Hotel Marketing Process After His Attempts to Purchase the Hotel Properties for Himself at Below-Market Prices Fail.**

108.   In connection with the instant lawsuit, on or about February 27, 2015, and after Obeid's LOIs had expired, Obeid brought a Proposed Order to Show Cause seeking a temporary restraining order to prevent Gemini from "transferring, selling or disposing of the hotel projects of Gemini Real Estate Advisors, LLC, Gemini Equity Partners, LLC, and their subsidiaries and affiliates" ("Obeid's Order to Show Cause").

109.   At the March 3, 2015 hearing on Obeid's Order to Show Cause, Judge Laura

Taylor Swain declined to execute Obeid's Order to Show Cause, ruling that:

> [T]he requisite showing of irreparable harm has not been made.  This is at the end of the day a financial negotiation.  There has been no showing that there would be an inability to collect damages were the underpricing proven.  The reputational damage of a disaster goes equally to the company and to Mr. Obeid.

The Court further held that, "with respect to the breaches of fiduciary duty, the factual proffers are inferential and highly speculative" and denied Obeid's request for injunctive relief.

110.    After his attempts to interfere with the business judgment of Gemini's majority failed through his baseless and retaliatory Orders to Show Cause in the instant litigation, Obeid set his sights on the Supreme Court for New York County.

111.    On March 16, 2015, in an effort to take a second bite at the apple, Obeid filed a separate lawsuit in the Supreme Court for New York County (the "New York State Action").  In connection with the New York State Action, Obeid filed unjustified Notices of Pendency in a last-ditch effort to disrupt Gemini's marketing and sale of the Best Western Seaport Hotel, the Bryant Park Development Site, the Greenwich Village Hotel, and the Wyndham Flatiron Hotel (together, the "Hotel Properties").

112.    The New York State Action alleges that the Individual Defendants engaged in a conspiracy with third parties to sell Gemini assets at below-market prices.  Specifically, Obeid alleges that the Individual Defendants breached their fiduciary duties to him and Gemini by retaining Bridgeton as a subcontractor to direct, supervise and manage the operations of Gemini's existing hotel portfolio and marketing the Hotel Properties for sale.  However, in an apparent attempt to inhibit the Individual Defendants' ability to defend the New York State Action, Obeid did not name the Individual Defendants as parties to the New York State Action.

113.    In reality, the New York State Action was nothing more than a continuation of the ongoing dispute between Obeid and the majority member-managers of Gemini over the

management of the company and a vehicle by which to use improper Notices of Pendency to prevent an open-market sale of the Hotel Properties to third parties.

114.    Obeid's filing of the Notices of Pendency chilled the market for the Hotel Properties, spooked the buyers, and ultimately caused the collapse of the deals Gemini planned to enter into.  Whereas Gemini would have received a total of $63.5 million from the deals with Atlantic Pearl and Hansji.

115.    Atlantic Pearl and Hansji withdrew their offers as a result of Obeid's filing of the Notices of Pendency.

116.    In order to free the Hotel Properties from the Notices of Pendency, the entities that own the Hotel Properties were forced to file Chapter 11 bankruptcy petitions.

117.    Obeid did not submit a bid to purchase any of the Hotel Properties through the bankruptcies.

118.    Gemini is in the process of selling the properties through the bankruptcy auction, and the bids obtained in the auctions confirm that the prices obtained by Gemini in early 2015 reflected the true market value of the properties.

119.    The significant legal fees and delays associated with fighting Obeid's baseless TROs in this court and notices of pendency in the State Court Action, even when taking into account the transfer tax savings associated with the bankruptcy sales, are resulting in significant expenses and losses to Gemini, the Individual Defendants, and investors.

120.    Furthermore, because the market for development sites has softened considerably since 2015, the bankruptcy auction bids for the Bryant Park Development Site obtained thus far have been well below the $25.5 million Hansji bid obtained through the Robert Douglas marketing process in early 2015, and the extent of Gemini's damages as a result of Obeid's

interference in the sale of that property are currently unknown.

**Long After His Removal as Gemini's Operating Manager, Obeid Unilaterally Attempted to Sell Gemini Properties Without Any Authority to Do So.**

121.  On or about June 18, 2015, Obeid executed a Letter of Interest under which Macrolink Holding Co., Ltd. ("Macrolink") would purchase the Wyndham Flatiron Hotel from Gemini.  Obeid executed this Letter of Interest on behalf of Gemini prior to presenting it to Gemini's other member-managers and despite his complete lack of authority to unilaterally sell Gemini assets.

122.  Discovery in this action has made clear that Macrolink's offer was not bona fide, but rather that Obeid entered into the unauthorized agreement in an effort to further interfere with Gemini's marketing efforts of its hotel assets.

123.  Indeed, Gemini's Amended Operating Agreement specifically requires majority approval for any sale of a Gemini property.  Amended Operating Agreement § 4.2.1.9.

