UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
WILLIAM T. OBEID, directly and derivatively
 on behalf of GEMINI REAL ESTATE
ADVISORS LLC, et al.,

        Plaintiff,

   -v-
                                 No.  14CV6498-LTS-MHD

CHRISTOPHER LA MACK, et al.,

        Defendants,

   and

GEMINI REAL ESTATE ADVISORS LLC, et al.,

        Nominal Defendants.
--------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

        Plaintiff, William T. Obeid ("Obeid" or "Plaintiff"), brings this filed suit against

Defendants Christopher La Mack and Dante A. Massaro (the "Individual Defendants"),

Bridgeton Holdings, LLC, Bridgeton Hotel Management, LLC, Bridgeton Acquisition, LLC, and

Atit Jariwala (together, the "Bridgeton Defendants") and Elevation Real Estate Group LLC

("Elevation"), asserting a series of direct and derivative claims, including claims for breach of

contract, breach of fiduciary duty, Lanham Act violations, Computer Fraud and Abuse Act

("CFAA") violations, and state law claims.  The Court has subject matter jurisdiction of this

action pursuant to 28 U.S.C. §§ 1331 and 1367.

        The Individual Defendants and the Bridgeton Defendants have moved to dismiss

the Third Amended Complaint ("TAC").  The Court has reviewed carefully the papers submitted

by the parties.  For the following reasons, the motions to dismiss are granted in part and denied

in part.

BACKGROUND

The following is a summary of the allegations contained in the operative TAC, which the Court takes to be true for the purposes of this motion practice.

La Mack, Massaro, and Obeid are equal one-third Member-Managers of Gemini Real Estate Advisors, LLC ("GREA"), which, along with its subsidiaries and affiliates, operates as a single family of closely-held entities under the brand "Gemini."  (TAC ¶ 2.)  Gemini owns, manages, and develops commercial real estate, with over $1 billion of real estate assets under management, consisting largely of hotel and retail properties.  (Id. ¶ 3.)

The GREA Operating Agreement ("Operating Agreement") is a valid and binding agreement that sets forth the respective Member-Managers' rights and obligations as to GREA and each Member-Manager.  (Id. ¶ 388.)[1]  The Agreement provides that "[a] Member shall not be entitled to participate in the day-to-day affairs and management of the Company, but instead, the Member's right to vote or otherwise participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the Act, the Certificate of Formation, or this Agreement vest in the Member the right to so vote or otherwise participate."  (Id. Ex. 1 § 4.1.)[2]  Section 4.2 sets forth a list of "Actions Requiring Approval of Members," providing in subdivision 4.2.1 that "[e]xcept as otherwise provided in this

---

[1]    The Court notes that the Operating Agreement contains provisions relating to "Members" and provisions relating to "Managers" but does not appear to use the term "Member-Manager."  It is, however, undisputed that Obeid, Massaro and La Mack were both Members and Managers of GREA at all relevant times.

[2]    The parties agree that "the Act" referred to in the provision is the Delaware Limited Liability Company Act ("DLLCA").

Agreement, the approval of a Majority in Interest of the Members shall be required in order for

any of the following actions to be taken on behalf of the Company: [list of actions omitted]."

Section 4.9 provides that "[a]ll actions of the Members provided for herein may be taken by

written consent without a meeting.  Any such action which may be taken by the Members

without a meeting shall be effective only if the consents are in writing, set forth the action so

taken, and are signed by a Majority In Interest of the Members."  Section 5.1 sets forth the

"Powers of Managers," which includes the ability to enter into contracts.  Section 6.1, titled

"Limitation of Liability," states:

> Except as otherwise provided herein, no Manager or Member of the Company
> shall be liable to the Company or its Members for monetary damages for an act or
> omission in such person's capacity as a Manager or a Member, except for acts or
> omissions constituting willful misconduct or gross negligence or breach of
> fiduciary duty, and further except for breaches of contractual obligations or
> agreements, including breaches of this Agreement, between the Manager, or
> Member, and the Company.  If the Act is amended to authorize action further
> eliminating or limiting the liability of Managers and Members, then the liability
> of a Manager or Member of the Company shall be eliminated or limited to the
> fullest extent permitted by the Act as so amended.

On July 1, 2014, during a Special Meeting of GREA's three Member-Managers,

the Individual Defendants introduced a corporate resolution, approved by a 2-1 vote, replacing

Obeid as GREA's Operating Manager and appointing Massaro as the new Operating Manager.

(Id. ¶ 5.)  Obeid alleges that, once the Individual Defendants came into control of Gemini, they

concealed material information and updates concerning Gemini from Obeid.  (Id. ¶ 6.)  The

Individual Defendants also allegedly embarked on a campaign of self-dealing designed to enrich

themselves at Gemini's and Obeid's expense, including using Gemini funds and diverting

Gemini resources to launch newly formed entities such as defendant Elevation.  (See id. ¶¶ 7, 9.)

For instance, Obeid has alleged that the Individual Defendants directed specific expenditures in

connection with Elevation's soft launch, including over $20,000 paid by Gemini to host a booth and party, the sublease of Gemini's North Carolina office to Elevation without charge, and the compensation of Gemini employees for work benefitting the Individual Defendants' competing entities.  (See, e.g., TAC ¶¶ 232-40.)  Obeid alleges that the Individual Defendants dismantled Gemini's lucrative hospitality business in exchange for "disguised kickbacks," and destroyed the specific business segment that Obeid exclusively built, to which his outside investors had committed their capital based on Obeid's excellent reputation.  (Id. ¶ 10.)  Obeid also alleges that the Individual Defendants embarked on a campaign to divest Gemini of its hospitality assets through insider transactions with co-conspirators at below fair market prices (and in some cases for no consideration at all) to the detriment of Gemini, its investors and Obeid.  (Id. ¶ 11.)

