UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

WILLIAM T. OBEID, directly and derivatively
 on behalf of GEMINI REAL ESTATE
ADVISORS LLC, et al.,

        Plaintiff,

    -v-                                  No.  14CV6498-LTS-MHD

CHRISTOPHER LA MACK, et al.,

        Defendants,

   and

GEMINI REAL ESTATE ADVISORS LLC, et al.,

        Nominal Defendants.

--------------------------------------------------------x


MEMORANDUM OPINION AND ORDER

        Plaintiff, William T. Obeid ("Obeid" or "Plaintiff") filed suit against Defendants

Christopher La Mack and Dante A. Massaro (together, "Individual Defendants"), along with

others, asserting various claims including breach of contract, breach of fiduciary duty, Lanham

Act violations, Computer Fraud and Abuse Act violations, and state law claims.  On February 2,

2016, Individual Defendants filed Amended Counterclaims (docket entry no. 336) against

Plaintiff, asserting eight counterclaims: (1) violation of the Computer Fraud and Abuse Act

("CFAA"), 18 U.S.C. § 1030, et seq.; (2) violation of the Stored Communications Act ("SCA"),

18 U.S.C. § 2701, et seq.; (3) violation of Federal Wiretap Act ("FWA"), 18 U.S.C. § 2511, et

seq.; (4) fraud; (5) breach of contract; (6) breach of the implied covenant of good faith and fair

dealing; (7) breach of fiduciary duty; and (8) unfair and deceptive trade practices, under N.C. GEN. STAT. § 75-1.1, et seq.  The Court has subject matter jurisdiction of this action pursuant to 18 U.S.C. §§ 1331 and 1367.

Plaintiff has moved to dismiss all of the counterclaims for lack of standing and failure to state a claim.

The Court has carefully reviewed the papers, and for the following reasons, the Plaintiff's motion to dismiss is granted in part and denied in part.

BACKGROUND

The following is a summary of the allegations contained in the Amended Counterclaims.  The Court assumes the Individual Defendants' factual allegations to be true for the purposes of this motion practice.

In April 2003, Obeid and the Individual Defendants formed Gemini Real Estate Advisors, LLC ("GREA") in order to acquire, own, operate, improve, manage and dispose of commercial real estate.  (Counterclaims ¶ 15.)  GREA is a closely held Delaware limited liability company.  (Id. ¶ 10.)  Obeid and the Individual Defendants entered into an initial Operating Agreement for the governance of GREA in 2004, which was subsequently amended in 2009 ("Amended Operating Agreement").  (Id. ¶¶ 16, 18.)  Pursuant to the Amended Operating Agreement, the Individual Defendants and Obeid each hold an one-third interest in GREA.  (Id. ¶ 19.)  In July 2012, Obeid and the Individual Defendants formed Gemini Equity Partners LLC ("GEP," and together with GREA, "Gemini"), and entered into the GEP Operating Agreement, which regulates GEP's governance.  (Id. ¶ 22.)  GEP is a closely held Delaware limited liability company.  (Id. ¶ 11.)  At all times, Obeid and the Individual Defendants each had a one-third

interest in GEP.  (Id. ¶ 24.)

The Amended Operating Agreement for GREA provides, in Section 4.2 (Actions Requiring Approval of Members), that:

4.2.1 Except as otherwise provided in this Agreement, the approval of a Majority in Interest of Members shall be required in order for any of the following actions to be taken on behalf of the Company:

. . .

4.2.1.3 Taking any action that would make it impossible to carry on the ordinary business of the Company.

. . .

4.2.1.9 The sale or other disposition of a Project.

4.2.1.10 The borrowing of funds, including a refinance of existing indebtedness, or the pledging of any assets of the Company, in excess of $250,000.

4.2.1.11 The pledging of any assets of the Company with a value in excess of $250,000.

(Am. Op. Agmt., Pencu Decl. Ex. B, Docket Entry No. 367-2, at 7-8.)

Section 5.16 of the Agreement (Operating Manager), provides, inter alia, that "[t]he Operating Manager shall have the power to act on behalf of the Company and to execute any and all documents, instruments and agreements, including, but not limited to, deeds, promissory notes, deeds of trust, financing documents and the like, provided the execution of such documents has been approved by the Managers."  (Id. at 16.)  Obeid served as Operating Manager of Gemini at certain relevant times.  (E.g., Counterclaims ¶¶ 5, 6.)

In the Amended Counterclaims, the Individual Defendants allege that Obeid is

engaged in ongoing misconduct in connection with his role as a manager of Gemini, including "blocking the sales of Gemini's assets; encumbering Gemini's assets with liens and encumbrances; unilaterally entering into letters of intent to sell Gemini properties without authorization; surreptitiously using Gemini employees to advance projects for an entirely separate company owned and controlled exclusively by Obeid; using Gemini employees to funnel inside information to Obeid regarding properties he sought to purchase from Gemini; and unauthorized spying on Individual Defendants and Gemini employees in order to gain an advantage in the instant litigation."  (Id. ¶ 2.)

Among the deals Obeid allegedly unilaterally caused Gemini to enter into in violation of the Amended Operating Agreement was the acquisition of a hotel in Miami, Florida (the "Miami Hotel Deal").  (Id. ¶ 33.)  Obeid, without seeking or obtaining approval from the Individual Defendants and knowing that it was a highly risky investment, caused Gemini to pay a non-refundable deposit of $250,000 towards the purchase of the hotel.  (Id.)  The Individual Defendants were unaware of the Miami Hotel Deal until approximately two weeks prior to the scheduled closing date, at which point Obeid "attempted to coerce the Individual Defendants into personally co-signing for a $1,000,000 line of credit from Bank of America in order to fund the additional required deposit."  (Id. ¶ 35.)  As a result, the Individual Defendants' only choice was to execute loan documents on behalf of Gemini and allow the Miami Hotel Deal to close, because otherwise Gemini would lose its deposit.  (Id. ¶ 36.)  Obeid misrepresented to the Individual Defendants that they would need invest a total of $500,000 to preserve the $250,000 deposit; in fact Obeid invested a total of $1,078,000 of Gemini's funds without the authorization or consent of the Individual Defendants.  (Id. ¶ 39.)  Bank loans for the Miami Hotel Deal are currently in default due to Obeid's alleged mismanagement of the project.  (Id. ¶ 40.)

