UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

WILLIAM T. OBEID, directly and
derivatively on behalf of GEMINI REAL
ESTATE ADVISORS LLC,

        Plaintiff,

    -v-                                   No.  14 CV 6498-LTS-HBP

CHRISTOPHER LA MACK, DANTE
MASSARO, GEMINI REAL ESTATE
ADVISORS L.L.C., BRDIGETON HOTEL
MANAGEMENT, LLC, ELEVATION REAL
ESTATE GROUP, LLC, BRIDGETON
ACQUISITIONS, LLC, ATIT JARIWALA,
and BRIDGETON HOLDINGS, LLC,

        Defendants.

--------------------------------------------------------x

MEMORANDUM OPINION AND ORDER
(UNSEALED PURSUANT TO ORDER DATED MAY 1, 2018)

        Plaintiff William Obeid brings this action asserting claims against Elevation Real

Estate Group, LLC ("Elevation") for conversion and unjust enrichment, against Christopher La

Mack and Dante Massaro (collectively, the "Individual Defendants") for breach of fiduciary

duty, conversion, and unjust enrichment, and against Bridgeton Hotel Management, LLC,

Bridgeton Acquisitions, LLC, and Atit Jariwala (collectively "Bridgeton" and cumulatively, the

"Defendants") for aiding and abetting a breach of a fiduciary duty and unjust enrichment.  (Third

Amended Complaint ("TAC"), Docket Entry No. 327.)  Individual Defendants counterclaimed

against Plaintiff for violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §

1030 et seq., the Stored Communications Act ("SCA"), 18 U.S.C. § 2701 et seq., the Federal

Wiretap Act (the "FWA"), 18 U.S.C. § 2511 et seq., fraud, breach of contract, breach of

fiduciary duty, and breach of the implied covenant of good faith and fair dealing. (Am. Counterclaims, Docket Entry No. 336.) Elevation, Individual Defendants, and Bridgeton Defendants have each moved for summary judgment dismissing Plaintiff's claims (Docket Entry Nos. 432, 454, and 464) and Plaintiff has moved for summary judgment dismissing Individual Defendants' counterclaims (Docket Entry No. 468). Bridgeton and Individual Defendants each also move to strike Plaintiff's S.D.N.Y. Local Rule 56.1 ("Rule 56.1") Counterstatements in connection with their respective motions for summary judgment. (Docket Entry Nos. 524 and 525.) Individual Defendants have also moved in limine for the exclusion of evidence of certain communications, as part of confidential settlement negotiations, from consideration at trial and this motion practice. (Docket Entry No. 543.)

The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1367.

The Court has carefully reviewed the parties' submissions and, for the following reasons, Bridgeton's motion for summary judgment is granted in its entirety and Elevation's, Individual Defendants', and Plaintiff's motions for summary judgment are each granted in part and denied in part. The Court also grants, in part, both motions to strike Plaintiff's Rule 56.1 Counterstatements and denies Individual Defendants' motion in limine.

## I.  BACKGROUND[1]

Plaintiff and Individual Defendants La Mack and Massaro are members, each with an equal one-third share, of Gemini Real Estate Advisors, LLC ("GREA"), "which, along

---

[1]     The facts recited herein are undisputed unless otherwise indicated. Facts recited as undisputed are identified as such in the parties' statements pursuant to

with its subsidiaries and affiliates, operates as a single family of closely-held entities as 'Gemini.'" (Elevation's 56.1 St. ¶ 1; Individual Defs.' 56.1 St. ¶ 1; see also Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 1.) Gemini develops, owns, sells, and manages real estate, primarily hotel and retail properties, and also operated a hotel management business through a succession of limited liability companies that would become Gemini Property Management, LLC ("GPM"), and 33 Peck Slip Property Management, LLC. (Elevation's 56.1 St. ¶ 2; Individual Defs.' 56.1 St. ¶ 81; see also Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 81 (disputing the specifics of the corporate evolution of the hotel management companies). ) To facilitate its real estate activities, GREA created single-purpose entities to develop and operate specific projects. (Individual Defs.' 56.1 St. ¶ 14.) GREA raises capital by establishing investment funds and granting membership interests in such funds to investors, who may earn a return based upon the assets owned by the funds in which they invest. (Id.; Obeid Decl., July 28, 2017, Docket Entry No. 501, ¶ 30.) Gemini maintained offices in New York and North Carolina. (See Individual Defs.' 56.1 St. ¶ 31; see also Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 31.)

Of the 122 Gemini parent entities, affiliates, investment funds, and subsidiaries on whose behalf Plaintiff purports to bring suit against Individual Defendants, he provides documentary evidence that he is a member of GREA, Gemini Equity Partners, LLC ("GEP"), and Gemini Rowlett Partners, L.P. ("GRP"). (Obeid Decl., July 28, 2017, ¶¶ 1, 11, 15, 16; Amended and Restated GREA Operating Agreement, Docket Entry No. 501-2, § 3.1, Ex. A;

S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Elevation's 56.1 St.," "Individual Defs.' 56.1 St.," "Bridgeton's 56.1 St.," "Pl.'s 56.1 St.," and the responses to the relevant 56.1 statement) incorporate by reference the parties' citations to underlying evidentiary submissions. The Court declines to consider facts raised by the parties that are either immaterial or constitute conclusory statements of law which the parties proffer as facts.

Gemini Rowlett Partners, LLC Operation Agreement, Docket Entry No. 501-4, § 5.1(a); Gemini Equity Partners, LLC Limited Liability Company Agreement, Docket Entry No. 501-6, § 5, Ex. B.)  Plaintiff also asserts in an uncontroverted declaration that he owns a direct membership interest in 300 West 22nd Street, LLC.  (Obeid Decl., July 28, 2017, ¶ 127.)  According to Plaintiff, GPM, Gemini Fund 5 Manager, LLC, Gemini Acquisition Company, LLC, Gemini Holdings, LLC, Sprucewood Realty, LLC, Gemini Brandon S, LLC,[2] Gemini Lewisville Commons H, LLC, Gemini Town Center H, LLC,[3] Gemini Ebensburg Plaza S, LLC,[4] Gemini Tinley Park H, LLC, Gemini Johnstown Galleria H, LLC,[5] Gemini Loan Servicing, LLC, and Gemini Capital Markets, LLC are wholly owned subsidiaries of GREA and 1775 James Avenue Manager, LLC, 33 Peck Slip Manager, LLC, 36 West 38th Street Manager, LLC, Gemini Jade Bryant Park Developer, LLC,  and Gemini Rowlett Crossing GP, LLC, are wholly owned subsidiaries of GEP.  (Id. ¶¶ 13, 21.)  Plaintiff further proffers that Gemini 449 West 36th Street MT, LLC, Gemini 305 West 39th Street MT, LLC, Gemini 442 West 36th Street MT, LLC and Gemini 135 East Houston MT, LLC are wholly-owned subsidiaries of GRP.  (Id. ¶ 17.) Defendants have not proffered evidence controverting these contentions.

Of the five investment funds that GREA controls, either directly or through a subsidiary, it or an intermediate subsidiary is also named the manager of the fund, with complete control over investments and legal action, although Plaintiff is not personally a member of any of

---

[2]     In his July 28, 2017 declaration, Plaintiff refers to this entity as Brandon H, LLC.  (Obeid Decl., July 28, 2017, ¶ 13.)

[3]     In his July 28, 2017 declaration, Plaintiff refers to this entity as Gemini Oviedo Town Center H, LLC.  (Obeid Decl., July 28, 2017, ¶ 13.)

[4]     In his July 28, 2017 declaration, Plaintiff refers to this entity as Gemini Ebensburg Plaza H, LLC.  (Obeid Decl., July 28, 2017, ¶ 13.)

[5]     In his July 28, 2017 declaration, Plaintiff refers to this entity as Gemini Johnstown H, LLC.  (Obeid Decl., July 28, 2017, ¶ 13.)

the investment funds.  (Individual Defs.' 56.1 St. ¶ 17; <u>see</u> Pl.'s Resp. to Individual Defs.' 56.1

St. ¶ 17; Obeid Decl., July 28, 2017, ¶¶ 31-33, 67.)  Plaintiff identifies GREA's direct stakes in

Gemini's other subsidiaries, affiliates, or investment funds as ranging from 1.72%, in Gemini

Opportunity Fund I, LLC, to 25%, in EWH Capital, LLC.  (Obeid Decl., July 28, 2017, ¶¶ 39,

91, and <u>see</u> <u>generally</u> ¶¶ 29-131.)  Plaintiff offers conclusory representations that the balance of

the Gemini-affiliated entities are "majority controlled by GREA or its three Member-Managers."
[6]  (<u>Id.</u> ¶ 13.)

GREA was organized in 2004 as a limited liability company under Delaware law,

through the execution of an operating agreement in 2004 (the "2004 Agreement"), with Obeid

named its initial operating manager or president.  (2004 Agreement, Muckenfuss Decl. in

Support of Individual Defs.' Mot. for Summ. J., Ex. E; Individual Defs.' 56.1 St. ¶¶ 4, 5; <u>see</u> <u>also</u>

Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 4.)   The 2004 Agreement includes a section entitled

"Limitation of Liability," which provides:

> Except as otherwise provided herein, no Manager or Member of the Company
> shall be liable to the Company or its Members for monetary damages for an act or
> omission in such person's capacity as a Manager or a Member, except for acts or
> omissions constituting willful misconduct or gross negligence or breach of
> fiduciary duty, and further except for breaches of contractual obligations or
> agreements, including breaches of this Agreement, between the Manager, or
> Member, and the Company.  If the [Delaware Limited Liability Company] Act is
> amended to authorize action further eliminating or limiting the liability of
> Managers and Members, then the liability of a Manager or Member of the

---

[6]     In light of the small ownership stakes in the GREA subsidiaries delineated in the
remainder of Obeid's declaration, this statement at best constitutes a legal conclusion and
will not be considered by the Court as evidence of the relationships among the Gemini-
affiliated entities.  <u>LaRouche v. Webster</u>, 175 F.R.D. 452, 455 (S.D.N.Y. 1996) ("When
ultimate facts and legal conclusions appear in an affidavit, such extraneous material
should be disregarded by the court."); (Obeid Decl., July 28, 2017, ¶ 13).

Company shall be eliminated or limited to the fullest extent permitted by the [Delaware Limited Liability Company] Act as so amended.

(2004 Agreement § 6.1; Individual Defs.' 56.1 St. ¶ 5; <u>see</u> Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 5.)

In 2006, the agreement was amended to add Atit Jariwala as a minority member. (Individual Defs.' 56.1 St. ¶ 6.)  On February 19, 2009, the parties executed an amended and restated operating agreement (the "2009 Agreement"), which removed Jariwala as a member. (Individual Defs.' 56.1 St. ¶ 7.)  Section 6.1 of the 2009 Agreement is identical to section 6.1 of the 2004 Agreement.  (Individual Defs.' 56.1 St. ¶ 8; Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 8; 2009 Agreement, Muckenfuss Decl. in Support of Individual Defs.' Mot. for Summ. J., Ex. B, § 6.1.)  Each agreement contains a clause authorizing Gemini's members to engage in other business, including real estate ventures that may directly compete with Gemini.  (2004 Agreement § 5.13; 2009 Agreement § 5.13.)  The provision of the 2009 Agreement relating to the powers of the operating manager and members in connection with GREA business affairs included a section denying the operating manager authority to borrow or pledge assets exceeding $250,000 without the approval of the majority of member managers.  (2009 Agreement § 4.2.1.10.)  Section 4.2.1.9 of the 2009 Agreement requires a vote of the majority of members to dispose of or sell any projects and section 4.2.1.3 requires membership approval to take any action "that would make it impossible to carry on the ordinary business of the Company."  (<u>Id.</u>) Section 5.16 delineates the powers of the operating manager and empowers him to "execute any and all documents, instruments and agreements, including, but not limited to, deeds, promissory notes, deeds of trust, financing documents and the like, provided the execution of such documents has been approved by the Managers."  (<u>Id.</u>)  A member-manager or his representative may inspect GREA's books of accounts and records during "reasonable business hours" and the

requesting member will bear all associated expenses.  (2009 Agreement § 8.6.1.)  Both

Agreements also include an integration clause that provides that the Agreement contains the

entirety of the terms agreed to by the parties and that it "supersedes all prior or contemporaneous

promises, agreements, representations, and understandings, whether written or oral."  (2004

Agreement ¶ 11.8; 2009 Agreement ¶ 11.8.)

Hotel 18 Investment

In late 2013 or early 2014, Plaintiff identified an opportunity to purchase and

redevelop a hotel in Miami Beach that would come to be known as Hotel 18.  (Obeid Tr., Pencu

Decl. in Supp. of Pl.'s Mot. for Summ. J., Ex. 12, at 120:15-122:3.)  Plaintiff testified that, by

March or April of 2014, he had been negotiating for months, and alleges that he would have

notified Massaro and La Mack on partner calls about the deal to provide them with updates and

ask their advice on negotiating with Hotel 18's original owner, within weeks of starting to work

on this transaction.  (Id. at 122:4-123:20.)  Plaintiff agreed to acquire the property in a joint

venture with Edward Schmidt for a purchase price of $12.9 million dollars, towards which

Gemini was to remit $525,000, including a $250,000 initial deposit. (Pl.'s 56.1 St. ¶ 50;

Individual Defs.' Resp. to Pl.'s 56.1 St. ¶¶ 50, 51; GREA Rule 30(b)(6) Tr., Muckenfuss Decl. in

Resp. to Pl.'s Mot. for Summ. J., Ex. S, at 333:16-20.)  Individual Defendants maintain that

Plaintiff did not inform them about Hotel 18 until a few weeks before the transaction was to

close and only after Gemini remitted a non-refundable $250,000 deposit to acquire the property

in a $525,000 joint venture with Edward Schmidt.  (Individual Defs.' Resp. to Pl.'s 56.1 St. ¶ 48;

see Pl.'s 56.1 St. ¶ 48; GREA Rule 30(b)(6) Tr., Muckenfuss Decl. in Resp. to Pl.'s Mot. for

Summ. J., Ex. S, at 333:21-25; Obeid Tr., Pencu Decl. in Supp. of Pl.'s Mot. for Summ. J., Ex.

12, at 123:21-25 (deposit was refundable then, at some point, became non-refundable).)

Although Individual Defendants then agreed, through the execution of a written consent as the sole member of the single-use entity used to acquire Hotel 18 (the "Written Consent"), to authorize Gemini to pursue the acquisition for a total investment of $525,000, they testified that they did so only to avoid forfeiting Gemini's $250,000 deposit. (GREA Rule 30(b)(6) Tr., Muckenfuss Decl. in Resp. to Pl.'s Mot. for Summ. J., Ex. S, at 333:21-25; Pencu Decl. in Support of Pl.'s Mot. for Summ. J., Ex. 20).) The Written Consent provided that Gemini, through its members, ratified and approved Obeid's previous actions in relation to the Hotel 18 transaction. (Pencu Decl. in Support of Pl.'s Mot. for Summ. J., Ex. 20, at pg. 2.)

Individual Defendants also proffer an affidavit by William Stelma, Gemini's operations manager, with their brief opposing Plaintiff's motion for summary judgment in which he states that, in February of 2014, Plaintiff instructed him to make a distribution of $430,000 from GEP to its three members, but rather than actually remitting the funds to Obeid, Massaro, and La Mack, Plaintiff instructed Stelma to remit those funds to GREA as contributions from its member-managers. (Stelma Decl., Docket Entry No. 496, ¶¶ 3-5.) Plaintiff then instructed Stelma to "apply those funds to costs and equity associated with closings of the Miami Hotel 18 and Best Western Seaport Hotel projects in March 2014." (Id. ¶ 6.) Individual Defendants deny that they knew of this distribution or its resultant transactions. (Id. ¶ 7; Massaro Decl., July 28, 2017, Docket Entry No. 495, ¶¶ 6-8; La Mack Decl., July 27, 2017, Docket Entry No. 494, ¶¶ 7-9.) Gemini then secured a $10 million loan from Edgewood MAC V LLC ("Edgewood") to fund the acquisition of Hotel 18, with Gemini eventually investing a total of $1,137,464 million in the project. (Pl.'s 56.1 St. ¶¶ 53-54.)

After Individual Defendants brought suit against Plaintiff in North Carolina Superior Court, La Mack v. Obeid, No. 14-CVS-12010 (N.C. Super. Ct.), Edgewood declared

Gemini to be in default of the loan and increased the interest rate to 18% per annum. (Obeid Decl., June 7, 2016, Docket Entry No. 388, ¶ 10.) This caused Gemini's single-purpose entity that owned Hotel 18 to draw down its funds more rapidly and, consequently, to default on the Edgewood loan. (Id. ¶ 12.) Plaintiff entered negotiations with Edgewood and came to an agreement to resolve the default, but the agreement was contingent on Plaintiff and Edward Schmidt purchasing the interests of Individual Defendants and taking control of the project from GREA. (Individual Defs.' 56.1 St. ¶ 154; Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 154, Obeid Decl., June 7, 2016, ¶ 13.) Plaintiff proposed this transaction and other alternatives to Individual Defendants, such as a sale of Hotel 18. (Pencu Decl. in Opp'n to Individual Defs.' Mot. for Summ. J., Exs. 191, 192.) Plaintiff points to La Mack's testimony, on behalf of GREA, that Individual Defendants did not respond to Plaintiff's proposals, although Individual Defendants, in their Rule 56.1 statement, point to another excerpt from the same deposition in which La Mack states that Gemini proposed revised terms to Plaintiff's proposal, which he rejected. (Individual Defs.' 56.1 St. ¶ 155; Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 154; GREA Rule 30(b)(6) Tr., Pencu Decl. in Opp'n to Individual Defs.' Mot. for Summ. J., Ex. 99, at 29:8-30:23; GREA Rule 30(b)(6) Tr., Muckenfuss Decl. in Supp. of Individual Defs.' Mot. for Summ. J., Ex. Z, at 336:2-16.) Hotel 18 was ultimately sold through a private sale to a third party. (Individual Defs.' 56.1 St. ¶ 157.)

Removal of Obeid as Operating Manager

Obeid remained GREA's operating manager from 2004 until July 1, 2014, when, after the members were unable to agree on a plan to restructure GREA, La Mack and Massaro voted to replace Obeid with Massaro. (Massaro Decl., June 14, 2017, Docket Entry No. 458, ¶¶ 13-16.) Obeid alleges that, after his removal as operating manager, Individual Defendants

excluded him from management of Gemini, taking corporate action based on the consent of Massaro and La Mack, who comprised the majority of GREA's members. (Obeid Decl., June 15, 2017, Docket Entry No. 470, ¶ 3.) Specifically, Plaintiff alleges that Individual Defendants terminated his access to Gemini's files and his corporate email and instructed Gemini employees to withhold information from him to which he had customarily been privy. (Obeid Decl., June 15, 2017, ¶¶ 4, 8, 9; Obeid Tr., Pencu Decl. in Supp. of Pl.'s Mot. for Summ. J., Ex. 12, at 174:22-175:14.) Massaro testified that Plaintiff retained access to Gemini's computer server until April 2015 and that, from that point until July 2015, he was forwarded his corporate emails. (Massaro Decl., June 14, 2017, ¶ 17.) Obeid was later given direct access to his email account but was not enabled to send communications. (Id.) Massaro further testified that he sent all member-managers monthly updates from May 2015 to April 2016 and then quarterly updates on April 13 and July 11, 2017. (Massaro Decl., June 14, 2017, ¶ 19; Massaro Decl., July 28, 2017, ¶ 9.)