124.  To further this fraud, Obeid told investors and potential purchasers that he and Arcade owned and operated Gemini properties, usurping the goodwill the Individual Defendants had labored to build up in the Gemini, Jade, and Gem trademarks.  In Obeid's own words, he wanted to convince third-parties to "[a]ssume that all projects that I own / manage as part of Gemini are part of Arcade experience.  Ergo, we operate all the Gemini hotels."

125.  On or about June 24, 2015, Obeid executed three Non-Circumvent Non-Disclosure and Fee Agreements (the "Commission Agreements") purportedly on behalf of Gemini under which Gemini would be obligated to pay to SRM Management, LLC ("SRM") a commission of 1% of the sale price for the Greenwich Village Hotel, the Wyndham Flatiron Hotel, and the Holiday Inn Express Boston.  The Commission Agreements purport to obligate Gemini to pay millions of dollars in commissions to SRM.  Obeid did not disclose these

Commission Agreements to the Individual Defendants, and did not seek the consent of a majority of Gemini's members before entering into them.

126.    On information and belief, Obeid communicated with SRM and its agents exclusively through Arcade in order to keep such communications secret from the Individual Defendants.

**Obeid Illegally Spies on the Individual Defendants and Other Gemini Employees and Intercepts Privileged Communications Between the Individual Defendants and Their Counsel.**

127.    In a complete breach of trust, Obeid unlawfully spied on the Individual Defendants and other innocent Gemini employees through the use of sophisticated spy software, Spector 360, designed to track keystrokes and take real-time video snapshots of computer desktops like a surveillance camera.   Obeid engaged in this disgusting and illegal conduct without the victims' knowledge or consent and for the purpose of advancing his interests in this litigation and obtaining inside information about the Hotel Properties.

128.    At this time, the email accounts of each of Gemini's three member-managers and each of Gemini's employees were maintained on a server hosted by third-party information technology provider Madison Technology ("Madison").

129.    In order to protect against unauthorized access to Gemini's documents and the individual member-managers' emails, Gemini maintains a strong set of security measures.  These security measures include, but are not limited to, a password-encrypted server; password-encrypted email accounts with a separate password for each employee; and locked file cabinets, the keys to which are provided on a need-to-know basis.  During the regular course of business, the Individual Defendants change their email passwords on a regular basis.

130.    The Individual Defendants and the other targeted Gemini employees did not

consent to allowing Obeid access to their emails.  Nor did Obeid seek to obtain the Individual Defendants' consent.

131.    In or about June 2014, Obeid contacted Jerry Chrzanowski and Alexander Schmidt of Madison and directed Madison to install spy software allowing Obeid illegal access to all information passing through the server, including the contents of the Individual Defendants' password-protected email accounts and the email accounts of other targeted Gemini employees.

132.    The sophisticated spy software that Obeid used also tracked user keystrokes and took real-time video snapshots of computer desktops like a surveillance camera, among other functions.

133.    Obeid has testified in this case that his purpose for spying on the Individual Defendants and other Gemini employees was to advance his interests in the litigation.  Upon information and belief, Obeid also used inside information obtained through his surveillance to target his bids for the Best Western Seaport Hotel and the Bryant Park Development Site.

134.    On or about August 25, 2014, Obeid verbally told Mr. Chrzanowski of Madison to remove the software from the system, a request with which Madison later claimed it complied. On or about August 27, 2014, the Individual Defendants met with Madison and specifically instructed it that any future changes to Gemini's servers would require approval by Mr. Massaro, as the Operating Manager of Gemini.  Moreover, after discovering that spy software had been installed on their machines, the Individual Defendants told Madison no one was authorized to spy on any Gemini member or employee and that all such software must be removed.

135.    Despite the removal of the illicit spy software and Mr. Massaro's explicit instructions to Madison, Obeid arranged with Mr. Chrzanowski and Mr. Schmidt to return to

Madison's New York offices in December of 2014 for the express purpose of continuing his illegal spy efforts. Obeid made multiple visits to Madison's New York offices, where he downloaded materials from Gemini's document and email server onto his personal laptop computer.

136.    Obeid has admitted in this litigation that he made two multi-hour visits to Madison's offices where he obtained unrestricted access to the email accounts of the Individual Defendants and other targeted Gemini employees. Madison and Obeid engaged in this illegal conduct despite Mr. Massaro's explicit instructions that any further changes in access would have to be approved by him. Obeid made affirmative efforts to conceal his conduct and never sought the consent of the people he targeted.

137.    In these clandestine visits to Madison, Obeid downloaded any information he wanted including privileged and confidential email correspondence between the Individual Defendants and their counsel related to their personal defenses in this lawsuit, as well as privileged and confidential email correspondence related to the representation of Gemini in this dispute.

138.    Obeid has admitted in this litigation that he obtained the Individual Defendants' privileged communications during his visits to Madison's offices in December 2014 and still retains copies of these communications on his personal computer. One such privileged communication included the Individual Defendants' detailed legal invoices from their law firm relating to their personal defense in this litigation.

139.    Upon information and belief, Obeid used his surveillance software and unauthorized access to Gemini's servers to disrupt settlement negotiations between the parties by intercepting the Individual Defendants' confidential communications with counsel.