More specifically, Obeid alleges that the Individual Defendants lobbied Gemini's lender UBS Realty ("UBS") to stop funding two of Gemini's hotel development projects (the Jade Seaport and Jade Bryant Park) so they could sell them at discounted prices to a third-party developer (the Congress Group) that had been "pre-selected because of a side-deal [the Individual Defendants] entered into with the Congress Group in which the Individual Defendants . . . would joint venture with [the Congress Group] to complete and manage those development projects (without Obeid and Gemini and to their investors' detriment)."  (Id. ¶ 12.)  Once Obeid found out that the Individual Defendants were advocating a "fire-sale" of the Seaport and Bryant Park hotel development projects, he submitted Letters of Intent to purchase both properties on February 4, 2015.  (Id. ¶ 14.)  Obeid's offers were vastly superior to the Congress Group's offers in terms of price, conditions, and timing.  (See id.)  The Individual Defendants then directed their commercial broker, RobertDouglas, to undertake a sham marketing process to ostensibly market the two hotel development projects, plus Gemini's luxury boutique hotel (the Jade

Greenwich Village Hotel) in a "confidential public marketing process" requiring third-party bidders to submit final and best offers by February 25, 2015, even though that deadline would not meet UBS' pre-payment deadline of March 31, 2015.  (Id. ¶¶ 14-15.)  The Individual Defendants concealed all information concerning the "so-called marketing process" from Obeid, including information concerning the bids themselves.  (Id. ¶ 16.)  Even though Obeid's bid remained the "highest and superior" one by the February 25, 2015, deadline, the Individual Defendants refused to sell the property to him out of "sheer malice even though their vindictiveness caused further financial injury to Gemini, its investors and Obeid."  (Id.)

Obeid alleged that the Individual Defendants had the assistance of a direct Gemini competitor, Bridgeton Holdings, LLC ("Bridgeton") and its principal, Atit Jariwala.  (Id. ¶ 12.) Jariwala knew that the Individual Defendants' actions were in violation of Gemini's operating agreement and went against Gemini's best interests.  (Id.)  The Individual Defendants represented to Obeid that they had decided to sell the Jade Greenwich Village Hotel pursuant to a public marketing process administered by RobertDouglas.  (Id. ¶ 17.)  However, the Individual Defendants had secretly agreed to sell the Jade Greenwich Village Hotel to Bridgeton in a side-deal reached between the Individual Defendants and Jariwala in late November 2014, wherein the Individual Defendants had guaranteed Bridgeton rights of "first refusal" and "last looks" to acquire at least three Gemini hotels (the Jade Greenwich Village Hotel, the Wyndham Flatiron Hotel and the Boston Holiday Inn).  (Id.)  Bridgeton publicized its rights of first refusal and last looks "to the marketplace," which had the effect of steeply discounting third-party offers for those properties so that Bridgeton could come in at the end and scoop them up at fire-sale prices. (Id. ¶ 18.)  Unbeknownst to Obeid, on March 9, 2015, the Individual Defendants accepted a Letter of Intent from Bridgeton to acquire the Jade Greenwich Village Hotel for $78 million,

despite the fact that the Individual Defendants' own commercial brokers at RobertDouglas performed two separate valuations of the property and determined its mid-point valuation to be $90 million.  (Id. ¶¶ 19-20.)  Throughout February 2015, Jariwala boasted and publicized to outside investors that he had "unparalleled inside opportunities" to acquire Gemini hotels at deep discounted prices based on "his relationship" with the Individual Defendants.  (Id. ¶ 21.)  The Bridgeton Defendants knew that they were acquiring Gemini hotels as a result of Jariwala's secret conspiracy with the Individual Defendants for kickbacks.  (Id.)  On June 30, 2015, Obeid discovered that the Individual Defendants accepted a binding Letter of Intent in May 2015 to sell the Boston Holiday Inn to Bridgeton for a below fair market price value of $24.5 million.  (Id. ¶ 22.)

The Individual Defendants also allegedly transferred Gemini's most profitable business segment—its hospitality group and hotel management contracts—to Bridgeton for free. (Id. ¶ 23.)  Aside from developing and owning its own hotels, Gemini's hospitality group also operated hotels for third-parties and received management fees in exchange for its services.  (Id. ¶ 24.)  On January 26, 2015, the Individual Defendants abruptly transferred all of Gemini's hospitality employees located in Gemini's corporate headquarters in New York City to Bridgeton's New York office, and completed a massive data transfer from Gemini to Bridgeton of all Gemini's confidential information concerning its hospitality business compiled over the last decade.  (Id. ¶ 26.)  Obeid alleges that the Individual Defendants, in connection with the data transfer, "unlawfully copied and duplicated Gemini's entire network and created a parallel network that hosts Gemini's stolen confidential information."  (Id. ¶ 422; see also id. ¶ 9.)  There was no economic justification for the transfer of Gemini's hospitality business to Bridgeton, beyond the kickbacks to the Individual Defendants.  (Id. ¶ 31.)  Bridgeton now serves as a sub-

manager to Gemini on the existing hotel management contracts and receives approximately 65 percent of the historical revenues that originally flowed directly to Gemini.  (Id. ¶ 32.)  Gemini's overhead costs remain approximately the same after the transfer of the hospitality group to Bridgeton.  (Id. ¶ 33.)  Since Gemini remains the official "hotel manager" on all existing hotel management contracts, Gemini, not Bridgeton, maintains all risk of liability in the event of a dispute with a hotel owner concerning the management of its hotel property.  (Id.)  Bridgeton has embarked on a campaign of false and deceptive advertising in which it has represented to investors and lenders through marketing and investor teasers that Bridgeton's founder, Jariwala, is responsible for the acquisition, development and management of Gemini's hotel properties. (Id. ¶ 37.)  The marketing materials falsely portray Gemini's hotels as properties currently owned by Bridgeton so much so that Bridgeton's advertising materials overwhelmingly feature Gemini's upscale properties (and not Bridgeton's low-end ones), including Gemini's trademarked Jade and Gem hotel properties, for which Bridgeton never received a license to use the trademarks.  (Id.)  The Individual Defendants "assisted Bridgeton in creating these materials" and "encouraged Jariwala to use the deceptive and false advisements content contained in Bridgeton's materials."  (Id. ¶¶ 332, 337, 338.)  Obeid alleges that Gemini's brand and reputation in the hospitality industry have been tarnished, since the Individual Defendants and Bridgeton have publicized to the marketplace that Bridgeton now operates Gemini's hospitality business.  (Id. ¶ 36.)