The Individual Defendants also allege that, on numerous occasions, Obeid hired and fired employees of Gemini, including senior managers, without informing, consulting, or obtaining the approval of the Majority in Interest (i.e., the Individual Defendants).  (Id. ¶ 42.) Obeid hired people to work for Gemini without consulting the Individual Defendants, including employees who were not qualified for the jobs for which they were hired.  (Id. ¶¶ 43-45.)

On July 1, 2014, Obeid called a meeting of Gemini's member-managers for the purpose of demanding that the Individual Defendants provide him with a restructuring proposal to increase his ownership in Gemini.  (Id. ¶ 51.)  That same day, the Individual Defendants voted to remove Obeid as the Operating Manager of GREA pursuant to the Amended Operating Agreement, allegedly in order to protect GREA and stop Obeid from acting unilaterally and without regard to Individual Defendants' and GREA's rights.  (Id. ¶ 53.)  Obeid filed this lawsuit on August 14, 2014.

Almost immediately after Obeid was terminated as Gemini's Operating Manager, he formed a company, Arcade Capital LLC ("Arcade"), that soon competed with Gemini.  (Id. ¶ 55.)  Obeid used Arcade to further projects that benefitted only Obeid and harmed the Individual Defendants and Gemini, including attempting to coerce the sale of properties from Gemini to Arcade at below-market prices, causing Gemini employees to work on Arcade projects while employed and paid by Gemini, and contacting investors and lenders to sabotage deals the Individual Defendants sought to pursue.  (Id. ¶ 57.)  The Individual Defendants also allege that Obeid continued to interfere with Gemini's business, including filing frivolous motions and using litigation hold letters in the instant lawsuit to jeopardize specific prospective transactions (see id. ¶¶ 58-67), and refusing to sign a loan modification agreement "solely for the purpose of interfering with Gemini's business" (id. ¶¶ 68-71).

More specifically, the Individual Defendants allege that Obeid, through Arcade, "in an attempt to preempt the [public] marketing process [for certain Gemini hotel properties] and cause it to terminate prematurely, made offers to purchase the Best Western Seaport Hotel for $36 million and the Bryant Park Development Site for $24.0 million" and thereafter approached the investors in those properties "in an effort to persuade them to put pressure on Gemini to accept his offers, rather than proceed to the final call for offers."  (Id. ¶¶ 87-88.) Gemini subsequently received higher offers from other parties on the Best Western Seaport Hotel, and accepted the highest offer in the amount of $38 million, and accepted the highest offer of $25.5 million for the Bryant Park Development Site.  (Id. ¶¶ 92, 96.)  In April 2015, GREA made an agreement to sell the Greenwich Village Hotel, and began to market the sale of the Wyndham Flatiron Hotel (together with the Best Western Seaport Hotel, Bryant Park Development Site, and Greenwich Village Hotel, the "Hotel Properties").  (Id. ¶¶ 104, 107.)  The Individual Defendants allege that Obeid, in connection with a separate lawsuit he brought in the Supreme Court for New York County, filed unjustified Notices of Pendency to disrupt the marketing and/or sale of the Hotel Properties.  (See id. ¶¶ 108-14.)  As a result of the filing of the Notices of Pendency, the market for the Hotel Properties was chilled and the deals Gemini planned to enter into collapsed.  (Id. ¶ 114.)

On or about June 28, 2015, Obeid executed a Letter of Interest ("LOI") under which Marcolink Holding Co. Ltd. ("Macrolink") would purchase the Wyndam Flatiron Hotel from Gemini.  (Id. ¶ 121.)  The Individual Defendants allege that Obeid's unilateral action in executing the LOI violated Section 4.2.1.9 of the Amended Operating Agreement, which required majority approval for any sale of Gemini property.  (Id. ¶ 123.)  According to the Individual Defendants, Marcolink's offer was not bona fide, and Obeid entered into the LOI in

an effort to further interfere with Gemini's marketing effort of its hotel assets.  (Id. ¶ 122.)  On or about June 24, 2015, unbeknownst to the Individual Defendants, Obeid executed three Non-Circumvent Non-Disclosure and Fee Agreements (the "Commission Agreements") purportedly on behalf of Gemini, under which Gemini would be obligated to pay to SRM Management, LLC ("SRM") a commission of 1% of the sale price for the Greenwich Village Hotel, the Wyndham Flatiron Hotel, and the Holiday Inn Express Boston.  (Id. ¶ 125.)  The Commission Agreements purport to obligate Gemini to pay millions of dollars in commissions to SRM.  (Id.)

The Individual Defendants also allege that Obeid unlawfully spied on the Individual Defendants and other Gemini employees through the use of sophisticated spy software designed to track keystrokes and take real-time video snapshots of computer desktops like a surveillance camera.  (Id. ¶ 127.)  Obeid allegedly engaged in this conduct for the purpose of advancing his interests in the instant litigation and obtaining inside information about the Hotel Properties.  (Id.)

The email accounts of each of Gemini's three member-managers and employees are maintained on a server hosted by third-party information technology provider Madison Technology ("Madison").  (Id. ¶ 128.)  Gemini maintains a strong set of security measures to protect against unauthorized access to Gemini's documents and individual member-managers' emails, including a password-encrypted server, password-encrypted email accounts with a separate password for each employee, and locked file cabinets with keys provided on a "need-to-know" basis.  (Id. ¶ 129.)  The Individual Defendants and other targeted Gemini employees did not consent to allowing Obeid to access their emails.  (Id. ¶ 130.)  In or about June 2014, Obeid contacted Madison to install spy software allowing Obeid access to all information passing through the server, including the contents of the Individual Defendants' password-protected

emails and email accounts of other targeted Gemini employees.  (<u>Id.</u> ¶ 131.)  Obeid instructed

Madison to remove the software on or about August 25, 2014.  (<u>Id.</u> ¶ 134.)