       After realizing that they no longer shared a common vision for Gemini's future, Individual Defendants and Plaintiff began discussing splitting up Gemini, with each side retaining certain assets and Individual Defendants retaining use of the Gemini name. (Elevation's 56.1 St. ¶ 9; see Pl.'s Resp. to Elevation's 56.1 St. ¶ 9; Arcade Capital, LLC Rule 30(b)(6) Dep. Tr., Muckenfuss Decl. in Support of Individual Defs.' Mot. for Summ. J., Ex. G, at 11:17-12:9, 20:10-21:5.) Consistent with these expectations, Plaintiff created Arcade Capital ("Arcade") on July 10, 2014 to consolidate his share of Gemini and his future business while Individual Defendants contemplated creating an entity that was eventually organized as G2 Real Estate Advisors, LLC ("G2") on January 23, 2015. (Elevation's 56.1 St. ¶¶ 9-11; Pl.'s Resp. to Elevation's 56.1 St. ¶¶ 9-11; G2 Certificate of Cancellation, Muckenfuss Decl. in Support of

Elevation's Mot. for Summ. J., Ex. T.)  The restructuring discussions ceased in early 2015. (Individual Defs.' 56.1 St. ¶ 46; see also Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 46 (attributing the end of negotiations to Individual Defendants' subcontracting Gemini's hotel management business to Bridgeton).)  Obeid testified, on behalf of Arcade, that he sought and received assistance from Gemini employees David Rosen, James Kot, and Robert Marcus with issues related to the potential settlement arrangement and property purchases that would divide Gemini, including analysis and feedback on draft letters of intent for projects Obeid was considering pursuing through Arcade.  (Arcade Rule 30(b)(6) Tr., Muckenfuss Decl. in Supp. of Elevation's Mot. for Summ. J., Ex. J, at 32:21-33-25, 37:19-40:5, 44:5-45:8, 58:7-59:12, 76:15-77:25; see Elevation's 56.1 St. ¶ 13; see also Pl.'s Resp. to Elevation's 56.1 St. ¶ 13.)

Individual Defendants then cancelled G2 and created Elevation, a limited liability company owned solely by Individual Defendants to continue to develop real estate, in March 2015.  (Elevation's 56.1 St. ¶¶ 15-16; Pl.'s Resp. to Elevation's 56.1 St. ¶¶ 15-16; G2 Certificate of Cancellation.)  Massaro and La Mack decided to "wind up" Gemini and determined that Gemini would cease "pursuing any new deals," although it still planned to pursue pending deals to develop properties in Greenville, South Carolina and Centerville, Georgia.[7]  (GREA Rule 30(b)(6) Tr., Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 7, at 326:12-25; Massaro Tr., Pencu Decl. in Opp'n to Individual Defs.' Mot. for Summ. J., Ex. 114, at 179:21-180:8.)

---

[7]      Plaintiff asserts that this statement was made six months before the International Conference of Shopping Centers and, although he provides insufficient facts and excerpts of GREA's corporate deposition to support this timeframe, Defendants do not dispute that it was made prior to that conference.  (Pl.'s Resp. to Elevation's 56.1 St. ¶ 23; see generally GREA Tr.)

Sale of Gemini Assets

GPM provided hotel management services to many of Gemini's hotel properties. (Individual Defs.' 56.1 St. ¶¶ 81-82; <u>see</u> Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 81.)  GPM earned a management fee of between 3-5% of each hotel's gross revenues for its services. (Individual Defs.' 56.1 ¶ 83.)  Obeid alleges that he was able to charge all of Gemini's costs and overhead relating to GPM's hotel management businesses back to the hotel properties themselves.[8]  (Obeid Tr., Pencu Decl. in Resp. to Individual Defs.' Mot. for Summ. J., Ex. 1, at 387:17-21.)  Plaintiff's expert, Embree Bedsole, values Gemini's hotel management business at $27.9 million as of the time the sub-management agreement was executed.  (Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 85.)

Individual Defendants negotiated for several weeks with Jariwala, who had founded Bridgeton after leaving Gemini, to enter into a sub-management contract with GPM to manage Gemini's hotels in exchange for 35% of the management fees received by Bridgeton. (Bridgeton 56.1 St. ¶¶ 66-69; Pl.'s Resp. to Bridgeton 56.1 St. ¶¶ 66-69; Individual Defs. 56.1 St. ¶ 90; La Mack Tr., Cooper Decl., Ex. 46, at 292:2-295:20.)  The contract was executed on January 26, 2015.  (Individual Defs.' 56.1 St. ¶ 85.)  Individual Defendants did not seek alternative management proposals from any other party, and there is no evidence that Individual Defendants considered an outright sale of the hotel management unit.  (Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 86.)  Plaintiff proffers evidence that another entity would have been interested in exploring an investment in GPM, and Plaintiff's expert, Bedsole, opines that investors would

---

[8]     The parties disagree on whether Gemini was able to recoup all or only a portion of its overhead costs.  (<u>See</u> Individual Defs.' 56.1 St. ¶ 84; see Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 84; <u>see also</u> Pl.'s Resp. to Bridgeton's 56.1 St. ¶ 66.)  This disputed fact is not material to the Court's decision.

have found the opportunity to purchase Gemini's hotel management business appealing. (Mackey Tr., Pencu Decl. in Opp'n to Individual Defs.' Mot. for Summ. J., Ex. 153, at 76:8-18; Expert Report of Embree Bedsole, Pencu Decl. in Resp. to Individual Defs.' Mot. for Summ. J., Ex. 7, ¶¶ 76-78.)  Individual Defendants proffer that they believed this transaction would benefit Gemini by allowing it to sell its hotels, reduce overhead while retaining some management fees, and ensure the continued employment of Gemini's hotel management employees.  (Individual Defs.' 56.1 St. ¶ 86; see Plaintiff's Resp. to Individual Defs.' 56.1 St. ¶ 86.)

Prior to the execution of this transaction, Jariwala and Individual Defendants exchanged emails, in which Jariwala noted that the lenders for many of the hotels would have to approve Bridgeton as the hotel manager.  (Pencu Decl. in Opp'n to Bridgeton's Mot. for Summ. J., Ex. 255.)  Jariwala then suggested that "maybe the easiest course of action is submanagement agreements with teeth for all of the assets with the intent to change them into direct management agreements over the short term upon lender and owner . . . approval.  I don't believe there are any real restrictions or approvals on submanagement."  (Id.)  Massaro responded that a single sub-management agreement was "the best and most airtight way to do this."  (Id.)

Gemini acquired two buildings, the "Bryant Park Property," located at 34-36 West 38th Street, New York, New York, and the Best Western Seaport, located at 33 Peck Slip, New York, New York, which were, respectively, to be reconstructed as a hotel and rehabilitated with loans from UBS Realty Advisors LLC ("UBS"), in late 2014.  (Pl.'s Resp. to Individual Defs.' 56.1 St. ¶¶ 17(E)(i), (ii).)  After Obeid's removal as operating manager, the Individual Defendants proposed to UBS that, rather than redevelop the Best Western Seaport and the Bryant Park Property as UBS had intended, Gemini should sell them and repay UBS.  (Individual Defs.' 56.1 St. ¶ 56; Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 56; Hall Tr., Pencu Decl. in Resp. to

Individual Defs.' Mot. for Summ. J., Ex. 90, at 51:9-17.) As part of this proposed sale, Gemini

and the Congress Group ("Congress") would form a joint venture to develop the projects with

Congress providing extra funding and receiving an equity position senior to that of Gemini and

its existing investors. (David Rosen Tr., Pencu Decl. in Resp. to Individual Defs.' Mot. for

Summ. J., Ex 97, at 156:4-157:13.) UBS indicated it was considering this proposal. (Hall Tr. at

120:15-122:17, 126:5-127:17; Pl.'s Opp'n to Individual Defs.' 56.1 St. ¶ 59.) Individual

Defendants then listed the properties, along with the Jade Hotel GV, for sale with

RobertDouglas, a broker, in November 2014, even though UBS did not affirmatively approve the

sale proposal. (Individual Defs.' 56.1 St. ¶ 59; see Pl.'s Opp'n to Individual Defs.' 56.1 St. ¶ 59;

Hall Tr. at 120:15-122:17, 126:5-127:17.)

During the sub-management negotiations, Bridgeton was made aware that Gemini

had listed the hotel three properties for sale and might soon list other properties.[9] (Jariwala Tr.,

Cooper Decl., Ex. 6, at 95:4-97-14.) Gemini drafted a letter agreement that would grant

Bridgeton a "Right of First Offer"[10] for the Wyndham Garden Chelsea ("Wyndham") and the

Boston Holiday Inn Express ("HIEX") and provided that Gemini would grant Bridgeton an

exclusivity period and agree not to engage a broker to sell the Wyndham, but that letter

agreement was never executed. (Bridgeton's 56.1 St. ¶¶ 117, 118, 119, 124; see Pl.'s Resp. to

---

[9]     Plaintiff disputes Defendants' allegation that Individual Defendants planned, at this time,
to sell off Gemini's hotel assets, pointing to testimony by La Mack that Gemini would
evaluate each project as the loans matured to determine whether to sell it and that he did
not anticipate selling off all Gemini's hotel assets until about 2018, when all loans would
be mature. (See La Mack Tr., Pencu Decl. in Resp. to Individual Defs.' Mot. for Summ.
J., Ex. 59, at 33:17-34:13.)

[10]   Plaintiff agrees that a Right of First Offer includes the opportunity to tender the first offer
for the sale of an asset, but also posits that the term includes the right of first refusal. He
provides no factual or legal support for the latter assertion. (See Pl.'s Resp. to
Bridgeton's 56.1 St. ¶ 124.)

Bridgeton's 56.1 St. ¶ 124.)  Plaintiff proffers evidence that Bridgeton was ultimately granted a Right of First Offer on the Jade Hotel GV, the Wyndham, and HIEX, although Bridgeton proffers testimony that such an arrangement was never, in fact, agreed to.  (Bridgeton's 56.1 St. ¶¶ 167-69; see Pl.'s Resp. to Bridgeton's 56.1 St. ¶ 167-69; Pencu Decl. in Resp. to Bridgeton's Mot. for Summ. J., Exs. 32-34; see La Mack Tr., Cooper Decl., Ex. 3, at 20:13-24; see Amirian Decl., Cooper Decl., Ex. 106, ¶¶ 4-6; see also Jariwala Tr., Cooper Decl., Ex. 7, at 622:3-22.)

Arcade made offers on two of the properties, offering $24.9 million for the Bryant Park Property with a 10% refundable deposit and a 45-day closing deadline, and offering $36 million for the Best Western Seaport.  (Individual Defs.' 56.1 St. ¶ 73; Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 75.)  At the initial close of bidding on February 25, 2015, Arcade's bid for the Bryant Park Property was $2.4 million higher than the next higher offer.  (Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 75.)  Its offer for the Best Western Seaport was approximately $2 million lower than the highest offer although, unlike that higher bid, Arcade's offer did not have a due diligence condition.  (Individual Defs.' 56.1 St. ¶ 73.)  RobertDouglas also received bids for Jade Hotel GV, ranging from $62.7 to $78 million, which were below RobertDouglas' midpoint valuation of $90 million for that property.  (Individual Defs.' 56.1 St. ¶ 67; Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 67.)

Rather than accepting these offers, Gemini instructed RobertDouglas to contact some of the bidders and ask for their best and final offers, although Robert Douglas did not recommend and Gemini indeed did not contact Arcade.  (Douglas P. Hercher Tr., Pencu Decl. in Resp. to Individual Defs.' Mot. for Summ. J., Ex 45, at 236:5-239:25.)  After the close of bidding, Massaro asked Jariwala why Bridgeton did not submit a bid in response to the initial solicitation, to which Jariwala responded that he thought the Jade Hotel GV was being

overvalued by RobertDouglas.  (Bridgeton's 56.1 St. ¶¶ 152-53, <u>see</u> Pl.'s Resp. to Bridgeton's

56.1 St. ¶¶ 152-53.)  After encouragement from Massaro, Bridgeton placed a bid of $77 million

dollars for Jade Hotel GV on March 7, 2015, which was increased to $78 million following

RobertDouglas' further encouragement.  (Bridgeton's 56.1 St. ¶¶ 152-53, 155-159; <u>see</u> Pl.'s

Resp. to Bridgeton's 56.1 St. ¶¶ 152-53, 159.)

       Gemini then accepted offers of $78 million for the Jade Hotel GV from

Bridgeton, $38 million for the Best Western Seaport from Atlantic Pearl Investments, Inc., and

$25.5 million for the Best Western Seaport from the Hansji Corporation, which would not be

binding unless Gemini and Hansji negotiated and executed a further agreement.  (Individual

Defs.' 56.1 St. ¶¶ 69, 72, 76; Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 76.)

       Plaintiff then petitioned the New York State Supreme Court for New York

County for a temporary restraining order enjoining these sales and filed notices of pendency

against the Bryant Park Property, the Best Western Seaport, the Jade Hotel GV, and the

Wyndham, which the court ordered would be cancelled if bonds were posted in the sums of $25

million, $25 million, $10 million, and $5 million respectively.  (Individual Defs.' 56.1 St. ¶¶ 100,

103-104, 106; <u>see</u> <u>also</u> Pl.'s Resp. to Individual Defs.' 56.1 St. ¶¶ 103-104.)  Plaintiff and

Individual Defendants discussed the conditions under which Obeid would remove the notices of

pendency but did not come to an agreement.[11]  (Individual Defs.' 56.1 St. ¶ 105; <u>see</u> <u>also</u> Pl.'s

Resp. to Individual Defs.' 56.1 St. ¶ 105.)  Plaintiff appealed the Supreme Court's bond order

---

[11]    Individual Defendants move to exclude evidence of the negotiations to remove the
notices of pendency from trial and this motion practice under Federal Rule of Evidence
408, as evidence of settlement negotiations.  (Docket Entry Nos. 543, 544.)  Because
such evidence is not material to the Court's decision in this motion practice, Individual
Defendants' motion <u>in</u> <u>limine</u> is denied without prejudice to renewal in connection with
trial.

and Individual Defendants cross-appealed; the appeals precluded Individual Defendants from posting the bond. (Individual Defs.' 56.1 St. ¶ 108; Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 108.)

After Plaintiff filed the notices of pendency against the hotels in New York, Gemini listed the Boston HIEX for sale with a broker, Marcus & Millichap, on May 4, 2015. (Individual Defs.' 56.1 St. ¶ 159.) There were five bidders and Marcus & Millichap invited Summit Hotel Properties, LLC ("Summit"), RLJ Lodging Trust ("RLJ"), and Bridgeton, which was by then sub-managing HIEX pursuant to its agreement with Gemini, to submit their best and final bids. (Bridgeton's 56.1 St. ¶¶ 182-88.) RLJ offered $24 million with a 30-day due diligence period; Bridgton offered $24.05 million and agreed to assume HIEX's franchise agreement and the existing mortgage on the property; and Summit offered $25 million dollars to close within 40 days and agreed cover fees for terminating HIEX's franchise agreement if Summit decided it did not want to assume the agreement. (Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 17(A)(i); Pencu Decl. in Resp. to Individual Defs.' Mot. for Summ. J., Ex. 184.) Marcus & Millichap then asked Bridgeton if it could make a better offer and Bridgeton responded with a bid for $24.5 million if Bridgeton assumed HIEX's debt or $25 million if it did not and, in either case, agreed to assume the franchise agreement. (Pencu Decl. in Resp. to Individual Defs.' Mot. for Summ. J., Ex. 185.) Marcus & Millichap recommended and Gemini accepted Bridgeton's offer because Bridgeton was the only party willing assume HIEX's debt, which would have cost Gemini $520,000 to retire. (Bridgeton's 56.1 St. ¶¶ 191-93; see Pl.'s Resp. to Bridgeton's 56.1 St. ¶¶ 191-93.) Gemini and Bridgeton entered into a purchase agreement on August 19, 2015. (Id. ¶ 195.)

Before the sale closed, Bridgeton, as the sub-manager of HIEX, expended $226,059 of Gemini's funds for capital improvements to the hotel. (Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 164; Steve Cius Tr., Pencu Decl. in Resp. to Individual Defs.' Mot. for Summ. J., Ex. 10, at 178:19-182:4; Expert Report of Joseph T. Gardemal III ("Gardemal Report"), Pencu Decl. in Resp. to Individual Defs.' Mot. for Summ. J., Ex. 4, ¶¶ 111-14.)

On June 24, 2015, Obeid executed, on behalf of Gemini, three "Non-Circumvent Non-Disclosure and Fee Agreements" with SRM Management, LLC ("SRM") for the Jade Hotel GV, HIEX, and the Wyndham, despite the fact that Marcus & Millichap and RobertDouglas had already been retained to market these properties. (Pl.'s 56.1 St. ¶ 67; Individual Defs.' Resp. to Pl.'s 56.1 St. ¶ 67; James Goldberg Tr., Muckenfuss Decl. in Resp. to Pl.'s Mot. for Summ. J., Ex. T, at 55:16-56:11.) Under these agreements, Gemini agreed to deposit into an escrow a one percent commission for James Goldberg, an SRM employee, upon the closing of any sale of these properties by SRM. (See SRM Agreements, Pencu Decl. in Support of Pl.'s Mot. for Summ. J., Ex. 31.) Obeid received a letter of interest from Macrolink Holding Co., Limited ("Macrolink") dated June 18, 2015,[12] expressing interest in purchasing the Wyndham for $70-76 million. (Pencu Decl. in Supp. of Pl.'s Mot. for Summ. J., Ex. 32.) This letter of interest contemplated further negotiations that would culminate in a binding sale agreement. (Id. ¶ 3.) Obeid countersigned this letter, which provided for a 15-day exclusivity period that prohibited Gemini from communicating with any other party regarding the sale of the Wyndham. (Id. ¶ 8.) Macrolink did not purchase the Wyndham and no commission payments were ever made to SRM. (Pl.'s 56.1 St. ¶¶ 72-73.)

---

[12]     Obeid maintains that SRM found the Marcolink opportunity even though the letter of interest predates the SRM retention agreements. (See Pl.'s 56.1 St. ¶ 69.)

The Gemini single-purpose entities that owned the properties subject to the notices of pendency filed for bankruptcy under Chapter 11 on September 3, 2015. (Individual Defs.' 56.1 St. ¶ 123.) On November 20, 2015, Judge James L. Garrity, Jr. entered a stipulation among Individual Defendants, Plaintiff, and Bridgeton providing that Obeid waived his rights to object to the separately agreed-upon sales procedures for the properties and the "transactions closing the Sales," but that Obeid's waiver

> shall not constitute (i) evidence of (a) any parties' good faith, (b) the lack of any objection by Obeid to the Sales or the conduct of the parties; and (ii) a waiver of any allegation, right or claim that Obeid may have in the Pending Actions, including the right to seek money damages against La Mack, Massaro, Elevation, Bridgeton, or Jariwala in connection with the Sales. Without conceding that the claims asserted in the Pending Actions are meritorious and without waiving any claims or except as specifically set forth herein, . . . the Parties other than Obeid covenant and agree not to assert res judicata or collateral estoppel as a defense in the Pending Actions as a result of the Obeid Waiver or the Court's approval of the Sales or the Auction. Specifically, they agree that the Findings and Conclusions, which shall be determined without any objection by Obeid because of the Obeid Waiver, shall not be entitled to any preclusive effect, including res judicata or collateral estoppel, with respect to any claims asserted by Obeid (including any Derivative Claims seeking money damages).