140.     Upon information and belief, Obeid used his surveillance software and unauthorized access to Gemini's servers to obtain inside information regarding the Hotel Properties, which he used to assemble his bids for those properties.   By obtaining this information, Obeid upset the carefully constructed sealed-bid process Gemini used to ensure it received the highest possible bids for the Hotel Properties.

141.     After surreptitiously and wrongfully obtaining the information described herein, Obeid passed the information to his counsel who used it to attempt to obtain advantage in litigation and in settlement negotiations and threatened to disseminate it to the public unless the Individual Defendants consented to Obeid's litigation demands.

142.     For example, at 11:33 p.m. on February 27, 2015, counsel for Obeid contacted counsel for Defendants by email threatening to file three Orders to Show Cause the following Monday, March 2, 2015 at 11:30 a.m. unless Defendants' counsel assented to a temporary restraining order preventing Gemini from transferring or selling any of its hotel properties and an order for expedited discovery, and withdrew from its representation of Defendants.

143.     By obtaining and threatening to disclose Defendants' privileged and confidential communications, Obeid violated the common decency expected among business partners, undermined the Individual Defendants' defense of this lawsuit, and flouted the rules governing attorney-client privilege.   As discussed below, he also violated multiple federal statutes and otherwise committed tortious acts for which the Individual Defendants are entitled to recover against him.

144.     Obeid has attempted to excuse his illegal spying by claiming Gemini's Employee Handbook provides that an employee's emails belong to the company and the company may review such emails "for business purposes."   Obeid's after-the-fact attempt to justify his

outrageous conduct ignores the fact that Obeid engaged in this behavior for the purpose of advancing his personal interests in the litigation and not for any legitimate business purpose. Moreover, Obeid took measures to hide his misconduct from Gemini's majority in interest and continued his spying even after Gemini's new Operating Manager, Mr. Massaro, provided clear instructions that such conduct cease immediately. Finally, the Employee Handbook also states that "[e]mployees shall not use unauthorized codes or passwords to gain access to other files."

**Obeid Causes Gemini Employees to Leak Information to Him, Prepare Investment Materials for Arcade, and Pitch Arcade Deals to Investors.**

145. Obeid did not limit his spying to electronic surveillance. He also formed a faction of insiders within Gemini's hospitality division that leaked information to him in order to facilitate Arcade's attempts to purchase the Hotel Properties from Gemini at below-market prices and flip those properties to investors. Meanwhile, Obeid used these employees to assist him and Arcade with deals in which Gemini had no involvement, with Gemini paying the bill for their work.

146. At least as early as November 2014, Obeid approached Gemini employees Robert Marcus, James Kot, and David Rosen and instructed them to assist Arcade with several projects. These projects included Arcade's acquisitions of the Bryant Park Development Site and the Best Western Seaport Hotel from Gemini, and the acquisition of a hotel development project located at 139–141 Orchard Street, New York, NY (the "Orchard Street Project") from a third party currently in bankruptcy. Marcus, Kot, and Rosen were junior-level employees within Gemini's hospitality division.

147. Over the course of several months, Marcus, Kot, and Rosen provided Obeid and Arcade with up-to-date loan payoff numbers, historical financial information, projections, and calculations related to the Hotel Properties.

148.    Obeid set up a Dropbox website to which he instructed the Marcus, Kot, and Rosen to transfer files for Arcade's use.  Marcus, Kot, and Rosen also leaked documents to Obeid by email.

149.    Obeid instructed Marcus, Kot, and Rosen to communicate with him exclusively through their Gmail accounts so that there was no chance the Individual Defendants could become aware of what they were doing.  Ironically, Obeid told Marcus, Kot, and Rosen that they "should use these Gmail accounts because he did not know who was looking at [their] e-mails." (R. Marcus Dep. 30:23–25.)  Obeid did not tell them that he was the person monitoring Gemini emails.

150.    In addition to funneling Obeid inside information about Gemini properties, Marcus, Kot, and Rosen also provided detailed analyses of proprietary Gemini data in order to assist Arcade with purchasing the Properties at the best value to it (and the worst value to Gemini).  As a result of this improper insider information, Obeid and Arcade did not compete fairly in attempting to purchase the Hotel Properties.

151.    Obeid's insider trading cost Gemini dearly both in terms of the lost productivity of Marcus, Kot, and Rosen—who were supposed to be working for Gemini—and because Arcade's unfair competition (especially after Obeid filed the Notices of Pendency to prevent sales of the properties to anyone other than him) chilled the market for the Hotel Properties, spooked the buyers, and ultimately caused the collapse of the deals into which Gemini planned to enter.

152.    Marcus, Kot, and Rosen also assisted Obeid with Arcade's attempted purchase of the Orchard Street Project—a project in which Gemini had no involvement—while they remained on Gemini's payroll.

153.    In late 2014, Obeid approached Marcus, Kot, and Rosen and asked them to assist him with a new hotel development opportunity.  He approached them in his capacity as a one-third member-manager of Gemini, and did not immediately tell them that he intended the Orchard Street Project for Arcade.