Gemini has agreed to indemnify and hold Bridgeton harmless against any claims arising from the transfer of Gemini's hospitality business.  (Id. ¶ 35.)  Obeid alleges that the Individual Defendants have bound Gemini to various indemnities, including indemnities in favor

of the Congress Group and Bridgeton for any and all losses, damages or costs arising from their dealings concerning Gemini.  (<u>Id.</u> ¶ 39.)  The Individual Defendants agreed to Bridgeton's request that Gemini provide Bridgeton a second indemnity for all losses, claims, liabilities, damages, costs and attorneys' fees of "every nature and character" from any and all claims asserted by Obeid in connection with Bridgeton's insider purchase of the Jade Greenwich Village.  (<u>Id.</u> ¶ 40.)  The Individual Defendants agreed to provide Bridgeton with this second indemnity on May 9, 2015 - over two months after the Individual Defendants accepted Bridgeton's Letter of Intent and signed a Purchase and Sale Agreement for the hotel.  (<u>Id.</u>)

The TAC sets forth twenty-one causes of action: (1) a derivative claim for breach of fiduciary duty against the Individual Defendants; (2) a direct claim for breach of fiduciary duty against the Individual Defendants; (3)-(6) derivative claims for unfair competition/reverse palming off and false advertising under the Lanham Act against the Individual Defendants and the Bridgeton Defendants; (7)-(8) derivative and direct claims for breach of the GREA Operating Agreement against the Individual Defendants; (9) a derivative claim for common law unfair competition against the Bridgeton Defendants; (10)-(11) derivative claims for conversion against the Individual Defendants, the Bridgeton Defendants and Elevation; (12) a derivative claim for breach of contract against Jariwala; (13) a derivative claim for violation of the Computer Fraud and Abuse Act ("CFAA") against the Bridgeton Defendants, the Individual Defendants and Elevation; (14)-(15) derivative claims for unjust enrichment against the Bridgeton Defendants, the Individual Defendants and Elevation; (16)-(17) direct and derivative claims for aiding and abetting breach of fiduciary duty against the Bridgeton Defendants; (18)-(19) direct and derivative claims for tortious interference with contractual relations against the Bridgeton

Defendants; (20) a derivative claim seeking declaratory relief that the indemnities running to Bridgeton and the Congress Group from Gemini are null and void; and (21) a direct claim for prima facie tort against the Individual Defendants.[3]

## DISCUSSION

When resolving a motion to dismiss, the Court must "construe the Complaint liberally, accepting all factual allegations in the Complaint as true, drawing all reasonable inferences in the [non-movant's] favor." Galiano v. Fid. Nat'l Title Ins. Co., 684 F.3d 309, 311 (2d Cir. 2012). To survive a motion to dismiss, a plaintiff must plead the grounds upon which the claims rest, through factual allegations sufficient to raise a right to relief above the speculative level. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

The Individual Defendants first argue that all of Obeid's damages claims against them must fail because GREA's Operating Agreement eliminates the liability for monetary damages of Members and Managers for any act in capacity of member or manager, other than conduct amounting to a bad faith violation of the implied contractual covenant of good faith and fair dealing. In support of this position, the Individual Defendants point to the "Limitation of Liability" provision in Section 6.1 of the GREA Operating Agreement, which provides:

---

[3]     On March 17, 2016, the Court granted in part Elevation's motion to dismiss the Second Amended Complaint, dismissing the conversion and CFAA claims against Elevation. (Docket entry no. 352.)

> Except as otherwise provided herein, no Manager or Member of the Company shall be liable to the Company or its Members for monetary damages for an act or omission in such person's capacity as a Manager or a Member, except for acts or omissions constituting willful misconduct or gross negligence or breach of fiduciary duty, and further except for breaches of contractual obligations or agreements, including breaches of this Agreement, between the Manager, or Member, and the Company.  If the Act is amended to authorize action further eliminating or limiting the liability of Managers and Members, then the liability of a Manager or Member of the Company shall be eliminated or limited to the fullest extent permitted by the Act as so amended.

(TAC Ex. 1 § 6.1.)  As noted above, the parties agree that "the Act" referred to in the provision is the Delaware Limited Liability Company Act ("DLLCA").  According to the Individual Defendants, the second sentence of the provision overrides and cabins the first because the DLLCA permits members of LLCs to eliminate monetary liability for any breach of contract or duty.  As pointed out by Obeid, however, the version of the Operating Agreement that is annexed to the TAC was signed in 2009, and the DLLCA was last amended in 2005.  Thus, on the face of the pleadings, there is no indication of a "further" elimination or limitation of liability by operation of an amendment to the DLLCA after the Operating Agreement was entered into.[4] Moreover, the first sentence of Section 6.1 of the Operating Agreement, by its express terms, carves out from any potential limitation on liability causes of action based on breaches of fiduciary duty and breaches of the Operating Agreement itself, which form the basis of Obeid's claims here.  Accordingly, the Individual Defendants' motion to dismiss Obeid's damages claims based on the scope of the current DLLCA provision is denied.  The Court will now proceed to evaluate the aspects of the motions to dismiss that are directed to specific claims.

---

[4]     The Operating Agreement recites that it is an amendment and restatement of an agreement originally entered into in 2004 and amended in 2006, but there is nothing in the record indicating whether the language of the current provision differs from the text adopted by the parties prior to the 2005 DLLCA amendment.

A.          Breach of Fiduciary Duty Related Claims Against Individual and Bridgeton
           Defendants (Counts 1, 2, 16, and 17)

      The TAC asserts direct and derivative breach of fiduciary duty claims against the

Individual Defendants, and aiding and abetting breach of fiduciary duty claims against the

Bridgeton Defendants.  The Individual Defendants contend that the Operating Agreement, which

permits members to conduct competing businesses, operates to eliminate the duty of loyalty.

      Section 5.13 of the Operating Agreement provides that "[a] Manager . . . may

engage in business ventures, including the acquisition of real estate properties or interests therein

and the development, operation, and management and/or syndication of real estate properties or

interests therein, which may compete with the business of the Company."  (TAC Ex. 1 § 5.13;

see also id. § 11.1 (providing that members are not prohibited from investing or conducting

competing businesses).)  These provisions do not, however, eliminate all aspects of the duty of

loyalty.  The ability under the Operating Agreement to conduct competing business is not

tantamount to authorization to take such actions in a disloyal manner.  See Cont'l Ins. Co. v.