On or about August 27, 2014, the Individual Defendants instructed Madison that

any future changes to Gemini's servers would require approval by Massaro, as the new

Operating Manager of Gemini.  (<u>Id.</u>)  Moreover, after discovering that the spy software had been

installed on their machines, the Individual Defendants told Madison that no one was authorized

to spy on any Gemini member or employee and that all such software must be removed.  (<u>Id.</u>)

Despite the removal of the spy software and Massaro's explicit instruction to Madison, Obeid

made multiple visits to Madison's New York offices, including in December 2014, where he

downloaded materials from Gemini's document and email server onto his personal laptop

computer.  (<u>Id.</u> ¶ 109.)  Obeid made two multi-hour visits to Madison's offices where he

obtained unrestricted access to the email accounts of the Individual Defendants and other

targeted Gemini employees.  (<u>Id.</u> ¶ 135.)  During these visits, Obeid downloaded information,

including privileged and confidential email correspondence between Individual Defendants and

their counsel, and privileged and confidential email correspondence related to the representation

of Gemini in this lawsuit.  (<u>Id.</u> ¶ 137.)

Obeid allegedly used the information he obtained to disrupt settlement

negotiations and to "obtain inside information regarding the Hotel Properties" in order to

assemble his bids for those properties, which in turn "upset the carefully constructed sealed-bid

process Gemini used to ensure it received the highest possible bids for the Hotel Properties."

(<u>Id.</u> ¶ 140.)  Obeid also allegedly threatened to disseminate the information he obtained, unless

the Individual Defendants consented to Obeid's litigation demands.  (<u>Id.</u> ¶ 141.)  The Individual

Defendants incurred "increased litigation costs and losses associated with Obeid's prevention of

the sales of the Hotel Properties" and "costs to re-secure Gemini's servers and otherwise repair the damage Obeid caused to the integrity and availability of their documents and information and Gemini's data, computer programs, systems and information."  (Id. ¶ 169.)  Within less than one year's time, the Individual Defendants have incurred substantial damages in excess of $5,000.00.  (Id. ¶ 170.)

The Individual Defendants also allege that Obeid "formed a faction of insiders within Gemini . . . that leaked information to him in order to facilitate Arcade's attempts to purchase the Hotel Properties from Gemini at below-market prices and flip those properties to investors" and also used those employees to assist him and Arcade with deals in which Gemini had no involvement, with Gemini paying for the employees' work.  (Id. ¶ 145; see id. ¶¶ 146-159.)  The Individual Defendants allege that the inside information included detailed analyses of proprietary Gemini data that were provided to assist Arcade with purchasing the Hotel Properties at the best value to it and that, as a result, Obeid and Arcade did not compete fairly in attempting to purchase the Hotel Properties.  (Id. ¶ 150.)

DISCUSSION

When resolving a motion to dismiss, the Court "must construe the Complaint liberally, accepting all factual allegations in the Complaint as true, drawing all reasonable inferences in the [non-movant's] favor."  Galiano v. Fid. Nat'l Titles Ins. Co., 684 F.3d 309, 311 (2d Cir. 2012).  To survive a motion to dismiss, a plaintiff must provide notice of the grounds upon which the claims rest, through factual allegations sufficient to raise a right to relief above the speculative level.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

1.          Standing to Assert Claims

Obeid asserts that all of the Individual Defendants' counterclaims should be dismissed for lack of standing, arguing that any harm arising from the alleged wrongdoing was necessarily suffered by Gemini only, rather than by Gemini's members as individuals. According to Obeid, the claims asserted by the Individual Defendants are derivative ones belonging to Gemini, which has independent counsel and has not asserted them.

Standing refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance, and the question of derivative standing is a threshold issue that the Court must decide. See El Paso Pipeline GP Co., LLC v. Brinckerhoff, No. 103, 2016 WL 7380418, at *6 (Del. 2016). The Court looks to the law of Delaware, the state law under which Gemini was created, in determining the question of standing. See In re BP p.l.c. Derivative Litig., 507 F. Supp. 2d 302, 307 (S.D.N.Y. 2007).

In Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031 (2004), the Delaware Supreme Court laid out the analytical method to be applied in determining whether a shareholder's claim is derivative or direct, holding that "[the] issue must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Id. at 1032. The Tooley Court further explained:

> That is, a court should look to the nature of the wrong and to whom the relief should go.  The stockholder's claimed direct injury must be independent of any alleged injury to the corporation.  The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.

Id. at 1039.  These principles are equally applicable to the distinction between direct and derivative claims of members of an LLC.  Kelly v. Blum, No. 4516-VCP, 2010 WL 629850, at *9 (Del. Ch. 2010).  The inquiry may be particularly nuanced with respect to claims involving the rights and duties of members of an LLC, whose underlying agreement defines the nature, powers and duties of the entity as well as the parties' rights and duties to the entity and inter se. The Court must examine whether suing members are seeking to enforce their own direct rights under the foundational agreement, in which case there is no question as to standing, or duties owed to the LLC, in which case there is a question as to whether a claim to enforce the entity's rights must be asserted derivatively or is "dual" in nature and can proceed directly.  See Brinckerhoff, 2016 WL 7380418, at *9-*11.

a.      Claims Based on GREA Operating Agreement (Counts 5 and 7)

In Count 5 of the Counterclaims, the Individual Defendants allege that Obeid violated the provisions of the Amended Operating Agreement that require majority member approval for the execution of documents and certain borrowing and property transactions.  They claim that, by failing to inform them of certain actions and in taking certain actions unilaterally, Obeid deprived them of contractual governance authority and usurped control of Gemini. (Counterclaims ¶¶ 209-15.)