Stipulation and Order, In re 33 Peck Slip Acquisition LLC, et al., 15-12479-jlg, Docket Entry No. 176, ¶¶ 5-6 (Bankr. S.D.N.Y. Nov. 20, 2015).

Bridgeton signed purchase agreements and agreed to serve as the stalking horse for the court-supervised sale of the Jade Hotel GV with a $78 million dollar bid, and the Wyndham with a $57 million bid. (Bridgeton's 56.1 St. ¶¶ 198 , 213.) Hansji Corporation agreed to make a $37.4 million stalking horse bid for the Bryant Park Property and Morning View Hotels agreed to make a $37.3 stalking horse bid for the Best Western Seaport. (Individual Defs.' 56.1 St. ¶¶ 128, 133.) Through the Chapter 11 bankruptcy proceedings, Bridgeton purchased the Jade Hotel GV, without any competing bids, for $78 million; Fortuna 37 West 24th

Street LLC purchased the Wyndham at auction for $60 million; the Howard Hughes Corporation purchased the Best Western Seaport at auction for $38.3 million; and Joginder Sharma purchased the Bryant Park Property for $19.25 million. (Id. ¶¶ 131, 136-37, 142, 147.) Plaintiff's expert, Scott Fowler, valued the Jade Hotel GV and the Wyndham, as of September 1, 2015, above the prices at which they were sold through the bankruptcy proceedings. (Expert Report of Scott Fowler, dated Feb. 27, 2017, Pencu Decl. in Resp. to Bridgeton's Mot. for Summ. J., Ex. 75, pg. 4.)

In January 2015, Bridgeton and Individual Defendants began discussing a joint venture to acquire and develop a hotel known as Morgan Point in Jersey City, New Jersey, that La Mack intended to be developed under the Gemini name, but would have been purchased by an entity that did not include Plaintiff. (Bridgeton's 56.1 St. ¶ 224; La Mack Tr., Pencu Decl. in Resp. to Bridgeton's Mot. for Summ. J., Ex. 156, at 99:10-24; see also Pl.'s Resp. to Bridgeton's 56.1 St. ¶ 224.) Gemini and Bridgeton submitted a joint letter of intent to acquire Morgan Point. (Bridgeton's 56.1 St. ¶ 225; see Pl.'s Resp. to Bridgeton's 56.1 St. ¶ 225.) Although the parties to the joint venture anticipated that they would reap a profit from this transaction, they ultimately did not complete it. (Bridgeton's 56.1 St. ¶ 227; Pl.'s Resp. to Bridgeton's 56.1 St. ¶¶ 226-27; Pl.'s Resp. to Individual Defs.' 56.1 St. ¶ 65.)

In March 2015, a representative for Choice Hotels emailed Massaro regarding opportunities to develop several Cambria Hotel ("Cambria") properties, including locations in Orlando and Memphis which Massaro testified that Individual Defendants planned to pursue through Elevation. (Massaro Tr., Pencu Decl. in Resp. to Individual Defs.' Mot. for Summ. J., Ex. 114, at 174:17-175:16, 179:3-180:8; La Mack Tr., Pencu Decl. in Resp. to Bridgeton's Mot. for Summ. J., Ex. 156, at 101:7-102:7.) Jariwala testified that La Mack then briefly discussed

the opportunity to develop Cambria's Orlando and Memphis locations, but he said he was not interested and neither party ultimately pursued the deal. (Jariwala Tr., Pencu Decl. in Resp. to Bridgeton's Mot. for Summ. J., Ex. 14, at 269:3-17, 307:23-309:25, 316:5-317:25; La Mack Tr., Pencu Decl. in Resp. to Bridgeton's Mot. for Summ. J., Ex. 156, at 101:7-16.)

<u>Launch of Elevation</u>

Following Plaintiff's removal as president, La Mack and Massaro exercised control over Gemini even as they attempted to form G2, and later formed and launched Elevation. (<u>See</u> Elevation's 56.1 St. ¶¶ 10, 16.) In January of 2015, Massaro and La Mack worked with Forge Communications ("Forge") to consult with Rachael Feurtado, Gemini's Vice President of Marketing and Investor Relations, on future marketing programs and to purchase several internet URLs featuring variations on "G2," including suggesting a color palette for the Gemini (presumably G2) web site; Forge billed GREA $2,000 for these services. (Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Exs. 37 and 38.) Barbara Guillote, a Gemini employee at the time, assisted Individual Defendants in establishing the infrastructure for G2, including phones and internet service. (Elevation's 56.1 St. ¶ 26; <u>see</u> Pl.'s Resp. to Elevation's 56.1 St. ¶¶ 26, 29: Guillote Tr., Pencu Decl. in Opp'n to Elevation's Mot. for Summ. J., Ex. 11, at 208:12-25.)

In preparation for Elevation's launch, Feurtado sent logo designs to Christopher Melling, an independent contractor for Gemini who later simultaneously worked for Elevation, on April 8, 2015, from her personal email address. (Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 54; Elevation's 56.1 St. ¶ 30.) Elevation sublet office space from Gemini on a different floor in the same Huntersville, North Carolina office building where Gemini was located. (Elevation Rule 30(b)(6) Tr., Muckenfuss Decl. in Support of Elevation's Mot. for

Summ. J., Ex. I., 151:2-18.)  Elevation signed the sublease in May or June 2015, but it was

backdated to April 6, 2015. (Id. at 151:19-152:14.)  Despite the subleasing arrangement,

Elevation paid rent directly to the landlord.  (Elevation's 56.1 St. ¶ 39; see Pl.'s Resp. to

Elevation's 56.1 St. ¶ 39.)

   Both Gemini and Elevation sent employees to the International Conference of

Shopping Centers ("ICSC Conference") in Las Vegas in May 2015.  (Elevation Rule 30(b)(6)

Tr., Muckenfuss Decl. in Support of Elevation's Mot. for Summ. J., Ex. I, at 86:11-20, 90:8-11.)

Paul Harnett, Steve Ellis, and Jeff Swanson were Gemini employees who attended the

conference and Garrett Giusti and Carolyn Kellogg were, respectively, an Elevation employee

and contractor who also attended the ICSC Conference.  (Elevation's 56.1 St. ¶ 22; see Pl.'s

Resp. to Elevation's 56.1 St. ¶ 22; see Pencu Decl.in Resp. to Elevation's Mot. for Summ. J., Ex.

46; see also La Mack Tr., Muckenfuss Decl. in Supp. of Elevation's Mot. for Summ. J., Ex. 9, at

26:17-24.)  La Mack also attended ISCS.  (Pl.'s Resp. to Elevation's 56.1 St. ¶ 23.)  Based upon

the incomplete evidence, the Court will infer in favor of the non-moving Plaintiff that La Mack

attended as a principal of Elevation, rather than as a representative of  Gemini.  (See Elevation

Rule 30(b)(6) Tr., Muckenfuss Decl. in Support of Elevation's Mot. for Summ. J., Ex. I, at

91:13-24 (Massaro states that he does not know if La Mack attended on Gemini or Elevation's

behalf).) [13]  Gemini purchased a booth, and the attendant furniture and equipment, at this

---

[13]  The deposition excerpts cited in Plaintiff's response to Elevation's Rule 56.1 Statement
do not include all the pages cited, making it impossible to definitively determine whether
Plaintiff's assertion that La Mack attended ICSC on Elevation's behalf is supported by
competent evidence.  Nevertheless, the Court will draw a reasonable inference from
Massaro's statement that he did not know on which entity's behalf La Mack attended
the conference that he attended on Elevation's behalf.  See Mhany Mgmt. v. Cnty. of Nassau,
819 F.3d 581, 620 (2d Cir. 2016) (when considering a motion of summary judgment, the
Court "draw[s] all reasonable inference in favor of the nonmoving party")

conference for $38,129 and paid Hendon Properties, LLC, $20,000 to sponsor a suite at its ICSC party.  (Elevation's 56.1 St. ¶ 22; Pl.'s Resp. to Elevation's 56.1 St. ¶ 22; Elevation Rule 30(b)(6) Tr., Muckenfuss Decl. in Support of Elevation's Mot. for Summ. J., Ex. I, at 88:10-90:19.)  Giusti and La Mack testified that only Gemini employees staffed the Gemini booth "as the leasing team for the shopping centers," and that they did not promote Elevation.  (La Mack Tr., Muckenfuss Decl. in Supp. of Elevation's Mot. for Summ. J, Ex. A, at 101:14-17; Elevation Rule 30(b)(6) Tr., Muckenfuss Decl. in Support of Elevation's Mot. for Summ. J., Ex. I, at 91:4-25; Giusti Tr., Muckenfuss Decl. in Support of Elevation's Mot. for Summ. J., Ex. D, at 330:5-16.)

On April 30, 2015, Barbara Guillote sent an email to several people, including Giusti and Kellogg, scheduling a May 1, 2015, meeting regarding the ICSC Conference, to which was attached a schedule of meetings for various Gemini employees at the Gemini Booth or other locations in the conference and contained space for Giusti and Kellogg's meetings even though none were listed. [14]  (Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 46.)

Several Gemini and Elevation employees either moved between the two entities or performed work for the other corporation.  Guillote, who was a Gemini employee until April 1, 2015, when she began work at Elevation, continued to perform services for Gemini, which she recorded in a diary to enable Gemini to reimburse Elevation for her labor.  (Elevation's 56.1 St. ¶ 28; see Pl.'s Resp. to Elevation's 56.1 St. ¶ 28.)  Guillote's diary indicates that in April and May, she spent time charged to Gemini on health insurance issues, including several entries indicating

---

[14]     In its 56.1 statement, Plaintiff asserts that Gemini employees met with representatives of tenants or prospective tenants for Elevation's properties but cites no evidence to establish that the participants of these meetings had any relationships or prospective relationships with Elevation.  (See Pl.'s Resp. to Elevation's 56.1 St. ¶ 24.)

that she prepared for and conducted open-enrollment.  (Muckenfuss Decl. in Support of

Elevation's Mot. for Summ. J., Ex. X, at ELVNYF10001051-55.)  Guillote also indicated that

she updated the ICSC schedule for Gemini, responded to 401(k) questions, and attended a

meeting on 401(k) and healthcare issues during that same time period.  (Id.)  On May 1, 2015,

Guillote corresponded by email with ADP Retirement Services to discuss adding Elevation to

Gemini's 401(k) plan as an affiliate and submitted forms to Blue Cross and Blue Shield of North

Carolina to establish Elevation as an affiliate of Gemini.  (Pencu Decl. in Resp. to Elevation's

Mot. for Summ. J., Ex. 22, 23, 57.)

At her deposition, Guillote admitted to not monitoring her Gemini email closely

for a period of days, despite the fact she was performing Gemini work during that time, including

"office management tasks, mail, phones, etc."  (Guillote Tr., Pencu Decl. in Resp. to Elevation's

Mot. for Summ. J., Ex. 11, at 236:23-240-13.)  Guillote testified that such tasks included filling

the copy machine, distributing mail, and meeting with vendors of office services.  (Id. at 240:4-

13.)

Guillote also exchanged emails with Dennis Esselman of incsNOW in June 2015,

in which she requested instructions on how to remotely access the Gemini network because,

although she was no longer a Gemini employee, she needed to instruct Gemini staff on how to do

so.  (Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Exs. 59, 61.)

Giusti also moved from Gemini to Elevation on April 1, 2015, and maintained a

diary to track his time spent on Gemini projects.  (Elevation's 56.1 St. ¶ 25.)  Giusti worked on

"identifying, sourcing or procuring new retail developments" for Gemini.  (Giusti Tr. at 20:22-

21:11.)  On March 6, 2015, Giusti exchanged emails with an outside company, discussing a

proposal to acquire Edgewater Place, a retail development in Raleigh, North Carolina. (Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 53; see also Massaro Tr., Muckenfuss Decl. in Supp. of Elevation's Mot. for Summ. J., Ex. B, at 162:7-10) (stating that Massaro worked with Giusti on the letter of intent for Edgewater Place).) Plaintiff proffers an unsigned letter of intent from Massaro, dated March 26, 2015, offering to purchase Edgewater Place on behalf of Gemini. (Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 73.) Massaro, however, testified that that document was a draft and that he intended to, and indeed did, submit the letter on behalf of Elevation. (Massaro Tr., Muckenfuss Decl. in Supp. of Elevation's Mot. for Summ. J., Ex. B, at 163:16-166:24.) Elevation was ultimately unsuccessful in purchasing the property. (Elevation's 56.1 St. ¶ 60.)

Paul Harnett is a Gemini employee whom, according to La Mack's testimony, Individual Defendants were considering hiring to work for Elevation. (La Mack Tr., Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 9, at 32:11-33:6.) An Elevation letter of intent to purchase a property in Florida listed Harnett as a member of the "team at Elevation" and detailed his experience. (Pencu Decl. in Resp. to Elevations Mot. for Summ. J., Ex. 76, Docket Entry No. 706, at ELVNYF0009233.)

According to Elevation's corporate testimony, Steve Ellis is a Gemini employee, but acted as an agent to lease space to tenants in Elevation's Riverside Crossing development pursuant to an agreement with Gemini to provide a leasing agent under which any commission earned would be paid to Gemini, which would in turn pay Ellis. (Elevation Rule 30(b)(6) Tr., Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 6, at 181:20-187:22.) This arrangement lasted from Kellogg's departure in January of 2016 until a replacement was hired to manage leasing for Elevation. (Id. at 183:17-184:15.)

Melling was hired by both Gemini and Elevation as an independent contractor.[15] (Elevation's 56.1 St. ¶ 30.)  Gemini hired Melling to help manage investor relations in October 2014, although Gemini already had two employees who worked on investor relations issues. (Melling Tr., Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 10, at 37:4-39:20; Pl.'s Resp. to Elevation's 56.1 St. ¶ 29.)  Although sourcing new investment opportunities was not in his "particular job description," he helped Gemini pursue a development in Brooklyn in November 2014.[16]  (Melling Tr., Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 10, at 69:10-13, 99:16-102:18.)

Plaintiff identifies several Gemini business opportunities that he believes were appropriated by Elevation.  Gemini entered into a contract of sale to purchase Riverside Crossing, a commercial development in Greenville, South Carolina, on November 21, 2013, which was last amended on October 10, 2014.  (Contract of Sale and Subsequent Amendments, Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 66.)  Ashville Savings Bank, Gemini's lender for this transaction, withdrew its commitment and Gemini then assigned the contract of sale to Ryland Corporation, the parent of Lowes Foods ("Lowes"), the anchor tenant for the development.  (Elevation's 56.1 St. ¶ 47; see Pl.'s Resp. to Elevation's 56.1 St. ¶ 47; La Mack Tr., Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 9, at 81:17-82:5; Elevation Rule 30(b)(6) Tr., Muckenfuss Decl. in Supp. of Elevation's Mot. for Summ. J., Ex. I, at 195:4-196:12.)  La Mack testified that he and Massaro believed that Gemini might have a future

---

[15]     Plaintiff asserts that only Gemini paid Melling for his services and that only Elevation derived any benefit, but fails to cite any relevant evidence.  (See Pl.'s Resp. to Elevation's 56.1 St. ¶ 30.)

[16]     Plaintiff also asserts that Melling helped pursue a joint venture between Elevation and Bridgeton to purchase a property in Jersey City, New Jersey, but only cites an email from La Mack to Jariwala asking to discuss the deal and on which Melling was carbon copied. (Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 50, at Bridgeton-00052593.)

opportunity to develop the property for Ryland, although no agreement was reached.  (See La Mack Tr., Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 9, at 82:6-83:19; see also Massaro Tr., Muckenfuss Decl. in Support of Elevation's Mot. for Summ. J., Ex. B, at 139:22-141:9.)  In 2015, Individual Defendants began negotiating an agreement to purchase and develop Riverside Crossing.  (Elevation's 56.1 St. ¶ 49; see Pl.'s Resp. to Elevation's 56.1 St. ¶ 49.)  By email dated May 8, 2015, La Mack offered Plaintiff the choice to proceed with the transaction as a Gemini project, in which each partner would receive one-third of Gemini's 20 percent stake; La Mack stated that the Individual Defendants would proceed with the transaction outside of Gemini if Plaintiff declined the opportunity.  (Muckenfuss Decl. in Support of Elevation's Mot. for Summ. J., Ex. BB.)  Plaintiff did not respond, and Individual Defendants proceeded with the transaction through Elevation.  (Elevation's 56.1 St. ¶ 51; see Pl.'s Resp. to Elevation's 56.1 St. ¶ 51.)  In May 2014, Elevation secured Gemini's due diligence file, which had been created in preparation for Gemini's failed 2014 transaction to acquire Riverside Crossing.  (Massaro Decl., Apr. 6, 2017, Docket Entry No. 435, ¶ 14.)  On August 12, 2015, following the closing of the transaction, Elevation reimbursed Gemini $102,650.01 for its due diligence expenses.  (Id.; Muckenfuss Decl. in Supp. of Elevation's Mot. for Summ. J., Ex. CC.)

Gemini entered into a Purchase and Sale Agreement to purchase the Lee Vaughn Property in Simpsonville, South Carolina on December 17, 2014, which was amended on May 13, 2015.  (Elevation 56.1 St. ¶ 61; Pl.'s Resp. to Elevation's 56.1 St. ¶ 61.)  Although Elevation never closed on this transaction, Plaintiff has proffered an email chain, dated October 1, 2015, in which La Mack states that he is waiting for his counsel to determine whether the contract could be assigned by Gemini to Elevation.  (Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 75; Elevation's 56.1 St. ¶ 63.)

In 2015, Individual Defendants and the Alto Group explored acquiring an LA Fitness location in Apple Valley, Minnesota, that was being marketed by Marcus & Millichap. (Massaro Decl., Apr. 6, 2017, ¶ 12.)  Although two Gemini investment funds held a note on this property, the owners were not affiliated with Gemini.  (Id. ¶ 13.)  Plaintiff has proffered an email and attached offering memorandum from an investment advisor to Massaro, dated March 19, 2015, suggesting that, if the building were sold, the Gemini investors would be "paid off." (Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 72.)  Despite entering into a sales contract on the property in May 2015, Elevation ultimately did not close on this transaction. (Elevation's 56.1 St. ¶ 58.)

Plaintiff's Access to Individual Defendants' Communications

On June 14, 2014, Obeid contacted Madison Technology ("Madison"), GREA's information technology provider, based on his suspicions that Individual Defendants were not acting in the best interests of Gemini and requested access to their email accounts.  (Pl.'s 56. St. ¶ 11; see Individual Defs.' 56.1 Resp. ¶ 11.)  Madison, which was not aware that anyone other than Obeid had a membership interest in Gemini, recommended and installed Spector 360 software, which tracked keystrokes, "collect[ed] email, [and] collect[ed] file access," on Individual Defendants' virtual desktops, and allowed Obeid to observe Individual Defendants' desktops remotely, "as if someone is standing over [Individual Defendants'] shoulder watching what [they] are doing on [their] computer."[17]  (Alexander Schmidt Tr., Muckenfuss Decl. in

---

[17]    Plaintiff asserts that he disclosed his monitoring to Individual Defendants when he relied on the communications he gathered from the Spector 360 monitoring in his later application to this Court for a temporary restraining order to enjoin the closing of Riverside Crossing, but he cites no relevant evidence in support of this proposition.  (See Pl.'s 56.1 St. ¶ 22.)