154.    Over the next several months, Obeid caused Marcus, Kot, and Rosen to assist him in acquiring the Orchard Street Project on Gemini time, and using Gemini resources.  For example, Obeid caused Marcus, Kot, and Rosen to prepare detailed presentations for Arcade's investors and potential investors and to attend meetings with these potential investors.

155.    Obeid also represented the Orchard Street Project as a Gemini project to potential investors and lenders in order to trade on Gemini's reputation to Arcade's benefit and Gemini's detriment.

156.    The Orchard Street Project ultimately collapsed due to Obeid's misrepresentations and lack of financial backing and Obeid found himself as the defendant in a lawsuit accusing him of fraud.

157.    Obeid's improper diversion of the three Gemini employees caused the company significant losses of money, time, and resources, which could have been devoted to projects actually involving Gemini.

158.    Marcus, Kot, and Rosen are each subject to strict confidentiality and non-compete agreements, which prohibit the above-described acts, and which Obeid caused them to breach.

159.    Marcus remained a Gemini employee until March 31, 2015 when he was terminated from Gemini and immediately hired by Arcade.  Rosen and Kot remained Gemini employees until July 24, 2015 and August 6, 2015, respectively.

**COUNT ONE**
**VIOLATION OF 18 U.S.C. § 1030, *et seq.***
**COMPUTER FRAUD AND ABUSE ACT**

160.    The Individual Defendants hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of these Amended Counterclaims.

161.    Gemini's computers and email server are used in interstate commerce to conduct business in many different states.

162.    Obeid, without authorization and/or in excess of his authorization, intentionally accessed protected computers and thereby obtained confidential and protected information of the Individual Defendants.

163.    Specifically, without informing the Individual Defendants or the other Gemini employees or seeking or obtaining their consent, Obeid caused Madison to install spy software on Gemini's server, which Obeid then used to access the Individual Defendants' password-protected email accounts, track their computer usage, take photographs of their computer screens, track their keystrokes and access confidential documents processed through Gemini's document scanners.

164.    Obeid used the unauthorized spy software to access virtually all of Gemini's and the Individual Defendants' documents and emails, including but not limited to, the Individual Defendants' confidential and privileged correspondence with counsel pertaining to this lawsuit and the related cases in the North Carolina and New York State Courts.  Obeid intercepted communications from the Individual Defendants' personal and Gemini email accounts.

165.    Even after Obeid's misconduct was discovered by the Individual Defendants and Madison was instructed to cease assisting Obeid with such access, Obeid returned to Madison's New York offices in December 2014 and continued his illegal spying activity without informing

the other owners of Gemini or the other targets of his surveillance, and downloaded documents and information to his personal laptop where he, upon information and belief, retains these documents as of this filing.

166.    Obeid then knowingly and intentionally divulged the contents of these communications to third parties, including his counsel, for the purpose of advancing his personal interests in this litigation.

167.    Obeid accessed these communications with the intent to defraud, to obtain leverage over the Individual Defendants in the litigation and their management of Gemini, obtain a greater ownership share of Gemini for himself at the expense of the Individual Defendants, obtain confidential information about the Hotel Properties in order to purchase them at below-market prices, and stymie efforts to settle the parties' claims, thereby running up their litigation costs.

168.    Obeid also formed a cabal of junior-level Gemini employees and instructed them to leak highly sensitive Gemini financial information to him, which he used to compete against Gemini in attempting to purchase the Hotel Properties.  For example, Obeid caused Marcus, Kot, and Rosen to upload proprietary financial data, analyses, and reports from Gemini's server to a secret Dropbox website created and controlled by Obeid.  Obeid also instructed these employees to send him documents from Gemini's server as email attachments to assist him with his bids on Gemini's properties.  Obeid's sole purpose in carrying out these acts was to benefit himself and Arcade at the expense of the Individual Defendants and Gemini.

169.    In addition to increased litigation costs and losses associated with Obeid's prevention of the sales of the Hotel Properties, the Individual Defendants also incurred costs to re-secure Gemini's servers and otherwise repair the damage Obeid caused to the integrity and

availability of their documents and information and Gemini's data, computer programs, systems, and information.

170.    Obeid engaged in all of the above-described acts with a knowing or intentional state of mind.

171.    As a result of Obeid's conduct, within less than one year's time, the Individual Defendants have incurred substantial damages in excess of $5,000.00.

**COUNT TWO**
**VIOLATION OF 18 U.S.C. § 2701, *et seq.***
**<u>STORED COMMUNICATIONS ACT</u>**

172.    The Individual Defendants hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of these Amended Counterclaims.

173.    Gemini's computers and email server are used in interstate commerce to conduct business in many different states.

174.    Obeid, without authorization, intentionally and improperly accessed and/or exceeded access to a facility through which an electronic communication service is provided.

175.    Specifically, without informing the Individual Defendants and the other Gemini employees or seeking or obtaining their consent, Obeid caused Madison to install spy software on Gemini's server, which Obeid then used to access the Individual Defendants' password-protected email accounts, track their computer usage, take photographs of their computer screens, track their keystrokes and access confidential documents processed through Gemini's document scanners.