Rutledge & Co., Inc., 750 A.2d 1219, 1236 (Del. Ch. 2000) (noting that a similar clause

permitting competition leaves intact the duty of loyalty's prohibition on self-interested

transactions).  The TAC alleges that the Individual Defendants not only engaged in a competing

business, but also diverted resources, personnel and corporate opportunities from Gemini

towards their competing business to Gemini's detriment.  The Individual Defendants' motion to

dismiss the breach of fiduciary duty claims is therefore denied.

      The Bridgeton Defendants argue that the aiding and abetting breach of fiduciary

duty claims should be dismissed against them because, inter alia, certain of the alleged actions

are not primary breaches of fiduciary duty and the allegations surrounding knowledge and assistance are conclusory.  A viable claim of aiding and abetting breach of fiduciary duty requires the following: "(1) a breach of a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in a breach, and (3) that plaintiff suffered damages as a result of the breach."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006). "Although a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty."  Id. "A person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance to the primary violator.'"  Id. (citation omitted).  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."  Kaufman v. Cohen, 307 A.D.2d 113, 126 (N.Y. App. Div. 2003).  "Knowing participation may be inferred where 'it appears that the defendant may have used knowledge of the breach to gain a bargaining advantage in the negotiations' or 'where the terms of the transaction are so egregious or the magnitude of the side deals is so excessive as to be inherently wrongful.'"  Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P., No. 13 CV 1654 RA, 2014 WL 2610608, at *27 (S.D.N.Y. Jun. 10, 2014) (citations omitted).

The Court finds that Obeid has sufficiently pleaded the aiding and abetting breach of fiduciary claim as against the Bridgeton Defendants.  The TAC alleges a multitude of actions taken by the Individual Defendants involving the Bridgeton Defendants that form the basis of its aiding and abetting claims.  The Bridgeton Defendants are alleged to have been given Gemini's most profitable business segment for no consideration, thereby receiving a large percentage of revenues previously belonging to Gemini at apparently little or no cost.  The Bridgeton

Defendants are alleged to have been given insider access to the sale of several Gemini properties, resulting in the sale of those properties at below market prices, which stemmed, in part, from the Bridgeton Defendants' market-facing statements advertising its insider access. For instance, the TAC specifically alleges that the Bridgeton Defendants publicized that they had "unparalleled inside opportunities" to acquire Jade Greenwich Village, Wyndham Flatiron Hotel and Boston Holiday Inn at deeply discounted prices based on their relationship with Individual Defendants. The TAC also alleges that, with the approval of the Individual Defendants, the Bridgeton Defendants improperly advertised their relationship to Gemini-owned and -managed property. The TAC further alleges that the Individual Defendants agreed to indemnify the Bridgeton Defendants fully for any lawsuits that may arise from transfer of Gemini's hospitality business and the purchase of the Jade Greenwich Village hotel. All of these actions taken to benefit the Bridgeton Defendants are alleged to have resulted from a secret side-deal with the Individual Defendants that included kickbacks to the Individual Defendants.

While the Bridgeton Defendants argue that allegations concerning the existence of the secret deals and kickbacks are conclusory, the Court finds that there are sufficient facts pled—including, inter alia, the "free" transfer of the hospitality business, the "insider" opportunities, and the indemnity agreement—to support a plausible inference that there was such a scheme. Although the existence of a first and last look opportunity standing alone will not create an inference of improper conduct, Plaintiff's allegations regarding totality the relationship between the Individual Defendants and the Bridgeton Defendants and their actions affecting Obeid and Gemini are sufficient to support a reasonable inference that Bridgeton's "insider" opportunities were provided in violation of the Individual Defendants' duty of loyalty to Gemini.

Similarly, the contents of the Bridgeton marketing materials that promote Gemini properties, which were approved by the Individual Defendants and allegedly advertised self-dealing transactions, plausibly support a claim for breach of fiduciary duty.  The extensiveness of the Bridgeton Defendants' involvement in several of the allegedly improper transactions with the Individual Defendants, the sophistication and familiarity of the Bridgeton Defendants with Gemini's operations given Jariwala's prior employment with Gemini, and the existence of the indemnity agreements in the Bridgeton Defendants' favor, all support the reasonable inference that the Bridgeton Defendants knew that the actions undertaken were violative of the Individual Defendants' fiduciary duties.  The allegations that the Bridgeton Defendants entered into transactions that operated to the detriment of Gemini and actively collaborated with the Individual Defendants, including in purchasing the Gemini properties, suffice to plead plausibly the substantial assistance element of the claim.

The Individual Defendants' motion to dismiss the breach of fiduciary duty claims is denied.  The Bridgeton Defendants' motion to dismiss the aiding and abetting breach of fiduciary duty claims is denied.

B.      Unfair Competition Claim Against Bridgeton Defendants (Count 9)

The Bridgeton Defendants contend that Obeid cannot sustain an unfair competition claim because the TAC does not sufficiently plead bad faith or special damages.  To state a claim for unfair competition under New York law, a plaintiff must allege that: (1) the plaintiff has a valid, protectable mark, (2) there is a likelihood of confusion as to the source or sponsorship or the defendant's goods or services and (3) the defendant acted in bad faith.  ESPN Inc. v. Quicksilver Inc., 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008).  Special damages must also

be plead.  Gucci America, Inc. v. Duty Free Apparel, Ltd., 277 F. Supp. 269, 271 (S.D.N.Y.

2003). "The rules surrounding the pleading and proof of special damages are stringent and well-

articulated.  Special damages are limited to losses having pecuniary or economic value and must

be fully and accurately stated, with sufficient particularity to identify actual losses."  Kirby v.

Wildenstein, 784 F. Supp. 1112, 1116 (S.D.N.Y. 1992).  See, e.g., Gucci, 277 F. Supp. 2d at 278

(holding dismissal of general allegation of loss figure of "not less than $50,000," which did not

itemize losses, was required for failure to plead special damages with sufficient particularity).

Obeid failed to respond to the Bridgeton Defendants' arguments.