The denial of members' rights to participate in management and to vote on entity affairs is an injury that is separate and distinct from that suffered by an entity, and thus can

support a direct claim.  See In re Tyson Foods, 919 A.2d 563, 601 (Del. Ch. 2007) ("[w]here a

shareholder has been denied one of the most critical rights he or she possesses - the right to a

fully informed vote - the harm suffered is always individual, not corporate, harm"); see also La

Mack v. Obeid, 2015 NCBC 21, 28-29 (N.C. Super. Ct. 2015) (denying Obeid's motion to

dismiss related action on standing grounds under Delaware law on the basis that denial of fully

informed vote is an individual harm).  Thus, the Individual Defendants' claims that Plaintiff

acted in contravention of the voting and participation provisions of the operating agreement are

properly brought as direct claims.  To the extent, however, that the Individual Defendants assert

claims for injury to Gemini occasioned by allegedly "ultra vires" actions,[1] the wrong alleged is a

wrong to Gemini, the remedy would necessarily flow to the entity rather than its individual

members, and the Individual Defendants lack standing to pursue those claims.

        Count 7, asserting a claim for breach of the implied covenant of good faith and

fair dealing under Delaware law, combines allegations of breaches of duties running among

members inter se with a claim that the breach "deprived the Individual Defendants of the benefit

of the Amended Operating Agreement by causing expense to Gemini in the form of lost

productivity and chilling the market for the Hotel Properties."  (Counterclaims ¶ 238 (emphasis

added.)  Insofar as the Individual Defendants seek a remedy measured by losses to Gemini, their

claim is one for diminution of the value of their interests in the entity and cannot be asserted

directly.  See Brinckerhoff, 2016 WL 7380418, at *10 ("to prove that a claim is direct, a plaintiff

'must demonstrate that the duty breached was owed to the stockholder and that he or she can

prevail without showing an injury to the corporation.'" (footnote and citation omitted)).

---

[1]    See Counterclaims ¶ 221 ("Obeid's breaches have cause substantial harm to . . . Gemini .
. ..").

b.      Claim for Breach of Fiduciary Duty (Count 6)

The Individual Defendants' claim of breach of fiduciary duty is also principally

derivative in nature.  The Individual Defendants assert that Obeid breached a fiduciary duty to

act in the Individual Defendants' best interests in managing Gemini.  With one exception,

however, the Individual Defendants' allegations relate entirely to Obeid's mismanagement of

Gemini, including self-dealing, diverting resources, and interfering with sales of Gemini

property to Gemini's detriment, all of which are harms that flow to Gemini.  See Saltz v. First

Frontier, LP, 782 F. Supp. 2d 61, 78-79 (S.D.N.Y. 2010) (finding that, under Delaware law,

claim for breach of fiduciary duty based on mismanagement is derivative because it represents a

direct wrong to the corporation).

The Individual Defendants also, allege, however, that Obeid's breach caused

expenditures of the Individual Defendants' funds (Counterclaims ¶ 227), and they seek

prospective injunctive relief "relating to Obeid's ongoing ultra vires conduct" (id. ¶ 230).  To the

extent they seek a remedy for harm suffered directly, and injunctive relief to protect personal

rights of control over the LLC's affairs, they have standing to pursue direct claims.

c.      Computer Fraud, Stored Communications Act and Wiretapping Claims
        (Counts 1-3)

In these Counts, the Individual Defendants allege that Obeid surreptitiously

accessed and used information belonging to them, as well as information belonging to Gemini.

To the extent they claim invasion and misuse of their own information, they assert direct claims

and thus have standing.  To the extent they seek to remediate harm allegedly done to Gemini

through the misuse of such information, the claim is derivative and cannot be asserted on a direct basis by the Individual Defendants.

### d.   Fraud Claim (Count 4)

The Individual Defendants have asserted a direct claim to the extent they allege that Obeid owed them a duty to disclose to them his improper acquisition and use of information and business dealings that undermined their rights to participate in control of Gemini.  Their claim is, however, derivative to the extent they complain that Gemini was defrauded or injured.

### e.   Unfair and Deceptive Trade Practices Claim (Count 8)

To the limited extent that Individual Defendants complain here of invasion of their personal rights in information and the necessitation of personal expenditures by reason of Obeid's allegedly unfair and deceptive trade practices, they have asserted a direct claim.  Their claims is in all other respects based on allegations of harm suffered by Gemini and is thus derivative.

Obeid's motion is therefore denied to the extent it seeks to dismiss the Counterclaims in their entirety for lack of standing.  The Individual Defendants have standing to pursue the direct claims identified above.

### 2.   Merits of Asserted Claims

### a.   Computer Fraud and Abuse Act Claim (Count One)

The CFAA imposes liability on a party who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from

any protected computer."  18 U.S.C.S. § 1030(a)(2)(C) (LexisNexis 2011).  The term "exceeds authorized access" means to access a computer "without authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter[.]"  18 U.S.C.S. § 1030(e)(6) (LexisNexis 2011).

Obeid, citing the provision of the Amended Operating Agreement that gives members of GREA the right to inspect its books and records, and a document purporting to be the company's Employee Handbook[2] that provides that the company may monitor email and stored information, argues that the Individual Defendants have failed to plead plausibly that Obeid exceeded his authorized access to the information on Gemini's computers and servers.  In this connection, Obeid relies on the Second Circuit's holding that an employee who has been granted access to certain information in the first instance, but misuses that information for an improper purpose, such as by violating the terms of use or by breaching a duty of loyalty to the employer, does not "exceed authorized access" within the meaning of the CFAA.  See U.S. v. Valle, 807 F.3d 508, 511 (2d Cir. 2015) ("individual does not 'exceed authorized access' to a computer when, with an improper purpose, he accesses a computer to obtain or alter information that he is otherwise authorized to access"); see also JBCHoldings NY, LLC v. Parker, 931 F. Supp. 2d 514, 522-23 (S.D.N.Y. 2013) (granting motion to dismiss where employee used confidential employer information he was otherwise permitted to access to set up a competing enterprise).  Rather, authorized access is exceeded "only when [the employee] obtains or alters information that he does not have authorization to access for any purpose which is located on a

---

[2]     The purported Employee Handbook, which is not referred to in the Counterclaims, is beyond the scope of documents properly considered in connection with this motion practice.

computer that he is otherwise authorized to access." Valle, 807 F.3d at 511.