Resp. to Pl.'s Mot. for Summ. J., Ex. C, at 50:3-18, 116:12-17; Pl.'s 56.1 St. ¶¶ 12-14; see also Individual Defs.' 56.1 Resp. ¶¶ 12-14.)   In August of 2014, Obeid instructed Madison to cease the monitoring activity and Madison disclosed the monitoring to Individual Defendants.  (Obeid Tr., Muckenfuss Decl. in Resp. to Pl.'s Mot. for Summ. J., Ex. D, at 140:17-141:11; Schmidt Tr. at 117:2-7.)  On August 28, 2014, after Massaro had displaced Obeid as operating manger, Massaro emailed Alexander Schmidt ("Schmidt"), a Madison representative, to instruct him that "Obeid should be replaced [by Massaro] with regard to all authorizations, notices, and requests" and informing Schmidt that Massaro was now president of GREA.  (Muckenfuss Decl. in Resp. to Pl.'s Mot. for Summ. J., Ex. N.)  In December of 2014 and January of 2015, Obeid visited Madison and requested administrative access to Individual Defendants' emails.  (Pl.'s 56.1 St. ¶¶ 38-40; Individual Defs.' Resp. to Pl.'s 56.1 St. ¶¶ 38-40; Schmidt Tr. at 114:6-117:16.)  Schmidt granted Obeid's request.  (Schmidt Tr. at 114:17-22.)  According to Schmidt, he granted Obeid access despite Massaro's instructions because, in his view, all partners were entitled to equal access to all Gemini's data and, even had he known Gemini had additional partners in the summer of 2014, he would still have acceded to Obeid's original request to monitor Individual Defendants' computers.  (Id. at 115:1-116:25.)

Plaintiff accessed Individual Defendants' files, including personal documents and communications between them and their attorneys regarding the current litigation.  (Pl.'s 56.1 St. ¶¶ 38-40; Individual Defs.' Resp. to Pl.'s 56.1 St. ¶¶ 38-40; La Mack Tr., Pencu Decl. in Support of Pl.'s Mot. for Summ. J., Ex. 12, at 147:2-148:23; see Massaro Decl., July 28, 2017, ¶¶ 2-5; La Mack Decl., July 27, 2017, ¶¶ 3-6.)

Both Massaro and La Mack state that they would not have continued to use the Gemini email accounts and computer systems had they known Plaintiff was monitoring them.

(La Mack Decl., July 27, 2017, ¶ 5; Massaro Decl., July 28, 2017, ¶ 4.)  They assert that they

incurred damages as a result of the monitoring, insofar as they were required to retain legal

counsel to prevent Plaintiff from further accessing their information and disclosing the

information he had obtained.  (Massaro Decl., July 28, 2017, ¶¶ 3, 5; La Mack Decl., July 27,

2017, ¶¶ 4-6; La Mack Tr., Pencu Decl. in Support of Pl.'s Mot. for Summ. J., Ex. 12, at 147:2-

148:23.)

> Gemini's Corporate Handbook provides, in pertinent part, that:

> For business purposes, management reserves the right to enter, search and/or
> monitor the company's private email system and the file/transmission of any
> employee without advance notice and consistent with applicable state and federal
> laws. Employees should expect that communications that they send and receive
> by the company's private email system will be disclosed to management.
> Employees should not assume that communications that they send and receive by
> the company's private email system are private or confidential.

(Docket Entry No. 514, section 1, page 7.)

GREA Member-managers receive distributions rather than salaries, are not party

to employment contracts, and do not receive W-2 forms.  (Massaro Decl., July 28, 2017, ¶ 12.)

Individual Defendants also proffer a report from ADP Employer services, which purports to list

GREA's employees but does not include the member-managers.  (See Muckenfuss Decl. in

Resp. to Pl.'s Mot. for Summ. J., Ex. M.)  Plaintiff asserts that the Individual Defendants'

reference to "the Individual Defendants and other targeted Gemini employees" (and other similar

phrases) in their Amended Counterclaims relating to Plaintiff's computer system access

constitute an admission that the Individual Defendants were employees within the meaning of

the quoted policy.  (See Am. Counterclaims ¶¶ 127, 130, 131, 134, 136; Pl.'s Reply Mem. of

Law in Further Supp. of his Mot. for Summ. J. as to the Individual Defs.' Am. Counterclaims,

Docket Entry No. 516, at 1 n. 2.)

## II. DISCUSSION

### A. Summary Judgment Standard

The pending motions are brought pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Under Rule 56(a), summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a material issues of fact, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986), and the court must be able to find that, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." Marvel Entertainment, Inc. v. Kellytoy (USA), Inc., 769 F. Supp. 2d 520, 523 (S.D.N.Y.2011) (quoting Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted). A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted). "[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation marks and citations omitted). When considering cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Schwabenbauer v. Board of Educ. of City School Dist. of City of Olean, 667 F.2d 305, 314 (2d Cir. 1981).

B.  Motions to Strike

Both Bridgeton and the Individual Defendants move to strike vast portions of Plaintiff's  responses to their respective S.D.N.Y. Local Civil Rule 56.1 ("Rule 56.1") statements and request that the Court deem the Bridgeton and Individual Defendants' related assertions of fact uncontested and thus admitted.  "The purpose of a rule 56.1 Statement is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties."  Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001).  Rule 56.1(a) requires that a motion for summary judgment be accompanied by a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The non-moving party must respond with a "correspondingly numbered paragraph responding to each . . . statement of the moving party [citing to admissible evidence], and if necessary, [may add] additional paragraphs containing a separate, short and concise statement of additional material facts."  Rule 56.1(b), (c).  Each statement of material facts not specifically controverted by the non-moving party is deemed admitted.  Rule 56.1(d).  Bridgeton and Individual Defendants argue that Plaintiff's responses contain legal arguments, are unresponsive to the specific facts Defendants contend are uncontested, and are often unsupported by citations to admissible evidence.

Courts may strike argumentative statements in Rule 56.1 response that are appropriate for a non-moving party's opposition briefing or consist of extraneous facts not responsive to the moving party's Rule 56.1 statement.  See Goldstick v. The Hartford, Inc., No. 00 CIV. 8577 (LAK), 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (striking argumentative sections but retaining any admissions or denials and citations to the record); see also Costello v. N.Y. State Nurses Ass'n, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011)

(disregarding responses that were not responsive to the moving party's respective Rule 56.1 statements and failed to cite to admissible evidence).

Plaintiff's Rule 56.1 responses are excessive in length, at 202 and 124 pages respectively, are infused with legal arguments, and include lengthy narrative and argumentative factual proffers that are neither responsive to the factual assertion they purport to dispute nor compliant with Rule 56.1(b)'s provision for a "separate, short and concise statement of additional facts as to which it is contended there exists a Guinee issue to be tried." Rule 56.1(b) (emphasis added). Furthermore, in Plaintiff's opposition briefs, he often makes broad factual assertions without references to specific supporting facts, instead citing to lengthy segments of his Rule 56.1 response containing scattered references to a few specific relevant facts and, often, further legal argument, leaving the Court to parse his Rule 56.1 response for cited evidence to determine which facts might support the arguments advanced in his opposition briefs.

Because Plaintiff's facial noncompliance is so pervasive, the Court has found it prudent to examine Plaintiff's Rule 56.1 responses in the context of specific issues that are relevant to the legal questions that are material to the disposition of these summary judgment motions rather than to rule separately on every element of the motions to strike. In so doing, the Court has reviewed evidentiary citations that accompany factual assertions that are directly responsive to the Defendants' factual propositions, and disregarded legal argument and "additional . . . facts" proffered in narrative factual arguments included in Plaintiff's purported responses to Defendants' Rule 56.1(a) contentions. Where the Court finds that Plaintiff has identified a genuine issue of material fact, the Court identifies the relevant evidence directly or by reference to the specific portion of the Plaintiff's Rule 56.1 response. Cf. Holtz, 258 F.3d at

74 ("Where, as here, the record does not support the assertions in a Rule 56.1 statement, those assertions should be disregarded and the record reviewed independently.").

C.  Choice of Law

A federal court sitting in diversity will adopt the choice of law analysis of the forum state in which it sits.  Softel, Inc. v. Dragon Med & Sci. Commc'ns, 118 F.3d 955, 967 (2d Cir. 1997).  Pursuant to the New York Limited Liability Company Law, "the laws of the jurisdiction under which a foreign limited liability company is formed govern its organization and internal affairs and the liability of its members and managers."  N.Y. L.L.C. Law § 801(a). Because GREA was organized under the laws of Delaware, the Court will apply the law of that state to Plaintiff's and Individual Defendants' claims for breach of fiduciary duty and for breach of GREA's operating agreement, which also provides that it will be construed under Delaware law.  See id.; (2009 Agreement ¶ 11.7).  The parties do not advance any particular arguments as to which state's law should apply to the balance of the parties' state law claims, such as conversion and unjust enrichment, but do proffer evidence that Gemini kept some of its offices in New York.  Because, by relying on New York law in their briefs, the parties implicitly consented to its application, the Court will apply New York law in addressing the balance of the parties' claims.  Celle v. Filipino Reporter Enters., Inc., 209 F.3d 163, 175-76 (2d Cir. 2000) (parties are deemed to have consented to a choice of law if they do not object to its application); Joyce v. Thompson Wigdor & Gilly LLP, No. 06-CV-15315-RLC, 2008 WL 2329227, at *3 (S.D.N.Y. June 3, 2008) (court applied New York law when parties assumed the application of New York law in their submissions).

## D. Derivative Standing

Individual Defendants do not dispute that Plaintiff has standing to assert derivative claims on behalf of GREA and GEP, of which he is a member, but argue that, Obeid lacks standing to bring derivative claims on behalf of the remaining 120 Gemini entities.[18] See In re Nine Sys. Corporation Shareholders Litig., No. CIV.A. 3940-VCN, 2014 WL 4383127, at *21 (Del. Ch. Sept. 4, 2014), aff'd sub nom. Fuchs v. Wren Holdings, LLC, 129 A.3d 882 (Del. 2015) (equating derivative status with standing). In order to bring a derivative suit on behalf of a corporate entity the plaintiff must be a corporate stockholder, limited liability company member, or partner in a limited partnership who, prior to filing the derivative action, has demanded that the directors pursue the claim on behalf of the corporation who, in turn, wrongfully refused to do so or who establishes that such a demand would be futile. Wood v. Baum, 953 A.2d 136, 140 (Del. 2008); see 6 Del. C. §§ 17-1001, 1002, 18-1001, 1002 (permitting limited liability

---

[18]    Plaintiff contends that Defendants are barred from contesting Plaintiff's derivative standing because the Delaware Court of Chancery, in a related proceeding in which Plaintiff opposed GEP's appointment to a special litigation committee, ruled that the instant action had "progressed well beyond the stage where La Mack and Massaro could contest Obeid's authority to assert derivative claims." Obeid v. Hogan, No. CV 11900-VCL, 2016 WL 3356851, at *2 (Del. Ch. June 10, 2016), judgment entered, (Del. Ch. Sept. 7, 2016). The Chancery Court's decision, however, analyzed only the demand requirement for a derivative suit, which it noted can be waived if the corporation fails to take a litigation position or move to dismiss the action pursuant to Chancery Court Rule 23.1. Id. at *9. Because a plaintiff's standing as a stockholder or member is jurisdictional, the Court finds that Individual Defendants' failure to move to dismiss this action for failure to comply with Delaware Chancery Rule or Federal Rule of Civil Procedure 23.1 does not preclude them from contesting Plaintiff's standing to sue on behalf of various Gemini-affiliated entities. Kautz v. Sugarman, No. 10 CIV. 3478 RJS, 2011 WL 1330676, at *3-4 (S.D.N.Y. Mar. 31, 2011), aff'd, 456 F. App'x 16 (2d Cir. 2011) (analyzing a motion to dismiss a derivative claim for failure to verify that plaintiff was a stockholder for lack of standing under Federal rule of Civil Procedure 12(b)(1)).

company members, limited partnership partners, or their assignees to bring a derivative suit); VGS, Inc. v. Castiel, No. C.A. 17995, 2003 WL 723285, at *11 (Del. Ch. Feb. 28, 2003) ("[C]ase law governing corporate derivative suits is equally applicable to suits on behalf of an LLC."); Gotham v. Hallwood Realty Partners, L.P., No. CIV. A. 15754-NC, 1998 WL 832631, at *6 (Del. Ch. Nov. 10, 1998) (precedent for corporate derivative suits may be applied to limited partnerships).  Under Delaware law, a stockholder of a parent corporation may have standing to bring a "double derivative" suit on behalf of a subsidiary that is "either wholly owned or majority controlled" by the parent entity despite the fact he or she lacks a direct ownership interest in the subsidiary.  See Lambrecht v. O'Neal, 3 A.3d 277, 282 (Del. 2010).

Here, Plaintiff has presented evidence that he has a direct membership interest in GRP and 300 West 22nd Street, LLC.  He also asserts in his declaration that GPM, Gemini Fund 5 Manager, LLC, Gemini Acquisition Company, LLC, Gemini Holdings, LLC, Sprucewood Realty, LLC, Gemini Brandon S, LLC, Gemini Lewisville Commons H, LLC, Gemini Town Center H, LLC, Gemini Ebensburg Plaza S, LLC, Gemini Tinley Park H, LLC, Gemini Johnstown Galleria H, LLC, Gemini Loan Servicing, LLC, Gemini Capital Markets, LLC, 1775 James Avenue Manager, LLC, 33 Peck Slip Manager, LLC, 36 West 38th Street Manager, LLC, Gemini Jade Bryant Park Developer, LLC, Gemini Rowlett Crossing GP, LLC, Gemini 449 West 36th Street MT, LLC, Gemini 305 West 39th Street MT, LLC, Gemini 442 West 36th Street MT, LLC and Gemini 135 East Houston MT, LLC are wholly owned subsidiaries of GEP, GRP, or GREA, entities of which he is a member.  Defendants have not controverted his assertions regarding the relationship between these entities; the undisputed facts thus indicate that Plaintiff has standing to bring double derivative suits on behalf of these aforementioned subsidiary entities.

Plaintiff also makes the conclusory argument that his interests in GREA and GEP grant him derivative standing in all Gemini subsidiary entities in which GREA or GEP is a manger or has an ownership stake, but cites no authority in support of this proposition. He also argues, apparently relying on his own conclusory assertion in his declaration, that the balance of the Gemini-affiliated entities are "majority controlled by GREA or its three Member-Managers," despite his testimony that GEP or GREA held minority interests in or were only appointed to manage those entities. (Obeid Decl., July 28, 2017, ¶ 13.) Because Plaintiff has cited no admissible evidence to establish his derivative standing to bring suit on behalf of the balance of the Gemini-affiliated entities, his claims brought on behalf of those entities are dismissed. [19]  See

---

[19]    Accordingly, Plaintiff's claims brought on behalf of Gemini Asset Management, LLC, Gemini Hotel Manager, LLC, Gemini Realty GP, LLC, Gemini Realty Trust, Inc., Gemini Property Advisor, LLC, Gemini Acquisition Subsidiary, LLC, GCM Olean, LLC, Gemini Dunbar Mezz Lender, LLC, Gemini Hospitality Management, LLC, Gemini Hospitality Advisors, LLC, GMP Funding, LLC, GMP Parent, LLC, GMP Manager, LLC, Gemini CP Operator, LLC, Gemini Real Estate Partners, LP, EWH Capital, LLC, Gemini Commercial Realty, LLC, Gemini 135 East Houston, LLC, Gemini 135 East Houston H, LLC, Gemini 442 West 36th Street, LLC, Gemini 442 West 36th Street H, LLC, Gemini 442 West 36th Street 30, LLC, Gemini 305 West 39th Street, LLC, Gemini 305 West 39th Street H, LLC, Gemini 305 West 39th Street 4, LLC, 300 West 22 Realty LLC, 300 West 22 Managing Member, LLC, 300 West 22 Retail, LLC, 52 West 13th P, LLC, 52 West 13th Holding, LLC, The Gem Hotel Union Square, LLC, Gemini 37 West 24th Street MT, LLC, Gemini 37 West 24th Street, LLC, Gemini NYC Hotel, LLC, Gemini JFK Hotel, LLC, Gemini 280 Friend Street MT, LLC, Gemini 280 Friend Street JV, LLC, 36 West 38th Street Holding, LLC, 36 West 38th Street, LLC, 33 Peck Slip Acquisition, LLC, 33 Peck Slip Holding, LLC, 33 Peck Slip Property Management, LLC, 1775 James Avenue, LLC, 1775 James Avenue Holding, LLC, LLC, Gemini Boynton Beach S, LLC, Gemini Town Center M, LLC, Gemini Real Estate Ranch Lake, LLC, Gemini Ranch Lake Member, LLC, Gemini Tamiami, LLC, Gemini Tamiami H, LLC, Gemini Centerville Galleria LLC, Gemini Centerville Galleria H, LLC, Gemini Centerville Outparcel, LLC, Gemini East West, LLC, Gemini East West H, LLC, Gemini Indian Creek, LLC, Gemini Indian Creek H, LLC, Gemini Real Estate Indian Creek, LLC, Gemini Real Estate Indian Creek Member, LLC, Gemini DuBois Mall, LLC, Gemini DuBois Mall H, LLC, DuBois Venture 1, LLC, LLC, Gemini Johnstown Galleria, LLC, Gemini Johnstown Galleria S, LLC, Gemini Realty Harper Crossing, LLC, Gemini Realty Harper Crossing Member, LLC, Gemini River Ridge, LLC, Gemini River Ridge H, LLC, Gemini Youngsville Crossing, LLC, Gemini Youngsville Crossing

<u>Joseph v. Brooklyn Developmental Disabilities Servs. Office</u>, No. 12CV4402PKCCLP, 2016

WL 6700831, at \*26 (E.D.N.Y. Sept. 30, 2016) ("[C]onclusory testimony, unsupported by any

other evidence in the record, is insufficient at [the summary judgment stage] to support Plaintiff's

<u>prima facie</u> case."); <u>see also</u> <u>Whad v. FBI</u>, 179 F.R.D. 429 (S.D.N.Y. 1998) (striking affidavit

testimony that police withheld exculpatory evidence as a legal conclusion).

E. <u>Elevation's Motion for Summary Judgment</u>

Elevation moves for summary judgment on Plaintiff's remaining derivative

claims, brought on behalf of Gemini, against it for conversion and unjust enrichment.

1. <u>Conversion Claim (11th Cause of Action)</u>

Under New York law, "[c]onversion is the unauthorized assumption and exercise

of the right of ownership over goods belonging to another to the exclusion of the owner's rights."

<u>Thyroff v. Nationwide Mut. Ins. Co.</u>, 460 F.3d 400, 403-404 (2d Cir. 2006); <u>see also</u> <u>Colavito v.</u>

<u>N.Y. Organ Donor Network, Inc.</u>, 8 N.Y.3d 43, 49-50 (N.Y. 2006) ("A conversion takes place

when someone, intentionally and without authority, assumes or exercises control over personal

property belonging to someone else, interfering with that person's right of possession.")  A

---

M, LLC, Gemini Youngsville Crossing Manager, LLC, SPEBNE Acquisitions, LLC, Gemini Parkway Plaza, LLC, Gemini Parkway Plaza H, LLC, Gemini Rio Norte H GP, LLC, Gemini Rio Norte, LLC, Gemini Rio Norte H, LLC, Gemini Rowlett Crossing, LP, Gemini Rowlett Crossing H GP, LP, Gemini Rowlett Crossing S GP, LP, Gemini Rowlett Crossing Holdings, LLC, Gemini Rowlett Crossing H, LLC, Gemini Rowlett Crossing S, LLC, Gemini Richardson Square, LP, Gemini Richardson Square GP, LLC, Gemini Richardson Square Investors, LLC, Richardson Village Holdings, LLC, Gemini OF III Richardson Square, LLC, Gemini College Plaza, LLC, Gemini College Plaza H, LLC, Gemini Opportunity Fund I, LLC, Gemini Opportunity Fund III, LLC, Gemini Opportunity Fund IV, LLC, Gemini New York Hospitality Fund, LLC, Gemini Fund 5, LLC, and Gemini Olean Mezz Lender, LLC are dismissed.

plaintiff asserting a conversion claim must establish that it had "ownership, possession or control over the property before its conversion." Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (citation and internal quotation marks omitted). The plaintiff must also establish that the defendant converted a specific, identifiable piece of property. See Berman v. Sugo LLC, 580 F. Supp. 2d 191, 207 (S.D.N.Y. 2008) (citation omitted).