176.    Obeid used the unauthorized spy software to access virtually all of Gemini's and the Individual Defendants' documents and emails, including but not limited to, the Individual Defendants' confidential and privileged correspondence with counsel pertaining to this lawsuit

and the related cases in the North Carolina and New York State Courts. Obeid intercepted communications from the Individual Defendants' personal and Gemini email accounts.

177.    Even after Obeid's misconduct was discovered by the Individual Defendants and Madison was instructed to cease assisting Obeid with such access, Obeid returned to Madison's New York offices in December 2014, continued his illegal spying activity without informing the Individual Defendants or the other targets of his surveillance, and downloaded documents and information to his personal laptop where he, upon information and belief, retains these documents as of this filing.

178.    Obeid then knowingly and intentionally divulged the contents of these communications to third parties including his counsel.

179.    Obeid also caused Marcus, Kot, and Rosen to upload proprietary financial data, analyses, and reports from Gemini's server to a secret Dropbox website created and controlled by Obeid, and to send Obeid documents from Gemini's server as email attachments. Obeid's sole purpose in carrying out these acts was to benefit himself and Arcade at the expense of the Individual Defendants and Gemini.

180.    Obeid accessed this information, including the Individual Defendants' private email communications, with the intent to defraud, to obtain leverage over the Individual Defendants in the litigation and their management of Gemini, obtain a greater ownership share of Gemini for himself at the expense of the Individual Defendants, obtain confidential information about the Hotel Properties in order to purchase them at below-market prices, and stymie efforts to settle the parties' claims thereby running up their litigation costs.

181.    In addition to increased litigation costs and losses associated with Obeid's prevention of the sales of the Hotel Properties, the Individual Defendants also incurred costs to

re-secure Gemini's servers and otherwise repair the damage Obeid caused to the integrity and availability of their documents and information and Gemini's data, computer programs, systems, and information.

182.    Obeid engaged in all of the above-described acts with a knowing or intentional state of mind.

183.    As a result of Obeid's conduct, the Individual Defendants have incurred substantial damages.

184.    In addition to actual and/or statutory damages, the Individual Defendants are entitled to recover their attorneys' fees and punitive damages for Obeid's unlawful and egregious conduct.

**COUNT THREE**
**VIOLATION OF 18 U.S.C. § 2511, *et seq.***
**FEDERAL WIRETAP ACT**

185.    The Individual Defendants hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of these Amended Counterclaims.

186.    Gemini's computers and email server are used in interstate commerce to conduct business in many different states.

187.    Obeid, without authorization, intentionally intercepted the Individual Defendants' electronic communications.

188.    Specifically, without informing the Individual Defendants and the other Gemini employees or seeking or obtaining their consent, Obeid caused Madison to install spy software on Gemini's server, which Obeid then used to access the Individual Defendants' password-protected email accounts, track their computer usage, take real-time video snapshots of their computer screens, track their keystrokes and access confidential documents processed through

Gemini's document scanners.

189.    Obeid used the unauthorized spy software to access virtually all of Gemini's and the Individual Defendants' documents and emails, including but not limited to, the Individual Defendants' confidential and privileged correspondence with counsel pertaining to this lawsuit and the related cases in the North Carolina and New York State Courts.  Obeid intercepted communications from the Individual Defendants' personal and Gemini email accounts.

190.    Even after Obeid's misconduct was discovered by the Individual Defendants and Madison was instructed to cease assisting Obeid with such access, Obeid returned to Madison's New York offices in December 2014 and continued his illegal spying activity without informing the Individual Defendants or the other targets of his surveillance.

191.    Obeid then knowingly used the electronic communications he unlawfully obtained by intentionally divulging the contents of these communications to third parties, including his counsel.

192.    Upon information and belief, Obeid also used the contents of the unlawfully obtained electronic communications to engage in tortious conduct, including but not limited to, disrupting the competitive bidding process for the Hotel Properties, preventing the sale of these Properties to third parties, and attempting to obtain them for himself at below-market prices in violation of his duties to Gemini and the Individual Defendants.

193.    Obeid accessed these communications with the intent to defraud, to obtain leverage over the Individual Defendants in the litigation and their management of Gemini, obtain a greater ownership share of Gemini for himself at the expense of the Individual Defendants, obtain confidential information about the Hotel Properties in order to purchase them at below-market prices, and stymie efforts to settle the parties' claims thereby running up their litigation

costs.

194.    The Individual Defendants also incurred costs to re-secure Gemini's servers and otherwise repair the damage Obeid caused to the integrity and availability of their documents and information and Gemini's data, computer programs, systems, and information.

195.    Obeid engaged in all of the above-described acts with a knowing or intentional state of mind.

196.    As a result of Obeid's conduct, the Individual Defendants have incurred substantial damages.

197.    In addition to actual and/or statutory damages, the Individual Defendants are entitled to recover punitive damages for Obeid's unlawful and egregious conduct.