Here, with respect to losses stemming from the unfair competition claim, Obeid

has pleaded that the Bridgeton Defendants' actions "have caused and will continue to cause

irreparable harm and injury" and will continue to "cause immeasurable damage to the goodwill

and reputation of Gemini . . . ."  (TAC ¶ 414.)  These general allegations do not meet the

requirement for special damages.  Accordingly, the Bridgeton Defendants' motion to dismiss the

unfair competition claim is granted.

C.        Breach of Contract Claims Against Individual Defendants (Counts 7, 8)

Citing several provisions of the GREA Operating Agreement, Obeid claims that

the Individual Defendants breached the Operating Agreement by not keeping Obeid informed of

material decisions and refusing to set those material decisions down for a vote.  (See Pl. Br. at

28.)  The Individual Defendants have moved to dismiss these breach of contract claims, arguing

that Obeid mischaracterizes the provisions of the Operating Agreement and has failed to identify

any breaches of the Operating Agreement.

The Agreement provides that "[a] Member shall not be entitled to participate in

the day-to day affairs and management of the Company, but instead, the Member's right to vote or otherwise participate with respect to matters relating to the Company shall be limited to those matters as to which the express terms of the Act, the Certificate of Formation, or this Agreement vest in the Member the right to so vote or otherwise participate."  (TAC Ex. 1 § 4.1.)  Section 4.2 sets forth a list of "Actions Requiring Approval of Members," providing that "[e]xcept as otherwise provided in this Agreement, the approval of a Majority in Interest of the Members shall be required in order for any of the [specified] actions to be taken on behalf of the Company."  Section 4.9 provides that "[a]ll actions of the Members provided for herein may be taken by written consent without a meeting.  Any such action which may be taken by the Members without a meeting shall be effective only if the consents are in writing, set forth the action so taken, and are signed by a Majority In Interest of the Members."   Section 5.1 sets forth the "Powers of Managers," which includes the ability to enter into contracts and take any action as directed by Members in furtherance of their approval of any matter set forth in Section 4.2.1.

Obeid contends that Sections 4.1 and 4.2 of the Operating Agreement give him, as a minority Member, an indefeasible right to vote on material corporate decisions.  His argument ignores, however, the text of Section 4.9, which permits a Majority in Interest (i.e., two-thirds) of the Members to act by written consent, without a full membership meeting or vote.  Obeid also asserts that Section 4.9 of the Operating Agreement provides that the Operating Manager cannot take any material action on behalf of GREA without holding a meeting or obtaining written consent from the Members.  No such language appears in the Operating Agreement. Obeid's assertions that the Operating Agreement gave him a right to notice of all of GREA's major decisions and actions is likewise without foundation in the text of the Operating

Agreement.  Accordingly, there is no basis under Sections 4.1, 4.2, 4.9, and 5.1 for Obeid's

claim that the Individual Defendants breached contractual obligations to inform Obeid of major

decisions and afford him an opportunity to vote on them.

        Obeid further claims that the Individual Defendants breached Sections 5.13 and

5.16 of the Agreement by failing to devote sufficient time to Gemini.  (Pl. Br. at 30.)  Section

5.13 provides, in relevant part, that "a Manager shall devote such time to the business of the

Company as may reasonable be required to conduct its business in an efficient and profitable

manner."  Here, Obeid alleges in a conclusory manner that "Individual Defendants have further

breached the GREA Operating Agreement by failing to devote sufficient time and fidelity to

Gemini matters and instead spending their time on launching their various new and competing

entities including but not limited to Elevation."  (TAC ¶ 395; see also ¶¶ 393, 403, 405.)  Obeid

has failed to plead any facts in support of his conclusory allegation that the Individual

Defendants have breached Section 5.13.  Particularly given that the Operating Agreement

specifically contemplates that the Member-Managers may engage in competitive ventures, Obeid

has failed to plead sufficient facts to rise to the reasonable inference that the Individual

Defendants have breached Section 5.13 by devoting insufficient time to Gemini's affairs.

        Obeid further contends that the Individual Defendants breached Section 5.16

captioned "Operating Manager" because that section "expressly provides" that GREA shall be

managed by Obeid and the Individual Defendants, but Obeid was frozen out of participation in

management.  Section 5.16, which states that the Managers can appoint an Operational Manager

pursuant to their "managerial authority," does not expressly address the scope of any individual

Manager's entitlement to participation in management at all, let alone guarantee any such

participation.  Rather, Section 5.4 of the Operating Agreement provides that "any scheduled meeting of the Managers, may be held without notice," though notice must be given of "Special Meetings," unless waived.  Section 5.5 of the Operating Agreement provides that decisions can be made at a meeting with and by a number of Managers representing a Majority in Interest of the Members and that "the Managers shall take action by the vote of those Managers who are a Majority in Interest of the Members."  Obeid's argument appears to be that, because Section 5.16 provides for the delegation of management and operational responsibility to an Operational Manager, each Manager must therefore have been empowered with management and operational authority to begin with.  Even if that position has some facial merit, it does not support the conclusion that Obeid was entitled to participation in all management decisions.  Obeid has not identified any other substantive or procedural provision of Section 5 that supports his interpretation of Section 5.16, nor has he presented facts indicating that any other provision of Article 5 of the Operating Agreement has been breached.  Accordingly, the Individual Defendants' motion to dismiss the breach of contract claims is granted.

D.        Breach of Contract Claim Against Jariwala (Count 12)

Obeid alleges that Jariwala breached the Separation Agreement and the accompanying Intellectual Property Assignment that Jariwala entered into upon his departure from Gemini by "stealing Gemini's confidential and proprietary information," and using the Jade and Gem marks in the Bridgeton Defendants' advertisements and investment materials without obtaining prior approval from GREA.  (TAC ¶¶ 427-28.)  Obeid alleges that, pursuant to the Separation Agreement, Jariwala agreed that he would not publish, display, disclose, copy or

otherwise use Gemini Intellectual Property without prior consent from GREA.  (Id. ¶ 426.)

Obeid's own allegations, however, proffer that the Individual Defendants, as majority owners of

Gemini, approved of Bridgeton's use of the advertising materials at issue, thus providing the

approval required by the contracts.  Accordingly, the breach of contract claim against Jariwala is

dismissed.