The Counterclaims here sufficiently allege facts supporting the inference that Obeid accessed information belonging to the Individual Defendants that he did not have authorization to access for any purpose. The Individual Defendants allege that Obeid used spyware to gain access to the information. None of the documents that are integral to the Amended Counterclaims affirmatively grants him access to Individual Defendants' password protected emails and/or real-time computer snapshots through the methods he allegedly used. Indeed, the very allegation that Obeid needed to install spyware in order to gain access to the Individual Defendants' emails and computers belies the notion that he was authorized to access all of the information on them. Cf. Penrose Computer Marketgroup, Inc. v. Camin, 682 F. Supp. 2d 202, 210 (N.D.N.Y. 2010) (in context of an SCA claim, finding that full access to a company's computer system does not equal authorization to access another employee's email account).

Obeid also argues that the Individual Defendants have not alleged any compensable injury within the scope of the CFAA statute. The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damages assessment, and restoring the data, program, system, or information . . . . and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]" Id. (citing 18 U.S.C. § 1030(e)(11)). Any recoverable damage or loss under the CFAA must be directly caused by computer impairment or damage. Nexans Wires S.A. v. Sark-USA, Inc., 166 F. App'x 559, 562-63 (2d Cir. 2006). Here, the Individual Defendants have alleged that they have "incurred costs to re-secure Gemini's servers and otherwise repair the damage Obeid caused" and that "within less than one year's time, the Individual Defendants

have incurred substantial damages in excess of $5,000.00."  (Counterclaims ¶¶ 167, 171.)

Because such costs were allegedly borne by the Individual Defendants and were associated with

responding to the unauthorized access to the computers, the Counterclaims have pleaded

damages sufficient to withstand a motion to dismiss.  See Penrose, 682 F. Supp. 2d at 208

(upholding CFAA claim that alleged damages in form of "costs of investigation [Defendant's]

actions and assessing the damage they caused").  Accordingly, Obeid's motion to dismiss the

CFAA claim is denied.

### b.    Stored Communications Act Claim (Count 2)

The SCA creates a civil cause of action for damages against "whoever—(1)

intentionally accesses without authorization a facility through which an electronic

communication service is provided; or (2) intentionally exceeds authorization to access that

facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic

communication while it is in electronic storage in such system . . . ."  See 18 U.S.C.S. §§

2701(a), 2707 (LexisNexis 2008).  "Electronic communication service" is defined as "any

service which provides to users thereof the ability to send or receive wire or electronic

communications."  18 U.S.C. § 2510(15) (LexisNexis 2008).   "Electronic storage" is defined as

"any temporary, intermediate storage of a wire or electronic communication incidental to the

electronic transmission thereof; and [] any storage of such communication by an electronic

communication service for purposes of backup protection of such communication."  18 U.S.C. §

2510(17)(A), (B); see In re DoubleClick Inc. Privacy Litig., 154 F. Supp. 2d 497, 512 (S.D.N.Y.

2001) (communications in "electronic storage" are those temporarily stored by electronic

communication services incident to their transmission, "for example, when an e-mail service stores a message until the addressee downloads it.").

Plaintiff contends that the "electronic storage" covered by the statute is narrowly limited to email messages that are stored "temporarily" by "third party internet service provider" such as Google or Hotmail, and does not encompass information stored on permanent storage servers like the one maintained by Gemini, and that it is implausible that Gemini's computers and email server are "a facility through which an electronic communication service is provided." (Pl. Br. at 13.)

The Amended Counterclaims allege that "the email accounts of each of Gemini's three member-managers and each of Gemini's employees were maintained on a server hosted by third-party information provider Madison Technology" and that "Obeid caused Madison to install spy software on Gemini's server," which then permitted Obeid, among other things, to access Individual Defendants' emails and take screenshots of their computers. (Counterclaims ¶¶ 28, 163.)  The Individual Defendants have pleaded that the email server hosted by Madison Technology is "a facility through which an electronic communication service is provided" and that Madison Technology functions to provide third party internet and/or email service as an electronic communication service provider.  These allegations are sufficient because the weight of authority regarding this aspect of the SCA holds that emails stored on an electronic communication service provider's systems after it has been delivered, as opposed to e-mails stored on a personal computer, are stored communications subject to the SCA.  See Pure Power Boot Camp v. Warrior Fitness Boot Camp, 587 F. Supp. 2d 548, 555 (S.D.N.Y. 2008). Here, the Individual Defendants do not allege that Plaintiff accessed documents or emails saved on to their personal computers, but instead allege that he accessed them through their email

accounts hosted on servers by Madison Technology.  See id. at 555-56 (obtaining emails while they are in storage on service providers' systems rather than a company computer's memory triggers applicability of SCA); see, e.g., Gen. Bd. of Global Ministries of the United Methodist Church v. Cablevision Lightpath, Inc., No. 06 CV 3669, 2006 WL 3479332, at *3-4 (E.D.N.Y. Nov. 30, 2006) (provision of email accounts by company through a computerized facility constitutes electronic communications service).  Accordingly, the Individual Defendants have plausibly pleaded a claim under the SCA, and Plaintiff's motion to dismiss on this ground is denied.

Obeid also moves to dismiss the Individual Defendants' SCA claim on the basis that he was authorized to view all of the information hosted on Gemini's servers and contained in Gemini's corporate email accounts.  For the reasons outlined above in connection with the CFAA counterclaim, this argument is unavailing.  Accordingly, Obeid's motion to dismiss the SCA claim is denied.