The first instance of conversion alleged by Plaintiff is Gemini's expenditure of $58,219 for the ICSC booth and to sponsor a suite at an ICSC party. Even if the Court were to find that Elevation benefitted from Gemini's expenditures by being permitted to network at Gemini's suite at the ICSC party or advertise at Gemini's booth, Plaintiff is unable to meet his burden of establishing that Elevation exercised control of the funds to Gemini's complete exclusion. See Harper & Row, Publrs., Inc. v. Nation Enters., 723 F.2d 195, 201 (2d Cir. 1983), rev'd and remanded on other grounds, 471 U.S. 539 (1985) ("Conversion requires . . . the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor."). Courts will dismiss conversion claims where the true owner is not deprived of the property, such as when a defendant's use of a trade secret or client list did not deprive the plaintiff of its use of the purportedly converted property. See Stanacard, LLC v. Rubard, LLC, No. 12 CIV. 5176, 2016 WL 462508, at *20 (S.D.N.Y. Feb. 3, 2016) (granting summary judgment when no evidence suggested that defendant's appropriation of a trade secret deprived plaintiff of the use of that trade secret); see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d 489, 536 (S.D.N.Y. 2011) (plaintiff did not state conversion claim where it alleged defendant "possessed only a copy of the client list and did not, in any way, limit or otherwise deprive Pure Power of possession or use of that list")

Here, Plaintiff asserts that Gemini accrued no benefit from its ICSC expenditures and use of its employees to staff its booth, which Plaintiff contends were purely for Elevation's benefit, because Individual Defendants had already decided that Gemini would pursue no new deals, other than the two developments that Gemini was already pursuing. This statement alone cannot support a reasonable jury's inference that Gemini received no benefit from its participation in the conference because Plaintiff has pointed to no evidence from which the trier of fact could infer that Gemini had ceased seeking to solicit new tenants or to foster and renew relationships with existing tenants, a position that, in any event, is inconsistent with La Mack's testimony that the Gemini booth was staffed by Gemini's shopping center leasing team.[20] Because Plaintiff has not established that Elevation exercised control of the ICSC funds to the complete exclusion of Gemini, the Court dismisses his claims with respect to these funds.[21] <u>See</u>

---

[20]   Plaintiff's damages expert, in his report, also states that Gemini derived no benefits from its ICSC Conference attendance and expenditures because, according to Massaro's cited testimony, Gemini was not pursuing any new deals and therefore all ICSC expenses were for Elevation's sole benefit. (Gardemal Report ¶ 148.) Gardemal's inference is inadmissible pursuant to Federal Rule of Evidence 702(a), because his expertise would not assist the trier of fact to determine whether testimony that Gemini was pursuing no new deals, aside from the pending development deals, is sufficient to support a determination that Gemini received no benefit from its ICSC Conference attendance. The Court also notes that both Plaintiff and Gardemal cite Massaro's deposition, but have failed to provide the Court with the relevant excerpts. (<u>See</u> Pl.'s Resp. to Elevations 56.1 St. ¶ 23; <u>see also</u> Gardemal Report ¶ 148 n. 259.) The Court therefore relies on GREA's Rule 30(b)(6) deposition and other relevant portions of Massaro's deposition.

[21]   According to Plaintiff, Gardemal discovered that La Mack used his Gemini credit card to pay for the travel expenses of Elevation's ICSC Conference Attendees. (Gardemal Report ¶ 149.) Because this claim for conversion was not raised in Plaintiff's TAC, but only in its opposition to Elevation's motion for summary judgment, and Plaintiff failed to move to amend his TAC to assert a claim in this regard, it is not properly before the Court. <u>See</u> <u>Southwick Clothing LLC v. GFT (USA) Corp.</u>, No. 99 CV 10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion.").

Thyroff, 460 F.3d at 403-404 (to convert property, defendant's dominion must be to a plaintiff's complete exclusion).

Plaintiff next asserts that Elevation converted a portion of Gemini's North Carolina office space by occupying it without payment. Because Plaintiff has adduced no evidence to controvert Elevation's proffer that it paid rent to the landlord for the use of this space, he has failed to demonstrate conversion as a matter of law and this claim is also dismissed.

Plaintiff's next claim is for the conversion of funds Gemini reimbursed to Elevation for the work performed for Gemini by Elevation employees Giusti and Guillote. Plaintiff argues that Giusti charged Gemini for time he spent working on the Riverside Crossing development, which was ultimately developed by Elevation rather than Gemini. Elevation, however, proffers evidence that Riverside Crossing was offered to Gemini pending Obeid's approval, and, therefore, a reasonable jury could not conclude that the funds were expended purely for Elevation's benefit to the exclusion of Gemini; Gemini was only excluded from the benefits of Giusti's work later on, when Obeid declined to assent to Gemini's pursuit of the project. Cf. Reis, Inc. v. Spring11 LLC, No. 15 CIV. 2836 (PGG), 2016 WL 5390896, at *10-11 (S.D.N.Y. Sept. 26, 2016) (granting motion to dismiss where defendant used data but did not interfere with the plaintiff's use of that data).

Plaintiff points to Guillote's time sheets, which indicate that she billed Gemini for work relating to health insurance, Gemini's 401(k) plan, and the ICSC Conference schedule,

which he asserts was for Elevation's rather than Gemini's benefit. As previously explained, Plaintiff has not demonstrated that Gemini derived no benefit from its ICSC attendance and related activities. Plaintiff has similarly failed to establish that Guillote's work on the ICSC schedule benefitted only Elevation, an unlikely proposition given that the proffered ICSC schedule contains meetings for Gemini's employees. (See Pencu Decl. in Resp. to Elevation's Mot. for Summ. J., Ex. 46.) Plaintiff's observation that none of Gemini's principals attended the ICSC Conference on Gemini's behalf is of no moment to this analysis since it is undisputed that Gemini representatives did attend.

Although Plaintiff has produced evidence indicating that Elevation charged Gemini for Guillote's work on Gemini's health insurance and 401(k) plans during the same period in which she was working to secure 401(k) and healthcare coverage for Elevation, he has pointed to no evidence sufficient to support a reasonable jury's inference that she performed the Elevation work during the time charged to Gemini for her services, rather than during the remainder of her time in which Elevation was responsible for her compensation. Plaintiff argues that Guillote spent an "extraordinary" amount of time on health insurance issues for Gemini, but proffers no evidence from which the Court could determine the amount of time that a human resources professional would reasonably have spent on insurance and retirement issues and thus fails to demonstrate that there is a genuine issue of fact as to whether Gemini's resources were diverted for Elevation's benefit.

Similarly, Plaintiff asserts that Guillote's failure to conscientiously monitor her email while she completed some of her more routine office management tasks leads to the inference that she was not performing work on Gemini's behalf as she claimed. Accepting any of Plaintiff's proposed inferences that Guillote was performing work for Elevation during the

time charged to Gemini, rather than during the remainder of her time in which she worked for Elevation, without any further direct or circumstantial evidence, would amount to speculation, which cannot create a genuine issue of material fact.  See Zapata v. Riverside Study Ctr., Inc., No. 10 CIV. 6283 CM, 2012 WL 1744792, at *12 (S.D.N.Y. May 16, 2012) (finding that non-moving plaintiff's assertion that employees of defendant company could have supervised premises despite testimony that defendant company did not supervise the work on that project, amounted to merely colorable speculation and thus insufficient to avoid summary judgment).

Plaintiff also alleges that Elevation converted Gemini funds to pay Forge for its marketing work for G2.  Plaintiff has not demonstrated how Elevation, which did not exist at the time Forge performed its services, exercised dominion over or otherwise benefitted from Forge's work to promote G2, and, accordingly, the Court also grants summary judgment as to this aspect of Plaintiff's conversion claim.

Finally, Plaintiff also alleges that Individual Defendants caused Gemini to expend funds to third parties to perform due diligence services in connection with the Riverside Crossing acquisition.  Because these costs were originally incurred in anticipation of Gemini's acquisition of the property and were again used for the second acquisition from Ryland, which was originally offered to Gemini pending Plaintiff's consent, Gemini was able to use the due diligence material in preparation for its unsuccessful attempts to acquire the property.  Thus Elevation did not completely deprive Plaintiff of the benefit of the material purchased with the allegedly converted funds, although it too benefited from the due diligence information. Accordingly summary judgment is granted as to this aspect of Plaintiff's conversion claim. Thyroff, 460 F.3d at 403-404 (to convert property, defendant's dominion must be to a plaintiff's complete exclusion).

For the foregoing reasons, the Court grants Elevation's motion for summary judgment as to conversion and dismisses Plaintiff's 11th Cause of Action against Elevation.

## 2. Unjust Enrichment (15th Cause of Action)

The Court next turns to Plaintiff's unjust enrichment claims against Elevation. Unjust enrichment is a quasi-contractual remedy whereby "a court may infer the existence of an implied contract to prevent one person who has obtained a benefit from another . . . from unjustly enriching himself at the other party's expense." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 905 (2d Cir. 1997) (citation omitted). An unjust enrichment claim under New York law requires a demonstration: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation marks and citation omitted). "The requirements that a defendant be enriched at plaintiff's expense and that good conscience necessitate that defendant make restitution to plaintiff, clearly contemplate that a defendant and plaintiff must have some type of direct dealings or an actual, substantive relationship." In re Motel Sec. Litig., No. 93 CV 2183, 1997 U.S. Dist. LEXIS 3909, at *21 (S.D.N.Y. Apr. 2, 1993).

Elevation argues that most of the work Plaintiff alleges was performed by Gemini employees for Elevation's benefit took place within the context of Gemini's potential separation into Arcade and G2 and that, given Plaintiff's concurrent private use of Gemini staff and resources, concerns of "equity and good conscience would [militate against] restitution." See Kaye, 202 F.3d at 616. Although Elevation's proffer of testimony that Obeid and Arcade benefited from Gemini resources is insufficient to establish that Elevation is entitled to judgment as a matter of law as to whether equitable concerns bar Plaintiff's claim, there are no material

fact issues precluding judgment dismissing certain of Plaintiff's claims against Elevation, as explained below.

Plaintiff asserts that Elevation was unjustly enriched by Melling's labors because, when he was hired by Gemini as an independent contractor, Gemini already had two employees who managed investor relations and Melling sourced new investment opportunities even though that was not, strictly, in his job description. The aforementioned evidence does not support the conclusion that Elevation benefitted in any way from Melling's work at Gemini's expense. To the extent that Melling performed any work on the potential joint venture between Elevation and Bridgeton to develop a property in Jersey City, Plaintiff points to no evidence that this work was performed at Gemini's expense, as Melling was concurrently working as an independent contractor for Elevation. Plaintiff has thus failed to meet its burden to establish unjust enrichment as to Melling's work.

Similarly, Plaintiff has proffered no evidence to controvert Elevation's Rule 30(b)(6) testimony that Ellis worked as a leasing agent on an Elevation project pursuant to an arrangement with Gemini to broker leases in exchange for a commission to be paid to Ellis through Gemini, instead inviting the Court to speculate that this arrangement was a sham. Waag v. Sotera Def. Solutions, Inc., 857 F3d 179, 190-91 (4th Cir. 2017) (finding that no reasonable jury, absent speculation, could conclude that an employee returning from Family and Medical Leave Act leave was reinstated into a different "sham" job based on the fact that the employer eliminated his new, but not his previous, position shortly after he was reinstated).

Plaintiff next advances arguments that Elevation was unjustly enriched by Guillote and Giusti's labor for substantially the same reasons articulated in its conversion claim, and for substantially the same reasons the Court finds Plaintiff has failed to frame a genuine

issue of material fact as to whether Elevation benefited at Gemini's expense. To the extent Plaintiff focuses on Guillote's efforts to establish G2's human resources and information technology infrastructure, he fails to identify how the efforts benefitted Elevation, an entity not then in existence. Elevation's motion for summary judgment is therefore granted as to Plaintiff's unjust enrichment claims with respect to Guillote, Giusti, Ellis and Melling's work.

The Court finds, however, that Plaintiff has demonstrated the existence of a genuine issue of material fact as to whether Elevation benefitted from the work of Feurtado, a Gemini officer who worked on options for Elevation's logo, and whether a reasonable jury could conclude that this work was at Gemini's expense. Similarly, the letter of intent produced by Plaintiff that holds Harnett out as a member of the Elevation's team could reasonably support a jury's conclusion that he was performing work on Elevation's behalf despite the fact he remained a Gemini employee. Elevation's motion for summary judgment is accordingly denied as to Plaintiff's unjust enrichment claims with respect to Feurtado and Harnett.

The Court now examines Plaintiff's claims that Elevation was unjustly enriched by its alleged usurpation of Gemini's corporate opportunities. GREA's 2009 Agreement explicitly permits the member-managers to engage in business ventures that may directly compete with Gemini. Therefore, Plaintiff must demonstrate more than that Individual Defendants caused Elevation to engage in competing real estate ventures in which Gemini might have been interested. To demonstrate that Elevation benefitted from investment prospects at the expense of Gemini, Plaintiff must establish that the potential investment constituted the diversion of a corporate opportunity, a doctrine normally applied to corporate fiduciaries who personally benefit from opportunities at the expense of their employers. Cf. Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 674, 676 (S.D.N.Y. 2005), aff'd sub nom. Design Strategy, Inc. v.

Davis, 469 F.3d 284 (2d Cir. 2006) (finding that a defendant was not unjustly enriched at plaintiff's expense because the purported benefit, a contract awarded by a third party, did not constitute a corporate opportunity).  New York courts will apply this doctrine where "the corporation has a tangible expectation in the opportunity, . . . the opportunity is the same as, or is 'necessary' for, or 'essential' to, the line of business of the corporation," and the failure to exploit the opportunity would threaten the continued viability of the corporation.  Nostrum Pharm., LLC v. Dixit, No. 13 CIV. 8718 CM AP, 2014 WL 4370695, at *13 (S.D.N.Y. Sept. 2, 2014).  A tangible expectancy "means something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope."  American Fed. Group v. Rothenberg, 136 F.3d 897, 906 (2d. Cir. 1998) (quoting Alexander & Alexander v. Fritzen, 542 N.Y.S.2d 530, 534 (App. Div. 1st Dep't 1989) (internal quotation marks omitted).

Here, the Riverside Crossing development deal was not consummated by Elevation until Gemini ceased to have any expectancy of effectuating the transaction, after Individual Defendants had offered Obeid the opportunity to pursue this development as a Gemini project and he declined to consent.  Even if the Court were to assume the truth of Plaintiff's argument, that Individual Defendants and Ryland entered into a side deal to later develop the property outside of Gemini, Plaintiff has presented no evidence that Individual Defendants would not have honored his consent to pursue this project through Gemini.

Plaintiff proffers evidence that Gemini was party to a Purchase and Sale Agreement for the Lee Vaughn Property, which Individual Defendants contemplated causing Gemini to assign to Elevation.[22]  Although the Purchase and Sale Agreement represented

---

[22]     In his opposition brief, Plaintiff discusses Elevation's alleged usurpation of Gemini's corporate opportunity to develop a parcel of land in Centerville, Georgia to be occupied

Gemini's tangible expectancy in the property, Plaintiff points to no evidence that Elevation ever actually appropriated this expectancy and thus accrued a benefit, which is a necessary predicate to a viable unjust enrichment claim.  See Rothenberg, 136 F.3d at 906 (a tangible expectancy is more than a hope).

Nor has Plaintiff presented any evidence to indicate that Gemini had an expectancy in the Apple Valley Property; the email cited by Plaintiff does not support his contention that Massaro was exploring the purchase of Apple Valley for Gemini.  It shows only that a financial advisor was apprising Massaro that the property was for sale and that the sale would affect the Gemini investment funds that held a note on the property.[23]

---

by a BJ's Wholesale Club, and which is currently owned by a Gemini investment fund. (Pl.'s Mem. of Law in Opp'n to Def. Elevation's Mot. for Summ. J. ("Pl.'s Mem. in Opp'n to Elevation"), Docket Entry No. 446, at 18.)  Plaintiff's citations to his Counter Statement of Material Facts, however, reference the Lee Vaughn property and the Court is unable to find any information in the record or TAC referencing a property in Centerville.  Accordingly, the Court construes Plaintiff's arguments with respect to this property as relating to the Lee Vaughn Property.  Furthermore, Plaintiff fails to cite any evidence for the proposition that a Gemini-affiliated entity is the current owner of either the Centerville or Lee Vaughn Property.  (See Pl.'s Resp. to Elevation's 56.1 St. ¶¶ 61-64.)

[23]  Elevation argues that, by failing to contest its motion for summary judgment with respect to the Apple Valley Property, Plaintiff has abandoned those claims.  A party's failure to partially oppose a motion for summary judgment does not relieve the Court of its responsibility to insure that no genuinely disputed issues of material fact exist and that the moving party's Rule 56.1 statement is supported by admissible evidence.  See Jackson v. Federal Express, 766 F.3d 189, 194 (2d Cir. 2014).  In his Rule 56.1 response, Plaintiff asserts that the investment advisor who sent the Apple Valley email to Massaro was a Gemini investor and that Individual Defendants then considered pursuing this transaction on Gemini's behalf.  (See Pl.'s Resp. to Elevation's 56.1 St. ¶ 56-57.)  Although the email cited in Plaintiff's Rule 56.1 response does not support his assertions, it does evidence his intent not to abandon this aspect of his unjust enrichment claim. Cf. Jackson, 766 F.3d at 196 (on a motion for summary judgment, deeming abandoned all claims by a non-moving plaintiff that she failed to oppose and which, the court observed, she proffered no evidence to support); (see Pencu Decl. in Opp'n to Elevation's Mot. for Summ. J., Ex. 72).

Despite Massaro's insistence that the unsigned letter of intent to purchase Edgewater Place on Gemini's behalf was merely a draft of the letter that was always intended to be submitted on Elevation's behalf, a jury could infer that the letter of intent was originally to be submitted on Gemini's behalf. Plaintiff has thus raised a genuine issue of material fact as to whether Gemini had a tangible expectancy, insofar as it was contemplating or had resolved to acquire this property, which was clearly within Gemini's line of business. See Burg v. Horn, 380 F.2d 897, 899 (2d Cir. 1967) (A director may not "purchase property which the corporation needs or has resolved to acquire, or which it is contemplating acquiring.") (internal citations omitted). Accordingly Elevation's motion for summary judgment is granted with respect to Plaintiff's claims for unjust enrichment through the usurpation of corporate opportunity except as to the attempted purchase of Edgewater Place, as to which the motion is denied.[24]

Finally, Plaintiff alleges that Elevation was unjustly enriched by access to Gemini's propriety information and computer network, but has failed to identify any tangible benefits accrued by Elevation or any detriment to Gemini. See Kaye, 202 F.3d at 616. Plaintiff's unjust enrichment claim is therefore dismissed with respect to Elevation's appropriation of Gemini's proprietary information.[25]

For the foregoing reasons, the Court grants Elevation's motion for summary judgment, dismissing all claims other than Plaintiff's unjust enrichment claim based on the work

---

[24]  Elevation also contends that Plaintiff abandoned his unjust claim with respect to Edgewater Place.  However, Plaintiff addressed this claim in his opposition brief.  (Pl.'s Mem. in Opp'n to Elevation at 2, 14.)