## COUNT FOUR
## FRAUD

198.    The Individual Defendants hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of these Amended Counterclaims.

199.    Obeid made numerous misrepresentations and omissions in his dealings with the Individual Defendants.  Specifically, Obeid, acting in bad faith, intentionally concealed from the Individual Defendants the fact that he was actively spying on their emails and other communications as set forth herein and above through the use of sophisticated spy software and with the assistance of Madison during multiple visits to Madison's New York offices.

200.    Obeid had the duty to notify the Individual Defendants of the installation and use of the surveillance software and conversion of Gemini's and the Individual Defendants' confidential and personal documents, including their documents protected by the attorney-client privilege.

201.    Obeid knew that his misrepresentations and omissions regarding the surveillance

software and his spying on his business partners were false.  By failing to inform the Individual Defendants of the installation and use of the surveillance software, Plaintiff intended that the Individual Defendants rely on the perceived privacy of their communications.

202.    The Individual Defendants justifiably relied upon Plaintiff's misrepresentations and omissions in that they continued using their computers and emails without knowledge that Obeid was illegally monitoring the same.

203.    Obeid's misrepresentations and omissions caused harm to the Individual Defendants including, but not limited to, loss of control over the privacy of their personal and business affairs, the interception of privileged communications with counsel, and costs associated with re-securing Gemini's servers and otherwise repairing the damage Obeid caused to the integrity and availability of their documents and information and Gemini's data, computer programs, systems, and information.

204.    Obeid, acting in bad faith, fraudulently concealed his unilateral and unauthorized entry into agreements to sell Gemini properties, including the Greenwich Village Hotel, the Wyndham Flatiron Hotel, and the Holiday Inn Express Boston.  Obeid knew that his concealment of these actions would mislead the Individual Defendants, and he went to great lengths to make sure the Individual Defendants did not discover his actions, including communicating with potential buyers and agents exclusively through Arcade.  Obeid purposely did not inform the Individual Defendants of his actions relating to the sales of these properties because he wished to exercise exclusive control over Gemini.

205.    Obeid had the duty to inform the Individual Defendants of transactions involving the disposition of Gemini properties and obtain their consent prior to entering into agreements for the sale of such properties.

206.    The Individual Defendants justifiably relied on Obeid's fraudulent concealment of his wrongful actions, expecting that if their partner intended to sell Gemini assets, he would seek majority approval as required by the Amended Operating Agreement and would negotiate the terms of any such sale through Gemini.  Obeid's fraudulent omissions in connection with the sales of Gemini properties harmed the Individual Defendants by exposing Gemini and the Individual Defendants to expenses and commissions associated with the contracts Obeid purported to enter into with brokers including SRM, harming Gemini's and the Individual Defendants' reputations and credibility, and disrupting the marketing of the Hotel Properties, leading to diminution of value.

207.    Obeid's behavior was egregious, offensive, and deserving of punishment.

208.    In addition to actual damages, the Individual Defendants are entitled to recover their attorneys' fees and punitive damages for Obeid's unlawful and egregious conduct.

## COUNT FIVE
## BREACH OF AMENDED OPERATING AGREEMENT

209.    The Individual Defendants hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of these Amended Counterclaims.

210.    On or about February 19, 2009, Obeid executed the Amended Operating Agreement, a valid and enforceable contract governing numerous aspects of Gemini's business, including its operation and management.

211.    The Amended Operating Agreement prohibits Gemini's Managers—including its Operating Manager—from acting on behalf of the Company and executing documents on behalf of the Company unless the majority in interest approves execution of the documents.  Amended Operating Agreement § 5.16 (emphasis added).

212.    Moreover, "[n]either any Member nor a successor, representative or assign of

40

such Member, shall have any right, title or interest in or to any Company property," *id.* § 2.7, and

"Company funds shall not be commingled with funds from other sources and shall be used solely

for the business of the Company," *id.* § 5.1.2.

213.    The Amended Operating Agreement also requires the approval of a majority of

Gemini's members for "[t]he borrowing of funds, . . . or the pledging of any assets of the

Company, in excess of $250,000.00," *id.* §§ 4.2.1.10, 4.2.1.11, and for the "sale or other

disposition" of any property owned by Gemini, *id.* § 4.2.1.9.

214.    Obeid breached the aforementioned provisions of the Amended Operating

Agreement by engaging in the acts described above, including but not limited to unilaterally

causing Gemini to make a nonrefundable deposit on the Miami Hotel Deal without informing the

majority in interest and seeking their approval of the transaction, disregarding the votes of

Gemini's majority in interest and otherwise acting unilaterally when the Amended Operating

Agreement required majority consent.    In taking these actions, Obeid acted in bad faith,

purposely attempting to usurp power, harm the Individual Defendants, and take improper control

of Gemini.

215.    Obeid breached the Amended Operating Agreement when he unilaterally entered

into a Letter of Interest with Macrolink to sell the Wyndham Flatiron Hotel without obtaining

majority approval.    Obeid further breached the Amended Operating Agreement when, without

obtaining majority approval, he executed the Commission Agreements, which purport to obligate

Gemini to expend more than $250,000 in commissions.    In taking these actions, Obeid acted in

bad faith, purposely attempting to usurp power, harm the Individual Defendants, and take

improper control of Gemini.