E.        Lanham Act Claim Against Individual and Bridgeton Defendants (Counts 3, 4, 5, 6)

          Obeid alleges that the Individual Defendants encouraged and assisted the

Bridgeton Defendants' engagement in unfair competition, reverse palming off and false

advertising in violation of the Lanham Act and asserts derivative claims against both sets of

defendants on this basis.  The Individual Defendants and the Bridgeton Defendants argue that

Obeid's allegations that the Individual Defendants, who are the majority owners of Gemini,

acquiesced in and otherwise encouraged the preparation of the advertising materials at issue,

preclude any viable claim of reverse palming off or false advertising.

          In order to establish infringement under the Lanham Act, a plaintiff must prove

that the alleged infringing use was done without plaintiff's consent.  See 1-800 Contacts, Inc. v.

WhenU.com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005) (internal quotation marks and citations

omitted).  To be liable for contributory Lanham Act violations, a plaintiff must plead facts

demonstrating that the defendant intentionally induced the infringing party to engage in the

infringing behavior.  Kelly-Brown v. Winfrey, 717 F.3d 295, 314 (2d Cir. 2013).  Here, Obeid

has expressly alleged that the Individual Defendants knowingly "assisted" and "encouraged" the

creation of the Bridgeton advertising materials in question.  (See TAC ¶¶ 332, 337-38.)  The

Individual Defendants, as majority Member-Managers of Gemini, had authority to grant

Bridgeton permission to use Gemini trademarks in its advertising material.[5]  (See infra pp.15-18;

see also Operating Agreement §§ 5.1, 5.5.)  Therefore, Obeid cannot state a primary violation of

the Lanham Act, and his claims of contributory Lanham Act violations must also fail.

Accordingly, the Individual Defendants' and the Bridgeton Defendants' motions

to dismiss the Lanham Act claims are granted.


F.        Tortious Interference With Hotel Management Contracts Claim Against
          Bridgeton Defendants (Counts 18 and 19)

Obeid alleges that the Bridgeton Defendants tortiously interfered with Gemini's

hotel management contracts by conspiring with the Individual Defendants to transfer the

contracts to Bridgeton.  (TAC ¶¶ 464-69.)  Tortious interference with contracts requires "the

existence of a valid contract between the plaintiff and a third party, defendant's knowledge of

that contract, defendant's intentional procurement of the third-party's breach of the contract

without justification, actual breach of the contract, and damages resulting therefrom."  Lama

Holding Co. v. Smith Barney, 88 N.Y.2d 413, 424 (N.Y. 1996) (citations omitted).

The TAC specifically alleges that Gemini's "existing hotel management contracts

[] remained in place," and "Gemini remains the official 'hotel manager' on all the existing hotel

management contracts."  (TAC ¶¶ 320, 322.)  Obeid presents no legal authority to support his

theory that a tortious interference with contract claim can be sustained in the absence of a breach

of contract, and indeed, this theory has been explicitly rejected.  See, e.g., NBT Cancorp Inc. v.

---

[5]        The Court notes that Obeid's invocation of the doctrine of acquiescence is
           inapposite because affirmative consent was allegedly given here.

Fleet/Norstar Fin. Grp. Inc., 87 N.Y.2d 614, 620-21 (N.Y. 1996) (reaffirming the requirement of breach and rejecting argument that "a defendant's deliberate interference with plaintiff's contractual rights that causes damage should be punishable as tortious interference whether or not the contract was actually breached.")  Accordingly, this claim is dismissed.

Obeid also alleges tortious interference with the GREA Operating Agreement on the basis that the Bridgeton Defendants induced the Individual Defendants to breach the Agreement by entering into unfavorable and self-dealing transactions with the Bridgeton Defendants.  (TAC ¶¶ 470-76.)  As discussed above, Plaintiff has not pleaded any viable breach of contract claim against the Individual Defendants with respect to the Operating Agreement. Accordingly, Obeid's tortious interference with the Operating Agreement claim must also be dismissed.

G.      Conversion Claim Against Individual and Bridgeton Defendants (Counts 10 and 11)

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."  Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403-404 (2d Cir. 2006); see also Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43, 49-50 (N.Y. 2006) ("A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession.") A plaintiff asserting a conversion claim must allege that it had "ownership, possession or control over the property before its conversion."  Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (citation and internal quotation marks omitted).  The plaintiff must

also allege that the defendant converted a specific, identifiable piece of property.  See Berman v. Sugo LLC, 580 F. Supp. 2d 191, 207 (S.D.N.Y. 2008) (citation omitted).

The Court finds that Obeid has sufficiently identified, for the purposes of the motion to dismiss stage, specific funds that were allegedly converted.  For instance, Obeid has alleged that the Individual Defendants directed specific expenditures in connection with Elevation's soft launch, including over $20,000 paid by Gemini to host a booth and party, the sublease of Gemini's North Carolina office to Elevation without charge, and the work of employees compensated by Gemini towards the Individual Defendants' competing entities. (See, e.g., TAC ¶¶ 232-40.)  The allegations of improper diversion of corporate funds in the form of expenses, salaries and other sums, are sufficient to state a conversion claim.  See Goldberger v. Rudnicki, 94 A.D.3d 1047, 1047-48 (N.Y. App. Div. 2012) (allegations that defendant "intentionally, and without authority, assumed or exercised control over, inter alia, equipment, money, and accounts receivable belonging in part to the plaintiff" stated a claim for conversion); Lemle v. Lemle, 92 A.D.3d 494, 497 (N.Y. App. Div. 2012) (allegations of falsification of loan documents and using corporate funds for personal benefit and to pay excessive compensation sufficiently stated conversion claim).