### c.  Federal Wiretap Act Claim (Count 3)

The FWA provides a private right of action against "any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept wire, oral, or electronic communication[.]"  18 U.S.C.S. § 2511 (LexisNexis 2008).  "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C.S. § 2510(4) (LexisNexis 2008).

Obeid argues that no claim can be stated under the FWA unless the interception occurred simultaneously with transmission, and that the Counterclaims must be dismissed for

failure to allege simultaneous transmission.  The Second Circuit has not squarely addressed the issue of whether simultaneous transmission is required.  See Conte v. Newsday, Inc., 703 F. Supp. 2d 126, 139, n.11 (E.D.N.Y. 2010).  Assuming for purposes of this motion practice that simultaneous transmission is required, the Counterclaims are nonetheless sufficient because they allege that Obeid used sophisticated spy software "designed to track keystrokes and take real-time video snapshots of computer desktops like a surveillance camera," and that Obeid used the spy software "to access the Individual Defendants' password-protected email accounts, track their computer usage, take real-time video snapshots of their computer screens, track their keystrokes and access confidential documents processed through Gemini's document scanners." (Counterclaim ¶¶ 127, 188.)  Drawing inferences in favor of the Individual Defendants, the Counterclaims have alleged that the spyware software installed by Obeid functions like a surveillance camera,  capturing information while it is being processed, viewed, or sent, which is sufficient to support the inference that interception was simultaneous with the transmission of the information contained on Individual Defendants' computers.  See, e.g., Shefts v. Petrakis, No. 10-CV-1104, 2012 U.S. Dist. LEXIS 130542, at *41-42 (C.D. Ill. Sept. 13, 2012) (holding that spyware that contemporaneously transmitted "screen shots" of computer activity to remote location constitutes interception); cf. Zaratzian v. Abadir, No. 10 CV 9049, 2014 WL 4467919, at *7 (S.D.N.Y. Sep. 2, 2014) (auto-forwarding email messages from defendant's account satisfies any "contemporaneous" requirement under FWA).[3]  Accordingly, Obeid's motion to dismiss the FWA claim is denied.

---

[3]     Plaintiff also argues that the Individual Defendants merely allege damages in a conclusory manner with respect to the FWA claim.  The FWA, however, permits the Court to assess statutory damages in the absence of actual damages.  See 18 U.S.C. § 2520(c).

     d.     <u>Common Law Fraud Claim (Count 4)</u>

        To state a claim for fraud under New York law, a plaintiff must allege (1) a

material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3)

which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably

relied; and (5) which caused injury to the plaintiff.  <u>Fin. Gaur. Ins. Co. v. Putnam Advisory Co.,</u>

<u>LLC</u>, 783 F. 3d 395, 402 (2d Cir. 2015) (citation omitted).  With respect to causation, a plaintiff

must allege both that "defendant's misrepresentation induced plaintiff to engage in the

transaction in question (transaction causation) and that the misrepresentation directly caused the

loss about which plaintiff complains (loss causation)."  <u>Id.</u> (citation omitted).  To satisfy the

heightened pleading requirements of Federal Rule of Civil Procedure 9(b), a complaint must

allege "with some specificity the acts constituting fraud . . . . [C]onclusory allegations that

defendant's conduct was fraudulent or deceptive are not enough."  <u>Odyssey Re (London) Ltd. v.</u>

<u>Stirling Cooke Brown Holdings Ltd.</u>, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000) (citations

omitted).

        Here, the Individual Defendants allege that Obeid concealed the fact that he had

installed spyware on their computers, that the Individual Defendants "justifiably relied upon

Plaintiff's misrepresentations and omissions in that they continued using their computers and

emails without knowledge that Obeid was illegally monitoring the same" (<u>id.</u> ¶ 202); and that

they suffered injury comprising "loss of control over the privacy of their personal and business

affairs, the interception of privileged communications with counsel, and costs associated with re-

securing Gemini's servers and otherwise repairing the damage Obeid caused to the integrity and

availability of their documents and information and Gemini's data, computer programs, systems,

and information" (<u>id.</u> ¶ 203).  The Individual Defendants further allege that Obeid "fraudulently

concealed his unilateral and unauthorized entry into agreements to sell Gemini properties" and

that he had a duty "to inform the Individual Defendants of transactions involving the disposition

of Gemini properties and obtain their consent prior to entering into agreements for the sale of

such properties."  (Id. ¶¶ 204-205.)

Obeid contends that the fraud counterclaim should be dismissed because he did

not have a duty to disclose that he was "accessing [Individual Defendants'] company

communications" as he was authorized to do so, and that the Individual Defendants failed to

allege with particularity how they relied on the purported concealment and how such reliance

caused them any damages.  As explained above, however, even if Obeid had general access to

Gemini's computer systems, he was not necessarily authorized to access the Individual

Defendants' computers in the manner that he did—using spyware.  With respect to causation, the

Individual Defendants have alleged that, after the spyware was installed secretly, the Individual

Defendants continued to access and use their computers, which they would not have done had

Obeid informed them of the spyware.  Further, the Individual Defendants have alleged that they

suffered exposure of their confidential information and damages in excess of $5,000.00 as a

result.  Accordingly, this aspect of Obeid's motion to dismiss the fraud counterclaim is denied.

The Individual Defendants also claim Obeid fraudulently concealed his entry into

agreements to sell Gemini properties, which allegedly harmed Individual Defendants by

exposing Gemini to transaction costs with respect to those agreements, harming Gemini and the

Individual Defendant's reputations, and diminution of value with respect to Gemini properties.