[25]  To the extent Plaintiff's premise their unjust enrichment claim on Elevation's use of Gemini's office space, that aspect of Plaintiff's claim is dismissed because Elevation has proffered uncontroverted evidence that it paid rent, as discussed with respect to Plaintiff's related conversion claim.

of Feurtado and Harnett and Elevation's alleged usurpation of Gemini's opportunity to acquire Edgewater Place.

    F.   <u>Individual Defendants' Motion for Summary Judgment</u>

        1.   <u>Breach of Fiduciary Duty (Plaintiff's 1st and 2nd Causes of Action)</u>

Individual Defendants move for summary judgment dismissing Plaintiff's remaining derivative and individual claims for breach of fiduciary duty, conversion, and unjust enrichment. Individual Defendants assert that section 6.1 of the 2009 Agreement immunizes them from claims for monetary damages for breach of fiduciary duty.[26] The 2004 Agreement shielded GREA's members from monetary liability except for willful misconduct, gross negligence, and breach of fiduciary duties, but provided that if the Delaware Limited Liability Company Act ("DLLCA") was amended to allow a greater limitation of liability, the member's liability would be "eliminated or limited to the fullest extent permitted by the Act as so amended." (2004 Agreement § 6.1.) Later in 2004, the DLLCA was in fact amended to permit limited liability companies' operating agreements to limit "any and all liabilities for breach of contract and breach of duties (including fiduciary duties) . . . [except for] bad faith violation[s] of the implied contractual covenant of good faith and fair dealing." 6 Del. C. § 18-1101(e); <u>see also</u> 74 Del. Laws 275 (enacted June 24, 2004). Individual Defendants argue that, by operation of law, the 2004 Agreement was amended to eliminate their liability for a breach of fiduciary duty and the execution of the 2009 Agreement, which had identical language in section 6.1, merely

---

[26]     Individual Defendants contend that the Court should dismiss all claims against them based upon section 6.1, presumably to include the claims for unjust enrichment and conversion, but provide no argument or rationale as to how liability for those additional claims is precluded by the 2009 Agreement. The Court declines to address whether section 6.1 precludes Plaintiff's conversion and unjust enrichment claims against Individual Defendants.

carried that limitation of liability forward. Plaintiff contends the reuse of the 2004 language, which exposed members to monetary liability for a breach of fiduciary duty, after Delaware law was amended to allow members to so limit their liability, evinces the members' intent to revert to the conditions when the 2004 Agreement was originally executed and thus to allow recovery for a breach of fiduciary duty pending a further revision of the DLLCA after 2009.

When contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate. Thompson v. Gjivoje, 896 F.2d 716, 721 (2d Cir. 1990) (citation omitted). Only where the language is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly. Id.; Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) ("[T]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous."). "[I]f an agreement is 'complete, clear and unambiguous on its face [, it] must be enforced according to the plain meaning of its terms.'" Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 177-78 (2d Cir. 2004) (citation omitted) (second alteration in original).

As discussed in the Court's decision on Individual Defendants' motion to dismiss, the 2009 Agreement, when viewed in isolation, contemplates that members may be liable breaches of fiduciary duty, pending "a 'further' elimination or limitation of liability by operation of an amendment to the DLLCA after the [2009] Operating Agreement was entered into." Obeid v. Mack, No. 14-CV-6498-LTS-MHD, 2016 WL 5719779, at *4 (S.D.N.Y. Sept. 30, 2016). Because the 2009 Agreement unambiguously permits liability for breaches of fiduciary duty and the integration clause explicitly states that the 2009 Agreement supersedes all previous agreements, the Court may not examine extrinsic evidence such as the 2004 Agreement to create

ambiguity.  Cf. Eagle Indus. v. DeVilbiss Health Care, 702 A.2d 1228, 1233 (Del. 1997) (a court

may examine extrinsic evidence, such as a previous version of a contract to interpret ambiguous

terms).  Accordingly, the Court denies Individual Defendants' motion to the extent it is premised

on the proposition that the 2009 agreement relieves them from liability for breach of fiduciary

duty.

   The Court next turns to Plaintiff's substantive contention that Individual

Defendants breached their fiduciary duties of loyalty and due care owed to Gemini's members.

Under Delaware law the decisions of corporate directors, or their equivalents, are protected by

the Business Judgment Rule so long as the decisions can be "attributed to any rational business

purpose."  Cede & Co. v. Techniclor, 634 A.2d 345, 360-61 (Del. 1993) (quoting Sinclair Oil

Corp. v. Levien, 280 A.2d 717, 720 (Del. 1971)); see Minn. Invco of RSA # 7, Inc. v. Midwest

Wireless Holdings, LLC, 903 A.2d 786, 797 (Del. Ch. 2006) (applying corporate breach of

fiduciary duty standards to a limited liability company).  In order to overcome the Business

Judgment Rule, a plaintiff bears the burden of establishing that a director breached his duty of

good faith, loyalty, or due care.  Cede, 634 A.2d at 360-61.  The duty of care is breached through

gross negligence and such an "examination . . . focus[es] on a board's decision-making process,"

to determine "whether a board has acted in a deliberate and knowledgeable way in identifying

and exploring alternatives."  Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 66

(Del. 1989).

   The duty of loyalty is breached when a controlling group of directors "appear on

both sides of a transaction [or] expect to derive any personal financial benefit from [the

transaction] in the sense of self-dealing, as opposed to a benefit which devolves upon the

corporation or all stockholders generally."  See Aronson v. Lewis, 473 A.2d 805, 812 (Del.

1984).    If a plaintiff succeeds in rebutting the Business Judgment Rule by demonstrating such conflict of interest or self-dealing, the burden shifts to the defendant to demonstrate the entire fairness of the transaction, consisting of both procedural and substantive fairness.  See Calma v. Templeton, 114 A.3d 563, 577 (Del. Ch. 2015).

Plaintiff first asserts that Individual Defendants violated their duties of care and loyalty through the sub-management agreement with Bridgeton, which Plaintiff characterizes as the gift of a business unit for no overt consideration, and the sale of HIEX at what Plaintiff contends was an inadequate price.  Plaintiff first posits that Individual Defendants caused Gemini to give its hotel management business to Bridgeton and sell HIEX at a favorable price, as consideration for a side deal in which Bridgeton agreed to partner with Individual Defendants to jointly purchase and develop future properties to the exclusion of Gemini and Obeid, thereby conferring a benefit on Individual Defendants greater than they would have enjoyed had the projects been done by Gemini.  Even taking as true Plaintiff's allegations that the terms of the sub-management agreement and HIEX sale were unusually favorable to Bridgeton, however, Plaintiff has failed to proffer evidence sufficient to frame a genuine issue of fact as to whether those terms were the products of a secret side deal between Bridgeton and Individual Defendants.  There is, for example, no evidence of the terms and parameters of the purported deal, or any evidence that the Individual Defendants engaged in or expected to engage in future business with Bridgeton on more favorable terms than would have been achieved through an arm's-length transaction in the absence of Gemini's purported economic concessions.  Cf. In re Nat'l Auto Credit S'Holders Litig., No. 19028, 2003 Del. Ch. LEXIS 5, 37-43 (Del. Ch. 2003) (finding a complaint sufficiently pled a set of transactions undertaken by a board that constituted a quid pro quo from which the court could infer the directors were interested in the outcome of

the decisions that would otherwise not personally benefit them). Plaintiff's reference to Bridgeton and the Individual Defendants' potential cooperation on the Cambria Projects and Morgan Point as circumstantial evidence of the existence of a side deal unfairly benefiting Individual Defendants and prejudicing Gemini is insufficient to raise Plaintiff's thesis above the level of speculation. The mere fact that Bridgeton and the Individual Defendants sought to enter into business together, without evidence that the Individual Defendants were receiving particularly favorable terms from Bridgeton, expected such terms, or that Bridgeton would not have been interested in entering such partnerships absent the sub-management and HIEX deals, is insufficient to permit a rational jury to conclude that the Individual Defendants breached their duty of loyalty by acting in their own personal interest in connection with the HIEX sale and the sub-management agreement. Accordingly, Plaintiff has not met his burden of proffering evidence that, taken as true, could support a finding that Individual Defendants breached their duty of loyalty and thus overcome the presumptions established by the Business Judgment Rule. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Plaintiff has, however, made a sufficient factual proffer with respect to breaching of the duty of care, pointing to evidence that the Individual Defendants, despite their articulated rationale for electing to enter into the sub-management agreement with Bridgeton, failed to consider any alternatives to the sub-management agreement, such as contracting with a different management company or selling the business outright, although other entities were likely interested in engaging in such transactions. A rational jury could conclude that a sale or sub-management agreement with another party were reasonable alternatives to the Bridgeton

agreement and that Individual Defendants were grossly negligent in failing to investigate the possibility of such alternatives.  See Citron, 569 A.2d at 66 (stating that the duty of care focuses on the decision making process, including the consideration of alternative transactions).  Plaintiff has not, however, identified any deficiency in Individual Defendants' decision to sell HIEX; Gemini hired a broker and, although Plaintiff asserts that Individual Defendants did not choose the most advantageous offer, it is undisputed that they selected the buyer that agreed to assume the property's debt and franchise agreement based upon the advice of their broker.

Plaintiff also claims that Individual Defendants breached their fiduciary duties with respect to Gemini's attempted prepetition sales of the Bryant Park Property, the Best Western Seaport, and the Jade Hotel GV, and the eventual sale of those properties and the Wyndham under the supervision of the bankruptcy court.  Plaintiff's claim as to prepetition conduct must fail because the prepetition sale attempts were never consummated, although such inchoate transactions may be relevant to evaluating claims of subsequent breaches of fiduciary duties.  See Freedman v. Rest. Assocs. Indus., Inc., No. CIV. A. 9212, 1990 WL 135923, at *7 (Del. Ch. Sept. 19, 1990).

Individual Defendants next contend that Plaintiff is preempted from using their conduct in the bankruptcy proceedings as the basis for a tort claim under state law, citing Astor Holdings v. Roski, 325 F. Supp. 2d 251, 262-63 (S.D.N.Y. 2003).  The Astor court, relying on the Second Circuit's decision in Eastern Equip. & Servs. Corp. v. Factory Point Nat'l Bank, 236 F.3d 117 (2d Cir. 2001), reasoned that permitting a plaintiff to bring a state law claim challenging a debtor's conduct in a bankruptcy proceeding for which he would have had recourse in the bankruptcy proceeding would unduly interfere with the federal process, and thus found that a claim against a defendant for aiding and abetting a debtor's breach of fiduciary duty in

relation to filing for bankruptcy was preempted under the Supremacy Clause.  Astor, 325 F.

Supp. 2d at 262-63; Eastern Equip., 236 F.3d (claims brought for breach of a bankruptcy court's

automatic stay under both state and federal law were preempted and thus the district court lacked

jurisdiction to consider them).  Here, as in Astor, Plaintiff could have objected within the

bankruptcy proceeding to the procedures themselves, to the proposed sale process, and to the

ultimate sales.  See e.g., 11 U.S.C. § 363.  Furthermore, that Individual Defendants were not

themselves the debtors in these proceedings is of no moment to the Court's analysis.  Astor, 325

F. Supp. 2d at 262 ("[T]he fact that the particular defendant in the state-law suit was not the

debtor is a distinction without a difference, since preemption entails that a claim that could have

been made, and for which a remedy is provided, under the Bankruptcy Code cannot be the

subject of regulation by state statutory or common-law remedies.") (internal quotation marks and

citations omitted).

   Plaintiff relies upon certain stipulations that were "so ordered" by the bankruptcy

court to support his contention that his breach of fiduciary duty claims with respect to the four

hotels were preserved to be prosecuted in this current action.  However, because the preemption

of state law claims challenging the validity of conduct supervised by the bankruptcy court is

jurisdictional, neither the parties by stipulation nor the bankruptcy court could grant this Court

jurisdiction over the preempted claims.  See Eastern Equip., 236 F.3d at 120-21) (holding that

the Bankruptcy Code's preemption of state law torts is jurisdictional); Reale Int'l v. Fed.

Republic of Nig., 647 F.2d 330, 331 (2d Cir. 1981) ("Graven in stone is the maxim that parties

cannot confer jurisdiction on a federal court by consent or stipulation.").

   Plaintiff's reliance on David v. Yageo Corp., 481 F.3d 661 (9th Cir. 2007) for the

proposition that parties may enter into a stipulation before a bankruptcy court to preserve a

breach of fiduciary claim is misplaced. The <u>Davis</u> court found that a breach of fiduciary duty claim was not preempted because the conduct which formed the basis of that claim involved corporate decisions to place a company into bankruptcy that occurred before the filing of the bankruptcy petition. <u>Id.</u> at 678-80. Here, Plaintiff does not allege in his complaint nor argue in this motion practice that Individual Defendants breached their fiduciary duty by placing the four Gemini hotels into bankruptcy, but rather seeks to assail their control of Gemini's subsidiaries' actions within the bankruptcy proceedings. <u>See</u> <u>id.</u> The Court, therefore grants Individual Defendants' motion for summary judgment with respect to Plaintiff's breach of fiduciary duty claims concerning the Bryant Park Property, the Best Western Seaport, the Jade Hotel GV, and the Wyndham.

Plaintiff also contends that Individual Defendants breached their fiduciary duties when they caused Gemini to default on the mortgage loan on Hotel 18 in Miami Beach, Florida, for which Obeid was the personal guarantor, and ignored Obeid's entreaties and proposals to avoid foreclosure on the property. Although Individual Defendants do not respond to this claim in their brief, they have cited testimony in their Rule 56.1 statement that indicates Individual Defendants examined Plaintiff's proposal and tendered a counteroffer. Plaintiff has, however, proffered sufficient testimony that Individual Defendants did not respond to his proposals to raise a genuine issue of material fact as to whether Individual Defendants were grossly negligent in failing, without explanation, to service Gemini's debts. Plaintiff has also proffered sufficient evidence for a jury to conclude that Individual Defendants breached their duty of loyalty. Causing Gemini to default on an obligation for which Plaintiff was the sole personal guarantor could lead to the reasonable inference that Individual Defendants were personally interested in using this default to injure or gain negotiating leverage over Plaintiff.

Plaintiff also claims that Individual Defendants usurped Gemini's corporate opportunities to acquire or develop Riverside Crossing, Apple Valley, the Lee Vaughn Property and Edgewater Place. These claims are based on the same theories of corporate usurpation that formed the basis of similar unjust enrichment claims against Elevation. For substantially the same reasons, the Court grants summary judgment and dismisses the usurpation of corporate opportunity claims with respect to Riverside Crossing, Apple Valley, and the Lee Vaughn Property, but denies summary judgment as to Edgewater Place.

Plaintiff asserts several other claims against Individual Defendants for breaches of fiduciary duty, including claims premised upon their withholding a payment termed a "promote distribution" due to him and their permitting, whether through lack of oversight or as consideration for a purported side deal, Bridgeton to charge Gemini for repairs to HIEX after Bridgeton had contracted to purchase that hotel but before the sale closed. Because these theories of liability were not pleaded in the TAC, Plaintiff may not assert them in connection with this motion practice.[27] See Southwick Clothing LLC v. GFT (USA) Corp., No. 99 CV 10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion.").

---

[27] The Court deems Plaintiff's claim that Individual Defendants breached their fiduciary duties by "aiding Bridgeton and Jariwala to publicize false and deceptive advertisement concerning Gemini's hospitality business, its hotel properties, and its intellectual property" abandoned because Plaintiff fails to contest Individual Defendants' motion for summary judgment on that claim. See Kovaco v. Rockbestos-Surprenant Cable Corp., 834 F.3d 128, 142-44 (2d Cir. 2016) (when a non-moving counseled party opposes summary judgment on some claims but not others, such claims are generally deemed abandoned); (see Pl.'s Resp. to Bridgeton's 56.1 St. ¶ 80 (not materially disputing that the sub-management agreement permitted Bridgeton to engage in advertisement)).

Plaintiff alleges that Gemini's proposed joint venture with Congress represents a breach of the duty of loyalty but, because the transaction was never consummated, it cannot form the basis of a breach of a viable fiduciary duty claim and this aspect of Plaintiff's claim is accordingly dismissed.  See Freedman, 1990 WL 135923, at *7.

Plaintiff generally asserts that Individual Defendants have deprived him of access to information that he contends he is entitled to as a member of Gemini, which also seems to include information required for discovery or in connection with the bankruptcy proceeding, but fails to articulate what information Individual Defendants, as fiduciaries, are required to provide him with, and the Court therefore dismisses this aspect of Plaintiff's breach of fiduciary duty claims.[28]  (See Pl.'s Resp. to Individual Defs.' 56.1 St. ¶¶ 170-72.)