216.    Obeid exceeded the scope of his authority under the Amended Operating

Agreement and thereby breached the Amended Operating Agreement by unilaterally making decisions related to the hiring, firing, and salaries of Gemini employees, including hiring friends of Obeid and firing employees the parties had agreed to retain, without the approval of the majority in interest.

217.    Many of these employees were unqualified for the jobs they received, and were paid artificially inflated salaries.  Obeid took these actions in bad faith, seeking to benefit himself and curry personal favor with friends and family at the expense of the Individual Defendants and Gemini.

218.    Obeid also exceeded the scope of his authority under the Amended Operating Agreement when he created and used a faction of junior-level Gemini employees to leak inside Company information to him and to work on projects having nothing to do with Gemini.  In taking these actions, Obeid acted in bad faith, purposely attempting to usurp power, harm the Individual Defendants, and take improper control of Gemini.

219.    The Individual Defendants have fully performed all of their obligations under the Amended Operating Agreement.

220.    Obeid's breach of the Amended Operating Agreement has harmed the Individual Defendants who are parties to the Amended Operating Agreement.

221.    Obeid's breaches have caused substantial harm to the Individual Defendants, Gemini, and investors, and the Individual Defendants seek injunctive relief relating to Obeid's ongoing *ultra vires* conduct.

222.    Furthermore, should the Court disagree with the Individual Defendants' arguments in their Motion to Dismiss Plaintiff's Third Amended Complaint [Dkt. 331] that the members of GREA have eliminated monetary liability for breaches of the Amended Operating

Agreement, the Individual Defendants seek monetary damages relating to Obeid's breaches.

## COUNT SIX
## BREACH OF FIDUCIARY DUTY

223.    The Individual Defendants hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of these Amended Counterclaims.

224.    There was a relationship of trust and confidence between the Individual Defendants on the one hand and Obeid as Operating Manager of Gemini on the other hand.

225.    As the Operating Manager of Gemini, Obeid was vested with discretionary power to manage Gemini's business.

226.    Obeid had a duty as Operating Manager and manager of Gemini to act in the best interests of the Individual Defendants in managing Gemini.

227.    Obeid breached the trust and confidence placed in him by the Individual Defendants by exceeding the scope of his powers as Operating Manager, unilaterally causing Gemini to enter into real estate transactions and expend substantial amounts of funds of Gemini and the Individual Defendants without seeking the Individual Defendants' prior consent, and generally by interfering with Gemini's existing and prospective business relationships and by abusing his position as Operating Manager.  In taking these actions, Obeid acted in bad faith, purposely attempting to usurp power, harm the Individual Defendants, and take improper control of Gemini.

228.    Obeid breached the duty of trust and confidence placed in him by the Individual Defendants by improperly spying on the Individual Defendants and using information obtained from that spying to attempt to purchase the Hotel Properties at below-market value.  Obeid further destroyed the value of the Hotel Properties, breaching his fiduciary duties by filing Notices of Pendency on the Hotel Properties, preventing their sale and chilling the market for

them.  Obeid undertook all of these actions in bad faith, purposely intending to inflict harm on the Individual Defendants.

229.    Obeid breached the duty of trust and confidence placed in him by the Individual Defendants as well as his duty of good faith and fair dealing by forming a group of junior-level Gemini employees who he instructed to leak inside Company information to him and to work on projects—such as the Orchard Street Project—having nothing to do with Gemini.  In taking these actions, Obeid acted in bad faith, purposely attempting to usurp power, harm the Individual Defendants, and take improper control of Gemini.

230.    Obeid's actions have caused substantial harm to the Individual Defendants, Gemini, and investors, and the Individual Defendants seek injunctive relief relating to Obeid's ongoing *ultra vires* conduct.

231.    Furthermore, should the Court disagree with the Individual Defendants' arguments in their Motion to Dismiss Plaintiff's Third Amended Complaint [Dkt. 331] that the members of GREA have eliminated monetary liability for breaches of their fiduciary duties, the Individual Defendants seek monetary damages relating to Obeid's breaches.

### COUNT SEVEN
### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING

232.    The Individual Defendants hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of these Amended Counterclaims.

233.    The Amended Operating Agreement contained an implied covenant of good faith and fair dealing pursuant to Delaware law.

234.    Accordingly, each of Gemini's member-managers owes the other member-managers a duty of good faith and fair dealing with respect to all acts undertaken on behalf of or

with respect to Gemini.

235.    Specifically, Obeid had implied contractual obligations as a member-manager to direct Gemini employees to perform work for the benefit of Gemini and not for competing companies, to preserve the integrity of the bidding process of any sale conducted by Gemini of its properties, assist Gemini with its efforts to sell its properties to the highest bidders, and to keep the majority in interest informed of material developments, such as his secret attempts to bind Gemini into sales of its assets without consulting the majority in interest of the Company.