The TAC also alleges, in relevant part, that the Individual Defendants committed conversion by duplicating Gemini's network and information and cutting Obeid off from his Gemini email and access to Gemini's network.  (See Pl. Br. 33; TAC ¶ 213.)  The conversion claim cannot, however, be maintained with respect to the alleged duplication of Gemini's network.  Fatal to this aspect of the claim is Obeid's allegation that Elevation "unlawfully copied and duplicated Gemini's entire network and created a parallel network that hosts Gemini's stolen

confidential information."  (TAC ¶ 422; see also id. ¶ 9.)  Although the TAC contains a

conclusory allegation the Individual Defendants and Elevation used Gemini's information "to

the exclusion of Gemini's rights," there is no plausible allegation that the original network did

not remain in the possession of, and accessible to, Gemini, or that the Individual Defendants or

Elevation interfered with Gemini's possession.  See Pure Power Boot Camp, Inc. v. Warrior

Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 536 (S.D.N.Y. 2011) (plaintiff did not state

conversion claim where it alleged defendant "possessed only a copy of the client list and did not,

in any way, limit or otherwise deprive Pure Power of possession or use of that list.")  To the

extent that Obeid is arguing that he personally had reduced access to the Gemini network due to

actions by the Individual Defendants, such alleged deprivation was not a result of any taking of

Gemini's network and does not give rise to a derivative conversion claim on behalf of Gemini.

Accordingly, Obeid's conversion claim against the Individual Defendants is dismissed to the

extent it is based on the copying of Gemini's network.

The TAC includes additional allegations in support of the conversion claim

against the Bridgeton Defendants, specifically that they "intentionally stole and converted

Gemini's hotel management contracts, employees and Gemini's confidential and proprietary

information to the exclusion of Gemini's rights."  (TAC ¶ 418.)  Even assuming that the

conversion of a contract is actionable, Obeid's claim of conversion as to the Bridgeton

Defendants must fail because the Bridgeton Defendants never assumed unauthorized rights of

ownership over property belonging to Gemini.  According to the TAC, they merely entered into

a sub-contract with Gemini to perform certain of Gemini's hotel management business, as

authorized by the majority owners of Gemini.  Likewise, as to the claim that the Bridgeton

Defendants converted Gemini's proprietary and confidential information, the TAC alleges that it was the Individual Defendants, exercising their rights as majority Member-Managers of Gemini, who directed the transfer of the data to Bridgeton.  Furthermore, as explained above, Obeid never alleges that the transfer resulted in the exclusion of Gemini from access to the information. Accordingly, the conversion claims against the Bridgeton Defendants are dismissed.

H.        CFAA Claim Against Individual Defendants (Count 13)

The CFAA imposes liability on a party who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."  18 U.S.C.S. § 1030(a)(2)(C) (LexisNexis 2011).  The term "exceeds authorized access" means to access a computer "without authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter[.]"  Id. § 1030(e)(6).  As a general matter, the CFAA applies to an "'outside' hacker who remotely enters a computer system without authority to do so."  JBCHoldings NY, LLC v. Pakter, 931 F. Supp. 2d 514, 521 (S.D.N.Y. 2013).  The Second Circuit recently held that the concept of unauthorized access or exceeding unauthorized access under the CFAA does not extend to situations when an employee who has been granted access to certain information in the first instance misuses that information for an improper purpose, such as by violating the terms of use or by breaching a duty of loyalty to the employer.  See U.S. v. Valle, 807 F.3d 508, 511 (2d Cir. 2015); see also JBCHoldings, 931 F. Supp. 2d at 522-23 (granting motion to dismiss on CFAA claim where employees used confidential employer information they were otherwise permitted to access to set up a competing enterprise).

Here, the Individual Defendants, who were controlling members of GREA and one of whom was the Operating Manager of GREA, clearly were authorized to access Gemini's network.  (TAC ¶¶ 183, 202.)  Obeid's contrary allegations that the Individual Defendants "intentionally accessed Gemini's protected computer systems, without valid corporate authorization and/or in excess of authorized access" (TAC ¶ 432) are conclusory and implausible in light of the express provisions of the Operating Agreement.  Thus, even if the Individual Defendants accessed Gemini's computer network for the benefit of their competing enterprise, the fact that the Individual Defendants were permitted to access the information in the first place precludes liability under the CFAA.  Accordingly, the CFAA claim against the Individual Defendants is dismissed.

I.          Unjust Enrichment Claim Against Individual and Bridgeton Defendants (Counts 14 and 15)

Unjust enrichment is a quasi-contractual remedy whereby "a court may infer the existence of an implied contract to prevent one person who has obtained a benefit from another . . . from unjustly enriching himself at the other party's expense."  Lightfoot v. Union Carbide Corp., 110 F.3d 898, 905 (2d Cir. 1997) (citation omitted).  An unjust enrichment claim under New York law requires a demonstration: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation marks and citation omitted).  "The requirements that a defendant be enriched at plaintiff's expense and that good conscience necessitate that defendant make restitution to plaintiff, clearly contemplate that a defendant and plaintiff must have some type of direct dealings or an actual, substantive relationship."  In re

Motel Sec. Litig., No. 93 CV 2183, 1997 U.S. Dist. LEXIS 3909, at *21 (S.D.N.Y. Apr. 2, 1993).   "An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."   Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, 790 (2d Cir. 2012).

The Individual Defendants argue that Obeid's unjust enrichment claim is duplicative of his other claims and that the TAC does not establish that the Individual Defendants benefitted at Gemini's expense.  Here, reading the TAC in the manner most favorable to Obeid, the Individual Defendants are alleged to have obtained the benefit of, inter alia, Gemini's funds, employees' labor, office space, confidential information and data platform, and corporate opportunities.  (See TAC ¶¶ 9-10, 200-22.)  The TAC alleges facts demonstrating plausibly that the Individual Defendants, who were also the principals of Gemini at the same time, diverted resources and opportunities to their competing companies at Gemini's expense. The parties' prior dealings here were substantial, and Plaintiff's factual allegations plausibly raise an inference of inequitable conduct of which Elevation was the beneficiary.  These allegations, taken together, suffice to state an unjust enrichment claim.  Obeid, moreover, is permitted to alternative theories of recovery, see Singer v. Xipto Inc., 852 F. Supp. 2d 416, 426 (S.D.N.Y. 2012), and based on the facts alleged and the disputes surrounding the extent of the Individual Defendants' contractual obligations and fiduciary duties, the unjust enrichment claim is not entirely duplicative of Obeid's other claims.

The Bridgeton Defendants also argue that Obeid's derivative unjust enrichment claim against them should be dismissed as conclusory.  However, the TAC alleges that the Bridgeton Defendants obtained, without consideration, Gemini's hospitality business and the

ability to purchase Gemini properties at below market prices, to the detriment of Gemini. Although the transfer of the hospitality business was technically authorized by the Individual Defendants and permitted under the Operating Agreement, the allegations concerning a kickback conspiracy between the Bridgeton Defendants and the Individual Defendants frame plausibly an issue of inequitable conduct.  The Court finds that Plaintiff has pleaded sufficient facts to raise the requisite inference of inequitable conduct.