(Counterclaims ¶ 206.)  Plaintiff argues that there has been no financial injury resulting from any

agreements that he has allegedly entered into because the agreements are either not identified or

did not close.  While the Court finds that the Individual Defendants have plausibly identified

specific agreements that Plaintiff allegedly entered into unilaterally, those allegations amount to

a reiteration of Individual Defendants' breach of contract claim (discussed below) that Plaintiff

failed to obtain the proper approvals under the Amended Operating Agreement.  (See Def. Opp.

at 17.)  The Individual Defendants have not alleged additional "fraudulent" conduct directed at

them above and beyond what they have alleged with respect to their breach of contract claims.

See Ellington Credit Fund, Ltd. v. Select Portfolio Services Inc., 37 F. Supp. 2d 162, 197

(S.D.N.Y. 2011) (a cause of action sounding in fraud cannot be maintained when the only fraud

charges relate to a breach of contract).  Accordingly, Obeid's motion to dismiss the fraud claim

is denied in part and granted insofar as the Counterclaims complain of fraudulent concealment of

unilateral business activity.


    e.  Breach of Contract Claim (Count 5)

    Under Delaware law,[4] a viable breach of contract claim requires "(1) the existence

of a contract, (2) the breach of an obligation imposed by that contract, and (3) resulting damages

to the claimant."  Kickflip, Inc. v. Facebook, Inc., No. 12-1368-LPS, 2015 U.S. Dist. LEXIS

41049, at *14-15 (D. Del. Mar. 31, 2015) (citation omitted).

    The Individual Defendants allege that Obeid unilaterally caused Gemini to enter

into a business deal for the acquisition of a hotel in Miami, requiring a non-refundable deposit of

$250,000, and that Obeid ultimately invested a total of $1,078,000 Gemini funds in the deal.

(Counterclaims ¶¶ 31, 37.)  In so doing, the Individual Defendants claim, Obeid acted in breach

---

[4]  The Amended Operating Agreement provides that the right and obligations of Members under the agreement "shall be interpreted, construed and enforced in accordance with the laws of the State of Delaware."  (Am. Op. Agmt. at 36.)

of Section 4.2.1.10 of the Amended Operating Agreement and deprived the Individual

Defendants of their contractual right to a majority vote.

Section 4.2.1.10 of the Amended Operating Agreement prohibited Obeid from

"pledging" any GREA funds "in excess of $250,000."  (Am. Op. Agmt. at 8.)  Obeid argues that

this claim should be dismissed because he acted within the authority granted by the Amended

Operating Agreement, and the Individual Defendants otherwise ratified his actions.  Given the

fact that the Miami Hotel Deal ultimately required funds in excess of $250,000, the Court cannot

find as a matter of law that Section 4.2.1.10 authorized Obeid to unilaterally commit the initial

$250,000 without obtaining the approval of the majority in interest.  At the motion to dismiss

stage, the Court also cannot find that the subsequent alleged "ratification" by the Individual

Defendants in the form of agreeing to close the Miami Hotel Deal or committing additional

funds towards the deal would preclude a breach of contract claim against Obeid for pledging the

initial deposit.  At a minimum, there are factual issues with respect to the circumstances

surrounding the apparent ratification and whether the Individual Defendants were coerced into

closing the deal due to the potential loss of a non-refundable deposit.  (See Counterclaims ¶¶ 35-

36.)

The Individual Defendants also allege that Obeid breached the Amended

Operating Agreement when he unilaterally entered into an LOI with Macrolink to sell the

Wyndham Flatiron Hotel without obtaining majority approval, and executed the Commission

Agreements without obtaining majority approval.  (Counterclaims ¶ 215.)  Obeid asserts that the

LOI did not bind Gemini to any sales and that the Commission Agreements "obligated Gemini to

pay a commission only in the event it consummated a sale"—in other words, he argues that

neither the LOI nor the Commission Agreements constituted a pledge of any Gemini assets

within the meaning of Section 4.2.1.10.  (Pl. Br. at 20.)  This argument, which calls for factual determinations concerning the circumstances underlying the agreements at issue and potential parol evidence pertaining to the Amended Operating Agreement itself, is improper for adjudication on a motion to dismiss.[5]

The Individual Defendants also allege that Obeid breached the Amended Operating Agreement by unilaterally hiring and firing employees of Gemini and leaking information outside of Gemini.  With respect to this aspect of the claim, however, the Amended Counterclaims identify no specific contractual provision breached by this conduct.  In the Individual Defendants' opposition brief, they point to Section 4.2.1.3, which provides that the approval of a majority in interest of Members is required for "any action that would make it impossible to carry on the ordinary business of the Company."  (Def. Br. at 20.)  The Amended Counterclaims, however, are devoid of any allegations to support plausibly the conclusion that Obeid's alleged actions with respect to employees made it "impossible to carry on the ordinary business of the Company."  Nor do they identify any direct harm allegedly suffered by the Individual Defendants, as opposed to the Company.  Accordingly, this aspect of the Individual Defendants' breach of contract claim is dismissed.

As to damages, the Individual Defendants, as parties to the Amended Operating Agreement, have adequately pleaded that they have been harmed directly in that they are

---

[5]        The Court notes that the Individual Defendants also point to Section 5.16 of the Amended Operating Agreement, which provides that "the Operating Manager shall have the power to act on behalf of the Company and to execute any and all documents . . . . provided the execution of such documents has been approved by the Managers," alleging that Obeid executed documents in violation of their management rights, and the Amended Counterclaims also identifies Section 4.2.1.9 (requiring majority approval for "the sale or disposition of a Project") as a provision breached by Obeid's actions.

suffering ongoing deprivation of their management and participation rights based on Obeid's actions in breach of the agreement.  (Counterclaims ¶ 221.)

Accordingly, Obeid's motion to dismiss the breach of contract claim is granted in part and denied in part.

6.    Breach of Fiduciary Duty Claim (Count 6)

A claim for breach of fiduciary requires identification of a relevant fiduciary duty and allegations demonstrating that a fiduciary breached that duty.  Hardy v. Hardy, No. 7531-VCP, 2014 Del. Ch. LEXIS 135, *35 (Del. Ch. Jul. 29, 2014) (citation omitted); see also Kelly, 2010 WL 629850, at *1 ("though contracting parties to an LLC agreement have the freedom to expand, restrict, or eliminate fiduciary duties owed by managers to the LLC and its members and by members to each other, in the absence of a provision explicitly altering such duties, an LLC's managers and controlling members in a manager-managed LLC owe the traditional fiduciary duties that directors and controlling shareholders in a corporation would.").

Obeid does not dispute that he owed a fiduciary duty to the Individual Defendants to act with respect to LLC-related affairs in a manner consistent with their interests, but rather argues there was no breach of any such duty because the Individual Defendants ratified the Miami Hotel Deal and Obeid's use of monitoring software.  As discussed above, there are factual issues surrounding the question of ratification of the Miami Hotel Deal, and the Individual Defendants allege that Obeid was not authorized to install spyware.  Accordingly, Obeid's motion to dismiss the fiduciary duty claim is denied.

7.      Breach of the Implied Covenant of Good Faith and Fair Dealing Claim
        (Count 7)

Obeid moves to dismiss the counterclaim for breach of the implied covenant of

good faith and fair dealing as duplicative of the breach of contract claim because the alleged

misconduct is expressly prohibited by the Amended Operating Agreement.  Under Delaware

law, the implied covenant of good faith and fair dealing inheres in every contract and "requires a

party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has

the effect of preventing the other party to the contract from receiving the fruits of the bargain."

Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005) (citation and internal

quotation marks omitted).  The implied covenant cannot be invoked to override the express

terms of the contract, however, and can "only be used conservatively to ensure the parties'

reasonable expectations are fulfilled."  Kuroda v. SPJS Holdings, LLC, 971 A.2d 872, 888 (Del.

Ch. 2009) (citation and internal quotation marks omitted).  "General allegations of bad faith

conduct are not sufficient.  Rather, the plaintiff must allege a specific implied contractual

obligation and allege how the violation of that obligation denied the plaintiff the fruits of the

contract."  Id.

Here, the Individual Defendants allege that "Obeid had implied contractual

obligations as a member-manager to direct Gemini employees to perform work for the benefit of

Gemini and not for competing enterprises, to preserve the integrity of the bidding process of any

sale conduct by Gemini . . . assist Gemini with its efforts to sell its properties to the highest

bidders, and to keep the majority in interest informed of material developments . . . ."

(Counterclaims ¶ 235.)  The Individual Defendants further allege that Obeid violated these

obligations "by directing Gemini employees to work on projects for the benefit of Arcade and to

leak sensitive Gemini information to Arcade while being paid by Gemini, by filing Notices of Pendency on the Hotel Properties to obstruct the sale process, and by failing to keep the Individual Defendants informed of material developments . . . ."  (Id. ¶ 235.)

Contrary to Obeid's contentions, the above allegations are not expressly covered by the Amended Operating Agreement.  The Individual Defendants, under their breach of contract claim, allege violations of very specific provisions of the agreement relating to the approval by the majority in interest of various company actions, including the pledging of assets of the company in excess of $250,000.  (E.g., Counterclaims ¶¶ 213-18.)  The Individual Defendants' general allegation of Obeid's failure to inform them of material developments is sufficient to plead breach of the implied duty of good faith and fair dealing in connection with the Individual Defendants' management rights under the agreement.  Accordingly, Obeid's motion to dismiss the claim of breach of the implied covenant of good faith and fair dealing is denied.

### 8.   North Carolina Unfair and Deceptive Trade Practices Claim (Count 8)

Section 75-1.1 of the UDTPA provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."  The UDTPA does not, however, extend to conduct of individuals within a single market participant, i.e., a single business.  White v. Thompson, 364 N.C. 47, 54 (N.C. 2010).

Obeid contends that the instant dispute is within a single business, and thus is outside the scope of the UDTPA.  While Obeid entered into marketplace transactions on behalf of, and as a proposed counterparty to, Gemini, the crux of the Individual Defendants' allegations

of violations of their interests (i.e., the Individual Defendants' direct claims) relates to the

internal management structure and decision making process of Gemini and whether Obeid

abused his relative authority vis-a-vis the Individual Defendants in their business arrangement.

See, e.g., White, 364 N.C. at 50-53 (partner's unfair and deceptive interactions with his other

partners, including diverting business to a new business, were outside of purview of the

UDTPA).  Their computer-related claims of spying by Obeid on the Individual Defendants'

electronic information are similarly internal to Gemini and its members.  The Individual

Defendants have, accordingly, failed to state a claim for violation of the UDTPA and their eighth

cause of action is therefore dismissed.


CONCLUSION

Obeid's motion to dismiss the Individual Defendants' Amended Counterclaims is

denied in part and granted in part.  Obeid's motion to dismiss the entire set of the Amended

Counterclaims for lack of standing is denied.  The Court finds that the Individual Defendants

have standing to litigate the direct claims identified in Section 1 of the Discussion Section of this

Memorandum Opinion and Order.  The motion to dismiss for lack of standing is granted to the

extent that the Individual Defendants are asserting injuries that are derivative of Gemini's rights

and injuries, as explained in Section 1 above.

Obeid's motion to dismiss the remaining element of the North Carolina Unfair

and Deceptive Trade Practices (Count Eight) for failure to state a claim is granted.  Obeid's

motion to dismiss the remaining element of the breach of contract claim (Count Five) is granted

in part and denied in part, and Obeid's motion to dismiss the fraud counterclaim (Count Four) is

granted in part and denied in part.  Obeid's motion to dismiss the direct elements of the

Amended Counterclaims is denied in all other respects.

This Memorandum Opinion and Order resolves docket entry number 365.  The
case remains referred to Magistrate Judge Pitman for general pre-trial management.


SO ORDERED.


Dated: New York, New York
       March 31, 2017

                                            /s/ Laura Taylor Swain
                                          LAURA TAYLOR SWAIN
                                          United States District Judge