Plaintiff finally alleges that Individual Defendants breached their duties of loyalty to Gemini by converting its assets and directing its employees to perform work for the benefit of either Elevation or G2.  Although the conduct parallels that alleged in Plaintiff's conversion and unjust enrichment claims against Elevation, any actions by a member or officer to benefit their outside interests at the expense of the company, such as directing employees to perform work for another business in which the member or officer has an interest, represents a breach of the duty of loyalty.  Backus v. U3 Advisors, Inc., No. 1:16-CV-8990-GHW, 2017 WL 3600430, at *20 (S.D.N.Y. Aug. 18, 2017) (finding that allegations that officers directed employees to perform work for another company in which they had an interest constituted a breach of the duty of

---

[28]    Furthermore, aside from the assertion that Individual Defendants denied him access to information he was "unquestionably entitled" to, Plaintiff impermissibly advances his case through argument in his Rule 56.1 response and such argument is accordingly disregarded.  See Goldstick, 2002 WL 1906029, at *1 (striking argumentative sections from a Rule 56.1 statement).

loyalty).  Accordingly, summary judgment is denied to the same extent as to the conversion and unjust enrichment claims brought against Elevation, namely the work of Harnett and Feurtado.  To the extent the claim is based on Individual Defendants' conduct in connection with G2, however, Individual Defendants' motion is denied with respect to the alleged conversion of Gemini funds to pay Forge for design and marketing services for G2 and, under a theory of unjust enrichment, Guillote's work to establish G2's infrastructure, benefits they, as members of G2, enjoyed.[29]

  2. <u>Unjust Enrichment and Conversion (11<u>th</u> and 15<u>th</u> Causes of Action)</u>

   Individual Defendants contend that they are entitled to summary judgment dismissing Plaintiff's Elevation-related unjust enrichment and conversion causes of action as asserted against them because Plaintiff has not put forward sufficient evidence to warrant the piercing of the member protection afforded by Elevation's LLC structure.  <u>See</u> <u>NetJets Aviation, Inc. v. LHC Communs., LLC</u>, 537 F.3d 168, 176 (2d Cir. 2008) (limited liability companies' members are protected from liability similarly to corporate shareholders); <u>see also</u> <u>Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC</u>, 975 F. Supp. 2d 392, 402 (S.D.N.Y. 2013) (under Delaware law, the plaintiff bears a heavy burden to persuade a court to disregard the liability

---

[29] Plaintiff's breach of fiduciary duty claim is dismissed to the extent it is based on Individual Defendants' alleged conversion of services Guillote provided for G2 while on the Gemini payroll.  Although Guillote's work to establish G2's office, technology, and human resources infrastructure before she started work for Elevation similarly would have benefited Individual Defendants as G2's principals, Plaintiff has not identified any specific funds or property that Individual Defendants exerted control over, except for Guillote's time, which as an intangible asset may not be converted under New York law.  <u>See</u> <u>MBF Clearing Corp. v. Shine</u>, 212 A.D.2d 478, 479, 623 N.Y.S.2d 204, 205 (1995) (dismissing claims for the conversion of employees' service because they, <u>inter</u> <u>alia,</u> represented intangible property).

protections of the corporate form).  Under Delaware law, however, a director or officer may be held liable for a corporation's tort that he or she personally commits regardless of a member or director's customary limitation on liability.  <u>Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC</u>, No. CIV. A. 3658-VCS, 2009 WL 1124451, at *12 (Del. Ch. Apr. 20, 2009). Plaintiff's conversion claims, which sound in tort, may thus be maintained against Individual Defendants whereas Plaintiff's unjust enrichment claims, which are quasi-contractual, must be dismissed.[30]  <u>Versatile Housewares & Gardening Sys., Inc. v. SAS Grp., Inc.</u>, No. 09-CV-10182(SHS), 2016 WL 4064036, at *5 (S.D.N.Y. July 29, 2016) ("[U]njust enrichment is not a tort, but rather is a quasi-contract claim."); <u>Krog Corp. v. Vanner Grp., Inc.</u>, 52 Misc. 3d 1225(A), at *4 (N.Y. Sup. Ct. 2016), <u>aff'd as modified</u>, 158 A.D.3d 914 (N.Y. App. Div. 2018) (conversion sounds in tort).  Consistent with the Court's determinations in connection with Elevation's summary judgment motion, the Individual Defendants are granted summary judgment dismissing all of the conversion claims for benefits accrued by Elevation but, as explained with respect to Individual Defendants alleged breach of the duty of loyalty, denied as to Individual Defendants' alleged conversion of funds to pay Forge for design and marketing services for G2's benefit.[31]

Accordingly Individual Defendants' motion for summary judgment is granted for Plaintiff's claims for unjust enrichment, conversion, and breach of fiduciary duty, except as to whether Individual Defendants converted the funds used to pay Forge, whether Individual Defendants breached their duty of care in selecting Bridgeton to sub-manage Gemini's hotels,

---

[30]    As previously discussed, the Court looks to Delaware law to examine claims related to the form and governance of the relevant limited liability companies, but looks to New York law for the characterization of Plaintiff's other claims, such as whether conversion or unjust enrichment is properly classified as a tort.

[31]    <u>See</u> <u>supra</u> note 29.

whether Individual Defendants breached their duties of loyalty and care in failing to cure Hotel

18's default, whether Individual Defendants usurped Gemini's corporate opportunity to acquire

Edgewater Place, and whether Individual Defendants breached their duty of loyalty by diverting

Gemini funds to pay Forge, directing Guillote to establish G2's infrastructure, and directing

Feurtado and Harnett to perform work for Elevation's benefit.

G. <u>Bridgeton's Motion for Summary Judgment</u>

Bridgeton moves for summary judgment dismissing Plaintiff's claims for aiding

and abetting a breach of fiduciary duty and for unjust enrichment (16th and 17th Causes of

Action).  A viable claim of aiding and abetting breach of fiduciary duty requires the following:

"(1) a breach of a fiduciary of obligations to another, (2) that the defendant knowingly induced

or participated in a breach, and (3) that plaintiff suffered damages as a result of the breach."[32]

<u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d 273, 294 (2d Cir. 2006).  "Although a plaintiff is not

required to allege that the aider and abettor had an intent to harm, there must be an allegation that

such defendant had actual knowledge of the breach of duty."  <u>Id.</u>  "A person knowingly

participates in a breach of fiduciary duty only when he or she provides 'substantial assistance to

the primary violator.'"  <u>Id.</u>  (citation omitted).  "Substantial assistance occurs when a defendant

affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the

breach to occur."  <u>Kaufman v. Cohen</u>, 307 A.D.2d 113, 126 (N.Y. App. Div. 2003).  "Knowing

participation may be inferred where 'it appears that the defendant may have used knowledge of

---

[32]    The Court applies New York law in evaluating the cause of action for aiding and abetting
of a breach of fiduciary duty cause of action, as did the parties in their briefing of the
issue.  <u>See Celle</u>, 209 F.3d at 175-76 (parties are deemed to have consented to a choice of
law if they do not object to its application); <u>Joyce</u>, 2008 WL 2329227, at *3 (court
applied New York law when parties assumed the application of New York law in their
submissions).

the breach to gain a bargaining advantage in the negotiations' or 'where the terms of the

transaction are so egregious or the magnitude of the side deals is so excessive as to be inherently

wrongful.'" Refco Grp. Ltd., LLC v. Cantor Fitzgerald, L.P., No. 13 CV 1654 RA, 2014 WL

2610608, at *27 (S.D.N.Y. Jun. 10, 2014) (citations omitted).

        Because the only primary claim for breach of fiduciary duty to survive summary

judgment that implicates Bridgeton is Individual Defendants' alleged breach of the duty of care

in the selection of Bridgeton to sub-manage its hotels, the Court addresses only that claim.

Plaintiff has failed to identify any evidence that Bridgeton engaged in any activity that aided

Individual Defendants in their allegedly deficient decision making other than acting as a willing

contract counterparty and negotiating with them.  See M & T Bank Corp. v. Gemstone CDO VII,

Ltd., 23 Misc. 3d 1105(A), 881 N.Y.S.2d 364 (Sup. Ct.), aff'd as modified, 68 A.D.3d 1747, 891

N.Y.S.2d 578 (2009) (substantial assistance does not include acting as a counterparty to an

arm's-length credit default swap transaction, but includes participation and concealment of a

fraud).  Plaintiff argues that Bridgeton recommended structuring the transaction as a sub-

management agreement to avoid violating the provisions of the 2009 Agreement or triggering a

covenant default on any of the loans for the managed hotel properties.  The email cited, however,

only reveals Jariwala's suggestion that they structure the transaction as a sub-management

agreement to avoid the need to seek lender approval, and does not support an inference that

Bridgeton induced Individual Defendants to forgo identifying and duly considering reasonable

alternative transactions.  (See Pencu Decl. in Opp'n to Bridgeton's Mot. for Summ. J., Ex. 255.)

Plaintiff's assertions that Bridgeton induced Individual Defendants to enter into a side deal are

insufficient to raise an issue of material fact because, as explained above, Plaintiff has proffered

insufficient evidence for a rational jury to infer the existence of such a side deal. The aiding and abetting claims against Bridgeton are thus dismissed.

Bridgeton next argues that Plaintiff's unjust enrichment claims (14th Cause of Action) must be dismissed as duplicative of his claims against it for aiding and abetting Individual Defendants' breaches of fiduciary duty. New York courts will dismiss unjust enrichment claims where the violative conduct alleged is conterminous with a conventional tort or contract claim, regardless of whether the tort or contract claim is dismissed. Trainum v. Rockwell Collins, Inc., No. 16-CV-7005 (JSR), 2017 WL 2377988, at *19-20 (S.D.N.Y. May 31, 2017) ( quoting Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 791 (2012)) ("[T]o the extent that the tort claims succeed the unjust enrichment claim is duplicative; if . . . [the] other claims succeed, the unjust enrichment claim cannot remedy the defects."). In his response to Bridgeton's summary judgment motion, Plaintiff has not identified any conduct by Bridgeton that was unique to the unjust enrichment claims, and his unjust enrichment claims against Bridgeton are accordingly dismissed.[33] See Marini v. Adamo, 644 Fed. App'x 33, 35-36 (2d Cir. 2016) (dismissing an unjust enrichment claim that duplicated a dismissed breach of fiduciary duty claim); Matter of Bear Stearns Litig., 870 N.Y.S.2d 709, 741 (Sup. Ct. 2008) (dismissing an unjust enrichment claim on summary judgment that was duplicative of a claim for aiding and abetting a breach of fiduciary duty).

---

[33]     Although the Court refused to dismiss the unjust enrichment claim against Bridgeton at the pleading stage because it was then possible that a non-duplicative claim might be proven, Plaintiff's summary judgment proffers are insufficient to establish the existence of such a claim based on any conduct distinct from his aiding and abetting claims. See Obeid, 2016 WL 5719779, at *11.

For the foregoing reasons, Bridgeton's motion for summary judgment is granted in its entirety.

## H. Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment dismissing Individual Defendants' counterclaims against him.   The Court first examines Individual Defendants' counterclaims relating to Obeid's monitoring of their communications, before turning to Individual Defendants' next set of counterclaims for breaches of contract, fiduciary duty, and the implied covenant of good faith and fair dealing arising from several actions undertaken by Obeid during and following his tenure as Gemini's operating manager.

### 1. Computer Fraud and Abuse Act Claim (1st Counterclaim)

The CFAA imposes liability on a party who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."  18 U.S.C.S. § 1030(a)(2)(C) (LexisNexis 2011).  The term "exceeds authorized access" means to access a computer "without authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter[.]"  18 U.S.C.S. § 1030(e)(6) (LexisNexis 2011).  Authorized access is exceeded "when [the employee] obtains or alters information that he does not have authorization to access for any purpose which is located on a computer that he is otherwise authorized to access."   See U.S. v. Valle, 807 F.3d 508, 511 (2d Cir. 2015).

Here, the Individual Defendants have raised a genuine issue of material fact as to whether Plaintiff's use of the Spector 360 software and administrative privileges to access the Individual Defendants'' emails, communications, files, and other information about Massaro and

La Mack's digital activity was authorized or exceeded any level of access that was authorized. Massaro and La Mack have proffered evidence that could support a finding that the member-managers were not considered Gemini employees and thus were not subject to Gemini's monitoring policy.[34]  Furthermore, there are factual issues as to the scope of the monitoring authorized even as to employees, as the policy references to email and "file transmission" do not necessarily indicate that all computer use is subject to monitoring.  Plaintiff cites several cases for the proposition that employees do not have an expectation of privacy at work, but these cases are not conclusive of the issue both because there is a factual question as to whether the Individual Defendants were employees and because the authorities Plaintiff cites primarily address the boundaries of the 4th Amendment and do not consider the scope of affirmative authorizations to access certain information under corporate policies similar to that of Gemini. See e.g. United States v. Simons, 206 F.3d 392 (4th Cir. 2006).  As this Court has previously noted, "the very allegation that Obeid needed to install spyware in order to gain access to the Individual Defendants' emails and computers belies the notion that he was authorized to access all of the information on them."  Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack, No. 14-CV-6498-LTS-MHD, 2017 WL 1215753, at *8 (S.D.N.Y. Mar. 31, 2017).

Plaintiff also contends that his access to Individual Defendants' computers and communications was authorized by section 8.6.1 of the 2009 Agreement, which permits a member to inspect GREA's books and records.  That section cannot, however, reasonably be

---

[34]    Plaintiff argues that Individual Defendants admitted they were employees in their Amended Counterclaims (Docket Entry No. 336, ¶¶ 127, 130, 131, 134, 136.).  Read in the light most favorable to the Individual Defendants, the cited statements cannot be fairly characterized as conclusive admissions of employee status, as they simply refer to Plaintiff's access to the data of "Individual Defendants" and either "other" or "Gemini" employees.  (See id.)

interpreted to authorize monitoring access to individuals' email and computer usage. See id. at *8 ("None of the documents that are integral to the Amended Counterclaims[, including the 2009 Agreement,] affirmatively grants [Obeid] access to Individual Defendants' password protected emails and/or real-time computer snapshots through the methods he allegedly used.").

Plaintiff next asserts that he is entitled to judgment because Individual Defendants suffered no damages related to Plaintiff's monitoring. The CFAA defines a loss as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system or information to its [prior] condition . . . and any revenue lost, cost incurred, or other consequential damage incurred." 18 U.S.C.S. § 1030(e)(11) (LexisNexis 2011.) Any recoverable damages or loss under the CFAA must be directly caused by computer impairment or damage. Nexans Wires S.A. v. Sark-USA, Inc., 166 F. App'x 559, 562-63 (2d Cir. 2006). Litigation costs are not recoverable, but legal expenses associated with remediating any damage, including any necessary preceding investigation, are recoverable. See Turner W. Branch, P.A. v. Osborn, No. CV 13-00110 MV/WPL, 2014 WL 12593991, at *15-18 (D.N.M. Mar. 26, 2014) (granting motion to dismiss where alleged damages consisted of attorneys' fees to investigate and prosecute a CFAA claim); see also Mahoney v. DeNuzzio, No. CIV. 13-11501-FDS, 2014 WL 347624, at *5 (D. Mass. Jan. 29, 2014) (granting leave to amend complaint to allege the cost of a computer forensics professional and an attorney to remedy a data breach as damage cognizable under the CFAA). Here, La Mack and Massaro both assert in their declarations that they incurred legal expenses to prevent Obeid from continuing to access their information, which is sufficient to raise a genuine issue of material fact as to whether they suffered compensable losses. Obeid's motion for summary judgment dismissing the CFAA counterclaim is therefore denied.

2. Stored Communications Act (2nd Counterclaim)

The SCA creates a civil cause of action for damages against "whoever—(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system . . . ." See 18 U.S.C.S. §§ 2701(a), 2707 (LexisNexis 2008). The SCA provides a defense for conduct authorized "by the person or entity providing a wire or electronic communications service," except where such authorization is secured by "fraudulent or deceitful conduct." 18 U.S.C.S. § 2701(c)(1) (LexisNexis 2008); Connolly v. Wood-Smith, No. 11 CIV. 8801 DAB JCF, 2012 WL 7809099, at *12 (S.D.N.Y. May 14, 2012), report and recommendation adopted as modified, No. 11 CIV. 8801 DAB JCF, 2013 WL 1285168 (S.D.N.Y. Mar. 28, 2013). Here, Plaintiff avers that he obtained access to Gemini's computer system with Madison's permission. Individual Defendants counter that he obtained the authorization through deceit.[35]

Madison's representative, Schmidt, testified that he granted Plaintiff permission to access Individual Defendant's files even after he was aware that Gemini had three members, that Massaro displaced Obeid as president, and that Massaro had instructed him not to honor Obeid's requests. Schmidt further testified that, before he was made aware of the involvement of partners other than Obeid in Gemini's affairs, he would have granted Plaintiff access whether or not Obeid had other partners. Because the undisputed factual record demonstrates that Plaintiff secured Madison's assent without the need to resort to misrepresentation or material omission,

---

[35]     The parties do not dispute that Madison qualifies as the provider of Gemini's wire or electronic communications for SCA purposes.

Obeid's actions are excepted from SCA liability and the Court grants summary judgment to Plaintiff, dismissing this counterclaim.

3. <u>Federal Wiretap Act (3rd Counterclaim)</u>

The FWA provides a private right of action against "any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication[.]"  18 U.S.C.S. § 2511(1)(a) (LexisNexis 2008).  "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C.S. § 2510(4) (LexisNexis 2008).

Obeid argues that no claim can be stated under the FWA unless the interception occurred simultaneously with transmission and that his alleged conduct falls outside of the statute's coverage because accessing emails stored on a central server does not occur simultaneously with the transmission of the email.  <u>See</u> <u>Fraser v. Nationwide Mut. Ins. Co.</u>, 352 F.3d 107, 113-14 (3d Cir. 2003).  The Second Circuit has not squarely addressed the issue of whether simultaneous transmission is required.  <u>See</u> <u>Conte v. Newsday, Inc.</u>, 703 F. Supp. 2d 126, 139, n.11 (E.D.N.Y. 2010).  Even assuming that simultaneous transmission is required, Individual Defendants proffered testimony that the Spector 360 software allowed Plaintiff to monitor a computer in real time, as though Plaintiff was standing over the user's shoulder.

As discussed above, there are also genuine issues of material fact as to whether Plaintiff was authorized to access Individual Defendants' computers and whether they suffered compensable damages, and the Court accordingly denies Plaintiff's motion for summary judgment as to this counterclaim.

4. Fraud (4th Counterclaim)

Individual Defendants assert a counterclaim for common law fraud based on Plaintiff's surreptitious monitoring of their communications without their knowledge. A viable claim for fraud under New York law requires (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff. Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC, 783 F. 3d 395, 402 (2d Cir. 2015) (citation omitted).

Plaintiff contends that he had no duty to disclose his monitoring, relying on his purported authority as president and, as to the later monitoring, his status as a member of Gemini. Individual Defendants have, as previously explained, raised a genuine issue of material fact as to whether Plaintiff was authorized to monitor their emails and their computer activity, and relatedly whether they reasonably expected that their computer usage was not being monitored by other company personnel.[36] A jury could also infer Plaintiff's knowledge that he was engaging in unauthorized conduct from his surreptitious use of spyware to conceal the fact of his monitoring.

Individual Defendants have proffered sufficient evidence of reliance and damages to withstand Plaintiff's motion for summary judgment. Individual Defendants have produced evidence that Plaintiff accessed communications between them and their attorneys, that they

---

[36]    Plaintiff also asserts that he constructively disclosed his monitoring by relying on documents and communications gleaned from his surveillance in support of an application for a temporary restraining order to enjoin the Riverside Crossing project, but provides no relevant evidence demonstrating that use of the documents necessarily revealed that he was surreptitiously monitoring the Individual Defendants' use of their company computers. See supra note 17.

incurred legal fees to prevent Plaintiff from continuing to access their information, and that they would not have used Gemini systems had they known of Plaintiff's surveillance.  Accordingly summary judgment is denied as to this counterclaim.

5. Breach of Contract (5th Counterclaim)

Individual Defendants allege that Plaintiff breached the GREA operating agreement when, as operating manager, he committed Gemini to remit $525,000 to a joint venture to acquire Hotel 18, an amount that exceeded the $250,000 sum that the operating manager was permitted to pledge without the approval of the membership, and by using a member distribution from GEP to fund Hotel 18 and another project, and after his removal as president, by entering into an agreement to sell the Wyndham to Macrolink and by entering into a series of agreements with SRM that bound Gemini to pay a commission.[37]  Under Delaware law, a viable breach of contract claim requires "(1) the existence of a contract, (2) the breach of an obligation imposed by that contract, and (3) resulting damages to the claimant."  Kickflip, Inc. v. Facebook, Inc., No. CV 12-1369-LPS, 2015 WL 1517237, at *5 (D. Del. Mar. 31, 2015) (citation omitted).

Plaintiff contends that he did not violate the agreement by committing the $525,000 because he only caused Gemini to pay a $250,000 deposit and Massaro and La Mack consented to paying the balance of Gemini's expenditures, whereas Individual Defendants argue

---

[37] Individual Defendants premise their theories of breach on section 5.16, which permits the operating manager to execute documents on behalf of Gemini if approved by the members, section 4.2.1.10, which prohibits the  operating manager from pledging or borrowing more than $250,000 without the approval of the majority of the member, section 4.2.1.9,  which requires the approval of the members to sell or dispose of a project, and section 4.2.1.3, which requires the approval of a majority of the members to take any action that would make it impossible for Gemini to continue to engage in its ordinary course of business.

that they only authorized the additional payments under duress, in that Gemini would have lost the $250,000 deposit unless the further payments were made. An agreement is unenforceable if consent is obtained through duress, including economic duress. See E.I. DuPont de Nemours & Co. v. Custom Blending Int'l, Inc., No. C.A. 16295-NC, 1998 WL 842289, at *4 (Del. Ch. Nov. 24, 1998) (recognizing the doctrine of economic duress). A party seeking to invalidate an agreement as secured through duress must establish "(1) a 'wrongful' act, (2) which overcomes the will of the aggrieved party, (3) who has no adequate legal remedy to protect himself." Cianci v. JEM Enter., Inc., No. CIV. A. 16419-NC, 2000 WL 1234647, at *9 (Del. Ch. Aug. 22, 2000). "[A]n act may be wrongful though lawful[,] . . . more specifically, . . . acts that are wrongful in a moral sense, though not criminal or tortious or in violation of contractual duty, may also constitute duress under the doctrine of economic duress." Way Rd. Dev. Co. v. Snavely, No. C.A. 89C-DE-48, 1992 WL 19969, at *4 (Del. Super. Ct. Jan. 31, 1992) (quoting Fowler v. Mumford, 48 Del. 282, 286 (Del. Super. Ct. 1954) (internal quotation marks and alterations omitted). Here, committing $250,000 which became non-refundable and then asking Individual Defendants to consent to fund the balance of the cost or face the loss of the deposit, could be construed by a rational jury as an extortive, and thus a wrongful, although legal, act. Individual Defendants provided testimony that indicates they assented to fully fund Hotel 18 only out of fear of losing Gemini's deposit. Individual Defendants, when confronted with this choice, appear to have had no alternative legal remedy because Obeid was authorized by the 2009 Agreement to pledge the initial $250,000 deposit on Gemini's behalf. Plaintiff's motion for summary judgment is accordingly denied for the breach of contract counterclaim with respect to the purchase of Hotel 18.

Individual Defendants also contend that Plaintiff breached the operating agreement by directing the $430,000 in member distributions from GEP and the subsequent transfer to GREA to fund Hotel 18 and another project.[38]  Plaintiff argues that Stelma's affidavit offered with Individual Defendant's opposition brief, in which he testifies about the nature of this transaction, should be discarded as sham.  "[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony. . . . Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  Hayes v. New York City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  Plaintiff cites La Mack's Rule 30(b)(6) testimony that "the basis of Individual Defendant's breach of contract claim . . . was his alleged 'unilateral' commitment of $250,000 . . . not the $430,000," as evidence that Stelma's description of the allegedly improper $430,000 distribution was offered in contradiction to previous testimony.  (Pl.'s Reply Mem. of Law in Further Support of his Mot. for Summ. J. as to the Individual Defs.' Am. Counterclaims, Docket Entry No. 516, at 8.)  Plaintiff has not offered any prior testimony by Stelma that is contradicted by his affidavit and Plaintiff mischaracterizes La Mack's testimony; La Mack only agreed that Obeid breached the operating agreements "by engaging in the acts described above, including but not limited to unilaterally causing Gemini to make a nonrefundable deposit on the Miami hotel."  (GREA Rule 30(b)(6) Tr., Muckenfuss Decl. in Resp. to Pl.'s Mot. for Summ. J., Ex. S, at 136:24-137:12 (emphasis added).)  Accordingly, summary judgment is denied with respect to Individual

---

[38]    While it does not appear that this diversion was specifically alleged in the amended counterclaims, the expenditure of these funds to develop Hotel 18 falls within Individual Defendants' allegation that Plaintiff used Gemini funds in excess  of $250,000 to acquire Hotel 18 and eventually invest over $1 million, without the approval of a majority of Gemini's membership.  (Am. Counterclaims ¶¶ 39, 214.)

Defendants' breach of contract counterclaim for the distribution and expenditure of the $430,000 from GEP.

Individual Defendants also contend that Obeid breached the operating agreement by executing the Macrolink letter of intent, which purported to bind Gemini to a 15-day exclusivity period and required Gemini to produce certain records for the subject property. Because the letter of interest did not bind Gemini to actually sell or dispose of the property, and thus did not violate section 4.2.1.9 of the 2009 Agreement,[39] and Individual Defendants have not proffered any evidence that would suggest the value of the 15-day exclusivity period and the property's records were in excess of $250,000 and thus violative of section 4.2.1.10,[40] they have not met their burden of demonstrating that Plaintiff's actions with respect to the Macrolink transaction constituted a breach of the operating agreement.[41]

Similarly, Individual Defendants have not proffered sufficient evidence to establish that Plaintiff's execution of the agreements to retain SRM constituted a pledge of $250,000 because the agreements did not obligate Gemini to any sale, thus Gemini was not obligated at any relevant time to transfer any funds to SRM as a sales commission.

Individual Defendants also assert that Plaintiff breached Section 5.16 of the 2009 agreement, which authorizes the operating manager, or his delegate, to execute "any and all documents" with the approval of Gemini's membership, when he executed the SRM agreements and Macrolink letter of interest after being removed as the operating manager. Individual

---

[39]     See supra note 37.
[40]     See supra note 37.
[41]     Individual Defendants also do not explain how either transaction prevents Gemini from conducting business in the ordinary course in violation of section 4.2.1.3, and summary judgment is thus granted dismissing this aspect of the breach of contract claim.

Defendants assert that this is the only section of the operating agreement that authorizes an individual to execute a document on Gemini's behalf. Plaintiff does not dispute this interpretation of the operating agreement, but argues that the Macrolink letter was non-binding. Because Plaintiff advances no reasonable argument that section 5.16's requirement that the operating manager execute "any and all documents, instruments, and agreements," is unambiguously limited in its application to "binding" documents, Plaintiff's motion for summary judgment dismissing Individual Defendants' counterclaim for breach of section 5.16 based on Obeid's execution of the Macrolink letter and SRM agreements is denied.[42] Cf. Thompson, 896 F.2d at 721.

Plaintiff finally argues that all of the breach of contract claims must be dismissed because Individual Defendants have not suffered any damages. He cites as authority Zhu v. Boston Sci. Corp., No. CV 14-542-SLR, 2016 WL 1039487, at *5 (D. Del. Mar. 15, 2016), in which summary judgment was denied to a plaintiff who offered no of evidence damages, but sought specific performance, and Vanguard Grp., LLC v. Engel, in which summary judgment was denied to the prospective purchaser of land who asserted as damages that he "lost the property he sought to acquire and all damages with respect to such loss." Vanguard Grp., LLC v. Engel, No. CIV.A. 07C-01-016THG, 2008 WL 3319839, at *4 (Del. Super. Ct. Mar. 20, 2008) (holding that the plaintiff's claim was time barred and, in the alternative, that the plaintiff failed to establish damages). Plaintiff's reliance on these cases is misplaced, as the plaintiffs in those cases had failed to specify the damages they claimed to have suffered. Here, Individual

---

[42]    Individual Defendants also contend that Plaintiff breached section 5.16 of the 2009 Agreement by executing the sale agreement for Hotel 18 without the consent of Gemini's members. This argument relies on a similar analysis of whether La Mack and Massaro consented to the original $250,000 deposit and subsequent investment under duress, and the Court therefore denies Plaintiff's motion for summary judgment as to this theory.

Defendants have identified the $430,000 distribution that presumably should have been split between the members and the loss of their governance rights through Plaintiff's actions taken without a vote of the members, which may even be addressed through nominal damages. Cf. Siga Techs., Inc. v. PharmAthene, Inc., 132 A.3d 1108, 1131 (Del. 2015), as corrected (Dec. 28, 2015) (In the determination of expectation damages "the injured party need not establish the amount of damages with precise certainty "where the wrong has been proven and injury established.") (internal quotation marks and citations omitted); see also Wit Capital Group, Inc. v. Benning, 897 A.2d 172, 183 (Del. 2006), (stating that while nominal damages may be awarded, they do not substitute for a lack of proof of injury).

Accordingly Plaintiff's motion for summary judgment is granted as to the alleged breaches of sections 4.2.1.9, 4.2.1.10, and 4.2.1.3 of the 2009 Agreement with respect to Plaintiff's execution of the Macrolink letter of interest, and section 4.2.1.10 with respect to his retention of SRM. Summary judgment is denied as to the alleged breaches of sections 5.16 with respect to the acquisition of Hotel 18, the $430,000 distribution, Plaintiff's retention of SRM, and Plaintiff's execution of the Macrolink letter. Summary judgment is also denied as to Plaintiff's alleged breaches of section 4.2.1.10 with respect to the acquisition of Hotel 18 and the $430,000 distribution.

6. Breach of Fiduciary Duty (6th Counterclaim)

Massaro and La Mack contend that Plaintiff breached his fiduciary duties owed to them by through his monitoring of their communications and his purportedly unauthorized actions with respect to Hotel 18. Plaintiff seeks summary judgment dismissing the claim, although he only advances an argument for dismissal of the breaches of fiduciary duties related to the transactions alleged as breaches of the operating agreement, rather than those related to his

alleged computer monitoring. Aside from arguing that his monitoring was authorized, a position

as to which Individual Defendants have raised material issues of fact, as previously discussed,

Plaintiff relies on the Delaware Supreme Court's decision in a <u>Nemec v. Shrader</u> to argue that

the breach of fiduciary duty claim is duplicative of Individual Defendants' breach of contract

claims because both causes of action arose from the same conduct. 991 A.2d 1120, 1129 (Del.

2010) ("It is a well-settled principle that where a dispute arises from obligations that are

expressly addressed by contract, that dispute will be treated as a breach of contract claim.").

Individual Defendants attempt to distinguish this case by arguing that the conduct complained of

in <u>Nemec</u> arose from the defendants' exercise of a contractual right and that a defendant's

conduct should be analyzed in light of the contract which "created contract duties that

superseded and negated any distinct fiduciary duties," whereas Obeid's conduct was allegedly

prohibited by the operating agreement. <u>See id.</u> 1128-30. The Court does not find Individual

Defendant's reasoning persuasive; similar to <u>Nemec</u>, these counterclaims involve Plaintiff's

expenditure of funds and execution of documents for corporate purposes circumscribed by the

specific limitations set forth in a governing contract, not necessarily in violation of the general

duties of a fiduciary. The Court therefore dismisses Individual Defendants' breach of fiduciary

duty counterclaims with respect to the Hotel 18 expenditures and diverted distributions, the SRM

agreements, and the Macrolink letter of interest, but denies summary judgment as to the

counterclaims involving Plaintiff's monitoring of Individual Defendants' communications.

7. <u>Implied Covenant of Good Faith and Fair Dealing (7th Counterclaim)</u>

       Individual Defendants' final surviving counterclaim is for breach of the covenant

of good faith and fair dealing implied in the 2009 Agreement. Under Delaware law, the implied

covenant of good faith and fair dealing inheres in every contract and "requires a party in a

contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." <u>Dunlap v. State Farm Fire & Cas. Co.</u>, 878 A.2d 434, 442 (Del. 2005) (citation and internal quotation marks omitted). The implied covenant cannot be invoked to override the express terms of a contract, however, and can "only be used conservatively to ensure the parties' reasonable expectations are fulfilled." <u>Kuroda v. SPJS Holdings, LLC</u>, 971 A.2d 872, 888 (Del. Ch. 2009) (citation and internal quotation marks omitted).

Here, Individual Defendants point to evidence that Plaintiff failed to inform them about material developments in the acquisition of Hotel 18 and his activities with respect to the sale of the Jade Hotel GV, HIEX, and the Wyndham. Plaintiff again contends that Massaro and La Mack have suffered no damages, but for the reasons discussed in connection with the breach of contract counterclaim, the denial of material information about Plaintiff's parallel activities undertaken on Gemini's behalf could have deprived Individual Defendants of the ability to make informed corporate choices.[43] The Court therefore denies Plaintiff's motion for summary judgment as to this counterclaim.

<u>CONCLUSION</u>

For the foregoing reasons the Court denies Elevation's motion for summary judgment dismissing Plaintiff's unjust enrichment claims with respect to the usurpation of Gemini's corporate opportunity to develop Edgewater Place and the work of Feurtado and

---

[43]     Plaintiff contends that, after being removed as operating manager he was "frozen out" and could not have known of any material developments of which he would have had an implied duty to inform Individual Defendants. Defendants have, however, produced evidence that he was still conducting business on Gemini's behalf despite his exclusion from Gemini's formal governance.

Harnett, but grants summary judgment dismissing the balance of Plaintiff's unjust enrichment claims (15th Cause of Action) and all of his conversion claims (11th Cause of Action) against Elevation.

Individual Defendants' motion for summary judgment is denied with respect to Plaintiff's claims that: Individual Defendants breached their duty of care in selecting Bridgeton to sub-manage Gemini's hotels; Individual Defendants breached their duties of loyalty and care in failing to cure Hotel 18's default; Individual Defendants breached their duty of loyalty by diverting Gemini funds to pay Forge, directing Guillote to establish G2's infrastructure, and directing Feurtado and Harnett to perform work for Elevation's benefit; Individual Defendants usurped Gemini's corporate opportunity to acquire Edgewater Place (1st and 2nd Causes of Action); and that Individual Defendants converted Gemini's funds to pay Forge (11th Cause of Action). Individual Defendants' motion for summary judgment is granted dismissing the balance of Plaintiffs claims for breach of fiduciary duty (1st and 2nd Causes of Action) and conversion (11th Cause of Action) and the entirety of Plaintiff's unjust enrichment claim (15th Cause of Action).

Bridgeton's motion for summary judgment is granted in its entirety (14th, 16th, and 17th Causes of Action).

Plaintiff's motion for summary judgment is granted dismissing Individual Defendants SCA counterclaim (2nd Counterclaim), breach of fiduciary duty counterclaim with respect to Plaintiff's actions to acquire Hotel 18 and use of the $430,000 distribution, execution of the Macrolink letter, and execution of the SRM agreements (6th Counterclaim). Plaintiff's motion for summary judgment is also granted dismissing Individual Defendants' counterclaims for breaches of sections 4.2.1.9, 4.2.1.10, and 4.2.1.3 of the 2009 Agreement with respect to

Plaintiff's execution of the Macrolink letter of interest and section 4.2.1.10 with respect to his retention of SRM (5th Counterclaim). Plaintiff's summary judgment motion is denied as to the alleged breaches of section 5.16 with respect to the acquisition of Hotel 18, the $430,000 distribution, Plaintiff's retention of SRM, and Plaintiff's execution of the Macrolink letter, and Plaintiff's alleged breaches of section 4.2.1.10 with respect to the acquisition of Hotel 18 and the $430,000 distribution (5th Counterclaim). Plaintiff's motion is also denied as to Individual Defendants' counterclaims for violation of the CFAA (1st Counterclaim), FWA (3rd Counterclaim), fraud (4th Counterclaim), breach of the implied duty of good faith and fair dealing (7th Counterclaim), and breach of fiduciary duty with respect to Plaintiff's computer monitoring (6th Counterclaim).

Plaintiff's derivative claims brought on behalf of Gemini Asset Management, LLC, Gemini Hotel Manager, LLC, Gemini Realty GP, LLC, Gemini Realty Trust, Inc., Gemini Property Advisor, LLC, Gemini Acquisition Subsidiary, LLC, GCM Olean, LLC, Gemini Dunbar Mezz Lender, LLC, Gemini Hospitality Management, LLC, Gemini Hospitality Advisors, LLC, GMP Funding, LLC, GMP Parent, LLC, GMP Manager, LLC, Gemini CP Operator, LLC, Gemini Real Estate Partners, LP, EWH Capital, LLC, Gemini Commercial Realty, LLC, Gemini 135 East Houston, LLC, Gemini 135 East Houston H, LLC, Gemini 442 West 36th Street, LLC, Gemini 442 West 36th Street H, LLC, Gemini 442 West 36th Street 30, LLC, Gemini 305 West 39th Street, LLC, Gemini 305 West 39th Street H, LLC, Gemini 305 West 39th Street 4, LLC, 300 West 22 Realty LLC, 300 West 22 Managing Member, LLC, 300 West 22 Retail, LLC, 52 West 13th P, LLC, 52 West 13th Holding, LLC, The Gem Hotel Union Square, LLC, Gemini 37 West 24th Street MT, LLC, Gemini 37 West 24th Street, LLC, Gemini NYC Hotel, LLC, Gemini JFK Hotel, LLC, Gemini 280 Friend Street MT, LLC, Gemini 280 Friend

Street JV, LLC, 36 West 38th Street Holding, LLC, 36 West 38th Street, LLC, 33 Peck Slip Acquisition, LLC, 33 Peck Slip Holding, LLC, 33 Peck Slip Property Management, LLC, 1775 James Avenue, LLC, 1775 James Avenue Holding, LLC, LLC, Gemini Boynton Beach S, LLC, Gemini Town Center M, LLC, Gemini Real Estate Ranch Lake, LLC, Gemini Ranch Lake Member, LLC, Gemini Tamiami, LLC, Gemini Tamiami H, LLC, Gemini Centerville Galleria LLC, Gemini Centerville Galleria H, LLC, Gemini Centerville Outparcel, LLC, Gemini East West, LLC, Gemini East West H, LLC, Gemini Indian Creek, LLC, Gemini Indian Creek H, LLC, Gemini Real Estate Indian Creek, LLC, Gemini Real Estate Indian Creek Member, LLC, Gemini DuBois Mall, LLC, Gemini DuBois Mall H, LLC, DuBois Venture 1, LLC, LLC, Gemini Johnstown Galleria, LLC, Gemini Johnstown Galleria S, LLC, Gemini Realty Harper Crossing, LLC, Gemini Realty Harper Crossing Member, LLC, Gemini River Ridge, LLC, Gemini River Ridge H, LLC, Gemini Youngsville Crossing, LLC, Gemini Youngsville Crossing M, LLC, Gemini Youngsville Crossing Manager, LLC, SPEBNE Acquisitions, LLC, Gemini Parkway Plaza, LLC, Gemini Parkway Plaza H, LLC, Gemini Rio Norte H GP, LLC, Gemini Rio Norte, LLC, Gemini Rio Norte H, LLC, Gemini Rowlett Crossing, LP, Gemini Rowlett Crossing H GP, LP, Gemini Rowlett Crossing S GP, LP, Gemini Rowlett Crossing Holdings, LLC, Gemini Rowlett Crossing H, LLC, Gemini Rowlett Crossing S, LLC, Gemini Richardson Square, LP, Gemini Richardson Square GP, LLC, Gemini Richardson Square Investors, LLC, Richardson Village Holdings, LLC, Gemini OF III Richardson Square, LLC, Gemini College Plaza, LLC, Gemini College Plaza H, LLC, Gemini Opportunity Fund I, LLC, Gemini Opportunity Fund III, LLC, Gemini Opportunity Fund IV, LLC, Gemini New York Hospitality Fund, LLC, Gemini Fund 5, LLC, and Gemini Olean Mezz Lender, LLC are dismissed.

The Court grants Bridgeton and Individual Defendants' motions to strike

Plaintiff's Local Civil Rule 56.1 responses in part, as explained in Section II B.  The Court also

denies Individual Defendants' motion in limine to exclude evidence of confidential settlement

negotiations from this motion practice and trial, without prejudice to renewal in connection with

trial preparation.

The final pretrial conference scheduled for May 4, 2018 is hereby adjourned to

**July 18, 2018** at **noon** in **Courtroom 17C** and all related deadlines are hereby modified in

accordance with the pretrial scheduling order (Docket Entry No. 423), as subsequently modified.

All prior trial-related submissions must be revised to reflect the determinations set forth in the

Opinion.

The parties must meet promptly with Magistrate Judge Pitman for settlement

purposes.

This order resolves Docket Entry Nos. 432, 454, 464, 468, 524, 525, and 543.


SO ORDERED.

Dated: New York, New York
       March 30, 2018

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge


Copies emailed to all counsel listed on the docket.