236.    Obeid violated these obligations by directing Gemini employees to work on projects for the benefit of Arcade and to leak sensitive Gemini information to Arcade while being paid by Gemini, by filing Notices of Pendency on the Hotel Properties to obstruct the sale process, and by failing to keep the Individual Defendants informed of material developments, such as his attempts to bind Gemini into various contractual obligations with the consent of the majority in interest in the Company.

237.    In taking these actions, Obeid acted in bad faith, purposely attempting to usurp power, harm the Individual Defendants, and take improper control of Gemini.

238.    Obeid's violation deprived the Individual Defendants of the benefit of the Amended Operating Agreement by causing expense to Gemini in the form of lost productivity and chilling the market for the Hotel Properties.

### COUNT EIGHT
### VIOLATION OF N.C. GEN. STAT. § 75-1.1, et seq.
### UNFAIR AND DECEPTIVE TRADE PRACTICES

239.    The Individual Defendants hereby incorporate by reference, as if fully stated herein, all the preceding paragraphs of these Amended Counterclaims.

240.    Obeid committed numerous unfair and deceptive acts in his dealings with the

Individual Defendants, his management of Gemini, and his competition with third-parties to purchase the Hotel Properties.

241.    Specifically, Obeid intentionally concealed from the Individual Defendants the fact that he was actively spying on their emails and other communications as set forth herein and above through the use of sophisticated spy software and with the assistance of Madison during multiple visits to Madison's New York offices.

242.    Obeid's use of the spy software was unfair and deceptive.

243.    Obeid used his surveillance software and unauthorized access to Gemini's servers to take screenshots and monitor keystrokes of the Individual Defendants' computers maintained in Gemini's North Carolina office and to obtain the Individual Defendants' emails and correspondence maintained in North Carolina, including but not limited to attorney-client privileged billing invoices and communications mailed to the Individual Defendants in North Carolina.

244.    Upon information and belief, Obeid also used his surveillance software and unauthorized access to Gemini's servers to obtain inside information regarding the Hotel Properties, which he used to assemble his bids for those properties.  By obtaining this information, Obeid upset the carefully constructed sealed-bid process the Individual Defendants used to ensure that Gemini received the highest possible bids for the Hotel Properties.

245.    Similarly, Obeid assembled and used a cabal of Gemini employees to funnel inside Company information to him relating to the Hotel Properties so that he could unfairly compete with third-party bidders for these Properties and obtain them at prices below market value in order to benefit himself and to the detriment of the Individual Defendants.

246.    Obeid took these actions while acting as the owner of Arcade and competitor to

third-party bidders for the Hotel Properties, which the Individual Defendants were marketing for sale on the open market on behalf of Gemini.

247.    All of the above-described acts are in or affecting commerce as they directly relate to transactions taking place in an otherwise competitive marketplace.  Indeed, Obeid's use of improperly obtained inside information to compete against third parties, chill the market for the Hotel Properties, and take those Properties for himself is the very definition of unfair competition.

248.    These acts were directed at, and caused harm to the Individual Defendants in North Carolina, where they work and reside.

249.    Obeid's acts proximately caused substantial harm to the Individual Defendants including, but not limited to, the loss of control over the privacy of their personal and business affairs, the interception of privileged communications with counsel, costs associated with failed and/or blocked real estate transactions, and loss of promote fees associated with the sales of the Hotel Properties as a result of Obeid's inference with the marketing and sale process.

250.    Plaintiff's behavior was intentional, willful, and deserving of punishment

251.    In addition to actual and/or statutory damages, the Individual Defendants are entitled to recover their attorneys' fees and treble damages for Obeid's unlawful and egregious conduct.

## COUNTERCLAIMANTS' PRAYER FOR RELIEF

WHEREFORE, the Individual Defendants pray for judgment against Obeid as follows:

A.    Compensatory, statutory, and punitive damages;

B.    Injunctive relief;

C.    Reasonable attorneys' fees and other litigation costs;

D.    Treble damages; and

D.    Any further relief the Court deems appropriate.


Dated: February 26, 2016
Charlotte, North Carolina


By:    */s/ Robert A. Muckenfuss*
Noreen A. Kelly-Dynega
MCGUIREWOODS LLP
1345 Avenue of the Americas
New York, NY 10105
T: 212-548-7025
F: 212-715-6290
Email: nkelly-dynega@mcguirewoods.com

Robert A. Muckenfuss
R. Locke Beatty
Admission Pro Hac Vice
MCGUIREWOODS LLP
201 N. Tryon St., Suite 3000
Charlotte, NC 28202
T: 704-343-2052
F: 704-343-2300
Email: rmuckenfuss@mcguirewoods.com

Elizabeth M.Z. Timmermans
Admission Pro Hac Vice
MCGUIREWOODS LLP
434 Fayetteville Street, Suite 2600
Raleigh, North Carolina 27601
T: 919-755-6600
F: 919-755-6699
Email: eztimmermans@mcguirewoods.com
*Attorneys for Defendants Christopher La Mack*
*and Dante A. Massaro*