Accordingly, the motion to dismiss the unjust enrichment claim is denied.

J.          Declaratory Judgment Claim Against Individual and Bridgeton Defendants (Count 20)

Obeid seeks a declaratory judgment that the two indemnification agreements entered into by Gemini in favor of Bridgeton and the Congress Group were ultra vires and are therefore null and void.  The Individual and Bridgeton Defendants have moved to dismiss.

Delaware law defines the ultra vires doctrine extremely narrowly, limiting its application to three circumstances outlined by statute, namely: in a proceeding by a stockholder against the corporation to enjoin transfer of property by or to the corporation; in a proceeding by corporation against an incumbent or former officer or director, for loss or damage due to such a person's unauthorized act; and in a proceeding by the Attorney General to dissolve the corporation.  8 Del. Ch. § 124.   As explained recently by the Delaware Chancery court, although the term ultra vires has been used imprecisely by courts, the crux of the doctrine really centers on acts that an entity is without the power to do, not on acts that are authorized but may have been performed in violation of a corporate charter, for which the remedy lies in contract.  See Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618, 650 (Del. Ch. 2013).

Neither the parties' submissions nor the Court's own research has identified case law applying the <u>ultra vires</u> doctrine outside of the corporation context.  But, even assuming that the doctrine has applicability in the LLC context, the complained of act in this count—that the Individual Defendants caused Gemini to enter into an indemnity agreement with Bridgeton and Congress Group—was clearly authorized by the GREA Operating Agreement.  (<u>See</u> TAC Ex. 1 § 5.1.1 (Individual Defendants as majority Member-Managers were authorized to "enter[] into, mak[e] and perform[] contracts, agreements and other undertakings binding [GREA.]").  Whatever grievances Obeid may have concerning the indemnification contracts, a declaration that such contracts were <u>ultra vires</u> is not an available remedy.  Accordingly, Obeid's declaratory judgment claim is dismissed.

K.        <u>Prime Facie Tort Claim Against Individual Defendants (Count 21)</u>

A cause of action for prima facie tort consists of four elements: (1) intentional infliction of harm (2) causing special damages (3) without excuse or justification (4) by an act or series of acts that would otherwise be unlawful.  <u>Curiano v. Suozzi</u>, 63 N.Y. 2d 113, 117 (N.Y. 1984).  Special damages "must be alleged with sufficient particularity to identify actual losses . . . [R]ound sums without any attempt at itemization are insufficient."  <u>See</u> <u>Bear, Stearns Funding, Inc. v. Interface Group-Nevada, Inc.</u>, 361 F. Supp. 2d 283, 306 (S.D.N.Y. 2005) (quoting <u>Curiano</u>, 63 N.Y.2d at 117).  It is well established that a plaintiff cannot recover unless a defendant's conduct "was not only harmful, but done with the <u>sole</u> intent to harm."  <u>Margrabe v. Sextor & Warmflash, P.C.</u>, 353 F. App'x 547, 549 (2d Cir. 2009) (citation omitted) (emphasis in original).  "[M]otives other than disinterested malevolence, such as profit, self-interest, or business advantage will defeat a prima facie tort claim."  <u>Id.</u> (internal quotation marks and

citations omitted).

The TAC does not plausibly allege that disinterested malevolence was the sole reason for the alleged harm directed at Obeid.  The TAC is replete with allegations that the Individual Defendants diverted resources and opportunities to their competing business ventures and that they did so out of self-interest and for profits.  (See, e.g., TAC ¶¶ 197, 208, 223, 232, 325, 327.)  Moreover, Obeid alleges only that he suffered "special and unique damages to his reputation . . . as well as his monetary damages arising from the disproportionate impact the destruction of Gemini's hospitality business has had on Obeid . . . in amount to be proven at trial, but not less than $100 million, plus punitive damages."  (TAC ¶¶ 482-83.)  Such a general allegation is not sufficient to state the requisite special damages element.  See Bear, Sterns, Funding, Inc., 361 F. Supp. 2d at 306 (dismissing prima facie tort claim for failure to adequately plead special damages where damages claim was "in an amount to be determined at trial, but no less than $1,500,000."); see also Phillips v. New York Daily News, 111 A.D.3d 420, 421 (N.Y. App. Div. 2013) (dismissing prima facie tort claim for failure to allege special damages where alleged damages were "an amount exceeding the monetary jurisdictional limits" and "moving expenses in excess of Fifteen Thousand Dollars.")   Accordingly, Obeid's prima facie tort claim is dismissed.


<u>CONCLUSION</u>

The Individual Defendants' motion to dismiss the TAC is granted in part and denied in part, as follows.  The Individual Defendants' motion is granted as to: the Lanham Act claims (Counts 4 and 6); the breach of contract claims (Counts 7 and 8); the conversion claim

insofar as it is based on duplication and use of Gemini's network (Count 10); the CFAA claim (Count 13); the declaratory judgment claim (Count 20); and the prima facie tort claim (Count 21). The Individual Defendants' motion to dismiss the TAC is denied in all other respects.

The Bridgeton Defendants' motion to dismiss the TAC is granted in part and denied in part, as follows. The Bridgeton Defendant's motion is granted as to: the Lanham Act claims (Counts 3 and 5); the unfair competition claim (Count 9); the conversion claim (Count 11); the breach of contract claim against Jariwala (Count 12); the tortious interference with hotel management contracts claims (Counts 18 and 19); and the declaratory judgment claim (Count 20). The Bridgeton Defendants' motion to dismiss the TAC is denied in all other respects.

This Memorandum and Order resolves docket entry numbers 329 and 332. The case remains referred to Magistrate Judge Pitman for general pre-trial management.


　　　　　　　　SO ORDERED.


Dated: New York, New York
　　　　September 30, 2016

　　　　　　　　　　　　　　　　　　　　　　　　  /s/ Laura Taylor Swain
　　　　　　　　　　　　　　　　　　　　　　　　LAURA TAYLOR SWAIN
　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge